**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDGE CAPTURE L.L.C., and EDGE SPECIALISTS, L.L.C.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | Civil Action No. 08-CV-2412 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LEHMAN BROTHERS HOLDINGS INC.,** | ) | |
| **and LEHMAN BROTHERS INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
OR, ALTERNATIVELY, TO BIFURCATE PATENT INVALIDITY AND
UNENFORCEABILITY FROM INFRINGEMENT AND DAMAGES**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.................................................................................................1

II.  BACKGROUND................................................................................................2

    A.  The Parties.............................................................................................2

    B.  The asserted patents implicate business methods for automating well-
        known techniques for trading securities..................................................2

    C.  The patents in suit were improvidently granted. ...................................3

        1.  The patents were issued using a now-overruled obviousness
              standard.......................................................................................3

        2.  The patent applicants withheld material prior art from the Patent
              Office and ensured that the record was incomplete. ..................5

III.  THE COMPLAINT SHOULD BE DISMISSED. ...........................................6

    A.  Dismissal is appropriate where a complaint does not provide fair notice. ............7

    B.  The complaint here fails to provide notice of the alleged infringement.................7

    C.  The complaint fails to adequately plead other alleged acts of infringement..........9

IV.  ALTERNATIVELY, VALIDITY AND ENFORCEABILITY SHOULD BE
    BIFURCATED AND HEARD BEFORE INFRINGEMENT AND DAMAGES. ............9

    A.  The Court has broad discretion to order bifurcation under Rule 42(b) for
        convenience, to avoid prejudice, or to expedite and promote efficiency................9

    B.  Bifurcation will produce an efficient and expeditious resolution........................10

        1.  The patents are invalid...........................................................................11

        2.  The patents are unenforceable. .............................................................12

        3.  Considerable resources would be unnecessarily required to
              accommodate Edge's fishing expedition into its conclusory
              allegations. ...........................................................................14

    C.  Bifurcation will avoid prejudice by simplifying the issues................................14

V.  CONCLUSION. ................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anticancer Inc. v. Xenogen Corp.*,
   248 F.R.D. 278 (S.D. Cal. 2007) ....................................................................7

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ..................................................................................7

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*,
   267 F.3d 1370 (Fed. Cir. 2001) ..................................................................13

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   No. 93 C 4788, 1994 WL 362186 (N.D. Ill. July 11, 1994)....................14

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*,
   910 F.2d 804 (Fed. Cir. 1990) ....................................................................13

*Dann v. Johnston*,
   425 U.S. 219 (1976)....................................................................................11

*DM Research, Inc. v. College of Am. Pathologists*,
   170 F.3d 53 (1st Cir. 1999) ..........................................................................7

*Engelhard Minerals and Chem. Corp. v. Anglo-American Clays Corp.*,
   212 U.S.P.Q. 668 (M.D. Ga. 1981).............................................................10

*Fort James Corp. v. Solo Cup Co.*,
   412 F.3d 1340 (Fed. Cir. 2005) ..................................................................11

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
   820 F.2d 1209 (Fed. Cir. 1987) ..............................................................9, 10

*General Patent Corp. v. Hayes Microcomputer*,
   No. SA CV 97-429GLT ANX, 1997 WL 1051899 (C.D. Cal. Oct. 20, 1997) ........... 10, 11, 14

*Gen-Probe, Inc. v. Amoco Corp.*,
   926 F. Supp. 948 (S.D. Cal. 1996)...........................................................7, 8, 9

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
   909 F.2d 1464 (Fed. Cir. 1990) ....................................................................9

*Hewlett-Packard Co. v. Intergraph Corp.*,
   No. C 03-2517 MJJ, 2003 WL 23884794 (N.D. Cal. Sept. 6, 2003)....................8, 9

*In re Comiskey*,
   499 F.3d 1365 (Fed. Cir 2007) ..................................................................11

*In re Venner*,
   262 F.2d 91 (C.C.P.A. 1958)......................................................................11

*Industrias Metalicas Marva, Inc. v. Lausell,*
    172 F.R.D. 1 (D.P.R. 1997) .......................................................................... 10, 14

*Izzo Golf, Inc. v. King Par Golf Inc.,*
    Civ. No. 02-6012,T 2007 WL 1987789 (W.D.N.Y. July 5, 2007) .......................................... 4

*KSR Int'l Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007) .......................................................................... 4, 12

*Lear Inc. v. Adkins,*
    395 U.S. 653 (1969) .......................................................................... 10

*Limestone Dev. Corp. v. Village of Lemont, Ill.,*
    520 F.3d 797 (7th Cir. 2008) .......................................................................... 8

*Ludlow Corp. v. Textile Rubber & Chem. Co.,*
    77 F.R.D. 752 (N.D. Ga. 1978) .......................................................................... 10, 15

*MCI Commc'ns Corp. v. AT&T Co.,*
    708 F.2d 1081 (7th Cir. 1983) .......................................................................... 10

*McKesson Info. Solutions, Inc. v. Bridge Med., Inc.,*
    487 F.3d 897 (Fed. Cir. 2007) .......................................................................... 13

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995) .......................................................................... 13

*Monsanto Co. v. Bayer Bioscience N.V.,*
    514 F.3d 1229 (Fed. Cir. 2008) .......................................................................... 13

*Nilssen v. Osram Sylvania, Inc.,*
    504 F.3d 1223 (Fed. Cir. 2007) .......................................................................... 14

*Northern Trust Co. v. Peters,*
    69 F.3d 123 (7th Cir. 1995) .......................................................................... 7

*Novopharm Ltd. v. Torpharm, Inc.,*
    181 F.R.D. 308 (E.D.N.C. 1998) .......................................................................... 10

*Ondeo Nalco Co. v. EKA Chems., Inc.,*
    No. Civ.A.01-537-SLR, 2002 WL 1458853 (D. Del. June 10, 2002) ...................................... 8

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,*
    225 F.3d 1315 (Fed. Cir. 2000) .......................................................................... 13

*RCA Corp. v. Applied Digital Data Sys., Inc.,*
    730 F.2d 1440 (Fed. Cir. 1984) .......................................................................... 12

*Stambler v. RSA Security, Inc.,*
    123 Fed. Appx. 982 (Fed. Cir. 2005) .......................................................................... 10

*Technitrol, Inc. v. Digital Equip. Corp.,*
    62 F.R.D. 91 (N.D. Ill. 1973) .......................................................................... 10, 11

## <u>Other Authorities</u>

35 U.S.C. § 103 ....................................................................................................4

35 U.S.C. § 133 ....................................................................................................9

35 U.S.C. § 271(b) ...............................................................................................9

35 U.S.C. § 271(c) ...............................................................................................9

37 C.F.R. 1.56(a) (2007) ....................................................................................13

Fed. R. Civ. P. 11 ................................................................................................8

Fed. R. Civ. P. 12(b)(6) ..................................................................................1, 7

Fed. R. Civ. P. 42(b) .....................................................................................9, 10

Fed. R. Civ. P. 8(a)(2) ...................................................................................1, 7

Examination Guidelines, 72 Fed. Reg. 57,526 (Oct. 10, 2007) .......................4

Manual For Complex Litigation, 3d § 33.62 (Fed. Judicial Center, 1995)..................10

Wright & Miller, 9A Federal Practice and Procedure Civil 3d § 2388 (2008) ...........11

## I.     INTRODUCTION.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Inc. (collectively, "Lehman") hereby move to dismiss Plaintiffs Edge Capture L.L.C. and Edge Specialists, L.L.C.'s (collectively, "Edge") complaint for patent infringement, for failure to state a claim.  The complaint fails to identify any Lehman product or service that is subject to Edge's infringement allegations, and thus, does not comply with fundamental pleading requirements under Fed. R. Civ. P. 8(a)(2).  Dismissal is, therefore, appropriate.

Alternatively, if the Court does not dismiss the complaint, Lehman respectfully requests the Court to bifurcate, and hear all patent invalidity and unenforceability issues before conducting proceedings on alleged infringement and damages.  The unique circumstances of this case strongly support bifurcation:

- **The patents are invalid, and an invalidity ruling would moot the need for further proceedings**. The patents here merely attempt to automate a well-known decision-making process that has been employed by traders and electronic trading systems for years, as significant prior art confirms.  The patents present a well-known solution to a known problem and are invalid for anticipation and obviousness.  The patents were never scrutinized under the new obviousness standard from the Supreme Court's landmark *KSR* decision, which confirms that the patents are invalid.

- **The patents are also unenforceable, and an unenforceability ruling would similarly moot the need for further proceedings**. The patent applicants engaged in a pattern of inequitable conduct before the Patent Office, including:  (i) withholding highly material information about prior art systems that plaintiffs' owner and purported inventor knew were in widespread public use; (ii) withholding other material prior art specifically requested by the patent examiner; (iii) subsequently misrepresenting that requested prior art had been submitted; (iv) filing contradictory and misleading declarations regarding inventorship; and (v) withholding highly material prior art cited in a co-pending application.  Such conduct renders the patents unenforceable.

- **Judicial economy and efficiency supports bifurcation**. Staying complex and costly infringement and damages proceedings in favor of the case-dispositive invalidity and unenforceability issues here is economical and efficient.  Costly discovery issues will be streamlined, and the Court could potentially resolve the case without a lengthy jury trial.

- **Edge will not be prejudiced by bifurcation**. Even if infringement proceedings are ultimately required, the harm (if any) from any delay would be substantially outweighed by the benefits of an efficient and expeditious resolution.  In contrast, Lehman would be severely prejudiced if Edge were permitted to pursue unnecessary and exorbitant discovery on Edge's inadequate infringement allegations.

Accordingly, the Court should bifurcate and hear all patent invalidity and unenforceability issues before conducting any further proceedings on alleged infringement and damages.

## II.    BACKGROUND.

### A.    The Parties.

Edge Capture is a patent holding company and the purported assignee of the patents in suit, U.S. Patent Nos. 7,251,629 and 7,177,833, both entitled "Automated Trading System in an Electronic Trading Exchange." The '629 patent was filed October 14, 1999, and issued nearly eight years later on July 31, 2007. The '833 patent was filed on July 18, 2000, and issued about seven years later, on February 13, 2007. Edge Capture's only assets are these patents.

Edge Specialists is the alleged exclusive licensee of the patents in suit. It shares an office with Edge Capture and purports to sell "quote engine" software for options trading.

Lehman was founded over 150 years ago as a general store in Montgomery, AL and has grown into one of the largest and most successful global financial services firms. Lehman provides a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. Lehman has invested significant resources and millions of dollars in developing and implementing its proprietary strategies for trading securities.

### B.    The asserted patents implicate business methods for automating well-known techniques for trading securities.

The patents in suit address business methods for automating trades in an electronic exchange. According to the patents, "most trader stations in use [in 1999] rely on traders themselves to decide whether to submit an order in response to a trading opportunity presented through the exchange." Exh. 1,[1] '629 patent at Col. 1, ll. 40-42. The trader would review the trading information "received from the exchange, processed, and displayed on a monitor of the trader's station" and decide whether to place an order. *Id.,* Col. 1, ll. 42-45. The patents acknowledge that automated trading systems existed at the time of filing "that automate decision-making, so that orders may be submitted with limited interaction." *Id.*, Col. 1, ll. 49-51.

Notwithstanding this acknowledgement, the patents seek to automate and speed up a trader's decision-making process, by having a computer system determine whether an order or quote should be submitted using theoretical buy and sell prices. The '833 patent discloses the

---

[1]        "Exh." refers to the exhibits to the Declaration of Jeffrey G. Randall in support of this motion.

use of traditional mathematical models (*e.g.*, Black-Scholes) employed by traders for decades to calculate theoretical buy/sell prices in real-time based on market prices for the underlying security.  Exh. 2, Col. 12, ll. 31-44.  To increase the speed of these calculations, the '833 patent draws on a well-known computer processing approach of using dedicated computers with little overhead to increase processing time.  Instead of performing calculations in real-time, the '629 patent, in turn, discloses the use of another well-known approach for increasing speed, and fetches theoretical prices from a "look-up table" that stores previously-calculated prices.  Exh. 1, Col. 4, ll. 5-15.  To make a buy/sell decision, the '833 and '629 systems simply compare the theoretical prices to the price of the underlying security, as traders and automated trading systems have done for years.

C.      The patents in suit were improvidently granted.

The Patent Office prosecution files confirm that the '629 and '833 patents should not have granted.  *First*, the patents were issued using a now-overruled obviousness standard that required a rigid application of the so-called teaching, suggestion, or motivation test ("TSM" test).  The United States Supreme Court substantially changed this obviousness standard after the patents were allowed, and the patents were never scrutinized under the new, controlling standard. *Second*, the patent applicants withheld highly-material prior art during prosecution, leaving the Patent Office without the most significant prior art when considering whether to issue the patents.

1.      The patents were issued using a now-overruled obviousness standard.

The applications that ultimately issued as the patents in suit were pending before the Patent Office for seven years, during which time the claims were repeatedly rejected.  While the patents here merely seek to speed up traditional trading techniques (a known problem) through the use of a computer (a known solution), the examiner was required to apply the rigid TSM test for obviousness.  For instance, the examiner recognized that "look-up tables" were "notoriously old and well known."  Exh. 3, '629 Office Action, at 4 (Aug. 1, 2002).  Nevertheless, the TSM test precluded the examiner from using common sense, and ultimately lead the examiner to allow the '629 patent, because the prior art did not "suggest" the use of pricing data with a "look-up table."  Exh. 4, '629 Notice of Allowability, at 3 (Feb. 23, 2006).  The '833 patent was similarly allowed in the alleged absence of an express suggestion in the prior art.

3

Shortly after the examiner reached these conclusions, the United States Supreme Court substantially changed the law of obviousness. On April 30, 2007, the Supreme Court issued its seminal decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007), and rejected the Federal Circuit's application of the long-standing TSM standard for assessing the invalidity of a patent for obviousness under 35 U.S.C. § 103. *Id.* at 1734-35. The Court adopted a common sense approach to obviousness that is not "confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 1741. The Court noted that "[o]ne of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."[2] *Id.* at 1739. *KSR* has been called "'one of the most significant patent rulings in decades, representing a 'sea change' in patent law turning established precedent 'upside down.'" *Izzo Golf, Inc. v. King Par Golf Inc.*, Civ. No. 02-6012T, 2007 WL 1987789, *19 (W.D.N.Y. July 5, 2007) (citing commentaries) (Exh. 32). Unfortunately, *KSR* was never applied to the patents here, and the examiner was confined by the rigid TSM approach, effectively precluding the use of common sense. The TSM test was the sole basis for allowing each and every claim. *See, e.g.,* Exh. 4 at 2-3 and Exh. 37 at 2.

Several prior art systems were also not before the examiner during prosecution. For example, the Stanford Real-Time Information Processor (STRIP) system is an automated electronic trading system that was in public use in 1998 before the patents were filed and described in several prior art publications (Exhs. 6-9), which disclose each and every feature of the claimed invention. *See* Exhs. 10-11. The Nimble system is another automated equity options market making system that was implemented in the Chicago Board Options Exchange's SPX Pit

---

[2]    On October 10, 2007, the Patent Office issued extensive Examination Guidelines, which instruct patent examiners on how to apply *KSR*. Exh. 5, Examination Guidelines, 72 Fed. Reg. 57,526 (Oct. 10, 2007). The guidelines identify and explain a number of rationales for assessing whether an alleged invention is obvious, including: "Combining prior art elements according to known methods to yield predictable results;" "Simple substation of one known element for another;" "Use of known technique to improve similar devices (methods, or products) in the same way;" "Obvious to try;" and applying a known technique in another field. *Id.* at 57,529. The patents in suit were never subjected to the *KSR* standard and would not have issued if the guidelines had been applied.

in the late 1980s, and described in a publication by Alotta before the patents were filed (Exhs. 12-13). The Nimble system discloses each and every feature of the claimed invention. *See* Exhs. 14-15. The Swiss Exchange SWX system is yet another automated trading system that was in public use in 1996-97, well before the patents were filed, and a SWX user manual (Exh. 17) discloses each and every feature of the claimed invention. *See* Exh. 18.

The patents themselves admit that numerous automated trading systems were in public use before filing, confirming that the inventors here did nothing new. *See, e.g.*, Exh. 1, '629, Col. 1, ll. 49-51 ("Attempts have been made to implement trading systems that automate decision-making so that orders may be submitted with limited trader interaction."). None of these systems, however, were disclosed to the Patent Office. Without these and other references, the Patent Office issued the patents on an incomplete record.

### 2. The patent applicants withheld material prior art from the Patent Office and ensured that the record was incomplete.

The patent applicants repeatedly withheld highly-material prior art from the Patent Office. *First*, Edge's owner, Bradley G. Griffith, and its president and purported inventor, Thomas M. O'Donnell, withheld the highly-material Nimble system. The Nimble system was developed in the ***same building*** in which Edge resides, and was implemented and operated in the SPX Pit at the Chicago Board Options Exchange ("CBOE"), where Mr. Griffith has been a trader for nearly thirty years, and Mr. O'Donnell has served as a member of the CBOE's Screen Based Trading Committee. *See* Exh. 12 at 392; and Exh. 16 at 28 (CBOE Annual Report 2001).[3] While Mr. Griffith and Mr. O'Donnell were both involved in the prosecution throughout, neither of them disclosed the Nimble system to the Patent Office, notwithstanding their knowledge of the system, its widespread public use at CBOE and the applicants' duty to disclose such material prior art to the Patent Office.

*Second*, during the prosecution of the '629 patent, the patentee withheld a prior art article authored by Joubert (Exh. 19), even after the examiner specifically asked for a copy. During an

---

[3] In the background section of the patents, the inventors admit that the claimed invention was known in the prior art: "Attempts have been made to implement trading systems that automate decision-making so that orders may be submitted with limited trader interaction." *See* Exh. 1, '629, Col. 1, ll. 49-51. The applicants, however, withheld these specific systems from the Patent Office.

interview on February 15, 2006, the examiner told the patent applicants that he was interested in the Joubert article based on its title, but said that he did not have a copy of the full article. *See* Exh. 20 (2/24/06 Interview Summary) and Exh. 21 at 10-11 (Applicants' 3/14/06 Request for Reconsideration). The applicants acknowledged the examiner's interest and stated that they would submit the article to the Patent Office in an Information Disclosure Statement (IDS). Exh. 21 at 10-11. The applicants, however, withheld the Joubert article, notwithstanding their duty to provide it to the Patent Office. *Id.* (I.D.S.). This is highly material, as the '629 patent's purported point of novelty is the use of ***look-up tables*** to decrease processing times, Exh. 1, '629 Patent, Col. 5, ll. 42-46, and the article teaches using such ***look-up tables*** for "fast, accurate" valuation of options. *See* Exh. 19.

*Third*, the applicants cited 14 references during the prosecution of the '833 patent, but withheld them from the '629 patent examiner. This misconduct is highly material as several of these references teach the use of "look-up tables," which again is the purported point of novelty of the '629 patent. *See, e.g.*, Exh. 25, Kosaka, 5,267,148, Col. 7, ll. 55-69 ("As the data are input in real-time, the dealing conditions of each customer in the dealing timing detection conditions knowledge data base [*i.e.*, look-up table]. . . are checked, and if there is any customer with satisfied dealing conditions, the corresponding dealer/trader is notified of such effect.").

In addition, when the applicants did submit information, their submissions were contradictory. For instance, during prosecution, purported inventors John M. Marynowski, Catalin D. Voinescu, and Stefan Puscasu swore in a declaration that they were the only inventors of the '833 and '629 patents. Exhs. 27-28. Approximately six years later, however, the President of Edge, Thomas M. O'Donnell, alleged in both applications that he was also an inventor. Exhs. 29-30. O'Donnell participated in the prosecution of both applications, but waited six years to contradict the original inventors' declarations. Exh. 31 (Statement Claiming Small Entity Status signed October 13, 1999 by Mr. O'Donnell).

## III.   THE COMPLAINT SHOULD BE DISMISSED.

The complaint fails to identify any Lehman conduct, product or service that is subject to Edge's infringement allegations, and accordingly should be dismissed.

**A.      Dismissal is appropriate where a complaint does not provide fair notice.**

Dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is appropriate where the plaintiff fails to satisfy the pleading requirements. Fed. R. Civ. P. 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While Rule 8(a)(2) does not require particularity, it does require that the accused infringer be given "fair notice of [1] what the . . . claim is and [2] the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (citation omitted); *see also Anticancer Inc. v. Xenogen Corp.*, 248 F.R.D. 278, 282 (S.D. Cal. 2007) (applying *Bell Atlantic* in patent case and granting motion to dismiss). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 S. Ct. at 1974.

Conclusory or vague accusations of infringement are insufficient to plead a claim. *See, e.g., Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995). The pleading requirements are needed to avoid unnecessary and costly discovery. *See DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55-56 (1st Cir. 1999) ("Conclusory allegations in a complaint if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.").

**B.      The complaint here fails to provide notice of the alleged infringement.**

Edge's complaint fails to provide notice as to what the claim of infringement is and the grounds upon which it rests. *See Bell Atlantic*, 127 S. Ct. at 1964. Edge broadly asserts infringement over the use of "technology to perform automated/algorithmic trading of derivatives and/or underlying securities." Complaint ¶ 17. The vague term "automated/algorithmic" fails to identify any Lehman system or method accused of infringement. Instead, the term appears to implicate any trading that involves the use of a computer—even that which was practiced long before the patents were filed.[4]

Courts have consistently dismissed patent infringement complaints when faced with similarly vague accusations. In *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 960 n.19 (S.D. Cal. 1996), the plaintiff accused several defendants of infringing its patent by "making,

---

[4]      The patent applicants admit that using computers and algorithms were well known before filing. *See, e.g.*, Patent 7,251,629, col. 1, ll. 49-51 ("Attempts have been made to implement trading systems that automate decision-making so that orders may be submitted with limited trader interaction."). Such systems are impermissibly encompassed by Edge's vague infringement allegations.

using, selling and/or offering for sale products and/or kits." The court dismissed the complaint: "pointing to 'products and/or kits' . . . does not provide adequate notice as required by the Rules, and does not reflect the reasonable inquiry required by the rules." *Id.* at 962. In *Ondeo Nalco Co. v. EKA Chems., Inc.*, No. Civ.A.01-537-SLR, 2002 WL 1458853, at *1 n.2-3 (D. Del. June 10, 2002) (Exh. 33), the court held that an allegation of infringement "by selling products, including the 8692 product" was too vague (except to the specific accusation against the 8692 product). Likewise, in *Hewlett-Packard Co. v. Intergraph Corp.*, No. C 03-2517 MJJ, 2003 WL 23884794, at *1 (N.D. Cal. Sept. 6, 2003) (Exh. 34), the court found Rule 8 was not satisfied by the patentee's overly-broad accusation that the defendants' "software and hardware products" infringed, since the defendant had 150 core technology platforms implemented in over 4,000 end-user application products. These cases confirm that Edge's vague accusations of infringement do not comply with Rule 8.

Compliance with Rule 8 is particularly necessary here, where discovery on Edge's unbounded allegations would effectively permit exorbitant and unnecessary discovery into virtually every aspect of Lehman's proprietary business operations.[5] As the Seventh Circuit has stated, "*Bell Atlantic* . . . teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802-03 (7th Cir. 2008). The detail in the complaint should reflect the information obtained in the pre-filing investigation pursuant to Fed. R. Civ. P. 11. *See Gen-Probe*, 926 F. Supp. at 962 ("Rule 11's requirement of certification of well-foundedness of the factual contentions of the complaint would be meaningless unless Rule 8(a)(2) required some minimum allegations of fact to support the claim."). The minimum threshold for filing suit requires Edge to have identified a specific instrumentality that is allegedly covered by at least one claim of each patent and provide notice of that accused instrumentality in the complaint. The complaint here falls far short of the pleading requirements and demonstrates that Edge likely lacks a Rule 11 basis for this lawsuit.

---

[5]     Unfortunately, there is a growing trend of patent-plaintiffs that seek to gain inappropriate leverage through the huge burden placed on defendants from wide-ranging discovery, in an attempt to extract unwarranted settlements.

**C.    The complaint fails to adequately plead other alleged acts of infringement.**

Edge has also failed to plead any facts sufficient to establish indirect infringement.  For example, contributory infringement requires the sale, or offer for sale, of "a **component** of a patented machine . . . constituting a material part of the invention, **knowing** the same to be especially made or especially adapted for use in an infringement of such patent . . . .  35 U.S.C. § 271(c) (emphasis added).   The complaint fails, however, to identify any component that Lehman has sold or offered to sell, much less that such acts were knowing and resulted in direct infringement.   *See Hewlett-Packard*, 2003 WL 23884794 at *2 (dismissing contributory infringement claim on similar facts).  Edge has similarly failed to allege any facts to support its inducement claim, which also requires direct infringement by someone other than the inducer along with specific intent.  *See* 35 U.S.C. § 271(b); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990).   Without any facts, Edge instead couples all three infringement causes of action—direct, contributory, and inducement—into one claim, even though these causes of action must be plead separately.  *See Gen-Probe*, 926 F. Supp. at 962.

The complaint is insufficient as a matter of law, and should accordingly be dismissed.

**IV.    ALTERNATIVELY, VALIDITY AND ENFORCEABILITY SHOULD BE BIFURCATED AND HEARD BEFORE INFRINGEMENT AND DAMAGES.**

If the Court elects not to dismiss the complaint, the Court should alternatively bifurcate and hear invalidity and unenforceability of the patents in suit before any proceedings on infringement and damages.   The unique circumstances of this case support bifurcation, as the patents are invalid and unenforceable, mooting the need for other proceedings.[6]

**A.    The Court has broad discretion to order bifurcation under Rule 42(b) for convenience, to avoid prejudice, or to expedite and promote efficiency.**

Under Fed. R. Civ. P. 42(b), courts have "broad discretion" to separate "issues and claims for trial as part of its wide discretion in trial management."  *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1212 (Fed. Cir. 1987).  Rule 42(b) provides that a court can order separate

---

[6]    In addition to the invalidity and unenforceability bases discussed *infra*, the Patent Office may also have exceeded its authority in issuing the patents, after the applicants failed to comply with a statutorily-set deadline for responding to an Office Action and thereby abandoned the applications.  *See* 35 U.S.C. § 133.  If the Court does not dismiss the complaint, Lehman expects to move for summary judgment on this basis, as the Court's schedule and rules permit.

trials "[1] [f]or convenience, [2] to avoid prejudice, or [3] to expedite and economize." Fed. R. Civ. P. 42(b). Only one of these conditions needs to be met for the court to order a separate trial. *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983). "One of the purposes of bifurcation under Rule 42(b) is to defer costly discovery and trial preparation costs pending the resolution of preliminary liability issues." *Novopharm Ltd. v. Torpharm, Inc.*, 181 F.R.D. 308, 312 (E.D.N.C. 1998) (staying discovery); *Industrias Metalicas Marva, Inc. v. Lausell*, 172 F.R.D. 1, 4 (D.P.R. 1997) (simplifying discovery is a major benefit of bifurcation).

Separate trials are common in patent litigation due to the complexity of the issues, expense, and risk of jury confusion. *See, e.g.*, *General Patent Corp. v. Hayes Microcomputer*, No. SA CV 97-429GLT ANX, 1997 WL 1051899, at *1 n.1 (C.D. Cal. Oct. 20, 1997) (citing Manual For Complex Litigation, 3d § 33.62, pp. 360-61 (Fed. Judicial Center, 1995)) (Exh. 35). It is within the sound discretion of the district court to try validity and enforceability separate from liability. *See, e.g.*, *Stambler v. RSA Security, Inc.*, 123 Fed. Appx. 982, 986 (Fed. Cir. 2005) (no abuse of discretion to bifurcate invalidity and infringement); *Gardco*, 820 F.2d at 1211-13 ("clearly" not an abuse of discretion to try inequitable conduct claim first). Courts have utilized Rule 42(b) to try validity and enforceability before infringement where it will promote a quick resolution of the matter.[7] *See, e.g.*, *General Patent*, 1997 WL 1051899, at *1-2; *see also Technitrol, Inc. v. Digital Equip. Corp.*, 62 F.R.D. 91, 92 (N.D. Ill. 1973) (trying validity before infringement). After bifurcation, the prudent course is to stay discovery related to infringement and damages pending resolution of validity and enforceability. *See, e.g.*, *Engelhard Minerals and Chem. Corp. v. Anglo-American Clays Corp.*, 212 U.S.P.Q. 668, 669 (M.D. Ga. 1981) (liability discovery stayed pending resolution of validity); *Ludlow Corp. v. Textile Rubber & Chem. Co.*, 77 F.R.D. 752, 753 (N.D. Ga. 1978) (same).

### B.    Bifurcation will produce an efficient and expeditious resolution.

The patents here should be held invalid and unenforceable. Bifurcation would produce an efficient and expeditious resolution, and avoid expending unnecessary resources on alleged

---

[7]    Hearing invalidity first also promotes "the strong federal policy favoring free competition in ideas which do not merit patent protection." *Lear Inc. v. Adkins*, 395 U.S. 653, 656 (1969).

infringement and damages.[8]    Wright & Miller, 9A Federal Practice and Procedure Civil 3d § 2388 at 100 (2008) (Where an "issue could be dispositive of the case . . ., and resolution of it might make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expense of the parties."). In *Technitrol,* a serious challenge to patent's validity warranted bifurcation because "a determination of invalidity would end the litigation." 62 F.R.D. and 92. Similarly, in *General Patent*, the district court reasoned that the potential for quick disposition "indicates this court should first consider the validity and enforceability claims." 1997 WL 1051899, at *1.

### 1.    The patents are invalid.

The patents here merely seek to automate activities that have been performed by human traders and electronic trading systems for decades. Such automation is not patentable. The Federal Circuit has stated that "[t]he routine addition of modern electronics to an otherwise unpatentable invention typically creates a prima facie case of obviousness." *In re Comiskey*, 499 F.3d 1365, 1380 (Fed. Cir 2007); *see also Dann v. Johnston*, 425 U.S. 219, 220, 230 (1976) (obvious to combine the computer program described in the patent with "existing machine systems in the banking industry"); *In re Venner*, 262 F.2d 91, 95 (C.C.P.A. 1958) (replacing manual activity with an automatic means to accomplish the same result is not patentable).

While automated electronic trading systems existed before the patents were filed, the Patent Office issued the patents on an incomplete record. The Patent Office did not have the benefit of, or apply, significant prior art that confirms that the patents are invalid.

- **The STRIP system**. The STRIP system is another automated trading system that was in public use in 1996-97, before the patents were filed, and was not considered by the Patent Office. *See* Exhs. 6-9. The publications describing the STRIP system include each and every feature of the claimed invention, confirming that the patents are not valid. *See* Exhs. 10-11 (claim charts).

- **The Nimble system**. The Nimble system is an automated, algorithmic equity options market making system that was implemented in the late 1980s in the CBOE's SPX Pit, where Edge's own principals have worked for years, and is based on the same computational models (*e.g.*, Black-Scholes) disclosed in the patents. *See* Exhs. 12-13.

---

[8]    In contrast, disposition of infringement issues first will not render the invalidity and unenforceability issues moot. "[A] counterclaim questioning the validity or enforceability of a patent raises issues beyond the initial claim for infringement that are not disposed of by a decision of non-infringement." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348-49 (Fed. Cir. 2005).

The publication describing the system includes each and every feature of the claimed invention and confirms that the patents here are invalid.[9]  *See* Exhs. 14-15 (claim charts).

- **The Pang patent**.  The Pang patent discloses yet another automated trading system that pre-dates the patents in suit.  *See* Exh. 22.  While the Pang patent was submitted to the Patent Office late in prosecution, it was never applied to the patents' claims.  The Pang patent anticipates the '833 patent and renders the '629 patent obvious, particularly in view of the Joubert article that the applicants withheld.  *See* Exhs. 23-24 (claim charts).

- **The SWX system**.  The SWX system is another automated trading system from 1998 that was in public use before filing, and was not considered by the Patent Office.  *See* Exh. 17.  The SWX user manual includes each and every feature of the claimed invention, further confirming that the patents in suit are not valid.  *See* Exh. 18 (claim chart).

- **Other prior art systems**.  Other systems in public use confirm that the patents here are invalid.  For example, The Hull Group used a "real-time" automated trading system, like the patents here, to trade equity derivatives and equity securities and profit from short-lived mispricings in the market.  Exh. 26, Hull 5/13/99 Form S-1 Registration Statement at 42.  In 1998, Hull's automated equity trading system traded "more than two billion shares of stock, representing about 1.2% of the volume on the NYSE." *Id.*

Such prior art shows that the patents' approach was nothing new.  The patentees here have simply applied a known solution (computer automation) to a known problem (manual or inefficient electronic trading), which is clearly obvious under *KSR*.[10]  *See KSR*, 127 S. Ct. at 1739. ("One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.")  The *KSR* standard was never applied to these patents, and the examiner was required to ignore common sense and apply the rigid TSM test, in erroneously allowing the patents to issue.  The patents here are clearly invalid, and bifurcation would allow that conclusion to be reached expeditiously and efficiently.

2.     **The patents are unenforceable.**

The patent applicants withheld highly material information from the examiner and created a fraudulent and incomplete record that renders the patents unenforceable.  The Patent Office imposes a duty of candor and good faith on every individual associated with the filing and

---

[9]      A patent claim is invalid for "anticipation" when a single prior art reference discloses, expressly or under principles of inherency, each and every element of a claimed invention.  *See, e.g., RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1444 (Fed. Cir. 1984).

[10]     Unlike anticipation, obviousness need not be confined to a single prior art reference and encompasses the knowledge of persons skilled in the art.  *See, e.g., KSR*, 127 S. Ct. at 1734.

prosecution of a patent application.  37 C.F.R. 1.56(a) (2007).  A breach of this duty constitutes "inequitable conduct" and may occur through, for example, an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with intent to deceive or mislead the Patent Office.  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  Inequitable conduct renders the entire patent unenforceable and may adversely affect related patents.  *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1243 (Fed. Cir. 2008) (inequitable conduct on one claim renders entire patent unenforceable); *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 809 (Fed. Cir. 1990) (holding several related patents unenforceable for inequitable conduct).  An unenforceability ruling would moot the need for further proceedings.

At this early stage of the litigation, Lehman has identified numerous acts of inequitable conduct that would render the patents unenforceable, such as:

- **Withholding prior public uses**.  The applicants withheld highly-material information about prior public uses, including the highly-material Nimble system operated in the SPX Pit at the CBOE, where Edge's owner, Mr. Griffith, has been a trader for nearly thirty years, and Edge's President and the patents' purported inventor, Mr. O'Donnell, has served as a member of the CBOE's Screen Based Trading Committee.  Such conduct is inequitable.  *See Molins*, 48 F.3d at 1178.

- **Withholding highly-material prior art**.  The applicants withheld the highly-material Joubert article, even after the examiner specifically requested it.  The applicants subsequently further misled the examiner by misrepresenting that the reference was submitted.  Edge cannot credibly claim that the applicants were under no obligation to obtain a copy of the article, as the Federal Circuit has repeatedly held.  *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1382-85 (Fed. Cir. 2001).

- **Withholding prior art cited in a co-pending application**.  The applicants withheld numerous references in the '629 prosecution that were cited in the '833 prosecution.  These references teach the '629 patent's purported point of novelty, but were nonetheless withheld.  Such conduct is inequitable.  *See McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 917-18 (Fed. Cir. 2007); *Molins*, 48 F.3d at 1178.

- **Submission of contradictory and misleading declaration(s)**.  Six years after the patents were filed, Edge's President, Mr. O'Donnell, submitted a declaration swearing that he is an inventor for both patents.  Mr. O'Donnell was involved in the prosecution all along, but waited six years to contradict the declarations submitted by the alleged original inventors.  Filing a false declaration constitutes inequitable conduct.  *See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1322 (Fed. Cir. 2000).

Taken together, these acts demonstrate a pattern of failing to act in good faith before the Patent Office and are more than sufficient, whether individually and in combination, to render the

patents unenforceable for inequitable conduct. *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1235 (Fed. Cir. 2007). Judicial expediency and economy dictate hearing these issues before any alleged infringement, particularly since inequitable conduct does not require a jury trial and can be efficiently heard by the Court—making bifurcation appropriate here.

### 3. Considerable resources would be unnecessarily required to accommodate Edge's fishing expedition into its conclusory allegations.

The lengthy and complex nature of broad discovery and an infringement trial underscores the convenience and efficiency that will be attained by bifurcation. This case, like *General Patent*, is complex and may "involve[] multiple patents, multiple defendants, and multiple accused products." 1997 WL 1051899, *1. Not only will this complicate any trial, but discovery will be costly and litigious.

*First*, Edge is asserting its patents broadly, accusing all "technology to perform automated/algorithmic trading" of infringement. Such a position will inevitably lead to numerous discovery disputes as Edge attempts to seek equally broad discovery into Lehman's confidential business operations to support its claim.

*Second*, even if narrowly tailored, discovery into Lehman's confidential business operations should be avoided if possible. *See Industrias Metalicas*, 172 F.R.D. at 4 (finding a "major benefit" of bifurcation is to protect the defendants' proprietary information). It makes sense to bifurcate invalidity and unenforceability and stay all discovery and other proceedings on alleged infringement and damages.

### C. Bifurcation will avoid prejudice by simplifying the issues.

Trying multiple, complex issues of invalidity, infringement, and damages before the same jury increases the risk of confusion. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, No. 93 C 4788, 1994 WL 362186, *3 (N.D. Ill. July 11, 1994) (discussing the "significant potential for jury confusion" if infringement and validity are tried together) (Exh. 36). Bifurcation significantly reduces that risk, and the benefits far outweigh any harm that Edge might claim.

*First*, any argument that Edge will suffer harm from the expense of two trials is unavailing, as it presumes that resolution of invalidity and unenforceability will not resolve the case through a ruling in favor of Lehman. The court in *General Patent*, 1997 WL 1051899 at *2,

14

rejected a similar argument, where, like here, there was a strong showing that the case would be resolved by addressing invalidity and unenforceability first.

*Second*, even if proceedings on alleged infringement will ultimately be required, Edge will not be prejudiced, as the proceedings on invalidity and unenforceability may not require a jury and can be resolved by the Court, unlike alleged infringement and damages.  There is also no harm in delaying proceedings on alleged infringement, as  "[t]he short delay is not significant in relation to the time required to complete full discovery and the possibility of a speedy resolution of the [invalidity] issues." *Ludlow*, 77 F.R.D. at 753.

## V.    CONCLUSION.

Edge's complaint is insufficient as a matter of law, and dismissal is appropriate.  If the Court does not dismiss the complaint, Lehman respectfully requests that the Court bifurcate and hear all patent invalidity and unenforceability issues before conducting unnecessary proceedings on alleged infringement and damages.

Respectfully submitted,

Dated:  June 4, 2008                    By:    /s/ Albert L. Hogan III
                                        Jeffrey G. Randall (*pro hac vice* motion pending)
                                        SKADDEN, ARPS, SLATE,  MEAGHER & FLOM LLP
                                        525 University Avenue, Suite 1100
                                        Palo Alto, CA  94301
                                        (650) 470-4500

                                        Allan M. Soobert  (*pro hac vice* motion pending)
                                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                        1440 New York Avenue, NW
                                        Washington, DC  20005
                                        (202) 371-7000

                                        Albert L. Hogan III
                                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                        333 West Wacker Drive
                                        Chicago, IL 60606
                                        (312) 407-0700

                                        *Attorneys for Defendants Lehman Brothers*
                                        *Holdings Inc. and Lehman Brothers Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDGE CAPTURE L.L.C., and EDGE SPECIALISTS, L.L.C.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | Civil Action No. 08-CV-2412 |
| **v.** | ) ) | |
| **LEHMAN BROTHERS HOLDINGS INC., and LEHMAN BROTHERS INC.,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

**DECLARATION OF JEFFREY G. RANDALL IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
OR, ALTERNATIVELY, TO BIFURCATE PATENT INVALIDITY AND
UNENFORCEABILITY FROM INFRINGEMENT AND DAMAGES**

I, Jeffrey G. Randall, declare as follows:

I am an attorney with Skadden, Arps, Slate, Meagher & Flom LLP, counsel of record for

Lehman Brothers Holding Inc. and Lehman Brothers Inc. in this action. I currently have pending

a *pro hac vice* motion to practice before this Court. I have personal knowledge of the facts

herein and, if called as a witness, could and would testify competently as to their truth.

1.      Attached hereto as Exhibit 1 is a true and correct copy of United States Patent

Number 7,251,629.

2.      Attached hereto as Exhibit 2 is a true and correct copy of United States Patent

Number 7,177,833.

3.      Attached hereto as Exhibit 3 is a true and correct copy of the August 1, 2002

Office Action for the '629 patent.

1

4.      Attached hereto as Exhibit 4 is a true and correct copy of the February 23, 2006 Notice of Allowability for the '629 patent.

5.      Attached hereto as Exhibit 5 is a true and correct copy of Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme Court Decision in *KSR International Co. v. Teleflex Inc.*, 72 Fed. Reg. 57,526 (Oct. 10, 2007).

6.      Attached hereto as Exhibit 6 is a true and correct copy of Brad Adelberg et al., *Overview of the STanford Real-time Information Processor (STRIP)* (March 1996).

7.      Attached hereto as Exhibit 7 is a true and correct copy of the index of 25:1 SIGMOD Record (March 1996) containing *Overview of the STanford Real-time Information Processor (STRIP)*, *available* at http://www.sigmod.org/record/issues/9603/.

8.      Attached hereto as Exhibit 8 is a true and correct copy of Brad Adelberg et al., *The STRIP Rule System For Efficiently Maintaining Derived Data* (June 1997).

9.      Attached hereto as Exhibit 9 is a true and correct copy of 26:2 SIGMOD Record (June 1997) publishing the Proceedings of the 1997 ACM SIGMOD International Conference on Management of Data (May 13-15, 1997, Tucson, AZ, USA) and containing *The STRIP Rule System For Efficiently Maintaining Derived Data*, *available* at http://www.sigmod.org/sigmod/record/issues/9706/.

10.     Attached hereto as Exhibit 10 is a true and correct copy of a representative claim charts applying the teachings of the STRIP system to the '629 patent.

11.     Attached hereto as Exhibit 11 is a true and correct copy of a representative claim chart applying the teachings of the STRIP system to the '833 patent.

12.    Attached hereto as Exhibit 12 is a true and correct copy of Joseph Alotta, *Project Nimble: An Automated Equity Options Market Making System*, *in* COMPUTERIZED TRADING: MAXIMIZING DAY TRADING AND OVERNIGHT PROFITS 387-96 (Mark Jurik ed., 1999).

13.    Attached hereto as Exhibit 13 is a true and correct copy of ISBN information listing a May 10, 1999 publication date for COMPUTERIZED TRADING: MAXIMIZING DAY TRADING AND OVERNIGHT PROFITS (Mark Jurik ed., 1999), *available at* http://www.chapters.indigo.ca.

14.    Attached hereto as Exhibit 14 is a true and correct copy of a representative claim chart applying the teachings of the Nimble system to the '629 patent.

15.    Attached hereto as Exhibit 15 is a true and correct copy of a representative claim chart applying the teachings of the Nimble system to the '833 patent.

16.    Attached hereto as Exhibit 16 is a true and correct copy of excerpts of the Chicago Board Options Exchange Annual Report 2001, *available at* http://www.cboe.com/AboutCBOE/AnnualReportArchive/AnnualReport2001.pdf.

17.    Attached hereto as Exhibit 17 is a true and correct copy of the Swiss Exchange SWX TS User Manual (Ver. 2.1, Dec. 31, 1998).

18.    Attached hereto as Exhibit 18 is a true and correct copy of a representative claim chart applying the teachings of the Swiss Exchange SWX system to the '629 patent.

19.    Attached hereto as Exhibit 19 is a true and correct copy of Adriaan Joubert & L.C.G. Rogers, *Fast, accurate and inelegant valuation of American Options*, *in* NUMERICAL METHODS IN FINANCE 88-92 (L.C.G. Roger & D. Talay eds., 1997).

20.    Attached hereto as Exhibit 20 is a true and correct copy of the February 24, 2006 Interview Summary for the '833 patent.

21.    Attached hereto as Exhibit 21 is a true and correct copy of the March 14, 2006 Request for Reconsideration for the '833 patent.

22.    Attached hereto as Exhibit 22 is a true and correct copy of United States Patent Number 6,546,375 ("the Pang patent").

23.    Attached hereto as Exhibit 23 is a true and correct copy of a representative claim chart applying the teachings of the Pang patent in view of Joubert to the '629 patent.

24.    Attached hereto as Exhibit 24 is a true and correct copy of a representative claim chart applying the teachings of the Pang patent to the '833 patent.

25.    Attached hereto as Exhibit 25 is a true and correct copy of United States Patent Number 5,267,148.

26.    Attached hereto as Exhibit 26 is a true and correct copy of excerpts of the Hull Group Inc. Form S-1 filed with the Securities Exchange Commission on May 13, 1999.

27.    Attached hereto as Exhibit 27 is a true and correct copy of the Combined Declaration for Patent Application and Power of Attorney for the '833 patent signed from June 2, 2000 to July 7, 2000.

28.    Attached hereto as Exhibit 28 is a true and correct copy of the Combined Declaration for Patent Application and Power of Attorney for the '629 patent signed from October 4, 1999 to October 7, 1999.

29.    Attached hereto as Exhibit 29 is a true and correct copy of Request to Correct Inventorship Under 37 C.F.R. § 1.48(a) received June 27, 2006 for the '833 patent.

30.    Attached hereto as Exhibit 30 is a true and correct copy of Inventor's Statement Regarding Correction of Inventorship Under 37 C.F.R. § 1.48(a)(2) received June 26, 2006 for the '629 patent.

31.     Attached hereto as Exhibit 31 is a true and correct copy of Statement Claiming Small Entity Status signed October 13, 1999 by Thomas M. O'Donnell.

32.     Attached hereto as Exhibit 32 is a true and correct copy of *Izzo Golf, Inc. v. King Par Golf Inc.*, Civ. No. 02-6012, 2007 WL 1987789 (W.D.N.Y. July 5, 2007).

33.     Attached hereto as Exhibit 33 is a true and correct copy of *ONDEO Nalco Co. v. EKA Chems., Inc.*, No. Civ.A.01-537-SLR, 2002 WL 1458853 (D. Del. June 10, 2002).

34.     Attached hereto as Exhibit 34 is a true and correct copy of *Hewlett-Packard Co. v. Intergraph Corp.*, No. C 03-2517 MJJ, 2003 WL 23884794 (N.D. Cal. Sept. 6, 2003).

35.     Attached hereto as Exhibit 35 is a true and correct copy of *General Patent Corp. v. Hayes Microcomputer*, No. SA CV 97-429GLT ANX, 1997 WL 1051899, at *1 n.1 (C.D. Cal. Oct. 20, 1997).

36.     Attached hereto as Exhibit 36 is a true and correct copy of *C.R. Bard, Inc. v. M3 Sys., Inc.*, No. 93 C 4788, 1994 WL 362186 (N.D. Ill. July 11, 199).

37.     Attached hereto as Exhibit 37 is a true and correct copy of the May 29, 2006 Notice of Allowability for the '833 patent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on June 4, 2008, at Palo Alto, California.

_____
Jeffrey G. Randall

# EXHIBIT 1

US007251629B1

(12) **United States Patent**    (10) **Patent No.:**    **US 7,251,629 B1**
Marynowski et al.    (45) **Date of Patent:**    **Jul. 31, 2007**

(54) **AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE**

(75) Inventors: **John M. Marynowski**, Amherst, NY (US); **Catalin D. Voinescu**, Brasov (RO); **Stefan Puscasu**, Brasov (RO); **Thomas M. O'Donnell**, Woodstock, IL (US)

(73) Assignee: **Edge Capture, LLC**, Woodstock, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/417,774**

(22) Filed: **Oct. 14, 1999**

(51) **Int. Cl.**
*G06F 17/60*    (2006.01)

(52) **U.S. Cl.** ............................ **705/37**; 705/36; 705/38; 235/379; 235/380; 340/825.6

(58) **Field of Classification Search** ................. 705/37, 705/35, 26
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,046,381 A | * | 7/1936 | Hicks et al. ................ 177/353 |
| 3,082,402 A | * | 3/1963 | Scantlin ...................... 340/152 |
| 3,296,597 A | * | 1/1967 | Scantlin et al. .......... 340/172.5 |
| 3,573,747 A | * | 4/1971 | Adams et al. ................ 705/37 |
| 4,412,287 A | * | 10/1983 | Braddock, III ............... 705/37 |
| 4,674,044 A | * | 6/1987 | Kalmus et al. ............. 364/408 |
| 4,903,201 A | * | 2/1990 | Wagner ....................... 705/37 |
| 5,038,284 A | * | 8/1991 | Kramer ....................... 705/37 |
| 5,063,507 A | * | 11/1991 | Lindsey et al. ............. 364/408 |
| 5,101,353 A | * | 3/1992 | Lupien et al. .............. 364/408 |
| 5,315,634 A | * | 5/1994 | Tanaka et al. ............ 379/93.02 |
| 5,500,793 A | * | 3/1996 | Deming, Jr. et al. ....... 364/401 |
| 5,870,730 A | * | 2/1999 | Furuya et al. ............... 706/47 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0573991 A1 | * | 6/1993 |
| WO | WO9010910 | * | 9/1990 |
| WO | WO9737735 | * | 10/1997 |

OTHER PUBLICATIONS

Barone-Asesi, G and Whaley. R., "Efficient Analytic Approximation of American Option Values" Journal of Finance. vol. 42, No. 2 (Jun. 1987), 301-320.*
Web-Pop (Professional Options Package) (www.pmpublishing.com).*

*Primary Examiner*—Vincent Millin
*Assistant Examiner*—David S Felten
(74) *Attorney, Agent, or Firm*—Morgan Lewis & Bockius LLP

(57)    **ABSTRACT**

An electronic exchange system network includes a trader site having an automated trading system capable of submitting orders to an exchange site. The automated trading system determines whether an order should be submitted based on, for example, the current market price of an option and theoretical buy and sell prices. The theoretical buy and sell prices are derived from, among other things, the current market price of the security underlying the option. A look-up table stores a range of theoretical buy and sell prices for a given range of current market price of the underlying security. Accordingly, as the price of the underlying security changes, a new theoretical price may be indexed in the look-up table, thereby avoiding calculations that would otherwise slow automated trading decisions. Other techniques may be used in addition or in the alternative to speed automatic decision-making. In addition, a system of checks may be conducted to ensure accurate and safe automated trading. The automated trading system may be capable of automatically submitting orders in connection with the underlying security in order to hedge part of the delta risk associated with the automated option trades.

**46 Claims, 8 Drawing Sheets**



**US 7,251,629 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,884,286 A | * | 3/1999 | Daughtery, III | 705/36 R |
| 5,963,923 A | | 10/1999 | Garber | 70/37 |
| 6,016,483 A | * | 1/2000 | Rickard et al. | 705/36 R |
| 6,058,391 A | * | 5/2000 | Gardner | 707/4 |
| 6,061,662 A | * | 5/2000 | Makivic | 705/36 R |
| 6,173,270 B1 | * | 1/2001 | Cristofich et al. | 705/37 |
| 6,236,980 B1 | * | 5/2001 | Reese | 705/36 |
| 6,263,321 B1 | * | 7/2001 | Daughtery, III | 705/36 R |
| 6,304,858 B1 | * | 10/2001 | Mosler et al. | 705/37 |
| 6,317,728 B1 | * | 11/2001 | Kane | 705/36 R |
| 6,415,269 B1 | * | 7/2002 | Dinwoodie | 705/37 |
| 6,546,375 B1 | * | 4/2003 | Pang et al. | 705/37 |
| 6,594,643 B1 | * | 7/2003 | Freeny, Jr. | 705/36 R |
| 6,839,686 B1 | * | 1/2005 | Galant | 705/36 R |

* cited by examiner



*FIG. 1*



*FIG. 2*



FIG. 3

THEORETICAL PRICE LOOK-UP TABLE 635

ASSUMPTIONS OF INPUT VARIABLES FOR THEORETICAL PRICES
(2) RISK FREE INTEREST RATE = 3.0% PER ANNUM
(3) VOLATILITY OF THE UNDERLYING SECURITY = 32.0% PER ANNUM
(4) EXPECTED DIVIDEND STREAM = A DIVIDEND OF $10.00, PAYABLE IN 77 DAYS (AUGUST 19 MINUS JUNE 03)
(5) TIME UNTIL OPTION EXPIRATION = 109 DAYS (SEPTEMBER 20 MINUS JUNE 03)
(6) CAN BE EXERCISED EARLY = YES = AMERICAN STYLE OPTION
(7) IS THE OPTION A CALL OR PUT = CALL

| STRIKE | 75.0 | 75.1 | 75.2 | 75.3 | 75.4 | 75.5 | 75.6 | 75.7 | 75.8 | 75.9 | 76.0 | 76.1 | 76.2 | 76.3 | 76.4 | 76.5 | 76.6 | 76.7 | 76.8 | 76.9 | 77.0 | 77.1 | 77.2 | 77.3 | 77.4 | 77.5 | 77.6 | 77.7 | 77.8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50.0 | 25.17 | 25.27 | 25.37 | 25.47 | 25.57 | 25.67 | 25.77 | 25.87 | 25.97 | 26.07 | 26.17 | 26.27 | 26.37 | 26.47 | 26.57 | 26.67 | 26.77 | 26.87 | 26.97 | 27.07 | 27.17 | 27.27 | 27.37 | 27.47 | 27.57 | 27.67 | 27.77 | 27.87 | 27.97 |
| 52.5 | 22.70 | 22.80 | 22.90 | 23.00 | 23.10 | 23.20 | 23.30 | 23.40 | 23.50 | 23.59 | 23.69 | 23.79 | 23.89 | 23.99 | 24.09 | 24.19 | 24.29 | 24.39 | 24.49 | 24.59 | 24.69 | 24.79 | 24.89 | 24.99 | 25.09 | 25.19 | 25.29 | 25.39 | 25.49 |
| 55.0 | 20.24 | 20.34 | 20.44 | 20.54 | 20.64 | 20.74 | 20.84 | 20.94 | 21.04 | 21.13 | 21.23 | 21.33 | 21.43 | 21.53 | 21.63 | 21.73 | 21.83 | 21.93 | 22.03 | 22.13 | 22.23 | 22.32 | 22.42 | 22.52 | 22.62 | 22.72 | 22.82 | 22.92 | 23.02 |
| 57.5 | 17.83 | 17.92 | 18.02 | 18.12 | 18.22 | 18.31 | 18.41 | 18.51 | 18.61 | 18.71 | 18.81 | 18.90 | 19.00 | 19.10 | 19.20 | 19.30 | 19.40 | 19.49 | 19.59 | 19.69 | 19.79 | 19.89 | 19.98 | 20.08 | 20.18 | 20.28 | 20.38 | 20.48 | 20.58 |
| 60.0 | 15.46 | 15.56 | 15.66 | 15.76 | 15.86 | 15.96 | 16.04 | 16.14 | 16.23 | 16.33 | 16.42 | 16.52 | 16.62 | 16.71 | 16.81 | 16.91 | 17.00 | 17.10 | 17.20 | 17.29 | 17.39 | 17.49 | 17.58 | 17.68 | 17.78 | 17.87 | 17.97 | 18.07 | 18.16 |
| 62.5 | 13.21 | 13.30 | 13.39 | 13.49 | 13.58 | 13.67 | 13.76 | 13.85 | 13.94 | 14.03 | 14.13 | 14.22 | 14.32 | 14.41 | 14.51 | 14.60 | 14.69 | 14.79 | 14.88 | 14.98 | 15.07 | 15.17 | 15.26 | 15.35 | 15.45 | 15.54 | 15.64 | 15.73 | 15.83 |
| 65.0 | 11.16 | 11.26 | 11.35 | 11.44 | 11.52 | 11.61 | 11.69 | 11.78 | 11.87 | 11.95 | 12.04 | 12.12 | 12.21 | 12.30 | 12.39 | 12.48 | 12.57 | 12.66 | 12.76 | 12.85 | 12.94 | 13.03 | 13.12 | 13.21 | 13.30 | 13.39 | 13.48 | 13.57 | 13.67 |
| 67.5 | 9.12 | 9.20 | 9.28 | 9.36 | 9.44 | 9.52 | 9.60 | 9.68 | 9.76 | 9.84 | 9.92 | 10.01 | 10.09 | 10.16 | 10.26 | 10.35 | 10.44 | 10.52 | 10.61 | 10.69 | 10.78 | 10.86 | 10.95 | 11.03 | 11.12 | 11.20 | 11.29 | 11.37 | 11.46 |
| 70.0 | 7.36 | 7.43 | 7.50 | 7.58 | 7.65 | 7.72 | 7.79 | 7.86 | 7.93 | 8.00 | 8.08 | 8.16 | 8.24 | 8.31 | 8.39 | 8.47 | 8.55 | 8.63 | 8.70 | 8.79 | 8.86 | 8.94 | 9.02 | 9.10 | 9.17 | 9.25 | 9.33 | 9.41 | 9.49 |
| 72.5 | 5.80 | 5.86 | 5.93 | 5.99 | 6.05 | 6.11 | 6.18 | 6.25 | 6.32 | 6.39 | 6.46 | 6.53 | 6.60 | 6.67 | 6.74 | 6.81 | 6.88 | 6.95 | 7.02 | 7.09 | 7.16 | 7.23 | 7.30 | 7.37 | 7.44 | 7.51 | 7.58 | 7.65 | 7.72 |
| 75.0 | 4.46 | 4.51 | 4.57 | 4.62 | 4.69 | 4.75 | 4.81 | 4.87 | 4.93 | 4.99 | 5.05 | 5.11 | 5.17 | 5.23 | 5.29 | 5.35 | 5.41 | 5.47 | 5.53 | 5.59 | 5.65 | 5.71 | 5.78 | 5.84 | 5.90 | 5.96 | 6.02 | 6.08 | 6.15 |
| 77.5 | 3.36 | 3.41 | 3.46 | 3.51 | 3.55 | 3.61 | 3.66 | 3.71 | 3.76 | 3.81 | 3.86 | 3.91 | 3.95 | 4.01 | 4.06 | 4.11 | 4.16 | 4.21 | 4.27 | 4.32 | 4.37 | 4.42 | 4.47 | 4.52 | 4.57 | 4.62 | 4.68 | 4.73 | 4.78 |
| 80.0 | 2.46 | 2.51 | 2.55 | 2.59 | 2.63 | 2.67 | 2.71 | 2.75 | 2.79 | 2.83 | 2.88 | 2.91 | 2.96 | 3.00 | 3.04 | 3.08 | 3.12 | 3.16 | 3.20 | 3.24 | 3.29 | 3.33 | 3.37 | 3.41 | 3.46 | 3.51 | 3.56 | 3.61 | 3.66 |
| 82.5 | 1.76 | 1.79 | 1.82 | 1.85 | 1.88 | 1.91 | 1.94 | 1.97 | 2.01 | 2.03 | 2.07 | 2.10 | 2.13 | 2.16 | 2.20 | 2.23 | 2.26 | 2.30 | 2.33 | 2.38 | 2.42 | 2.46 | 2.50 | 2.54 | 2.58 | 2.62 | 2.66 | 2.70 | 2.74 |
| 85.0 | 1.21 | 1.23 | 1.25 | 1.28 | 1.30 | 1.32 | 1.34 | 1.37 | 1.39 | 1.41 | 1.44 | 1.46 | 1.49 | 1.52 | 1.55 | 1.58 | 1.61 | 1.64 | 1.68 | 1.71 | 1.74 | 1.77 | 1.80 | 1.83 | 1.86 | 1.89 | 1.92 | 1.95 | 1.98 |
| 87.5 | 0.77 | 0.79 | 0.81 | 0.83 | 0.85 | 0.87 | 0.89 | 0.91 | 0.94 | 0.96 | 0.99 | 1.01 | 1.03 | 1.05 | 1.07 | 1.10 | 1.12 | 1.14 | 1.16 | 1.19 | 1.21 | 1.23 | 1.25 | 1.27 | 1.30 | 1.32 | 1.34 | 1.37 | 1.39 |
| 90.0 | 0.47 | 0.48 | 0.50 | 0.51 | 0.53 | 0.54 | 0.56 | 0.58 | 0.59 | 0.61 | 0.62 | 0.64 | 0.65 | 0.67 | 0.69 | 0.70 | 0.72 | 0.73 | 0.75 | 0.77 | 0.78 | 0.80 | 0.81 | 0.83 | 0.85 | 0.87 | 0.88 | 0.90 | 0.92 |
| 92.5 | 0.27 | 0.28 | 0.29 | 0.30 | 0.31 | 0.32 | 0.33 | 0.34 | 0.35 | 0.36 | 0.38 | 0.40 | 0.41 | 0.42 | 0.43 | 0.45 | 0.46 | 0.48 | 0.49 | 0.51 | 0.52 | 0.54 | 0.55 | 0.57 | 0.52 | 0.54 | 0.55 | 0.57 | 0.60 |
| 95.0 | 0.10 | 0.11 | 0.12 | 0.13 | 0.13 | 0.14 | 0.15 | 0.16 | 0.16 | 0.17 | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.23 | 0.24 | 0.25 | 0.26 | 0.27 | 0.28 | 0.29 | 0.30 | 0.31 | 0.31 | 0.33 | 0.33 | 0.34 | 0.35 |
| 97.5 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 0.02 | 0.03 | 0.03 | 0.05 | 0.05 | 0.05 | 0.06 | 0.06 | 0.07 | 0.07 | 0.09 | 0.10 | 0.10 | 0.11 | 0.11 | 0.12 | 0.12 | 0.13 | 0.14 | 0.14 | 0.15 | 0.16 | 0.17 |



FIG. 4

FIG. 5



**FIG. 5 CONT.**



**FIG. 6**



**FIG. 7**

US 7,251,629 B1

## AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to an automated trading system for use in an electronic trading exchange network system and, more particularly, a trading system that rapidly, accurately, and safely responds to desirable trading opportunities.

2. Description of the Related Art

Trading exchanges historically provided a location for buyers and sellers to meet to trade stocks, bonds, currencies, commodities, and other items. The New York Stock Exchange and the Chicago Mercantile Exchange are examples of such trading exchanges. Recent advances in computer and communications technology have led to electronic trading exchange system networks. Electronic trading exchange system networks use communications networks and computers to replicate traditional face-to-face exchange functions. For example, centralized exchange computers disseminate market information, maintain records and statistics, settle cash payments, determine risk based margin requirements, and match trades. Matching of trades is typically done on a first come-first served basis, whereby time of order entry is an important criterion for determining priority in fulfillment of a transaction.

A communications network connects the exchange computers to numerous trader sites. Each trader site includes one or more trader stations operated by traders. Exchange network operators typically provide exchange members with interface software and, in some cases, hardware to enable traders to view prices and other information relating to products, and to execute transactions by submitting orders and quotes. This trading information is displayed in a grid or other organized format. Market competition is fierce. Traders who can quickly identify opportunities and act on them generate the largest profits.

Most trader stations in use today rely upon the traders themselves to decide whether to submit an order in response to a trading opportunity presented through the exchange. In this regard, the trading information is received from the exchange, processed, and displayed on a monitor of the trader's station. The trader reads the trading information from the monitor and decides whether or not to submit an order. The trader submits an order by entering instructions into the trader station using a keyboard or mouse.

Attempts have been made to implement trading systems that automate decision-making so that orders may be submitted with limited trader interaction. These systems have a number of drawbacks. For example, user-friendly systems that automatically submit orders without trader interaction, while faster than a human trader, are relatively slow in terms of computer speed due to application and system design. In a typical set-up, trading information received from the exchange is processed by general purpose backend computer equipment. The backend computer may, among other things, (1) act as a gateway by communicating market information from the exchange to various types of client equipment, (2) submit, delete, and modify orders and quotes to the exchange from the various client equipment, (3) receive real-time trade confirmations and end-of-day back office reports, and (4) perform risk analysis, position management, and accounting functions. The trader stations are clients of the backend computer. The trader stations may be tasked with numerous functions, such as (1) receiving and displaying real-time market information, (2) creating and displaying theoretical prices related to market products, (3) composing, submitting, modifying, and deleting orders and quotes, (4) maintaining positions and calculating risk management, to name a few. Each trader station is typically configured in a very user-friendly, Windows-based environment since the trader will spend long periods of time each day watching and interacting with it. The overhead associated with the functions performed by the backend computer and the trader stations reduces the response speed of automated trading.

In addition, computer equipment lacks the judgment of a human trader. A computer can generate staggering losses in the blink of an eye by submitting orders based upon incomplete or mistaken assumptions inherent in the trading program, erroneous input data, or corrupted data relied upon by the trading program. Accordingly, there exists a need in the art for an automated trading system that rapidly responds to trade information transmitted from an exchange, yet is safe and accurate.

### SUMMARY OF THE INVENTION

The present invention has been made in view of the above circumstances and has as an object to provide an improved trading system that rapidly responds to trading information received from an exchange.

A further object of the invention is to provide an automated trading system in an electronic trading exchange system that rapidly submits orders in response to trading information received from the exchange.

A further object of the invention is to provide an automated trading system that ensures the accuracy of automatic trading operations.

A further object of the invention is to provide an automated trading system that performs automatic trading operations without the risk of enormous losses due to erroneous, mistaken and/or repeated operation.

A further object of the invention is to provide a trading system in an automated trader station that may be remotely controlled.

A further object of the invention is to provide an automated trader system that automatically hedges some or all of the delta risk associated with the execution of a trade by submitting an order in connection with another, related trade opportunity.

Additional objects and advantages of the invention will be set forth in part in the description that follows, and in part will be obvious from the description, or may be learned by practice of the invention. The objects and advantages of the invention will be realized and attained by means of the elements and combinations particularly pointed out in the appended claims.

To achieve the objects and in accordance with the purpose of the invention, as embodied and broadly described herein, the invention comprises an automated trading system for use in an electronic exchange system network that includes a receiver interface that receives market price information for a first traded item from an exchange, data reference logic that outputs a transaction value for the first traded item from a data structure based on price information for a second traded item related to the first traded item, decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit an order for the first traded item, and an output interface for outputting a request for market transaction for one of the first traded item and the second traded

US 7,251,629 B1

3

item for transmission to the exchange in response to the decision logic. By way of example, the first traded item may correspond to an option and the second traded item may correspond to a security underlying the option.

The data reference logic may receive current price information for the second traded item and uses the current price information to output the transaction value. The data reference logic may include memory storing the data structure, which maps pre-calculated transaction values of the first traded item over a range of price values of the second traded item, and reference logic for identifying one of the pre-calculated transaction values based at least in part on a current price value for the second traded item. The data structure may comprise one or more of a two-dimensional data structure mapping pre-calculated transaction values of the first traded item over a range of prices of the second traded item, an n-dimensional data structure, where n is 3 or more, a look-up table, a linked list, and/or a tree structure.

The decision logic may compare at least a portion of the received market price information to the transaction value when automated trading in the first item first becomes enabled. The automated trading system may also include safety check logic, responsive to the decision logic, to prevent transmission of a request for market transaction (or to cap the maximum quantity of the market transaction) for the first traded item to the exchange if the request does not meet a predetermined criterion, such as a maximum trade quantity for the first traded item or a maximum number of market transaction attempts within a predetermined period of time. The decision logic may compare at least a portion of the received market price information to the transaction value when the maximum number of attempts is increased.

The receiver interface may receive the market price information for the first traded item indirectly from the exchange via an exchange interface. Further, the decision logic may compare the transactional value to at least a portion of the received market price information, where the transaction value is a minimum sell price for the first traded item, and the market price information includes a market bid price for the first traded item. The transaction value may be a maximum buy price for the first traded item, and the market price information may include a market ask price for the first traded item. The transactional value may be a theoretical value of the first traded item based on a mathematical model.

The price information for the second traded item may correspond to a current market price for the second traded item. The decision logic may then generate a comparison when the current market price for the second traded item changes. Comparisons may additionally be generated when the current market price for the first traded item changes, when a table variable are updated or changed, when automated trading is enabled, and/or when safety checks are relaxed.

A backend computer may include the receiver interface, the data reference logic, the decision logic, and the output interface. The first backend computer may operate using a Windows-based operating system or a text-based operating system. A trader station separate from the backend computer may be coupled to the backend computer through a communication link. The trader station may include a graphic user interface to enable a trader to monitor the operation of the backend computer. The trader station may transmit updated data reference information for updating the data reference logic to the backend computer over the communication link. For example, the trader station can calculate the updated data reference information, which the backend

4

computer stores. The backend computer may be located substantially closer than the trader station to the exchange that transmits the market price information for the first traded item.

The present invention further comprises an automated trading method for use in an electronic exchange system network, that includes receiving market price information for a first traded item, identifying a desired price for the first traded item in a look-up table based on price information for a second traded item related to the first traded item, comparing the received market price information for the first traded item to the desired price for the first traded item, and generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price.

The first traded item may correspond to an option and the second traded item may correspond to a security underlying the option. The step of identifying a desired price may include receiving current market price information for the second traded item, using that current market price information to index a desired price for the first traded item in the look-up table. The look-up table may be a two-dimensional table providing desired price values indexed by item traded and price of the second traded item or an n-dimensional table, where n is 3 or more.

The present invention further comprises an automated method of trading in an electronic exchange system network, comprising the steps of receiving a current market price for an option from an electronic exchange, comparing the current market price for the option with a desired price for the option, where the desired price is derived from current price information for an underlying security for the option, and submitting an order for the option to the electronic exchange within 1 millisecond of the step of receiving the current market price.

The step of submitting an order may be performed within 600 microseconds of the step of receiving the current market price, and even within 380 or 250 microseconds of the step of receiving the current market price.

The present invention further comprises an automated trading method for use in an electronic exchange system network, including the steps of receiving market information for a first traded item, identifying a transaction value for the first traded item in a look-up table based on at least one of price information for a second traded item related to the first traded item and received market information for the first traded value, and using at least the identified transaction value in determining whether to submit an order for the first traded item.

The identified transaction value may be an implied volatility value corresponding to the first traded item, a maximum buy value for the first traded item, a minimum sell value for the first traded item, or a theoretical value for the first traded item generated based on a mathematical model. Further, the look-up table may comprise a linked list.

The backend computer may perform the receiving, identifying, and using steps on a Windows-based operating system or on a text-based platform. A trader station separate from the backend computer may calculates transaction values for storage in the look-up table and transmit the calculated transaction values to the backend computer, which stores the calculated transaction values in the look-up table. The values stored in the look-up table of the backend computer may be checked against values stored in a look-up table in the trader station to confirm the accuracy of the look-up table stored in the backend computer.

US 7,251,629 B1

**5**

Moreover, the method may further include submitting an order for the first traded item receiving confirmation of a transaction from an exchange responsive to the order submitted, and submitting an order for the second traded item to hedge a delta risk associated with the confirmed transaction.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention, as claimed.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate embodiment(s) of the invention and together with the description, serve to explain the principles of the invention.

FIG. **1** illustrates an embodiment of an electronic trading exchange system network in accordance with the present invention.

FIG. **2** illustrates a further embodiment of an electronic trading system network in accordance with the present invention.

FIG. **3** provides a schematic of the functionality of an embodiment of an automated trading system in accordance with the present invention.

FIG. **4** illustrates a representation of an embodiment of a theoretical price look-up table in accordance with the present invention.

FIG. **5** illustrates an embodiment of a trading screen for use in connection with a trader station in accordance with the present invention.

FIG. **6** provides a flow diagram of the steps performed in automated trading in accordance with the present invention.

FIG. **7** illustrates a further embodiment of an electronic exchange system network in accordance with the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention recognizes that electronic trading exchange system computers match buy and sell orders on a first come/first serve basis. Accordingly, the speed and accuracy of submitting orders or other responses is critical to the trader's ability to participate in the most profitable transactions. Even short delays in response may freeze a trader out of an otherwise lucrative transaction.

The present invention is capable of reducing the time it takes for the trader to submit an order in response to incoming trading information from the exchange. In accordance with one aspect of the present invention, the trader's computer equipment automatically decides whether or not to submit an order based upon a look-up table of trading information stored by the computer equipment and trading information received from the exchange computers. The look-up table, among other advantages, eliminates the need to recalculate decision information when trading conditions change. Recalculating decision information is time consuming, particularly when trading conditions change frequently. For example, calculating a single price for an option can take several hundred microseconds to a few milliseconds and each underlying security may correspond to several hundred options. In addition, information in the look-up table can be structured to enable automated decisions to be made for select traded items sooner than for other traded items. To further enhance the response speed of the trader, the trader's

**6**

computer equipment may be dedicated or substantially dedicated to performing automated trading operations, with limited or minimized overhead permitted for other tasks. Further, the trader's computer equipment assigned to automated trading may be used to process raw trading information received from the exchange. The present invention is further capable of reducing the time delay associated with the transfer of trading information from the exchange computers to the trader.

In an additional aspect of the present invention, safe and accurate automated trading may be achieved by performing various checks of the information used in decision-making and/or information concerning the order. Further, an automated hedging feature may be invoked which, when a trader takes a position in a security, automatically establishes a hedge position in a related security.

Reference will now be made in detail to the present exemplary embodiment(s) of the invention illustrated in the accompanying drawings. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

FIG. **1** provides a schematic of an embodiment of an electronic trading exchange system network **10** that may be used in connection with the present invention. Other network arrangements may be used as well. The electronic trading exchange system network **10** includes an exchange site **100** and a plurality of trading sites **200**. For purposes of simplification, FIG. **1** illustrates an exchange site **100** linked to a single trading site **200**. Other trading sites **200** may be located in a different part of the same city, as the exchange site **100**, a different city, a different country or different continent as the exchange site **100**. The exchange site **100** need not be limited to equipment provided at a single location, but may be provided in multiple locations linked by a network. Similarly, the trading sites **200** need not be limited to equipment provided at a single location, but may include equipment at multiple locations linked by a network, such as a wide area network (WAN).

The exchange site **100** may be linked to the trading site **200** by one or more communication links **300**. The communication links **300** may be part of a wide area network formed by dedicated communications lines, commonly-accessible communication lines, or a combination thereof. For example, dedicated lines may be strung between the exchange site **100** and one or more of the member trading sites **200**. Alternatively, dedicated lines may be leased from telephone, cable, or other communication network operators. For example, the public switched telephone network may embody the commonly-accessible communication lines. Of course, the communications links **300** may also include, in whole or in part, wireless communications, such as microwave or satellite links.

In one embodiment, the exchange site **100** may be designed as a local area network (LAN) and include, for example, one or more security routers and one or more back office computers, among other equipment. For purposes of illustration only, two security routers **111**, **112** and three back office computers **130-1 130-2**, **130-3** (referred to collectively as back office computer **130**) are shown in FIG. **1**. The security routers **111**, **112** control communications between the back office computers **130** and the communications links **300**. Each security router **111**, **112** transmits and receives communications over the communications links **300**, as well as restricts communications from unauthorized sources.

More particularly, the security router **111**, **112** may be used to isolate the equipment at the exchange site **100** from intrusion and facilitate communication with the back office

US 7,251,629 B1

7

computers **130**. The back office computers **130** manage the trading of the various securities (e.g., futures, options, swaps or other derivatives; currencies, stocks, bonds, or other physicals like corn, precious metals, electricity, etc.) and/or other items traded on the exchange. For example, one or more of the back office computers **130** may function as market servers. In this capacity, they may maintain order books, perform order matching, generate market information for use at the exchange site **100** and/or for transmission over the communication links **300**, and supply trade information to other back office computers **130** for accounting and/or cash settlement purposes. One or more of the back office computers **130** may function as short-term accounting servers. As such, these computers may receive information from the market servers and generate information for transmission over the communication links **300**. The short-term accounting servers may be initialized with status information from the previous day's trading before performing accounting tasks for the current day. One or more of the back office computers **130** may function as long-term account servers and, accordingly, function to collect data from the short-term accounting servers for batch processing and record. The long-term account servers may supply information to initialize the short-term account servers and generate reports for transmission to trading sites **200**. Of course, the back office computers **130** may perform additional functions and a single computer may perform more than one of the above functions.

The trading sites **200** may include a LAN architecture having one or more security routers, one or more backend computers, one or more trader stations, and one or more hubs, among other equipment. For purposes of illustration only, FIG. **1** shows two security routers **211**, **212**, two backend computers **220**, **225**, three trader stations **230-1**, **230-2**, **230-3**, (collectively referred to as trader stations **230**) and two hubs **240**, **241**. The security routers **211**, **212** transfer trading information between the trading site **200** and the exchange site **100** and screen communications from unauthorized sources. The hubs **240**, **241** distribute data between the backend computers **220**, **225** and the trading stations **230**.

Backend computer **220** may be configured as a communication server for the trader stations **230**. The exchange often supplies software and/or hardware for the backend computer **220** to facilitate communications with the exchange site **100**. Backend computer **220** handles communications between the trader stations **230** and the back office computers **130** of the exchange. Of course, the trader site **200** may include multiple backend computers **220**.

Backend computer **225** may also be equipped with software and/or hardware that facilitates communications with the exchange site. Some exchanges, for example, such as the EUREX (the German and Swiss Derivatives Exchange), recommend installation of a redundant on-site backend computer in the event that the primary communication backend computer **220** fails. In addition, backend computer **225** may be configured to perform automated trading functions under the control of one or more of the trader stations **230**. The automated trading functions are described in more detail below. The backend computer **225** should be equipped with a high-speed processor and sufficient memory to efficiently handle automated trade processing. The trader stations **230** may control backend computer **225** remotely through a communication link **250**, for example, a WAN. The trader site **200** may include multiple backend computers **225**.

8

In one preferred embodiment, backend computer **225** is dedicated or substantially dedicated to performing automated trading-related functions, as discussed in greater detail below. Backend computer **220**, rather than backend computer **225**, may be assigned trading-related tasks, such as (1) serving as a gateway to communicate market information from the exchange site **100** to trader stations **230**, (2) submitting, deleting, and modifying orders and quotes to exchange site **100** from the trader stations **230**, (3) receiving real-time trade confirmations and end-of-day back office reports, and/or (4) performing risk analysis, position management, and accounting functions. In this way, backend computer **225** may perform automated trading functions with limited interruption or delays associated with other tasks the backend computers (such as backend computer **220**) may be requested to perform. This increases the response speed for automated trading operations. Moreover, the total time delay in submitting an order to the exchange site **100** includes a component attributable the transmission delay or network lag in transmitting signals between the exchange site **100** and the trader site **200**. Therefore, backend computer **225** is preferably located near to the equipment of the exchange site **100** to reduce delays associated with transmitting information and orders between the backend computer **225** and the exchange site **100**. Accordingly, the total time for responding to trading opportunities can be reduced both by reducing transmission delays and by increasing decision-making speed at the trader site **200**. Significantly, the backend computer **225** may be remotely supported or controlled by a distant trader station **230**, which permits the trader station **230** to be located virtually anywhere without adversely affecting the response time of the automated trading system. Accordingly, the trader site **230** may be chosen based on considerations such as tax, real estate costs, and quality of life, without having to worry that trader station location will impair the performance of automated trading carried on by backend computer **225**.

Trader stations **230** receive information from the exchange site **100**, process that information, and display at least part of it on a monitor. Each trader station **230** typically runs interactive software that enables a trader, among other things, to submit orders and/or quotes to the exchange site **100**. As discussed further below, one or more of the trader stations **230** may additionally be equipped with software for controlling the automated trading functions of backend computer **225**.

FIG. **2** illustrates an alternative embodiment of an electronic trading exchange system network **20**. For the sake of brevity, features of FIG. **2** similar to those in FIG. **1**, which are described above, will not be repeated. In FIG. **2**, the trading site **200** includes an automated trading system computer **225-2** separate from the backend computer **225-1**. In this embodiment, the automated trading system computer **225-2** performs automated trading system functions and the backend computer **225-1** manages communications between the automated trading system computer **225-2** and the exchange site **100**. The automated trading system computer **225-2** may be connected to the backend computer **225-1** using, for example, network interface cards or through a hub (not shown). The automated trading system computer **225-2** may be controlled using one or more trader stations **230** either locally or through a communication link **250**. Alternatively, the automated trading system computer **225-2** may be controlled through the communication computer **225-1** (as indicated by the dotted lines), which would serve to communicate information between the trader stations **230** and the automated trading system computer **225-2**.

US 7,251,629 B1

9

FIG. 3 provides a functional diagram illustrating the operation of an embodiment of an automated trading system used in connection with options trading. Of course, the embodiment may be modified for use in trading other securities (e.g., futures, options, swaps or other derivatives; currencies, stocks, bonds, or other physicals like corn, precious metals, electricity, etc.) and/or other items traded on the exchange. The automated trading system is preferably resident in the backend computer 225 as configured in FIG. 1, which may utilize multiple CPUs. However, it may also be resident in one or more of the trader stations 230 or the backend computers 220. The automated trading system software may run in a text-based environment or a Windows or Windows-like environment. For example, the automated trading system may be run on an operating system, such as VMS, DOS, or LINUX, or in a WINDOWS or similar operating system, which is more user-friendly. In some operating systems, automated trading may be assigned priority over other tasks or processes and run without debug messages. Local decision-making times of less than 250 microseconds have been achieved in a text-based VMS system run on a backend computer 225 and times of 50-150 milliseconds or less have been achieved on a Windows-based system run on a trader station 230, depending on the processor load from other tasks.

The automated trading system receives and decodes current market information broadcast from the exchange site 100 through a receiver interface 410. The decoding of market information may be performed, for example, transparently by software supplied by the exchange for use with the backend computers, by the exchange software at the request or direction of the automated trading system, or by the automated trading system itself. The current market information may include information related to the options and underlying security of the option. Specifically, market bid, ask and last prices and the day's volume for call options (the right to buy the underlying security at a specified time in the future at a specified price), put options (the right to sell the underlying security at a specified time in the future at a specified price) and the underlying security, to name a few, are typically received by the trader site. An option look-up protocol 420 is used to locate the particular option identified in the current market information in an option look-up array or table 430, which may be formed in memory of the backend computer 225. The look-up protocol 420 may be any of several known look-up or search protocols. For example, the look-up protocol may involve a linear search, search tree, use of a hash or index table, or other known search protocol.

The option look-up array or table 430 stores information concerning options that may be automatically traded. For simplicity, a two-dimensional table having rows and columns will be described. However, it should be understood that higher-dimension arrays or tables may be used in connection with the present invention. Each row of the option look-up table 430 stores information relevant to a particular option, including, for example, option name, current market prices, times and quantities of the most recent trades by the trader, maximum 430 order quantity, and whether automated trading is enabled for the option. As discussed further below, this information may be used as a check against erroneous operation. Alternatively, option look-up table 430 may store information in connection with items that are actually being automatically traded at a given time. As a further alternative, look-up table 430 may include indices that link only the items currently enabled for automated trading and skip those for which automated trading is

10

not enabled. In such a case, an additional table may be maintained for the full set of items for which automated trading may be performed. This is useful in increasing the speed at which a disabled option can be enabled. Accuracy checks may use both the additional table and look-up table 430. Communications between the automated trading system and the trader stations 230 are conducted through a trading station interface 440. For example, a trader station 230 may update information contained in the option look-up table 430 via a trading station interface 440. In this way, the option look-up table 430 may be updated to enable (disable) automated trading for a particular option.

The option look-up table 430 may be organized in several different ways. For example, the market bid and ask prices for a particular option may be stored in different rows of the option look-up table 430. Alternatively, the bid and ask prices may be stored in the same row of the option look-up table 430, but in different columns, or as different cells in a price dimension, for example. Also, the option look-up table 430 may be segmented, for example, so that all bid prices are grouped together and all ask prices are grouped together. Different classes of options (i.e., options with different underlying securities) may be indexed in a single look-up table 430 or in multiple look-up tables 430, for example, with each option having its own look-up table 430.

In addition to the current market information concerning option trading, the automated trading system may receive and decode current market information concerning the security (or securities) underlying the options. For example, an exchange that trades the underlying security typically maintains a book of bid (ask) prices and quantities of current order and quotes of those traders wishing to buy (sell) the underlying security. The automated trading system may receive the underlying market information, for example, from the exchange site 100, from a separate exchange site, or from another market feed either directly or indirectly, e.g., through a trader station 230. The underlying market information for a given security may be indexed in a theoretical price look-up array or table 435, which may be formed in the memory of backend computer 225, to identify theoretical buy and sell prices for options associated with the underlying security. While the theoretical price look-up table 435 may constitute a multi-dimensional array or table, a two-dimensional table will be described for purposes of simplicity. It should be understood that data structures other than arrays or tables may be used in connection with the present invention. The theoretical price look-up table 435 may be updated by a trading station 230 via trading station interface 440. In one embodiment, the trader station 230 supplies the content of the theoretical price look-up table 435 to the automated trading system.

The theoretical buy and sell prices for derivatives, such as options, may be determined using mathematical models. The mathematical models produce a theoretical value for an option given values for a set of variables that may change over time. Variables considered in these models may include (1) the current market price of the underlying security (e.g., the price of the stock or future from which the option is derived), (2) risk free interest rates, (3) volatility of underlying price, (4) dividend stream, (5) time until expiration, (6) whether the option can be exercised before the expiration date, and (7) whether the option is a call or put. Variables (2)-(7) are not likely to change as frequently as the price of the underlying security, variable (1). Some variables, such as price of the underlying security, can be derived from the market. Other variables require some qualitative assessment by the trader. In one embodiment of the invention, the

US 7,251,629 B1

11

current market price of the underlying security is used to index the theoretical price look-up table **435**. However, the theoretical price look-up table **435** may be indexed using other variables in addition to or instead of current market price of the underlying security.

The current market price of the underlying security may be defined in several different ways. At any given time during normal trading, the underlying security will usually have: (1) bid prices and quantities; (2) ask prices and quantities; (3) a last price and volume at which the underlying security was traded (last price); (4) an average of the current highest bid and lowest offer prices (average best bid, best ask price); and (5) an average price of a certain depth, among other values. The average price of a certain depth, say 5000 shares, would take the average of the: (a) best (highest) bid prices in the book of the first 5000 shares, and (b) best (lowest) offer prices in the book of the first 5000 shares. Obviously, there are many more definitions of underlying price that can be created, for example, using permutations of the five definitions provided above.

It is highly probable that at least four of these five definitions will yield (perhaps slightly) different results at any time. Since the normal hedging response of an option trade is to buy or sell the underlying security, the option trader may very carefully define underlying price used in her models. Specifically, buying (selling) calls and selling (buying) puts will usually lead to selling (buying) the underlying for hedging. For reasons discussed further below, the trader may want to set the theoretical buy price for call options and the theoretical sell price for put options using the bid price (and/or possibly bid underlying depth) of the underlying security. Likewise, the trader may want to set the theoretical sell price for call options and the theoretical buy price of put options using the ask price (and/or possibly the ask underlying depth) of the underlying security. In summary, theoretical value calculations used for automatic option trading should be flexible enough to use various definitions of underlying price.

In addition to generating a theoretical value for an option, the trader selects a buy spread and a sell spread. The buy spread may be subtracted from the theoretical value to produce the theoretical buy price—the highest price at which the trader is willing to buy a particular option using automated trading. The sell spread may be added to the theoretical value to produce the theoretical sell price—the lowest price at which the trader is willing to sell a particular option using automated trading. Accordingly, the trader would like to sell an option having a bid price that is the same as, or higher than, the trader's theoretical sell price. The trader would like to buy the option from anyone offering a price that is the same as, or lower than, the trader's theoretical buy price.

Accordingly, in the embodiment illustrated in FIG. **3**, the theoretical price look-up table **435** is designed to correlate the current market price of an underlying security to the theoretical buy and sell prices of the options for which automated trading is performed. For example, if automated trading is performed for options underlying Exxon stock, the theoretical price look-up table correlates the current price of Exxon stock to the theoretical buy and sell prices of Exxon stock options. If the price of Exxon stock changes, the theoretical price look-up table can be used to index different theoretical prices for the Exxon stock options.

Similar to the option look-up table **430**, the theoretical price look-up table **435** may be organized in several ways. For example, all theoretical buy prices for a given price (such as bid price or ask price) of an underlying security may

12

be provided in a single column of a look-up table **435**, with a separate sub-table provided for theoretical sell prices. Alternatively, the look-up table **435** may index both a theoretical buy price and a theoretical sell price. The theoretical price look-up table **435** may be segmented or multidimensional. Moreover, the theoretical price look-up table **435** may be combined with, a portion of, or linked to option look-up table **430**.

In addition, the theoretical look-up table **435** and the option look-up table **430** can be structured consistent with the particular search protocol used by the option look-up protocol **420** so that certain options or other items are located by the search protocol before other options or items. For example, if option look-up protocol **420** implements a linear search, the first options in the option look-up table **430** and the theoretical look-up table **435** (e.g., at the top of the tables **430** and **435**) will be reviewed by the option look-up protocol **420** before options at the bottom of the table. Accordingly, the trader station **230** or the backend computer **225** may structure the option look-up table **430** and/or the theoretical price look-up table **435** so that options that have shown in the past, or are likely to show in the future, the most promising profits will be located first. The particular order of the options in the tables **430** and **435** may depend on the trading volume in an option, for example. Options with relatively high traded volumes over recent trading days or the current trading day may be given a higher priority ranking in look-up table **430** and/or theoretical price look-up table **435**. Moreover, some exchanges may limit the number of orders that a particular trader may submit at a given time. Accordingly, structuring the tables **430** and **435** as described increases the opportunity for the trader to participate in the most lucrative transactions when there are restrictions on the number of concurrent orders placed.

In accordance with the embodiment shown in FIG. **3**, the trader station **230** may respond to changes in variables (2)-(7) and/or other variables taken into account in determining theoretical buy and sell prices by updating the theoretical price look-up table **435**. Alternatively, the theoretical price look-up table **435** may hold theoretical prices over ranges of any one or more of the items defined by theoretical price variables (1)-(7) described above, as well as other variables that one may wish to take into account, such as variable buy and sell spreads (described in more detail below). In such a case, theoretical price is identified in an n-dimensional look-up table **435** responsive to n variables.

Calculating the theoretical value for options or other trading derivatives can be relatively time consuming. Moreover, the theoretical values for a series of options change when one of the contributing variables changes. As noted above, some of these variables, such as price of the underlying security, may change frequently. Use of the theoretical price look-up table **435** avoids the need for recalculating theoretical prices when the value of a variable that affects the theoretical price changes. Calculating the theoretical price each time a variable changes unnecessarily consumes computer resources, such as CPU time, better allocated to performing automated trading. The automated trading system of the present invention utilizes a precalculated table of theoretical prices over a range of one or more variables that affect theoretical price. Accordingly, when a variable affecting theoretical price (such as the market price of the underlying security) changes, the automated trading system simply references a new theoretical price in the theoretical price look-up table **435** and uses the new theoretical price in deciding whether to buy or sell options.

US 7,251,629 B1

13

The values stored in the theoretical price look-up table **435** may be calculated, for example, using one or more of the trader stations **230**, a backend computer **220**, the backend computer **225**, or some combination of these. When a trader station **230** calculates the values for the theoretical price look-up table **435**, the backend computer **225** may be free to focus its computing resources on automated trading. However, the additional overhead associated with using the backend computer **225** to calculate the values for the theoretical price look-up table **435** may be acceptable in some applications.

Referring still to FIG. **3**, decision logic **450** compares the theoretical price identified in the theoretical price look-up table **435** to the market price for the option, and based on the comparison, determines whether the option should be bought or sold. For example, in an embodiment in which the theoretical look-up table **435** indexes theoretical buy and sell prices for a particular option based on the price of the underlying security, decisions may be triggered (1) when the market price of the underlying security changes, but the market bid and ask prices of the option remain the same (i.e., changing underlying price, static option price), (2) when the bid or ask price of the option changes, but the market price for the underlying security remains the same (i.e., changing option prices, static underlying price), (3) when the values of theoretical price table **435** are updated, (4) when automated trading is enabled for a particular option, and (5) when safety checks are relaxed for a particular option.

Consider example (1) in which the theoretical buy (sell) price of a particular option changes (for example, as a result of a change in underlying security price) and the bid and ask prices of an option remain static. Decision logic **450** will compare the current market ask (bid) price of the option to the new theoretical buy (sell) price obtained from the theoretical price table **435**. In this case, the decision logic **450** performs all comparisons affected by the change in underlying price. For example, a change in the bid (ask) price of the underlying security may affect the theoretical buy (sell) price of some or all call options and the theoretical sell (buy) price of some or all put options associated with the underlying security. Accordingly, the decision logic **450** makes comparisons of market bid or ask prices corresponding to new theoretical sell and buy prices.

Consider example (2) in which the market bid (ask) price for a particular option changes and the price of the underlying security remains static. The decision logic **450** will compare the new market bid (ask) price to the corresponding theoretical sell (buy) price that exists at that time from the theoretical price table **435**. Accordingly, a change in market bid (ask) price of a particular option may trigger a comparison of market bid (ask) price to theoretical sell (buy) price. Based on the comparison, for example, if the market bid (ask) price is greater (less) than or equal to the theoretical sell (buy) price, the automated trading system may prepare an order for the particular option.

Consider example (3) in which the theoretical price look-up table **435** is updated with static market option and underlying prices. For example, when the look-up table **435** is updated, the decision logic **450** compares the updated theoretical buy and sell prices corresponding to the current market price of the underlying security to the current ask and bid prices of the options subject to automated trading. As noted above, the theoretical price look-up table **435** may be updated when, for example, one or more of the values that effect the theoretical buy and sell prices changes such as, but not limited to, the buy and ask spreads and/or theoretical variables (2)-(7). For example, theoretical price variables

14

(2)-(7) discussed above could change, perhaps due to a change in the trader's assessment of market conditions. These changes may occur when the trader enters new information through a trader station **230** or when new information becomes available through another source (e.g., a change in risk-free interest rate occurs in a database associated with the trading site **200**). A change in one or more of variables (2)-(7) triggers a re-computation of (probably) all values in the theoretical look-up table **435**. These new values in table **435** are updated on backend computer **225**. Accordingly, the decision logic **450** makes comparisons of market bid and ask prices corresponding to new theoretical sell and buy prices.

Consider example (4) when automated buying or selling trading for a particular option is changed from disabled to an enabled state. This could arise, for instance, at the beginning of the trading day if the default state of a new trading session is all options disabled. Enabling automated selling (buying) for a particular option or group of options can trigger decision logic **450** to make a comparison of the market bid (ask) prices to the theoretical sell (buy) price in table **435**.

In addition to enabled and disabled states, a third, "warming up" or "test" state may be provided for an option in the automated trading system. In this third state, the automated trading system may perform all steps except actually placing an order. This allows the trader to monitor the operation of the automated trading system without actually submitting orders, thereby reducing the risk of enabling options for automatic trading using theoretical prices which are not market realistic.

Consider example (5) in which a safety check for a particular option is relaxed. This could arise, for example, if a global safety check condition implemented by safety check logic **460** is disabled or changed. For example, a safety check condition relating to the maximum quantity or frequency of trading attempts of a particular option may be increased. In connection with the trading frequency condition, the entire automated trading system may be held in a "pause" state if it had made more than a predetermined number (e.g., 3) automated trading attempts within a predetermined time period (e.g., 60 seconds). If this global safety check is disabled or relaxed, for example, by increasing the predetermined number of attempts (e.g., from 3 to 5), the trading frequency safety check may no longer be in violation. As a result, the entire automated trading system may transition from the "paused" state to the enabled state. If a particular option had been enabled for automated selling (buying), the decision logic **450** will then compare the market bid (ask) price to the theoretical sell (buy) price in table **435**.

Decision logic **450** determines that a sell (buy) order should be submitted if the market bid (ask) price is greater (less) than or equal to the theoretical sell (buy) price. Even if decision logic **450** determines that an order should be submitted, safety check logic **460** may be used to prevent an order from being submitted. Safety check logic **460**, for example, can block orders entirely, or put a cap on the maximum quantity attempted to be bought or sold, for an option when acceptance of that order would result in the trader having a position greater than a predetermined threshold quantity of that option. Also, the automated trading system may be paused or stopped if the number of attempted orders exceeds a predetermined amount in a predetermined period of time. The constraints may be provided in look-up tables provided to the automated trading system and may be varied for individual options. Other constraints may involve generating warnings and/or preventing orders, for example,

US 7,251,629 B1

15

when the: (1) theoretical buy price exceeds the theoretical ask price, (2) theoretical buy price exceeds the theoretical value, (3) theoretical sell price is less than the theoretical value, and/or (4) theoretical sell price is less than the intrinsic value of the option. The intrinsic value may be defined as the difference between the strike price and the market price of the underlying security for puts, and the difference between the market price of the underlying security and the strike price for calls, where the minimum intrinsic value is zero. The trader may be able to override some or all of the checks performed by safety check logic **460** to increase speed of automated trading.

If the safety checks are passed (or overridden), order logic **470** creates an order and submits the order to the exchange site **100** via an output interface **480**. The trading station **230** is notified through a trading station interface whether or not the safety checks are passed. The output interface **480** may pass the order to exchange interface software for ultimate transmission to the exchange site **100**. The receiver interface **410** and the output interface **480** may be formed by common equipment and/or data ports.

FIG. **4** illustrates an example of theoretical price look-up table **435** for call options with an expiration date of Sep. 20, 1999; an annualized volatility of 32.0%; expected dividend to be paid on the underlying security on Aug. 19, 1999, for an amount of $10.0; risk free interest rate of 3.0%; American style option; and today's date being Jun. 3, 1999. When created, the look-up table **435** may be centered about the current price of the underlying security. Each row of the look-up table **435** provides theoretical prices for a given strike price. As illustrated, the look-up table **435** includes twenty (20) rows having strike values ranging from 50.0 to 97.5, in increments of 2.5. The strike values correspond to individual options available for trading as determined by the exchange. The trader may limit the set of options to those he/she actually trades, and consequently can enable them for automatic trading, individually or in predefined groups. The columns of the look-up table **435** provide theoretical prices for a given price of the underlying security. The range of underlying security price provided in the table and the incremental price between adjacent entries (tick size) can be selected by the trader. For example, the look-up table **435** shown in FIG. **4** has twenty-nine (29) price entries ranging from 75.0 to 77.8 with tick size is 0.1 and with the underlying price centered at 76.4. A smaller tick size and a larger range will, of course, result in a larger look-up table. Under the assumptions of FIG. **4**, a September 1999 call, with a strike price of 72.5 and an underlying price of 77.2 (using a definition of underlying price determined by the trader), has a theoretical price of 7.30.

Several alternatives are available for updating the look-up table **435** to avoid the underlying price from exceeding the boundaries of the table. For example, the automated trading system may notify the trader station **230**, which may then in turn supply an updated look-up table **435** centered about a new underlying price. The trader station **230** may be called upon to calculate the additional entries needed to complete the updated look-up table **435** or simply recall them from memory. For example, the look-up table **435** table may be updated dynamically from the trader station **230** when the underlying price moves from the center price by a predetermined margin. This methodology serves to increase the processing power that the backend computer **225** can apply to automated decision making.

The look-up table **435** can be checked periodically to ensure the accuracy of its content. For example, checks may be performed every, say, 15 seconds. This can be done, for

16

example, by performing a checksum operation in which the entries in the look-up table are summed and the sum is compared with the sum of a corresponding look-up table maintained by a trader station **230**. If the sums match, the look-up table **435** may be presumed to be accurate. If the sums do not match, a warning is generated and automated trading is stopped completely or paused until look-up table **435** is reloaded or updated and accuracy can be ensured. Of course, other or additional techniques for testing the accuracy of look-up table **435** may be implemented. Moreover, such an accuracy check may be omitted if one is sufficiently confident in the reliability of the software and hardware.

Knowledge of how the search protocol locates data within the look-up tables may be used to structure the look-up tables to ensure that selected options will be located particularly quickly. The selected options may be, for example, frequently traded options and/or options whose price will become attractive with a small change in the underlying security price. For example, the look-up protocol may conduct searches by starting at the first row of the table and then stepping through each successive row until a particular row is identified. In this case, the look-up table may be structured so that a select option is placed in the first row. Consequently, the search protocol will locate the select option first. Statistics may be maintained, for example, at a trader station **230**, and used to restructure the look-up table as trading conditions change.

The embodiment described in connection with FIG. **3** compares the current market price of an option to theoretical buy and sell prices from a theoretical option price look-up table **435** to make a buy/sell decision. However, other values may be compared consistent with the present invention to generate buy/sell decisions. For example, the theoretical option value may be subtracted from the market bid (ask) price and compared to a sell (buy) spread selected by the trader to generate buy/sell decisions. Alternatively, the market option bid (ask) price and the price of the underlying security may be used to index an implied volatility value, for example, with that indexed implied volatility value compared to a trader-generated volatility value to make buy/sell decisions. Of course, other values may also be indexed and used for comparison to generate buy/sell decisions consistent with the present invention.

FIG. **5** illustrates an embodiment of a trader screen **500** displayed on a trader station **230** in connection with trading options on a particular security or commodity. The trading screen **500** may provide a graphic user interface to enable the trader to set parameters associated with automated trading. Trading screen **500** is organized as an array of cells **510**. The rows **512** of the array represent different options available in the market for the particular security or commodity. The columns **514** of the array provide information concerning the options. More particularly, the columns to the left of the "Strike" column provide information on call options and the columns to the right of the "Mon" column provide information on put options. Call and put options are, thus, displayed as mirror images of each other.

Each row of the array represents information relating to a different pair of call and put options for a particular strike price, month and year. The first column from left to right is labeled "DCX," which identifies the underlying security for the options as Daimler-Chrysler stock. The values below the "DCX" label consecutively number the rows of the array. The trading screen may be scrolled up or down to view additional rows in the array, if any exist. The next fourteen columns contain information relating to call options. The second column, "POS," is to the right of the "DCX" column.

US 7,251,629 B1

17

18

The values below the column heading POS indicate the trader's position (i.e., how many of the options the trader possesses) in call options for each row of the array. A negative cell value in the "POS" column indicates that the trader has sold more of the option than she has bought (this is called a short position. Positive values denote a long position). Cells in the "B" column (three columns to the right of the "POS" column) indicate whether automated buying is enabled for the particular options corresponding to those cells. Cells in the "S" column (three columns to the right of the "B" column) indicate whether automated selling is enabled for the particular options corresponding to those cells. The trader may select one or more sells in the "B" and "S" columns to enable or disable automated buying and selling, respectively, of options corresponding to the selected cells.

The "TBid" and "TAsk" columns indicate the theoretical buy and sell prices for automated trading. The "Theo" column represents the theoretical value assigned to the call option for each row. To the right of the "Mon" column, the screen provides "TBid," "TAsk," "Theo," and "POS" columns, among others, for the put options in each row of the array. Additional detail concerning the remaining columns of the trader screen **500**, as well as other information concerning its functionality, can be found in U.S. application Ser. No. 09/273,362 to Marynowski et al., filed Mar. 22, 1999, and expressly incorporated herein by reference.

The "POS" columns provide information received from the exchange site and are not adjustable by the trader. The "TBid," "TAsk," and "Theo" columns may be adjusted by the trader using a mouse, keyboard, or other input device, such as a game pad. For example, the trader may select a particular "TBid" or "TAsk" cell by clicking once and then using up or down arrows, for instance, to increase (arrow up) or decrease (arrow down) the value. Mathematically, this may be achieved by increasing or decreasing the bid spread value (BSprd) or the ask spread value (ASprd). This may not effect the "Theo" value since BSprd and ASprd are not inputs into the "Theo" calculation. A particular "Theo" cell may be adjusted in the same manner as a "TBid" or "TAsk" cell. Mathematically, adjustments to a Theo cell may be achieved by increasing or decreasing the assumed volatility of that particular option. Since "TBid" and "TAsk" of a particular option are related to the "Theo" value, changes to the "Theo" obviously will change "TBid" and "TAsk." The "TBid", "TAsk", and "Theo" values may also adjustable in groups, for example, by selecting multiple cells or all cells in the column by selecting the column header. The trader station **230** may update the displayed values of Theo, TBid and TAsk values as the underlying security price change, or any variable contributing to Theo, TBid, or TAsk change (such as theoretical variables (2)-(7) discussed above). For example, the trader station **230** may receive a market feed providing price information concerning the underlying security. The price information may be used to update or refresh the trading screen **500**. This may include the displayed TBid, TAsk, and Theo values for a given underlying price. Additionally, market information received by **230** may trigger an update of the theoretical price look-up table **435** maintained at the backend computer **225**. For example, if the underlying price has moved sufficiently far enough from the value of the underlying security used the last time table **435** was created and/or last modified, trading station **230** may update theoretical look-up table **435** using the most current underlying price as a new center point. The updates of the theoretical price look-up table **435** maintained at the backend **225** might be accomplished several different ways. For example, the

trader station **230** may perform calculations and supply the calculated information to the backend computer **225** for updating the theoretical price look-up table **435**. As an alternative, the trader station **230** may supply data to the backend computer **225**, which is used to calculate updates of the theoretical price look-up table **435**. Of course, updates of look-up table **435** may not be necessary if the new information (e.g., price information of the underlying security) corresponds to a value: (1) already in the theoretical price look-up table **435**, and/or (2) within predetermined margins around the previous center value of the look-up table **435**.

FIG. **6** provides an exemplary progression of steps from transmission of the current market information from the exchange site **100** to receipt of trade confirmation by the trader site **200** and the delay experienced at each step. Link **1** represents the line delay experienced by current trading information as it is transmitted from the exchange site **100** to the trader site **200**. Locating the automated trading system close to the exchange site **100** reduces the line delay of Link **1** (as well as that of Link **15**). Thus, by reducing the delay associated with making automated trading decisions as well as the associated line delay, the overall speed in submitting orders to the exchange site **100** is increased. Moreover, the trader station **230** that monitors and controls the backend computer **225** that implements the automated trading need not be located close to the exchange site **100**, but may monitor and control the backend computer **225** remotely.

Link **2** represents delays associated with operating system (networking subsystem) related to receiving data packets from the exchange site **100**. One technique for reducing this delay is to choose a platform, such as VMS or Linux, that has a good quality implementation of networking services used in automated trading.

Link **3** represents delays associated with decompressing information received from the exchange site **100**. Link **4** represents other processing delays that may be inherent in exchange interface software provided by the exchange for use at the trader site **200**. The exchange interface software allows the trader's equipment to interface with the exchange equipment. The exchange may impose obligations requiring traders to use the exchange interface software in trading. The exchange interface software, for example, may process the received market data and supply the data to an interface of an automated trading application installed by the trader. For instance, the market data may be input to internal tables and/or may be converted to actual values. Links **5** and **6** represent delays associated with the distribution of information from the exchange interface software to an interface of the trading system application. The exchange site **100** typically broadcasts information concerning all traded items. Each trading application usually subscribes to several sources of data (e.g. market data and trade confirmations for several products). In some cases, the exchange interface software will receive and decode all information received from the exchange site **100**, but only pass some of the information to the interface of the automated trading system. The exchange interface software spends some time in determining whether a particular piece of market information should be passed to the automated trading system. The exchange interface software and the trading system interface software communicate via a protocol. For example, the exchange interface software may notify the automated trading system via a callback function supplied by the latter, or by some other operating-system dependent mechanism (e.g., mailboxes on VMS). This delay can be reduced by choosing a platform that efficiently supports the protocol chosen.

US 7,251,629 B1

19

After receiving the current market information, the automated trading system decodes the information and, using a look-up protocol, searches a table of traded products, resulting in a delay indicated by link **7**. A hash table with an efficient hash key or a search tree may be used to reduce the delay associated with the processing associated with link **7**. The particular look-up protocol should be fine-tuned to the platform used for the automated trading system as performance may vary with the platform to the extent that a linear search may prove better than a hash table even for a surprisingly large number of products (over **100**). The look-up time for hash tables is almost constant. For binary trees, the look-up time is proportional to the logarithm of N (in O(log N)), where N is the number of products traded. A linear search has a look-up time that is proportional to N (in O(N)). Of course, the actual times encountered in practice matter, so the look-up protocol should be tailored to the platform used

Link **8** represents the delay attributable to decision-making and safety checks. As noted above, decisions are made based on a numeric comparison between the current market price and the corresponding theoretical price. Safety checks account for most of the delay experienced in link **8**. Safety checks may include, for example: (1) price and quantity reasonability checks, and (2) trade attempt frequency limitations.

Links **9-15** corresponds to the delay associated with composing an order and submitting the order to the exchange. In particular, link **9** reflects the time spent composing the order, which may require a format defined by the exchange. Link **10** corresponds to the time required for the automated trading system output interface to communicate the order to the exchange interface software. This may be done, for example, using a synchronous function call or an asynchronous call. In some embodiments, the tasks associated with links **9** and **10** may be performed at the same time. Links **11** and **12** correspond to the time expended while the exchange interface software receives the order, decides which module should be used to submit the order, interprets the order request, and performs a series of validations. If the order passes these tests, it is converted into the exchange format and passed to the exchange, as indicated by links **13-15**.

As noted above, the delays attributable to links **1** and **15** may be reduced by locating the automated trading system close to the exchange site **100**. In addition, if routers and LANs are used at the trader site **200**, the selection of high-speed equipment may reduce delays and/or priority schemes. The delay experienced in links **2-14** may be reduced, of course, by using a faster computer. However, the efficiency of the software and algorithms is also an important factor in reducing delay. Further, in some situations, it is possible to integrate the automated trading system software with the software that interfaces with the exchange site **100**, which leads to reduced delay. In such a case, the automated trading system receiver and output interfaces may be the same as the exchange receiver and output interfaces.

In accordance with the present invention, assuming a change in the bid or ask price, links **6** and **7** may be completed within 80 microseconds, and commonly may be completed within 60 microseconds, and as fast or faster than 31 microseconds. The time from link **6** to the completion of the decision-making by the decision logic may be less than 155 microseconds, less than 120 microseconds, and even less than 80 microseconds. Links **6-8** may be completed within 690 microseconds, may be completed within 370 microseconds, and performed as fast as 260 microseconds or

20

less. Links **6-9** may be completed within 930 microseconds, commonly be completed within 585 microseconds, and as fast or faster than 301 microseconds. Assuming now a change in the price of the underlying security, the time from receipt of the new price information by the automated trading system to submission of an order may be may be the same as or about 20-25 microseconds more than the totals provided in connection with links **6-9** above, depending on the number of options or other items in the data structure (e.g., table) and their respective order. The times required for links **2-5** and **10-14** are generally determined by exchange software and, accordingly, may change from exchange to exchange.

Link **16** reflects the processing of the order at the exchange site **100**. Following the exchange site **100** processing, a confirmation of the trade is returned to the trader if the trader's order is matched. Not all orders result in a match. There is no sharing of lucrative trades with other traders who may have submitted similar matching orders that are received by the exchange even some microseconds later.

The embodiment illustrated in FIG. **6** corresponds to an arrangement in which the interface software provided by the exchange and the automated trading system are resident on the backend computer **225**. In arrangements in which the interface software and the automated trading system are resident on separate backend computers, the vertical dashed line **610** indicates the interface between the separate computers. The separate backend computers may be connected via network interface cards or a common hub. Additional delays may be experienced in the transmission and reception of between the backend computers as well as from LAN throughput and latency.

FIG. **7** provides a schematic of an embodiment of an electronic trading exchange system network **70** coupled to multiple trading sites. The electronic trading exchange system network **70** is similar to that shown as **10** in FIG. **1** and, for the sake of brevity, duplicative description will be omitted.

As shown in FIG. **7**, exchange site **700** is coupled to trader site **200** by communication links **300**. In one embodiment, the exchange site **700** may be designed as a local area network (LAN) and include, for example, one or more security routers and one or more back office computers, among other equipment. For purposes of illustration only, a single security router **710** and three back office computers **730-1**, **730-2**, **730-3** (referred to collectively as back office computers **730**) are shown in FIG. **7**. Security router **710** controls communications between the back office computers **730** and the communications link **300**. Security router **710** transmits and receives communications over the communications link **300**, as well as restricts communications from unauthorized sources. More particularly, the security router **710** may be used to isolate the equipment at the exchange site **700** from intrusion and facilitate communication with the back office computers **730**. The back office computers **730** manage the trading of the various securities, currencies, commodities and/or other items traded on the exchange. In this regard, back office computers **730** may function similarly to the back office computers **130** of exchange site **100**.

For purposes of illustration only, trading site **200** additionally includes a security router **213** and a backend computer **223** coupled to hub **240**. The security router **213** and backend computer **223** may be located remotely from other equipment of the trader site **200**. Security router **213** transfers trading information between the trading site **200** and the exchange site **700**. As above, the security router **213** screens

US 7,251,629 B1

21

communications from unauthorized sources. Backend computer **223** may be configured as a communication server for the trader stations **230**. Hub **240** handles communications between backend computer **223** and trader stations **230**.

In the embodiment shown in FIG. **7**, trader site **200** is connected to a first exchange site **100** and a second exchange site **700**. Of course, other network arrangements may be used in connection with the present invention. Through the first exchange site **100**, the trader site **200** may receive market information and trade securities, such as options, futures, and other derivatives; currencies, stocks, bonds, and other physicals like corn, metals, electricity, etc., and/or other items. Through the second exchange site **700**, the trader site **200** may receive market information and/or trade securities (e.g., options, futures, and other derivatives; currencies, stocks, bonds, and other physicals like corn, metals, electricity, etc.,) and/or other items. Traders site **200** receives market information and trades securities or other items related to the securities or other items traded through the first exchange site **100**.

The trader site **200** may be equipped with an automatic hedging capability that automatically buys or sells securities (e.g., futures, options, swaps or other derivatives; currencies, stocks, bonds, or other physicals like corn, precious metals, electricity, etc.) and/or other items traded on the exchange to hedge at least some of the risk (for example, delta risk) associated with an automated trade for other securities or items. For example, trader site **200** may trade options for a particular stock through exchange site **100** and the particular stock through exchange site **700**. In general, two types of orders may be submitted to an exchange to buy (sell) a security. A market order instructs the exchange to buy (sell) a specified quantity of the security at the going market price. A limit order instructs the exchange to buy (sell) up to a specific quantity of the security if the market price is equal or better than a specified value. A trader usually can be assured that a market order will be filled by the exchange, but cannot be certain of the price at which the order is filled. The actual price that the market order is filled depends on available price and depth of market. While the trader placing a limit order can be assured of a price, all or a portion of the limit order may never be filled if the market price never meets the limit order conditions.

The principles of a market order and a limit order are illustrated by the following examples.

| Market Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| Best Available Market Prices | 1000 shares | $110/share | 400 shares | Yes |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | No |

The above table assumes a market with current bids of $110/share for 400 shares, $100/share for 600 shares and $80/share for 2000 shares, as indicated above. A market order to sell 1000 shares will be executed by the exchange at an average price of $104/share. In other words, the 1000 share market order will be matched with 400 shares at $110/share and 600 shares at $100/share, for a net of 1000 shares at an average price of $104/share.

If the bid of $110/share for 400 shares is sold just before the market order is received, the following market is presented.

22

| Market Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| Best Available Market Prices | 1000 shares | | | Not Available |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | Yes |

Because 400 shares at $110/share is no longer available, the exchange will match the market order using 600 shares of the $100/share bid and 400 shares of the $80/share bid, resulting in an average price of $92/share.

We next consider a similar scenario using limit orders instead of market orders.

| Limit Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| $100/share | 1000 shares | | | Not Available |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | No |

Now assume that a limit order to sell 1000 shares at $100/share is submitted instead of the market order and the $110/share bid has already been matched. The exchange will match 600 shares of the limit order at $100/share and will not match the remaining 400 shares because the $80/share bid is too low. Accordingly, the remaining 400 shares of the limit order will stay in the exchange's book until a new matching order to buy at $100/share or higher is received by the exchange, which may never occur, or until it is cancelled.

As discussed above, order submission in the automated trading system depends, for example, on the price of the underlying security, which is liable to change frequently. Thus, if the automated trading system makes an option trade, the trader may wish to hedge the risk associated with underlying price movement. This risk, commonly called delta risk, may be quantified using mathematical models. These models may be similar to, or the same as, the models used for determining theoretical option prices using input variables (1)-(7) discussed above. The option lot size (shares per option contract) and number of option contracts traded are typically factored into the hedging decision. The option lot size is typically defined by the options exchange when the contract is created and changed only under special circumstances, such as capital adjustments. The number of options that the trader has bought or sold is included in the confirmation notice transmitted from the options exchange. Accordingly, assuming a total delta hedge is desired, a trader may determine the number of shares of the underlying security to be bought or sold after each option trade based on: (1) mathematical models, including price of the underlying security, (2) options per contract and (3) number of options traded.

As noted above, the price of the underlying security may be defined in several different ways. A typical hedging response of an option trade will be to buy or sell the underlying security. Specifically, buying (selling) calls and selling (buying) puts will usually lead to selling (buying) the underlying for delta hedging. Since the trader will need to sell (buy) the underlying to hedge the delta risk, he may be

US 7,251,629 B1

23

most interested in the bid (ask) price of the underlying security. While delta risk is referred to specifically, it should be understood that the automated hedging feature might be used to hedge other known risks. For example, automated hedging may be used to hedge the vega risk, the risk of a position or trade due to price changes of the options arising from changes of an option's volatility.

From a trading perspective, the trader must define how and to what extent to delta hedge. Obviously, a trader must first decide whether he wants to delta hedge manually, or automatically. In either case, he must consider two opposing dynamics: (1) speed of executing the underlying security orders, and (2) execution price of the underlying security orders. Typically, a trader may choose to hedge using market orders if she is most concerned about speed of execution, or limit orders if she is most concerned about the price at which the underlying orders are executed. As described above, entering a market order will (nearly) always result in the desired quantity being executed, but at potentially unfavorable or unexpected prices. Conversely, entering a limit order will always result in executed prices which meet certain criteria (i.e., greater than or equal to limit price if selling, and less than or equal to the limit price if buying), but only some or none of the desired quantity may actually be executed.

The trader may assess several qualitative factors in deciding whether to automatically hedge and, if so, whether to use market orders or limit orders. Some of the qualitative factors include the quantity of delta hedge underlying trade relative to the depth of the entire underlying market, volatility of the underlying market, the size of the underlying bid-ask price spread relative to the price of the underlying, and the amount of mental attention the trader can give toward the delta hedge trade. Different traders trading options on different underlying securities may opt for different hedging methods. Thus, in one embodiment of the automatic option trading system of the present invention, the trader may choose manual hedging, automatic hedging using market orders, or automatic hedging using limit orders.

The automatic hedging software may be resident on one or more of the trader stations **230**, a backend computer **220**, **223**, **225**, or other equipment of the trader site **200**. One embodiment of the automated hedging system will be described in connection with FIG. 7. Backend computer **220** receives option trade confirmations from exchange site **1100** based on an order submitted automatically by backend computer **225**. Alternatively, or in addition, backend computer **225** may receive option trade confirmations from the exchange site **100**. Further, the option trade confirmations may correspond to orders submitted either automatically or manually by a trader. Backend computer **220** routes the trade confirmation to a trader station **230** that is associated with the automatic option trade made by the backend computer **225**.

If a manual hedge feature has been selected, trader station **230** displays the appropriate hedge action based on factors previously entered by the trader. For example, the trader may see a message such as "buy 4500 shares" of the underlying security. If automatic hedging using the market order has been selected, trader station **230** automatically submits a market order, for example to buy 4500 shares at the market prices, to exchange site **700** via backend computer **223**. At the exchange site **700**, the market order will (nearly) always be immediately filled by buying 4500 shares, albeit at a potentially unexpected or undesirable average price for those shares.

If automatic hedging using a limit order has been selected, trader station **230** automatically submits an order, for

24

example to buy 4500 shares at a price of 68.05, to exchange site **700** via backend computer **223**. The specific limit price submitted depends on the current underlying market and trader definable (a priori) as, perhaps, either: (1) current ask price, since she is buying, (2) average of current bid and ask price, or (3) last traded price. Depending on the market conditions, exchange site **700** may not be able to match the limit order immediately, if ever. Exchanges typically enable the trader to modify or delete partially matched or completely unmatched limit orders. In some cases, the exchange site through which the underlying security is traded may depend on the option traded. For example, both futures of an equity index (e.g. Standard and Poor's **500**) and options on the same equity index may be traded through exchange site **100**. A stock may be traded through exchange site **700**, but options for the stock may be traded through exchange site **100**. In such a case, the system configurations at either the trader station **230** performing hedging or other equipment at trader site **200** must ensure that hedge orders are routed to the appropriate exchange.

While the above-embodiments have been described in terms of look-up arrays or tables, it should be understood that data may include or be maintained in other organizational memory constructs consistent with the present invention, for example, linked lists, trees, heaps, hash lists, or some combination, or any other data structure or combinations of data structures useful in implementing a search algorithm. In addition, the trader site **200** is described as submitting orders to the exchange site **100** using the automated trading system. However, the trader site **200** may submit its "order" in the form of a quote to the exchange site, where the bid (ask) price of the quote corresponds to the theoretical buy (sell) price if, say, the trader wanted to buy (sell) the item.

It will be apparent to those skilled in the art that various modifications and variations can be made without departing from the scope or spirit of the invention. For example, the present invention may be applied in areas other than electronic securities, for example, the purchase and/or sale of goods or services, contests, auctions, and other applications in which fast, accurate responses are desirable. Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with a true scope and spirit of the invention being indicated by the following claim.

What is claimed is:

**1**. An automated trading system for use in an electronic exchange system network, comprising:

a receiver interface that receives market price information for a first traded item from an exchange;

data reference logic that outputs a transaction value for the first traded item from a data structure based on price information for a second traded item related to the first traded item;

decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit an order for the first traded item; and

an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to said decision logic.

**2**. The automated trading system according to claim **1**, wherein data reference logic receives current price informa-

25

tion for the second traded item and uses the current price information to output the transaction value.

**3**. The automated trading system according to claim **2**, wherein said data reference logic comprises:

memory storing the data structure, wherein the data structure maps pre-calculated transaction values of the first traded item over a range of price values of the second traded item; and

reference logic for identifying one of the pre-calculated transaction values based at least in part on a current price value for the second traded item.

**4**. The automated trading system according to claim **3**, wherein the data structure is a two-dimensional data structure mapping pre-calculated transaction values of the first traded item over a range of prices of the second traded item.

**5**. The automated trading system according to claim **3**, wherein the data structure is an n-dimensional data structure, where n is 3 or more.

**6**. The automated trading system according to claim **3**, wherein the data structure is a look-up table.

**7**. The automated trading system according to claim **3**, wherein the data structure comprises a linked list.

**8**. The automated trading system according to claim **3**, wherein the data structure comprises a tree structure.

**9**. The automated trading system according to claim **1**, said decision logic compares at least a portion of the received market price information to the transaction value when automated trading in the first item first becomes enabled.

**10**. The automated trading system according to claim **1**, further comprising safety check logic, responsive to said decision logic, to prevent transmission of a request for market transaction for the first traded item to the exchange if the request does not meet a predetermined criterion.

**11**. The automated trading system according to claim **10**, where the predetermined criterion is maximum trade quantity for the first traded item.

**12**. The automated trading system according to claim **10**, wherein said predetermined criterion is a maximum number of market transaction attempts within a predetermined period of time and said decision logic compares at least a portion of the received market price information to the transaction value when the maximum number of attempts is increased.

**13**. The automated trading system according to claim **1**, where the receiver interface receives the market price information for the first traded item indirectly from the exchange via an exchange interface.

**14**. The automated trading system according to claim **1**, wherein the decision logic compares the transactional value to at least a portion of the received market price information.

**15**. The automated trading system according to claim **14**, wherein the transaction value is a minimum sell price for the first traded item, and the market price information includes a market bid price for the first traded item.

**16**. The automated trading system according to claim **14**, wherein the transaction value is a maximum buy price for the first traded item, and the market price information includes a market ask price for the first traded item.

**17**. The automated trading system according to claim **14**, wherein the transactional value is a theoretical value of the first traded item based on a mathematical model.

**18**. The automated trading system according to claim **14**, wherein the price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the current market price for the second traded item changes.

26

**19**. The automated trading system according to claim **14**, wherein said price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the price information for the first traded item changes.

**20**. The automated trading system according to claim **1**, wherein a backend computer includes said receiver interface, said data reference logic, said decision logic, and said output interface and said first backend computer operates using a Windows-based operating system.

**21**. The automated trading system according to claim **1**, wherein a backend computer includes said receiver interface, said data reference logic, said decision logic, and said output interface and said first backend computer operates using a text-based operating system.

**22**. The automated trading system according to claim **21**, further comprising a trader station separate from said backend computer, said trader station coupled to said backend computer through a communication link, said trader station including a graphic user interface to enable a trader to monitor the operation of said backend computer.

**23**. The automated trading system according to claim **22**, wherein said trader station transmits updated data reference information for updating said data reference logic to said backend computer over the communication link.

**24**. The automated trading system according to claim **23**, wherein said decision logic compares at least a portion of the received market price information to the transaction value when the data reference information is updated.

**25**. The automated trading system according to claim **23**, wherein said trader station calculates the updated data reference information and the backend computer stores the calculated updated data reference information.

**26**. The automated trading system according to claim **22**, wherein said backend computer is located substantially closer than said trader station to the exchange that transmits the market price information for the first traded item.

**27**. An automated trading method for use in an electronic exchange system network, comprising:

using equipment to perform trading of a first traded item or a second traded item related to the first traded item, including:

receiving market price information for the first traded item;

identifying a desired price for the first traded item in a look-up table based on price information for the second traded item;

comparing the received market price information for the first traded item to the desired price for the first traded item; and

generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price.

**28**. The automated trading method according to claim **27**, wherein said first traded item corresponds to an option and the second traded item corresponds to a security underlying the option.

**29**. The automated trading method according to claim **27**, wherein said step of identifying a desired price, comprises:

(a) receiving current market price information for said second traded item;

(b) using said current market price information for said second traded item to index a desired price for said first traded item in said look-up table.

**30**. The automated trading method according to claim **27**, wherein said look-up table comprises a two-dimensional

US 7,251,629 B1

27

table providing desired price values indexed by item traded and price of the second traded item.

**31**. The automated trading method according to claim **27**, wherein said look-up table comprises an n-dimensional table, where n is 3 or more.

**32**. An automated method of trading in an exchange system network, comprising:

using equipment to perform trading of an option including:

receiving a current market price for the option from an exchange;

comparing the current market price for the option with a desired price for the option, said desired price derived from current price information for an underlying security for the option; and

submitting an order for the option to the exchange within 1 millisecond of the step of receiving the current market price.

**33**. The automated trading method according to claim **32**, wherein said step of submitting an order is performed within 600 microseconds of the step of receiving the current market price.

**34**. The automated trading method according to claim **33**, wherein said step of submitting an order is performed within 380 microseconds of the step of receiving the current market price.

**35**. The automated trading method according to claim **34**, wherein said step of submitting an order is performed within 250 microseconds of the step of receiving the current market price.

**36**. An automated trading method for use in an exchange system network, comprising:

using equipment in a network architecture to perform trading of a first traded item including:

receiving market information for the first traded item;

identifying a transaction value for the first traded item in a look-up table of transaction values for the first traded item, wherein the identifying is responsive to receiving the market information for the first traded item and wherein the transaction values in the look-up table are based on price information for a second traded item related to the first traded item; and

using at least the identified transaction value in determining whether to submit an order for the first traded item.

**37**. The automated trading method according to claim **36**, wherein the identified transaction value is a volatility value corresponding to the first traded item.

28

**38**. The automated trading method according to claim **36**, wherein the identified transaction value is a maximum buy value for the first traded item.

**39**. The automated trading method according to claim **36**, wherein the identified transaction value is a minimum sell value for the first traded item.

**40**. The automated trading method according to claim **36**, wherein the identified transaction value is a theoretical value for the first traded item generated based on a mathematical model.

**41**. The automated trading method according to claim **36**, wherein the look-up table comprises a linked list.

**42**. The automated trading method according to claim **36**, wherein a backend computer performs the receiving, identifying, and using steps on a Windows-based operating system.

**43**. The automated trading method according to claim **36**, wherein a backend computer performs the receiving, identifying, and using steps on a text-based platform.

**44**. The automated trading method according to claim **36**, wherein:

(a) a backend computer performs the receiving, identifying, and using steps,

(b) a trader station separate from said backend computer calculates transaction values for storage in the look-up table and transmits the calculated transaction values to the backend computer, and

(c) the backend computer stores the calculated transaction values in the look-up table.

**45**. The automated trading method according to claim **44**, further comprising the steps of checking values stored in the look-up table of the backend computer with values stored in a look-up table in said trader station to confirm the accuracy of the look-up table stored in the backend computer.

**46**. The automated trading method according to claim **36**, further comprising the steps of:

(a) submitting an order for the first traded item;

(b) receiving confirmation of a transaction from an exchange responsive to the order submitted; and

(c) submitting an order for the second traded item to hedge a delta risk associated with the confirmed transaction.

* * * * *

# EXHIBIT 2

US007177833B1

(12) **United States Patent**
Marynowski et al.

(10) **Patent No.:**    **US 7,177,833 B1**
(45) **Date of Patent:**    **Feb. 13, 2007**

(54) **AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE**

(75) Inventors: **John M. Marynowski**, Buffalo, NY (US); **Catalin D. Voinescu**, London (GB); **Stefan Puscasu**, Bucuresti (RO); **Thomas M. O'Donnell**, Woodstock, IL (US)

(73) Assignee: **Edge Capture, LLC**, Woodstock, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1336 days.

(21) Appl. No.: **09/618,222**

(22) Filed: **Jul. 18, 2000**

(51) **Int. Cl.**
   *G06F 17/60*    (2006.01)
(52) **U.S. Cl.** ........................... **705/38**; 705/35; 705/36; 705/37
(58) **Field of Classification Search** ................. 705/37, 705/38, 35, 36
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,046,381 A | 7/1936 | Hicks et al. | 177/353 |
| 3,082,402 A | 3/1963 | Scantlin | 340/152 |
| 3,296,597 A | 1/1967 | Scantlin et al. | 340/172.5 |
| 3,573,747 A | 4/1971 | Adams et al. | 340/172.5 |
| 3,581,072 A | 5/1971 | Nymeyer et al. | 235/152 |
| 4,412,287 A | 10/1983 | Braddock, III et al. | 364/408 |
| 4,674,044 A | 6/1987 | Kalmus et al. | 364/408 |
| 4,903,201 A | 2/1990 | Wagner | 705/37 |
| 5,038,284 A | 8/1991 | Kramer | 705/37 |
| 5,063,507 A | 11/1991 | Lindsey et al. | 364/408 |
| 5,077,665 A | 12/1991 | Silverman et al. | 364/408 |
| 5,101,353 A | 3/1992 | Lupien et al. | 364/408 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0573991 A1    6/1993

(Continued)

OTHER PUBLICATIONS

Barone-Asesi, G. and Whaley. R., "Efficient Analytic Approximation of American Option Values", Journal of Finance, vol. 42, No. 2 (Jun. 1987), pp. 301-320.

(Continued)

*Primary Examiner*—Vincent Millin
*Assistant Examiner*—Daniel Felten
(74) *Attorney, Agent, or Firm*—Morgan Lewis & Bockius LLP

(57)    **ABSTRACT**

An electronic exchange system network includes a trader site having an automated trading system capable of submitting orders and/or quotes to an exchange site. The automated trading system determines whether an order or quote should be submitted based on, for example, the current market price of an option and theoretical buy and sell prices. The theoretical buy and sell prices are derived from, among other things, the current market price of the security underlying the option. The theoretical buy and sell prices are calculated when underlying factors that contribute to the theoretical prices change. Computation times of the theoretical prices may be reduced by using precalculated values and/or using interpolation and extrapolation. Other techniques may be used in addition or in the alternative to speed automatic decision-making. In addition, a system of checks may be conducted to ensure accurate and safe automated trading. The automated trading system may be capable of automatically submitting orders in connection with the underlying security in order to hedge part of the delta risk associated with the automated option trades.

**39 Claims, 6 Drawing Sheets**



**US 7,177,833 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,161,103 A | | 11/1992 | Kosaka et al. | 364/408 |
| 5,258,908 A | | 11/1993 | Hartheimer et al. | 364/408 |
| 5,267,148 A | | 11/1993 | Kosaka et al. | 364/408 |
| 5,270,922 A | | 12/1993 | Higgins | 364/408 |
| 5,297,032 A | | 3/1994 | Trojan et al. | 364/408 |
| 5,313,560 A | | 5/1994 | Maruoka et al. | 395/54 |
| 5,315,634 A | | 5/1994 | Tanaka et al. | 379/93.02 |
| 5,375,055 A | | 12/1994 | Togher et al. | 364/408 |
| 5,497,317 A | | 3/1996 | Hawkins et al. | 364/408 |
| 5,500,793 A | | 3/1996 | Deming, Jr. et al. | 364/401 |
| 5,809,483 A | | 9/1998 | Broka et al. | 705/37 |
| 5,845,266 A | | 12/1998 | Lupien et al. | 705/37 |
| 5,857,176 A | | 1/1999 | Ginsberg | 705/36 |
| 5,870,730 A | | 2/1999 | Furuya et al. | 706/47 |
| 5,873,071 A | | 2/1999 | Ferstenberg et al. | 705/37 |
| 5,884,286 A | | 3/1999 | Daughtery, III | 705/36 R |
| 5,905,974 A | | 5/1999 | Fraser et al. | 705/37 |
| 5,963,923 A | * | 10/1999 | Garber | 705/37 |
| 6,016,483 A | * | 1/2000 | Rickard | 705/37 |
| 6,058,391 A | | 5/2000 | Gardner | 707/4 |
| 6,061,662 A | | 5/2000 | Makivic | 705/36 R |
| 6,173,270 B1 | | 1/2001 | Cristofich et al. | 705/37 |
| 6,236,980 B1 | | 5/2001 | Reese | |
| 6,263,321 B1 | | 7/2001 | Daughtery, III | 705/36 R |
| 6,304,858 B1 | | 10/2001 | Mosler et al. | 705/37 |
| 6,317,728 B1 | | 11/2001 | Kane | 705/36 R |
| 6,415,269 B1 | | 7/2002 | Dinwoodie | 705/37 |
| 6,546,375 B1 | | 4/2003 | Pang et al. | 705/37 |
| 6,594,643 B1 | | 7/2003 | Freeny, Jr. | 705/36 R |
| 6,839,686 B1 | | 1/2005 | Galant | 705/36 R |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 90 10910 | 9/1990 |
| WO | WO 97 37735 | 10/1997 |

### OTHER PUBLICATIONS

Web-Pop (Professional Options Package) (www.pmpublishing.com).

* cited by examiner

FIGURE 1

FIGURE 2

# FIGURE 3



**FIGURE 4**

**FIGURE 5**





US 7,177,833 B1

**1**

## AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to an automated trading system for use in an electronic trading exchange network system and, more particularly, a trading system that rapidly, accurately, and safely responds to desirable trading opportunities.

#### 2. Description of the Related Art

Trading exchanges historically provided a location for buyers and sellers to meet to trade stocks, bonds, currencies, commodities, and other items. The New York Stock Exchange and the Chicago Mercantile Exchange are examples of such trading exchanges. Recent advances in computer and communications technology have led to electronic trading exchange system networks. Electronic trading exchange system networks use communications networks and computers to replicate traditional face-to-face exchange functions. For example, centralized exchange computers disseminate market information, maintain records and statistics, settle cash payments, determine risk based margin requirements, and match trades. Matching of trades is typically done on a first come-first served basis, whereby time of order entry is an important criterion for determining priority in fulfillment of a transaction.

A communications network connects the exchange computers to numerous trader sites. Each trader site includes one or more trader stations operated by traders. Exchange network operators typically provide traders with interface software and, in some cases, hardware to enable traders to view prices and other information relating to products and to execute transactions by submitting orders and quotes. Orders are requests to buy or sell a specified amount of a particular item at a specified price. As an example, a trader may place an order to buy 100 shares of IBM stock for a bid price of 57.25. Quotes differ from orders in that quotes indicate bid price and ask prices, and bid and ask quantities for a particular item. As an example, a trader may place a quote indicating she is willing to buy 100 shares of IBM stock for a bid price of 57.0 and sell 100 shares of IBM stock at a price of 57.5. Retail customers, who may use brokers to execute their trades, typically will place an order to initiate a transaction. Professional market makers can use either orders or quotes, but tend to fulfill their role of providing liquidity to a particular market by using quotes. This trading information is displayed in a grid or other organized format. Market competition is fierce. Traders who can quickly identify opportunities and act on them generate the largest profits.

Many trader stations in use today rely upon the traders themselves to decide whether to submit an order in response to a trading opportunity presented through the exchange. In this regard, the trading information is received from the exchange, processed, and displayed on a monitor of the trader's station. The trader reads the trading information from the monitor and decides whether or not to submit a matching order. The trader submits an order by entering instructions into the trader station using a keyboard or mouse, or even a gamepad or voice-activation as described in U.S. application Ser. No. 08/273,362, filed on Mar. 22, 1999 and incorporated herein by reference.

Attempts have been made to implement trading systems that automate decision-making so that orders may be submitted with limited trader interaction. These systems have a

**2**

number of drawbacks. For example, user-friendly systems that automatically submit orders without trader interaction, while faster than a human trader, are believed to be relatively slow in terms of computer speed due to application and system design. In a typical set-up, trading information received from the exchange is processed by general purpose backend computer equipment. The backend computer may, among other things, (1) act as a gateway by communicating market information from the exchange to various types of client equipment, (2) submit, delete, and modify orders and quotes to the exchange from the various client equipment, (3) receive real-time trade confirmations and end-of-day back office reports, and (4) perform risk analysis, position management, and accounting functions. The trader stations are clients of the backend computer. The trader stations may be tasked with numerous functions, such as (1) receiving and displaying real-time market information, (2) creating and displaying theoretical prices related to market products, (3) composing, submitting, modifying, and deleting orders and quotes, and (4) maintaining positions and calculating risk management, to name a few. Each trader station is typically configured in a very user-friendly, Windows-based environment since the trader will spend long periods of time each day watching and interacting with it. The overhead associated with the functions performed by the backend computer and the trader stations reduces the response speed of automated trading.

In addition, computer equipment lacks the trading judgment of a human trader. A computer can generate staggering losses in the blink of an eye by submitting orders based upon incomplete or mistaken assumptions inherent in the trading program, erroneous input data, or corrupted data relied upon by the trading program. Accordingly, there exists a need in the art for an automated trading system that rapidly responds to trade information transmitted from an exchange, yet is safe and accurate.

### SUMMARY OF THE INVENTION

The present invention has been made in view of the above circumstances and has as an object to provide an improved trading system that rapidly responds to trading information received from an exchange.

A further object of the invention is to provide an automated trading system in an electronic trading exchange system that rapidly submits orders in response to trading information received from the exchange.

A further object of the invention is to provide an automated trading system that ensures the accuracy of automatic trading operations.

A further object of the invention is to provide an automated trading system that performs automatic trading operations without the risk of enormous losses due to erroneous, mistaken and/or repeated operation.

A further object of the invention is to provide a trading system in an automated trader system that may be remotely controlled.

A further object of the invention is to provide an automated trader system that automatically hedges some or all of the delta risk associated with the execution of a trade by submitting an order in connection with another, related trade opportunity.

Additional objects and advantages of the invention will be set forth in part in the description that follows, and in part will be obvious from the description, or may be learned by practice of the invention. The objects and advantages of the

US 7,177,833 B1

3

invention will be realized and attained by means of the elements and combinations particularly pointed out in the appended claims.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention, as claimed.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate embodiment(s) of the invention and together with the description, serve to explain the principles of the invention.

FIG. 1 illustrates an embodiment of an electronic trading exchange system network in accordance with the present invention.

FIG. 2 illustrates a further embodiment of an electronic trading system network in accordance with the present invention.

FIG. 3 provides a schematic of the functionality of an embodiment of an automated trading system in accordance with the present invention.

FIG. 4 illustrates an embodiment of a trading screen for use in connection with a trader station in accordance with the present invention.

FIG. 5 provides a flow diagram of the steps performed in automated trading in accordance with the present invention.

FIG. 6 illustrates a further embodiment of an electronic exchange system network in accordance with the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention recognizes that electronic trading exchange system computers may match bid and ask prices on a first come/first serve basis. Accordingly, the speed and accuracy of submitting orders or other responses is critical to the trader's ability to participate in the most profitable transactions. Even short delays in response may freeze a trader out of an otherwise lucrative transaction.

The present invention is capable of reducing the time it takes for the trader to submit an order or quote in response to incoming trading information from the exchange. In accordance with one aspect of the present invention, the automated trading system automatically decides whether or not to submit an order or quote based on calculation logic and decision logic, and trading information received from the exchange computers. To decrease the response time, the automated trading system may be dedicated or substantially dedicated to performing automated trading operations, with limited or minimized overhead permitted for other tasks unrelated to trading. The present invention is further capable of reducing the time delay due to network lags arising from the transfer of trading information from the exchange computers to the automated trading system, and vice versa.

In an additional aspect of the present invention, safe and accurate automated trading may be achieved by performing various checks of the information used in decision-making and/or information concerning the order. Further, an automated hedging feature may be invoked which, when a trader takes a position in a security, reduces the time needed to establish a delta hedge position in a related security.

Reference will now be made in detail to the present exemplary embodiment(s) of the invention illustrated in the accompanying drawings. Wherever possible, the same ref-

4

erence numbers will be used throughout the drawings to refer to the same or like parts.

FIG. 1 provides a schematic of an embodiment of an electronic trading exchange system network 10 that may be used in connection with the present invention. Other network arrangements may be used as well. The electronic trading exchange system network 10 includes an exchange site 100 and a plurality of trading sites 200. For purposes of simplification, FIG. 1 illustrates an exchange site 100 linked to a single trading site 200. Other trading sites 200 may be located in a different part of the same city as the exchange site 100, a different city, a different country, or different continent as the exchange site 100. The exchange site 100 need not be limited to equipment provided at a single location, but may be provided in multiple locations linked by a network. Similarly, the trading sites 200 need not be limited to equipment provided at a single location, but may include equipment at multiple locations linked by a network, such as a wide area network (WAN).

The exchange site 100 may be linked to the trading site 200 by one or more communication links 300. The communication links 300 may be part of a wide area network formed by dedicated communications lines, commonly-accessible communication lines, or a combination thereof. For example, dedicated lines may be strung between the exchange site 100 and one or more of the member trading sites 200. Alternatively, dedicated lines may be leased from telephone, cable, or other communication network operators. For example, the public switched telephone network may embody the commonly-accessible communication lines. Of course, the communications links 300 may also include, in whole or in part, wireless communications, such as microwave or satellite links. While not shown in FIG. 1, an intermediary (such as broker for a retail customer, or a clearing member for a professional market maker) may exist between the trading sites 200 and the exchange site 100. The role of an intermediary may include some level of risk analysis to confirm, say, sufficient capital exists to cover margin requirements for a potential resulting position, or some level of network routing to, say, ensure an order is sent to the intended exchange. Under the cases where risk analysis checks are passed and the routing information is proper, an intermediary should be transparent or substantially transparent to the functionality described herein and may be subsumed in the communication links 300. Of course, additional time delays may be introduced by any such intermediary processing.

In one embodiment, the exchange site 100 may be designed as a local area network (LAN) and include, for example, one or more security routers and one or more back office computers, among other equipment. For purposes of illustration only, two security routers 111, 112 and three back office computers 130-1, 130-2, 130-3 (referred to collectively as back office computer 130) are shown in FIG. 1. The security routers 111, 112 control communications between the back office computers 130 and the communications links 300. Each security router 111, 112 transmits and receives communications over the communications links 300, as well as restricts communications from unauthorized sources. More particularly, the security router 111, 112 may be used to isolate the equipment at the exchange site 100 from intrusion and facilitate communication with the back office computers 130.

The back office computers 130 manage the trading of the various securities (e.g., futures, options, swaps or other derivatives; currencies, stocks, bonds, or other physicals like corn, precious metals, electricity, etc.) and/or other items

US 7,177,833 B1

**5**

traded on the exchange. For example, one or more of the back office computers **130** may function as market servers. In this capacity, they may maintain order books, perform order matching, generate market information for use at the exchange site **100** and/or for transmission over the communication links **300**, and supply trade information to other back office computers **130** for accounting and/or cash settlement purposes. One or more of the back office computers **130** may function as short-term accounting servers. As such, these computers may receive information from the market servers and generate information for transmission over the communication links **300**. The short-term accounting servers may be initialized with status information from the previous day's trading before performing accounting tasks for the current day. One or more of the back office computers **130** may function as long-term account servers and, accordingly, function to collect data from the short-term accounting servers for batch processing and record-keeping. The long-term account servers may supply information to initialize the short-term account servers and generate reports for transmission to trading sites **200**. Of course, the back office computers **130** may perform additional functions and a single computer may perform more than one of the above functions.

The trading sites **200** may include a LAN architecture having one or more security routers, one or more backend computers, one or more trader stations, and one or more hubs, among other equipment. For purposes of illustration only, FIG. **1** shows two security routers **211**, **212**, two backend computers **220**, **225**, three trader stations **230-1**, **230-2**, **230-3**, (collectively referred to as trader stations **230**) and two hubs **240**, **241**. The security routers **211**, **212** transfer trading information between the trading site **200** and the exchange site **100** and screen communications from unauthorized sources. The hubs **240**, **241** distribute data between the backend computers **220**, **225** and the trading stations **230**.

Backend computer **220** may be configured as a communication server for the trader stations **230**. The exchange may supply software and/or hardware for the backend computer **220** to facilitate communications with the exchange site **100**. Alternatively, the exchange may simply provide protocol specifications that enable the trader site computers to communicate with the exchange computers. In this case, the trader has flexibility in choosing how it implements the protocol specifications running locally at trading site **200**. Alternatively, if an intermediary site, such as a broker or clearing member site, is part of the communications routing between the exchange site and the trader site, the backend computer **220** may use communication software supplied by the intermediary site or, if permitted, communication software developed by the trader or a third party. Backend computer **220** handles communications between the trader stations **230** and the back office computers **130** of the exchange. Of course, the trader site **200** may include multiple backend computers **220**.

Backend computer **225** may also be equipped with software and/or hardware that facilitates communications with the exchange site and/or the intermediary site. Some exchanges, for example, such as the EUREX (the German and Swiss Derivatives Exchange), recommend installation of a redundant on-site backend computer in the event that the primary communication backend computer **220** fails. In the case of the EUREX exchange, backend computer **225** may be configured to perform automated trading functions under the control of one or more of the trader stations **230**. The automated trading functions are described in more detail

**6**

below. The backend computer **225** should be equipped with a high-speed processor and sufficient memory to efficiently handle automated trade processing. The trader stations **230** may control backend computer **225** remotely through a communication link **250**, for example, a WAN. The trader site **200** may include multiple backend computers **225**.

In one preferred embodiment, backend computer **225** is dedicated or substantially dedicated to performing automated trading-related functions, as discussed in greater detail below. Backend computer **220**, rather than backend computer **225**, may be assigned trading-related tasks, such as (1) serving as a gateway to communicate market information from the exchange site **100** to trader stations **230**, (2) submitting, deleting, and modifying orders and quotes to exchange site **100** from the trader stations **230**, (3) receiving real-time trade confirmations and end-of-day back office reports, and/or (4) performing risk analysis, position management, and accounting functions. In this way, backend computer **225** may perform automated trading functions with limited interruption or delays associated with other tasks the backend computers (such as backend computer **220**) may be requested to perform. This increases the response speed for automated trading operations. Moreover, the total time delay in submitting an order to the exchange site **100** includes a component attributable the transmission delay or network lag in transmitting messages between the exchange site **100** and the trader site **200**. Therefore, backend computer **225** is preferably located near to the equipment of the exchange site **100** to reduce delays associated with transmitting information and orders between the backend computer **225** and the exchange site **100**. Accordingly, the total time for responding to trading opportunities can be reduced both by reducing transmission delays and by increasing decision-making speed at the trader site **200**. Significantly, the backend computer **225** may be remotely supported or controlled by a distant trader station **230**, which permits the trader station **230** to be located virtually anywhere without adversely affecting the response time of the automated trading system. Accordingly, the trader site **230** may be chosen based on considerations such as tax, real estate costs, and quality of life, without having to worry that trader station location will impair the performance of automated trading carried on by backend computer **225**.

Trader stations **230** receive information from the exchange site **100**, process that information, and display at least part of it on a monitor. Each trader station **230** typically runs interactive software that enables a trader, among other things, to submit orders and/or quotes to the exchange site **100**. As discussed further below, one or more of the trader stations **230** may additionally be equipped with software for controlling the automated trading functions of backend computer **225**.

FIG. **2** illustrates an alternative embodiment of an electronic trading exchange system network **20**. For the sake of brevity, features of FIG. **2** similar to those in FIG. **1**, which are described above, will not be repeated. In FIG. **2**, the trading site **200** includes an automated trading system computer **225-2** separate from the backend computer **225-1**. In this embodiment, the automated trading system computer **225-2** performs automated trading system functions and the backend computer **225-1** manages communications between the automated trading system computer **225-2** and the exchange site **100**. The automated trading system computer **225-2** may be connected to the backend computer **225-1** using, for example, network interface cards or through a hub (not shown). The automated trading system computer **225-2** may be controlled using one or more trader stations **230**

US 7,177,833 B1

7

either locally or through a communication link **250**. Alternatively, the automated trading system computer **225-2** may be controlled through the communication computer **225-1** (as indicated by the dotted lines), which would serve to communicate information between the trader stations **230** and the automated trading system computer **225-2**.

FIG. **3** provides a functional diagram illustrating the operation of an embodiment of an automated trading system used in connection with options trading. Of course, the embodiment may be modified for use in trading other securities (e.g., futures, swaps or other derivatives; currencies, stocks, bonds, or other physicals like corn, precious metals, electricity, etc.) and/or other items traded on the exchange. As described in greater detail below, the general function of the automated trading system is to generate and automatically submit responses (such as orders or quotes) for transmission to an exchange based on market data received from the exchange and/or other sources. The automated trading system may perform this function in several different ways, as discussed greater detail below, including calculating a theoretical value for the traded item in real time when one or more of the underlying factors that affect the theoretical value changes. The calculated theoretical value is then used to determine whether an order or quote should be submitted based upon existing market prices for the traded item.

The automated trading system is preferably resident in the backend computer **225** as configured in FIG. **1**, which may utilize multiple CPUs. However, it may also be resident in one or more of the trader stations **230** or the backend computers **220**. The automated trading system software may run in a text-based environment or a Windows or Windows-like environment. In some operating systems, automated trading may be assigned priority over other tasks or processes and run without debug messages.

The automated trading system receives and decodes current market information broadcast from the exchange site **100** through a receiver interface **410**. The decoding of market information may be performed, for example, transparently by software supplied by the exchange for use with the backend computers, by the exchange software at the request or direction of the automated trading system, or by the automated trading system itself. The current market information may include information related to the options and an underlying security of the option. Market bid, ask and last prices and the day's volume for call and put options and the underlying security, to name a few, are typically received by the trader site. A call option is the right to buy the underlying security at a specified time in the future at a specified price, while a put option is the right to sell the underlying security at a specified time in the future at a specified price.

An option look-up protocol **420** indexes an option data table **430**. The option data table **430** stores information concerning options that may be automatically traded. For simplicity, a two-dimensional table having rows and columns will be described. However, it should be understood that higher-dimension arrays or tables may be used in connection with the present invention. Each row of the option table **430** stores information relevant to a particular option including, for example, option name, current market option prices, times and quantities of the most recent trades by the trader, maximum order quantity, inputs that may needed to calculate option transaction prices, and whether automated trading is enabled for the option. As discussed further below, this information may be used as a check against erroneous operation. Alternatively, option data table

8

**430** may store information in connection with items that are actually being automatically traded at a given time. As a further alternative, option data table **430** may store information in connection with all of the options that may be subject to automated trading and include indices or pointers that link only the items currently enabled for automated trading. Accordingly, any search of the option data table can skip those entries for which automated trading is not enabled. In such a case, an additional option data table may be maintained for the full set of items for which automated trading may be performed. This is useful in increasing the speed at which a disabled option can be enabled. Accuracy checks may use both the additional option data table and option data table **430**. Communications between the automated trading system and the trader stations **230** are conducted through a trading station interface **440**. For example, a trader station **230** may update information contained in the option data table **430** via a trading station interface **440**. In this way, the option data table **430** may be updated to enable (disable) automated trading for a particular option.

The option data table **430** may be organized in several different ways. For example, the market bid and ask prices for a particular option may be stored in different rows of the option data table **430**. Alternatively, the bid and ask prices may be stored in the same row of the option data table **430**, but in different columns, or as different cells in a price dimension, for example. Also, the option data table **430** may be segmented, for example, so that all bid prices are grouped together and all ask prices are grouped together. Different classes of options (i.e., options with different underlying securities) may be indexed in a single data table **430** or in multiple look-up tables **430**, for example, with each option having its own look-up table **430**.

In addition to the current market information concerning option trading, the automated trading system may receive and decode current market information concerning the security (or securities) underlying the options. For example, an exchange that trades the underlying security typically maintains a book of bid (ask) prices and quantities of current order and quotes of those traders wishing to buy (sell) the underlying security. The automated trading system may receive the underlying market information, for example, from the exchange site **100**, from a separate exchange site, or from another market feed either directly or indirectly, e.g., through a trader station **230**. The underlying market information for a given security may be stored in option data table **430**, which may be formed in the memory of backend computer **225**, since it may be one of the inputs needed to calculate option transaction prices. Theoretical price table **435**, which may be formed in the memory of backend computer **225**, may store option transaction prices for options defined in option data table **430** and/or the additional option data table described above.

The theoretical prices for derivatives, such as options, may be determined using complex mathematical models. Theoretical price logic **490** is tasked with generating the theoretical prices based on input information. Theoretical price logic **490** may be implemented in hardware or in a combination of hardware and software. For example, theoretical price logic may be implemented by the central processor and memory, and possible other equipment useful in performing fast mathematical calculations, in a general purpose computer. Alternatively, the theoretical price logic may be implemented in a separate processor in communication with the processor of a general purpose computer or an array of processors. Of course, theoretical price logic **490**

US 7,177,833 B1

9

may be embodied by other devices capable of generating theoretical prices as described herein.

Theoretical price logic 490 generates theoretical prices in accordance with mathematical models. The mathematical models produce a theoretical value for an option given values for a set of option pricing input variables that may change over time. Option pricing input variables considered in these models may include (1) the current market price of the underlying security (e.g., the price of the stock or future from which the price is derived), (2) interest rates, (3) the future volatility of underlying security, (4) dividend stream, (5) time until expiration, (6) whether the option can be exercised before the expiration date, and (7) whether the option is a call or put. Option pricing input variables (2)–(7) are not likely to change as frequently as the price of the underlying security, option pricing input variable (1). Some option pricing input variables, such as price of the underlying security, can be derived from the market. Other option pricing input variables, such as the future volatility of the underlying security, require some qualitative assessment by the trader.

The current market price of the underlying security may be defined in several different ways. At any given time during normal trading, the underlying security will usually have: (1) bid prices and quantities; (2) ask prices and quantities; (3) a last price and volume at which the underlying security was traded (last price); (4) an average of the current highest bid and lowest offer prices (average best bid, best ask price); and (5) an average price of a certain depth, among other values. The average price of a certain depth, say 5000 shares, would take the average of the: (a) best (highest) bid prices in the book of the first 5000 shares, and (b) best (lowest) offer prices in the book of the first 5000 shares. Obviously, there are many more definitions of underlying price that can be created, for example, using permutations of the five definitions provided above.

It is highly probable that at least four of these five definitions will yield (perhaps slightly) different results at any time. Since the normal hedging response of an option trade is to buy or sell the underlying security, the option trader may very carefully define underlying price used in her models. Specifically, buying (selling) calls and selling (buying) puts will usually lead to selling (buying) the underlying for hedging. For reasons discussed further below, the trader may want to set the theoretical buy price for call options and the theoretical sell price for put options using the bid price (and/or possibly bid underlying depth) of the underlying security. Likewise, the trader may want to set the theoretical sell price for call options and the theoretical buy price of put options using the ask price (and/or possibly the ask underlying depth) of the underlying security. In summary, theoretical value calculations used for automatic option trading may use any of several definitions of underlying price.

In addition to generating a theoretical value for an option, the trader may define a buy spread and a sell spread to compute an option transaction price. The buy spread may be subtracted from the theoretical value to produce the theoretical buy price—the highest price at which the trader is willing to buy a particular option using automated trading. The sell spread may be added to the theoretical value to produce the theoretical sell price—the lowest price at which the trader is willing to sell a particular option using automated trading. Accordingly, the trader would like to sell an option having a bid price that is the same as, or higher than, the trader's theoretical sell price. The trader would like to buy the option from anyone offering a price that is the same as, or lower than, the trader's theoretical buy price. Of

10

course, buy and sell spreads may be defined by the trader in either absolute terms (i.e. theoretical buy price=theoretical price−0.10) or percentage terms (i.e. theoretical buy price=theoretical price−0.01* theoretical price). In summary, buy and sell spreads may be used to calculate option transaction prices such as theoretical buy and sell prices.

Accordingly, in the embodiment illustrated in FIG. 3, the theoretical table 435 stores option transaction prices including a theoretical buy and sell price of the options for which automated trading is performed. For example, if automated trading is performed for options underlying Exxon stock, the theoretical price table 435 contains the theoretical buy and sell prices of Exxon stock options. If any of the inputs affecting option transaction price changes, the theoretical price table 435 can be updated. Of course, the theoretical price table 435 may be formed as part of the same table as option data table 430. However, option data table 430 and theoretical price table 435 will be described separately for the sake of convenience and not by way of limitation.

Similar to the option data table 430, the theoretical price table 435 may be organized in several ways. For example, all theoretical option buy prices for a given set of option pricing input variables (1)–(7) may be provided in a single column of theoretical price table 435, with a separate theoretical table provided for theoretical sell prices. Alternatively, the theoretical table 435 may index both a theoretical buy price and a theoretical sell price. The theoretical price table 435 may be segmented or multi-dimensional. Moreover, the theoretical price table 435 may be combined with, form a portion of, or be linked to option data table 430. The values in theoretical price table 435 may be compared with market option prices and may trigger automated buy or sell decisions by the system. While the theoretical price table 435 may take many forms, a table like the option data table 430 with each row representing a single option will be described for purposes of simplicity. As noted above, it should be understood that data structures other than tables may be used in connection with the present invention.

In addition, the option data table 430 and theoretical price table 435 can be structured consistent with the particular search protocol used by the table update protocol 420 so that certain options or other items are located by the update protocol before other options or items. For example, if table update protocol 420 implements a linear search, the contents of option data table 430 for options at the top will be updated before options at the bottom even when multiple rows need updating. If the change in content affects the option transaction prices stored in theoretical price table 435, this implies options near the top could be recalculated and compared against market option prices before options at the bottom theoretical price table 435. Accordingly, the trader station 230 or the backend computer 225 may structure the option data table 430 and/or the theoretical price table 435 so that options that have shown in the past, or are likely to show in the future, the most promising profits will be located first. The particular order of the options in the tables 430 and 435 may depend on the trading volume in an option, for example. Options with relatively high traded volumes over recent trading days or the current trading day may be given a higher priority ranking in table 430 and/or theoretical price table 435. Moreover, some exchanges may limit the number of orders or quotes that a particular trader may have pending at a given time. For example, in some versions of the EUREX system, a trader can not submit a new quote before a confirmation that a previously submitted quote had been received from the exchange. Accordingly, structuring the tables 430 and 435 as described increases the opportunity for

US 7,177,833 B1

**11**

the trader to participate in the most lucrative transactions when there are restrictions on the number of concurrent orders placed. In addition, or in the alternative, the theoretical price logic **490** may calculate theoretical prices first for options likely to yield the highest profits. The calculated theoretical prices may be supplied to the decision logic **490** either before the theoretical price logic calculates the theoretical price of another option or concurrently therewith.

In accordance with the embodiment shown in FIG. **3**, the trader station **230** may respond to changes in market conditions by changing any of the option pricing input variables (1)–(7), changing buy or sell spreads, or changing any other variable that might effect option transaction prices. These changes would update the appropriate values for each option of the option data table **430** and then, since the changes affect option transaction prices, would trigger a recalculation of theoretical buy and/or sell prices in theoretical price table **435**. Of course, updates to option data table **430** may originate directly from exchange **100** or backend computer **220**, or even some other source. For instance, option pricing input variable (1), the price of the underlying security, used in option pricing models, may be received dynamically by backend computer **225** from exchange **100** rather than being received from trading station **230**. In this case, option data table **430**, and, subsequently, theoretical price table **435** would be updated automatically in real time with no trader intervention.

Calculating the theoretical value for options or other financial derivatives can be relatively time consuming. The speed of these calculations becomes especially critical when considering an exchange, such as the EUREX, may list some tens of thousands of options that a trader may want to continuously evaluate in real time. The time needed to calculate these values may depend upon the option's specifications, the particular mathematical model used to calculate the theoretical value, the use of pre-calculation or other calculation short cuts, and the level of desired precision of the calculated theoretical value. Moreover, hardware is also an important consideration, as faster and more efficient computers tend to reduce calculation times. Below is a comparison of some average times (in microseconds, us) needed to calculate a single theoretical price of some common options with different specifications using different mathematical models on PC using a Pentium III 450 MHz CPU and 128 MB of RAM:

**12**

described here. Of course, other mathematical models may be used besides the ones listed above.

Note that these times can vary as much as a factor of about 200×. If speed were the only consideration for choosing the model to use for calculating values in theoretical price table **435**, then the models having the smallest computation times would probably be picked. However, other factors may be taken into account when selecting a model. For instance, a trader may find that certain models yield theoretical prices that are more market-realistic than other models. The trader will ultimately profit by trading (buying and selling) with other market participants. Thus, a particular trader may select a model that, in the trader's opinion, best reflects these trading conditions, even at the expense of higher computation speeds. Accordingly, comparisons between theoretical prices and actual market prices may be necessary to decide which mathematical model to use. This comparison and model decision may be re-evaluated over time to reflect any changes in market conditions.

The times cited in the table above are typical for calculating a single theoretical option price without the use of pre-calculations, approximations, or other computational short cuts. Times for calculating subsequent theoretical prices for a given option may be reduced if part of the calculation made for the original option is stored and then used for the next calculation, or part of the calculation has been pre-calculated entirely before the first theoretical price has been calculated. Moreover, using part of the calculation of an option that is similar to the given option may reduce the calculation time for a given option.

For instance, the Black and Black-Scholes models contain an exponential term $(e^{-rt})$ related to the cost of carry. This term is unlikely to change frequently, since the three terms (e=natural log constant, r=the interest rate, and t=time until the expiration of the option) are unlikely to change frequently for a given trading day. This means that the term e may be pre-calculated before the first theoretical price is calculated, or stored after the first theoretical price is calculated. Using the approach of pre-calculating the exponential term $e^{-rt}$, the computation times needed for the Black model for futures with no early exercise and the Black-Scholes for stock with no early exercise and a dividend can be reduced by about 30% (1.1 us vs 1.7 us for Black; 1.3 us versus 1.9 us for Black-Scholes model). Likewise, the Cox-Rubenstein model has calculations which are: (1) com-

| Option Specifications | | | Models | | | | | |
|---|---|---|---|---|---|---|---|---|
| Type of Underlying Security | Early Exercise | Dividend | Black | Black-Scholes | Cox-Rubenstein | Garman-Kohlhagen | Implicit Finite Difference | Roll-Geske-Whaley |
| Future | No | No | 1.9 | 1.9 | 32.5 | NA | 338 | NA |
| Future | Yes | No | NA | NA | 77.0 | NA | 397 | NA |
| Stock | No | No | NA | 1.7 | 32.2 | NA | 338 | NA |
| Stock | Yes | No | NA | NA | 76.7 | NA | 396 | NA |
| Stock | No | Yes | NA | 1.9 | 33.4 | NA | NA | NA |
| Stock | Yes | Yes | NA | NA | 78.0 | NA | NA | 67.7 |
| Currency | No | No | NA | NA | 32.5 | NA | 339 | NA |
| Currency | Yes | No | NA | NA | 80.7 | 2.1 | 397 | NA |

Note, an "NA" means the mathematical model is not appropriate to calculate a theoretical price of an option with those specifications. The option specifications and each of the theoretical price models are known in the art and will not be

mon to all strike prices for a given underlying price and volatility, and (2) common for a given strike price independent of underlying price. Using the approach of using pre-calculated common values such as base nodes, the calculation times needed for the Cox-Rubenstein model for

US 7,177,833 B1

13

14

stock with dividend and early exercises may be reduced by about 10% (69.4 us versus 78.0 us). Likewise, the Garman-Kohlhagen model has calculations that are independent of strike price and underlying price. Specifically, there are two exponential terms like the one in Black and Black-Scholes, related to cost of carry in domestic and foreign currencies. If these values are pre-calculated, the computation times needed for the Garman-Kohlhagen model for currencies with early exercise can be reduced by about 40% (2.1 us versus 1.2 us). Likewise, the Roll-Geske-Whaley model uses a term that yields the underlying price assumed necessary for early exercise for call options. This term is independent of strike price and underlying price and is solved using numerical analysis. If the value of this term, as well as some exponential terms related to time decay are pre-calculated, the calculation times needed for the Roll-Geske-Whaley model for stock with dividend and early exercises may be reduced by about 60% (37.2 us versus 67.7 us). Thus, pre-calculation of certain parts of the mathematical models used for determining theoretical prices may reduce total computation times of single or groups of similar options. Pre-calculation may be performed by back end computer **225**, trader stations **230**, back end computer **220**, or another computational resource, for example, upon initialization of these computers or upon selection of automated trading. Of course, rather than calculating the theoretical values in real time, a pre-calculated look-up table of theoretical values may be used, as described in U.S. application Ser. No. 09/417,774 to Marynowksi et al., filed on Oct. 14, 1999, and expressly incorporated herein by reference.

Pre-calculating certain parts of the mathematical models reduces computation times without compromising the precision of the models. This means a theoretical price of a given option under a given set of conditions calculated using a given model using pre-calculated values would be identical to the theoretical price calculated using no pre-calculated values. Also, pre-calculating certain parts of the mathematical models also allows the off-loading of this computational overhead from the computers used for automated decision making. For instance, in one preferred embodiment, the pre-calculating tasks can be moved from backend computer **225** to, say, trading station **230**. In this case, trading station **230** may calculate the required pre-calculated values upon initialization and any time one or more of the inputs of term being pre-calculated changed. The pre-calculated values may be stored in option data table **430** and used by backend computer **225** when updating theoretical price table **435**.

Extrapolation may also be used to reduce computation times when using mathematical models to compute theoretical option prices. Consider the case when a theoretical option price has been computed for a given set of conditions. The input most likely to change is the price of the underlying security of the option. The mathematical models discussed above allow for the first derivative (the "delta" of an option) and second derivative (the "gamma" of an option) of the theoretical option price with respect underlying price to be calculated. If an option's theoretical price, delta, and gamma are known for a given set of assumptions, and only the price of the underlying security changes, an extrapolated theoretical price at the new price of the underlying security may be calculated based on the previously calculated theoretical price and the delta and gamma. Consider the example where for given set of option pricing input variables (2)–(7) and price of the underlying security=80.00, the theoretical price of the option=7.20, delta=0.40, and gamma=0.10. Now assume the price of the underlying security changes from

80.00 to 80.60, or a change of +0.60. Using the extrapolation method, the new theoretical option price can be estimated as: Old Theoretical Option Price+(Change in Underlying Price) *(Delta+Change in Underlying Price*Gamma/2)=7.20+ (0.60)*(0.40+0.60 *0.10/2)=7.46. The pre-calculated delta and gamma values may be stored in option data table **430**, or elsewhere. The table below summarizes typical computation times (in microseconds) using baseline, pre-calculation and extrapolation methods:

| Option Specifications | | | | Methodology | | |
|---|---|---|---|---|---|---|
| Security | Early Exercise | Dividend | Model | Baseline | Pre-Calculated | Extrapolation |
| Future | No | No | Black | 1.9 | 1.1 | 0.48 |
| Stock | No | Yes | Black-Scholes | 1.9 | 1.3 | 0.48 |
| Stock | Yes | Yes | Cox-Rubenstein | 78.0 | 69.4 | 0.15 |
| Currency | Yes | No | Garman-Kohlhagen | 2.1 | 1.1 | 0.47 |
| Stock | Yes | No | Implicit Finite Difference | 396 | NA | 0.19 |
| Stock | Yes | Yes | Roll-Geske-Whaley | 67.7 | 37.2 | 0.90 |

Note that the extrapolation methodology times include the steps of calculating the delta and gamma at the original underlying security price, as well as the actual extrapolation step. As the results above show, the extrapolation method yields considerably lower computation times compared to the baseline and pre-calculate methods. Also, note that the computation times of the extrapolation methodology are relatively consistent in absolute terms (i.e. less than 1.0 microsecond) across model type. This arises because the calculation of the delta and gamma, and the extrapolation step can be performed quickly relative to the entire process of calculating the theoretical option price using each of the models. Of course, the delta and gamma may be calculated in a prior step before the extrapolation calculation is initiated, which reduces the overall time to obtain the extrapolated theoretical price.

The advantage in speed of the extrapolation method may be offset by deficiencies in precision under certain circumstances. The extrapolation method assumes a constant gamma value over the range of the old and new underlying prices. This assumption may lead to differences in calculated theoretical option prices compared to using the baseline methodology with the same model at the new underlying price. The differences arise because the actual gamma is not constant across the range of underlying prices being considered. The magnitude of these differences may depend upon many factors, including time left to expiration, volatility assumed of the underlying security, strike price of the option relative to underlying security price, and magnitude of expected differences between the old and new underlying prices. Thus, the extrapolation method may not always be adopted, since there may be a trade-off between computation speed and precision. Accordingly, the trader may want to evaluate the magnitude of differences in precision for her particular trading conditions before adopting the extrapolation methodology.

Of course, the delta and gamma values used in the extrapolation method may be pre-calculated by a computer different than the computer making the automated trading decisions. For instance, in one preferred embodiment, the

US 7,177,833 B1

15

task of pre-calculating the delta and gamma values may be moved from backend computer **225** to, say, trading station **230**. In this case, trading station **230** may calculate the required delta and gamma values upon initialization and any time one or more of the inputs used to calculate the delta and gamma values change by some pre-defined quantity. These delta and gamma values may be stored on backend computer **225** in option data table **430**. If trading station **230** pre-calculates the delta and gamma values in option data table **430**, the time for calculating a theoretical price using the extrapolation method becomes independent of the mathematical model used to generate the delta and gamma values stored in option data table **430**. This is because the delta and gamma values are pre-calculated and do not have to be calculated as part of the extrapolation. Using the hardware specifications described above (i.e. 450 MHz Pentium III cpu, 128 MB RAM), typical computation times are less than 0.01 us.

Interpolation is another method to reduce computation time needed to calculate theoretical prices for options. Consider the case where the theoretical option prices are calculated for a given set of conditions, but for varying underlying prices. For instance, option pricing input variables (2)–(7) may be assumed constant and theoretical option prices may be calculated using, for example, underlying prices that vary the same amount above and below the current underlying price. Assume theoretical prices are calculated for a given set of conditions with option pricing input variables (2)–(7) remaining constant and for the following underlying prices to form an interpolation table:

| Assumed Underlying Price | Theoretical Option Price |
|---|---|
| 80.50 | 2.66 |
| 80.00 | 2.50 |
| 79.50 | 2.30 |

Using these points and assuming, say, a linear relationship between underlying price and option price, theoretical option prices may be calculated using interpolation for any new underlying price between 79.50 and 80.50. For instance, assume the underlying price changed to from 80.00 to 79.60. Using a linear interpolation method, the new theoretical option price can be calculated as:

New Theo Price=Theo1+(AUPnew−AUP1)*(Theo2−
Theo1)/(AUP2−AUP1) where:

New Theo Price—the new theoretical option price for the new underlying price,

Theo**1**—the theoretical option price for the first assumed underlying price (2.30),

AUPnew—the new underlying price (i.e., 79.60 in the example),

AUP**1**—the first assumed underlying price (79.5 in the example),

Theo**2**—the theoretical option price for the second assumed underlying price (2.50 in the example), and

AUP**2**—the second assumed underlying price (80.0).

In the example, the New Theo Price is calculated to be 2.34.

Interpolation is similar to extrapolation in that precision may be sacrificed since a constant, say linear, relationship is assumed to exist between theoretical option price and underlying price over the range of underlying prices used for interpolation. This constant relationship may not be valid

16

and the actual theoretical option price calculated using the same model at, say 79.60, would be somewhat different than the interpolated result of 2.34. As with the extrapolation method, the magnitude of these differences may depend upon many factors. These factors include time left to expiration, assumed volatility of the underlying security, strike price of the option relative to underlying security price, difference between assumed underlying prices, and distance between the expected underlying prices and assumed underlying prices. Of course, there is no sacrifice in precision for any underlying price found in the interpolation table, since these theoretical option prices have been calculated exactly for those underlying prices.

Likewise, reducing the distance between assumed underlying prices used for interpolating may increase precision. For example, adding theoretical option prices for underlying prices of 80.25 and 79.75 to the interpolation table above would probably improve precision of calculated theoretical option prices. This arises because the (1) assumed linear relationship between underlying price and theoretical option price is over a smaller underlying price distance, and (2) chance of an underlying price matching an underlying price already in the table increases. Of course, if the new underlying price equals one of the assumed underlying prices in the interpolation table, no interpolation is required and the theoretical prices corresponding to the underlying price may be passed to the theoretical price table **435**. Obviously, the interpolation table can be expanded to include all possible underlying prices within an expected underlying range, since the exchange usually defines a minimum "tick size" (i.e., smallest increment of change) of the underlying security. In the limit of the interpolation table including all possible underlying prices (say between 79.00 and 81.00, in steps of 0.01) the interpolation table resembles a look-up table since no interpolation is necessary for any underlying price within the underlying price range. The use of a look-up table to calculate theoretical values is described in U.S. application Ser. No. 09/417,774 to Marynowski et al., which is incorporated by reference.

Times needed to calculate new theoretical option prices are the fastest when values in the table above are pre-calculated and the new underlying price falls in the range of the underlying prices in the table. Under these conditions and using the hardware specifications described above (i.e., 450 MHz Pentium III cpu, 128 MB RAM), typical computation times for underlying prices not matching an underlying price in the table are less than 0.01 us. Interpolation between any two assumed underlying prices requires a constant time (i.e. less than 0.01 us), regardless of model used to calculate the theoretical prices if the theoretical prices are in the pre-calculated interpolation table. Calculation of the theoretical option prices can be done away from backend computer **225** on, say, trading station **230**. The interpolation table may be dynamically centered around the market underlying price. For instance, trading station **230** may be asked to calculate and send backend computer **225** a new interpolation table if the underlying price moves outside of some pre-defined underlying price range. The interpolation table, containing underlying prices and corresponding theoretical option prices, can be stored in option data table **430** on backend computer **225**, in the theoretical price logic, or in another accessible memory location. New theoretical option prices calculated for the current underlying price may be stored in theoretical price table **435**.

Referring still to FIG. **3**, decision logic **450** compares the theoretical price calculated and stored in the theoretical price

US 7,177,833 B1

17

table **435** to the market price for the option and, based on the comparison, determines whether the option should be bought or sold, or no action should be taken. For example, in an embodiment in which the theoretical price table **435** stores theoretical buy and sell prices for a particular option, decisions may be triggered when: (1) a theoretical option price in table **435** changes, but the market bid and ask prices of the option remain the same, (2) the market bid or ask price of the option changes, but the theoretical prices in table **435** remains the same, (3) automated trading is enabled for a particular option, and (4) when safety checks are relaxed for a particular option.

Consider example (1) in which a theoretical price of a particular option stored in theoretical price table **435** changes and the bid and ask prices of an option remain static. As noted above, the theoretical price table **435** may be updated when one or more of the values that affect the theoretical buy and sell prices changes such as, but not limited to, the buy and ask spreads and/or option pricing input variables (1)–(7). For example, option pricing input variables (1)–(7) discussed above could change, perhaps due to a change in the trader's assessment of market conditions. These changes may occur when the trader enters new information through a trader station **230** or when new information becomes available through another source (e.g., a change in interest rate occurs in a database associated with the trading site **200**). A change in one or more of option pricing input variables (1)–(7) triggers a re-computation of (probably) all values in the theoretical price table **435**. As noted above, re-computation may involve re-calculating the theoretical price in its entirety or using pre-calculated values, extrapolation, and/or interpolation. For purposes of discussion below, assume option pricing input variable (1), the price of the underlying security, changes and thereby changes a theoretical buy or sell price of a particular option in theoretical price table **435**. Decision logic **450** will compare the current market ask (bid) price of the option to the new theoretical buy (sell) price obtained from the theoretical price table **435**. In this case, the decision logic **450** performs all comparisons affected by the change in underlying price. For example, a change in the bid (ask) price of the underlying security may affect the theoretical buy (sell) price of some or all call options and the theoretical sell (buy) price of some or all put options associated with the underlying security. Accordingly, the decision logic **450** makes comparisons of market bid or ask prices corresponding to new theoretical sell and buy prices.

Consider example (2) in which the market bid (ask) price for a particular option changes and the theoretical prices of the option remain constant. The decision logic **450** will compare the new market bid (ask) price to the corresponding theoretical sell (buy) price that exists at that time from the theoretical price table **435**. Accordingly, a change in market bid (ask) price of a particular option may trigger a comparison of market bid (ask) price to theoretical sell (buy) price. Based on the comparison, for example, if the market bid (ask) price is greater (less) than or equal to the theoretical sell (buy) price, the automated trading system may prepare a response (such as an order or quote) for the particular option.

Consider example (3) when automated buying or selling trading for a particular option is changed from disabled to an enabled state. This could arise, for instance, at the beginning of the trading day if the default state of a new trading session on trading station **230** is all options disabled. Enabling automated selling (buying) for a particular option or group

18

of options can trigger decision logic **450** to make a comparison of the market bid (ask) prices to the theoretical (buy) price in table **435**.

In addition to enabled and disabled states, a third, "warming up" or "test" state may be provided for an option in the automated trading system. In this third state, the automated trading system may perform all steps except actually placing an order. This allows the trader to monitor the operation of the automated trading system without actually submitting orders, thereby reducing the risk of enabling options for automatic trading using theoretical prices which are not market realistic.

Consider example (4) in which a safety check for a particular option is relaxed. This could arise, for example, if a global safety check condition implemented by safety check logic **460** is disabled or changed. For example, a safety check condition relating to the maximum quantity or frequency of trading attempts of a particular option may be increased via a command from trading station **230**. In connection with the trading frequency condition, the entire automated trading system may be held in a "pause" state if it had made more than a predetermined number (e.g., 3) automated trading attempts within a predetermined time period (e.g., 60 seconds). If this global safety check is disabled or relaxed, for example, by increasing the predetermined number of attempts (e.g., from 3 to 5), the trading frequency safety check may no longer be in violation. As a result, the entire automated trading system may transition from the "paused" state to the enabled state. If a particular option had been enabled for automated selling (buying), the decision logic **450** will then compare the market bid (ask) price to the theoretical sell (buy) price in table **435**.

Of course, the automated trading system may be designed to automatically switch from the "enabled" to "paused" state if conditions are deemed too risky to run automated trading. For example, the automated trading system may change from an "enabled" state to a "paused" state when it senses, or receives a message, that: (1) communication in any of the communication links is not working properly, (2) trading has halted or closed in the underlying security and/or options of a particular security, (3) the options for a particular security are trading in a "fast market", as determined by exchange officials, (4) the difference between the ask and bid price of the underlying security is greater than some predetermined value, (5) the rate of change of the price of the underlying security is greater than some predetermined value, (6) trading in the underlying security is in an "auction" or "crossing" state, rather than normal "bid" and "ask" trading, and/or (7) release of known news events is pending. Assume the system automatically went into the "paused" state due to one of the conditions above. The system can be designed to either automatically go into the "warm-up" state when the triggering condition has passed, or require manual intervention to move from the "paused" to the "warm-up" stage. Obviously, the system should be designed to also let the trader manually switch the automated trading system from "enabled" to the "paused" state whenever the trader desires.

Decision logic **450** determines that a sell (buy) order should be submitted if the market bid (ask) price is greater (less) than or equal to the theoretical sell (buy) price. Even if decision logic **450** determines that an order should be submitted, safety check logic **460** may be used to prevent an order from being submitted. Safety check logic **460**, for example, can block orders entirely, or put a cap on the maximum quantity attempted to be bought or sold, for an option when acceptance of that order would result in the trader having a position greater than a predetermined thresh-

US 7,177,833 B1

19

old quantity of that option. A trader may be also set a limit on, say, the total delta of an automated trading attempt. This may arise if she is concerned about the potential size of the delta hedge that might be needed relative to the depth and liquidity of the underlying security market. This would mean that each option might have a different maximum quantity and the quantity would be inversely proportional to the delta of the option. Also, the automated trading system may be paused or stopped if the number of attempted orders exceeds a predetermined amount in a predetermined period of time. The constraints may be stored in option data table **430** or elsewhere and may be varied for individual options. Other constraints may involve generating warnings and/or preventing orders, for example, when: (1) the theoretical buy price exceeds the theoretical ask price, (2) the theoretical buy price exceeds the theoretical value, (3) the theoretical sell price is less than the theoretical value, (4) the price of the underlying security moves outside some range, and/or (5) the theoretical sell price is less than the intrinsic value of the option. The intrinsic value may be defined as the difference between the strike price and the market price of the underlying security for puts, and the difference between the market price of the underlying security and the strike price for calls, where the minimum intrinsic value is zero. The trader may be able to override some or all of the checks performed by safety check logic **460** to increase speed of automated trading.

If the safety checks are passed (or overridden), order logic **470** creates a response and submits the response to the exchange site **100** via an output interface **480**. The trading station **230** may be notified through a trading station interface whether or not the safety checks are passed. The output interface **480** may pass the order to exchange interface software for ultimate transmission to the exchange site **100**. The receiver interface **410** and the output interface **480** may be formed by common equipment and/or data ports.

The option data table **430** and theoretical price table **435** can be checked periodically to ensure the accuracy of its content. For example, checks may be performed every, say, 15 seconds. This can be done, for example, by performing a checksum operation in which the entries of tables **430** and **435** table are summed and the sums are compared with the sums of a corresponding tables maintained by a trader station **230**. If the sums match, option data table **430** and theoretical price table **435** may be presumed to be accurate. If the sums do not match, a warning is generated and automated trading is stopped completely or paused until option data table **430** and theoretical price table **435** are reloaded or updated and accuracy can be ensured. Of course, other or additional techniques for testing the accuracy of tables **430** and **435** may be implemented. Moreover, such an accuracy check may be omitted if one is sufficiently confident in the reliability of the software, hardware and communication networks.

Knowledge of how the search protocol locates data within the option data table **430** and theoretical price table **435** may be used to structure these tables to ensure that selected options will be located particularly quickly. The selected options may be, for example, frequently traded options and/or options whose price will become attractive with a small change in the underlying security price. For example, the search protocol may conduct searches by starting at the first row of the table and then stepping through each successive row until a particular row is identified. In this case, the tables **430** and **435** may be structured so that a select option is placed in the first row. Consequently, the search protocol will locate the select option first. Statistics may be

20

maintained, for example, at a trader station **230**, and used to restructure the tables **430** and **435** as trading conditions change. Further, when the market price of the underlying security changes, the theoretical price logic **490** may calculate the new theoretical prices in the same predetermined order as the search protocol, with the newly calculated theoretical price acted upon by the decision logic **450** either before or during calculation of the next theoretical price. In this way, the automated trading system calculates theoretical value and makes transaction decisions first for options believed to be most likely to generate profitable transactions, whether the decision logic **450** is triggered by a change in market price of the option, by a change in theoretical value, or otherwise.

The embodiment described in connection with FIG. **3** compares the current market price of an option to theoretical buy and sell prices from a theoretical price table **435** to make a buy/sell decision. However, other transaction values may be compared consistent with the present invention to generate buy/sell decisions. For example, the theoretical option value may be subtracted from the market bid (ask) price and compared to a sell (buy) spread selected by the trader to generate buy/sell decisions. Alternatively, implied volatilities may be calculated for market option bid (ask) prices using, say, mathematical models and inputs similar to those used for calculating theoretical option prices. These calculated implied volatilities may then be compared to trader-defined theoretical volatility values to make buy/sell decisions. Of course, other values may also be indexed and used for comparison to generate buy/sell decisions consistent with the present invention.

FIG. **4** illustrates an embodiment of a trader screen **500** displayed on a trader station **230** in connection with trading options on a particular security or commodity. The trading screen **500** may provide a graphic user interface to enable the trader to set parameters associated with automated trading. Trading screen **500** is organized as an array of cells **510**. The rows **512** of the array represent different options available in the market for the particular security or commodity. The columns **514** of the array provide information concerning the options. More particularly, the columns to the left of the "Strike" column provide information on call options and the columns to the right of the "Mon" column provide information on put options. Call and put options are, thus, displayed as mirror images of each other.

Each row of the array represents information relating to a different pair of call and put options for a particular strike price, month and year. The first column from left to right is labeled "DCX," which identifies the underlying security for the options as Daimler-Chrysler stock. The values below the "DCX" label consecutively number the rows of the array. The trading screen may be scrolled up or down to view additional rows in the array, if any exist. The next fourteen columns contain information relating to call options. The second column, "POS," is to the right of the "DCX" column. The values below the column heading POS indicate the trader's position (i.e., how many of the options the trader possesses) in call options for each row of the array. A negative cell value in the "POS" column indicates that the trader has sold more of the option than she has bought (this is called a short position. Positive values denote a long position). Cells in the "B" column (three columns to the right of the "POS" column) indicate whether automated buying is enabled for the particular options corresponding to those cells. Cells in the "S" column (three columns to the right of the "B" column) indicate whether automated selling is enabled for the particular options corresponding to those

US 7,177,833 B1

21

cells. The trader may select one or more sells in the "B" and "S" columns to enable or disable automated buying and selling, respectively, of options corresponding to the selected cells.

The "TBid" and "TAsk" columns indicate the theoretical buy and sell prices for automated trading. The "Theo" column represents the theoretical value assigned to the call option for each row. To the right of the "Mon" column, the screen provides "TBid," "TAsk," "Theo," and "POS" columns, among others, for the put options in each row of the array. Additional details concerning the remaining columns of the trader screen **500**, as well as other information concerning its functionality, can be found in U.S. application Ser. No. 09/273,362 to Marynowski et al., filed Mar. 22, 1999, and U.S. application Ser. No. 09/417,774 to Marynowski et al., filed Oct. 14, 1999, both of which are expressly incorporated herein by reference.

The "POS" columns usually provide information received from the exchange site and are not adjustable by the trader. The "TBid," "TAsk," and "Theo" columns may be adjusted by the trader using a mouse, keyboard, or other input device, such as a game pad. For example, the trader may select a particular "TBid" or "TAsk" cell by clicking once and then using up or down arrows, for instance, to increase (arrow up) or decrease (arrow down) the value. Mathematically, this may be achieved by increasing or decreasing the bid spread value (BSprd) or the ask spread value (ASprd). Changes made to the BSprd and ASprd values on trading station **230** would update option table data **430**, and, consequently, may trigger a recalculation of theoretical price table **435**. Note that changes to BSprd and Asprd values may not effect the "Theo" value since BSprd and ASprd are not inputs into the "Theo" calculation. A particular "Theo" cell may be adjusted in the same manner as a "TBid" or "TAsk" cell. Mathematically, adjustments to a Theo cell may be achieved by increasing or decreasing the assumed volatility of that particular option. Changes made to assumed volatilities on trading station **230** would update option table data **430**, and, consequently, trigger a recalculation of theoretical price table **435**. The "TBid", "TAsk", and "Theo" values may also be adjustable in groups, for example, by selecting multiple cells or all cells in the column by selecting the column header. The trader station **230** may update the displayed values of Theo, TBid and TAsk values as the underlying security price change, or any variable contributing to Theo, TBid, or TAsk change (such as option pricing input variables (2)–(7) discussed above). For example, the trader station **230** may receive a market feed providing price information concerning the underlying security. The price information may be used to update or refresh the trading screen **500**. This may include the displayed TBid, TAsk, and Theo values for a given underlying price.

FIG. **5** provides an exemplary progression of steps from transmission of the current market information from the exchange site **100** to receipt of trade confirmation by the trader site **200** and the delay experienced at each step. The progression of steps illustrated assumes that the exchange-required interface software runs locally on backend computers **220** and **225**. Link **1** represents the line delay experienced by current trading information as it is transmitted from the exchange site **100** to the trader site **200**. Locating the automated trading system close to the exchange site **100** reduces the line delay of Link **1** (as well as that of Link **15**). Thus, by a reducing the delay associated with making automated trading decisions as well as the associated line delay, the overall speed in submitting orders to the exchange site **100** is increased. Moreover, the trader station **230** that

22

monitors and controls the backend computer **225** that implements the automated trading need not be located close to the exchange site **100**, but may monitor and control the backend computer **225** remotely.

Link **2** represents delays associated with operating system (networking subsystem) related to receiving data packets from the exchange site **100**. One technique for reducing this delay is to choose a platform, such as VMS or Linux, that has a good quality implementation of networking services used in automated trading.

Link **3** represents delays associated with decompressing information received from the exchange site **100**. Link **4** represents other processing delays that may be inherent in exchange interface software provided by the exchange for use at the trader site **200**. The exchange interface software allows the trader's equipment to interface with the exchange equipment. The exchange may impose obligations requiring traders to use the exchange interface software in trading. The exchange interface software, for example, may process the received market data and supply the data to an interface of an automated trading application installed by the trader. For instance, the market data may be input to internal tables and/or may be converted to actual values. Links **5** and **6** represent delays associated with the distribution of information from the exchange interface software to an interface of the trading system application. The exchange site **100** typically broadcasts information concerning all traded items. Each trading application usually subscribes to several sources of data (e.g., market data and trade confirmations for several products). In some cases, the exchange interface software will receive and decode all information received from the exchange site **100**, but only pass some of the information to the interface of the automated trading system. The exchange interface software spends some time in determining whether a particular piece of market information should be passed to the automated trading system. The exchange interface software and the trading system interface software communicate via a protocol. For example, the exchange interface software may notify the automated trading system via a callback function supplied by the latter, or by some other operating-system dependent mechanism (e.g., mailboxes on VMS). Choosing a platform that efficiently supports the protocol chosen can reduce this delay.

After receiving the current market information, the automated trading system decodes the information and, using a search protocol, searches a table of traded products, resulting in a delay indicated by link **7a**. A hash table with an efficient hash key or a search tree may be used to reduce the delay associated with the processing associated with link **7a**. The particular search protocol should be fine-tuned to the platform used for the automated trading system as performance may vary with the platform to the extent that a linear search may prove better than a hash table even for a surprisingly large number of products (over **100**). The look-up time for hash tables is almost constant. For binary trees, the look-up time is proportional to the logarithm of N (in O(log N)), where N is the number of products traded. A linear search has a look-up time that is proportional to N (in O(N)). Of course, the actual times encountered in practice matter, so the look-up protocol should be tailored to the platform used.

Link **7b** represents the delay in updating the option data table **430** and recalculating table **435**, if necessary. Current market information received in link **7a** may include new prices related to the underlying security. A new underlying security price may trigger the underlying security price values in option data table **430** to be updated. This, in turn,

US 7,177,833 B1

23

may trigger a recalculation of values contained in the theoretical price table **435**. Of course, current market information in link **7a** may also contain other variables that may effect the theoretical price table **435**. In such cases, similar steps of updating option data table **430** and recalculating theoretical price table **435** may be necessary. If current market information received in link **7a** does not change any value in option table **430** that effects theoretical price table **430**, no actions are taken and the process continues to link **8**, bypassing link **7b** completely. Of course, values in option data table **430** may be updated from other sources besides exchange site **100**. For example, trading station **230** may send a new assumed volatility for a particular option without backend computer **225** processing links 1–**7a**. In this case, option data table **430** and theoretical prices table **435** will be updated in link **7b** and the process continues to link **8**.

Link **8** represents the delay attributable to decision-making and safety checks. As noted above, decisions are made based on a numeric comparison between the current market price and the corresponding theoretical price. Safety checks account for most of the delay experienced in link **8**. Safety checks may include, among other things, (1) price and quantity reasonability checks, (2) trade attempt frequency limitations, and (3) underlying bid and ask price checks.

Links **9**–**15** corresponds to the delay associated with composing an order and submitting the order to the exchange. In particular, link **9** reflects the time spent composing the order, which may require a format defined by the exchange. Link **10** corresponds to the time required for the automated trading system output interface to communicate the order to the exchange interface software. This may be done, for example, using a synchronous function call or an asynchronous call. In some embodiments, the tasks associated with links **9** and **10** may be performed at the same time. Links **11** and **12** correspond to the time expended while the exchange interface software receives the order, decides which module should be used to submit the order, interprets the order request, and performs a series of validations. If the order passes these tests, it is converted into the exchange format and passed to the exchange, as indicated by links **13**–**15**.

Links **1** and **15** may include any delays occurring between the trader site **200** and the exchange site **100**, including, for example, any delays attributable to an intermediary, such as a broker. As noted above, the delays attributable to links **1** and **15** may be reduced by locating the automated trading system close to the exchange site **100**. If, for example, the exchange site for an option is located in a city distant from the exchange site for the underlying stock, the trader site may be located in between the two exchange sites to reduce transmission delays, or closer to the exchange site that is expected to trigger the most trading activity for the automated trading system and thus minimize the effect of transmission delays on automated trading. In addition, if routers and LANs are used at the trader site **200**, the selection of high-speed equipment may reduce delays and/or priority schemes. The delay experienced in links **2**–**14** may be reduced, of course, by using a faster computer. However, the efficiency of the software and algorithms is also an important factor in reducing delay. Further, in some situations, it is possible to integrate the automated trading system software with the software that interfaces with the exchange site **100**, which leads to reduced delay. In such a case, the automated trading system receiver and output interfaces may be the same as the exchange receiver and output interfaces.

24

Link **16** reflects the processing of the order at the exchange site **100**. Following the exchange site **100** processing, a confirmation of the trade is returned to the trader if the trader's order is matched. Not all orders result in a match. There may be no sharing of lucrative trades with other traders who may have submitted similar matching orders that are received by the exchange even some microseconds later.

As noted above, the embodiment illustrated in FIG. **5** corresponds to an arrangement in which the interface software provided by the exchange and the automated trading system are resident on the backend computer **225**. In arrangements in which the interface software and the automated trading system are resident on separate backend computers, the vertical dashed line **610** indicates the interface between the separate computers. The separate backend computers may be connected via network interface cards or a common hub. Additional delays may be experienced in the transmission and reception of between the backend computers as well as from LAN throughput and latency.

In arrangements in which there is no exchange-provided interface software running locally on backend computers **220** and **225**, steps **2**–**6** and **10**–**14** may be performed by the automated trading software or eliminated completely. For example, steps **10** and **11** may not be needed since they are usually associated with communication between two applications, and not communication within a single application. Similarly, the trader may be able to choose not to perform the processing and pre-order validation performed in step **12** when using the proprietary trader system software. Whether or not compression per step **13** is performed depends on the communications protocols supported by the exchange. These protocols may be spelled out in an application programming interface (API) manual provided to the trader by the exchange.

Moreover, in arrangements in which an intermediary such as a broker or clearing agent is included in the communication routing between trader site **200** and exchange site **100**, steps **2**–**6** and **10**–**14** may be performed by communication software provided by the intermediary, or software that uses API's provided by the intermediary and is developed by the trader or some third party vendor. In this case, the intermediary would thus be responsible for translating communications between its protocol and that of the exchange before routing messages between the exchange and the trader. This would of course be outside the control of the trader and would introduce additional delays in the total response.

FIG. **6** provides a schematic of an embodiment of an electronic trading exchange system network **70** coupled to multiple trading sites. The electronic trading exchange system network **70** is similar to that shown as **10** in FIG. **1** and, for the sake of brevity, duplicative description will be omitted.

As shown in FIG. **6**, exchange site **700** is coupled to trader site **200** by communication links **300**. In one embodiment, the exchange site **700** may be designed as a local area network (LAN) and include, for example, one or more security routers and one or more back office computers, among other equipment. For purposes of illustration only, a single security router **710** and three back office computers **730-1**, **730-2**, **730-3** (referred to collectively as back office computers **730**) are shown in FIG. **6**. Security router **710** controls communications between the back office computers **730** and the communications link **300**. Security router **710** transmits and receives communications over the communications link **300**, as well as restricts communications from

US 7,177,833 B1

25

unauthorized sources. More particularly, the security router **710** may be used to isolate the equipment at the exchange site **700** from intrusion and facilitate communication with the back office computers **730**. The back office computers **730** manage the trading of the various securities, currencies, commodities and/or other items traded on the exchange. In this regard, back office computers **730** may function similarly to the back office computers **130** of exchange site **100**.

For purposes of illustration only, trading site **200** additionally includes a security router **213** and a backend computer **223** coupled to hub **240**. The security router **213** and backend computer **223** may be located remotely from other equipment of the trader site **200**. Security router **213** transfers trading information between the trading site **200** and the exchange site **700**. As above, the security router **213** screens communications from unauthorized sources. Backend computer **223** may be configured as a communication server for the trader stations **230**. Hub **240** handles communications between backend computer **223** and trader stations **230**.

In the embodiment shown in FIG. **6**, trader site **200** is connected to a first exchange site **100** and a second exchange site **700**. Of course, other network arrangements may be used in connection with the present invention. Through the first exchange site **100**, the trader site **200** may receive market information and trade securities, such as options, futures, and other derivatives; currencies, stocks, bonds, and other physicals like corn, metals, electricity, etc., and/or other items. Through the second exchange site **700**, the trader site **200** may receive market information and/or trade securities and/or other items. Traders site **200** receives market information and trades securities or other items related to the securities or other items traded through the first exchange site **100**.

The trader site **200** may be equipped with hedging capability that facilitates buying or selling securities and/or other items traded on the exchange to hedge at least some of the risk (for example, delta risk) associated with an automated trade for other securities or items. For example, trader site **200** may trade options for a particular stock through exchange site **100** and the particular stock through exchange site **700**. In general, two types of orders may be submitted to an exchange to buy (sell) a security. A market order instructs the exchange to buy (sell) a specified quantity of the security at the going market price. A limit order instructs the exchange to buy (sell) up to a specific quantity of the security if the market price is equal or better than a specified value. A trader usually can be assured that (under most circumstances) a market order will be filled by the exchange, but cannot be certain of the price at which the order is filled. The actual price that the market order is filled depends on available price and depth of market. While the trader placing a limit order can be assured of a price, all or a portion of the limit order may never be filled if the market price never meets the limit order conditions.

The principles of a market order and a limit order are illustrated by the following examples.

| Market Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| Best Available Market Prices | 1000 shares | $110/share | 400 shares | Yes |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | No |

26

The above table assumes a market with current bids of $110/share for 400 shares, $100/share for 600 shares and $80/share for 2000 shares, as indicated above. A market order to sell 1000 shares will be executed by the exchange at an average price of $104/share. In other words, the 1000 share market order will be matched with 400 shares at $110/share and 600 shares at $100/share, for a net of 1000 shares at an average price of $104/share.

If the bid of $110/share for 400 shares is sold just before the market order is received, the following market is presented.

| Market Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| Best Available Market Prices | 1000 shares | | | Not Available |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | Yes |

Because 400 shares at $110/share is no longer available, the exchange will match the market order using 600 shares of the $100/share bid and 400 shares of the $80/share bid, resulting in an average price of $92/share.

We next consider a similar scenario using limit orders instead of market orders.

| Limit Order Price | Market Order Quantity to Sell | Bid Price | Bid Amount | Matched Against Order? |
|---|---|---|---|---|
| $100/share | 1000 shares | | | Not Available |
| | | $100/share | 600 shares | Yes |
| | | $80/share | 2000 shares | No |

Now assume that a limit order to sell 1000 shares at $100/share is submitted instead of the market order and the $110/share bid has already been matched. The exchange will match 600 shares of the limit order at $100/share and will not match the remaining 400 shares because the $80/share bid is too low. Accordingly, the remaining 400 shares of the limit order will stay in the exchange's book until a new matching order to buy at $100/share or higher is received by the exchange, which may never occur, or until it is cancelled.

As discussed above, order submission in the automated trading system depends, for example, on the price of the underlying security, which is liable to change frequently. Thus, if the automated trading system makes an option trade, the trader may wish to hedge the risk associated with underlying price movement. This risk, commonly called delta risk, may be quantified using mathematical models. These models may be similar to, or the same as, the models used for determining theoretical option prices using option pricing input variables (1)–(7) discussed above. The option lot size (shares per option contract) and number of option contracts traded are typically factored into the hedging decision. The option lot size is typically defined by the options exchange when the contract is created and changed only under special circumstances, such as capital adjustments. The number of options that the trader has bought or sold may be included in the confirmation notice transmitted from the options exchange. Accordingly, assuming a total delta hedge is desired, a trader may determine the quantity

US 7,177,833 B1

27

28

of the underlying security to be bought or sold after each option trade based on: (1) mathematical models, including price of the underlying security, (2) options lot size, and (3) number of options traded.

As noted above, the price of the underlying security may be defined in several different ways. A typical hedging response of an option trade will be to buy or sell the underlying security. Specifically, buying (selling) calls and selling (buying) puts will usually lead to selling (buying) the underlying for delta hedging. Since the trader will need to sell (buy) the underlying to hedge the delta risk, he may be most interested in the bid (ask) price of the underlying security. While delta risk is referred to specifically, it should be understood that the automated hedging feature might be used to hedge other known risks. For example, automated hedging may be used to hedge the vega risk, the risk of a position or trade due to price changes of the options arising from changes of an option's volatility.

From a trading perspective, the trader must define how and to what extent to delta hedge. Obviously, a trader must first decide whether he wants to delta hedge manually, semi-automatically, or fully automatically. In any case, he may consider two opposing dynamics: (1) speed of executing the underlying security orders, and (2) execution price of the underlying security orders. Typically, a trader may choose to hedge using market orders if she is most concerned about speed of execution, or limit orders if she is most concerned about the price at which the underlying orders are executed. As described above, entering a market order will (nearly) always result in the desired quantity being executed, but at potentially unfavorable or unexpected prices. Conversely, entering a limit order will always result in executed prices which meet certain criteria (i.e., greater than or equal to limit price if selling, and less than or equal to the limit price if buying), but only some or none of the desired quantity may actually be executed. Of course, other types of orders such as Fill Or Kill, and Immediate Or Cancel may be considered when designing an automated hedging feature but for brevity, will not be discussed in detail here.

The trader may assess several qualitative factors in deciding whether to semi-automatically or fully automatically hedge and, if so, whether to use market orders or limit orders. Some of the qualitative factors include: (1) the quantity of delta hedge underlying trade relative to the depth of the entire underlying market, (2) volatility of the underlying market, (3) the size of the underlying bid-ask price spread relative to the price of the underlying, and (4) the amount of mental attention the trader can give toward the delta hedge trade. Different traders trading options on different underlying securities may opt for different hedging methods. Thus, in one embodiment of the automatic option trading system of the present invention, the trader may choose manual hedging, semi-automatic, or automatic hedging using market orders and/or limit orders.

The fully automatic hedging software may be resident on one or more of the trader stations 230, a backend computer 220, 223, 225, or other equipment of the trader site 200. One embodiment of the fully automated hedging systems will be described in connection with FIG. 6. Backend computer 220 receives option trade confirmations from exchange site 100 based on an order submitted automatically by backend computer 225. Alternatively, or in addition, backend computer 225 may receive option trade confirmations from the exchange site 100. Further, the option trade confirmations may correspond to orders submitted either automatically or manually by a trader. Moreover, the option trade confirma-

tion may correspond to a quote submitted automatically or manually by the trader. Thus, backend computer 220 routes the trade confirmation to a trader station 230 that is associated with the automatic option trade made by the backend computer 225.

If the manual hedge feature has been selected, trader station 230 displays the appropriate hedge action based on factors previously entered by the trader. For example, the trader may see a message such as "buy 4500 shares" of the underlying security. The trader would have the responsibility of executing the hedging trade, if she desired. If the semi-automatic hedging using a limit order has been selected, trader station 230 would automatically display a dialogue box to the trader. The dialogue would include information (such as type of order, price, quantity, buy or sell) related to the potential hedging trade. If the trader is comfortable with these specifications, she may then submit this particular hedging order through actions on the keyboard, mouse, gamepad or other input device of trading station 230 (e.g., voice activation equipment). Alternatively, the trader could modify some or all of the specifications of the order before submitted the order. Of course, the trader may have the ability to cancel the dialogue box entirely if she wished not to hedge that particular option trade using the semi-automated hedging feature. If the automatic hedging using market orders feature has been selected, trader station 230 automatically submits a market order, for example to buy 4500 shares at the market prices, to exchange site 700 via backend computer 223. At the exchange site 700, the market order will (nearly) always be immediately filled by buying 4500 shares, albeit at a potentially unexpected or undesirable average price for those shares.

If automatic hedging using a limit order has been selected, trader station 230 automatically submits an order, for example to buy 4500 shares at a price of 68.05, to exchange site 700 via backend computer 223. The default limit price specified in the semi-automated and fully automated hedging orders may depend on the current underlying market and/or parameters pre-defined by the trader. For instance, the trader may define the price to use when buying the underlying security with semi- or fully automatic hedging as, perhaps, either: (1) current ask price, since she is buying, (2) average of current bid and ask price, (3) last traded price, or (4) the ask price at which the automated option trade was triggered, regardless of the current underlying prices. Depending on the market conditions, exchange site 700 may not be able to match the limit order immediately, if ever. Exchanges typically enable the trader to modify or delete partially matched or completely unmatched limit orders. In some cases, the exchange site through which the underlying security is traded may depend on the option traded. For example, both futures of an equity index (e.g., Standard and Poor's 500) and options on the same equity index may be traded through exchange site 100. A stock may be traded through exchange site 700, but options for the stock may be traded through exchange site 100. In such a case, the system configurations at either the trader station 230 performing hedging or other equipment at trader site 200 must ensure that hedge orders are routed to the appropriate exchange.

While the above-embodiments have been described in terms of arrays or tables, it should be understood that data may include or be maintained in other organizational memory constructs consistent with the present invention, for example, linked lists, trees, heaps, hash lists, or some combination, or any other data structure or combinations of data structures useful in implementing a search algorithm. In addition, the trader site 200 is described as submitting orders

29

to the exchange site **100** using the automated trading system. However, the trader site **200** may submit its "order" in the form of a quote to the exchange site, where the bid (ask) price of the quote corresponds to the theoretical buy (sell) price if, say, the trader wanted to buy (sell) the item.

It will be apparent to those skilled in the art that various modifications and variations can be made without departing from the scope or spirit of the invention. For example, the present invention may be applied in areas other than electronically-traded securities, for example, the purchase and/or sale of goods or services, contests, auctions, and other applications in which fast, accurate responses are desirable. Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with a true scope and spirit of the invention being indicated by the following claims.

What is claimed is:

**1**. An automated trading system for use in an electronic exchange system network, comprising:

a receiver interface that receives market price information for a first traded item from an exchange;

a transaction value calculator that generates a transaction value for the first traded item based on price information for a second traded item related to the first traded item;

decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit a response to buy or sell the first traded item; and

an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to said decision logic.

**2**. The automated trading system according to claim **1**, wherein the transaction value calculator receives current price information for the second traded item and uses the current price information to generate the transaction value.

**3**. The automated trading system according to claim **2**, wherein said transaction value calculator generates the transaction value using interpolation.

**4**. The automated trading system according to claim **2**, wherein said transaction value calculator generates the transaction value by extrapolation.

**5**. The automated trading system according to claim **2**, wherein the transaction value calculator generates the transaction value by using some precalculated terms.

**6**. The automated trading system according to claim **2**, wherein the second traded item is a security and the first traded item is an option on the security.

**7**. The automated trading system according to claim **1**, wherein the request for market transaction is an order for the first traded item.

**8**. The automated trading system according to claim **1**, wherein the request for market transaction is a quote for the first traded item.

**9**. The automated trading system according to claim **1**, said decision logic compares at least a portion of the received market price information to the transaction value when automated trading in the first item first becomes enabled.

**10**. The automated trading system according to claim **1**, further comprising safety check logic, responsive to said decision logic, to prevent transmission of a request for market transaction for the first traded item to the exchange if the request does not meet a predetermined criterion.

30

**11**. The automated trading system according to claim **10**, wherein the predetermined criterion is a maximum trade quantity for the first traded item.

**12**. The automated trading system according to claim **10**, wherein the predetermined criterion is a maximum resulting delta position in the second traded item.

**13**. The automated trading system according to claim **10**, wherein said predetermined criterion is a maximum number of market transaction attempts within a predetermined period of time and said decision logic compares at least a portion of the received market price information to the transaction value when the maximum number of attempts is increased.

**14**. The automated trading system according to claim **1**, where the receiver interface receives the market price information for the first traded item indirectly from the exchange via an exchange interface.

**15**. The automated trading system according to claim **1**, wherein the decision logic compares the transaction value to at least a portion of the received market price information.

**16**. The automated trading system according to claim **15**, wherein the transaction value is a minimum sell price for the first traded item, and the market price information includes a market bid price for the first traded item.

**17**. The automated trading system according to claim **15**, wherein the transaction value is a maximum buy price for the first traded item, and the market price information includes a market ask price for the first traded item.

**18**. The automated trading system according to claim **15**, wherein the transaction value is a theoretical value of the first traded item based on a mathematical model.

**19**. The automated trading system according to claim **15**, wherein the price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the current market price for the second traded item changes.

**20**. The automated trading system according to claim **15**, wherein said price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the price information for the first traded item changes.

**21**. The automated trading system according to claim **1**, wherein a backend computer includes said receiver interface, said transaction value calculator, said decision logic, and said output interface and further comprising a trader station separate from said backend computer, said trader station coupled to said backend computer through a communication link, said trader station including a graphic user interface to enable a trader to monitor the operation of said backend computer.

**22**. The automated trading system according to claim **21**, wherein said backend computer is located substantially closer than said trader station to the exchange that transmits the market price information for the first traded item.

**23**. The automated trading system according to claim **1**, wherein:

said output interface outputs a request for market transaction for the first traded item; and

said receiver interface further receives trade confirmation information for the first traded item in response to the request for market transaction for the first traded item,

and said automated trading system further comprises:

hedge logic for generating a request for market transaction for the second traded item in response to the trade confirmation information, wherein said request for

US 7,177,833 B1

31

32

market transaction for the second traded item hedges at least some of the risk of the market transaction for the first traded item.

**24**. An automated trading method for use in an electronic exchange system network, comprising:

receiving market price information for a first traded item;

automatically calculating a transaction price for the first traded item based on price information for a second traded item related to the first traded item;

comparing the received market price information for the first traded item to the transaction price for the first traded item; and

automatically generating a request for market transaction for one of the first traded item and the second traded item based on the comparison of the received market price information to the transaction price.

**25**. The automated trading method according to claim **24**, wherein said first traded item corresponds to an option and the second traded item corresponds to a security underlying the option.

**26**. The automated trading method according to claim **24**, wherein said step of calculating a transaction price, comprises:

(a) receiving current market price information for said second traded item;

(b) generating said transaction price for said first traded item using said current market price information for said second traded item.

**27**. The automated trading method according to claim **26**, wherein said step of calculation uses interpolating the transaction price.

**28**. The automated trading method according to claim **26**, wherein said step of generating said transaction price comprises extrapolating the transaction price.

**29**. An automated method of trading in an electronic exchange system network, comprising:

receiving a current market price for an option from an electronic exchange;

automatically comparing the current market price for the option with a transaction price for the option, where the transaction price for the option is calculated at least in part from current price information for an underlying security for the option; and

based on the result of the comparing step, automatically submitting an order or quote for the option to the electronic exchange within 96 microseconds of the step of receiving the current market price for the option.

**30**. An automated method of trading in an electronic exchange system network, comprising the steps of:

receiving a current market price for a security from a market source;

automatically calculating a transaction price for an option of the security using the current market price for the security;

comparing the current market price for the option with a transaction price for the option; and

based on the step of comparing, automatically submitting an order or quote for the option to an electronic exchange within 154 microseconds of the step of receiving the current market price for the security.

**31**. The automated trading method according to claim **30**, wherein said step of submitting an order or quote is performed within 97 microseconds of the step of receiving the current market price for the security.

**32**. The automated trading method according to claim **31**, further comprising the step of performing safety checks before the submitting step.

**33**. The automated trading method according to claim **32**, wherein said step of calculating is performed within 80 microseconds.

**34**. An automated trading method for use in an electronic exchange system network, comprising the steps of:

receiving market price information for a first traded item;

automatically calculating a transaction value for the first traded item based on at least one of (a) price information for a second traded item related to the first traded item and (b) received market information for the first traded item; and

using at least the calculated transaction value in automatically determining whether to submit an order for the first traded item.

**35**. The automated trading method according to claim **34**, wherein the calculated transaction value is an implied volatility value corresponding to the first traded item.

**36**. The automated trading method according to claim **34**, wherein the calculated transaction value is a maximum buy value for the first traded item.

**37**. The automated trading method according to claim **34**, wherein the calculated transaction value is a minimum sell value for the first traded item.

**38**. The automated trading method according to claim **34**, wherein the calculated transaction value is a theoretical value for the first traded item generated based on a mathematical model.

**39**. The automated trading method according to claim **34**, further comprising the steps of:

(a) submitting an order for the first traded item;

(b) receiving confirmation of a transaction from an exchange responsive to the order submitted; and

(c) submitting an order for the second traded item to hedge a delta risk associated with the confirmed transaction.

* * * * *

# EXHIBIT 3



 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/417,774 | 10/14/1999 | JOHN M. MARYNOWSKI | 048289-5002 | 7919 |

9629    7590    08/01/2002
MORGAN LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004

| EXAMINER |
|---|
| FELTEN, DANIEL S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3624 | |

DATE MAILED: 08/01/2002

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/417,774 | MARYNOWSKI ET AL. |
| | Examiner | Art Unit |
| | Daniel S Felten | 3624 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on <u>14 October 1999</u> .

2a) ☐ This action is **FINAL**.  2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☐ Claim(s) <u>1-46</u> is/are pending in the application.

  4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☐ Claim(s) <u>1-46</u> is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11) ☐ The proposed drawing correction filed on _____ is: a) ☐ approved b) ☐ disapproved by the Examiner.

  If approved, corrected drawings are required in reply to this Office action.

12) ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

  a) ☐ All  b) ☐ Some * c) ☐ None of:

   1. ☐ Certified copies of the priority documents have been received.

   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

   * See the attached detailed Office action for a list of the certified copies not received.

14) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

  a) ☐ The translation of the foreign language provisional application has been received.

15) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)  
2) ☒ Notice of Draftsperson's Patent Drawing Review (PTO-948)  
3) ☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) <u>2</u> .  
4) ☐ Interview Summary (PTO-413) Paper No(s). _____ .  
5) ☐ Notice of Informal Patent Application (PTO-152)  
6) ☐ Other: _____

Serial Number: 09/417,774                    Applicant(s): Maryknowski (706/37)     **Page 2**
Art Unit: 3624                               Representative: ( )
------------------------------------------------------------------------------------------------------------


# DETAILED ACTION


## *Claim Rejections - 35 USC § 103*

1.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

>   (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
>   section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
>   such that the subject matter as a whole would have been obvious at the time the invention was made to a person
>   having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the
>   manner in which the invention was made.


2.    Claims 1-46 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lupien et al

(US 5,101,353) in view of Hartheimer et al (Hereinafter "Hartheimer", US 5,258,908)


Lupien discloses an automated trading system (see abstract) for use in an electronic exchange

system network (see Abstract), comprising:

        a receiver interface that receives market price information for a first traded item from an

exchange (see col. 4, ll. 32-41; and col. 6, ll. 60-66);

        data reference logic 10 ( *controller CPU*) that outputs a transaction value for the first

traded item from a data structure based on price information for a second traded item related to

the first traded item (see col. 3, ll. 7-23; and col. 6, ll. 3-15);

Serial Number: 09/417,774                    Applicant(s): Maryknowski *(70&07)*     Page 3
Art Unit: 3624                               Representative: ( )
------------------------------------------------------------------------------------------------------------

1      decision logic 10 using at least a portion of the received market price information and the

2  transaction value to generate a decision whether to submit an order for the first traded item (see

3  col. 3, ll. 7-14; and col. 6, ll. 41-45); and

4      an output interface (*computer*) for outputting a request (*orders*) for market transaction for

5  one of the first traded item and the second traded item for transmission to the exchange in

6  response to said decision logic (see col. 3, ll. 37-45).

7      memory storing the data structure 12 (*disc*), wherein the data structure maps precalculated

8  transaction values of the first traded item over a range of price values of the second traded item

9  (see col. 6, ll. 3+); and

10     reference logic for identifying one of the pre-calculated transaction values based at least

11 in part on a current price value for the second traded item (see col. 3, ll. 7-23; and col. 6, ll. 3-

12 15).

13     wherein the data structure is a two- dimensional data structure mapping pre-calculated

14 transaction values of the first traded item over a range of prices of the second traded item (see,

15 *portfolio,* col. 3, ll. 15-45 ).

16     wherein the data structure is an n-dimensional data structure, where n is 3 or more (see,

17 *portfolio,* col. 3, ll. 15-45 ).

18     wherein data reference logic receives current price information for the second traded item

19 and uses the current price information to output the transaction value (see col. 3, ll. 7-23; and col.

20 6, ll. 3-15).

Serial Number: 09/417,774                    Applicant(s): Maryknowski (705/37)          Page 4
Art Unit: 3624                               Representative: ( )
--------------------------------------------------------------------------------------------------------------

Lupien fails to disclose wherein the data structure is a look-up table. This feature is found in Hartheimer (see Hartheimer, col. 2, 40+). It would have been obvious for an artisan of ordinary skill at the time of the invention of Lupien to integrate the Look up tables disclosed by Hartheimer because an artisan at the time of the invention of Lupien would have recognized that the notoriously old and well known look up table would provide a substitute to the matching means in Lupien, to provide the status of a particular traded security during the trading process. Thus such a modification would constitute an alternative means of providing status of a security, being a mere design choice, for an artisan of ordinary skill in the art.

## Conclusion

3.      A list of relevant prior art appears below not relied upon in this Office Action:

US Patents:

Kalmus (US 4,674,044) discloses a automated trading system

Deming, Jr. et al (US 5,500,793) discloses a computerized system for developing multi-party property equity exchange scenarios

Dinwoodie (US 6,415,269 B1) discloses an interactive remote auction bidding system

Lindsey et al (US 5,063,507) discloses goods database employing electronic title or documentary type title

Scantlin (US 3,082,402) discloses a securities quotation apparatus

Scantlin (US 3,296,597) discloses a market quotation apparatus

●                              ●

**Serial Number: 09/417,774**                 **Applicant(s): Maryknowski** (705/07)        **Page 5**

**Art Unit: 3624**                            **Representative:** ( )

-----------------------------------------------------------------------------------------------------------------------------

1    Hicks et al (US 2,046,381) discloses a bid and asked quotation system

2

3    4.        Any inquiry concerning this communication or earlier communications from the examiner

4    should be directed to **Daniel S. Felten** whose telephone number is (703) 305-0724.   The

5    examiner can normally be reached between the hours of 7:00AM to 5:30PM Monday-Thursday.

6    Any inquiry of a general nature  relating to the status of this application or its proceedings should

7    be directed to the Customer Service Office  (703) 306-5631, or the examiner's supervisor

8    **Vincent Millin** whose telephone number is (703) 308-1065.

9

10   5.        Response to this action should be mailed to:

11

12                    Commissioner of Patents and Trademarks

13                    Washington,  D.C. 20231

14

15            for formal communications intended for entry, or (703) 305-0040, for informal or draft

16   communications,  please label "Proposed" or "Draft".

17            Communications via Internet e-mail regarding this application, other than those under 35

18   U.S.C. 132 or which otherwise require a signature, may be used by the applicant and should be

19   addressed to *[daniel.felten@uspto.gov]*.

20

21   All Internet e-mail communications will be made of record in the application file.  PTO

22   employees do not engage in Internet communications where there exists a possibility that

23   sensitive information could be identified or exchanged unless the record includes a properly

24   signed express waiver of the confidentiality requirements of 35 U.S.C. 122.  This is more clearly

**Serial Number: 09/417,774**

**Art Unit: 3624**

**Applicant(s): Maryknowski** (708/37)

**Representative:** ( )

**Page 6**

----------------------------------------------------------------------------------------------------

1    set forth in the Interim Internet Usage Policy published in the Official Gazette of the Patent and

2    Trademark on February 25, 1997 at 1 195 OG 89.

3

4    **DSF**

5    **July 25, 2002**

6

VINCENT MILLIN
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 3600

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| ***Notice of References Cited*** | 09/417,774 | MARYNOWSKI ET AL. |
| | Examiner | Art Unit | |
| | Daniel S Felten | 2164 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-5101353A | 03-1992 | Lupien et al | 364/408 |
| | B | US-4674044 A | 06-1987 | Kalmus et al | 364/408 |
| | C | US-5500793A | 03-1996 | Deming, Jr. et al | 364/401 |
| | D | US-6415269B1 | 07-2002 | dinwoodie | 705/37 |
| | E | US-5063507A | 11-1991 | Lindsey et al | 364/408 |
| | F | US-3082402 A | 03-1963 | Scantlin | 340/152 |
| | G | US-3296597 A | 01-1967 | Scantlin et al | 340/172.5 |
| | H | US-2046381 A | 07-1936 | Hicks et al | 177/353 |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 3

# EXHIBIT 4

| *Notice of Allowability* | Application No. | Applicant(s) |
| | 09/417,774 | MARYNOWSKI ET AL. |
| | Examiner | Art Unit | |
| | Daniel S. Felten | 3624 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *May 23, 2003*.

2. ☒ The allowed claim(s) is/are *1-46*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All   b) ☐ Some*  c) ☐ None  of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
         International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☒ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
    (a) ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .
    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
        Paper No./Mail Date _____ .
    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Attachment(s)
1. ☒ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08),
    Paper No./Mail Date _____
4. ☐ Examiner's Comment Regarding Requirement for Deposit
    of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)
6. ☐ Interview Summary (PTO-413),
    Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____ .

Ex. Daniel Felten
AU 3624
Business Methods

Application/Control Number: 09/417,774                                    Page 2
Art Unit: 3624

## DETAILED ACTION

### *Allowable Subject Matter*

1.      Upon further consideration of the prior art in view of the claim language and arguments presented in the May 23, 2003 amendment, claims 1-46 are allowed.

2.      The following is an examiner's statement of reasons for allowance: The closest prior art found on record is Kane (US 6,317,728). Kane discloses a data acquisition system having an input communicating with a securities exchange for securities buy/sell data; a decision logic having a repository for storing a set of buy/sell *rules* for buying and selling securities in response to buy and sell data aligned with clock times; a buy and sell execution system having an input communicating with the decision logic for executing buy and sell orders *in conformance to buy and sell rules*. The decision logic includes at least one decision agent, the agent representing a respective buy/sell rule. Artificial intelligence is provided in that the decision agents are given added or reduced voting power when recommendations are found to respectively result in successful or unsuccessful decisions (see Kane Abstract; column 2, line 51 to column 3, line 62; and column 5, lines 37 to column 6, line 4).

       *Re claim 1*:  Conversely, the applicant claims a data reference logic that outputs *a transaction value* for the first traded item from a data structure based upon price information for a second traded item related to the first traded item; and a decision logic using at least a portion of the received market price information and the *transaction value* to generate a decision whether to submit an order for the first traded item. There is no teaching or suggestion of Kane having a decision logic that uses a portion of the received market price information and the *transaction value* to generate a decision whether to submit an order for the first traded item.

Application/Control Number: 09/417,774                                          Page 3
Art Unit: 3624

*Re claim 27*:  By contrast, the applicant claims generating an order for one of the first traded item and the second traded item based upon comparison of the received market price information to the desired price, where the identifying a desired price for the first traded item is *in a look-up table* based on price information for the second traded item. Kane does not suggest a identifying a desired price for the first traded item is *in a look-up table* based on price information for the second traded item.

*Re claim 32*: Kane discloses a processing logic\which assigns clock times to the buy/sell data (see Kane Abstract). There is no suggestion in Kane of submitting an order for an option to the exchange within 1 millisecond of receiving a current market price for an option from an exchange.

*Re claim 36*:  By contrast, the applicant discloses identifying *a transaction value* for the first traded item *in a look-up table* of transaction values for the first item, wherein the identifying is responsive to receiving the market information for the first traded item and wherein the transaction value in look-up table are based on price information for a second traded item related to the first traded item. Kane, fails to suggest identifying *a transaction value* for the first traded item *in a look-up table* of transaction values for the first item.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Application/Control Number: 09/417,774                                         Page 4
Art Unit: 3624

### *Conclusion*

3.     The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure.

US Patents:

Daughtery, III  (US 6,263, 321)  Discloses an apparatus and process for calculating an option

Daughtery, III (US 5,884,286) Discloses an apparatus and process for executing an

expirationless option transaction

Rickard et al (US 6,016,483) Discloses a method and apparatus for automated opening of options

exchange

Cristofich et al  (US 6,173,270) Discloses stock option control and exercise system

Pang et al (US 6,546,375) Discloses an apparatus and method of pricing financial derivatives

Kalmus et al (US 4,674,044) Discloses an automated securities trading system

Kramer (US 5,038,284) Discloses a method and apparatus relating to conducting trading

transactions with portable trading stations

Furuya et al (US 5,870,730) Discloses decision-making method

Wagner (US 4,903,201) Discloses automated futures trading exchange

Tanaka et al (US 5,315,634) Discloses Automatic trading method and apparatus

Braddock III, (US 4,412, 287) Discloses an automated stock exchange

Adams (US 3,573,747) Discloses Instinet communication system for effectuating the sale or

exchange of fungible properties between subscribers

Application/Control Number: 09/417,774                                                                Page 5
Art Unit: 3624

Lupien et al (US 5,101,353) Discloses automated system for providing liquidity to securities

markets

Makivic (US 6,061,662)  Discloses simulation method and system for the valuation of derivative

financial instruments

Gardner (US 6,058,391) Discloses enhance user view/update capability for managing data from

relational tables

Galant ( US, 6,839,686) Discloses a method and system for providing financial information and

evaluating securities of a financial debt instrument

Moseler et al (US 6,304,858) Discloses a method, system and computer program for trading

interest rate swaps

Freeny, Jr. (US 6,594,643)  Discloses automatic stock trading system


Non-Patented Literature:

Web-POP (Professional Options Package)

Barone-Adesi, G. and Whaley, R., "Efficient Analytic Approximation of American Option

Values", *The Journal of Finance*, Vol. 42, No. 2 (June 1987), pg. 301-320


Foreign Patents:

Holt, K., (WO 97/37735) discloses a sporting event options market trading game

Ginsberg, Phlip., (EP 0573, 991) discloses fixed income portfolio data processor and method for

using the same

Belden, G., et al  (WO 90/10910) discloses a simulated pit trading system

Application/Control Number: 09/417,774                                                                Page 6
Art Unit: 3624

     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Daniel S. Felten whose telephone number is (571) 272-6742.

The examiner can normally be reached on Flex.

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Vincent Millin can be reached on (571) 272-6747.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Daniel S Felten
Examiner
Art Unit 3624

DSF
February 23, 2006

VINCENT MILLIN
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 3600

# EXHIBIT 5

**Special Accommodations**

This meeting is physically accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aids should be directed to Paul J. Howard (see **ADDRESSES**) at least 5 days prior to the meeting date.

Dated: October 3, 2007.

**Tracey L. Thompson,**

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. E7–19823 Filed 10–9–07; 8:45 am]

**BILLING CODE 3510–22–S**

---

# DEPARTMENT OF COMMERCE

## Patent and Trademark Office

**[Docket No.: PTO–P–2007–0031]**

**Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme Court Decision in *KSR International Co.* v. *Teleflex Inc.***

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Notice.

**SUMMARY:** The United States Patent and Trademark Office (USPTO) is publishing examination guidelines for determining obviousness under 35 U.S.C. 103 in view of the Supreme Court decision in *KSR International Co.* v. *Teleflex Inc.* These guidelines will assist USPTO personnel to make a proper determination of obviousness under 35 U.S.C. 103 and to provide an appropriate supporting rationale.

**DATES:** These guidelines are effective October 10, 2007.

**FOR FURTHER INFORMATION CONTACT:** Contact either Kathleen Kahler Fonda, Legal Advisor (telephone (571) 272–7754; e-mail *kathleen.fonda@uspto.gov*) or Pinchus M. Laufer, Patent Examination Policy Analyst (telephone (571) 272–7726; e-mail *pinchus.laufer@uspto.gov*), of the Office of the Deputy Commissioner for Patent Examination Policy. Alternatively, mail may be addressed to Ms. Fonda or Mr. Laufer at Commissioner for Patents, attn: KSR, P.O. Box 1450, Alexandria, VA 22313–1450.

**SUPPLEMENTARY INFORMATION:** These guidelines are intended to assist Office personnel to make a proper determination of obviousness under 35 U.S.C. 103, and to provide an appropriate supporting rationale in view of the recent decision by the Supreme Court in *KSR International Co.* v. *Teleflex Inc.* (KSR).[1] The guidelines are

based on the Office's current understanding of the law, and are believed to be fully consistent with the binding precedent of the Supreme Court.[2]

These guidelines do not constitute substantive rule making and hence do not have the force and effect of law. They have been developed as a matter of internal Office management and are not intended to create any right or benefit, substantive or procedural, enforceable by any party against the Office. Rejections will continue to be based upon the substantive law, and it is these rejections that are appealable. Consequently, any failure by Office personnel to follow the guidelines is neither appealable nor petitionable.

To the extent that earlier guidance from the Office, including certain sections of the current Manual of Patent Examining Procedure (MPEP), is inconsistent with the guidance set forth herein, Office personnel are to follow these guidelines. The next revision of the MPEP will be updated accordingly.

## I. The *KSR* Decision and Principles of the Law of Obviousness

Teleflex owned a patent claiming technology useful in the gas pedal of a car. The invention at issue in *KSR* was a pedal assembly that could be adjusted to accommodate drivers of different statures. The electronic pedal-position sensor was positioned on the support for the pedal assembly, and the pivot point of the pedal remained fixed regardless of how the pedal assembly was adjusted. This combination of the fixed pivot point for the adjustable pedal and the fixed sensor position on the support resulted in a simpler, lighter, and more compact design.

Teleflex sued KSR for infringement. The district court cited references that separately taught adjustable pedals and sensors, and found on summary judgment that Teleflex's patent was invalid for obviousness. On appeal, the Federal Circuit vacated the district court's decision, and remanded the case. The Federal Circuit stated that "the district court's analysis applied an incomplete teaching-suggestion-motivation test" in arriving at the finding of obviousness.[3]

Upon KSR's petition for review of the Federal Circuit's decision, the Supreme Court reversed, concluding that the district court had correctly determined that the patent was invalid for

obviousness. The Supreme Court reaffirmed the familiar framework for determining obviousness as set forth in *Graham* v. *John Deere Co.*, but stated that the Federal Circuit had erred by applying the teaching-suggestion-motivation (TSM) test in an overly rigid and formalistic way.[4] Specifically, the Supreme Court stated that the Federal Circuit had erred in four ways: (1) "By holding that courts and patent examiners should look only to the problem the patentee was trying to solve;"[5] (2) by assuming "that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem;"[6] (3) by concluding "that a patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try;'"[7] and (4) by overemphasizing "the risk of courts and patent examiners falling prey to hindsight bias" and as a result applying "[r]igid preventative rules that deny factfinders recourse to common sense."[8]

In *KSR*, the Supreme Court particularly emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art,"[9] and discussed circumstances in which a patent might be determined to be obvious. Importantly, the Supreme Court reaffirmed principles based on its precedent that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."[10] The Supreme Court stated that there are "[t]hree cases decided after *Graham* [that] illustrate this doctrine."[11] (1) "In *United States* v. *Adams*, * * * [t]he Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."[12] (2) "In *Anderson's-Black Rock, Inc.* v. *Pavement Salvage Co.*, * * * [t]he two [pre-existing elements] in combination did no more than they would in separate, sequential operation."[13] (3) "[I]n *Sakraida* v. *AG Pro, Inc.*, the Court derived * * * the conclusion that when

---

[1] 550 U.S. __, 82 USPQ2d 1385 (2007).

[2] Further developments in the law of obviousness are to be expected in view of *KSR*. Thus, it is not clear which Federal Circuit decisions will retain their viability.

[3] *Teleflex Inc.* v. *KSR Int'l Co.*, 119 Fed. Appx. 282, 288 (Fed. Cir. 2005).

[4] *KSR*, 550 U.S. at __, 82 USPQ2d at 1391.

[5] *Id.* at __, 82 USPQ2d at 1397.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at __, 82 USPQ2d at 1395.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.'' [14] (Internal quotations omitted.) The principles underlying these cases are instructive when the question is whether a patent application claiming the combination of elements of prior art would have been obvious. The Supreme Court further stated that:

When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, 35 U.S.C. 103 bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.[15]

When considering obviousness of a combination of known elements, the operative question is thus ''whether the improvement is more than the predictable use of prior art elements according to their established functions.'' [16]

## II. The Basic Factual Inquiries of *Graham* v. *John Deere Co*

An invention that would have been obvious to a person of ordinary skill at the time of the invention is not patentable.[17] As reiterated by the Supreme Court in *KSR*, the framework for the objective analysis for determining obviousness under 35 U.S.C. 103 is stated in *Graham* v. *John Deere Co*.[18] Obviousness is a question of law based on underlying factual inquiries. The factual inquiries enunciated by the Court are as follows:

(1) Determining the scope and content of the prior art;
(2) Ascertaining the differences between the claimed invention and the prior art; and
(3) Resolving the level of ordinary skill in the pertinent art.

Objective evidence relevant to the issue of obviousness must be evaluated by Office personnel.[19] Such evidence, sometimes referred to as ''secondary considerations,'' may include evidence of commercial success, long-felt but unsolved needs, failure of others, and unexpected results. The evidence may be included in the specification as filed,

accompany the application on filing, or be provided in a timely manner at some other point during the prosecution. The weight to be given any objective evidence is decided on a case-by-case basis. The mere fact that an applicant has presented evidence does not mean that the evidence is dispositive of the issue of obviousness.

The question of obviousness must be resolved on the basis of these factual determinations. While each case is different and must be decided on its own facts, the *Graham* factors, including secondary considerations when present, are the controlling inquiries in any obviousness analysis.[20] As stated by the Supreme Court in *KSR*, ''While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls.'' [21]

### Office Personnel as Factfinders

Office personnel fulfill the critical role of factfinder when resolving the *Graham* inquiries. It must be remembered that while the ultimate determination of obviousness is a legal conclusion, the underlying *Graham* inquiries are factual. When making an obviousness rejection, Office personnel must therefore ensure that the written record includes findings of fact concerning the state of the art and the teachings of the references applied. In certain circumstances, it may also be important to include explicit findings as to how a person of ordinary skill would have understood prior art teachings, or what a person of ordinary skill would have known or could have done. Factual findings made by Office personnel are the necessary underpinnings to establish obviousness.

Once the findings of fact are articulated, Office personnel must provide an explanation to support an obviousness rejection under 35 U.S.C. 103. 35 U.S.C. 132 requires that the applicant be notified of the reasons for the rejection of the claim so that he or she can decide how best to proceed. Clearly setting forth findings of fact and the rationale(s) to support a rejection in an Office action leads to the prompt

resolution of issues pertinent to patentability.[22]

In short, the focus when making a determination of obviousness should be on what a person of ordinary skill in the pertinent art would have known at the time of the invention, and on what such a person would have reasonably expected to have been able to do in view of that knowledge. This is so regardless of whether the source of that knowledge and ability was documentary prior art, general knowledge in the art, or common sense. What follows is a discussion of the *Graham* factual inquiries.

## A. Determining the Scope and Content of the Prior Art

In determining the scope and content of the prior art, Office personnel must first obtain a thorough understanding of the invention disclosed and claimed in the application under examination by reading the specification, including the claims, to understand what the applicant has invented.[23] The scope of the claimed invention must be clearly determined by giving the claims the ''broadest reasonable interpretation consistent with the specification.'' [24] Once the scope of the claimed invention is determined, Office personnel must then determine what to search for and where to search.

1. *What to search for:* The search should cover the claimed subject matter and should also cover the disclosed features which might reasonably be expected to be claimed.[25] Although a rejection need not be based on a teaching or suggestion to combine, a preferred search will be directed to finding references that provide such a teaching or suggestion if they exist.

2. *Where to search:* Office personnel should continue to follow the general search guidelines set forth in MPEP § 904 to § 904.03 regarding search of the prior art. Office personnel are reminded that, for purposes of 35 U.S.C. 103, prior art can be either in the field of applicant's endeavor or be reasonably pertinent to the particular problem with which the applicant was concerned. Furthermore, prior art that is in a field of endeavor other than that of the applicant,[26] or solves a problem which

---

[14] *Id.* at ___, 82 USPQ2d at 1395–96.

[15] *Id.* at ___, 82 USPQ2d at 1396.

[16] *Id.*

[17] 35 U.S.C. 103(a).

[18] 383 U.S. 1, 148 USPQ 459 (1966).

[19] *Id.* at 17–18, 148 USPQ at 467.

[20] The *Graham* factors were reaffirmed and relied upon by the Supreme Court in its consideration and determination of obviousness in the fact situation presented in *KSR*, 550 U.S. at ___, 82 USPQ2d at 1391. The Supreme Court has utilized the *Graham* factors in each of its obviousness decisions since *Graham. See Sakraida* v. *Ag Pro, Inc.*, 425 U.S. 273, 189 USPQ 449, reh'g denied, 426 U.S. 955 (1976); *Dann* v. *Johnston*, 425 U.S. 219, 189 USPQ 257 (1976); and *Anderson's-Black Rock, Inc.* v. *Pavement Salvage Co.*, 396 U.S. 57, 163 USPQ 673 (1969).

[21] *KSR*, 550 U.S. at ___, 82 USPQ2d at 1391.

[22] These guidelines focus on the proper content of an obviousness rejection, and should not be construed as dictating any particular format.

[23] *See* MPEP § 904 (8th edition, revision 5, August 2006).

[24] *See Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) and MPEP § 2111.

[25] *See* MPEP § 904.02.

[26] As noted by the Court in *KSR*, ''[w]hen a work is available in one field of endeavor, design

Continued

is different from that which the applicant was trying to solve, may also be considered for the purposes of 35 U.S.C. 103.[27]

For a discussion of what constitutes prior art, see MPEP § 901 to § 901.06(d) and § 2121 to § 2129.

**B. Ascertaining the Differences Between the Claimed Invention and the Prior Art**

Ascertaining the differences between the claimed invention and the prior art requires interpreting the claim language,[28] and considering both the invention and the prior art as a whole.[29]

**C. Resolving the Level of Ordinary Skill in the Art**

Any obviousness rejection should include, either explicitly or implicitly in view of the prior art applied, an indication of the level of ordinary skill. A finding as to the level of ordinary skill may be used as a partial basis for a resolution of the issue of obviousness.

The person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art may include: (1) "Type of problems encountered in the art;" (2) "prior art solutions to those problems;" (3) "rapidity with which innovations are made;" (4) "sophistication of the technology;" and (5) "educational level of active workers in the field. In a given case, every factor may not be present,

and one or more factors may predominate."[30]

"A person of ordinary skill in the art is also a person of ordinary creativity, not an automaton."[31] "[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."[32] Office personnel may also take into account "the inferences and creative steps that a person of ordinary skill in the art would employ."[33]

In addition to the factors above, Office personnel may rely on their own technical expertise to describe the knowledge and skills of a person of ordinary skill in the art.[34]

**III. Rationales To Support Rejections Under 35 U.S.C. 103**

Once the *Graham* factual inquiries are resolved, Office personnel must determine whether the claimed invention would have been obvious to one of ordinary skill in the art.

The obviousness analysis cannot be confined by * * * overemphasis on the importance of published articles and the explicit content of issued patents * * *. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends.[35]

Prior art is not limited just to the references being applied, but includes the understanding of one of ordinary skill in the art. The prior art reference (or references when combined) need not teach or suggest all the claim limitations; however, Office personnel must explain why the difference(s) between the prior art and the claimed invention would have been obvious to one of ordinary skill in the art. The "mere existence of differences between the prior art and an invention does not establish the invention's nonobviousness."[36] The gap between the prior art and the claimed invention may not be "so great as to render the

[claim] nonobvious to one reasonably skilled in the art."[37] In determining obviousness, neither the particular motivation to make the claimed invention nor the problem the inventor is solving controls. The proper analysis is whether the claimed invention would have been obvious to one of ordinary skill in the art after consideration of all the facts.[38] Factors other than the disclosures of the cited prior art may provide a basis for concluding that it would have been obvious to one of ordinary skill in the art to bridge the gap. The rationales discussed below outline reasoning that may be applied to find obviousness in such cases.

If the search of the prior art and the resolution of the *Graham* factual inquiries reveal that an obviousness rejection may be made using the familiar teaching-suggestion-motivation (TSM) rationale, then such a rejection using the TSM rationale can still be made. Although the Supreme Court in *KSR* cautioned against an overly rigid application of TSM, it also recognized that TSM was one of a number of valid rationales that could be used to determine obviousness.[39] Office personnel should also consider whether one or more of the other rationales set forth below support a conclusion of obviousness.[40] Note that the list of rationales provided below is not intended to be an all-inclusive list. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel.

The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. The Court quoting *In re Kahn*[41] stated that "'[R]ejections on obviousness cannot be sustained by

---

[27] The Court in *KSR* stated that "[t]he first error * * * in this case was * * * holding that courts and patent examiners should look only to the problem the patentee was trying to solve. The Court of Appeals failed to recognize that the problem motivating the patentee may be only one of many addressed by the patent's subject matter * * * . The second error [was] * * * that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *Id.* at __, 82 USPQ2d at 1397. Federal Circuit case law prior to the Supreme Court's decision in *KSR* is generally in accord with these statements by the *KSR* Court. *See, e.g., In re Dillon,* 919 F.2d 688, 693, 16 USPQ2d 1897, 1901 (Fed. Cir. 1990) (en banc) ("[I]t is not necessary in order to establish a *prima facie* case of obviousness that both a structural similarity between a claimed and prior art compound (or a key component of a composition) be shown and that there be a suggestion in or expectation from the prior art that the claimed compound or composition will have the same or a similar utility as one newly discovered by applicant."); *In re Lintner,* 458 F.2d 1013, 1018, 173 USPQ 560, 562 (CCPA 1972) ("The fact that [applicant] uses sugar for a different purpose does not alter the conclusion that its use in a prior art composition would be *prima facie* obvious from the purpose disclosed in the references.").

[28] *See* MPEP § 2111.

[29] *See* MPEP § 2141.02.

---

incentives and other market forces can prompt variations of it, either in the same field or a *different one.*" (Emphasis added) 550 U.S. at __, 82 USPQ2d at 1396.

[30] *In re GPAC,* 57 F.3d 1573, 1579, 35 USPQ2d 1116, 1121 (Fed. Cir. 1995); *Custom Accessories, Inc.* v. *Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 962, 1 USPQ2d 1196, 1201 (Fed. Cir. 1986); *Envtl. Designs, Ltd.* v. *Union Oil Co.,* 713 F.2d 693, 696, 218 USPQ 865, 868 (Fed. Cir. 1983).

[31] *KSR,* 550 U.S. at __, 82 USPQ2d at 1397.

[32] *Id.*

[33] *Id.* at __, 82 USPQ2d at 1396.

[34] The Federal Circuit has stated that examiners and administrative patent judges on the Board are "persons of scientific competence in the fields in which they work" and that their findings are "informed by their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art." *In re Berg,* 320 F.3d 1310, 1315, 65 USPQ2d 2003, 2007 (Fed. Cir. 2003).

[35] *KSR,* 550 U.S. at __, 82 USPQ2d at 1396.

[36] *Dann* v. *Johnston,* 425 U.S. 219, 230, 189 USPQ 257, 261 (1976).

---

[37] *Id.*

[38] 35 U.S.C. 103(a).

[39] According to the Supreme Court, establishment of the TSM approach to the question of obviousness "captured a helpful insight." 550 U.S. at __, 82 USPQ2d 1385, 1396 (citing *In re Bergel,* 292 F.2d 955, 956–57, 130 USPQ 206, 207–08 (1961)). Furthermore, the Court explained that "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis." *KSR,* 550 U.S. at __, 82 USPQ2d at 1396. The Supreme Court also commented that the Federal Circuit "no doubt has applied the test in accord with these principles [set forth in *KSR*] in many cases." *Id.* at __, 82 USPQ2d at 1396.

[40] The Court in *KSR* identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in Graham. *Id.* at __, 82 USPQ2d at 1395–97.

[41] 441 F.3d 977, 988, 78 USPQ2d 1329, 1336 (Fed. Cir. 2006).

mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.' "[42]

*Rationales*

(A) Combining prior art elements according to known methods to yield predictable results;

(B) Simple substitution of one known element for another to obtain predictable results;

(C) Use of known technique to improve similar devices (methods, or products) in the same way;

(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(E) "Obvious to try"—choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art;

(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

The subsections below include discussions of each rationale along with examples illustrating how the cited rationales may be used to support a finding of obviousness. The cases cited (from which the facts were derived) may not necessarily stand for the proposition that the particular rationale is the basis for the court's holding of obviousness. Note that, in some instances, a single case is used in different subsections to illustrate the use of more than one rationale to support a finding of obviousness. It may often be the case that, once the *Graham* inquiries have been satisfactorily resolved, a conclusion of obviousness may be supported by more than one line of reasoning.

A. Combining Prior Art Elements According to Known Methods To Yield Predictable Results

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that the prior art included each element claimed, although not

necessarily in a single prior art reference, with the only difference between the claimed invention and the prior art being the lack of actual combination of the elements in a single prior art reference;

(2) a finding that one of ordinary skill in the art could have combined the elements as claimed by known methods, and that in combination, each element merely would have performed the same function as it did separately;

(3) a finding that one of ordinary skill in the art would have recognized that the results of the combination were predictable; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods with no change in their respective functions, and the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention.[43] "[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." [44] If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The claimed invention in *Anderson's-Black Rock, Inc.* v. *Pavement Salvage Co.*[45] was a paving machine which combined several well-known elements onto a single chassis. Standard prior art paving machines typically combined equipment for spreading and shaping asphalt onto a single chassis. The patent claim included the well-known element of a radiant-heat burner attached to the side of the paver for the purpose of preventing cold joints during continuous strip paving.[46] All of the component parts were known in the prior art. The only difference was the combination of the "old elements" into a single device by mounting them on a single chassis. The Court found that the operation of the heater was in no way dependent on the operation of the other equipment, and that a separate heater could also be used in conjunction with a

standard paving machine to achieve the same results. The Court concluded that "[t]he convenience of putting the burner together with the other elements in one machine, though perhaps a matter of great convenience, did not produce a 'new' or 'different function' " [47] and that to those skilled in the art the use of the old elements in combination would have been obvious.

Note that combining known prior art elements is not sufficient to render the claimed invention obvious if the results would not have been predictable to one of ordinary skill in the art.[48] "When the prior art teaches away from combining certain known elements, discovery of successful means of combining them is more likely to be nonobvious." [49]

*Example 2:* The claimed invention in *Ruiz* v. *AB Chance Co.*[50] was directed to a system which employs a screw anchor for underpinning existing foundations and a metal bracket to transfer the building load onto the screw anchor. The prior art (Fuller) used screw anchors for underpinning existing structural foundations. Fuller used a concrete haunch to transfer the load of the foundation to the screw anchor. The prior art (Gregory) used a push pier for underpinning existing structural foundations. Gregory taught a method of transferring load using a bracket, specifically, a metal bracket transfers the foundation load to the push pier. The pier is driven into the ground to support the load. Neither reference showed the two elements of the claimed invention—screw anchor and metal bracket—used together. The court found that "artisans knew that a foundation underpinning system requires a means of connecting the foundation to the load-bearing member." [51]

The nature of the problem to be solved—underpinning unstable foundations—as well as the need to connect the member to the foundation to accomplish this goal, would have led one of ordinary skill in the art to choose an appropriate load bearing member and a compatible attachment. Therefore, it would have been obvious to use a metal bracket (as shown in Gregory) in combination with the screw anchor (as

---

[42] *KSR*, 550 U.S. at __, 82 USPQ2d at 1396.

[43] *Id.* at __, 82 USPQ2d at 1395; *Sakraida* v. *AG Pro, Inc.*, 425 U.S. 273, 282, 189 USPQ 449, 453 (1976); *Anderson's-Black Rock, Inc.* v. *Pavement Salvage Co.*, 396 U.S. 57, 62–63, 163 USPQ 673, 675 (1969); *Great Atl. & Pac. Tea Co.* v. *Supermarket Equip. Corp.*, 340 U.S. 147, 152, 87 USPQ 303, 306 (1950).

[44] *KSR*, 550 U.S. at __, 82 USPQ2d at 1396.

[45] 396 U.S. 57, 163 USPQ 673 (1969).

[46] The prior art used radiant heat for softening the asphalt to make patches, but did not use radiant heat burners to achieve continuous strip paving.

[47] *Id.* at 60, 163 USPQ at 674.

[48] *United States* v. *Adams*, 383 U.S. 39, 51–52, 148 USPQ 479, 483 (1966). In *Adams*, the claimed invention was to a battery with one magnesium electrode and one cuprous chloride electrode that could be stored dry and activated by the addition of plain water or salt water. Although magnesium and cuprous chloride were individually known battery components, the Court concluded that the claimed battery was nonobvious. The Court stated that "[d]espite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them as did Adams required that a person reasonably skilled in the prior art must ignore" the teaching away of the prior art that such batteries were impractical and that water-activated batteries were successful only when combined with electrolytes detrimental to the use of magnesium electrodes. *Id.* at 42–43, 50–52, 148 USPQ at 480, 483.

[49] *KSR*, 550 U.S. at __, 82 USPQ2d at 1395.

[50] 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004).

[51] *Id.* at 1276, 69 USPQ2d at 1691.

shown in Fuller) to underpin unstable foundations.

**B. Simple Substitution of One Known Element for Another To Obtain Predictable Results**

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that the prior art contained a device (method, product, etc.) which differed from the claimed device by the substitution of some components (step, element, etc.) with other components;

(2) a finding that the substituted components and their functions were known in the art;

(3) a finding that one of ordinary skill in the art could have substituted one known element for another, and the results of the substitution would have been predictable; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that the substitution of one known element for another would have yielded predictable results to one of ordinary skill in the art at the time of the invention. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The claimed invention in *In re Fout*[52] was directed to a method for decaffeinating coffee or tea. The prior art (Pagliaro) method produced a decaffeinated vegetable material and trapped the caffeine in a fatty material (such as oil). The caffeine was then removed from the fatty material by an aqueous extraction process. Applicant (Fout) substituted an evaporative distillation step for the aqueous extraction step. The prior art (Waterman) suspended coffee in oil and then directly distilled the caffeine through the oil. The court found that "[b]ecause both Pagliaro and Waterman teach a method for separating caffeine from oil, it would have been *prima facie* obvious to substitute one method for the other. Express suggestion to substitute one equivalent for another need not be present to render such substitution obvious."[53]

*Example 2:* The invention in *In re O'Farrell*[54] was directed to a method for synthesizing a protein in a transformed bacterial host species by substituting a heterologous gene for a gene native to the host species. Generally speaking, protein synthesis *in vivo* follows the path of DNA to RNA to protein. Although the prior art

Polisky article (authored by two of the three inventors of the application) had explicitly suggested employing the method described for protein synthesis, the inserted heterologous gene exemplified in the article was one that normally did not proceed all the way to the protein production step, but instead terminated with the RNA. A second reference to Bahl had described a general method of inserting chemically synthesized DNA into a plasmid. Thus, it would have been obvious to one of ordinary skill in the art to replace the prior art gene with another gene known to lead to protein production, because one of ordinary skill in the art would have been able to carry out such a substitution, and the results were reasonably predictable.

In response to applicant's argument that there had been significant unpredictability in the field of molecular biology at the time of the invention, the court stated that the level of skill was quite high and that the teachings of Polisky, even taken alone, contained detailed enabling methodology and included the suggestion that the modification would be successful for synthesis of proteins. This is not a situation where the rejection is a statement that it would have been "obvious to try" without more. Here there was a reasonable expectation of success. "Obviousness does not require absolute predictability of success."[55]

*Example 3:* The fact pattern in *Ruiz* v. *AB Chance Co.*[56] is set forth above in Example 2 in subsection III.A.

The prior art showed differing load-bearing members and differing means of attaching the foundation to the member. Therefore, it would have been obvious to one of ordinary skill in the art to substitute the metal bracket taught in Gregory for Fuller's concrete haunch for the predictable result of transferring the load.

*Example 4:* The claimed invention in *Ex parte Smith*[57] was a pocket insert for a bound book made by gluing a base sheet and a pocket sheet of paper together to form a continuous two-ply seam defining a closed pocket. The prior art (Wyant) disclosed at least one pocket formed by folding a single sheet and securing the folder portions along the inside margins using any convenient bonding method. The prior art (Wyant) did not disclose bonding the sheets to form a continuous two-ply seam. The prior art (Dick) disclosed a pocket that is made by stitching or otherwise securing two sheets along three of its four edges to form a closed pocket with an opening along its fourth edge.

In considering the teachings of Wyant and Dick, the Board "found that (1) each of the claimed elements is found within

the scope and content of the prior art; (2) one of ordinary skill in the art could have combined the elements as claimed by methods known at the time the invention was made; and (3) one of ordinary skill in the art would have recognized at the time the invention was made that the capabilities or functions of the combination were predictable." Citing *KSR*, the Board concluded that "[t]he substitution of the continuous, two-ply seam of Dick for the folded seam of Wyant thus is no more than 'the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for improvement.' "

**C. Use of Known Technique To Improve Similar Devices (Methods, or Products) in the Same Way**

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that the prior art contained a "base" device (method, or product) upon which the claimed invention can be seen as an "improvement;"

(2) a finding that the prior art contained a "comparable" device (method, or product that is not the same as the base device) that was improved in the same way as the claimed invention;

(3) a finding that one of ordinary skill in the art could have applied the known "improvement" technique in the same way to the "base" device (method, or product) and the results would have been predictable to one of ordinary skill in the art; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that a method of enhancing a particular class of devices (methods, or products) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in other situations. One of ordinary skill in the art would have been capable of applying this known method of enhancement to a "base" device (method, or product) in the prior art and the results would have been predictable to one of ordinary skill in the art. The Supreme Court in *KSR* noted that if the actual application of the technique would have been beyond the skill of one of ordinary skill in the art, then using the technique would not have been obvious.[58] If any of these findings cannot be made, then this

---

[52] 675 F.2d 297, 213 USPQ 532 (CCPA 1982).

[53] *Id.* at 301, 213 USPQ at 536.

[54] 853 F.2d 894, 7 USPQ2d 1673 (Fed. Cir. 1988).

[55] *Id.* at 903, 7 USPQ2d at 1681.

[56] 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004).

[57] 83 USPQ2d 1509 (Bd. Pat. App. & Int. 2007).

[58] *KSR*, 550 U.S. at __, 82 USPQ2d at 1396.

rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The claimed invention in *In re Nilssen* [59] was directed to a "means by which the self-oscillating inverter in a power-line-operated inverter-type fluorescent lamp ballast is disabled in case the output current from the inverter exceeds some pre-established threshold level for more than a very brief period." [60] That is, the current output was monitored, and if the current output exceeded some threshold for a specified short time, an actuation signal was sent and the inverter was disabled to protect it from damage.

The prior art (a USSR certificate) described a device for protecting an inverter circuit in an undisclosed manner via a control means. The device indicated the high-load condition by way of the control means, but did not indicate the specific manner of overload protection. The prior art (Kammiller) disclosed disabling the inverter in the event of a high-load current condition in order to protect the inverter circuit. That is, the overload protection was achieved by disabling the inverter by means of a cutoff switch.

The court found "it would have been obvious to one of ordinary skill in the art to use the threshold signal produced in the USSR device to actuate a cutoff switch to render the inverter inoperative as taught by Kammiller." [61] That is, using the known technique of a cutoff switch for protecting a circuit to provide the protection desired in the inverter circuit of the USSR document would have been obvious to one of ordinary skill.

*Example 2:* The fact pattern in *Ruiz* v. *AB Chance Co.*[62] is set forth above in Example 2 in subsection III.A.

The nature of the problem to be solved may lead inventors to look at references relating to possible solutions to that problem.[63] Therefore, it would have been obvious to use a metal bracket (as shown in Gregory) with the screw anchor (as shown in Fuller) to underpin unstable foundations.

D. Applying a Known Technique to a Known Device (Method, or Product) Ready for Improvement To Yield Predictable Results

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office

personnel must then articulate the following:

(1) a finding that the prior art contained a "base" device (method, or product) upon which the claimed invention can be seen as an "improvement;"

(2) a finding that the prior art contained a known technique that is applicable to the base device (method, or product);

(3) a finding that one of ordinary skill in the art would have recognized that applying the known technique would have yielded predictable results and resulted in an improved system; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that a particular known technique was recognized as part of the ordinary capabilities of one skilled in the art. One of ordinary skill in the art would have been capable of applying this known technique to a known device (method, or product) that was ready for improvement and the results would have been predictable to one of ordinary skill in the art. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The claimed invention in *Dann* v. *Johnston* [64] was directed towards a system (*i.e.*, computer) for automatic record keeping of bank checks and deposits. In this system, a customer would put a numerical category code on each check or deposit slip. The check processing system would record these on the check in magnetic ink, just as it did for amount and account information. With this system in place, the bank can provide statements to customers that are broken down to give subtotals for each category. The claimed system also allowed the bank to print reports according to a style requested by the customer. As characterized by the Court, "[u]nder respondent's invention, then, a general purpose computer is programmed to provide bank customers with an individualized and categorized breakdown of their transactions during the period in question."[65]

Base System—The nature of the current use of data processing equipment and computer software in the banking industry was that banks routinely did much of the record keeping automatically. In routine check processing, the system read any magnetic ink characters identifying the account and routing. The system also read the amount of the check and then printed that value in a designated area of the check. The check was then sent

through a further data processing step which used the magnetic ink information to generate the appropriate records for transactions and for posting to the appropriate accounts. These systems included generating periodic statements for each account, such as the monthly statement sent to checking account customers.

Improved System—The claimed invention supplemented this system by recording a category code which can then be utilized to track expenditures by category. Again, the category code will be a number recorded on the check (or deposit slip) which will be read, converted into a magnetic ink imprint, and then processed in the data system to include the category code. This enabled reporting of data by category as opposed to only allowing reporting by account number.

Known Technique—This is an application of a technique from the prior art—the use of account numbers (generally used to track an individual's total transactions) to solve the problem of how to track categories of expenditures to more finely account for a budget. That is, account numbers (identifying data capable of processing in the automatic data processing system) were used to distinguish between different customers. Furthermore, banks have long segregated debits attributable to service charges within any given separate account and have rendered their customers subtotals for those charges. Previously, one would have needed to set up separate accounts for each category and thus receive separate reports. Supplementing the account information with additional digits (the category codes) solved the problem by effectively creating a single account that can be treated as distinct accounts for tracking and reporting services. That is, the category code merely allowed what might previously have been separate accounts to be handled as a single account, but with a number of sub-accounts indicated in the report.

The basic technique of putting indicia on data which then enabled standard sorting, searching, and reporting would have yielded no more than the predictable outcome which one of ordinary skill would have expected to achieve with this common tool of the trade and was therefore an obvious expedient. The Court held that "[t]he gap between the prior art and respondent's system is simply not so great as to render the system nonobvious to one reasonably skilled in the art." [66]

---

[59] 851 F.2d 1401, 7 USPQ2d 1500 (Fed. Cir. 1988).
[60] *Id.* at 1402, 7 USPQ2d at 1501.
[61] *Id.* at 1403, 7 USPQ2d at 1502.
[62] 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004).
[63] *Id.* at 1277, 69 USPQ2d at 1691.

[64] 425 U.S. 219, 189 USPQ 257 (1976).
[65] *Id.* at 222, 189 USPQ at 259.

[66] *Id.* at 230, 189 USPQ at 261.

*Example 2:* The fact pattern in *In re Nilssen*[67] is set forth above in Example 1 in subsection III.C.

The court found "it would have been obvious to one of ordinary skill in the art to use the threshold signal produced in the USSR device to actuate a cutoff switch to render the inverter inoperative as taught by Kammiller."[68] The known technique of using a cutoff switch would have predictably resulted in protecting the inverter circuit. Therefore, it would have been within the skill of the ordinary artisan to use a cutoff switch in response to the actuation signal to protect the inverter.

### E. "Obvious To Try"—Choosing From a Finite Number of Identified, Predictable Solutions, With a Reasonable Expectation of Success

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that at the time of the invention, there had been a recognized problem or need in the art, which may include a design need or market pressure to solve a problem;

(2) a finding that there had been a finite number of identified, predictable potential solutions to the recognized need or problem;

(3) a finding that one of ordinary skill in the art could have pursued the known potential solutions with a reasonable expectation of success; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103."[69] If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The claimed invention in *Pfizer, Inc.* v. *Apotex, Inc.*[70] was directed to the amlodipine besylate drug product, which is commercially sold in tablet form in the United States under the trademark Norvasc®.

At the time of the invention, amlodipine was known as was the use of besylate anions. Amlodipine was known to have the same therapeutic properties as were being claimed for the amlodipine besylate but Pfizer discovered that the besylate form had better manufacturing properties (*e.g.*, reduced "stickiness").

Pfizer argued that the results of forming amlodipine besylate would have been unpredictable, and therefore were nonobvious. The court rejected the notion that unpredictability could be equated with nonobviousness here, because there were only a finite number (53) of pharmaceutically acceptable salts to be tested for improved properties.

The court found that one of ordinary skill in the art having problems with the machinability of amlodipine would have looked to forming a salt of the compound and would have been able to narrow the group of potential salt-formers to a group of 53 anions known to form pharmaceutically acceptable salts, which would be an acceptable number to form "a reasonable expectation of success."

*Example 2:* The claimed invention in *Alza Corp.* v. *Mylan Laboratories, Inc.*[71] was drawn to sustained-release formulations of the drug oxybutynin in which the drug is released at a specified rate over a 24-hour period. Oxybutynin was known to be highly water-soluble, and the specification had pointed out that development of sustained-release formulations of such drugs presented particular problems.

A prior art patent to Morella had taught sustained-release compositions of highly water-soluble drugs, as exemplified by a sustained-release formulation of morphine. Morella had also identified oxybutynin as belonging to the class of highly water-soluble drugs. The Baichwal prior art patent had taught a sustained-release formulation of oxybutynin that had a different release rate than the claimed invention. Finally, the Wong prior art patent had taught a generally applicable method for delivery of drugs over a 24-hour period. Although Wong mentioned applicability of the disclosed method to several categories of drugs to which oxybutynin belonged, Wong did not specifically mention its applicability to oxybutynin.

The court found that because the absorption properties of oxybutynin would have been reasonably predictable at the time of the invention, there would have been a reasonable expectation of successful development of a sustained-release formulation of oxybutynin as claimed. The prior art, as evidenced by the specification, had recognized the obstacles to be overcome in

development of sustained-release formulations of highly water-soluble drugs, and had suggested a finite number of ways to overcome these obstacles. The claims were obvious because it would have been obvious to try the known methods for formulating sustained-release compositions, with a reasonable expectation of success. The court was not swayed by arguments of a lack of absolute predictability.

*Example 3:* The claimed invention in *Ex parte Kubin*[72] was an isolated nucleic acid molecule. The claim stated that the nucleic acid encoded a particular polypeptide. The encoded polypeptide was identified in the claim by its partially specified sequence, and by its ability to bind to a specified protein.

A prior art patent to Valiante taught the polypeptide encoded by the claimed nucleic acid, but did not disclose either the sequence of the polypeptide, or the claimed isolated nucleic acid molecule. However, Valiante did disclose that by employing conventional methods, such as those disclosed by a prior art laboratory manual by Sambrook, the sequence of the polypeptide could be determined, and the nucleic acid molecule could be isolated. In view of Valiante's disclosure of the polypeptide, and of routine prior art methods for sequencing the polypeptide and isolating the nucleic acid molecule, the Board found that a person of ordinary skill in the art would have had a reasonable expectation that a nucleic acid molecule within the claimed scope could have been successfully obtained.

Relying on *In re Deuel,* Appellant argued that it was improper for the Office to use the polypeptide of the Valiante patent together with the methods described in Sambrook to reject a claim drawn to a specific nucleic acid molecule without providing a reference showing or suggesting a structurally similar nucleic acid molecule. Citing *KSR,* the Board stated that "when there is motivation to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." The Board noted that the problem facing those in the art was to isolate a specific nucleic acid, and there were a limited number of methods available to do so. The Board concluded that the skilled artisan would have had reason to try these methods with the reasonable expectation that at least one would be successful. Thus, isolating the

---

[67] 851 F.2d 1401, 7 USPQ2d 1500 (Fed. Cir. 1988).
[68] *Id.* at 1403, 7 USPQ2d at 1502.
[69] *KSR,* 550 U.S. at __, 82 USPQ2d at 1397.
[70] 480 F.3d 1348, 82 USPQ2d 1321 (Fed. Cir. 2007).

[71] 464 F.3d 1286, 80 USPQ2d 1001 (Fed. Cir. 2006).

[72] 83 USPQ2d 1410 (Bd. Pat. App. & Int. 2007).

**Federal Register** / Vol. 72, No. 195 / Wednesday, October 10, 2007 / Notices    **57533**

specific nucleic acid molecule claimed was ''the product not of innovation but of ordinary skill and common sense.''

F. Known Work in One Field of Endeavor May Prompt Variations of it for Use in Either the Same Field or a Different One Based on Design Incentives or Other Market Forces if The Variations Would Have Been Predictable to One of Ordinary Skill in the Art

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that the scope and content of the prior art, whether in the same field of endeavor as that of the applicant's invention or a different field of endeavor, included a similar or analogous device (method, or product);

(2) a finding that there were design incentives or market forces which would have prompted adaptation of the known device (method, or product);

(3) a finding that the differences between the claimed invention and the prior art were encompassed in known variations or in a principle known in the prior art;

(4) a finding that one of ordinary skill in the art, in view of the identified design incentives or other market forces, could have implemented the claimed variation of the prior art, and the claimed variation would have been predictable to one of ordinary skill in the art; and

(5) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claimed invention would have been obvious is that design incentives or other market forces could have prompted one of ordinary skill in the art to vary the prior art in a predictable manner to result in the claimed invention. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

*Example 1:* The fact pattern in *Dann* v. *Johnston* [73] is set forth above in Example 1 in subsection III.D.

The court found that the problem addressed by applicant—the need to give more detailed breakdown by a category of transactions—was closely analogous to the task of keeping track of the transaction files of individual business units.[74] Thus, an artisan in the data processing area would have recognized the similar class of problem

and the known solutions of the prior art and it would have been well within the ordinary skill level to implement the system in the different environment. The court held that ''[t]he gap between the prior art and respondent's system is simply not so great as to render the system nonobvious to one reasonably skilled in the art.'' [75]

*Example 2:* The claimed invention in *Leapfrog Enterprises, Inc.* v. *Fisher-Price, Inc.*[76] was directed to a learning device to help young children read phonetically.

The claim read as follows:
An interactive learning device, comprising:

a housing including a plurality of switches;
a sound production device in communication with the switches and including a processor and a memory;
at least one depiction of a sequence of letters, each letter being associable with a switch; and
a reader configured to communicate the identity of the depiction to the processor, wherein selection of a depicted letter activates an associated switch to communicate with the processor, causing the sound production device to generate a signal corresponding to a sound associated with the selected letter, the sound being determined by a position of the letter in the sequence of letter.

The court concluded that the claimed invention would have been obvious in view of the combination of two pieces of prior art, (1) Bevan (which showed an electro-mechanical toy for phonetic learning), (2) the Super Speak & Read device (SSR) (an electronic reading toy), and the knowledge of one of ordinary skill in the art.

The court made clear that there was no technological advance beyond the skill shown in the SSR device. The court stated that ''one of ordinary skill in the art of children's learning toys would have found it obvious to combine the Bevan device with the SSR to update it using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost. While the SSR only permits generation of a sound corresponding to the first letter of a word, it does so using electronic means. The combination is thus the adaptation of an old idea or invention (Bevan) using newer technology that is commonly available and understood in the art (the SSR).''

The court found that the claimed invention was but a variation on already known children's toys. This variation

presented no nonobvious advance over other toys. The court made clear that there was no technological advance beyond the skill shown in the SSR device. The court found that ''[a]ccomodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices. Applying modern electronics to older mechanical devices has been commonplace in recent years.''

*Example 3:* The claimed invention in *KSR International Co.* v. *Teleflex Inc.*[77] was an adjustable pedal assembly with a fixed pivot point and an electronic pedal-position sensor attached to the assembly support. The fixed pivot point meant that the pivot was not changed as the pedal was adjusted. The placement of the sensor on the assembly support kept the sensor fixed while the pedal was adjusted.

Conventional gas pedals operated by a mechanical link which adjusted the throttle based on the travel of the pedal from a set position. The throttle controlled the combustion process and the available power generated by the engine. Newer cars used computer controlled throttles in which a sensor detected the motion of the pedal and sent signals to the engine to adjust the throttle accordingly. At the time of the invention, the marketplace provided a strong incentive to convert mechanical pedals to electronic pedals, and the prior art taught a number of methods for doing so. The prior art (Asano) taught an adjustable pedal with a fixed pivot point with mechanical throttle control. The prior art ('936 patent to Byler) taught an electronic pedal sensor which was placed on a pivot point in the pedal assembly and that it was preferable to detect the pedal's position in the pedal mechanism rather than in the engine. The prior art (Smith) taught that to prevent the wires connecting the sensor to the computer from chafing and wearing out, the sensor should be put on a fixed part of the pedal assembly rather than in or on the pedal's footpad. The prior art (Rixon) taught an adjustable pedal assembly (sensor in the footpad) with an electronic sensor for throttle control. There was no prior art electronic throttle control that was combined with a pedal assembly which kept the pivot point fixed when adjusting the pedal.

The Court stated that ''[t]he proper question to have asked was whether a pedal designer of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to upgrading

---

[73] 425 U.S. 219, 189 USPQ 257 (1976).
[74] *Id.* at 229, 189 USPQ at 261.

[75] *Id.* at 230, 189 USPQ at 261.
[76] 485 F.3d 1157, 82 USPQ2d 1687 (Fed. Cir. 2007).

[77] 550 U.S.___, 82 USPQ2d 1385 (2007).

Asano with a sensor.'' [78] The Court found that technological developments in the automotive design would have prompted a designer to upgrade Asano with an electronic sensor. The next question was where to attach the sensor. Based on the prior art, a designer would have known to place the sensor on a nonmoving part of the pedal structure and the most obvious nonmoving point on the structure from which a sensor can easily detect the pedal's position was a pivot point. The Court concluded that it would have been obvious to upgrade Asano's fixed pivot point adjustable pedal by replacing the mechanical assembly for throttle control with an electronic throttle control and to mount the electronic sensor on the pedal support structure.

*Example 4:* The claimed invention in *Ex parte Catan* [79] was a consumer electronics device using bioauthentication to authorize sub-users of an authorized credit account to place orders over a communication network up to a pre-set maximum sub-credit limit.

The prior art (Nakano) disclosed a consumer electronics device like the claimed invention, except that security was provided by a password authentication device rather than a bioauthentication device. The prior art (Harada) disclosed that the use of a bioauthentication device (fingerprint sensor) on a consumer electronics device (remote control) to provide bioauthentication information (fingerprint) was known in the prior art at the time of the invention. The prior art (Dethloff) also disclosed that it was known in the art at the time of the invention to substitute bioauthentication for PIN authentication to enable a user to access credit via a consumer electronics device.

The Board found that the prior art ''shows that one of ordinary skill in the consumer electronic device art at the time of the invention would have been familiar with using bioauthentication information interchangeably with or in lieu of PINs to authenticate users.'' The Board concluded that one of ordinary skill in the art of consumer electronic devices would have found it obvious to update the prior art password device with the modern bioauthentication component and thereby gain, predictably, the commonly understood benefits of such adaptation, that is, a secure and reliable authentication procedure.

## G. Some Teaching, Suggestion, or Motivation in the Prior Art That Would Have Led One of Ordinary Skill To Modify the Prior Art Reference or To Combine Prior Art Reference Teachings To Arrive at the Claimed Invention

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Office personnel must then articulate the following:

(1) a finding that there was some teaching, suggestion, or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings;
(2) a finding that there was reasonable expectation of success; and
(3) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that ''a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and that there would have been a reasonable expectation of success.'' [80] If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

The courts have made clear that the teaching, suggestion, or motivation test is flexible and an explicit suggestion to combine the prior art is not necessary. The motivation to combine may be implicit and may be found in the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be solved.[81] ''[A]n implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient. Because the desire to enhance commercial opportunities by improving a product or process is universal—and even common-sensical—we have held that there exists in these situations a motivation to combine prior art references even absent any hint of suggestion in the references themselves. In such situations, the proper question is whether the ordinary artisan possesses knowledge and skills rendering him capable of combining the prior art references.'' [82]

## IV. Applicant's Reply

Once Office personnel have established the *Graham* factual findings and concluded that the claimed invention would have been obvious, the burden then shifts to the applicant to (1) show that the Office erred in these findings, or (2) provide other evidence to show that the claimed subject matter would have been nonobvious. 37 CFR 1.111(b) requires applicant to distinctly and specifically point out the supposed errors in the Office's action and reply to every ground of objection and rejection in the Office action. The reply must present arguments pointing out the specific distinction believed to render the claims patentable over any applied references.

If an applicant disagrees with any factual findings by the Office, an effective traverse of a rejection based wholly or partially on such findings must include a reasoned statement explaining why the applicant believes the Office has erred substantively as to the factual findings. A mere statement or argument that the Office has not established a *prima facie* case of obviousness or that the Office's reliance on common knowledge is unsupported by documentary evidence will not be considered substantively adequate to rebut the rejection or an effective traverse of the rejection under 37 CFR 1.111(b). Office personnel addressing this situation may repeat the rejection made in the prior Office action and make the next Office action final. *See* MPEP § 706.07(a).

## V. Consideration of Applicant's Rebuttal Evidence

Office personnel should consider all rebuttal evidence that is timely presented by the applicants when reevaluating any obviousness determination. Rebuttal evidence may include evidence of ''secondary considerations,'' such as ''commercial success, long felt but unsolved needs, [and] failure of others''[83], and may also include evidence of unexpected results. As set forth in section III. above, Office personnel must articulate findings of fact that support the rationale relied upon in an obviousness rejection. As a result, applicants are likely to submit evidence to rebut the fact finding made by Office personnel. For example, in the case of a claim to a combination, applicants may submit evidence or argument to demonstrate that:

(1) one of ordinary skill in the art could not have combined the claimed elements by known methods (e.g., due to technological difficulties);
(2) the elements in combination do not merely perform the function that each element performs separately); or
(3) the results of the claimed combination were unexpected.

---

[78] *Id.* at ___, 82 USPQ2d at 1399.
[79] 83 USPQ2d 1569 )Bd. Pat. App. & Int.

[80] DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co., 464 F.3d 1356, 1360, 80 USPQ2d 1641, 1645 (Fed. Cir. 2006).
[81] *Id.* at 1366, 80 USPQ2d at 1649.
[82] *Id.* at 1368, 80 USPQ2d at 1651.

[83] *Graham* v. *John Deere Co.*, 383 U.S. at 17, 148 USPQ at 467.

**Federal Register** / Vol. 72, No. 195 / Wednesday, October 10, 2007 / Notices **57535**

Once the applicant has presented rebuttal evidence, Office personnel should reconsider any initial obviousness determination in view of the entire record.[84] All the rejections of record and proposed rejections and their bases should be reviewed to confirm their continued viability. The Office action should clearly communicate the Office's findings and conclusions, articulating how the conclusions are supported by the findings. The procedures set forth in MPEP § 706.07(a) are to be followed in determining whether an action may be made final.

See MPEP § 2145 concerning consideration of applicant's rebuttal evidence. See also MPEP § 716 to

---

[84] *See, e.g., In re Piasecki,* 745 F.2d 1468, 1472, 223 USPQ 785, 788 (Fed. Cir. 1984); *In re Eli Lilly & Co.,* 90 F.2d 943, 945, 14 USPQ2d 1741, 1743 (Fed. Cir. 1990).

§ 716.10 regarding affidavits or declarations filed under 37 CFR 1.132 for purposes of traversing grounds of rejection.

Dated: October 3, 2007.

**Jon W. Dudas,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. E7–19973 Filed 10–9–07; 8:45 am]

**BILLING CODE 3510–16–P**

---

# DEPARTMENT OF DEFENSE

## Office of the Secretary

**[Transmittal Nos. 08–09]**

## 36(b)(1) Arms Sales Notification

**AGENCY:** Department of Defense, Defense Security Cooperation Agency.

**ACTION:** Notice.

**SUMMARY:** The Department of Defense is publishing the unclassified text of a section 36(b)(1) arms sales notification. This is published to fulfill the requirements of section 155 of Public Law 104–164 dated 21 July 1996.

**FOR FURTHER INFORMATION CONTACT:** Ms. B. English, DSCA/DBO/CFM, (703) 601–3740.

The following is a copy of a letter to the Speaker of the House of Representatives, Transmittals 08–09 with attached transmittal, policy justification, and Sensitivity of Technology.

Dated: October 3, 2007.

**L.M. Bynum,**

*OSD Federal Register Liaison Officer, Department of Defense.*

**BILLING CODE 5001–06–M**

# EXHIBIT 6

# Overview of the STanford Real-time Information Processor (STRIP) *

Brad Adelberg[†]          Ben Kao[‡]          Hector Garcia-Molina[§]

## Abstract

We believe that the greatest growth potential for soft real-time databases is not as isolated monolithic databases but as components in open systems consisting of many heterogeneous databases. In such environments, the flexibility to deal with unpredictable situations and the ability to cooperate with other databases (often non-real-time databases) is just as important as the guarantee of stringent timing constraints. In this paper, we describe a database designed explicitly for heterogeneous environments, the STanford Real-time Information Processor (STRIP). STRIP, which runs on standard Posix Unix, is a soft real-time main memory database with special facilities for importing and exporting data as well as handling derived data. We will describe the architecture of STRIP, its unique features, and its potential uses in overall system architectures.

## 1 Project Goals

The STanford Real-time Information Processor (STRIP) was designed with the following goals:

1. support for transactions and data with soft timing constraints,

2. high performance,

3. high availability,

4. the ability to share data with other components in open systems.

The first goal, support of soft timing constraints, is implemented through two mechanisms: value function scheduling and maximum age constraints. A number of different scheduling algorithms are available, including earliest deadline first, highest value first, highest value density first, and custom scheduling algorithms. To support temporal constraints on the data, users can define *maximum age* requirements for views and for data accesses, where the age of data is defined to be the amount of time since it was last changed. The second goal, high performance, is achieved by using a main memory database. To provide high availability, a STRIP system can be reconfigured on the fly: Changes to

---

*This work was partially supported by the Telecommunications Center at Stanford University, by Hewlett Packard, and by Philips.

[†]Stanford University Department of Computer Science. e-mail: adelberg@cs.stanford.edu

[‡]Hong Kong University Department of Computer Science. e-mail: kao@cs.hku.hk

[§]Stanford University Department of Computer Science. e-mail: hector@cs.stanford.edu



Figure 1: Example applications.

user and database code can be made without bringing the server down. As another feature, if extremely high availability is required, STRIP databases can be configured in master/slave pairs. The master executes all of the transactions and ships its log records across to the slave. The mechanism that supports the log transfer is the same one that allows views to be exported to other systems.

Determining how to meet the fourth goal was one of the main challenges of the project. Our aim was a database that could be incorporated into many different applications, with varying data requirements. To illustrate, consider the applications pictured in Figure 1. The first, Figure 1(a), is indicative of a credit card system. STRIP, due to its high throughput, is used to approve charges at the point of sale, while the conventional database, due to its large storage capacity and sophisticated report generation, is used to store charge records, to generate statements, etc. Of course, the two systems are not entirely separate: they need to share data. STRIP needs to know when accounts have been payed or when cards have been reported stolen and so it needs a materialized view of information from the conventional database. The conventional database needs the authorization records created at the MMDB and needs to know the available balance of the accounts to handle customer inquiries. Furthermore, there are temporal constraints on the data transfer: New status information should be sent to STRIP within a short time after a card is reported stolen.

The second example application, Figure 1(b), is program trading in financial markets. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites). In this example, the source of data is not another database but a commercially provided feed of price changes. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them.

In the rest of this paper we briefly summarize the overall STRIP architecture, and we highlight some of the research problems that were addressed. Due to space limitations, we do not provide references to prior work; instead, we refer the reader to our full papers that contain extensive references.



Figure 2: System architecture.

## 2  Data Sharing Facilities

The data sharing architecture of STRIP is shown in Figure 2. The middle layer, the query layer, has the equivalent functionality of a stand-alone database. The additional functionality in the import and export layers is what allows STRIP to be integrated with other systems. STRIP exchanges information with other systems over *streams*. The actual format of the data in the stream is determined by the source and is described in a stream schema record that is provided whenever a new connection is established. The schema describes the attributes of the tuples being sent as well as information about the properties of the stream itself which are described below.

The stream protocol was designed to provide flexible data sharing with other systems. For example, consider a stream being used to support distributed materialized views. Depending on how often the source refreshes the remote views, it may prefer differential or complete refresh. The stream protocol, which can transmit entire relations or sets of deltas (inserts, deletes, and modifies), will support both. In addition to distributed views, streams also support data migration: Tuples can be passed from the source to a remote site. Data migration is different from remote materialization because in the former, ownership (right to update) is transferred. A site receiving a stream of migrated data is actually importing a table and not a view. An example of use data migration is the transfer of authorization records in the credit card application. They are created in STRIP when a charge is approved and then transferred to the conventional database for permanent storage. Using the export facilities described below, the application designer can specify when the records should be transferred, allowing sophisticated migration strategies without custom coding.

### 2.1  Importing

In order to insulate the user from all of the details of streams, the import layer has been added to convert streams of re-mote data into views. This conversion presents the query layer with a single paradigm for all imported data regardless of its original format. The views defined in this layer can be derived from only one stream (although one stream can generate many views). Views that combine data from different streams must be defined in the query layer. To create an import view, the converter needs both the stream schema, provided by the source, and the view schema, provided by the user. For each attribute in the view, the view schema must specify not only its name and type but also a function to compute its value. The schema can also define real-time constraints on the use and upkeep of the view, such as the maximum age at which its data becomes useless, how important it is to maintain its freshness compared to the other work in the system (described in Section 4.2), etc. It is also possible to define consistency requirements such as: the view will eventually be consistent with the remote source, the changes to the view will be applied in the same order they occurred at the source, etc. Finally, the user can define an import table rather than an import view for cases when data will be migrated as explained above. In this case, if the source has requested 2-safe transfer (involving 2-phase commit), STRIP sends an acknowledgement to the source upon receipt of the data so that the source can delete it if desired.

### 2.2  Exporting

Views are exported (converted into output streams) by the export layer. For each export view, the user must specify a destination(s) and whether the view is to be migrated or just shared. For non-migrated views, the user must also select a refresh method: send the entire view every time, send all of the changed/inserted/deleted tuples, or send only the net effect of the changed/inserted/deleted tuples. Having defined 'what' is to be sent, the user must specify 'when' it is to be sent. The options are: when a tuple is changed, when a tuple becomes older than a predefined age, periodically, or when explicitly flushed by the application. Finally, the user can specify real-time and consistency constraints similar to those defined on the imported views.

## 3  Process Architecture

The process structure used to implement STRIP is shown in Figure 3. All of the data access and modification is done by a single pool of *execution* processes. These processes both apply updates to import views and run transactions. The interface to the process pool is a collection of queues: a transaction queue and one update queue for each import view. The transaction queue contains both application requests and internally triggered transactions. The updates are divided into separate queues so that the system can maintain some views more diligently than others in the case of different timing constraints or different values.

The other processes serve to connect the database to the outside world. The *import* and *export* processes decouple the network interface from the database core and perform the conversion from the internal format to the stream format. The *request* process conveys remote requests to the database and sends the results back to the originator. Local applications can access the queues directly using a client library for greater efficiency.



Figure 3: Process architecture.

## 4  Problems Studied

In the course of designing STRIP, we encountered a number of challenging sub-problems. When this happened, we performed detailed simulation studies in order to select the appropriate algorithm or strategy for STRIP. The results of three such studies are described below.

### 4.1  Developing under Unix

Since STRIP is intended for use in open systems, we decided to build STRIP on top of a standard operating system, Posix Unix, instead of a specialized real-time OS. Since standard operating systems do not provide real-time scheduling, this approach is not acceptable for hard real-time systems. However, it is acceptable in a soft real-time system like STRIP, as long as we somehow make the system adhere as closely as possible to the timing constraints of data and transactions.

One possibility is to write a threads package on top of Unix and then code any desired scheduling algorithm into it. This approach, however, requires a lot of code and is not portable across different Unix vendors. Therefore, we chose to use the built-in scheduler but to try to set the process priorities to emulate real-time scheduling algorithms. For instance, to emulate earliest deadline first (EDF) scheduling, a new process is assigned a priority greater than those of processes with later deadlines but less than those of processes with earlier deadlines. There are two complications to the assignment strategy:

- the limited number of priority levels - Most systems provide between 40 and 128 priority levels, This means that when a new task arrives, there may not be a free priority level to give it. If the priority of a running process cannot be changed, or is expensive to change (due to system call overhead), this problem is exacerbated: there could be free priority levels but not between the two processes that have the closest deadlines above and below that of the new process. This means that collisions can occur with far fewer processes than the number of total priority levels.

- the disruption of multi-level feedback - The standard Unix scheduler adjusts the priority of processes as they are running. Processes that hog the CPU have their priorities temporarily lowered to allow other processes to run. While this is important in a time-shared environment, it is undesirable in a real-time environment where some tasks should be allowed to run to completion before others are allowed to run. Posix Unix provides a new class of processes whose priorities are not adjusted by the scheduler.

In [AGMK94], we developed three strategies for priority assignment to emulate EDF and least slack first scheduling. Through simulation, we compared the performance of our emulation strategies to EDF and LSF. The effects of the number of available priority levels as well as the effects of multi-level feedback were studied. The results showed that the emulation algorithms are comparable in performance to the real-time algorithms (e.g., the number of missed deadlines is almost the same). In some cases, the emulation algorithms even outperform the conventional ones. This occurs because when the system is overloaded, EDF wastes system resources scheduling transactions with nearly expired deadlines that have no hope of finishing on time. In the same situation, our emulation algorithms sacrifice the oldest transactions to give resources to transactions that can still feasibly finish.

### 4.2  Update Scheduling

In a stand alone RTDB, the only source of work is the user transactions which are typically scheduled based on deadlines or value functions. In a system that imports or exports data, however, there are additional sources of work. If the volume of importing/exporting is relatively low, it can be given higher priority than user transactions without greatly affecting response time. In applications with a heavy import/export load, however, new scheduling algorithms must be designed to balance the two classes of work. For example, in the program trading application described in Section 1, rates as high as 500 updates per second have been reported just for the security price feed alone. If all of these updates

are performed before user transactions, the missed deadline percentage of the system will increase.

Thus the basic tradeoff is between transaction response time and data freshness. How freshness is defined can vary by application. In cases where the value stored in the database is a sample of a continuously changing real world variable, such as the temperature of a solution in a factory control setting, the data starts becoming stale immediately. In cases where the real world variable changes at discrete points in time, such as the price of traded securities, the data is fresh until another trade occurs. The behavior of different applications in the presence of stale data can vary as well: less critical applications may choose to use whatever is available while other applications may rather choose to abort the transaction. In [AGMK95] we study, through simulation, how four different algorithms to schedule both applying updates to imported views and running user transactions perform under these different assumptions about data freshness. We also consider other factors such as the update and transaction arrival rates, the costs of queueing and applying update, and the access patterns of the transactions. The results show that the choice of algorithm and system properties profoundly affect system performance. Hence, STRIP offers a variety of choices for update installation, to give good performance in all scenarios.

### 4.3  Derived Data

The program trading example from Section 1 requires STRIP to maintain substantial amounts of derived data. Let us consider it in more detail. For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments. From the reported price data the following derived data must be computed:

**computed index prices** - For each index on which a futures contract is traded, its price based on the underlying stocks (a weighted sum) must be computed.

**theoretical option prices** - For each listed option, a theoretical price must be computed. The pricing models are very complicated but depend mainly on the price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself.

The expert system can then look for discrepancies between calculated and market prices of securities and, if it finds a large enough difference, execute trades.

Such a system has not only the import load (from the price feed) and the user transaction load (from the expert system) described in the previous section but also a new source of work: recomputing derived data. This makes the scheduling problem even more difficult. Recomputation can actually be more expensive than applying updates for the following reasons:

- Recomputing a derived item may be an expensive operation. To compute the theoretical option price, for example, requires computing the cumulative distribution of the standard normal function and the natural log function.

- Recomputations can have high fan-in and fan-out. A derived data item may depend on a large numbers of base data items i.e., high *fan-in*. For example, the S&P

500 index is derived from a set of 500 stocks. When any one of these base data items changes, the derived data has to be updated, so the recomputation is triggered very frequently. Similarly, a base data item may be "popular" in the sense that it is used to derive a number of derived data items, i.e., high *fan-out*. For example, Intel's stock price is used to calculate 30 options and a number of composite indices.

In many applications, including program trading, we can use the *locality* of the updates to reduce the recomputation workload. Update locality means that when a base item is updated, it is very likely that the same item or a *related* one will be updated soon thereafter. For example, a stock price update indicates that there is an interest in its trading. The same stock is therefore likely to be the subject of further trading activities and have its price changed again. Update locality implies that recomputations for derived data occur in bursts. Recomputing the affected derived data on every single update is probably very wasteful because the same derived data will be recomputed very soon, often before any application transaction has a chance to read the derived data. Instead of recomputing immediately, a better strategy might be to defer a recomputation by a certain amount of time and coalesce the same recomputation requests into a single computation. In [AKGM96], we developed a variant of this strategy called *forced delay*. We then studied, through simulation, how it compares to other recomputation strategies, such as immediate and lazy recomputation, in terms of the response time of user transactions and the timeliness of the derived data. We also examined how the properties of the derivation functions affect the relative performance of all of the strategies. The simulation results showed that forced delay greatly reduced the recomputation cost while only modestly diminished data timeliness across a wide range of parameter values. Given the demonstrated desirability of the forced delay strategy, we proposed an an extension to the standard event-condition-action rule model to elegantly and efficiently support it.

### 5  Project Status

The first version of STRIP was completed in 1994 and contained the components shown in Figure 3 except for the import and export processes. It also supported very limited triggering. We are currently coding version 2, scheduled for completion by February 1996, which contains a powerful rule system and integrated support for import/export. We plan to test the new system in a full program trading application. For more information on STRIP, and for more detailed references, see the papers listed below.

### References

[AGMK94]  B. Adelberg, H. Garcia-Molina, and B. Kao. Emulating soft real-time scheduling using traditional operating system schedulers. In *IEEE Real-Time Systems Symposium*, 1994.

[AGMK95]  B. Adelberg, H. Garcia-Molina, and B. Kao. Applying update streams in a soft real-time database system. In *ACM SIGMOD Proceedings*, 1995.

[AKGM96]  B. Adelberg, B. Kao, and H. Garcia-Molina. Database support for efficiently maintaining derived data. In *EDBT Proceedings*, 1996.

# EXHIBIT 7



**Volume 25    Number 1    March 1996**

Current Issue          XML Edition
Previous Issues        About SIGMOD
Info for Authors       FAQ
Record Editors         Credits

Non-clickable items are available only in the hard-copy version of SIGMOD Record. All clickable items are in postscript format.

EDITOR'S NOTES

**SPECIAL SECTION ON ADVANCES IN REAL-TIME DATABASE SYSTEMS**

- Advances in Real-Time Database Systems Research
  A. Bestavros

- Integrating Temporal, Real-Time, and Active Databases
  K. Ramamritham, R. Sivasankaran, J.A. Stankovic, D.T. Towsley, M. Xiong

- Real-Time Index Concurrency Control
  J.R. Haritsa, S. Seshadri

- Real-Time Database - Similarity Semantics and Resource Scheduling
  T.-W. Kuo, A.K. Mok

- Exploiting Main-Memory DBMS Features to Improve Real-Time Concurrency Control Protocols
  O. Ulusoy, A. Buchmann

- Enhancing External Consistency in Real-Time Transactions
  K.-J. Lin, C.-S. Peng

- Improving Timeliness in Real-Time Secure Database Systems
  S.H. Son, R. David, B. Thuraisingham

- Overview of the STanford Real-time Information Processor (STRIP)
  B. Adelberg, B. Kao, H. Garcia-Molina

- DeeDS Towards a Distributed and Active Real-Time Database Systems
  S.F. Andler, J. Hansson, J. Eriksson, J. Mellin, M. Berndtsson, B. Eftring

**ANNOTATED BIBLIOGRAPHIES**

- Temporal Database Bibliography Update
  V.J. Tsotras, A. Kumar

**REPORTS**

- Database Research: Achievements and Opportunities into the 21st Century
  A. Silberschatz, M. Stonebraker, J. Ullman, editors

- Workshop Report: The First International Workshop on Active and Real-Time Database Systems (ARTDB-95)
  M. Berndtsson, J. Hansson

**RESEARCH SURVEYS**

- Integrating Contents and Structure in Text Retrieval
  R. Baeza-Yates, G. Novarro

**SYSTEMS AND PROTOTYPES**

- Lifestreams: A Storage Model for Personal Data
  E. Freeman, D. Gelernter

**STANDARDS ACTIVITIES**

- Object Query Standards
  A.E. Wade

**RESEARCH CENTERS**

- Database Research at the Indian Institute of Technology, Bombay
  D.B. Phatak, N.L. Sarda, S. Seshadri, S. Sudarshan

- Database Research at Arizona State University
  S.D. Urban, S.W. Dietrich, F. Golshani

**INDUSTRY NEWS**

- Illustra's Web DataBlade Module
  J. Gaffney

- MQSeries and CICS Link for Lotus Notes

**FUNDING NEWS**

- Shutdown, Budget, and Funding
  X. Qian

**ANNOUNCEMENTS AND CALLS FOR PAPERS**

- PDIS '96
- CIKM '96

*Jennifer Widom / widom@db.stanford.edu*

Last update: June 26, 2000

**Previous Issue:** December 1995                    **Next Issue:** June 1996

Send comments or suggestions to Alexandros Labrinidis.

© 2000 Association for Computing Machinery

Acknowledgements

# EXHIBIT 8

# The STRIP Rule System For Efficiently Maintaining Derived Data *

Brad Adelberg[†]        Hector Garcia-Molina[‡]        Jennifer Widom[§]

### Abstract

Derived data is maintained in a database system to correlate and summarize base data which records real world facts. As base data changes, derived data needs to be recomputed. This is often implemented by writing active rules that are triggered by changes to base data. In a system with rapidly changing base data, a database with a standard rule system may consume most of its resources running rules to recompute data. This paper presents the rule system implemented as part of the STanford Real-time Information Processor (STRIP). The STRIP rule system is an extension of SQL3-type rules that allows groups of rule actions to be batched together to reduce the total recomputation load on the system. In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a program trading application, and report the results of experiments performed on the running system. The experiments verify that STRIP's rules allow much more efficient derived data maintenance than conventional rules without batching.

**Keywords:** derived data, view maintenance, active database system, transaction scheduling, real-time database.

## 1  Introduction

This paper describes and evaluates the STRIP rule system. STRIP is a main-memory resident soft real-time database system implemented at Stanford. The major new feature of the STRIP rule system over previous active rule systems is its *unique transaction* facility. This facility allows for very efficient incremental maintenance of derived data. The two benefits provided by unique transactions are:

- they allow rule actions to act on database changes *batched* across transaction boundaries, not just within one transaction, and

- they allow the batches to be *partitioned* in any way that reduces the cost of the derived data computation.

Rather than inventing an entirely new active database model, unique transactions in STRIP have been added as an extension to SQL3-type triggers.

STRIP and its rule system are intended for real-time monitoring applications. These applications monitor a dynamic environment to discover the occurrences of "interesting" events. For

---

[*]This work was supported by the Telecommunications Center at Stanford University, by Hewlett Packard and by Philips.

[†]Northwestern University Department of Computer Science. e-mail: adelberg@ils.nwu.edu

[‡]Stanford University Department of Computer Science. e-mail: hector@cs.stanford.edu

[§]Stanford University Department of Computer Science. e-mail: widom@cs.stanford.edu

Figure 1: A high level model for the derived data maintenance problem.

instance, a military radar system can track aircraft and signal alerts when a dangerous pattern appears. Similarly, a program trading application can monitor the prices of stocks and other commodities, looking for good opportunities. Figure 1 illustrates the major components of a such a system. The dynamic environment is modeled by a set of *base data* items stored within a database system. The environment is monitored (e.g., through sensors or humans reporting information); any changes are captured by a stream of *updates* to the base data.

In addition to the base data, the system very often contains *derived data*: data that indirectly reflects the state of the outside environment, and can be computed from the base data. For example, the S&P 500 stock index (the derived data) represents the aggregate price of 500 U.S. stocks (the base data). In a robot arm control application, readings from sensors (base data) may be used to estimate the weight of the object being lifted by the arm (derived data).

The base and derived data are read by application transactions to determine how to react to changes in the environment. The application transactions may also need additional data. For instance, in a trading system, the database would also store the current stock holdings and outstanding trading orders. This type of additional data is labeled "other data" in Figure 1.

The base and other data used by the application need to be stored in the database, but the derived data does not: it could be computed from the base data every time it is needed. Still, it is often far more efficient to precompute the derived data and store it in the database. This is known as *materializing* the derived data. Of course the materialized data will have to be updated whenever the base data changes, but if the ratio of derived data reads to base data updates is high, or if there are tight constraints on access time to the derived data, it may still be worthwhile to materialize it. Also, if only a small portion of the base data is changing at any given time, it is often possible to correct the derived data based only on the changes to the base data rather than recomputing it completely from scratch. This is called *incremental maintenance*.

While few database systems provide direct support for maintaining derived data, it is possible to perform this task using rules in active databases. For instance, in [CW91] the authors demonstrate how rules can be automatically generated to incrementally maintain a broad class of views in a relational database. Applying these results to our program trading example, a rule might be written to update all of the derived data that changes when a stock price changes. After each base data change, the rule will be fired and will modify the materialized derived data accordingly.

The work performed by the rules to maintain the derived data can be very high, for the following reasons:

- Recomputing a derived item may be expensive. For instance, pricing models for financial instruments often involve trend analysis and complicated statistics.

- The base data update rate can be very high. For example, a financial database that keeps track of the prices of U.S. financial instruments may receive more than 500 updates per second during peak time [CB94].

- Some base data, often the most frequently changing, is used to compute a lot of derived data. This leads to a multiplicative effect on the base data update rate. For example, a popular stock may have fifty listed options derived from it as well as numerous composite indexes.

As observed in [AKGM96a], it is often the case that a single base datum or set of related base data changes in bursts and then remain constant for a relatively long time. Using the stock example, a small price change in a stock may trigger a burst of quotes until the market makers settle on a new price. This may be followed by minutes of inactivity. If a rule is fired for every individual change, the materialized views will be recomputed many times in a small time window, effectively swamping the CPU.

Instead, the unique transaction facility provided by STRIP's rule system allows the price changes to be collected during the burst and combined into a single recomputation. Intuitively, when base data is changed that is used to compute derived data, a new transaction is created to maintain the derived data, but the transaction is not immediately run. Instead, it is delayed for a period of time specified by the application designer. During this *delay window*, any additional changes to base data that affects the same derived data are grouped with the original changes so that when the new transaction finally runs, it can process all of the relevant changes. This way only one recompute transaction is run instead of one per change. Of course, during the delay window there is an inconsistency in the database since the base data has been changed but the derived data has not. In many applications, such short term inconsistencies are acceptable, especially if the value of the derived data does not move substantially from its previous value. One of the challenges, then, of using unique transactions is to pick a delay window size that improves performance without severely affecting the timeliness of the derived data.

The remainder of this paper will present the following:

- A description of the STRIP rule language and in particular unique transactions (Section 2).

- An example stock market application that serves both to illustrate the power of STRIP's rules and to provide a benchmark with which to evaluate the current STRIP implementation (Sections 3 and 4).

- An analysis of the experimental results of running the stock market application on STRIP version 2.0 (Section 5).

- A description of the implementation of STRIP's rule system that describes how "bound tables" are stored and how unique transactions are managed (Section 6).

- A description of related work (Section 7) and our conclusions from this study (Section 8).

```
create rule rule-name on t-name
    when transition-predicate
    [ if condition ]
    then
        [ evaluate query-commalist]
        execute function-name
        [ unique [ on column-commalist] ]
        [ after time-value ]


transition-predicate ::= event [,event [,event]]
event ::= inserted | deleted | updated [column-commalist]
condition ::= query-commalist
query-commalist ::= query [,query]*
query ::= table-expression [bind as bound-table-name]
column-commalist ::= column-name [,column-name]*
```

Figure 2: Syntax of rules in STRIP.

## 2    Rule Language

This section presents the syntax and semantics of the STRIP rule language. Since STRIP's rules have been designed as an extension of SQL3-type rules (see, e.g., [DD93][WC96]), rather than describe a complete rule system we will concentrate on the novel features of our rules. The current implementation, which supports most of the details presented in this section, is described further in Section 6.

First we will present the syntax for rule definition in STRIP and then discuss the semantics. The grammar is based on [DD93]. The syntax for creating rules in STRIP is shown in Figure 2.

The *transition predicate* (see Figure 2) in the rule definition specifies which events should trigger the rule. The three possible events are insertions, deletions, or updates to rows in the table on which the rule is defined, t-name. If the rule should only be triggered by updates to certain columns, a list of the columns can be attached to the updated event.

Event checking occurs at the end of each transaction prior to commit. Consider a particular transaction, $T$, preparing to commit. First, event checking is performed to determine which rules $T$ has triggered. Then, for every rule that has been triggered, the system evaluates the rule's condition (given by the if clause of the rule) which is composed of one or more queries. The condition evaluates to true if there are no queries or if every query returns one or more rows.

The queries in the if clause can be over the entire database as well as over the four transition tables for t-name: inserted, deleted, and new and old for updated tuples. STRIP does not reduce the transition tables to net effect: e.g., if a tuple is inserted and then deleted within the same transaction, it will appear in both the inserted and deleted transition tables. This gives the user more control by providing an "audit trail" where desired. It is always possible for the application to calculate net effect on its own using the transition tables as provided. The system adds an extra

4

column to the transition tables called `execute_order` which contains a sequence number that orders the tuples changed within the transaction. (If a tuple is updated, the corresponding tuples in the `old` and `new` transition tables will have the same value in their `execute_order` attribute.) Using the `execute_order` column, the application can recreate the order of the changes in the transition tables.

If a rule condition evaluates to true, the queries in the **evaluate** clause are evaluated within the triggering transaction. These queries do not affect the rule condition and are only used to pass tables to the action (see below).

Finally, a new transaction, $T'$, is created to perform the rule action given in the **execute** clause. Rule actions in STRIP are executed by application-provided functions that are linked into the database and are treated as black boxes. The user functions are not called with any parameters but it is possible to pass data into them using the *bound table* mechanism as described below.

Transaction $T'$ is released as soon as the triggering transaction, $T$, commits unless a delay is specified in the **after** clause. (This *coupling mode* is called "sequentially causally dependent" in [BBKZ93]). One consequence of executing rule actions in a new transaction is that rule processing is simplified. Because the rule condition contains only side-effect free queries, evaluating the condition can never alter the state of the database and hence cannot trigger any new rules. For the same reason, the order that the rules are considered by $T$ at commit time is unimportant. Finally, the time required to process rules within the triggering transaction is much more predictable, which is beneficial in a real-time environment.

A less desirable consequence of performing actions in separate transaction is that the new transaction $T'$ will not automatically have access to either the transition tables or the condition query results from transaction $T$. If either are needed, STRIP provides a mechanism to explicitly pass them. By using the **bind as** construct within STRIP rule definition, any of the query results from evaluating a rule in $T$ can be passed to $T'$ as a named temporary table. For example, the rule

**create rule foo on table1**
**when inserted**
**then evaluate**
        **select \***
        **from inserted**
        **bind as my_inserted**
     **execute my_function**

shows how a transition table can be passed to the transaction $T'$. Since there is no rule condition, any inserts to table `table1` will trigger the rule. The rule action renames and binds the inserted transition table and then creates a new transaction to execute the function `my_function`. Within the code of function `my_function`, the transition table will appear as an ordinary but read-only table named `my_inserted`. Queries in both the **if** condition and the **evaluate** clause can have their results bound and passed. (The reason for a separate **evaluate** clause is to pass data that does not contribute to the truth or falsehood of the rule condition.) To avoid scoping problems, the names chosen for the bound tables should not be used elsewhere in the database. The one exception is that other rules calling on the same function can use the same bound table name as long as it is defined identically. This is useful if more than one event should be handled by the same action

5

code.

As described so far, every time a rule is triggered and its condition evaluates to true, a new transaction is created to execute a user function. As described in Section 1, however, if many such transactions are being triggered within a short time span it is often more efficient to batch the changes and execute only one transaction to service all of them. The STRIP rule system supports this through the use of *unique transactions*, specified by including **unique** in the **execute** clause. A transaction being unique means that at any given time there is at most one such transaction queued in the system to execute a particular user function. If a rule fires that would trigger another transaction with the same function, no new transaction is enqueued. Instead, the tuples of the bound tables of the new rule firing are appended to those of the bound tables of the currently enqueued transaction. This is true even if the second rule is a different one from the first — the bound tables of all rules executing the same user function are combined (and must be defined identically, as mentioned above). Therefore, when the triggered transaction finally runs, it will have access to all of the changes that occurred since the time it was first triggered. Once a unique transaction begins to execute, its bound tables are fixed and any new rule firings will start a new transaction. An example where unique transactions are used very effectively is given in Section 3, and the implementation of this mechanism is described in Section 6.

As with transition tables, STRIP does not calculate the net effect of bound tables. If a tuple is changed in one transaction and that data is bound into a table, and then the same tuple is changed in another transaction which gets batched with the first, the resulting bound table will contain two entries, one for each change. It is up to the application code to properly calculate net effect if desired. If the application needs to preserve the order of the changes across transactions, the rule should define its bound tables to include a column called `commit_time`. This column is automatically instantiated at bind-time with the commit time of the transaction that produces the row in the bound table.

Sometimes batching all of the transactions that execute the same user function into one transaction is too extreme. For instance, we may want to batch only those transactions that would update the same tuple of a materialized view. In such cases, we want transactions to be unique on the combination of the user function *and* certain column values in the bound tables. This behavior can be achieved by qualifying the **unique** clause with the names of the unique columns.

As a simple example, consider a table $X(A, B)$ and a view $V$ defined as: **select** $A$, **sum**$(B)$ **from** $X$ **groupby** $A$. If the rule to recompute $V$ is defined as unique, all changes to $X$ will be batched together in one transaction that will then change many tuples in $V$. By defining the rule **unique on** $X.A$, only changes to the same tuple in the view will be batched together. That is, there can be as many triggered transactions as there are values for $A$.

Having informally described the semantics of the STRIP rule system, the next section demonstrates how to use STRIP's rules to maintain data for an example stock market application. The reader interested in a more formal discussion of the behavior of unique transactions is directed to Appendix A.

6

# 3  Stock Market Example

In this section we describe a simplified program trading application (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires. The same application will be used in Section 5 to evaluate the performance of the current implementation of the rule system. In practice, program trading systems are custom built by each trading firm and their market models and trading algorithms are closely held secrets. Thus the example we present here is simplified both out of necessity, since very little information is publicly available, and also to focus our attention on the important issues of data management without getting lost in the details of financial modeling. Still, we feel that our application model captures the important features of the real problem, and we will point out how to extend it where appropriate.

The PTA requires the database to maintain three types of prices: stock prices, composite index prices, and theoretical (call) option prices. The stock prices are the base data of the system, and are updated in the database according to the market feed. The composite and option prices, however, are derived data that must be computed from the stock prices. In actuality, the current trend of feed providers is to send more than stock prices with the feeds, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values. Still, additional derived data, such as that related to proprietary market models, will always need to be computed by the rule system. Because composite averages and theoretical option prices have known functions, are easy to understand, and reasonably reflect the types of data that need to be computed, we choose to compute them as part of the PTA as representative of the proprietary derived data.

The database for the PTA contains the following six tables:

stocks(symbol,price) - contains the current price of every stock as reported by the market feed.

stock_stdev(symbol,stdev) - contains the standard deviation of the annualized rate return of every stock. The standard deviation is usually computed from the daily closing prices of the stock over a period of years. While periodic recomputation is supported by STRIP, we do not model the computation of standard deviation in this study since we are focusing on the behavior of the PTA during trading hours. For our purposes, this table is base data.

comp_prices(comp,price) - contains the computed price of every composite average (e.g., DJIA). This table is a materialized view (defined below) and hence corresponds to derived data.

comps_list(comp,symbol,weight) - describes the many-many relationship between stocks and composites. This table is entered by the trading firm and changes very infrequently. It is an example of the "other data" from Figure 1.

option_prices(option_symbol,price) - contains the computed price of every listed option. The data in this table is derived and its materialized view definition is given below.

options_list(option_symbol,stock_symbol,strike,expiration) - describes the one-many relationship between stocks and options. This table must be updated once every three months when the option exchanges create new options and expunge expired options. In this example we only consider call options so the attribute strike is the price at which the option holder can buy the stock stock_symbol prior to expiration. We consider this table base data since it reflects the listed options currently being traded on the exchanges.

The tables comp_prices and option_prices are materialized views with the following definitions:

```
create rule do_comps1 on stocks
when updated price
if
      select comp, comps_list.symbol as symbol,weight,
           old.price as old_price,new.price as new_price
      from comps_list,new,old
      where comps_list.symbol = new.symbol
           and new.execute_order = old.execute_order
      bind as matches
then
      execute compute_comps1

define function compute_comps1
      real composite_change;
      foreach row r in matches
           composite_change = r.weight * (r.new_price - r.old_price);
           update comp_prices
           set price += composite_change
           where comp = r.comp;
end function
```

Figure 3: Standard rule to maintain comp_prices for stock price changes.

```
create view comp_prices as
select comp,sum(price*weight) as price
from stocks,comps_list
where stocks.symbol = comps_list.symbol
group by comp

create view option_prices as
select option_symbol,fBS(price,strike,expiration,stdev) as price
from stocks,stock_stdev,options_list
where stocks.symbol = options_list.stock_symbol and stocks.symbol = stock_stdev.symbol
```

The function $f_{BS}$ computes the theoretical price of an option based on the Black-Scholes pricing model. See Appendix B for the full equation.

In this paper we only focus on the rules that maintain these two materialized views as the stock prices change. In practice, we would need additional rules to handle changes to the other tables, e.g., comps_list or options_list. We will ignore these additional rules, both due to space constraints and because these other tables change very infrequently.

A straightforward way to handle stock price changes, and the only way available in most rule systems, is through a rule similar to the one shown in Figure 3. The rule do_comps1 states that when the price attribute of any stock changes, and that stock is used to compute at least one composite, the transaction compute_comps1 should be run to update comp_prices. When compute_comps1 runs, it will need to know information about the stocks that changed and how they impact the composite prices; this information is assembled when the condition query is checked. Note that the

8

| stocks | |
|---|---|
| symbol | price |
| S1 | 30 |
| S2 | 40 |
| S3 | 50 |

| comps_list | | |
|---|---|---|
| comp | symbol | weight |
| C1 | S1 | 0.5 |
| C1 | S3 | 0.5 |
| C2 | S1 | 0.3 |
| C2 | S2 | 0.7 |

| comp_prices | |
|---|---|
| comp | price |
| C1 | 40.0 |
| C2 | 37.0 |

Transaction $T_1$

S1: 30→31

S2: 40→39

| matches | | | |
|---|---|---|---|
| comp | weight | old_price | new_price |
| C1 | 0.5 | 30.0 | 31.0 |
| C2 | 0.3 | 30.0 | 31.0 |
| C2 | 0.7 | 40.0 | 39.0 |

Transaction $T_2$

S2: 39→38

S3: 50→51

| matches | | | |
|---|---|---|---|
| comp | weight | old_price | new_price |
| C2 | 0.7 | 39.0 | 38.0 |
| C1 | 0.5 | 50.0 | 51.0 |

Figure 4: Stock composite indices example.

condition query must equate the execute_order of the old and new transition tables to be sure that if the triggering transaction changed a stock price more than once, the correct old and new tuple images are being considered together. To allow comp_prices to use the data computed in the condition, we bind the results as the temporary table matches which is then passed to the action transaction. Using matches, the transaction running compute_comps1 can update comp_prices without any other database reads.

Consider the example shown in Figure 4 in which the tables are populated and two simple transactions that change the stock prices are shown. Transaction $T_1$ changes the prices of S1 and S2 which triggers rule do_comps1. The condition of the rule is satisfied since computing the condition query returns three rows. The result of the query is temporarily stored in table matches, and a new transaction, $T_{1a}$, is triggered immediately after $T_1$ commits. Transaction $T_{1a}$ will execute the function compute_comps1, and when it does, it will be able to read the result of the condition query as the table matches.

Suppose that before $T_{1a}$ runs, Transaction $T_2$ executes. Since $T_2$ also changes the prices of stocks that influence composite prices, it also triggers a new transaction, $T_{2a}$. Transaction $T_{2a}$ will also have access to a table called matches although it will see the second matches table shown in Figure 4. Although $T_{1a}$ and $T_{2a}$ update the same tuples in comp_prices, they remain in the system as two distinct transactions since compute_comps1 has not been defined as **unique**. Figure 5(a) shows the two transactions that are enqueued and the bound tables that they will be able to access when they execute.

As mentioned in the introduction, base data often changes in bursts. Hence the situation

9

matches ($T_{1a}$)

| comp | weight | old_price | new_price |
|------|--------|-----------|-----------|
| C1 | 0.5 | 30.0 | 31.0 |
| C2 | 0.3 | 30.0 | 31.0 |
| C2 | 0.7 | 40.0 | 39.0 |

matches ($T_{2a}$)

| comp | weight | old_price | new_price |
|------|--------|-----------|-----------|
| C2 | 0.7 | 39.0 | 38.0 |
| C1 | 0.5 | 50.0 | 51.0 |

(a) Transactions triggered by standard rules

matches ($T_{1a}$)

| comp | weight | old_price | new_price |
|------|--------|-----------|-----------|
| C1 | 0.5 | 30.0 | 31.0 |
| C2 | 0.3 | 30.0 | 31.0 |
| C2 | 0.7 | 40.0 | 39.0 |
| C2 | 0.7 | 39.0 | 38.0 |
| C1 | 0.5 | 50.0 | 51.0 |

(b) Transactions triggered using unique transactions

matches ($T_{1a}$)

| comp | weight | old_price | new_price |
|------|--------|-----------|-----------|
| C1 | 0.5 | 30.0 | 31.0 |
| C1 | 0.5 | 50.0 | 51.0 |

matches ($T_{2a}$)

| comp | weight | old_price | new_price |
|------|--------|-----------|-----------|
| C2 | 0.3 | 30.0 | 31.0 |
| C2 | 0.7 | 40.0 | 39.0 |
| C2 | 0.7 | 39.0 | 38.0 |

(c) Transactions triggered using unique transactions on comp

Figure 5: Triggered transactions for composite example.

of Figure 5(a) with multiple **matches** tables can occur frequently. Thus we would like to batch the changes to a particular composite to reduce the amount of recomputation required. This is accomplished using a unique transaction within the rule, along with a delay window of 1 second, as shown in the Figure 6 (changes from the previous rule and user function are boxed). Since compute_comps2 is defined as unique, only one transaction of this type can be queued in the system at once. Let us contrast the behavior of this rule to that of the previous rule. As before, transaction $T_1$ enqueues transaction $T_{1a}$ with a three row bound table. Now, however, assuming that $T_2$ executes within 1 second of $T_1$, when $T_2$ commits it does not enqueue a new transaction. Instead, the rows of the bound table that would have been passed to the new transaction are appended to the bound table of transaction $T_{1a}$. This is shown in Figure 5(b). Thus when transaction $T_{1a}$ finally runs, it will have the combined bound information of both triggering transactions. Note that this is similar to the behavior described in [CCS94] for deferred rules except that unique transactions allow changes to be batched across transaction boundaries.

Batching changes across transaction boundaries can greatly improve performance but it does require that the user rewrite the action function for maximum benefit. Consider the difference between compute_comps1 and compute_comps2 (Figures 3 and 6). The code compute_comps1 steps

```
create rule do_comps2 on stocks
when updated price
if
      select comp, comps_list.symbol as symbol,weight,
            old.price as old_price,new.price as new_price
      from comps_list,new,old
      where comps_list.symbol = new.symbol and new.execute_order = old.execute_order
      bind as matches
then
```
```
      execute compute_comps2
      unique
      after 1.0 seconds
```
```
define function compute_comps2
```
```
      real composite_change = 0.0;
      foreach row r in
            select comp, sum ((new-old)*weight) as diff from matches groupby comp)
            update comp_prices
            set price += r.diff
            where comp = r.comp;
```
```
end function
```

Figure 6: Unique transaction approach to maintain comp_prices for stock price changes.

through the matches table one row at a time, reading the affected composite, incrementally re-computing it, and then rewriting it. This same code would still work with the rule do_comps2 but it wouldn't take advantage of the fact that the same composite will probably appear many times in the matches table. In contrast, the code in compute_comps2 groups the changes according to the composite they affect. The select statement aggregates the incremental changes to each composite so that each only has to be read, recomputed, and written once.

Rule do_comps2 is a big improvement over do_comps1 since it allows batching, but the unit of batching is quite coarse: all of the changes that affect any tuple in comp_prices are applied together. A problem with performing all of the changes together is that the recompute transaction can be very long. Longer transactions have two drawbacks:

- They hold locks longer which leads to increased conflicts. More lock conflicts increase both response time and the variance in response time, neither of which is desirable in a real-time environment. The problem of choosing transaction boundaries in active databases was studied in [CJL91] where similar results were found.

- In a real-time system, transactions may have to be restarted either because they miss their deadlines or because a high priority transaction is blocked waiting for a lock that they hold. Longer transactions result in both more restarts and more lost work when a transaction is restarted.

Hence the goal in choosing a unit of batching should be to balance the performance benefits of

```
create rule do_comps3 on stocks
when updated price
if
     select comp, comps_list.symbol as symbol,weight,
        old.price as old_price,new.price as new_price
     from comps_list,new,old
     where comps_list.symbol = new.symbol and new.execute_order = old.execute_order
     bind as matches
then
```

```
execute compute_comps3
unique on comp
```

```
  after 1.0 seconds
```

```
define function compute_comps3
     real composite_change = 0.0;
```

```
foreach row r in matches
    composite_change += r.weight * (r.new_price - r.old_price);
update comp_prices
set price += composite_change
where comp = r.comp;
```

```
end function
```

Figure 7: Unique transaction approach (on `comp`) to maintain `comp_prices` for stock price changes.

combining like work and the scheduling flexibility of smaller transactions.

   With this goal in mind, we note that grouping all of the changes that affect a single composite price is useful because the old value can be read once, updated, and then written once. If the same changes were in separate transactions it would result in many more reads and writes of the composite. Any larger unit of batching does not seem to generate any further efficiency. This suggests that we batch on attribute comp, which would yield the grouping shown in Figure 5(c).

   The rule to batch on composite name is shown in Figure 7. When `compute_comps3` runs, the `matches` table it sees will only contain changes for a single composite. This results in simpler code than that used in `compute_comps2`: The for loop accumulates all of the weighted price changes from stock changes and then the total change is applied to the composite price.

   We have now seen three rules to incrementally maintain the `comp_prices` table. In Section 5, we compare their performance in experiments running on STRIP v2.0.

   In addition to maintaining the view `comp_prices`, we also want to maintain the view `option_prices` that contains theoretical option prices. When a stock price changes, the prices of all of the options that are based on it will change as well. A simple rule to recompute option prices when a stock price changes is shown in Figure 8. Note that since option prices cannot be computed incrementally, the transition table `old` is not bound as part of the condition.

   As with composite prices, it may be possible to improve on the performance of this rule using unique transactions, but we must choose a unit of batching. The efficiency to be gained by batching is that if an underlying stock price changes more than once in a delay window, we can use its last

```
create rule do_options1 on stocks
when updated price
if
      select option_symbol,stock_symbol,strike,expiration,new.price as new_price
      from options_list,new
      where options_list.stock_symbol = new.symbol
      bind as matches
then
      execute compute_options1

define function compute_options1
      real last_price, stdev;
      foreach row r in matches
          stdev = select sd from stock_stdev where symbol = r.stock_symbol
          update option_prices
          set price = f(r.new_price,r.strike,r.expiration)
          where option_prices.option_symbol = r.option_symbol;
end function
```

Figure 8: Standard rule to maintain option_prices for stock price changes.

value to compute the theoretical option price only once. This is different from the previous example in which we had to consider every change. Hence, batching based on option symbol might be a good choice. On the other hand, there are often many more options in the system than stocks, so batching on such a small unit may lead to a huge number of transactions in the system. Hence it may be wiser to batch on stock symbol, collecting all of the options related to a single stock together: this unit of batching may also allow some partial results used for every option to be computed only once. Section 5 reports the results of experiments to determine which unit of batching performs best on STRIP.

## 4   Performance Evaluation

To evaluate the performance of unique transactions, we have implemented the program trading application described in the previous section using STRIP. In addition to the rules and user functions, we still need a stream of stock price updates to drive the system, and data to populate the tables. Both are described below. In addition, this section describes the hardware used for the experiments and some basic performance numbers for STRIP.

### 4.1   Update stream

A program trading application is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database [New94]. The quote file lists all of the stock price quotes made during actual days of trading on all of the major U.S. exchanges. Each entry contains the symbol of the

stock being quoted, the bid and ask prices, and the time of the quote to the nearest second. To try to recreate the actual timing of the trades within the second boundaries, if more than one quote occurs within a given second we spread them evenly over the 1 second interval. For example, if 3 quotes are recorded at time 54 seconds, we will assume that they occurred at 54 ,54.33, and 54.66 seconds.

The experiments reported here are driven by the actual price changes from the TAQ file recorded during trading in January of 1994. Each experiment lasts for 30 minutes during which the price changes that occurred during real trading on the exchange are applied to the system in real-time. On average, each run contains over 60,000 stock price changes.

In real program trading applications, the quote stream arrives over a high speed network, often dedicated for this purpose only. Because we do not have access to a real-time quote service, we chose to load the entire trace into memory before the experiment begins, which has the following benefits:

- It eliminates overhead which is identical for all of the rules, such as market feed handling, allowing us to focus on the differences in rule performance.

- Our test machine is not on an isolated network, so the traffic generated by other users would make a controlled experiment very difficult.

## 4.2 Populating the tables

The table `stocks` is populated from the stocks quoted in the trace file and contains 6600 stocks. The table `comp_prices` contains 400 composites, each calculated from 200 stocks. The component stocks in each composite are chosen randomly but in direct proportion to their trading activity as measured by the number of price changes in a day of trading. We feel that this is indicative of the distribution of real stocks in real composites: the stocks of large companies which trade frequently are most often used in composites since they tend to be good indicators of entire industries. For instance, Netscape, which trades a few thousand times a day, is more likely to be used as a proxy for the Internet sector than is Spyglass, which trades a few hundred times a day. The many-many relationship between stocks and composites requires 80,000 rows and is stored in table `comps_list`.

In the baseline experiment, there are 50,000 options prices computed which means that the tables `options_list` and `option_prices` each contain 50,000 entries. As with composites, the division of options between the stocks is randomly generated but in relation to the frequency of trading of the underlying stocks. Hence the expected number of listed options for a particular stock is the total number of options times the fraction of the entire trace due to the particular stock. The other attributes of table `options_list`, besides `stock_symbol`, are chosen randomly but from a reasonable range of values. Since we do not actually use the theoretical option prices that are computed, and since the option pricing model is not data dependent, the choice of these attributes is not important.

## 4.3 Transactions

In a real program trading application, there can be four types of transactions in the system: base data updates, recomputations of derived data, user queries, and expert system code. We have

14

| Action | Time ($\mu$sec) |
|---|---|
| begin task | 10 |
| end task | 5 |
| begin transaction | 1 |
| commit transaction | 10 |
| open cursor | 60 |
| fetch cursor | 15 |
| update cursor | 10 |
| close cursor | 25 |
| get lock | 10 |
| release lock | 30 |
| run scheduler | 5 |

Table 1: Basic performance numbers for STRIP v2.0

chosen to focus on the first two because the last two are not necessary to study recomputation costs.

The update transactions are driven by the TAQ quote trace, with one update transaction being run for every price change. The recomputation transactions are triggered by the rules defined in Section 3. The code for the recompute transaction is similar to that shown in Section 3 although since STRIP v2.0 implements only a subset of SQL, some of the aggregation had to be done in the application code rather than in the database. The functions to compute composite and option prices, which appear in Appendix B, are fully implemented. The standard normal distribution function, $\Phi()$, is computed using the error function in the C math library.

### 4.4  System

The performance numbers reported here are for STRIP running on an HP-735 under HP-UX 9.03 with 144Mb of main memory. No other user processes were run on the system during the experiments. Response times are measured using the Unix function gettimeofday. The fraction of the CPU required for an experiment was measured using the Unix call times. In order to understand the reported results, some basic timing measurements on STRIP v2.0 (measured using gprof) are reported in Table 1.

Let us calculate the approximate timing of a simple transaction that updates one tuple. In STRIP, transactions must be executed within a task, which is the database's unit of scheduling. A task can contain zero or more transactions but every transaction must be contained within exactly one task. If a user sticks with one transaction per task, we can calculate the cost of a simple cursor based update of one tuple as begin_task(10)+begin_transaction(1)+get_lock(10)+open_cursor(60)+ fetch_cursor(15) +update_cursor(10)+close_cursor(25)+release_lock(30) +commit_transaction(10)+ end_task(1) = 172$\mu$sec. This results in a throughput of 5814 transactions per second(TPS), which is slightly lower than the 7000 TPS observed in practice. From this we can see that STRIP is a very high performance database. In addition, the overhead of the task/transaction mechanism is not very high, which is beneficial to rules that are unique on smaller granularities since they tend to create more transactions.

15




Figure 9: Effects of delay window on CPU usage.

Figure 10: Effects of delay window on number of recomputations, $N_r$.

# 5    Results

This section reports selected results of the experiments run on STRIP. By evaluating the system under different settings, we are able to address such questions as:

1. Do unique transactions significantly reduce the recomputation effort?

2. How long should the delay window be?

3. What is the most efficient unit of batching to use?

4. How do different units of batching affect the length of the recompute transactions and hence the schedulability of the system?

The answers to these questions very much depend on whether the derived data can be maintained incrementally, as with comp_prices, or if it must be maintained non-incrementally, as with option_prices. Therefore we divide our results and discussion into two parts, Section 5.1 for comp_prices and 5.2 for option_prices.

## 5.1    Maintaining comp_prices

In this section we describe the performance of STRIP maintaining the materialized view comp_prices. We ran experiments using both unique and non-unique transactions. For the unique transactions, we considered three units of batching: the entire table (**unique**), per stock symbol (**unique on symbol**) and per composite symbol (**unique on comp**). We also varied the size of the delay window for the unique transactions from 0.5 to 3 seconds.

The results for CPU utilization are shown in Figure 9. Maintaining the composite using non-unique transactions uses 36% of the processing resources, as indicated by the horizontal line on the graph. Given that our test scenario does not try to support user queries or expert system

16

transactions, 36% is a large part of the system's capacity to already be claimed. As shown by the figure, however, this load can be greatly reduced by using unique transactions.

The performance of the rules, and especially batching on composite, can be better understood by examining the number of recomputation transactions that were run during the experiment, $N_r$. As Figure 10 shows, batching on the composite symbol causes an order of magnitude more recompute transactions to be run than without any batching. This is to be expected since using the numbers from Section 4, the average stock participates in 12 composites and hence every price change will trigger 12 recomputations on average. When the delay window is small, there is little batching, so virtually every stock change triggers 12 new transactions. As the window is lengthened, more changes start to be batched and the number of recomputations performed decreases. The rule that causes the fewest recomputations is coarse batching (unique), which should be no surprise since there can be only one transaction queued at any given time.

Having to execute more recompute transactions increases the load on the system in two ways. First, there is overhead in starting and completing a task/transaction as reported in Section 4. Second, more recompute transactions means more tasks in the system at the same time which increases the scheduling time. Even in combination, these two sources of overhead are negligible when the number of transactions is small — executing queries and computing user functions dominates the CPU. The CPU load stays flat as the number of transactions increase until a critical region when transaction management costs become comparable to query costs. At this point, small increases in the number of transactions can noticeably increase CPU load. In the reported experiment, the critical region begins at approximately 500,000 recomputations so only unique on composite is affected by transaction overhead. Note that, when its delay is set above 1 second we see that its performance drastically improves.

These results help answer the first three questions listed at the beginning of this section. First, unique transactions dramatically reduce the recomputation load on the system: using a 3 second delay, two of the unique rules require less than $\frac{1}{3}$ of the non-unique processing. This is especially impressive in a main memory database such as STRIP where the access costs are small and hence the potential benefits of batching are small as well. In disk resident databases, where the access cost is higher, we would expect the gains to be even greater. In fact, simulation studies reported in [AKGM96a] do show improvements of an order of magnitude in CPU utilization.

It is more difficult to answer the second question on the optimal size of the delay window because increasing the window continues to decrease the recomputation load. For our experiment, it is clear that the gains due to increasing the delay window seem to taper off beyond 3 seconds. Since many stock market applications can accept delays in this range, the ideal delay window for our application is between 2 and 3 seconds. The exact point at which the the a balance is reached between CPU usage and data timeliness depends on the application. One of the strengths of unique transactions, however, is that they allow the application to adjust this tradeoff, even on a view by view basis.

Regarding the best unit of batching to use, the most efficient in this experiment was the coarsest, unique with no qualifying columns. This allowed the system to minimize the number of recomputation transactions, and hence overhead, and perform the most batching. Batching on composite symbol performed almost as well for higher delays since it allowed full batching, but the greater number of transactions that had to be run kept it slightly worse.




Figure 11: Effects of delay window on recompute transaction length.

Figure 12: Effects of delay window on CPU usage.

Reducing CPU load is not our only goal, however. Another important goal is to keep the recomputation transaction as short as possible. As discussed in Section 3, shorter transactions hold locks for less time and thus reduce conflicts in the system. Fewer conflicts result in shorter and more predictable response time, a critical metric of a real-time system.

Figure 11 plots the average system time spent per recompute transaction minus queueing time. We can see that while coarsest batching yields the best performance gains, it also results in the longest recomputation transactions. In fact, its recomputation times are an order of magnitude longer than batching on stock symbol or non-batching, and over two orders of magnitude longer than batching on composite symbol. Hence, assuming that short transactions are important, the best overall rule to maintain composite averages is batching on composite symbol.

To summarize, all of the rules using unique transactions achieved enough batching for delays $\geq 0.7$ seconds that they outperformed non-unique rules. Coarse batching reduces the CPU load the most but batching on composite symbol is nearly as good and results in better system schedulability. So in this case, the best unit of batching is the one that combines just enough work to allow us to take advantage of the natural overlap without trying to combine too much.

## 5.2  Maintaining option_prices

In this section we describe the performance of STRIP maintaining the materialized view option_prices. Whereas comp_prices could be incrementally maintained, option_prices cannot. Also, weighted composites have a high *fan-in* (200 stock prices), meaning that they are computed from many other data, whereas option prices do not (1 stock price plus 3 other base data items). Hence in this section we explore how these differences affect the performance of unique transactions.

As before, we ran experiments using both unique and non-unique transactions. Again, we wanted to consider three units of batching: the entire table (**unique**), per stock symbol (**unique on symbol**) and per option symbol (**unique on option_symbol**). After initial experiments, however, we discovered that the *fan-out* from stocks to options was so high that batching on option symbols

18

led to an unmanageable number of transactions in the system. Consequently, the results for batching on `option_symbol` are not shown in the graphs.

Figure 12 shows the fraction of CPU capacity required to maintain `option_prices`. The horizontal line is the performance of the system using non-unique rules. This graph raises two interesting points. First, for delays starting at slightly more than 1 second, both rules using unique transactions outperform the standard approach. For a delay of 3 seconds, batching on stock symbol required 20% less CPU time than non-unique transactions. While this is a significant savings, it is less than was achieved in the previous section. This is due to the high fan-out nature of maintaining option prices as opposed to the high fan-in of maintaining composite averages. In order to batch option recomputations, we need changes to the same stock to occur within the delay window (*temporal locality* in [AKGM96a]), while with the composite rules, we only need changes to different stocks that contribute to the same composite (*temporal-spatial locality* in [AKGM96a]). Thus the nature of maintaining the composite prices yields more batching for a given delay window.

The second interesting point from Figure 12 is that the coarsest unit of batching, unique with no qualifying columns, is not the best performer — batching on stock symbol uses less CPU. This is a contrast from the results in the previous section. In addition, batching on stock symbol achieves this performance despite requiring that almost two orders of magnitude more recomputations be run, as shown in Figure 13. This can be explained as follows:

- Since the number of recomputations required by batching on stock symbol is below the "critical region" (described in Section 5.1), the impact of transaction management on the overall CPU load is negligible.

- Depending on how the rule is written, grouping the rows of the bound table by stock symbol is done in different places in the code. If the rule is defined unique on stock symbol, the rule system groups the rows into different bound tables before the user code is run. If no qualifying columns are added to the unique clause, the rows are grouped in the recompute code provided by the user. Implementation peculiarities of STRIP v2.0 result in the former being slightly faster than the latter. We plan to correct this discrepancy in the next revision of the code.

- The longer running transactions of the coarse batching seem to be preempted more often, both by update arrival and by system processes, causing more context switches.

We anticipate that with further performance tuning of STRIP and its interaction with the operating system the last two points can be addressed. If so, coarse batching and batching on stock symbol will have very similar CPU usage.

Even if the CPU usage is similar, however, batching on stock symbol results in shorter recomputations. As shown in Figure 14, the length of its recomputation transactions are two orders of magnitude smaller than with coarse batching, the benefits of which were discussed in Section 5.1. Combining shorter transactions with less CPU usage, batching on stock symbols is the clear winner in this set of experiments. As with maintaining `comp_prices`, the best unit of batching is the one that allows redundancies in the calculations to be omitted without trying to batch too much together.

19




Figure 13: Effects of delay window on number of recomputations, $N_r$.

Figure 14: Effects of delay window on recompute transaction length.

# 6  Rule System

This section describes the implementation of the STRIP rule system. Due to space constraints, we focus only on the implementation issues related to unique transactions.

## 6.1  Table storage

There are two types of tables in STRIP:

**standard tables** - that are created and deleted via the SQL **create** and **drop** commands.

**temporary tables** - that are created and deleted by the database and used to store intermediate query-processing results, transition tables, and bound tables.

The tuples of a standard table will be called standard tuples and tuples of a temporary table temporary tuples. We use "table" or "tuple" to refer to a standard table or tuple unless otherwise noted. Both types of tables are stored in STRIP as linked lists of tuples. The format of the tuples, however, is different.

In standard tables, the values of the attributes are actually stored in the tuple as opposed to storing pointers to the values as in [PTV90]. In the current implementation, only fixed-length fields are permitted so tuple lengths are constant as well. In STRIP, the order of rows in standard tables is unimportant and tables can be indexed using either a hash or red-black tree structure.

For a temporary table, $T$, storing the actual attribute values in the tuple, $t$, would be wasteful since for all of our temporary tables we can use pointers instead; this requires one indirection but usually saves quite a bit of space. This suggests storing $t$ as an array of pointers to attribute values. Still, storing one pointer for each attribute requires more memory than is necessary. As proposed in [Rou82], we instead store one pointer to each standard tuple that contributes at least one attribute to $t$. (For aggregate, computed, or timestamp attributes, the actual value must still be stored, however, since it doesn't exist anywhere else and hence cannot be pointed to.) When temporary

table $T$ is created, a static mapping is built that specifies for each column in the temporary table which tuple pointer to follow and what the offset is in the referenced record.

For example, consider a temporary relation $V(A, B, C, D, E)$ that is a natural join of the three relations $R(A, B, C)$, $S(C, D)$, and $T(D, E)$. Using the simplest attribute pointer scheme, each tuple $t$ of $V$ would need an array of 5 pointers. In the STRIP scheme, each tuple is stored as $[t_r, t_t]$ where $t_r$ is a pointer to the $R$ tuple that contributed attributes $A, B,$ and $C$ to $t$ and $t_t$ points to the tuple in $T$ that contributed attributes $D$ and $E$. Notice that because relation $S$ only has attributes that are contributed by other relations, no pointer to a tuple in $S$ need be stored.[1] The static map for $V$ is the structure $[(R, \theta_{A,R}), (R, \theta_{B,R}), (R, \theta_{C,R}), (T, \theta_{D,T}), (T, \theta_{E,T})]$ where $\theta_{X,Y}$ is the offset of attribute $X$ in the tuples of relation $Y$.

For temporary tables being used for intermediate results, our approach works well. One complication arises, however, when the temporary tables are being used for bound tables in the rule system: Since the rule condition evaluation and the rule action occur in different transactions, and locks are not held across transactions, tuples referenced in the bound tables can change between the time when the bound table is computed and when it's read. If this were to happen, the bound tables seen by the rule action would no longer reflect the state of the database at the time of condition evaluation. To solve this problem, standard table records are not changed in place — a new record is created and linked into the relation. The old record is removed from the relation but kept in the system until the last bound table that references it is retired, as determined by a reference counting scheme.

The STRIP temporary tuple storage approach requires less memory than other schemes. Also, because data from standard tuples does not need to be recopied into temporary tuples, the amount of copying is minimized which improves system performance.

## 6.2  Task/Transaction Management

Tasks, not transactions, are the units of scheduling in STRIP. Tasks can be generated by user applications, the rule system, or the import/export system (described in [AKGM96b]). The flow of tasks in STRIP is shown in Figure 15, and is similar to other high performance and real-time databases such as [HSTR90]. Every new task to the system has associated with it a release time specifying when it should be run. Many user tasks have immediate release times and are placed in the ready queue. Some tasks, though, in particular those that will run unique transactions with delays, will have a future release time. These tasks are placed in the delay queue until their release time.

Tasks are serviced in STRIP by a pool of processes. Whenever a process becomes free, it moves a task from the ready queue to the running queue and starts executing its code. If, while running, a task must block waiting for a lock, it is placed in the blocked queue until the lock is granted. When a task finally finishes, results are returned to the user if appropriate and its process looks to the ready queue to find another task. STRIP provides standard real-time scheduling algorithms for tasks such as earliest-deadline and value-density first. Details of the algorithms are provided in [Ade96].

---

[1] Actually, the current version of STRIP stores a pointer for each joined table regardless of whether it contributes any attributes. The next version will contain the optimization described here.



Figure 15: The flow of tasks within STRIP.

## 6.3  Rule processing

Rule processing in STRIP occurs at the end of a transaction.[2] At this time, the transaction's log is scanned to to see which events have occurred, and hence which rules have been triggered. If a rule is triggered, its transition tables are built during the log pass.

After the pass through the log, each triggered rule is considered in turn. First, its condition is checked. If the results are to be bound, a temporary table is built. If the condition evaluates to true, any other queries in the **evaluate** clause are computed and bound as well. Finally a task is created to perform the rule action. The task is passed the following information through its task control block (TCB):

1. a pointer to the schema of each of the bound tables it will have access to when it runs, as well as a pointer to the the data in the table,

2. the name of the user function it should run, and

3. the amount of time its release should be delayed after this transaction commits.

When all of the rules triggered by a transaction have been processed, all of the triggered tasks will be enqueued in the database. Those with non-zero delays will be placed in the delay queue and the rest in the ready queue.

Once running, a task triggered by a rule is different from other tasks in one way: it has access to bound tables as well as the other tables in the database. Thus, whenever a triggered task tries to access a table, its bound table list must be checked as well as the database catalog. When a triggered task finishes, its bound tables are no longer needed and are reclaimed. Recall that this involves freeing the memory used for the linked list of pointer arrays as well as any old records from standard tables that were only being kept for the bound table.

To extend the base rule system to support unique transactions, we needed a way to discover if a task is already queued in the ready or delayed queues with particular unique column values. To support this lookup, a hash table is built for each type of unique transaction. The hash table is used to hash the unique column values of a task to a pointer to its TCB. The hash table for a particular unique transaction is created when the first rule that executes the transaction is defined.

---

[2]For statements not performed within a transaction, rule processing occurs at the end of the task or before the next transaction starts, whichever comes first.

To illustrate the use of the hash table, consider one built for the user function `compute_comps3` from Section 3 which is defined unique on `comp`. Suppose a transaction $T$ commits that has changed one stock price, and that the affected stock is used to compute two composites, $c_1$ and $c_2$. The bound table `matches` will have two rows, one for each composite. Transaction $T$ will look in the hash table for `compute_comps3` to see if two new tasks have to be created to recompute the two composites. It may find that a task is already queued for $c_1$, so it adds the relevant row of its bound table to that stored in the TCB of the enqueued task. If $c_2$, however, does not have a hash table entry, a new task is created and placed in the delay queue. Then an entry is inserted into the table to map the name of composite $c_2$ to the TCB of the new task. When an enqueued task, $T'$, finally begins to run, it removes its record from the hash table. This and all other modifications of the hash table are guarded by spinlocks.

# 7   Related Work

In this section, we discuss previous work related to STRIP's rule system. Due to space constraints, we do not discuss previous work on main memory databases other than referring the interested reader to [GMS92]. An overview of previous work in real-time databases is presented in [Ram93].

The results of Section 5 show that using unique transactions can greatly improve the performance of a rule-based system that maintains rapidly changing derived data. Here, we consider to what extent previously proposed rule systems can implement our unique transaction approach. To implement our approach, four requirements are placed on a rule system:

1. **Delayed Execution** - It must be possible to specify that a triggered transaction be released only after a fixed delay.

2. **Unique Execution** - If a particular transaction is in its delay period, no new transaction of the same type should be triggered.

3. **Storage of Transition Tables** - Since the recomputation is decoupled from the transaction that triggered it, the database must maintain the set of changes to base data and pass them to the triggered transaction so that it can perform incremental recomputation.

4. **Control Over the Unit of Batching** - As was shown in Section 5, using different units of batching for unique transactions can lead to very different CPU load versus recomputation length tradeoffs. Since the optimal choice is application dependent, the database must give the application designer control over this parameter.

While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only *single events* and those that support *composite events*. Single events are usually database operations such as insert, update, etc. Composite events are built from single events using logical or temporal operators. Systems based on single events are far more prevalent and will be considered first. The reader is directed to [WC96] for more details.

## 7.1 Single event detection

No system with only single events meets all four requirements. Delayed execution is only supported by systems that can specify timing requirements on rule actions, such as HiPAC [DHL90]. Currently no commercial systems provide timing requirements. Unique execution is not supported directly by any proposed system, but can be emulated by using rule "deactivation," where present. When a rule triggers a recompute, it can deactivate all rules (including itself) that could trigger another recompute of the same type. When the recompute finally runs, it can reactivate all of the rules that trigger it. Building and maintaining such a set of rules is fraught with danger. For example, if the recompute transaction is aborted, some other transaction must be run to re-enable all of the rules. Also, the addition of a new rule requires updating all of the other related rules and the recompute transaction. This scheme is even more difficult in combination with requirement 4, controlling the unit of batching. Using deactivation to guarantee uniqueness fixes the granularity of batching at the rule level: If we desire finer granularity, we must create many specific rules to replace one general rule. This can lead to an unacceptable increase in the total number of rules in the system.

To our knowledge, no single event system provides direct support for storage of transition tables across transaction boundaries. To simulate this aspect of unique transactions, application programmers will have to create and maintain the information explicitly using additional tables. In addition to being less efficient, the workaround necessitates more changes to the rule and transaction definitions, more complexity, and hence more opportunities for errors. Similarly, we know of no system with support for control over the unit of batching.

## 7.2 Composite event detection

The proposed systems with composite event detection come much closer to meeting the four requirements. In some systems, it is possible to emulate delayed and unique execution by defining a composite event that is composed of one or more similar single events over an interval of time. For instance, an event could be defined as one or more changes to a stock price in the interval [time of first change, time of first change + delay]. The condition check and action can then be triggered by the composite event which will occur only once if the consumption mode is set properly. This approach requires relative temporal events which are not supported by every system (e.g., not by Ode [GJS92]). Also, since the single events can come from different transactions, we require event histories that span transaction boundaries, not supported by, e.g., Sentinel [CKAK94].

The next requirement is storage of transition tables. The best any proposed systems seem to support is event parameters, which are the values of the data that caused the event. For instance, when a stock price changes, the new and/or old value might be included as event parameters. In SAMOS [GD92], the user has to choose which value is used, although both can be supported with additional rules and use of versioning. Even given both values, there are still two shortcomings. First, only data involved in the event is stored and not data computed in the condition check: this is equivalent to limiting the unique columns to come from the transition tables in our model. Second, the single event parameters must be composed in a useful way for the composite events. Most systems do not provide all of the parameter values with the composite event. For instance in SAMOS, only the parameters of the first or last event in the interval are saved. Event parameters

can also be used to control the unit of batching to a limited degree. Some systems, such as SAMOS and Ode, can constrain event parameters to be equal as part of composite event definition. In both systems, however, the number of single events must be known a priori, which is not possible in the systems we have studied.

To summarize, rule systems that support composite events come much closer to supporting the unique transaction approach than do those systems with only single events, but they still fall short.

# 8   Conclusion

In applications where base data changes rapidly, maintaining derived data is a critical component of overall system performance. In this paper, we have presented a rule system that allows very efficient maintenance of derived data in such environments through a new construct called *unique transactions*. Unique transactions allow changes to base data to be flexibly grouped to optimize the derivation functions: Changes can be both batched across transaction boundaries and partitioned by the attributes of the base and derived data. Through experimentation on a main memory DBMS with a special-purpose rule system, we have shown that batching changes significantly reduces the recomputation load on the CPU.

Unique transactions allow the tuning of two parameters: the unit of batching and the length of the delay window. As was shown in Section 5, having these two parameters provides great flexibility in managing the tradeoffs between performance, data timeliness, and schedulibility. It also, however, requires that someone or something choose appropriate values. The optimal choices for both parameters are heavily application dependent, but the results from Section 5 suggest two rules of thumb. First, the unit of batching should be chosen to be just large enough to take advantage of the redundancy in the recomputation but no larger. Second, increasing the size of the delay window yields diminishing returns so a small window should be chosen to begin and only lengthened if performance is not acceptable. Since most of the applications we have mentioned are characterized by a relatively static set of queries and predictable loads, gradual optimization of the two parameters is possible.

Finally, it is often argued that rules are difficult for humans to write and hence should be automatically generated. For example, in [CW91], the authors show how rules can be automatically derived to maintain a certain class of relational views given the view definitions. We are confident that this work can be extended to take advantage of unique transactions as well. By maintaining statistics such as join selectivities and how often tables are updated, it should be possible for a materialized view manager to derive not just the rules to maintain a view but the unit of batching and delay window size as well. This is a subject of future work.

# References

[Ade96]      B. Adelberg. *STRIP: A Soft real-time database for open systems*. PhD thesis, Stanford University, 1996.

[AKGM96a]  B. Adelberg, B. Kao, and H. Garcia-Molina. Database support for efficiently maintaining derived data. In *Proceedings of EDBT*, pages 223–40, 1996.

[AKGM96b] B. Adelberg, B. Kao, and H. Garcia-Molina. Overview of the STanford Real-time Information Processor (STRIP). *SIGMOD Record*, 25(1):34-7, 1996.

[BBKZ93] H. Branding, A. Buchmann, T. Kudrass, and J. Zimmermann. Rules in an open system: The REACH rule system. In *Proceedings of the first international workshop on rules in database systems*, pages 111–26, 1993.

[BS73] F. Black and M. Scholes. The pricing of options and corporate liabilities. *Journal of political economy*, 81(3):637–54, 1973.

[CB94] M. Cochinwala and J. Bradley. A multidatabase system for tracking and retrieval of financial data. In *Proceedings of the 20th VLDB Conference*, pages 714–721, 1994.

[CCS94] C. Collet, T. Coupaye, and T. Svensen. Naos - efficient and modular reactive capabilities in an object-oriented database system. In *Proceedings of the 20th VLDB Conference*, pages 132–43, 1994.

[CJL91] M. Carey, R. Jauhari, and M. Livny. On transaction boundaries in active databases: A performance perspective. *IEEE Transactions on Knowledge and Data Engineering*, 3(3):320–36, 1991.

[CKAK94] S. Chakravarthy, V. Krishnaprasad, E. Anwar, and S.K. Kim. Composite events for active databases. In *Proceedings of the 20th VLDB Conference*, pages 606–17, 1994.

[CW91] S. Ceri and J. Widom. Deriving production rules for incremental rule maintenance. In *Proceedings of the 17th VLDB Conference*, pages 577–89, 1991.

[DD93] C.J. Date and H. Darwen. *The SQL standard*. Addison-Wesley, 3.0 edition, 1993.

[DHL90] U. Dayal, M. Hsu, and R. Ledin. Organizing long-running activities with triggers and transactions. In *Proceedings of the ACM SIGMOD Annual Conference on Management of Data*, pages 204–14, 1990.

[GD92] S. Gatziu and K.R. Dittrich. SAMOS:an active object-oriented database system. *IEEE Data Engineering Bulletin*, 15(4):23–6, 1992.

[GJS92] N.H. Gehani, H.V. Jagadish, and O. Shmueli. Composite event specification in active databases: Model & implementation. In *Proceedings of the 18th VLDB Conference*, pages 327–38, 1992.

[GMS92] H. Garcia-Molina and K. Salem. Main memory database systems: an overview. *IEEE Transactions on Knowledge and Data Engineering*, 4(6):509–16, 1992.

[HSTR90] J. Huang, J. Stankovic, D. Towsley, and K. Ramamritham. Real-time transaction processing: design, implementation and performance evaluation. Technical Report COINS 90-43, Univ. of Massachusetts, 1990.

[New94] New York Stock Exchange, Inc. *The TAQ database*, 3.0 edition, June 1994.

[PTV90] P. Pucheral, J. Thévenin, and P. Valduriez. Efficient main memory data management using the DBGraph storage model. In *Proceedings of the 16th VLDB Conference*, pages 683–95, 1990.

[Ram93]    K. Ramamritham. Real-time databases. *Distributed and Parallel Databases*, 1(2):199–226, 1993.

[Rou82]    N. Roussopoulos. View indexing in relational databases. *ACM Transactions on Database Systems*, 7(2):258–90, 1982.

[WC96]    J. Widom and S. Ceri. *Active database systems*. Morgan Kaufmann, 1.0 edition, 1996.

# A    Unique transaction behavior

We formally specify the behavior of unique transactions. Assume that in its condition and its evaluate clause, a rule defines $n$ bound tables $\mathcal{T} = \{T_1, T_2, \ldots, T_n\}$. Let the set of columns of each table $T_i$ be denoted $\mathcal{C}_i = \{c_{i1}, c_{i2}, \ldots, c_{im_i}\}$ and assume that each column name is unique across all tables. Let $\mathcal{U} = \{u_1, u_2, \ldots, u_p\}$ be the $p$ unique columns chosen from $\bigcup \mathcal{C}_i$ and specified in the unique clause of the rule definition. We partition the set of tables $\mathcal{T}$ into two sets depending on whether any of their columns are defined as unique:

$$\mathcal{T}^u = \{T_i \in \mathcal{T} \mid (\exists c_j \in \mathcal{C}_i) c_j \in \mathcal{U}\}$$

$$\mathcal{T}^n = \mathcal{T} - \mathcal{T}^u$$

Further, let

$$B = \prod_{T_i \in \mathcal{T}^u} T_i, \text{ and}$$

$$unique\_cols(k_1, k_2, \ldots, k_p) = \pi_{u_1, u_2, \ldots, u_p} B$$

so that $unique\_cols$ is a relation containing all of the distinct combinations of the unique columns from the bound tables.

When a rule is triggered and its condition evaluated to true, the system will generate the relation $unique\_cols$ from its bound tables. Then, it will try to create a new transaction for each tuple in $unique\_cols$. Each new transaction will receive only the portion of the bound tables related to its unique column values. If $(v_1, v_2, \ldots, v_p)$ are the unique values for one of the triggered transactions, the set of bound tables passed to it, $\mathcal{T}'$ will be:

$$T_i' = \begin{cases} T_i & \text{if } T_i \in \mathcal{T}^n \\ \pi_{\mathcal{C}_i} \sigma_{u_1 = v_1, u_2 = v_2, \ldots, u_p = v_p} B & \text{otherwise} \end{cases}$$

If a transaction with the same name and the same unique column values is already queued in the system, the tuples of each of its bound tables $T_1', T_2', \ldots, T_n'$ will be appended to the those of the bound tables of the enqueued transaction. If not, a new transaction is enqueued with the bound tables.

# B    Formula for Program Trading Examples

The formula to compute a composite average composed of $n$ stocks is $comp\_price = \sum_{i=1}^n w_i p_i$ where $p_i$ and $w_i$ are the price and weighting of the $i$th stock respectively. For theoretical option prices, we use the Black-Scholes pricing model [BS73], which although known to undervalue options, is still commonly used and reported. The model computes the price of a call option according to the following formula:

$$p_{option} = p_s \Phi(d_1) - \frac{p_e}{e^{rt}} \Phi(d_2),$$

$$d_1 = \frac{\ln(\frac{p_s}{p_e}) + (r + \frac{1}{2}\sigma_{p_s}^2)t}{\sigma_{p_s}\sqrt{t}},$$

$$d_2 = \frac{\ln(\frac{p_s}{p_e}) + (r - \frac{1}{2}\sigma_{p_s}^2)t}{\sigma_{p_s}\sqrt{t}},$$

|          |   |   |
|----------|---|---|
|          | $p_s$ | = the current price of the underlying stock, |
|          | $\sigma_{p_s}$ | = the standard deviation of r, used as a measure of the riskiness of the stock, |
| where    | $p_e$ | = the exercise price of the option, |
|          | r | = the continuously compounded risk-less rate of return, |
|          | t | = the time remaining before expiration expressed as a fraction of a year, |
|          | $\Phi()$ | = the cumulative distribution function for the standard normal function. |

# EXHIBIT 9



**Volume 26    Number 2    June 1997**

- Current Issue
- Previous Issues
- Info for Authors
- Record Editors
- XML Edition
- About SIGMOD
- FAQ
- Credits

Proceedings of the 1997 ACM SIGMOD International Conference on Management of Data (May 13-15, 1997, Tucson, AZ, USA)

*Fast parallel similarity search in multimedia databases*
Stefan Berchtold, Christian Böhm, Bernhard Braunmüller, Daniel A. Keim and Hans-Peter Kriegel
Pages 1-12
[Index Terms]
[Full Text in PDF Format, 1269 KB]

*Similarity-based queries for time series data*
Davood Rafiei and Alberto Mendelzon
Pages 13-25
[Index Terms]
[Full Text in PDF Format, 1142 KB]

*Meaningful change detection in structured data*
Sudarshan S. Chawathe and Hector Garcia-Molina
Pages 26-37
[Index Terms]

[Full Text in PDF Format, 1635 KB]

*Improved query performance with variant indexes*
Patrick O'Neil and Dallan Quass
Pages 38-49
[Index Terms]
[Full Text in PDF Format, 1502 KB]

*Highly concurrent cache consistency for indices in client-server database systems*
Markos Zaharioudakis and Michael J. Carey
Pages 50-61
[Index Terms]
[Full Text in PDF Format, 1768 KB]

*Concurrency and recovery in generalized search trees*
Marcel Kornacker, C. Mohan and Joseph M. Hellerstein
Pages 62-72
[Index Terms]
[Full Text in PDF Format, 1548 KB]

*Range queries in OLAP data cubes*
Ching-Tien Ho, Rakesh Agrawal, Nimrod Megiddo and Ramakrishnan Srikant
Pages 73-88
[Index Terms]
[Full Text in PDF Format, 1867 KB]

*Cubetree: organization of and bulk incremental updates on the data cube*
Nick Roussopoulos, Yannis Kotidis and Mema Roussopoulos
Pages 89-99
[Index Terms]
[Full Text in PDF Format, 1116 KB]

*Maintenance of data cubes and summary tables in a warehouse*
Inderpal Singh Mumick, Dallan Quass and Barinderpal Singh Mumick
Pages 100-111
[Index Terms]
[Full Text in PDF Format, 1542 KB]

*Database buffer size investigation for OLTP workloads*
Thin-Fong Tsuei, Allan N. Packer and Keng-Tai Ko
Pages 112-122
[Index Terms]
[Full Text in PDF Format, 1316 KB]

*Database performance in the real world: TPC-D and SAP R/3*
Joachen Doppelhammer, Thomas Höppler, Alfons Kemper and Donald Kossmann
Pages 123-134
[Index Terms]
[Full Text in PDF Format, 1503 KB]

*The BUCKY object-relational benchmark*
Michael J. Carey, David J. DeWitt, Jeffrey F. Naughton, Mohammad Asgarian, Paul Brown, Johannes E. Gehrke
and Dhaval N. Shah
Pages 135-146
[Index Terms]
[Full Text in PDF Format, 1441 KB]

*The STRIP rule system for efficiently maintaining derived data*
Brad Adelberg, Hector Garcia-Molina and Jennifer Widom
Pages 147-158
[Index Terms]
[Full Text in PDF Format, 1643 KB]

*An array-based algorithm for simultaneous multidimensional aggregates*
Yihong Zhao, Prasad M. Deshpande and Jeffrey F. Naughton
Pages 159-170
[Index Terms]
[Full Text in PDF Format, 1413 KB]

*Online aggregation*
Joseph M. Hellerstein, Peter J. Haas and Helen J. Wang
Pages 171-182
[Index Terms]
[Full Text in PDF Format, 1876 KB]

*Balancing push and pull for data broadcast*
Swarup Acharya, Michael Franklin and Stanley Zdonik
Pages 183-194
[Index Terms]
[Full Text in PDF Format, 1748 KB]

*InfoSleuth: agent-based semantic integration of information in open and dynamic environments*
R. J., Jr Bayardo, W. Bohrer, R. Brice, A. Cichocki, J. Fowler, A. Helal, V. Kashyap, T. Ksiezyk, G. Martin, M.
Nodine, M. Rashid, M. Rusinkiewicz, R. Shea, C. Unnikrishnan, A. Unruh and D. Woelk
Pages 195-206
[Index Terms]
[Full Text in PDF Format, 1646 KB]

Case 1:08-cv-02412    Document 21-11    Filed 06/04/2008    Page 5 of 12

*STARTS: Stanford proposal for Internet meta-searching*
Luis Gravano, Chen-Chuan K. Chang, Héctor García-Molina and Andreas Paepcke
Pages 207-218
[Index Terms]
[Full Text in PDF Format, 1492 KB]

*On saying "Enough already!" in SQL*
Michael J. Carey and Donald Kossmann
Pages 219-230
[Index Terms]
[Full Text in PDF Format, 1532 KB]

*A framework for implementing hypothetical queries*
Timothy Griffin and Richard Hull
Pages 231-242
[Index Terms]
[Full Text in PDF Format, 1430 KB]

*High-performance sorting on networks of workstations*
Andrea C. Arpaci-Dusseau, Remzi H. Arpaci-Dusseau, David E. Culler, Joseph M. Hellerstein and David A. Patterson
Pages 243-254
[Index Terms]
[Full Text in PDF Format, 1495 KB]

*Dynamic itemset counting and implication rules for market basket data*
Sergey Brin, Rajeev Motwani, Jeffrey D. Ullman and Shalom Tsur
Pages 255-264
[Index Terms]
[Full Text in PDF Format, 1164 KB]

*Beyond market baskets: generalizing association rules to correlations*
Sergey Brin, Rajeev Motwani and Craig Silverstein
Pages 265-276
[Index Terms]
[Full Text in PDF Format, 1550 KB]

*Scalable parallel data mining for association rules*
Eui-Hong Han, George Karypis and Vipin Kumar
Pages 277-288
[Index Terms]
[Full Text in PDF Format, 1368 KB]

*Efficiently supporting ad hoc queries in large datasets of time sequences*
Flip Korn, H. V. Jagadish and Christos Faloutsos
Pages 289-300
[Index Terms]
[Full Text in PDF Format, 1393 KB]


*DEVise: integrated querying and visual exploration of large datasets*
M. Livny, R. Ramakrishnan, K. Beyer, G. Chen, D. Donjerkovic, S. Lawande, J. Myllymaki and K. Wenger
Pages 301-312
[Index Terms]
[Full Text in PDF Format, 1575 KB]


*Partitioned garbage collection of a large object store*
Umesh Maheshwari and Barbara Liskov
Pages 313-323
[Index Terms]
[Full Text in PDF Format, 1333 KB]


*Size separation spatial join*
Nick Koudas and Kenneth C. Sevcik
Pages 324-335
[Index Terms]
[Full Text in PDF Format, 1456 KB]


*Building a scaleable geo-spatial DBMS: technology, implementation, and evaluation*
Jignesh Patel, JieBing Yu, Navin Kabra, Kristin Tufte, Biswadeep Nag, Josef Burger, Nancy Hall, Karthikeyan
Ramasamy, Roger Lueder, Curt Ellmann, Jim Kupsch, Shelly Guo, Johan Larson, David De Witt and Jeffrey
Naughton
Pages 336-347
[Index Terms]
[Full Text in PDF Format, 1543 KB]


*A toolkit for negotiation support interfaces to multi-dimensional data*
Michael Gebhardt, Matthias Jarke and Stephan Jacobs
Pages 348-356
[Index Terms]
[Full Text in PDF Format, 1757 KB]


*Distance-based indexing for high-dimensional metric spaces*
Tolga Bozkaya and Meral Ozsoyoglu
Pages 357-368
[Index Terms]
[Full Text in PDF Format, 1444 KB]

*The SR-tree: an index structure for high-dimensional nearest neighbor queries*
Norio Katayama and Shin'ichi Satoh
Pages 369-380
[Index Terms]
[Full Text in PDF Format, 1372 KB]


*Wave-indices: indexing evolving databases*
Narayanan Shivakumar and Héctor García-Molina
Pages 381-392
[Index Terms]
[Full Text in PDF Format, 1639 KB]


*On-line warehouse view maintenance*
Dallan Quass and Jennifer Widom
Pages 393-404
[Index Terms]
[Full Text in PDF Format, 1434 KB]


*Supporting multiple view maintenance policies*
Latha S. Colby, Akira Kawaguchi, Daniel F. Lieuwen, Inderpal Singh Mumick and Kenneth A. Ross
Pages 405-416
[Index Terms]
[Full Text in PDF Format, 1517 KB]


*Efficient view maintenance at data warehouses*
D. Agrawal, A. El Abbadi, A. Singh and T. Yurek
Pages 417-427
[Index Terms]
[Full Text in PDF Format, 1270 KB]


*Eliminating costly redundant computations from SQL trigger executions*
François Llirbat, Françoise Fabret and Eric Simon
Pages 428-439
[Index Terms]
[Full Text in PDF Format, 1617 KB]


*Temporal aggregation in active database rules*
Iakovos Motakis and Carlo Zaniolo
Pages 440-451
[Index Terms]
[Full Text in PDF Format, 1483 KB]


*Association rules over interval data*

R. J. Miller and Y. Yang
Pages 452-461
[Index Terms]
[Full Text in PDF Format, 1390 KB]


*Secure transaction processing in firm real-time database systems*
Binto George and Jayant Haritsa
Pages 462-473
[Index Terms]
[Full Text in PDF Format, 1643 KB]


*A unified framework for enforcing multiple access control policies*
Sushil Jajodia, Pierangela Samarati, V. S. Subrahmanian and Eliza Bertino
Pages 474-485
[Index Terms]
[Full Text in PDF Format, 1667 KB]


*Revisiting commit processing in distributed database systems*
Ramesh Gupta, Jayant Haritsa and Krithi Ramamritham
Pages 486-497
[Index Terms]
[Full Text in PDF Format, 1577 KB]


*Lessons from Wall Street: case studies in configuration, tuning, and distribution*
Dennis Shasha
Pages 498-501
[Index Terms]
[Full Text in PDF Format, 579 KB]


*Object-relational database systems (tutorial): principles, products and challenges*
Michael J. Carey, Nelson M. Mattos and Anil K. Nori
Page 502
[Index Terms]
[Full Text in PDF Format, 184 KB]


*Databases on the Web: technologies for federation architectures and case studies*
Ralf Kramer
Pages 503-506
[Index Terms]
[Full Text in PDF Format, 646 KB]


*Data warehousing and OLAP for decision support*
Surajit Chaudhuri and Umeshwar Dayal

Pages 507-508
[Index Terms]
[Full Text in PDF Format, 217 KB]


*Query optimization at the crossroads*
Surajit Chaudhuri
Page 509
[Index Terms]
[Full Text in PDF Format, 171 KB]


*Delaunay: a database visualization system*
Isabel F. Cruz, M. Averbuch, Wendy T. Lucas, Melissa Radzyminski and Kirby Zhang
Pages 510-513
[Index Terms]
[Full Text in PDF Format, 726 KB]


*Picture programming project*
Nita Goyal, Charles Hoch, Ravi Krishnamurthy, Brian Meckler, Michael Suchow and Moshe Zloof
Pages 514-516
[Index Terms]
[Full Text in PDF Format, 394 KB]


*DEVise (demo abstract): integrated querying and visual exploration of large datasets*
M. Livny, R. Ramakrishnan, K. Beyer, G. Chen, D. Donjerkovic, S. Lawande, J. Myllymaki and K. Wenger
Pages 517-520
[Index Terms]
[Full Text in PDF Format, 654 KB]


*SEMCOG: an object-based image retrieval system and its visual query interface*
Wen-Syan Li, K. Selçuk Candan, Kyoji Hirata and Yoshinori Hara
Pages 521-524
[Index Terms]
[Full Text in PDF Format, 505 KB]


*The Context Interchange mediator prototype*
S. Bressan, C. H. Goh, K. Fynn, M. Jakobisiak, K. Hussein, H. Kon, T. Lee, S. Madnick, T. Pena, J. Qu, A. Shum and M. Siegel
Pages 525-527
[Index Terms]
[Full Text in PDF Format, 522 KB]


*MDM: a multiple-data model tool for the management of heterogeneous database schemes*
Paolo Atzeni and Riccardo Torlone

Pages 528-531
[Index Terms]
[Full Text in PDF Format, 583 KB]


*Template-based wrappers in the TSIMMIS system*
Joachim Hammer, Héctor García-Molina, Svetlozar Nestorov, Ramana Yerneni, Marcus Breunig and Vasilis Vassalos
Pages 532-535
[Index Terms]
[Full Text in PDF Format, 563 KB]


*Languages for multi-database interoperability*
Frédéric Gingras, Laks V. S. Lakshmanan, Iyer N. Subramanian, Despina Papoulis and Nematollaah Shiri
Pages 536-538
[Index Terms]
[Full Text in PDF Format, 411 KB]


*Infomaster: an information integration system*
Michael R. Genesereth, Arthur M. Keller and Oliver M. Duschka
Pages 539-542
[Index Terms]
[Full Text in PDF Format, 503 KB]


*The InfoSleuth Project*
R. J., Jr Bayardo, W. Bohrer, R. Brice, A. Cichocki, J. Fowler, A. Halal, V. Kashyap, T. Ksiezyk, G. Martin, M. Nodine, M. Rashid, M. Rusinkiewicz, R. Shea, C. Unnikrishnan, A. Unruh and D. Woelk
Pages 543-545
[Index Terms]
[Full Text in PDF Format, 311 KB]


*The distributed information search component (Disco) and the World Wide Web*
Anthony Tomasic, Rémy Amouroux, Philippe Bonnet, Olga Kapitskaia, Hubert Naacke and Louiqa Raschid
Pages 546-548
[Index Terms]
[Full Text in PDF Format, 500 KB]


*STRUDEL: a Web site management system*
Mary Fernandez, Daniela Florescu, Jaewoo Kang, Alon Levy and Dan Suciu
Pages 549-552
[Index Terms]
[Full Text in PDF Format, 582 KB]


*GeoMiner: a system prototype for spatial data mining*

Case 1:08-cv-02412     Document 21-11     Filed 06/04/2008     Page 11 of 12

Jaiwei Han, Krzysztof Koperski and Nebojsa Stefanovic
Pages 553-556
[Index Terms]
[Full Text in PDF Format, 671 KB]


*The WHIPS prototype for data warehouse creation and maintenance*
Wilburt J. Labio, Yue Zhuge, Janet L. Wiener, Himanshu Gupta, Héctor García-Molina and Jennifer Widom
Pages 557-559
[Index Terms]
[Full Text in PDF Format, 402 KB]


*Structural matching and discovery in document databases*
Jason Tsong-Li Wang, Dennis Shasha, George J. S. Chang, Liam Relihan, Kaizhong Zhang and Girish Patel
Pages 560-563
[Index Terms]
[Full Text in PDF Format, 632 KB]


*S3: similarity search in CAD database systems*
Stefan Berchtold and Hans-Peter Kriegel
Pages 564-567
[Index Terms]
[Full Text in PDF Format, 573 KB]


*PREDATOR: an OR-DBMS with enhanced data types*
Praveen Seshadri and Mark Paskin
Pages 568-571
[Index Terms]
[Full Text in PDF Format, 571 KB]


*Sentinel: an object-oriented DBMS with event-based rules*
S. Chakravarthy
Pages 572-575
[Index Terms]
[Full Text in PDF Format, 648 KB]


*The MENTOR workbench for enterprise-wide workflow management*
Dirk Wodtke, Jeanine Weissenfels, Gerhard Weikum, Angelika Kotz Dittrich and Peter Muth
Pages 576-579
[Index Terms]
[Full Text in PDF Format, 703 KB]


*Zoo: a desktop experiment management environment*
Yannis E. Ioannidis, Miron Livny, Anastassia Ailamaki, Anand Narayanan and Andrew Therber

Pages 580-583
[Index Terms]
[Full Text in PDF Format, 781 KB]

This Digital Library is published by the Association for Computing, Copyright © 1999 ACM, Inc.

Last update: June 26, 2000

**Previous Issue:** March 1997                                    **Next Issue:** September 1997

Send comments or suggestions to Alexandros Labrinidis.

© 2000 Association for Computing Machinery                              Acknowledgements

# EXHIBIT 10

## EXHIBIT 10: '629 INVALIDITY TABLE

# Adelberg, *Overview of the STanford Real-time Information Processor (STRIP)* (March, 1996)/ Adelberg, *The STRIP Rule System For Efficiently Maintaining Derived Data* (June, 1997)

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| **1.** An automated trading system for use in an electronic exchange system network, comprising | The Adelberg reference teaches an automated trading system that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br><br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is ***program trading in financial markets***. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a ***program trading application***, and report the results of experiments performed on the running system." [Adelberg #2, at 1.]<br><br>• "In this section we describe a simplified ***program trading application*** (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.]<br><br>• "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| a receiver interface that receives market price information for a first traded item from an exchange; | The trading system receives the current market prices of all trading instruments of interest through a feed provider:<br><br>• "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.]<br><br>• "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.] |

1

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | • "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.]<br><br>• "In actuality, ***the current trend of feed providers is to send more than stock prices with the feeds***, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.]<br><br>• "The database for the PTA contains the following six tables:<br><br>    stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the ***market feed***." [Adelberg #2, at 7.]<br><br>• "A program trading application is driven by changing stock prices as reported by a ***market feed***. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| data reference logic that outputs a transaction value for the first traded item from a data structure based on price information for a second traded item related to the first traded item; | The trading system utilizes logical operators to compute a theoretical price for each option. The theoretical option price is derived from the price of the underlying stock, which is stored in a materialized database view:<br><br>• "The program trading example from Section 1 requires STRIP to ***maintain substantial amounts of derived data***." [Adelberg #1, at 4.]<br><br>• "From the reported price data the following derived data must be computed: ***computed index prices*** - For each index on which a futures contract is traded, its price ***based on the underlying stocks*** (a weighted sum) must be computed. ***theoretical option prices*** - For each listed option, a ***theoretical price must be computed***. The pricing models are very complicated but depend mainly on the price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself." [Adelberg #1, at 4.] |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | <br>[Adelberg #1, Figure 2 ("System Architecture").]<br><br>• "Finally, the user can define an ***import table*** rather than an import view for cases when data will be migrated as explained above." [Adelberg #1, at 2.]<br><br>• "The database for the PTA contains the following ***six tables***:<br><br>    stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the market feed.…<br><br>    option_prices(<u>option_symbol</u>,price) - contains the computed price of every listed option. The data in this table is derived and its ***materialized view*** definition is given below." [Adelberg #2, at 7.]<br><br>• "The tables comp prices and option prices are ***materialized views*** with the following definitions:<br><br>```<br>create view comp_prices as<br>select comp,sum(price*weight) as price<br>from stocks,comps_list<br>where stocks.symbol = comps_list.symbol<br>group by comp<br><br>create view option_prices as<br>select option_symbol,f_{BS}(price,strike,expiration,stdev) as price<br>from stocks,stock_stdev,options_list<br>where stocks.symbol = options_list.stock_symbol and stocks.symbol = stock_stdev.symbol<br>```<br>[Adelberg #2, at 7-8.]<br><br>• "While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only single events and those that support composite events. Single events |

3

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | are usually database operations such as insert, update, etc. Composite events are built from single events using *logical* or temporal *operators*." [Adelberg #2, at 23.] |
| decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit an order for the first traded item; | The trading system utilizes logical operators to look for discrepancies between the calculated and market prices of a security in anticipation of executing a trade:<br><br>• "The expert system can then *look for discrepancies between calculated and market prices of securities* and, if it finds a large enough difference, *execute trades*." [Adelberg #1, at 4.]<br><br>• "While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only single events and those that support composite events. Single events are usually database operations such as insert, update, etc. Composite events are built from single events using *logical* or temporal *operators*." [Adelberg #2, at 23.] |
| and an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to said decision logic. | If a large enough discrepancy between the calculated and market prices of a security is uncovered, the trading system executes a trade:<br><br>• "The expert system can then *look for discrepancies between calculated and market prices of securities* and, if it finds a large enough difference, *execute trades*." [Adelberg #1, at 4.]<br><br>• "While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only single events and those that support composite events. Single events are usually database operations such as insert, update, etc. Composite events are built from single events using *logical* or temporal *operators*." [Adelberg #2, at 23.] |
| 27. An automated trading method for use in an electronic exchange system network, comprising: | The Adelberg reference teaches an automated trading method that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br>Feed Provider → STRIP → Trader Terminal; STRIP ↔ Expert System → Order System<br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is *program trading in financial markets*. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | present an example set of rules to maintain stock index and theoretical option prices in a ***program trading application***, and report the results of experiments performed on the running system." [Adelberg #2, at 1.] |
| | • "In this section we describe a simplified ***program trading application*** (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.] |
| | • "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| using equipment to perform trading of a first traded item or a second traded item related to the first traded item, including: | The trading method utilizes a real-time database that runs on the Unix operating system: |
| | • "In this paper, we describe a database designed explicitly for heterogeneous environments, the ***STanford Real- time Information Processor*** (STRIP). STRIP, which ***runs on standard Posix Unix, is a soft real-time main memory database with special facilities for importing and exporting data*** as well as handling derived data." [Adelberg #1, at 1.] |
| | • "The expert system can then look for discrepancies between calculated and market prices of securities and, if it finds a large enough difference, ***execute trades***." [Adelberg #1, at 4.] |
| | • "The performance numbers reported here are for STRIP running on an ***HP-735 under HP-UX 9.03 with 144Mb of main memory***." [Adelberg #2, at 13.] |
| receiving market price information for the first traded item; | A feed provider supplies the trading method with the current market prices of all trading instruments of interest: |
| | • "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.] |
| | • "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.] |
| | • "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.] |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | • "In actuality, ***the current trend of feed providers is to send more than stock prices with the feeds***, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.]<br><br>• "The database for the PTA contains the following six tables:<br><br>    stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the ***market feed***." [Adelberg #2, at 7.]<br><br>• "A program trading application is driven by changing stock prices as reported by a ***market feed***. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| identifying a desired price for the first traded item in a look-up table based on price information for the second traded item; | The trading method computes a theoretical price for each option. The theoretical option price is derived from the price of the underlying stock, which is stored in a materialized database view:<br><br>• "The program trading example from Section 1 requires STRIP to ***maintain substantial amounts of derived data***." [Adelberg #1, at 4.]<br><br>• "From the reported price data the following derived data must be computed: ***computed index prices*** - For each index on which a futures contract is traded, its price ***based on the underlying stocks*** (a weighted sum) must be computed. ***theoretical option prices*** - For each listed option, a ***theoretical price must be computed***. The pricing models are very complicated but depend mainly on the price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself." [Adelberg #1, at 4.]<br><br><br><br>[Adelberg #1, Figure 2 ("System Architecture").] |

6

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | • "Finally, the user can define an ***import table*** rather than an import view for cases when data will be migrated as explained above." [Adelberg #1, at 2.]<br><br>• "The database for the PTA contains the following ***six tables***:<br><br>    stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the market feed....<br><br>    option_prices(<u>option_symbol</u>,price) - contains the computed price of every listed option. The data in this table is derived and its ***materialized view*** definition is given below." [Adelberg #2, at 7.]<br><br>• "The tables comp prices and option prices are ***materialized views*** with the following definitions:<br><br>`create view comp_prices as`<br>`select comp,sum(price*weight) as price`<br>`from stocks,comps_list`<br>`where stocks.symbol = comps_list.symbol`<br>`group by comp`<br><br>`create view option_prices as`<br>`select option_symbol,f_{BS}(price,strike,expiration,stdev) as price`<br>`from stocks,stock_stdev,options_list`<br>`where stocks.symbol = options_list.stock_symbol and stocks.symbol = stock_stdev.symbol`<br><br>[Adelberg #2, at 7-8.] |
| comparing the received market price information for the first traded item to the desired price for the first traded item; and | The trading method looks for discrepancies between the calculated and market prices of a security:<br><br>• "The expert system can then ***look for discrepancies between calculated and market prices of securities*** and, if it finds a large enough difference, execute trades." [Adelberg #1, at 4.] |
| generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price. | If a large enough discrepancy between the calculated and market prices of a security is uncovered, the trading method executes a trade:<br><br>• "The expert system can then ***look for discrepancies*** between calculated and market prices of securities and, ***if it finds a large enough difference, execute trades***." [Adelberg #1, at 4.] |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| **36.** An automated trading method for use in an exchange system network, comprising: | The Adelberg reference teaches an automated trading method that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br><br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is ***program trading in financial markets***. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a ***program trading application***, and report the results of experiments performed on the running system." [Adelberg #2, at 1.]<br><br>• "In this section we describe a simplified ***program trading application*** (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.]<br><br>• "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| using equipment in a network architecture to perform trading of a first traded item including: | The trading method utilizes a real-time database that runs on the Unix operating system:<br><br>• "In this paper, we describe a database designed explicitly for heterogeneous environments, the ***STanford Real- time Information Processor*** (STRIP). STRIP, which ***runs on standard Posix Unix, is a soft real-time main memory database with special facilities for importing and exporting data*** as well as handling derived data." [Adelberg #1, at 1.]<br><br>• "The expert system can then look for discrepancies between calculated and market prices of securities and, if it finds a large enough difference, ***execute trades***." [Adelberg #1, at 4.]<br><br>• "The performance numbers reported here are for STRIP running on an ***HP-735 under HP-UX 9.03 with 144Mb of main memory***." [Adelberg #2, at 13.] |
| receiving market information for the first traded item; | A feed provider supplies the trading method with the current market prices of all trading instruments of interest:<br><br>• "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.] |
| | • "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.] |
| | • "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.] |
| | • "In actuality, ***the current trend of feed providers is to send more than stock prices with the feeds***, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.] |
| | • "The database for the PTA contains the following six tables: |
| |     stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the ***market feed***." [Adelberg #2, at 7.] |
| | • "A program trading application is driven by changing stock prices as reported by a ***market feed***. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| identifying a transaction value for the first traded item in a look-up table of transaction values for the first traded item, wherein the identifying is responsive to receiving the market information for the first traded item and wherein the transaction | The trading method identifies a theoretical price for each option.  The theoretical option price is derived from the price of the underlying stock, which is stored in a materialized database view: |
| | • "The program trading example from Section 1 requires STRIP to ***maintain substantial amounts of derived data***." [Adelberg #1, at 4.] |
| | • "From the reported price data the following derived data must be computed: ***computed index prices*** - For each index on which a futures contract is traded, its price ***based on the underlying stocks*** (a weighted sum) must be computed. ***theoretical option prices*** - For each listed option, a ***theoretical price must be computed***. The pricing models are very complicated but depend mainly on the price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself." [Adelberg #1, at 4.] |

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| values in the look-up table are based on price information for a second traded item related to the first traded item; | <br><br>[Adelberg #1, Figure 2 ("System Architecture").]<br><br>• "Finally, the user can define an ***import table*** rather than an import view for cases when data will be migrated as explained above." [Adelberg #1, at 2.]<br><br>• "The database for the PTA contains the following ***six tables***:<br><br>stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the market feed.…<br><br>option_prices(<u>option_symbol</u>,price) - contains the computed price of every listed option. The data in this table is derived and its ***materialized view*** definition is given below." [Adelberg #2, at 7.]<br><br>• "The tables comp prices and option prices are ***materialized views*** with the following definitions:<br><br>`create view comp_prices as`<br>`select comp,sum(price*weight) as price`<br>`from stocks,comps_list`<br>`where stocks.symbol = comps_list.symbol`<br>`group by comp`<br><br>`create view option_prices as`<br>`select option_symbol,f_{BS}(price,strike,expiration,stdev) as price`<br>`from stocks,stock_stdev,options_list`<br>`where stocks.symbol = options_list.stock_symbol and stocks.symbol = stock_stdev.symbol`<br><br>[Adelberg #2, at 7-8.] |
| and using at least the identified transaction | The trading method looks for discrepancies between the calculated and market prices of a security. If a large enough discrepancy is uncovered, the trading method executes a trade: |

10

| '629 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| value in determining whether to submit an order for the first traded item. | • "The expert system can then ***look for discrepancies between calculated and market prices of securities*** and, if it finds a large enough difference, ***execute trades***." [Adelberg #1, at 4.] |

# EXHIBIT 11

EXHIBIT 11: '833 INVALIDITY TABLE

**Adelberg, *Overview of the STanford Real-time Information Processor (STRIP)* (March, 1996)/ Adelberg, *The STRIP Rule System For Efficiently Maintaining Derived Data* (June, 1997)**

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| **1.** An automated trading system for use in an electronic exchange system network, comprising: | The Adelberg reference teaches an automated trading system that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br><br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is ***program trading in financial markets***. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a ***program trading application***, and report the results of experiments performed on the running system." [Adelberg #2, at 1.]<br><br>• "In this section we describe a simplified ***program trading application*** (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.]<br><br>• "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| a receiver interface that receives market price information for a first traded item from an exchange; | The trading system receives the current market prices of all trading instruments of interest through a feed provider:<br><br>• "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.]<br><br>• "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.] |

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
|  | • "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.] <br><br> • "In actuality, ***the current trend of feed providers is to send more than stock prices with the feeds***, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.] <br><br> • "The database for the PTA contains the following six tables: <br><br> stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the ***market feed***." [Adelberg #2, at 7.] <br><br> • "A program trading application is driven by changing stock prices as reported by a ***market feed***. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| a transaction value calculator that generates a transaction value for the first traded item based on price information for a second traded item related to the first traded item; | The trading system computes a theoretical price for each option.  The option price is derived from the price of the underlying stock: <br><br> • "The program trading example from Section 1 requires STRIP to maintain substantial amounts of ***derived data***." [Adelberg #1, at 4.] <br><br> • "From the reported price data the following ***derived data must be computed***: ***computed index prices*** - For each index on which a futures contract is traded, ***its price based on the underlying stocks*** (a weighted sum) must be computed. ***theoretical option prices*** - For each listed option, ***a theoretical price must be computed***. The pricing models are very complicated but ***depend mainly on the price of the underlying stock***, ***the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself***." [Adelberg #1, at 4.] <br><br> • "The PTA requires the database to maintain three types of prices: stock prices, composite index prices, and ***theoretical (call) option prices***." [Adelberg #2, at 7.] <br><br> • "The composite and option prices, however, are ***derived data that must be computed from the stock prices***." [Adelberg #2, at 7.] <br><br> • "The function $f_{BS}$ ***computes the theoretical price of an option based on the Black-Scholes pricing model***." [Adelberg #2, at 8.] |
| decision logic using at least a portion of the received market price information and | The trading system utilizes logical operators to look for discrepancies between the calculated and market prices of a security in anticipation of executing a trade: <br><br> • "The expert system can then ***look for discrepancies between calculated and market prices of securities*** and, if it finds a large enough difference, ***execute trades***." [Adelberg #1, at 4.] |

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| the transaction value to generate a decision whether to submit a response to buy or sell the first traded item; | • "While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only single events and those that support composite events. Single events are usually database operations such as insert, update, etc. Composite events are built from single events using *logical* or temporal *operators*." [Adelberg #2, at 23.] |
| and an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to said decision logic. | If a large enough discrepancy between the calculated and market prices of a security is uncovered, the trading system executes a trade:<br><br>• "The expert system can then *look for discrepancies between calculated and market prices of securities* and, if it finds a large enough difference, *execute trades*." [Adelberg #1, at 4.]<br><br>• "While these four requirements are supported to different degrees by currently proposed rule systems, no system other than STRIP supports all of them. To discuss the various rule systems, we split them into two categories: those that support only single events and those that support composite events. Single events are usually database operations such as insert, update, etc. Composite events are built from single events using *logical* or temporal *operators*." [Adelberg #2, at 23.] |
| **24.** An automated trading method for use in an electronic exchange system network, comprising: | The Adelberg reference teaches an automated trading method that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br><br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is *program trading in financial markets*. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a *program trading application*, and report the results of experiments performed on the running system." [Adelberg #2, at 1.]<br><br>• "In this section we describe a simplified *program trading application* (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.] |

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | • "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| receiving market price information for a first traded item; | A feed provider supplies the trading method with the current prices of all trading instruments of interest: <br><br> • "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.] <br><br> • "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.] <br><br> • "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.] <br><br> • "In actuality, ***the current trend of feed providers is to send more than stock prices with the feeds***, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.] <br><br> • "The database for the PTA contains the following six tables: <br><br> stocks(symbol,price) - contains the current price of every stock as reported by the ***market feed***." [Adelberg #2, at 7.] <br><br> • "A program trading application is driven by changing stock prices as reported by a ***market feed***. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| automatically calculating a transaction price for the first traded item based on price information for a second traded item related to the first traded | The trading method computes a theoretical price for each option.  The theoretical option price is derived from the price of the underlying stock: <br><br> • "The program trading example from Section 1 requires STRIP to maintain substantial amounts of ***derived data***." [Adelberg #1, at 4.] <br><br> • "From the reported price data the following ***derived data must be computed***: ***computed index prices*** - For each index on which a futures contract is traded, ***its price based on the underlying stocks*** (a weighted sum) must be computed. ***theoretical option prices*** - For each listed option, ***a theoretical price must be computed***. The pricing models are very complicated but ***depend mainly on the*** |

4

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| item; | *price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself.*" [Adelberg #1, at 4.]<br><br>• "The PTA requires the database to maintain three types of prices: stock prices, composite index prices, and *theoretical (call) option prices*." [Adelberg #2, at 7.]<br><br>• "The composite and option prices, however, are *derived data that must be computed from the stock prices*." [Adelberg #2, at 7.]<br><br>• "The function $f_{BS}$ *computes the theoretical price of an option based on the Black-Scholes pricing model*." [Adelberg #2, at 8.] |
| comparing the received market price information for the first traded item to the transaction price for the first traded item; and | The trading method looks for discrepancies between the calculated and market prices of a security:<br><br>• "The expert system can then *look for discrepancies between calculated and market prices of securities* and, if it finds a large enough difference, execute trades." [Adelberg #1, at 4.] |
| automatically generating a request for market transaction for one of the first traded item and the second traded item based on the comparison of the received market price information to the transaction price. | If a large enough discrepancy between the calculated and market prices of a security is uncovered, the trading method automatically executes a trade:<br><br>• "The expert system can then *look for discrepancies* between calculated and market prices of securities and, *if it finds a large enough difference, execute trades*." [Adelberg #1, at 4.] |

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| **34.** An automated trading method for use in an electronic exchange system network, comprising the steps of: | The Adelberg reference teaches an automated trading method that utilizes the New York Stock Exchange's trade and quote (TAQ) database:<br><br><br><br>[Adelberg #1, Figure 1(b) ("Trading Program").]<br><br>• "The second example application, Figure 1(b), is ***program trading in financial markets***. Here STRIP is used by an expert system to store security prices and compute derived data (e.g. composites)." [Adelberg #1, at 1.]<br><br>• "In this paper we describe the syntax and semantics of the STRIP rule system, present an example set of rules to maintain stock index and theoretical option prices in a ***program trading application***, and report the results of experiments performed on the running system." [Adelberg #2, at 1.]<br><br>• "In this section we describe a simplified ***program trading application*** (PTA) and show how the STRIP rule system can be used to maintain the derived data it requires." [Adelberg #2, at 7.]<br><br>• "A ***program trading application*** is driven by changing stock prices as reported by a market feed. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| receiving market price information for a first traded item; | A feed provider supplies the trading method with the current prices of all trading instruments of interest:<br><br>• "In this example, the source of data is not another database but a commercially provided ***feed of price changes***. Similarly, the destination of the exported data is a trader's terminal. Although the type of data being shared and the timing constraints on the propagation vary widely between this and the previous example, STRIP has been designed as a standard component that can be used for any of them." [Adelberg #1, at 1.]<br><br>• "For simplicity, assume that the only instruments we wish to arbitrage among are stocks, options, and index futures. The ***feed provider pictured in Figure 1(b) must supply STRIP with the current prices of all such instruments***." [Adelberg #1, at 4.]<br><br>• "The PTA requires the database to maintain three types of prices: ***stock prices, composite index prices, and theoretical (call) option prices***. The stock prices are the base data of the system, and are updated in the database according to the ***market feed***." [Adelberg #2, at 7.]<br><br>• "In actuality, ***the current trend of feed providers is to send more than stock*** |

| '833 Claim Language | Teachings of Adelberg #1 (*Overview of the STanford Real-time Information Processor (STRIP)*) & Adelberg #2 (*The STRIP Rule System For Efficiently Maintaining Derived Data*) |
|---|---|
| | *prices with the feeds*, including popular composite prices (e.g., Dow Jones Industrial Average (DJIA)) and other derived values." [Adelberg #2, at 7.]<br><br>• "The database for the PTA contains the following six tables:<br><br>stocks(<u>symbol</u>,price) - contains the current price of every stock as reported by the *market feed*." [Adelberg #2, at 7.]<br><br>• "A program trading application is driven by changing stock prices as reported by a *market feed*. For these experiments, we use the consolidated quote file provided as part of the New York Stock Exchange's TAQ database." [Adelberg #2, at 13.] |
| automatically calculating a transaction value for the first traded item based on at least one of (a) price information for a second traded item related to the first traded item and (b) received market information for the first traded item; | The trading method computes a theoretical price for each option. The theoretical option price is derived from the price of the underlying stock:<br><br>• "The program trading example from Section 1 requires STRIP to maintain substantial amounts of *derived data*." [Adelberg #1, at 4.]<br><br>• "From the reported price data the following *derived data must be computed*: *computed index prices* - For each index on which a futures contract is traded, *its price based on the underlying stocks* (a weighted sum) must be computed. *theoretical option prices* - For each listed option, *a theoretical price must be computed*. The pricing models are very complicated but *depend mainly on the price of the underlying stock, the variance of the price of the underlying stock, the risk free interest rate, and static parameters of the options contract itself*." [Adelberg #1, at 4.]<br><br>• "The PTA requires the database to maintain three types of prices: stock prices, composite index prices, and *theoretical (call) option prices*." [Adelberg #2, at 7.]<br><br>• "The composite and option prices, however, are *derived data that must be computed from the stock prices*." [Adelberg #2, at 7.]<br><br>• "The function $f_{BS}$ *computes the theoretical price of an option based on the Black-Scholes pricing model*." [Adelberg #2, at 8.] |
| and using at least the calculated transaction value in automatically determining whether to submit an order for the first traded item. | The trading method looks for discrepancies between the calculated and market prices of a security. If a large enough discrepancy is uncovered, the trading method automatically executes a trade:<br><br>• "The expert system can then *look for discrepancies between calculated and market prices of securities* and, if it finds a large enough difference, *execute trades*." [Adelberg #1, at 4.] |

# EXHIBIT 12

# COMPUTERIZED
# TRADING

## Maximizing Day Trading and Overnight Profits

# Mark Jurik

### Editor



NEW YORK INSTITUTE OF FINANCE

NEW YORK • TORONTO • SYDNEY • TOKYO • SINGAPORE

Library of Congress Cataloging in Publication Data
Computerized trading : maximizing day trading and overnight profits /
    Mark Jurik, editor.
        p.    cm.
    Includes index.
    ISBN 0-7352-0077-7
    1. Investments—Computer network resources.    2. Investments—Data
processing.    I. Jurik, Mark.
HG4515.95.C66   1999
332.64'0285—dc21                                                98-41212
                                                                CIP

© 1999 by Prentice Hall

*All rights reserved. No part of this book may be reproduced in any form or by any means,
without permission in writing from the publisher.*

This publication is designed to provide accurate and authoritative information in regard to the subject matter
covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other
professional service. If legal advice or other expert assistance is required, the services of a competent professional
person should be sought.

> . . . *From the Declaration of Principles jointly adopted by a Committee of*
> *the American Bar Association and a Committee of Publishers*
> *and Associations.*

*Printed in the United States of America*

10  9  8  7  6  5  4  3  2

ISBN 0-7352-0077-7

TradeStation® is a registered trademark of Omega Research, Inc.

---

### ATTENTION: CORPORATIONS AND SCHOOLS

Prentice Hall books are available at quantity discounts with bulk purchase for educational, business, or sales
promotional use. For information, please write to: Prentice Hall Special Sales, 240 Frisch Court, Paramus,
New Jersey 07652. Please supply: title of book, ISBN, quantity, how the book will be used, date needed.

---



NEW YORK INSTITUTE OF FINANCE
An Imprint of Prentice Hall Press
Paramus, NJ 07652
A Simon & Schuster Company

Prentice Hall International (UK) Limited, *London*
Prentice Hall of Australia Pty. Limited, *Sydney*
Prentice Hall Canada Inc., *Toronto*
Prentice Hall Hispanoamericana, S.A., *Mexico*
Prentice Hall of India Private Limited, *New Delhi*
Prentice Hall of Japan, Inc., *Tokyo*
Simon & Schuster Asia Pte. Ltd., *Singapore*
Editora Prentice Hall do Brasil, Ltda., *Rio de Janeiro*

PPENDIX C

input vari-

deStation,

isreputable
is agencies
erally free.
section on

uper prof-

rant to test
ience plac-
scover how
i. Here are

# Project Nimble: An Automated Equity Options Market Making System

## JOSEPH ALOTTA

This is the account of an actual and profitable trading system and the ideas and events that came together in the summer of 1987 and through 1989. The persons mentioned are real people to whom the author owes a debt of gratitude for a very challenging and satisfying project experience.

Although some of the circumstances described here happened over a decade ago, the reader may draw on our collective experience for the implementation of new projects, which all share the same basic principles of having a real edge in the market and exploiting it in a way that minimizes the downside risk. Though the models have become more complex and the systems are faster and cheaper, trading is still about game theory and risk management.

## ABOUT STEVE FOSSETT

I was introduced to Steve Fossett in March 1987. In addition to running a large trading organization, Steve had a number of sports exploits to his credit—swimming the English Channel, swimming the strait of Dardanelles, leading the Snowbird expedition to the top of Mount Everest, racing dogsleds in the Iditerod, running super marathons, skiing super marathons, holding the world record for the longest balloon flight (from Seoul, South Korea, to Vancouver, British Columbia), and most recently winning the Chicago to Mackinaw Island sailboat race, in a catamaran "Stars and Stripes," which won the Americas cup in Australia.

Fossett Corporation had about 350 market makers and about 20 staff persons. Some of the market makers traded with the firm's capital and some used their own capital and were essentially clearing customers. The largest part of the market makers worked on the Chicago Board Options Exchange (CBOE) trading equity options, a

387

smaller part traded futures options on the Chicago Board of Trade (CBOT) or the Chicago Mercantile Exchange (MERC).

Steve Fossett has that determination, that super perseverance, that tough-it-out till you succeed attitude that is infectious; so when he asked me to build him a trading machine, I found myself saying "Yes" and then thinking about how to accomplish it. There existed one other machine in early development, the Timber Hill system, partially deployed at the time. Steve took me onto the floor of the CBOE to study this system, but all I could see were colored monitors and options prices, and they were not always on line. The inner workings of their operation were a highly proprietary secret.

## THE SPX PIT

The pit designated by exchange authorities for automated systems was the SPX pit. This pit has European-style options on the S&P 500 index. The OEX was a much bigger and more active trading pit, containing American-style options on the S&P 100 index and I guess the motive was to increase the volume in the SPX pit, although it was still more active than all but the largest single stock option, IBM. Having European style options was an advantage to the systems designer; we could use the less computationally intensive Black-Scholes formula without having to worry about the binomial trees of the Cox-Ross-Rubenstein model.

## SELECTION OF THE DATA FEED SERVICE

I quickly did some calling around, wanting to use the best datafeed available. Steve Schwartz had an option trading system that was popular upstairs at the Options Exchange called the Schwartz-a-tron. The market makers would eat their lunches and play backgammon to the yellowish glow of the Schwartz-a-tron.

We hired two team members in the first few days, Rob Davis Jr. and Pat Mac-Caulley. Together we analyzed alternative quote sources and we presented our findings to Steve Fossett. All vendors were expensive; the quality was difficult to determine, sometimes good, sometimes not.

This was the problem: SIAC was the only carrier able to get feeds directly from the exchanges; all other data vendors received their data from SIAC. Vendors would attempt to avoid problems of the feed during peak times, such as crashes, panics, opening rotation, and closing rotations, first by omitting option bids and offers, then by omitting underlying bids and offers and then finally by omitting option last sale prices. These were times we absolutely needed to be operating with full data.

We decided to go to SIAC ourselves directly, becoming our own data vendor. This was a very expensive prospect and Steve Fossett backed it 100 percent. We still did not have a design for the complete trading system, but we acted on faith, knowing that the best source of data would be crucial for its success. In the opinion of some of

the team members, this would be the reason the system avoided big losses during the market break in 1989.

## HOW A DEVELOPMENT SYSTEM WAS CHOSEN

Computer salespersons visited me constantly—IBM, Stratus, Tandem, Data General. They kept saying only a minicomputer could handle a mainframe-oriented BYSNC feed. I decided to give a PC network a try. I was buying PC Limited's 286 computers for about $2,000 each (memory was dear at the time) and felt that we could get a long way toward the $200,000 to $350,000 a minicomputer would cost.

We had some PS/2's (we wanted to be ready when IBM decided to release the 386 chip), and we bought, Novell netware, on 3Com Ethernet and later Arcnet, when the 3Com drivers were delayed. We bought a dozen PC Limited 286's, now known as Dell Computer.

We had hired Cathy Huang and Belinda Chang to work on the feed problem. Cathy Huang worked on the BYSNC data reception, and Belinda Cheng worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other. Rob Davis was working on the touch screen and character mappings to display fractions. Pat MacCaulley was using the option models to print out trading sheets for Fossett market makers.

The option models came right from the book. The Cox-Ross-Rubenstein book was pretty much incomprehensible. We used McMillian and Bookstaber, which even had BASIC code. Three years later, I was teaching and deriving options models at First Chicago Corp.

## HARDWARE AND SOFTWARE DEVELOPMENT HEADACHES

The data reception problem was a much harder challenge than first supposed. Cathy Huang wrote her own drivers in assembler for this purpose. She got it working. Later, an engineer at SIAC explained to me how it was not possible for it to work since there were circuitry design flaws in the PS/2 serial port. We did not know that, but luckily Cathy used different computers to test with and we found it worked on the PC Limited 286.

When using the data storage servers on the live feeds, we quickly ran out of memory under DOS. 640K basic memory, 384K extended and 2MB expanded. We used the expanded memory until we could convert the b-tree program to OS/2.

I kept trying to get 3Com to deliver drivers for their boards under OS/2. They kept delaying. Finally in desperation, I popped out the Ethernet and replaced it with a Standard MicroSystems Arcnet that had a fully functioning OS/2 driver and we segmented the topology into an Arcnet segment and an Ethernet segment. It worked, but it was not elegant. A few months later, I was still on the phone to the developers

at 3Com trying to get their product shipped. The engineer told me that he could
write the driver in one day, but his management had forbidden him to do so, since
IBM was in the network business. I called him at home that night, and two days and
$200 dollars later, I had the driver.

## ENCOUNTERING A MINOR DELAY

The data was coming in full speed and the network was handling it. We powered
down machines to check the fault recovery. The touch screen was operating, trading
screens were being updated with real prices and our theoretical option prices, and the
fun was about to start. We were preparing to get a station in the OEX pit. It was the
October 1987.

After the initial terror, the introspection, the follies of some participants, and
the makings of great stories in years to come, business had changed substantially and
our efforts were needed elsewhere. The decision was made to put the project on hold
temporarily, to keep improving various components in our spare time, and to move
forward with other more timely endeavors. We concentrated our efforts on the quota-
tion system, the risk management system, and the clearing systems.

Rob Davis Jr., our lead programmer, resigned shortly after the October panic. He
made some comments about wanting to find an industry that is more stable where he
could responsibly raise a family. To me, stability meant boredom, and to Steve Fossett's
credit, no one was laid off at Fossett Corporation at the time.

## PROJECT NIMBLE BEGINS

In March 1988, Steve Fossett expressed his desire to resume the project. He picked
one of his best market makers, Jim Sauser to join the team. I picked two new software
engineers to join the team, Evan Jones and Dave Lawson. The four of us moved into
an office together and we brainstormed day and night. We thought of the name,
Nimble, because that is what we would have to be on the floor of the exchange to es-
cape harm. Then we designed the system, as shown in Figure D.1.

The Nimble system would be composed of three major and independent sys-
tems: the volatility monitor, the pricer, and the risk manager module. The volatility
monitor would listen to the data feeds constantly and back out the implied volatilities
for different expiry months and strike prices. It would always keep a current estimate
of what the market thinks the volatility is.

The pricer would use the volatility and calculate the house theoretical value for
each option, then apply a bias (to be discussed), and then issue the house price given
the bids and offers of other firms. This is an important feature. For example, suppose
our theoretical value was $1.50 but the best bid was $1.00. We would either bid with
them at $1 or become best bid at $1 1/16, but we would never bid more.

Case 1:08-cv-02412    Document 21-14    Filed 06/04/2008    Page 8 of 13

FIGURE D.1  THE LAYOUT OF PROJECT NIMBLE.



The risk module would keep track of all the options and hedges currently active in inventory. It would keep a live estimate of all the Greek letters. A clerk would sit by the screen and enter futures trades in the early days. Later, that was done from the trading floor.

The risk module would also be the generator of the bias parameters that the pricer would use. The bias would start to kick in to bias the pricer away from long options when our total delta was approaching our set limits and would bias the pricer away from buying options when our vega limits were approached. The delta limits would come down as a hedge was entered. We were looking at managing the gamma and theta limits as well, but early experience showed this was not necessary as they mainly took care of themselves, in such a large options book. However, we did display these values for the human traders to monitor.

392                                                                        APPENDIX D

## THE SCREEN IN THE PIT

Getting a screen installed in the pit was no easy matter. Although it was in the next building from us, (we were in 440 S. LaSalle and the CBOE is at 400 S. LaSalle), turf issues kept us from wiring directly from our Telco closet to their Telco closet only six feet away!

We had to order a dedicated 9600 baud line from Illinois Bell that ran from the 440 building to the switching station on Wabash and back to the 400 building. While we were waiting for the installation, we split the pricer in half. One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room. Thus traffic on the dedicated 9600 line would be kept to items by request only.

We had supposed that the 386 computer would be installed near where the monitors would be installed in the SPX pit. This was not the case. The CBOE had a separate computer room in the undercroft of the raised floor specifically for this purpose. It was about 30 feet away. The other trading firms used a computer that had the CPU built into the monitor, but we didn't want to do this because the built-in CPU was only a very slow 8088 and we needed the 286. To overcome the distance problem between the 386 and its monitors, I called around to the electronics supply houses and came up with a set of amplifiers. The manufacturer would not guarantee their use for monitors and the engineer thought it would only work for 20 feet. We tried it anyway and it worked fine. I took the opportunity to remove the floppy drive in the computer in the undercroft for security reasons. All file transfers were done remote via the 9600 baud line. I also taped a black trash bag to the ceiling to prevent dirt from falling through the above floor onto the computer. Two weeks after the line was installed, we were ready to test live on the floor.

## THE COMPUTER SHARKS

The first week was fraught with system problems. In that week, we lost more money than all but one week of market vagaries. The crowd in the SPX pit was quick to pick up and capitalize on any computer glitch. It was a game to them akin to taking candy from a baby. It was a hard week for the programmers. They worked late into the night to make changes that were furiously tested the next day. In addition, we had not anticipated that some members of the crowd would stand right on top of us and scrutinize everything we did.

The terminal in the pit controlled the market quote screens. The human operator could control the spreads, best bid/offer, behind the best bid/offer, the bias, long or short, the amount of deltas, long or short, in essence, the bet size, which would cause the bias to be less and less as it got closer to the delta limits. I am not sure if we were able to control the other Greek letters. All this information had to be available to the human operator and to many of the members of the crowd as well. I remember standing behind Jim Sauser as another market maker explained to his

buddy where the delta information was located on our screen, and so on. He said it in a matter-of-fact manner as if he was directing a newcomer to the restrooms. He generously gave us credit for things we had not yet implemented and probably would not.

To maintain some secrecy, we came up with a scheme to put all position information in one long number at the bottom of the screen. For example, character positions 3–5 would contain the delta and positions 10–12 would contain the bias. To hide the real information, additional numbers were added. These numbers would change based on a formula off of the real numbers. We tried using pure random numbers, but they would change when the others did not and the randomness became apparent to the crowd. Instead, we programmed a routine that would multiply the Greek letter by linear equations and put the result in the spare digits, and it would all move in sync together either up or down, but nobody else would know which was the real number. We also rotated the character position orders around a bit just to make sure. Before the trading day started, the human operators would go talk to the programmers to get the latest character location information as it usually was changed overnight.

Soon the computer failures decreased and the computer sharks laid off. We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot. We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.

## RISK MANAGEMENT

At the same time, work was progressing on the risk management side, which was located in the upstairs office. We added on-line position reports, smile charts, all the Greek letters, everything we could think about to measure our exposure. We also developed coded messages that could be sent down to the floor. These messages occupied a certain two-digit position. These were some of the messages:

- Everything OK.
- Check your screens—I think I see something.
- We are going to lunch.
- Don't feel well.
- Someone is giving me a hard time.
- Someone's coming downstairs to see you.
- The boss wants to see you.
- We are experiencing minor technical problems.
- We are experiencing more serious technical problems.
- Panic—pull the plug immediately.

Trading cards were made with all these codes translated and most of the staff kept them handy in their shirt pockets. My favorite message announced "We're eating donuts/bagels/muffins/pizza and they're going fast."

## ENTER CARY GRANT

Cary Grant came on the scene about this time. Not *the* Cary Grant, the actor, but Cary Grant the famous technical trader. I never did find out if it was true, but Cary told me that he figured it was worth about $10,000 a year to him to have this name, in terms of people remembering his name, doors opening to him, and especially people not cashing checks he wrote. Cary later went on to become the head of the Third Market Corporation.

Cary was a successful SPU trader (pronounced "spooze," S&P 500 Index futures traded at the Chicago Mercantile exchange). He used a technique based on George Lane's stochastics, Elliott waves and Gann angles. He was using FutureSource to trade SPUs from his desk and doing quite well. Somehow, he knew Steve Fossett and was on very friendly terms. An idea came up at one of our staff meetings, and Steve immediately put us both together and we were totally enthusiastic about the idea.

The idea was this: Nimble up to this point was making money following the market up and down, making money on allowing the orders to come to us. Cary was making money predicting short-term movements of the S&P, splitting his profits with the market makers and the brokers. We would have Cary call the market and instead of picking up his phone to place his order, he would call the upstairs Nimble risk management desk and they would adjust the bias as if he had entered a position in the underlying. We then would be trading without commissions, gaining the bid/offer spread from each transaction, instead of giving it up.

This was easy to implement and success came quickly. The only drawback was that execution was slower than futures directly. Cary would enter an order and it would take a few minutes to become long, and more than a few minutes on a slow day. This didn't seem to affect his trading very much. He took it on faith that orders would be "filled" and when it took time, well, that was the price one had to pay to trade without friction.

Cary did very well and the Nimble team did its best to keep the system operating smoothly and the rest is history. It was like being a runner who trains with ankle weights and takes the weights off before an important race. Cary's trading ran hot and stayed hot, thanks to the buffer of accumulated spreads and commissions he did not need to pay.

## HOW THE CROWD REACTED

Here we were with a successful trading system in the SPX pit and soon were one of the biggest market makers in the pit. We had expected more than the usual hostilities from

the non-computer crowd, but their reaction surprised me. They liked the system; they liked us. We took some suggestions from the crowd for ways to make our screens better. Different color schemes, different groupings, lines, and cosmetic things like this. The roving brokers liked our screens also. These are the floor brokers or market makers who work more than one pit, usually going from one pit to the other to fill orders or to stay where the action is. Their response was overly positive. They liked to look at screens that were always up-to-date, without having to yell out.

## TONY SALIBA AND THE SALIBA SYSTEM

We were not the first trading system in the pit and we were not the last. Tony Saliba gave it a try, and we would watch him daily. Burt Beckman was the programmer, systems manager for Tony. Their system came for a while, traded for a while, and then went without explanation. About six months after their monitors were taken down, I got a call from one of the marketing people of Tony's organization. He explained to me their now defunct system was for sale and asked if I was interested. I told him, I had one already, but that I would take a look at it. I tried to be humble and not rub in the fact that our system was still running.

Some of the other Fossett people joked with me about the value of an unsuccessful trading system. I was looking for system parts that might be useful. For example, our modem infrastructure would be outdated in just a few years and might be replaced with something faster. I went to their office and looked at their system. I was astounded! Only years later did I see a system as impressive, when I sat in the cockpit of a Boeing 767. It had a bewildering assortment of dials, meters, and other instruments filling 4 or more screens. I did not think I or anyone else I knew was smart enough to operate such a system. Jim Sauser said it early on, and it became a motto for the Nimble team, "Walk before you run, and crawl before you walk." This is a rule I have taken to heart and use constantly in my life. I do not know why the Saliba system failed, but I have a strong hunch it was all those dials.

## LESSONS LEARNED IN DEVELOPING THIS SYSTEM

- Walk before you run, and crawl before you walk.
- Trade without paying brokerage or bid/offer if you can.
- Systems never are as easy to implement as you think they will be.
- Sometimes technology leads you to a dead end, but being able to switch technologies will often get you past snags.
- Never pay fair value, just pay what you need to pay to get the trade accomplished.

396                                                                APPENDIX D

- Understand why a system should work logically. What is your edge, and why do you have it?
- Always be introspective about your trading.
- Ease yourself into the water slowly.
- Practice continuous, stepwise improvement.
- If an idea comes up, evaluate it fully, regardless of whose idea it is.
- If you want the freshest, get it from the source.
- Time and circumstance happen to us all.

# EXHIBIT 13

chapters.indigo.ca

Get it Used or Rare from $6. **Computerized Trading: Maximizing Day Trading and Overnight**
Author: Mark Jurik  |  See more titles by Mark Jurik

List Price:                              $59.95
irewards Member Price:      $56.95

**Sold Out**

**Community Reviews**

Looking for a hard-to-find book? Try searching our **Used & Rare** section. + See details

Eligible for **FREE Shipping on orders over $39**. +See Details

**Don't forget the gift wrap!** You can have your book or toy beautifully wrapped, plus include a personal

**Become an irewards member** and enjoy **5%** off books online, and **10%** off books in store every day. +

# About this Book

**Format:** Trade Paperback
**Dimensions:** 432 Pages, 7 x 9.25 in

**Published:** May 10, 1999
**Published By:** New York Institute of Finance

The following ISBNs are associated with this title:
**ISBN - 10:**  0735200777
**ISBN - 13:**  9780735200777

**From Our Editors**
**Mark Jurik** mines the minds of 20 experts for their strategies on how to get the most out of computerized trading systems. *Computerized Tr*
testing and analyzing of trading strategies, how to cope with the stress of using different trading methods and how to negotiate the best data feed

# From The Community

**Who's Listing it as a Top Ten**
This item has not yet appeared in a Top Ten List - be the first to create a list using this item!

**Who's Blogging**
This item has not yet appeared in a Post - be the first t

# Reviews from the Community

Canadians buy bestsellers and bargains at **Chapters Indigo**. Canada's biggest bookstores with locations across the country including Toronto, Halifax, Montre

Protected by Copyright. All Rights Reserved.

All prices in Canadian dollars.
**All chapters.indigo.ca prices are applicable to online purchases only.**

# EXHIBIT 14

**EXHIBIT 14: '629 INVALIDITY TABLE**

**Joseph Alotta, *Project Nimble: An Automated Equity Options Market Making System*, COMPUTERIZED TRADING: MAXIMIZING DAY TRADING AND OVERNIGHT PROFITS (Mark Jurik, ed., May, 1999) in view of Joubert, *Fast, Accurate and Inelegant Valuation of American Options* (1997)**

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| **27.** An automated trading method for use in an electronic exchange system network, comprising: | The Alotta reference teaches an automated equity options trading system, known as the "Nimble system," used in the SPX pit of the Chicago Board Options Exchange (CBOE) in 1987–1989:<br><br><br><br>[Alotta, at 391.]<br><br>• "This is the account of an ***actual and profitable trading system and the ideas and events that came together in the summer of 1987 and through 1989***." [Alotta, at 387.] |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
|  | • "THE SPX PIT  ***The pit designated by exchange authorities for automated systems was the SPX pit.***  This pit has European-style options on the S&P 500 index. … Having European style options was an advantage to the systems designer; we could use the less computationally intensive Black-Scholes formula …." [Alotta, at 388.] |
|  | • "I quickly did some calling around, wanting to use the best datafeed available.  ***Steve Schwarz had an option trading system that was popular upstairs at the Options Exchange called the Schwartz-a-tron.***  The market makers would eat their lunches and play backgammon to the yellowish glow of the Schwartz-a-tron." [Alotta, at 388.] |
|  | • "THE SCREEN IN THE PIT  ***Getting a screen installed in the pit was no easy matter.***  Although it was in the next building from us, (***we were in 440 S. LaSalle and the CBOE is at 400 S. LaSalle***), turf issues kept us from wiring directly from our Telco closet to their Telco closet only six feet away!   We had to order a dedicated 9600 baud line from Illinois Bell that ran from the 440 building to the switching station on Wabash and back to the 400 building.  While we were waiting for the installation, we split the pricer in half.  ***One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room.***  Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.] |
|  | • "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.] |
|  | • "Soon the computer failures decreased and the computer sharks laid off.  ***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot.  We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.] |
|  | • "HOW THE CROWD REACTED  ***Here we were with a successful trading system in the SPX pit and soon were one of the biggest market makers in the pit.***  We had expected more than the usual hostilities from the non-computer crowd, but their reaction surprised me.  They liked the system; they liked us." [Alotta, at 394–95.] |
|  | • "***We were not the first trading system in the pit and we were not the last.***" [Alotta, at 395.] |
|  | • "This was easy to implement and ***success came quickly***. … Cary did very well and the Nimble team did its best to keep the ***system operating smoothly and the rest is history***." [Alotta, at 394.] |
| using equipment to perform trading of a | The Nimble system used equipment such as servers to perform automated trading of equity options: |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| first traded item or a second traded item related to the first traded item, including: | *Project Nimble: An Automated Equity Options Market Making System*      **391**<br><br><br>FIGURE D.1 THE LAYOUT OF PROJECT NIMBLE.<br><br>[Alotta, at 391.]<br><br>• "Belinda Cheng ***worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other***. Rob Davis was working on ***the touch screen and character mappings to display fractions***. Pat MacCaulley was using the option models to print out trading sheets for Fossett market makers." [Alotta, at 389.]<br><br>• "THE SCREEN IN THE PIT ***Getting a screen installed in the pit was no easy matter.*** … We had to order ***a dedicated 9600 baud line*** from Illinois Bell. … While we were waiting for the installation, we split the pricer in half. ***One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room.*** Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.]<br><br>• "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.] |
| receiving market price information | The Nimble system received market price information through a live datafeed from the Securities Industry Automation Corporation ("SAIC"), who received feeds directly from exchanges like NYSE, CME, and AMEX: |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| for the first traded item; | [Alotta, at 391.]<br><br>• "*I quickly did some calling around, wanting to use the best datafeed available.*" [Alotta, at 388.]<br><br>• "This was the problem: *SIAC was the only carrier able to get feeds directly from the exchanges; all other data vendors received their data from SIAC.* Vendors would attempt to avoid problems of the feed during peak times, such as crashes, panics, opening rotation, and closing rotations, first by omitting *option bids and offers*, then by omitting *underlying bids and offers* and then finally by omitting *option last sale prices*. These were times we absolutely needed to be operating with full data. *We decided to go to SIAC ourselves directly, becoming our own data vendor.* This was a very expensive prospect and Steve Fossett backed it 100 percent. *We still did not have a design for the complete trading system, but we acted on faith, knowing that the best source of data would be crucial for its success.*" [Alotta, at 388.]<br><br>• "Belinda Cheng worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other." [Alotta, at 389.] |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| | • **"When using the data storage servers on the *live feeds*, we quickly ran out of memory under DOS."** [Alotta, at 389.]<br><br>• "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. ***The volatility monitor would listen to the datafeeds constantly*** …." [Alotta, at 390.]<br><br>• "While we were waiting for the installation, we split the pricer in half. One half would use a 386 PC to paint the screens down on the CBOE floor and the other half ***would listen to current markets*** on a 286 machine in our upstairs trading room." [Alotta, at 392.] |
| identifying a desired price for the first traded item in a look-up table based on price information for the second traded item; | The Nimble system used the Black-Scholes model (as described in the '629 patent), which identifies a desired price for the first traded item based on price information for a second traded item. The Joubert reference teaches a look-up table of prices for the Black-Scholes model used by the Nimble system:<br><br>• "Having European style options was an advantages to the systems designer; we could use the ***less computationally intensive Black-Scholes formula*** …." [Alotta, at 388.]<br><br>• "The method is simply to build a ***look-up table of option prices***…" [Joubert, at 88.]<br><br> • "Table 1: Results for short term puts with a strike price of $100 and no dividends. Here *S* is the stock price, *T* the expiry of the option, σ the volatility and *r* the risk-free interest rate. The results in the 'Binomial' column were calculated with a 5000-step binomial tree, using ***Black-Scholes*** in the last step." [Joubert, at 89.]<br><br>• "The results in this article demonstrate the ***feasibility of using look-up tables for pricing American options*** with continuous dividends." [Joubert, at 91.]<br><br>One skilled in the art would |

5

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| | have known to use the look-up tables in Joubert to increase the speed of processing options calculations in the Nimble system, as taught by Joubert:<br><br>• "***Fast***, Accurate and Inelegant Valuation of American Options" [Joubert, Title.]<br><br>• "The method is simply to build a look-up table of option prices, which thus splits the problem of pricing American option prices into three sub-problems: a) accurate calculation of the values in the table; b) storage of the values and access to it; c) ***rapid calculation of prices for given parameter values***." [Joubert, at 88.]<br><br>• "Seconds Per Put : 0.00027" [Joubert, at 89.] |
| comparing the received market price information for the first traded item to the desired price for the first traded item; and | The Nimble system compared the house theoretical value generated with the Black-Scholes model to the current market's bids and offers to generate a "house price" for the option:<br><br>• "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. The volatility monitor would listen to the data feeds constantly and back out the implied volatilities for different expiry months and strike prices. It would also keep a current estimate of what the market thinks the volatility is. The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the ***house price given the bids and offers of other firms.*** This is an important feature. ***For example, suppose our theoretical value was $1.50 but the best bid was $1.00. We would either bid with them at $1 or become best bid at $1 1/16, but we would never bid more.***" [Alotta, at 390.] |
| generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price. | The Nimble system automatically placed an order, *i.e.*, the "house price," based on the calculated "house theoretical value." The house price was transferred to the terminal in the pit of the CBOE:<br><br>• "***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.*** This is an important feature. For example, suppose our theoretical value was $1.50 but the best bid was $1.00. ***We would either bid with them at $1 or become best bid at $1 1/16, but we would never bid more.***" [Alotta, at 390.]<br><br>• "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.]<br><br>• "***One half would use a 386 PC to paint the screens down on the CBOE floor … .***" [Alotta, at 392.]<br><br>• "***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot. We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.] |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| | • "… *instead of picking up his phone to place his order, he would call the upstairs Nimble risk management desk and they would adjust the bias as if he had entered a position in the underlying. We then would be trading without commissions, gaining the bid/offer spread from each transaction, instead of giving it up.* This was easy to implement and success came quickly." [Alotta, at 394.] |
| **36.** An automated trading method for use in an exchange system network, comprising: | The Alotta reference teaches an automated equity options trading system, known as the "Nimble system," used in the SPX pit of the Chicago Board Options Exchange (CBOE) in 1987–1989:<br><br><br><br>*Project Nimble: An Automated Equity Options Market Making System*   391<br>FIGURE D.1 THE LAYOUT OF PROJECT NIMBLE.<br><br>[Alotta, at 391.]<br><br>• "This is the account of an *actual and profitable trading system and the ideas and events that came together in the summer of 1987 and through 1989*."  [Alotta, at 387.]<br><br>• "THE SPX PIT  *The pit designated by exchange authorities for automated systems was the SPX pit*.  This pit has European-style options on the S&P 500 index.  … Having European style options was an advantage to the systems designer; we could use the less computationally intensive Black-Scholes formula …."  [Alotta, at 388.]<br><br>• "THE SCREEN IN THE PIT  *Getting a screen installed in the pit was no easy matter.* |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
|  | Although it was in the next building from us, (*we were in 440 S. LaSalle and the CBOE is at 400 S. LaSalle*), turf issues kept us from wiring directly from our Telco closet to their Telco closet only six feet away!  We had to order a dedicated 9600 baud line from Illinois Bell that ran from the 440 building to the switching station on Wabash and back to the 400 building.  While we were waiting for the installation, we split the pricer in half.  *One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room.*  Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.] |
|  | • "*The terminal in the pit controlled the market quote screens.*  The human operator could control the spreads, best bid/offer, behind the best bid/offer, the bias, long or short, the amount of deltas, long or short, in essence, the bet size, which would cause the bias to be less and less as it got closer to the delta limits." [Alotta, at 392.] |
|  | • "Soon the computer failures decreased and the computer sharks laid off.  *We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot.  We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.*" [Alotta, at 393.] |
|  | • "HOW THE CROWD REACTED  *Here we were with a successful trading system in the SPX pit and soon were one of the biggest market makers in the pit.*  We had expected more than the usual hostilities from the non-computer crowd, but their reaction surprised me.  They liked the system; they liked us." [Alotta, at 394–95.] |
|  | • "*We were not the first trading system in the pit and we were not the last.*" [Alotta, at 395.] |
|  | • "This was easy to implement and *success came quickly*. …  Cary did very well and the Nimble team did its best to keep the *system operating smoothly and the rest is history*." [Alotta, at 394.] |
| using equipment in a network architecture to perform trading of a first traded item including: | The Nimble system used equipment such as servers to perform automated trading of equity options: |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| | <br><br>[Alotta, at 391.]<br><br>• "Belinda Cheng **worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other**. Rob Davis was working on **the touch screen and character mappings to display fractions**. Pat MacCaulley was using the option models to print out trading sheets for Fossett market makers." [Alotta, at 389.]<br><br>• "THE SCREEN IN THE PIT **Getting a screen installed in the pit was no easy matter.** … We had to order **a dedicated 9600 baud line** from Illinois Bell. … While we were waiting for the installation, we split the pricer in half. **One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room.** Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.]<br><br>• "**The terminal in the pit controlled the market quote screens.**" [Alotta, at 392.] |
| receiving market | The Nimble system received market price information through a live datafeed from the Securities Industry Automation Corporation ("SAIC"), who received feeds directly from exchanges like NYSE, CME, and AMEX: |

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
| information for the first traded item; |  |

[Alotta, at 391.]

- "*I quickly did some calling around, wanting to use the best datafeed available.*" [Alotta, at 388.]

- "This was the problem: *SIAC was the only carrier able to get feeds directly from the exchanges; all other data vendors received their data from SIAC.* Vendors would attempt to avoid problems of the feed during peak times, such as crashes, panics, opening rotation, and closing rotations, first by omitting **option bids and offers**, then by omitting **underlying bids and offers** and then finally by omitting **option last sale prices**. These were times we absolutely needed to be operating with full data. *We decided to go to SIAC ourselves directly, becoming our own data vendor.* This was a very expensive prospect and Steve Fossett backed it 100 percent. *We still did not have a design for the complete trading system, but we acted on faith, knowing that the best source of data would be crucial for its success.*" [Alotta, at 388.]

- "Belinda Cheng worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|

broadcast their status to each other. " [Alotta, at 389.]

- **"When using the data storage servers on the *live feeds*, we quickly ran out of memory under DOS."** [Alotta, at 389.]

- "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. **The volatility monitor would listen to the datafeeds constantly** … ." [Alotta, at 390.]

- "While we were waiting for the installation, we split the pricer in half. One half would use a 386 PC to paint the screens down on the CBOE floor and the other half **would listen to current markets** on a 286 machine in our upstairs trading room." [Alotta, at 392.]

---

**identifying a transaction value for the first traded item in a look-up table of transaction values for the first traded item, wherein the identifying is responsive to receiving the market information for the first traded item and wherein the transaction values in the look-up table are based on price information for a second traded item related to the first traded item; and**

The Nimble system used the Black-Scholes model described in the '629 patent, which inherently identifies a transaction value for the first traded item based on price information for a second traded item. The Joubert reference teaches a look-up table of prices for the Black-Scholes model used by the Nimble system:

- "Having European style options was an advantages to the systems designer; we could use the **less computationally intensive Black-Scholes formula** …." [Alotta, at 388.]

- "The method is simply to build a **look-up table of option prices**…" [Joubert, at 88.]

| S ($) | T (Years) | σ (%) | r (%) | Binomial ($) | Look-Up ($) | Rel. Err. | Abs. Err. |
|---|---|---|---|---|---|---|---|
| 80 | 0.500 | 40 | 6 | 21.6057 | 21.6057 | 0.0000 | 0.0000 |
| 85 | 0.500 | 40 | 6 | 18.0370 | 18.0368 | 0.0000 | 0.0002 |
| 90 | 0.500 | 40 | 6 | 14.9178 | 14.9178 | 0.0000 | 0.0000 |
| 95 | 0.500 | 40 | 6 | 12.2306 | 12.2303 | 0.0000 | 0.0003 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 105 | 0.500 | 40 | 6 | 8.0265 | 8.0267 | 0.0000 | -0.0003 |
| 110 | 0.500 | 40 | 6 | 6.4337 | 6.4339 | 0.0000 | -0.0002 |
| 115 | 0.500 | 40 | 6 | 5.1257 | 5.1253 | 0.0001 | 0.0003 |
| 120 | 0.500 | 40 | 6 | 4.0602 | 4.0601 | 0.0000 | 0.0001 |
| 100 | 0.500 | 40 | 2 | 10.7734 | 10.7739 | 0.0000 | -0.0005 |
| 100 | 0.500 | 40 | 4 | 10.3441 | 10.3447 | 0.0000 | -0.0006 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.500 | 40 | 8 | 9.5707 | 9.5712 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 10 | 9.2186 | 9.2191 | 0.0000 | -0.0005 |
| 100 | 0.500 | 30 | 6 | 7.2114 | 7.2114 | -0.0001 | -0.0004 |
| 100 | 0.500 | 35 | 6 | 8.5774 | 8.5779 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.500 | 45 | 6 | 11.3116 | 11.3123 | -0.0001 | -0.0006 |
| 100 | 0.500 | 50 | 6 | 12.6767 | 12.6774 | -0.0001 | -0.0007 |
| 100 | 0.083 | 40 | 6 | 4.3732 | 4.3743 | -0.0003 | -0.0012 |
| 100 | 0.167 | 40 | 6 | 6.0716 | 6.0718 | 0.0000 | -0.0002 |
| 100 | 0.250 | 40 | 6 | 7.3070 | 7.3074 | -0.0001 | -0.0004 |
| 100 | 0.333 | 40 | 6 | 8.3149 | 8.3154 | -0.0001 | -0.0005 |
| 100 | 0.417 | 40 | 6 | 9.1869 | 9.1874 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.583 | 40 | 6 | 10.6247 | 10.6263 | -0.0001 | -0.0006 |
| 100 | 0.667 | 40 | 6 | 11.2500 | 11.2506 | -0.0001 | -0.0006 |
| 100 | 0.750 | 40 | 6 | 11.8172 | 11.8178 | -0.0001 | -0.0006 |
| 100 | 0.833 | 40 | 6 | 12.3424 | 12.3430 | -0.0001 | -0.0006 |
| 100 | 0.917 | 40 | 6 | 12.8374 | 12.8380 | -0.0001 | -0.0007 |

- "Table 1: Results for short term puts with a strike price of $100 and no dividends. Here *S* is the stock price, *T* the expiry of the option, σ the volatility and *r* the risk-free interest rate. The results in the 'Binomial' column were calculated with a 5000-step binomial tree, using **Black-Scholes** in the last step." [Joubert, at 89.]

- "The results in this article demonstrate the **feasibility of using look-up tables for pricing American options** with

| '629 Claim Language | Teachings of Alotta, *Project Nimble* & Joubert |
|---|---|
|  | continuous dividends." [Joubert, at 91.] |
|  | One skilled in the art would have known to use the look-up tables in Joubert to increase the speed of processing options calculations in the Nimble system, as taught by Joubert: |
|  | • "***Fast***, Accurate and Inelegant Valuation of American Options" [Joubert, Title.] |
|  | • "The method is simply to build a look-up table of option prices, which thus splits the problem of pricing American option prices into three sub-problems: a) accurate calculation of the values in the table; b) storage of the table; and access to it; c) ***rapid calculation of prices for given parameter values***." [Joubert, at 88.] |
|  | • "Seconds Per Put : 0.00027" [Joubert, at 89.] |
| using at least the identified transaction value in determining whether to submit an order for the first traded item. | The Nimble system automatically placed an order, *i.e.*, the "house price," based on the calculated "house theoretical value." The house price was transferred to the terminal in the pit of the CBOE: |
|  | • "***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.*** This is an important feature. For example, suppose our theoretical value was $1.50 but the best bid was $1.00. *We would either bid with them at $1 or become best bid at $1 1/16, but we would never bid more.* …" [Alotta, at 390.] |
|  | • "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.] |
|  | • "***One half would use a 386 PC to paint the screens down on the CBOE floor*** … ." [Alotta, at 392.] |
|  | • "***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot. We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.] |

# EXHIBIT 15

# EXHIBIT 15: '833 INVALIDITY TABLE
## Joseph Alotta, *Project Nimble: An Automated Equity Options Market Making System*, COMPUTERIZED TRADING: MAXIMIZING DAY TRADING AND OVERNIGHT PROFITS (Mark Jurik, ed., May, 1999)

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| **24.** An automated trading method for use in an electronic exchange system network, comprising | The Alotta reference teaches an automated equity options trading system, known as the "Nimble system," used in the SPX pit of the Chicago Board Options Exchange (CBOE) in 1987–1989:<br><br><br><br>[Alotta, at 391.]<br><br>• "This is the account of an ***actual and profitable trading system and the ideas and events that came together in the summer of 1987 and through 1989***."  [Alotta, at 387.]<br><br>• "THE SPX PIT  ***The pit designated by exchange authorities for automated systems was the SPX pit***.  This pit has European-style options on the S&P 500 index.  …  Having European style options was an advantage to the systems designer; we could use the less computationally intensive Black-Scholes |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| | formula ...." [Alotta, at 388.] |
| | • "I quickly did some calling around, wanting to use the best datafeed available. ***Steve Schwarz had an option trading system that was popular upstairs at the Options Exchange called the Schwartz-a-tron.*** The market makers would eat their lunches and play backgammon to the yellowish glow of the Schwartz-a-tron." [Alotta, at 388.] |
| | • "THE SCREEN IN THE PIT ***Getting a screen installed in the pit was no easy matter.*** Although it was in the next building from us, (***we were in 440 S. LaSalle and the CBOE is at 400 S. LaSalle***), turf issues kept us from wiring directly from our Telco closet to their Telco closet only six feet away!  We had to order a dedicated 9600 baud line from Illinois Bell that ran from the 440 building to the switching station on Wabash and back to the 400 building.  While we were waiting for the installation, we split the pricer in half.  ***One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room.***  Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.] |
| | • "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.] |
| | • "Soon the computer failures decreased and the computer sharks laid off.  ***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot.  We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.] |
| | • "HOW THE CROWD REACTED ***Here we were with a successful trading system in the SPX pit and soon were one of the biggest market makers in the pit.***  We had expected more than the usual hostilities from the non-computer crowd, but their reaction surprised me.  They liked the system; they liked us." [Alotta, at 394–95.] |
| | • "***We were not the first trading system in the pit and we were not the last.***" [Alotta, at 395.] |
| | • "This was easy to implement and ***success came quickly***. ...  Cary did very well and the Nimble team did its best to keep the ***system operating smoothly and the rest is history***." [Alotta, at 394.] |
| receiving market price information for a first traded item; | The Nimble system received market price information through a live datafeed from the Securities Industry Automation Corporation ("SAIC"), which received feeds directly from exchanges like NYSE, CME, and AMEX: |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| |  |

[Alotta, at 391.]

- "*I quickly did some calling around, wanting to use the best datafeed available.*" [Alotta, at 388.]

- "This was the problem: *SIAC was the only carrier able to get feeds directly from the exchanges; all other data vendors received their data from SIAC.* Vendors would attempt to avoid problems of the feed during peak times, such as crashes, panics, opening rotation, and closing rotations, first by omitting *option bids and offers*, then by omitting *underlying bids and offers* and then finally by omitting *option last sale prices*. These were times we absolutely needed to be operating with full data. *We decided to go to SIAC ourselves directly, becoming our own data vendor.* This was a very expensive prospect and Steve Fossett backed it 100 percent. *We still did not have a design for the complete trading system, but we acted on faith, knowing that the best source of data would be crucial for its success.*" [Alotta, at 388.]

- "Belinda Cheng worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other." [Alotta, at 389.]

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
|  | • **"**When using the data storage servers on the ***live feeds***, we quickly ran out of memory under DOS." [Alotta, at 389.] <br><br> • "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. ***The volatility monitor would listen to the datafeeds constantly***…." [Alotta, at 390.] <br><br> • "While we were waiting for the installation, we split the pricer in half. One half would use a 386 PC to paint the screens down on the CBOE floor and the other half ***would listen to current markets*** on a 286 machine in our upstairs trading room." [Alotta, at 392.] |
| automatically calculating a transaction price for the first traded item based on price information for a second traded item related to the first traded item; | The Nimble system used the Black-Scholes model (described in the '833 patent), which identifies a transaction price for the first traded item based on price information for a second traded item related to the first traded item: <br><br> • "***The options models came right from the book."*** [Alotta, at 389.] <br><br> • "… we could use the ***less computationally intensive Black-Scholes formula***…." [Alotta, at 388.] <br><br> • "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. The volatility monitor would listen to the datafeeds constantly and ***back out the implied volatilities for different expiry months and strike prices***. … ***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.***" [Alotta, at 390.] |
| comparing the received market price information for the first traded item to the transaction price for the first traded item; and | The Nimble system compared the house theoretical value generated with the Black-Scholes model to the current market's bids and offers to generate a "house price" for the option: <br><br> • "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. The volatility monitor would listen to the data feeds constantly and back out the implied volatilities for different expiry months and strike prices. It would also keep a current estimate of what the market thinks the volatility is. The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the ***house price given the bids and offers of other firms.*** This is an important feature. ***For example, suppose our theoretical value was \$1.50 but the best bid was \$1.00. We would either bid with them at \$1 or become best bid at \$1 1/16, but we would never bid more***…." [Alotta, at 390.] |
| automatically generating a request for | The Nimble system automatically generated requests for a market transaction, *i.e.*, the "house prices." The house prices were transferred to the terminal in the pit of the CBOE: |

4

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| market transaction for one of the first traded item and the second traded item based on the comparison of the received market price information to the transaction price. | • "***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.*** This is an important feature. For example, suppose our theoretical value was \$1.50 but the best bid was \$1.00. *We would either bid with them at \$1 or become best bid at \$1 1/16*, but we would never bid more. …" [Alotta, at 390.]<br><br>• "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.]<br><br>• "*One half would use a 386 PC to paint the screens down on the CBOE floor* … ." [Alotta, at 392.]<br><br>• "*We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot. We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.*" [Alotta, at 393.] |
| **34**. An automated trading method for use in an electronic exchange system network, comprising the steps of: | The Alotta reference teaches an automated trading system ("Nimble system") used in the SPX pit of the Chicago Board Options Exchange (CBOE) in 1987–1989:<br><br><br><br>[Alotta, at 391.] |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
|  | • "This is the account of an ***actual and profitable trading system and the ideas and events that came together in the summer of 1987 and through 1989***." [Alotta, at 387.] <br><br> • "THE SPX PIT  ***The pit designated by exchange authorities for automated systems was the SPX pit***.  This pit has European-style options on the S&P 500 index.  …  Having European style options was an advantage to the systems designer; we could use the less computationally intensive Black-Scholes formula …." [Alotta, at 388.] <br><br> • "I quickly did some calling around, wanting to use the best datafeed available. ***Steve Schwarz had an option trading system that was popular upstairs at the Options Exchange called the Schwartz-a-tron***.  The market makers would eat their lunches and play backgammon to the yellowish glow of the Schwartz-a-tron." [Alotta, at 388.] <br><br> • "THE SCREEN IN THE PIT  ***Getting a screen installed in the pit was no easy matter.***  Although it was in the next building from us, (***we were in 440 S. LaSalle and the CBOE is at 400 S. LaSalle***), turf issues kept us from wiring directly from our Telco closet to their Telco closet only six feet away!  We had to order a dedicated 9600 baud line from Illinois Bell that ran from the 440 building to the switching station on Wabash and back to the 400 building.  While we were waiting for the installation, we split the pricer in half.  ***One half would use a 386 PC to paint the screens down on the CBOE floor and the other half would listen to current markets on a 286 machine in our upstairs trading room***.  Thus traffic on the dedicated 9600 line would be kept to items by request only." [Alotta, at 392.] <br><br> • "***The terminal in the pit controlled the market quote screens***." [Alotta, at 392.] <br><br> • "Soon the computer failures decreased and the computer sharks laid off.  ***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot.  We played like this for a few weeks, in the market, out of the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.] <br><br> • "HOW THE CROWD REACTED  ***Here we were with a successful trading system in the SPX pit and soon were one of the biggest market makers in the pit***.  We had expected more than the usual hostilities from the non-computer crowd, but their reaction surprised me.  They liked the system; they liked us." [Alotta, at 394–95.] <br><br> • "***We were not the first trading system in the pit and we were not the last.***" [Alotta, at 395.] <br><br> • "This was easy to implement and ***success came quickly***. …  Cary did very well and the Nimble team did its best to keep the ***system operating smoothly and the rest is history***." [Alotta, at 394.] |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| receiving market price information for a first traded item; | The Nimble system received market price information through a live datafeed from the Securities Industry Automation Corporation ("SAIC"), who received feeds directly from exchanges like NYSE, CME, and AMEX:<br><br>*Project Nimble: An Automated Equity Options Market Making System*     **391**<br><br><br>FIGURE D.1  THE LAYOUT OF PROJECT NIMBLE.<br><br>[Alotta, at 391.]<br><br>• "*I quickly did some calling around, wanting to use the best datafeed available.*" [Alotta, at 388.]<br><br>• "This was the problem: *SIAC was the only carrier able to get feeds directly from the exchanges; all other data vendors received their data from SIAC.* Vendors would attempt to avoid problems of the feed during peak times, such as crashes, panics, opening rotation, and closing rotations, first by omitting *option bids and offers*, then by omitting *underlying bids and offers* and then finally by omitting *option last sale prices*. These were times we absolutely needed to be operating with full data. *We decided to go to SIAC ourselves directly, becoming our own data vendor.* This was a very expensive prospect and Steve Fossett backed it 100 percent. *We still did not have a design for the complete trading system, but we acted on faith, knowing that the best source of data would be crucial for its success.*" [Alotta, at 388.] |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| | • "…Belinda Cheng worked on the protocol by which the feed handlers, data storage servers, backup feed handlers and backup servers would communicate and broadcast their status to each other." [Alotta, at 389.]<br><br>• **"When using the data storage servers on the *live feeds*, we quickly ran out of memory under DOS."** [Alotta, at 389.]<br><br>• "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. ***The volatility monitor would listen to the datafeeds constantly*** … ." [Alotta, at 390.]<br><br>• "While we were waiting for the installation, we split the pricer in half. One half would use a 386 PC to paint the screens down on the CBOE floor and the other half ***would listen to current markets*** on a 286 machine in our upstairs trading room." [Alotta, at 392.] |
| automatically calculating a transaction value for the first traded item based on at least one of<br><br>(a) price information for a second traded item related to the first traded item and<br><br>(b) received market information for the first traded item; and | The Nimble system used the Black-Scholes model (described in the '833 patent), which identifies a transaction value for the first traded item based on price information for a second traded item related to the first traded item:<br><br>• "***The options models came right from the book.***" [Alotta, at 389.]<br><br>• "… we could use the ***less computationally intensive Black-Scholes formula*** …." [Alotta, at 388.]<br><br>• "The Nimble system would be composed of three major and independent systems: the volatility monitor, the pricer, and the risk manager module. The volatility monitor would listen to the datafeeds constantly and ***back out the implied volatilities for different expiry months and strike prices***. … ***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.***" [Alotta, at 390.] |
| using at least the calculated transaction value in automatically determining whether to submit an order for the | The Nimble system used it calculations to automatically generate requests for a market transaction, *i.e.*, the "house prices." The house prices were transferred to the terminal in the pit of the CBOE:<br><br>• "***The pricer would use the volatility and calculate the house theoretical value for each option, then apply a bias (to be discussed), and then issue the house price given the bids and offers of other firms.*** This is an important feature. For example, suppose our theoretical value was $1.50 but the best bid was $1.00. ***We would either bid with them at $1 or become best bid at $1 1/16***, but we would |

| '833 Claim Language | Teachings of Alotta, *Project Nimble* |
|---|---|
| first traded item. | never bid more. ..." [Alotta, at 390.]<br><br>• "***The terminal in the pit controlled the market quote screens.***" [Alotta, at 392.]<br><br>• "***One half would use a 386 PC to paint the screens down on the CBOE floor*** ... ." [Alotta, at 392.]<br><br>• "***We gradually got our nerves up, turning on the best/bid offer for a while and then turning it off when it got too hot. We played like this for a few weeks, in the market, out of the market, in the market, always getting braver, staying in the market longer, adding more bias, setting larger deltas, always getting better.***" [Alotta, at 393.]<br><br>• "*... **instead of picking up his phone to place his order, he would call the upstairs Nimble risk management desk and they would adjust the bias as if he had entered a position in the underlying. We then would be trading without commissions, gaining the bid/offer spread from each transaction, instead of giving it up.*** This was easy to implement and success came quickly." [Alotta, at 394.] |

# EXHIBIT 16



Chicago Board Options Exchange Annual Report 2001

## COMMITTEES OF THE MEMBERSHIP (CONTINUED)

Bruce I. Andrews
Stephen P. Donahue
Boris Furman
Fred O. Goldman
William J. Gorman
Eric Henschel
Michael B. Hoban
Jeffrey T. Kaufmann
Kevin J. Keller
Michael R. Quaid
Howard N. Ring
Frank A. Roszkiewicz
Joseph Sellitto
Robert Silverstein

### FINANCIAL REGULATORY COMMITTEE
David T. DeArmey, Chairman
Richard E. Schell,
    Vice Chairman
Margaret E. Wiermanski,
    Vice Chairman
Matthew Abraham
Mark A. Babbich
Patrick Blackburn
William F. Carik
Frank Catris
Mark Gannon
Fred O. Goldman
William Gould
John Hiatt, Sr.
Kristen Hughes Kelly
Judith M. Kula
Bruce Marcinek
Steven O'Malley
Janice Rohr
*Ex-Officio*
Linda Haven
Andrew Naughton
Jacqueline Sloan

### FLOOR DIRECTORS COMMITTEE
Mark F. Duffy, Chairman
Thomas A. Bond
John Favia
David Johnson
Daniel P. Koutris
Michael Post
John M. Streibich
Alvin G. Wilkinson

### FLOOR OFFICIALS COMMITTEE
Raymond P. Dempsey, Chairman
Robert A. Fodor, Vice Chairman
Daniel C. Zandi, Vice Chairman
Janice R. Armstrong
Daniel A. Baldwin
Thomas A. Brady
James G. Brophy
Patrick J. Caffrey
James K. Corsey
Brian M. Dowd
Damon M. Fawcett
Craig R. Johnson
Donald H. Klein, Jr.
Daniel  P. McCollar
Thomas W. McEntegart
Kurt R. Passehl
John E. Smollen, Jr.
Charles D. Woodward

### INDEX FLOOR PROCEDURE COMMITTEE
Jeffrey S. Latham, Chairman
Jonathan G. Flatow,
    Vice Chairman
Peter Brown
Terrence J. Brown
Richard Cichy
Michael F. Gallagher
Edward M. Giangiorgi
Sean Haggerty
John Justic
Emanual Liontakes
Michael McGuire
Alec Milam
Robert C. O'Mullan
Steven J. Pettinato
Douglas W. Prskalo
Keith Siemiawski
Paul Stefanos
Scott Tinervia
Richard E. Tobin
Charles D. Woodward

### INDEX MARKET PERFORMANCE COMMITTEE
Jonathan G. Flatow, Chairman
Andrew W. Hall, Vice Chairman
Donald C. Cullen
Jerry E. Diegel
Charles E. Feuillan
Mark A. Harmon
Peter J. Heinz, Jr.
Thomas H. Jarck
Jeffrey L. Klein
Todd A. Koster
Walter J. Krop
Michael F. Lohman
James W. Lynch
John P. Mariner
Daniel F. McHugh
Brian M. Morgan
Christopher Nevins
Brian A. Novak
Daniel J. O'Shea
John A. Possidoni
Steven M. Quirk
Peter H. Schulte
Thomas J. Siurek
Elan A. Strominger
J. Todd Weingart

### LESSOR ADVISORY COMMITTEE
Michael J. Post, Chairman
Anthony P. Arciero
Arnold S. Arfa
Lawrence J. Blum
Allan H. Carney
Mario D'Agostino
Stephen Dillinger
Patrick J. English
Norman S. Friedland
Michael P. Held
John R. Hosty
Paul J. Jiganti
Ruth I. Kahn
Jerold Kopf
Victor R. Meskin
Michael M. Mondrus
Robert M. Murphy
T. Paul Natenberg
Loren H. Newman
Martin P. O'Connell

William R. Power
Berton Rubin
Robert Silverstein
Leslie R. Zuckerman

### MARKET PERFORMANCE COMMITTEE
John M. Streibich, Chairman
Mark Severin, Vice Chairman
Terrence J. Andrews
Susan C. Bannon
Michael R. Benson
Richard H. Bode
Terrence E. Burke
Terrence E. Cullen
Richard W. Fuller, Jr.
James E. Keaty
Donald H. Klein, Jr.
Brian R. Korbel
Licia J. Leslie
James J. Mead, Jr.
John B. Niemann
John P. O'Grady
Burt J. Robinson
Frank P. Tenerelli
John H. Waterfield, III
Thomas Weston

### MEMBER FIRM OPERATIONS COMMITTEE
Gerald T. McNulty, Chairman
Thomas Berk, III
Michael K. Brennan
James G. Brophy
Jeffrey J.  Bughman
Daniel Keith Busse
Daniel P. Carver
Steven M. Chilow
Raymond P. Dempsey
Robert B. Duddy
William Ellington
Joseph A. Frehr
Francis D. Gleason
Lawrence J. Hanson
David Johnson
Jeffrey S. Kantor
Jeffrey T. Kaufmann
Stuart Kipnes
Donald H. Klein
Jeffrey S. Latham
James C. Lavery
Gerald T. McNulty
David F. Miller
Mark T. Morse
Mark Oakley
Jonathan O'Donnell
Michael Stowick
Michael Trees
J. Todd Weingart

### MEMBERSHIP COMMITTEE
Robert B. Gianone, Chairman
Richard W. Fuller,
    Vice Chairman
Anthony P. Arciero
Craig R. Barone
Kenneth J. Bellavia
Gary L. Bowers
Thomas E. Callahan
Keir S. Collins
David A. Eglit
Robert R. Fabijanowicz
Matthew J. Filpovich
Sean W. Haggerty
David C. Ho

James J. Humes
Robert B. Hutchison
Michael T. Kalchbrenner
William M. Kennedy
Madeline Kiedysz
Lloyd William Montgomery
Dora Morano-Koop
Andrew B. Newmark
Philip Gregory Oakley
Donald F. Pratl
Michael L. Rodnick
Mary Rita Ryder
Gregg Rzepczynski
Stuart Saltzberg
Robert J. Wasserman
Patrick W. Wehr
Leslie Zuckerman

### MODIFIED TRADING SYSTEM (MTS) APPOINTMENTS COMMITTEE
William J. O'Keefe, Chairman
Cabot B. Caldwell
Daniel P. Carver, Sr.
Randy N. Chandra
Mark F. Duffy
Joseph A. Frehr
Brandon S. Koress
Gerald T. McNulty
John E. Smollen, Jr.
John M. Streibich
Christopher M. Wheaton

### NOMINATING COMMITTEE
Ilene M. Resnick Garber,
    Chairman
Steven M. Chilow
Lawrence J. Hanson
William C. McGowan
Victor R. Meskin
Donald F. Phillips
Howard N. Ring
William J. Terman
Richard L. Thomas
Arnold R. Weber

### PRODUCT DEVELOPMENT COMMITTEE
Thomas A. Bartlett, Chairman
Alan Burstein
Angelo Calvello
Boris Furman
Gary P. Lahey
Brian A. Novak
Martin P. O'Connell
Dominic Salvino
Robert C. Sheehan

### SCREEN-BASED TRADING COMMITTEE
John Favia, Chairman
Barton Bergman
James J. Boyle
Terrance G. Boyle
Jim Harkness
Paul J. Jiganti
Ross G. Kaminsky
John A. Koltes
Jeffrey Latham
Steve Malitz
Gerald T. McNulty
Brian A. Novak
Thomas M. O'Donnell
Joseph Sellitto
Phillip Teuscher

# EXHIBIT 17



# Swiss Exchange SWX
# TS User Manual

I-MSC-TSM-201/E, Version 2.1, 31 Dec 98

This document contains the User Manual for the SWX Trading System.

® Copyright Swiss Exchange SWX, 1998. All rights reserved. Manufactured in Switzerland.
No parts of this software may be reproduced, transmitted or translated in any form or by any means,
electronic, mechanical, manual, optical or otherwise, without prior written permission from the Swiss
Exchange SWX. This software incorporates third party software and is protected by copyright and
licensed from the following software supplier of the Swiss Exchange SWX:

Portions Copyright © 1994 Sybase, Inc. All rights reserved.
This application uses the ISIS Distributed Toolkit, 1993 ISIS Distributal Systems, Inc.
HyperHelp is a trademark of Bristol Technology Inc. Restricted rights.
The Swiss Exchange SWX does not assume any responsibility for any consequences resulting from
the use of this media.

Swiss Exchange SWX
TS User Manual
Table of contents

Page ii
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

# Table of contents

1. General Remarks ................................................................... 1-1

    1.1. Who needs the TS User Manual, and Why? .......................... 1-1
    1.2. Starting Point TS(X) ............................................... 1-1
    1.3. How to Use this Manual ............................................ 1-1
    1.4. Scenario .......................................................... 1-3

2. Introduction to TS and TS(X) ................................................... 2-1

    2.1. TS and TS(X) ...................................................... 2-1

3. Launching the Trading System's User Interface ................................. 3-1

    3.1. Unix Login ........................................................ 3-1
    3.2. User ID and Trader ID ............................................. 3-2
    3.3. User-Interface Windows ............................................ 3-3
    3.4. On-line Help ...................................................... 3-10

4. Market Situation before Opening ............................................... 4-1

    4.1. Unreleased Orders ................................................. 4-2
    4.2. Market Overview ................................................... 4-3
    4.3. Viewing the Order Book ............................................ 4-4
    4.4. Entering a buy order before the start of trading (Release) ........ 4-5
    4.5. Introduction of a Sell Order before the Start of Trading .......... 4-11

5. Opening ....................................................................... 5-1

    5.1. State of the Order Book directly after Opening .................... 5-1
    5.2. Personal Trades and Personal Orders after Opening ................ 5-2

6. Continuous Trading ............................................................ 6-1

    6.1. Market Observation ................................................ 6-1
    6.2. Order Book Overview ............................................... 6-7
    6.3. Normal Order ...................................................... 6-8
    6.4. Hidden Size Order ................................................. 6-26
    6.5. Accept Order ...................................................... 6-32
    6.6. Fill-or-Kill Order ................................................ 6-34
    6.7. Conditional Orders ................................................ 6-37
    6.8. Trade Slips ....................................................... 6-41

7. Off-exchange Trading .......................................................... 7-1

    7.1. Statement of Interest ............................................. 7-2
    7.2. Addressed Offer ................................................... 7-7
    7.3. Trade Confirmation ................................................ 7-22
    7.4. Trade Reporting ................................................... 7-27

8. Aggregated Orders ............................................................. 8-1

    8.1. Processing in the Form of an Unreleased Order ..................... 8-1
    8.2. Further processing of Client Details .............................. 8-3

Swiss Exchange SWX
TS User Manual
Table of contents

Page iii
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

9. Market Making ........................................................................................................ 9-1

   9.1.  Price-Model Window – Mass Functions ................................................... 9-1
   9.2.  Double Order Entry ................................................................................. 9-9
   9.3.  Calculating profits/losses and positions ................................................ 9-9
   9.4.  Entering an order with a book attribution .............................................. 9-11
   9.5.  Unrealised Profit & Loss ......................................................................... 9-14
   9.6.  Position Entry and Profit/Loss Entry ...................................................... 9-18
   9.7.  Partial Liquidation of a Position, Realised Profit/Loss ........................... 9-20
   9.8.  Marking to Market .................................................................................. 9-24
   9.9.  Transferring positions from one book to another ................................... 9-25

10. Exceptional trading situations .......................................................................... 10-1

   10.1.  Non Opening ......................................................................................... 10-1
   10.2.  Stop Trading .......................................................................................... 10-5

11. Reference Data ................................................................................................... 11-1

   11.1.  Security Reference Data ........................................................................ 11-2
   11.2.  Issuer Reference Data ........................................................................... 11-4
   11.3.  Calendar ................................................................................................ 11-5
   11.4.  Change Fix ............................................................................................. 11-7
   11.5.  System Parameters ............................................................................... 11-7

12. User Configuration ............................................................................................ 12-1

   12.1.  Who Decides What? ............................................................................... 12-1
   12.2.  Preferences ............................................................................................ 12-2
   12.3.  Settings Configured by the System Administrator ................................. 12-5
   12.4.  Configuration of Views and Panes ........................................................ 12-6
   12.5.  Taking over Objects from other Users ................................................... 12-18

13. Post-recorded Trades ........................................................................................ 13-1

   13.1.  Entering a Post-recorded Trade ............................................................ 13-2
   13.2.  Deleting a Post-recorded Trade ............................................................ 13-4
   13.3.  Trade Reversal ...................................................................................... 13-4

14. Index ................................................................................................................... 14-1

15. Matching Rules ................................................................................................... 15-1

   15.1.  Introduction ............................................................................................ 15-1
   15.2.  SWX Matching Rules – an Overview ..................................................... 15-1
   15.3.  Pre-opening Matching Rules .................................................................. 15-1
   15.4.  Opening Matching Rules ........................................................................ 15-4
   15.5.  Continuous Trading Matching Rules ...................................................... 15-16

# 1.    General Remarks

## 1.1.    Who needs the TS User Manual, and Why?

The TS/TS(X) User Manual is an introductory description of the Trading System (TS) user interface. As all trading at SWX is conducted on screens, this manual has been written not only for future traders, but also for readers whose work is indirectly associated with the SWX system. Combined with the brochure "EBS Story", the TS User Manual is a basis for a general understanding of the Trading System and the Exchange functions.

## 1.2.    Starting Point TS(X)

Contrary to its first edition, this manual is based on the functionality of TS(X), the Extended Trading System. For users of TS (in which extended functions are not available), alternative working methods are explained in context. In order to establish a clear distinction, the manual refers to "TS" or "TS(X)" as the case may be. It is worth noting that all TS functions are available under TS(X).

## 1.3.    How to Use this Manual

The TS User Manual has not been designed as a reference tool, but rather as a continuous introductory workbook. It is best read like a textbook, i. e. by going through the chapters sequentially. However, as its structure reflects the sequence of activities during a trader's working day, it can also serve as a reference tool after the first reading.

Swiss Exchange SWX
TS User Manual
General Remarks

Page 1-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 1.3.1. Structure

With the exception of an introductory description of TS and TS(X) in Chapter 2, the TS User Manual is structured like a "novel" describing the workflow on the Exchange from the perspective of a trader. In this manner, key user interactions are illustrated with practical examples and, if necessary, further explained as to their general function.

The trading day is divided into several periods. It begins with the Pre-opening Period, continues after the Opening with the Trading Period, and switches back into the Pre-Opening Period when the market closes. The TS User Manual generally describes the functions of on-exchange trading in this sequence. The daily break as mentioned in certain regulatory documents is not covered in this book. Off-exchange trading and *Market Making* are covered in separate chapters within the section devoted to the Trading Period.

Particular trading situations and fundamental concepts such as user configuration and reference data are partially addressed within the examples whereas a detailed description is provided in separate chapters at the end of the manual. Aspects of securities delivery are only addressed inasmuch as the Trading system has an influence on the process.

Repetition has been avoided as much as possible. Important concepts are explained at the point where they are encountered for the first time in the context of a practical example.

### 1.3.2. Related documents

The TS User Manual is not a full description of all Trading System and Extended Trading System functions. It does not replace the Reference Manual or the On-line Help function. It builds upon the EBS Story and introduces the reader by way of practical exam-

Swiss Exchange SWX
TS User Manual
General Remarks

Page 1-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

ples to the functions and concepts of the SWX Trading Systems.

The TS User Manual refers to the following documents:

| Document | Description |
|---|---|
| EBS Story | Introduction to the functioning of SWX |
| TS Reference Manual | Description of all Trading System functions |

## 1.4.    Scenario

The TS User Manual starts by describing the work of a fictitious trader named Bernardo Bianchi who works for the equally fictitious small exchange member Banca del Monte Rosa in Lugano. The activities of Banca del Monte Rosa include securities trading on behalf of institutional investors and trading for its own account.

Own-account and client transactions are handled by different traders. Bianchi, for instance, trades on behalf of customers on the Swiss stock market while his colleague William Black trades shares for the bank's own account.

Swiss Exchange SWX
TS User Manual
General Remarks

Page 1-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 1: Layout of the traders' computer network at Banca del Monte Rosa. The Trading System is available on a group of workstations. It does not bind a given trader to a specific machine as the individual configuration depends on the user identification code and is not stored on the individual workstation. Thanks to the link between the bank's internal computer system and TS(X), investment advisors, asset managers and traders can work together.

All traders at Banca del Monte Rosa work on a Trading System (TS) which can be accessed from a group of networked workstations.

The server database is kept up to date with the latest information from the exchange system (ES). Owing to this principle, the trader workstations can access data on the server and do not need to use the capacity of the exchange system for each piece of data they require.

Swiss Exchange SWX
TS User Manual
General Remarks

Page 1-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The link between the trader workstations on the internal network of Banca del Monte Rosa and the exchange system is maintained through the local Gateway[1].

Portfolio managers, such as Nicolas Nussbaumer, do not work in the capacity of SWX traders and often use *aggregated orders* as a way of working on a large number of portfolios simultaneously. Asset managers usually enter their orders directly via the bank's internal computer system, from where they are transmitted via the Host Interface (HI) to the TS(X) in the Trading Department.

Account executives, such as Sabine des Saules, usually enter their orders into the computer system whence they are forwarded to the TS(X). For the most actively traded stocks, the system has been configured by the system administrator (upon instruction from the head of the Trading Department) to automatically forward limit orders below CHF 10'000 to the exchange system. All other orders coming through the Host Interface are retained in the form of *unreleased orders* until they are released by a trader.

---

[1]. Additional information on the technical architecture is provided in "EBS Story".

## 2.    Introduction to TS and TS(X)

### 2.1.   TS and TS(X)

Two versions of the Trading System are available: the basic version, TS, and the extended version, TS(X). All TS functions are also supported in TS(X) and the TS(X) user interface is totally consistent with TS.

The additional functions of TS(X) reflect additional types of locally administered data as well as enhancements to the user interface, through which the additional data can be input, viewed and updated.



Fig. 2: TS functions are a subset of those supported by TS(X).

As far as the interaction between TS(X) and the Exchange System (ES) is concerned, there is no difference whatsoever between TS and TS(X). TS(X) communicates via the same interfaces with the ES, and uses the same types of orders as TS. A given Exchange member will use either the Trading System (TS) or the Extended Trading System (TS(X)). Because of its extended functions, TS(X) also uses an extended interface (MAPI), through which it can be linked to the member's own applications.

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 2.1.1.  Functions of the TS User Interface

The functions of TS can be grouped in three categories.



Fig. 3: TS Functions. Building upon the basic services of TS, which interact with the Exchange System and store local data, TS offers fundamental trading functions for order entry, trade tracking and the observation of market events.

### 2.1.1.1.  Entering, Changing and Deleting Orders

The TS offers the user a range of interaction methods, through which on-exchange or off-exchange orders can be entered, changed and deleted.

It is important to understand *how* the TS performs these functions. This is not a simple transmission of user instructions to the Exchange system: the TS validates the user's actions and "translates" them, if necessary, into individual or multiple instructions to the Exchange System.

In the case of changes to orders, the TS GUI (Graphic User Interface) ensures that the original order is deleted in the Exchange System and that the user is presented with an order entry dialogue for the substitute order. In fact, the Exchange System itself does not allow an order to be changed. Instead, it supports the deletion and entry of a substitute order.

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Individual user actions may be translated into a series of instructions to the Exchange System. *Market-Making Orders* are an example: the user presses a single button and the TS GUI may transmit a series of orders and/or order deletions to the Exchange System.

One general order management principle is that the Exchange System only transmits the information it actually requires. Conditional orders, for example, are therefore stored locally in the TS and only transmitted to the Exchange System if and when the conditions are met. In certain cases, the TS will also store additional information associated with orders transmitted to the Exchange System. For example, when mass functions are used for order entry, the respective orders are flagged as *Market-Making Orders*. This additional piece of information (*Market-Making Flag*), however, is not transmitted to the Exchange System but stored locally. Thanks to the additional information, the Trading System can identify the orders to be deleted in the event of a mass delete or mass update request.

## 2.1.1.2. Trades

As it does for market observation in general, TS offers the basic instruments for tracking members' own trades and information on their current status. This data is transmitted from the Exchange System to the respective TS (information on trades goes to the TS of each party involved), where it is stored and displayed.

## 2.1.1.3. Market Observation

TS offers a wide range of instruments through which the user can follow and analyse events on the market. It processes broadcast messages from the Exchange System and stores the related data locally.

As it does in the context of order entry, the TS reduces as much as possible any demand for Exchange Sys-

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

tem capacity -- and any need for user action – related to market observation. The data displayed on the user's screen (e.g. on the *Order Book Pane, Market Overview Pane* etc.) has been compiled and displayed based on broadcast messages from the Exchange System. Owing to the automatic storage and continuous updating of data received from the Exchange System, the TS is always in a position to inform the user immediately. When the user decides, for instance, to refresh the *Detailed Order Book Pane*, the Trading System does not need to retrieve the related data from the Exchange System before displaying it.

### 2.1.1.4. MAPI Interface

The MAPI-Interface is not only the foundation on which TS GUI services are based, but is also available as an interface for data interchange with the member's own applications (MOAs – Member's Own Applications).

### 2.1.2. Extended Functions of TS(X)

The extended functions of TS(X) have been designed to answer the user's need in two additional areas: the management of orders and trades on one hand, and the management of positions with profit/loss calculations on the other. Also part of TS(X) is a data interface for the member's internal computer system which supports the typical functions in this context.

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 4: TS(X) Functions. In addition to the trading functions available under TS, TS(X) offers tools for the management of incoming orders, tracking members' own-account transactions and a standardised interface for data interchange between a member's host computer and TS(X).

## 2.1.2.1. Management of Orders and Trades

The functions of TS are related to orders as they are input by the trader and transmitted to the Exchange System, i.e. order as they "leave" the member's trading department.

An additional objective pursued with TS(X) is to record the orders as they "come in" and process them as they take the form of SWX orders and trades.

### Early Recording of Orders

It makes sense to record data directly where it is generated. In an institution of a certain size this means, for instance, that the account executive will input orders in the member's internal computer system. A given order is then transmitted to a trader for validation and from there to the Exchange System for execution. The advantage of this method is to avoid any need for the trader to re-input the order data. The order only needs

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

to be validated or completed with further details to account for the current market situation in the customer's interest.



Fig. 5: Early recording of orders: One of the objectives is the ability to delegate the task of data inputting to those areas where orders are first received. The trader completes the data and decides upon the execution method.

**Partial Orders**

In many cases, the trader has to decide at which point in time orders or partial orders should be entered.



Fig. 6: Partial orders: An incoming order recorded by the Trading Department can be entered in several portions in the form of various partial orders. This may be the most effective way of achieving the best execution price. It is technically possible to execute a portion of the order on-exchange and the rest off-exchange (*Addressed Offer, Reported Trade*). (This must be done in accordance with regulations concerning compulsory on-exchange trading.)

Moreover, the method of execution is often not specified in the order. A given order from a customer or from a portfolio manager can be executed in the form of one or several on-exchange or off-exchange orders.

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Aggregated Orders*

The inverse situation is reflected in the concept of *Aggregated Orders*: a portfolio manager makes an investment decision concerning a large number of managed customer portfolios. For the sake of simplicity, these changes should be reflected in a single order transmitted to the trading department. In this context, there is also a need for pre-trade and post-trade processing of orders.



Fig. 7: Aggregated order: The order received by the Trading Department concerns several customer accounts but should be executed as a single action.

## 2.1.2.2. Trading Book Management and Profit/Loss Calculations

TS supports trading for the member's own account ("nostro trading") by way of a clear distinction between transactions where the member acts as a principal and those where the member acts as an agent. It also offers filter criteria to facilitate the tracking of own-account trading.

With TS(X), the member has the additional possibility of tracking the positions resulting from trades on the member's own account. These positions are aggregated per security and per value date and recorded in trading books.

Swiss Exchange SWX
TS User Manual
Introduction to TS and TS(X)

Page 2-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 8: Trading book management: The positions resulting from trades are grouped in the book in order to value the positions and make profit/loss calculations by department, by trader or by group of traders.

Based on the executed trades and the current market prices, it is possible to calculate the realised and unrealised (potential) profit or loss.

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-1
I-MSC–TSM-200/E
Version 2.0, 31 Dec 98

# 3.    Launching the Trading System's User Interface

## 3.1.    Unix Login

Bianchi reaches his desk just before eight o'clock. All he has to do is switch on his screen. The workstations are never shut down, as the traders do not switch them off.[1]

On the screen, the login dialogue box appears. This box concerns the Unix workstation's operating system (not the trading system), which runs the trading system and various other software applications. Bianchi enters his *User ID* and his password. This action announces his entry into the network of his bank's local data system.

Bianchi's workstation has been configured by the system administrator so that it automatically loads the computer's graphic user interface (Motif) as part of his personal configuration. Therefore, the system launches the applications chosen by Bianchi and the windows and icons appear in the positions he has selected.

In addition to the trading system, Bianchi also launches a number of independent programs (E-mail, news services, clock, etc.). The operating system can manage several programs at the same time.

Bianchi's screen now displays the trading system's graphic user interface, configured according to his preferences. In addition to the *Control Panel*, which enables him to call up any of the trading system's functions, the windows open when the user last gave the *Save* command reappear, still open. Other applica-

---

1. Your bank's internal directives concerning the trading system will determine whether the workstations remain on overnight.

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

tions are displayed as "Icons" in the lower left-hand corner of the screen.



Fig. 9: The workstation screen as it looks on starting GUI. It shows the windows open when Bianchi last gave the *Save* command. Other applications can be run in tandem with GUI. The windows can be moved and their dimensions can be changed, using the mouse.

## 3.2.    User ID and Trader ID

As a SWX-licensed trader, Bianchi has a personal *Trader ID* independent of his employer's ID. This identification is not the same as the *User ID* introduced when logging on to the system. However, given the link between the *User ID – Trader ID*, managed by the

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

system administrator, the trading system recognises the trader's identity.



Fig. 10: ViewLink between *Trader ID* and *User ID*. There is a fixed link between each SWX *Trader ID* and a *User ID* in the operating system. The bank's system administrator attributes this link. The data introduced into the system are always accompanied by the *Trader ID* (and not the *User ID*).

## 3.3.    User-Interface Windows

Whereas many programs possess a central menu and occupy the entire screen when called up, or have only a single window, the trading system displays several windows on the screen. They may be shown side-by-side or stacked one behind the other. In general, they are controlled by a specific menu. Usually, the trading system allows an unlimited number of windows to remain open at the same time.

One of these windows, the *Control Panel*, is always open as long as the trading system's user interface is in operation. The *Control Panel* provides access to all trading system functions. However, this does not imply that all functions must be activated from the *Control Panel*. To simplify the task, the trading system is designed so that a given function, such as the com-

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

mand to open an *Order Entry Window,* can be issued in a variety of ways.



Fig. 11: The *Control Panel* provides access to all trading system functions. The windows opened from the *Control Panel* contain other menus.

### 3.3.1.  Views and Panes

When a user presses the "Open" *button* on the *Control Panel*, he sees a selection window containing various *Views*, which he can choose to display stock market data on the screen. The user can create an unlimited number of *Views* and attribute names to them. When he is working, it is enough to show the *View* he currently needs on the screen. To gain space, he can also reduce them to icons, which will remain active.



Fig. 12: Views selection window. An unlimited number of *Views* can be opened simultaneously. The user can attain the selection window via the *Control Panel.*

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Not only does the trading system allow trading in a large number of stocks, it also provides information on each of these stocks, the orders entered, executed trades, etc. That is why the trader can include the information he needs in his *Views*. A *View* is a data consultation window composed of one or more sub-windows or *Panes*.



Fig. 13: Example of *Views*. Each *View* may be composed of one or more *Panes*. The user attributes the names of the *Views* and *Panes*. He also defines the stock to which the *Pane* corresponds.

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Panes* give an overall view of the market, trades, order cancellations, etc. for one or more stocks. *Panes* may be configured individually.



Fig. 14: Outline of data viewing apertures created by the user. *Panes* resemble building blocks placed by the user to provide a specific view of the market (hence the term "View").

The trading system provides the user with a range of different *Panes*, which he can modify to create tailor-made versions adapted to his needs. Bianchi has adapted the *Market Overview* model to define a number of *Panes*, each of which covers several of the stocks he follows: for example, the *"Chemicals Market Overview Pane"* allows him to survey that sector of the market. Other *Pane Types*, such as *Order Book*, refer to a single stock. Consequently, Bianchi has defined several *Views* based on the "Order Book Pane", to provide information on the stocks he trades regularly.

*Bianchi has grouped related panes (e.g., those concerning the same stock) into Views.* He attributes a name to each of these *Views*.

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 3.3.2. View Characteristics

To open a *View*, Bianchi often uses the *Control Panel*, by clicking with the mouse on the *Open* button.

The *View* contains a Menu from which all trading system functions can be opened. When the user clicks on an option, a menu rolls down *(Pulldown Menu)*, so that the user can select various options.



**Fig. 15:** *Pulldown Menus* contained in *Views*. All *Views* have the same options, grouped into five categories. Some Menu options are also available in other windows: for example, "Open" also appears on the *Control Panel*.

The options in the *View Pulldown Menu* (with the exception of "Print" and "Close") are not specific to the open *View*. They appear in all *Views* in order to facilitate access to the key functions at all times.

Open *Views* can be *moved, reduced in size or enlarged using the mouse*. In addition, by clicking on the corresponding button the user can maximize a *View* to occupy the entire screen or reduce it to an icon (minimize).

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 16: Maximise and minimise. A trader can enlarge a view or reduce it to an icon *by clicking* with the mouse.

### 3.3.3. Features of Panes

When a user opens a *View*, the trading system adapts the size of the various *Panes* that it contains to fit the available space. In principle, the height of the *View* is divided into equal parts according to the various *Panes*, but the trader can change their vertical dimensions with the mouse.

However, the contents of a pane are not always fully visible on the screen. In that case, *scrollbars* automatically appear. They allow the user to shift the contents of the screen from left to right and up or down.

Moreover, using the pop-up menu in each *Pane*, the user can activate the functions attributed to the *Panes*. The pop-up menu is not normally visible and must be activated by clicking the right-hand mouse button.

Note: For reasons of spacing, the disposition of the *Pane* columns in the User Guide may differ from those adopted by the trading system.

### 3.3.4. Other Windows

In addition to *Views*, the trading system also proposes data-input and data-reference windows, which the trader can open from the *Pulldown Menu in the View*. They are used for entering orders and displaying reference data managed by the exchange.

Case 1:08-cv-02412      Document 21-19      Filed 06/04/2008      Page 26 of 250

Swiss Exchange SWX
TS User Manual
Launching the Trading System's User Interface

Page 3-9
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



**Fig. 17: Pop-up Menu and *Scrollbar*.** The Pop-up menu offers all functions available in the active *Pane* or for the data selected therein. *Scrollbars* only appear where the *Pane* is too high or too wide to display all its lines or columns on-screen.



**Fig. 18: Examples of data-input and data-reference windows.** Like *Views*, the data-reference windows sometimes contain a menu list.

The names of the various windows are attributed by the system and cannot be changed by the user. Furthermore, unlike *Views*, the size of data-input windows usually cannot be altered.

## 3.4.  On-line Help

If a user does not know where to find a given item of information or how to execute a specific function, the trading system's "Help" file is there to solve the problem. The trader clicks on *"Help"* in the *Control Panel* or opens the *Help Pulldown Menu* of a *View.*



Fig. 19: Trading system's on-line help. Users can access topics via menus corresponding to chapters of the User Manual, references or the search function.

In addition to the possibility of choosing a topic from the list displayed in the help window, the system also answers questions based on keyword searches. To perform a keyword search, the user simply types in the first few letters of the word. The program then displays a list of possible keywords, one of which the user can select. The names of all windows and the titles of the various menus are included in the keyword list.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 4.    Market Situation before Opening

After the morning's section meeting, at 9:30 a.m., Bianchi checks the pre-registered orders entered via the bank's internal computer system (host) by the investment advisors and portfolio managers to discover whether he has orders to enter in the book during the pre-opening.

At Banca del Monte Rosa, investment advisors and portfolio managers enter orders directly into the host. From there the orders are routed to the trading system. Traders can now view them as *Unreleased Orders*. *Unreleased Orders* are pre-registered orders which have not yet been processed by a trader (either on- or off-exchange) and which therefore have not been executed. They form the basis for the orders the trader enters into the system.

All *Unreleased Orders* can be viewed in the *Unreleased Orders Ticker Pane*, where they are available for further processing.

Stock trading will open at 10:00 a.m. (*Opening*); for the moment, the stock market is still in the pre-opening phase. Bianchi has another 30 minutes to enter or change orders that might have an influence on the *Opening*.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 20: This is Bianchi's personally configured trading screen. He uses two *Views* (Bianchi1 and Bianchi2), which he has composed, according to his own needs, of the *Market Overview Pane, Order Book Pane, Detailed Order Book Pane* and *Unreleased Orders Ticker Pane, Personal Orders Ticker Pane* and *Personal Trades Ticker Pane*.

## 4.1. Unreleased Orders

On his trading screen, Bianchi has opened the Bianchi2 *View*, containing the *Unreleased Orders Ticker Pane*.

At Banca del Monte Rosa, each trader is in charge of specific stocks; Bianchi is responsible for S Holding and B Chemie. Therefore, his *Unreleased Orders Ticker Pane* is configured to show only *Unreleased*

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Orders* for the relevant stocks. The *Unreleased Orders Ticker Pane* is a dynamic *Pane* which is automatically updated.

Bianchi can see that, via the host, portfolio managers have entered two orders concerning S Holding stock and one concerning B Chemie into the trading system.

He wishes to execute these orders on the exchange as there will be no possibility of doing so off-exchange over the next half hour.

*Original Size* and *Unallocated Size* are identical because the order has not yet been processed by Bianchi.



Fig. 21: *Unreleased Orders Ticker Pane*. This pane shows the *Unreleased Orders* for a specific selection of securities *(Display Profile)*. If the *Profile* of an *Unreleased Orders Ticker Pane* of another trader of the bank also contains these stocks, his screen also displays such *Unreleased Orders*.

## 4.2.   Market Overview

To decide which orders he wants to enter during pre-opening, Bianchi consults the *Market Overview Pane*, on which he can see the "Inside Market", i.e. the best bid and ask prices for several selected stocks, among others S Holding and B Chemie. The information display also shows the theoretical opening price, i.e. the price at which orders would be executed if the market were to open immediately. This price is calculated and displayed upon each change in the order book. Like the *Unreleased Orders Ticker Pane*, the *Market Overview Pane* is a dynamic *Pane*, which is updated automatically.



Fig. 22: *Market Overview Pane.* This pane displays the Inside Market for the stocks selected by the trader. During pre-opening, the "Opng" column indicates the theoretical opening price.

Concerning S Holding, Bianchi notes that a total of 300 shares are sought at the best bid price, i.e. 501.00. On the other hand, 200 shares are offered at the same price. The bid column for B Chemie contains 2'000 shares at 225.00 and the ask column 500 at 224.00. This situation is possible because we are still in the pre-opening phase; during opening and continuous trading, a trade would of course have taken place.

Bianchi expects the price for B Chemie to fall during continous trading and therefore decides not to intervene on the stock during pre-opening. However, it appears to be interesting to enter at least part of the buy order for S Holding during pre-opening, so that the order is taken into account during opening.

Because Bianchi's buy order is likely to exceed the available size for the best ask price in the market, Bianchi is interested in learning the market depth, i.e. the volume of other orders in the book.

## 4.3.   Viewing the Order Book

Bianchi takes a look at the order book for S Holding by consulting the *Order Book Pane*, which displays all orders contained in the book. In this display, all orders for the same price are cumulated; to the left of the price column is the bid size and to the right the ask size.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 23: *Order Book Pane* during *Pre-Opening*. The highest bid price and the lowest ask price are identical to those displayed in the *Inside Market* of the *Market Overview Pane*.

Bianchi decides to enter only part of his buy order for a total of 1'000 S Holding shares, i.e. 400 units at 502.00. In the current order book situation, this limit order represents the best bid price.

## 4.4.    Entering a buy order before the start of trading (Release)

Since the portfolio manager has already entered almost all the information required for this order and stored it in the trading system, Bianchi can enter the order quickly into the system without having to type it in again.

To enter the order *(Release)* Bianchi uses the *Drop Site Pane,* which he has previously configured in a *Drop Site View,* which he keeps open at all times.[1]

---

1.  Bianchi could also release this order via the pop-up menu of the *Unreleased Own Orders Enquiry Pane,* which will be discussed in detail in Chapter 7.

Case 1:08-cv-02412    Document 21-19    Filed 06/04/2008    Page 33 of 250

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 24: *Drop Site Pane*. The individual fields allow the trader to enter, delete or replace orders quickly.

To enter the order into the trading system, Bianchi selects the corresponding *Unreleased Order* in the *Unreleased Orders Ticker Pane* with the left mouse button. Then he clicks on the middle mouse button, displaying the SWX icon and opening a window which displays the selected data. Keeping the mouse button down, he drags the SWX icon onto the "Normal Buy Input" field of the *Drop Site Pane* and releases the mouse button.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 25: *Drop Site Pane* and *Unreleased Orders Ticker Pane*. Bianchi selects the order to be processed in the *Unreleased Orders Ticker Pane* and drags it to the "Normal Buy Input" field. This opens a pre-configured *Order Entry Window*.

An *Order Entry Window* containing the information entered previously opens automatically.

Case 1:08-cv-02412     Document 21-19     Filed 06/04/2008     Page 35 of 250

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi has to adjust the
order size

*Unreleased Order No* indicates
that the order entered refers to
an *Unreleased Order*



Information is supplied automati-
cally on opening the *Order Entry
Window*

Internal bank reference (sent to
the Exchange System but not to
other exchange members)

Memorandum text field. May
contain additional information
on the order, e.g. information
from portfolio managers to the
trader (not transmitted to the
Exchange System)

By clicking on "Sub-
mit", the order is
entered in the system

Fig. 26: *Order Entry Window.* When an order is released, information entered beforehand is automatically dis-
played in the *Order Entry Window.* If necessary, the trader can simply change or complete this information.

All information required, except for the order size, is
already supplied in the *Order Entry Window.* For the
order size, the trading system will automatically indi-
cate the portion of the order that has not yet been pro-
cessed by the trader, i.e. the volume displayed in the
"Unall Size" column *(Unallocated Size)* of the *Unre-
leased Orders Ticker Pane.* In the present case, the
volume automatically displayed is identical to the full

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-9
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

order size, since Bianchi has not yet processed this order.

Bianchi therefore changes the order size to 400 shares. He uses the mouse to do so. For each entry field, he is of course free to choose the tool which is most convenient for him – mouse, keyboard or both.

Using the left mouse button, he first clicks on the "Clear" button to delete the figure automatically supplied, then clicks four times on the button "+100" to bring the order size to 400.



Fig. 27: To adjust the order size, Bianchi clicks four times on the "+100" button: at each click, the size is increased by 100, up to the desired size of 400.

Once the size has been raised to the desired figure, the order is ready for transmission to the Exchange System. To do so, Bianchi clicks with the left mouse button on the "Submit" button in the *Order Entry Window*.

Once the *Submit button* has been clicked on, the text in the *Order Entry Window* changes to grey until the Exchange System has acknowledged receipt of the order entry. To avoid duplicate orders, the *Order Entry Window* remains blocked completely for some time. The order identification number is displayed in the *Message Area*.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-10
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 28: *Message Area* within the *Order Entry Window*. Once the Exchange System has acknowledged receipt of the order, this area displays the order identification number. The trader thus recognizes that the order has been processed by the system. He can now enter new orders.

Because the order is now registered in the book, all members can view it on the corresponding *panes* (e.g. *Order Book Pane* and, if applicable, *Market Overview Pane*).

Bianchi takes another look at the *Order Book Pane*. He sees that the new order stands at the top of the bid list in the book (principle of price priority).



"Own Order Flag". This bid price corresponds to an own order and is therefore identified by an asterisk.

Fig. 29: Modified *Order Book Pane*. The newly entered order is the first on the bid list. The asterisk indicates that this price corresponds to the client or nostro orders of the bank's own member. Because we are still in the *pre-opening* phase for this stock, the best bid price can be equal to or higher than the best ask price. In continuous trading, this situation would immediately result in a trade.

On the *Unreleased Orders Ticker Pane* Bianchi can also see how far the *Unreleased Order* has already been processed and which portion has been executed. The current data is displayed in the last line, which is added at the bottom of the list.



The first line is displayed in grey, as this data is no longer up to date.

The *Open Size* is 400, i.e. the book still contains an order for 400 shares. The Open Size column displays the orders that are still open in the system.

In the *Unall Size* column Bianchi can see which portion he has not yet processed (600 shares).

Fig. 30: *Unreleased Orders Ticker Pane.* In the columns *Executed Size*, *Open Size* and *Unallocated Size*, the trader can see which portion of the order has already been executed, which portion is still in the book and which portion has not yet been processed.

## 4.5.    Introduction of a Sell Order before the Start of Trading

Bianchi keeps in direct touch with some of his institutional clients. At 9:45 a.m., one of his clients calls to tell him that he wishes to sell 200 S Holding at 503.00, valid until the end of the day (End of Day).

Over the *Order Entry Window* Bianchi can enter this order directly into the system as an *Unreleased Order.* By clicking the "On Exchange" button in the menu bar of the Bianchi1 *View,* he calls the *Pulldown Menu* up on the screen. To open the *Order Entry Window, he* then clicks on "Order...".



Fig. 31: *On Exchange Pulldown Menu.* By clicking on the option "Order...", an empty *Order Entry Window* is opened.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-12
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

When the *Order Entry Window* opens, it is automatically configured for the entry of a buy order ("Buy" is selected) and all input fields are empty. Because he wants to enter a sell order, Bianchi first clicks on "Sell". At the same time, the background color of the input fields for size and price changes in order to avoid mistakes.

Bianchi enters the symbol for S Holding in the input field next to "Security..." and the name of the share is automatically displayed in the same field.

He could also enter the abbreviation or part of it. If the text he has entered can be clearly identified as referring to S Holding, the text field displays S Holding. If the trading system is unable to identify the security unequivocally, it indicates the various possibilities and Bianchi has to select the one that is correct.

If he prefers to use the mouse, Bianchi has two possibilities: he can either click on the *Security* button and select S Holding AG in the *Security Selection Window* or change the *Security* field with the function *Drag & Drop*. To do so, he selects S Holding in the *Market Overview Pane* (or another *pane*) and, pressing and holding down the middle mouse button, drags it onto the *Order Entry Window*.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-13
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



When clicking with the middle mouse button on the name of a security (e.g. S Holding), the name appears in a separate window

Clicking here displays the *Security Selection Window*

Fast entry of a selected security in the *Order Entry Window* can be achieved by clicking on the security name and dragging and dropping the SWX icon onto the Window

Field where the user can enter symbol, abbreviation, security number or ISIN-number of the share via the keyboard

Options that are only displayed in the *Full Order Entry Window*.

Shrink to *Brief Order Entry Window*

Fig. 32: *Full Order Entry Window* containing the information required for our example. The additional options with respect to the *Brief Order Entry Window* have been set to the trader's ordinary requirements.

Having selected the security, Bianchi is free to choose the order in which he enters the other information. Only the order size (200), the price (503.00) and possibly an internal bank reference are missing.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-14
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 33: Using the mouse to enter the price. The client wishes to sell at 503.00 Bianchi can therefore simply click on the "Best Offer" button (displaying 501.00) and click twice on the arrow pointing upwards situated to the right of the price field. The price is thus increased to 503.00.

The additional information displayed in the *Full Order Entry Window* has been set to the standard Bianchi usually requires. He normally works with *Normal Orders* (order type button – Normal), which are valid until the end of the day (validity button – End of Day). Furthermore, he usually trades client orders (Nostro has not been selected) and does not wish his bank to appear as member together with the orders entered in the order book *(Disclose* has not been selected). These indications also apply for the buy order in question and he therefore does not need to make any changes.

Since all information required for this sell order has been entered, Bianchi can transmit it to the Exchange System by clicking on the "Submit" button.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-15
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



**Fig. 34:** The *Order Entry Window* (here *Full Order Entry Window*) is used to enter an order directly into the Exchange System. The *Unreleased Flag* has not been selected because the order is to be transmitted directly to the system.

Having entered this new order, Bianchi takes another look at the order book using the *Order Book Pane*. The theoretical opening price (displayed in the *Market Overview Pane*) has not changed.

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-16
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 35: Modified order book (in its *pre-opening* situation) after order entry. Entering the ask price of 503.00 for 200 shares increases the cumulated size from 300 to 500.

In the *Order Book Pane* Bianchi can see that the book contains other orders at 503.00. He would like to know the position of his client order in the book and therefore takes a look at the *Detailed Order Book Pane*, which displays the individual orders. Contrary to the *Order Book Pane*, the *Detailed Order Book Pane* does not continuously display the latest changes. In order to obtain up-to-date information, Bianchi must "Refresh" the *Detailed Order Book Pane*.

To do so, he positions the mouse cursor anywhere on the *Detailed Order Book Pane*, opens the pop-up menu by clicking with the right mouse button and selects "Refresh".

Swiss Exchange SWX
TS User Manual
Market Situation before Opening

Page 4-17
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 36: *Detailed Order Book Pane*. Contrary to the *Order Book Pane*, where orders at the same price are cumulated, the *Detailed Order Book Pane* displays each individual order according to price and time priority.

From the current order book situation, Bianchi can read that his sell order for 200 shares at 503.00 ranks after a previous sell order for 300 shares at the same price (time priority principle). If the market opened in the current order book situation with an opening price of 502.00, Bianchi's last client order would not be executed.

Stock trading opens at 10:00 a.m. The individual shares open according to a random selection procedure within a time span of two minutes. Bianchi therefore does not know to the second when trading in S Holding opens. All orders entered before trading in a given stock opens are taken into account during the opening. Orders entered into the system after opening are directly taken up in continuous trading.

Swiss Exchange SWX
TS User Manual
Opening

Page 5-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 5. Opening

At 10:01:15, the S Holding stock opens. Bianchi recognises this on the *Market Overview Pane*.



*Order Book State:* S Holding was previously listed with status "Pre" *(Pre Opening)* and has now changed to "Trd" *(Trading)*

Depending on *Order Book State – Trd or Pre* – this field shows either the opening price or the potential opening price

Fig. 37: *Market Overview Pane.* S Holding has now switched over to trading status. The stocks Noname and ABC have also entered the trading period.

## 5.1. State of the Order Book directly after Opening

The change of the order book during the opening cannot be followed on the screen because the opening takes place at a single point in time and all trades are executed at the same price, the opening price. The matching rules applied in this context are discussed in Chapter 15.

Swiss Exchange SWX
TS User Manual
Opening

Page 5-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

```
                    Detailed Order Book Pane
 S Holding
 Member   O B Size      Price    S Size  O  Member
                        505.00    300
                        505.00    100
                        503.00    200   *
                300     501.00
                100     500.00
                200     499.00
 BCS LG         100     498.00
                100     497.00
                100     497.00
```

Fig. 38: *Detailed Order Book Pane* directly after the opening. During the trading period, the best bid price is always lower than the best ask price. If this were not the case, a trade would be triggered immediately. The type of constellation seen in the Pre-Opening period is no longer possible here.

## 5.2.    Personal Trades and Personal Orders after Opening

Bianchi would like to see which of the orders he entered have been executed. He takes a look at the *Personal Trades Ticker Pane.*



An "O" in the trade number means that the trade has been made through the *Matcher*

These trades are the result of one and the same order

```
                        Personal Trades Ticker
 Security   B/S  Size   Price   Val Date  Cl  Bank Ref        Trade No        Order No
 S Holding   B   200   502.00    15Apr       3002222    02444O0000001980      2221
 S Holding   B   200   502.00    15Apr       3002222    02444O0000001981      2221
```

Fig. 39: *Personal Trades Ticker Pane.* The order number *(Order No)* is the same for both partial trades, while there are two consecutive trade numbers *(Trade No)*.

Unlike *enquiry panes,* the *Personal Trades* and the *Personal Orders Ticker* are dynamic panes which display the latest data without any need to issue a Refresh[1] command. As soon as one of the orders

Swiss Exchange SWX
TS User Manual
Opening

Page 5-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi entered into the exchange system has been executed, the *Personal Trades Ticker* automatically adds a new row at the end.

In the row of the executed buy order on the *Personal Orders Ticker*, the flag "Mch" has been added in front of the title. This means that the respective order is no longer in the order book because it has been executed. The last sell order entered by Bianchi does not have anything displayed in front of its title, which means that it is still in the order book and has not yet been executed.

This order has been matched and is no longer in the order book

The current *(Cur Size)* and the original size *(Org Size)* of the order are the same because the order has not yet been executed, nor partially executed. In the case of partially executed orders, the current size is smaller than the original size.



Fig. 40: *Personal Orders Ticker* after the opening. Orders which are no longer in the order book because they have either been executed or deleted are displayed in grey. The first column indicates why the order is no longer in the order book (reason for deletion).

Bianchi also checks the *Unreleased Orders Ticker Pane* to make sure that this trade relates to the *Unreleased Order*, and to see the size of the portion of the order that remains to be processed.

1. The equivalent *Enquiry Pane* to the *Personal Orders Ticker* is the *Own Open Orders Enquiry Pane* and that corresponding to the *Personal Trades Ticker* is the *Own Trades Enquiry Pane*. These *Enquiry Panes*, unlike the *Ticker Panes*, show not only the trades for a given trader but also all orders and trades of the member within the selected *Display Profile* on that day (if no filters are used). In the *Own Trades Enquiry Pane* there is also a column named "Member" showing the counterparty with whom the trade has been made.



Swiss Exchange SWX
TS User Manual
Opening

Page 5-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



The row that is no longer valid appears in grey

The *Executed Size* is 400, i.e. the displayed portion of the order has already been traded

The *Unallocated Size* is 600, that portion of the order has not yet been processed by Bianchi

Fig. 41: *Unreleased Orders Ticker Pane.* The row with the latest data is added below while the row that is no longer valid appears in grey. The trader can always clearly see which portion of the order remains to be processed, which portion has been executed and which portion is still in the order book.

Bianchi will try to trade the remaining 600 shares during continuous trading.

In addition to S Holding, the other stocks are now also in the trading state, unless a given stock has not opened. This can be caused by a *Non-Opening* condition (market order overflow) or by a *Stop Trading* condition (price change in excess of a certain fixed margin). While in the case of a *Non-Opening* condition each change in the order book triggers a new opening procedure, trading is suspended for 15 minutes in the case of a *Stop Trading* condition.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 6. Continuous Trading

## 6.1. Market Observation

After the beginning of the trading period for stocks at
10:00 a.m., it is important for Bianchi to follow the lat-
est market developments and to react immediately to
certain events. Therefore, he opens the "Bianchi Mar-
ket" view, which he has set up for his specific needs
and which displays the market data most important to
him. As far as other market observation pane types
are concerned, Bianchi only uses them in special
cases, which is why they are not further described
here[1].

---

1. These are the *Rolling Market Overview Pane*, the *Last Paid Price Pane* and the *Trade History Enquiry Pane*. In part,
they are explained further down in this manual or in the TS Reference Manual.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 96



Fig. 42: Trading screen as configured by Bianchi for continuous trading. It contains a *view* called "Bianchi Market" with *Market Overview Pane*, *Pop-in Market Overview Pane*, *Trade Ticker Pane* und *Newsboard Pane* as well as a *view* named "Bianchi Market 2" including a *Drop Site Pane*, *Order Book Pane*, *Personal Orders Ticker Pane*, *Personal Trades Ticker Pane* and *Unreleased Orders Ticker Pane*.

### 6.1.1. Market Overview Pane

Bianchi has already been using the *Market Overview Pane* during the pre-opening phase (which is why its contents do not need to be explained here).

He does not wish to see the stocks named Noname and Muster any more, but he would like to see market data on the XYZ stock. For this purpose, he has configured a *display profile*, i.e. a selection of securities, under the name of "CH Stocks Chemical & Pharma"[1].

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 43: The selection window for display profiles, opened through the Pop-up menu.

In order to change the *profile* assigned to the current pane, he activates the Pop-up menu with a mouse click (right button) while the mouse is positioned on the *Market Overview Pane*. From there he selects the "Profile" option. A selection window appears, displaying the *Profiles* he has configured previously, and he selects the one called CH Stocks Chemical & Pharma *Profile*.

All stocks are now in continuous trading status

| Security | T | B Size | B Price | S Price | S Size | Last | TS | Opng |
|----------|---|--------|---------|---------|--------|------|-----|------|
| S Holding | T | 300 | 501.00 | 503.00 | 200 | 502.00 | Trd | 502.00 |
| B Chemie | | 400 | 820.00 | 821.00 | 450 | 821.00 | Trd | 821.00 |
| ABC | | 120 | 784.00 | 786.00 | 100 | 780.00 | Trd | 785.00 |
| XYZ | | 500 | 221.00 | 226.00 | 300 | 223.00 | Trd | 223.00 |

Fig. 44: *Market Overview Pane* during continuous trading showing the stocks selected through the profile named "CH Stocks Chemical & Pharma". The scroll bar shows that there are additional columns available in the *Market Overview Pane*.

1. The subject of user configuration is covered in Chapter 12 of the TS User Manual.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 6.1.2. Pop-in Market Overview Pane

For stocks which he does not trade on a permanent basis (e.g. T Tech, BB Holding and C Chemie), Bianchi keeps open a *Pop-in Market Overview Pane* which has the same columns as the *Market Overview Pane*.

Contrary to the *Market Overview Pane*, however, the *Pop-in Market Overview Pane* shows the *Inside Market* for a given stock only if a given interest threshold specified by Bianchi has been exceeded. The interest threshold is specified with respect to the combined volume of orders at the best bid price multiplied with that price, or the combined volume of orders at the best ask price multiplied with that price[1] respectively. Bianchi has left the threshold at the default value specified in the *User Preferences Entry Window*[2], i.e. 100'000. Had he entered "0" instead, the entire *inside market* for all securities in the selected profile would be displayed, as on the *Market Overview Pane*.



Fig. 45: *Pop-in Market Overview Pane.* The trader sets the interest threshold, which determines the minimum volume for which market data should be displayed, as well as the time interval (activity time) during which the data should be visible on the screen. The threshold has not been exceeded for the securities T Tech and B Chemie, which is why their market data is not shown at this moment.

Bianchi has also specified in the *User Preferences Entry Window* that the respective data should be displayed during 15 minutes after the threshold has been exceeded. If the data concerning the security changes

---

1. For bonds, the value threshold refers either to the cumulative volume at the best bid price or at the best ask price.
2. The user configuration is discussed in greater detail in Chapter 12 of this Manual.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

during the 15 minutes, the new values are shown. Whenever the change results in a value above the threshold, the activity time count (15 minutes) starts over. If there has been no change, or if it has been below the threshold, the line is no longer displayed after 15 minutes. Traders who prefer to maintain those lines on display can set the activity time to 0.

At this moment, the pane only shows the inside market for the stock BB Holding. This means that the threshold has not been exceeded for the other securities in the profile.

### 6.1.3. Trade Ticker Pane

In addition to following the market overview, Bianchi would like to be informed about all trades taking place for a given selection of securities *(Profile)*. As explained above, it is possible to change the securities displayed *(Display Profile)* through the Pop-up Menu which can be activated by clicking the mouse on the *Trade Ticker Pane*.

The *Trade Ticker Pane* shows all the paid prices and volumes in chronological order for a given *display profile*. If a paid price is followed by another trade at the same price, the price appears again with the respective volume. New trades are automatically appended at the bottom of the list while the preceding lines move upwards.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 46: *Trade Ticker Pane*. The records are displayed in the chronological order of trades. New trades are appended automatically because the Trade Ticker is a dynamic pane.

### 6.1.4. Newsboard Pane

The *Newsboard Pane* provides Bianchi with messages on traded securities as well as broadcasts from the exchange system. The language (French, German and English) can be selected by the user.



Fig. 47: *Newsboard Pane*. The latest messages are displayed as they are received by the trader and appended at the bottom of the *Newsboard Pane*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi has also configured this pane so that he can see only those *Security Events* relating to stocks he is interested in. The change of securities covered is also performed via the Pop-up menu.

The first row shows general information with respect to the message, such as date, time, keyword and serial number. Urgent or important messages are marked with a "U" (Urgent flag) on the left.

The second row shows the message itself. If the message exceeds the length of the row, the additional rows can be viewed via the Pop-up menu or by double click and appear in a separate window.

## 6.2.   Order Book Overview

At the beginning of the trading period, Bianchi received additional orders from portfolio managers for the S Holding stock. The orders appear as *Unreleased Orders* on his screen. Before processing the orders and entering them into the exchange system, Bianchi takes another look at the Detailed Order Book Pane after updating it with the *Refresh* command. It is possible that other traders have entered more orders in the meantime.

| Detailed Order Book Pane | | | | | | |
|---|---|---|---|---|---|---|
| S Holding | | | | | | |
| Member | O | B Size | Price | S Size | O | Number |
| | | | 505.00 | 300 | | |
| | | | 505.00 | 100 | | |
| | | | 503.00 | 400 | | CBankZH |
| | | | 503.00 | 200 | * | |
| | | | 502.00 | 200 | | |
| | | 300 | 501.00 | | | |
| ABankGE | | 100 | 500.00 | | | |
| | | 300 | 500.00 | | | |
| | | 200 | 499.00 | | | |
| BDE LG | | 100 | 498.00 | | | |

Fig. 48: *Detailed Order Book Pane* during continuous trading. The order marked with a star has been entered by Bianchi. The order book is no longer in the same state as immediately after the opening because additional orders have been entered by market participants.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 6.3. Normal Order

After the market opening, an order for S Holding securities came in from a portfolio manager in addition to the *Unreleased Orders* already received before the opening.



Newly entered
*Unreleased Order*

Memorandum Text can contain remarks or instructions from the portfolio manager to the trader. Here it instructs the trader to call after executing the order.

Fig. 49: *Unreleased Orders Ticker Pane.* When this pane is opened, its content is equivalent to that of the *Unreleased Own Orders Enquiry Pane.* In the *Unreleased Orders Ticker Pane,* a new updated row is appended automatically (without the "Refresh" command) whenever a change in *Unreleased Orders* occurs (e.g. because an order has been executed). The color of any row no longer valid changes to grey.

Before entering the orders in the exchange system, Bianchi determines which of them should or should not be executed immediately, given the current state of the order book. He also thinks about how other traders might react to these orders.

Bianchi decides to process two of the *Unreleased Orders* in the following manner:

1. Buy 600 S Holding stocks at 502.00, order valid for the day (this corresponds to the as yet unprocessed portion of the *Unreleased Order).*

2. Sell 300 S Holding stocks at 503.00 (newly arrived *Unreleased Order).*

The orders to be input are *normal orders.* They are entered with a price limit (*limit order*)[1] into the exchange system.

1. See also *EBS Story.*

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-9
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 6.3.1. Release of an Unreleased Order in Continuous Trading

In order to *release* an *Unreleased Order,* Bianchi uses the *Drop Site Pane* as he did during the pre-opening phase. This pane is already displayed on his screen (Bianchi2 *View)*[1].

He starts with the buy order because it may result in a partial execution.

First, he selects the *Unreleased Order* to be processed by clicking on the left mouse button.



Fig. 50: *Drop Site Pane* and *Unreleased Orders Ticker Pane. The* order to be processed is selected in the *Unreleased Orders Ticker Pane* and dragged to the "Normal Buy Input" field, using the mouse. A pre-configured *Order Entry Window* opens automatically.

---

1. The Pop-up Menu of the *Unreleased Own Orders Enquiry Pane* (as explained in Chapter 7) also contains a "Release" command.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-10
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

He then clicks on the middle mouse button, which causes an SWX icon to appear along with a small window displaying the selected data. While holding down the mouse button, he drags the SWX icon onto the "Normal Buy Input" field of the *Drop Site Pane* and releases the mouse button.

This causes the *Order Entry Window* to open automatically with the data of the *Unreleased Order*. The order size is equal to the "Unall Size". The fact that this order entry relates to an *Unreleased Order* is visible from the number shown in the title bar of the *Order Entry Window* ("Unreleased Order No 555").



Fig. 51: *Order Entry Window*. The *Unreleased Order No* in the title bar shows that the order entry is related to an *Unreleased Order*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-11
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The values automatically set in the *Order Entry Window* (e.g. price and size) already correspond to the order, so that Bianchi does not make any changes and sends the order to the exchange system by clicking on "Submit".

After noting the order number in the *message area* of the *Order Entry Window*, he closes it and can proceed to enter the sell order in the same fashion.

The *memorandum text* field shows that the portfolio manager wishes to be informed as soon as the order has been executed.



Fig. 52: *Order Entry Window*. The *validity* value in the automatically generated *Order Entry Window* is the same as that of the *Unreleased Order*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-12
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi would like to limit the validity of the order he is about to enter so as to make sure that it is valid only until the end of the continuous trading period. He therefore changes the field to "End of Day". All other data remains unchanged. Bianchi clicks on "Submit" to transmit the order to the exchange system. The arrival of the order is confirmed by the exchange system in the form of the order number appearing in the window.

Bianchi can immediately tell from the new rows in the *Unreleased Orders Ticker Pane* that the buy order has been partly executed and that the sell order is still in the order book.



Fig. 53: *Unreleased Orders Ticker Pane*. The last rows indicate the current status of *Unreleased Orders*. When a book order is executed, a new row is added automatically, showing the new executed volume ("Exec Size").

The entire sell order is still in the order book, whereas the buy order of 600 S Holding stocks at 502.00 has been partly executed so that the remaining size (400) is now shown in the order book.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-13
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



The purchase order only
appears with the remain-
ing size because it has
been partially executed

Fig. 54: *Detailed Order Book* after the entry of the two customer orders.

The executed orders also appear as new lines in the
*Personal Trades Ticker Pane.* The *Trade Ticker* shows
the price paid along with the volume.



This field remains
empty for on-
exchange trades

"B" means that the
member itself is the
buyer in this transac-
tion

Fig. 55: *Trade Ticker Pane.* The order entered by Bianchi has been executed immediately and appears at the bot-
tom of the *Ticker Pane.*

### 6.3.2.  Entry of a Normal Order via "Input" Drop Sites

Bianchi can also use the *drop sites* shown in the
Bianchi2 *view* to enter orders directly – without going
through an *Unreleased Order.*

The S Holding order book has changed after Bianchi's
last order entry because of the entering and deletion of
orders by other traders.

Bianchi receives a call from a customer enquiring
about the market for S Holding stocks. He would like to
know if he should sell the S Holding stocks currently
held in his portfolio.

After getting more information from Bianchi, the cus-
tomer decides to offer 50 S Holding stocks at 502.00.

In order to input this limit sell order, Bianchi uses the
*drop sites* already shown on his screen as well as the
*Detailed Order Book Pane.*



Fig. 56: *Drop Site Pane* and *Detailed Order Book Pane.* Dragging the selected data on the *Normal Sell Input*
opens an *Order Entry Window* for a sell order, irrespective of whether the data was selected on the buy or the sell
side. *Security* and prices are automatically set to the selected data; only the order size need be entered manually.

Bianchi first selects the S Holding buy order at 502.00
in the *Detailed Order Book Pane* by clicking with the
left mouse button. The data selection could also be
performed on the *Order Book Pane.* As the selected

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-15
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

buy order represents the best bid price, it would also be possible to select the same data from the *Market Overview Pane* (BSize or BPrice Column) in the same fashion.

As in the case of *releasing* an *Unreleased Order*, Bianchi presses the middle mouse button and drags the SWX Icon to the "Normal Sell Input" field of the *Drop Site Pane* where he releases the mouse button.

This opens an *Order Entry Window* which is already configured for the entry of a sell order of S Holding stocks at 502.00. He need only set the size of the order to 50 shares and add the internal Bank reference, if required.

The order is transmitted to the exchange system by clicking on the *Submit* button. The message field thereafter displays the confirmation from the exchange system.

The order was executed immediately and will not, therefore, appear in the *Detailed Order Book Pane* for S Holding, but it will show in the *Personal Trades Ticker Pane* and in the *Trade Ticker Pane* (at the bottom of the window). In the *Personal Orders Ticker Pane*, Bianchi can also see from the "Mch" flag at the beginning of the row that the order has already been executed.

### 6.3.3. Input of a Normal Order via Drop Sites – All

Later in the day, investment advisor Sabine des Saules calls Bianchi on behalf of one of her customers to find out about the *inside market* of S Holding, as she is not currently in front of her terminal. Her customer decides to buy 200 at 503.00, which corresponds to the best ask price. In the event of a partial execution[1], the customer would like the remainder of the order to stay in the order book.

---

1. The order book can change during the time until the order reaches the exchange system.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-16
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

In order to increase the likelihood of execution, Bianchi decides to enter the order directly into the exchange system without recording it first as an *Unreleased Order*. As the order corresponds to an order in the order book, its entry can be performed more easily through the "Normal Buy All" drop site field.



**Fig. 57:** *Drop Site Pane* and *Detailed Order Book Pane*: Entry of a buy order using the *Normal Buy All Drop Site*. Attention! The order generated by the Trading System will be transmitted immediately – without further confirmation by the trader – to the exchange system.

Bianchi selects the desired order size of 503.00 in the *Detailed Order Book Pane*.

Holding down the middle mouse button, he drags the SWX icon onto the "Normal Buy All" drop site. The selected data is displayed in a separate window as long as the middle mouse button is held down. Attention: this order will now be transmitted to the exchange system without further confirmation by Bianchi. This

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-17
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

also means that the trader cannot add an internal Bank reference to the order.

Bianchi immediately receives an incoming order confirmation from the exchange system in the form of an order number. As the *message area* of the *Order Entry Window* is not available now, the message appears in a separate window on the screen.



Fig. 58: *Drop Result.* Message containing the order number after entering an order via *Drop Site – All.*

Bianchi can see that the volume of the best ask prices has changed. On the *Personal Trades Ticker Pane* he finds out that the order has been executed in its entirety and informs Sabine des Saules.

### 6.3.4. Deletion of a Normal Order

Nicolas Nussbaumer who, at the beginning of the trading period, entered an *Unreleased Order* to sell 300 S Holding stocks at 503.00 valid until the end of the week, asks Bianchi whether his order has been executed. Bianchi tells him that it is still in the order book. Nussbaumer instructs Bianchi to delete the order from the order book because he now only wants it to be executed on the next day. The easiest way for Bianchi to handle this is to delete the order in the order book, but to keep the *Unreleased Order,* so as to avoid having to re-enter the order the next day.

To delete the order in the order book, Bianchi selects it in the S Holding *Detailed Order Book Pane* and opens

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-18
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

the pop-up menu. After clicking on "Delete" and con-firming the intent to delete, the delete command for the selected order is transmitted to the exchange system[1].

The exchange system confirms the deletion to the trader. The order is no longer in the order book. It now appears with the text "Del" (for "Deleted") in the first column of the *Personal Orders Ticker Pane*.

Order deleted by trader. Delete reason: *Del*



| | Security | B/S | Cur Size | Org Size | Price | Bank Ref | Expiry | Order No |
|---|---|---|---|---|---|---|---|---|
| Del | S Holding | B | 150 | 600 | 502.00 | MB245987 | 15Apr | 2530 |
| Mch | S Holding | S | 300 | 300 | 503.00 | BKAB1985 | 15Apr | 2560 |
| Mch | S Holding | S | 50 | 50 | 502.00 | MKBAS987 | 15Apr | 2788 |
| | S Holding | B | 200 | 200 | 503.00 | 778899 | 15Apr | 2795 |

Fig. 59: *Personal Orders Ticker Pane*. If the order is no longer in the order book, the delete basis (e.g. Del, Mch) is indicated in the first column.

The *Own Deleted Orders Enquiry Pane* enables Bianchi to check which orders have been deleted during the day.

As he is only interested in the deleted orders for the S Holding stock, he selects that security in another pane and holds down the middle mouse button to drag the SWX icon onto the *Own Deleted Orders Enquiry Pane (Drag & Drop)*. This operation causes the *Own*

1. Bianchi could also select the order in the *Personal Orders Ticker* and delete it via the pop-up menu.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-19
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Deleted Orders Enquiry Pane* to be filtered and updated automatically.

Reason



| Security | B/S | Own Deleted Orders Enquiry Pane Del Size | Org Size | Price | Bank Ref | Expiry | Rsn |
|----------|-----|------|------|--------|---------|--------|-----|
| S Holding | B | 400 | 400 | 502.00 | | 15Apr | Mch |
| S Holding | B | 200 | 200 | 503.00 | | 15Apr | Mch |
| S Holding | S | 300 | 300 | 503.00 | 3002543 | 15Apr | Del |
| S Holding | S | 200 | 200 | 502.00 | | 15Apr | Mch |
| S Holding | S | 50 | 50 | 502.00 | | 15Apr | Mch |

Fig. 60: *Own Deleted Orders Enquiry Pane.* It provides a listing of orders which had been in the order book but are no longer held there. Possible delete reasons are not only the manual deletion of the order by the trader *(Del)*, but also its expiration *(Exp)*. It is worth noting that fully matched orders are also listed in the *Own Deleted Orders Enquiry Pane (Mch)*.

The change in the order book causes a new row to be displayed on the *Unreleased Orders Ticker Pane*, indicating that the order now remains to be processed in its entirety *(Unall Size = 300)*.

Bianchi can also delete orders via the *Drop Sites*. The process is similar to the previously explained order entry via *Drop Sites*. The trader clicks on the order to be deleted on the *Personal Orders Ticker Pane* or the *Detailed Order Book Pane* and holds down the middle mouse button to drag it over the "Delete" field on the top right corner of the *Drop Site Pane*. Just as in the case of deletion via the pop-up menu, the delete command is transmitted to the exchange system after additional confirmation by the trader. After the order has been deleted by the exchange system, the trader receives a message.

### 6.3.5.  Deleting an Unreleased Order

If Nussbaumer had decided not to have his order executed at all, Bianchi could have also *deleted* the *Unreleased Order* directly.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-20
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The deletion of an *Unreleased Order* can be performed in the same fashion as that of an order in the order book, either via the pop-up menu of the *Unreleased Orders Ticker Pane* or the *Unreleased Own Orders Enquiry Pane*, or else via the *Drop Sites*.

By deleting the *Unreleased Order*, Bianchi avoids having to handle the deletion of the corresponding order(s) in the order book manually. All related orders are removed automatically from the order book.

## 6.3.6. Changing an Order

Portfolio manager des Saules has entered an *Unreleased Order* to buy 1'000 S Holding at 502.00 earlier and now asks Bianchi how much of the order has been executed. Bianchi informs her that he has already processed the entire order, but that his last partial order with an original size of 600 is still in the order book with a remaining size of 350. Des Saules would like to execute the rest of the order at the current best ask price of 503.00. Just as in the case of order deletion, Bianchi can go about this in two ways. One method is to use the *Drop Sites*, the other is to use the pop-up menu of the *Detailed Order Book Pane* or the *Personal Orders Ticker Pane*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-21
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

As the "Bianchi2" *View* with the *Drop Site Pane* and the *Personal Orders Ticker Pane* is currently open, he uses them to change his order.



**Fig. 61:** *Drop Site Pane* and *Personal Orders Ticker Pane*. The order to be modified is selected in the *Personal Orders Ticker Pane* and dragged onto the "Replace" field.

Bianchi clicks on the order to be changed in the *Personal Orders Ticker Pane* and drags it onto the "Replace" field on the *Drop Site Pane*.

The Trading System now automatically sends a delete command for the selected order to the exchange system. The remaining order with a current size of 350 has now been cancelled and will appear with other deleted orders in the *Own Deleted Orders Enquiry Pane*. It will be replaced by a new order with a new time stamp.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-22
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

As soon as the exchange system confirms the deletion of the order, a new *Order Entry Window* appears, pre-configured with the data of the deleted order.

The trading system automatically associates the order with the corresponding *Unreleased Order*

The size of the order remaining to be executed is input automatically



The price can be changed by one price step per click on the upward or downward arrow

Fig. 62: *Order Entry Window* opened automatically by the Trading System as a result of a "Replace" command. The data in the window corresponds to that of the old order which is now being replaced. If the order is not related to an *Unreleased Order*, the trader can change the data in all the input fields, i.e can also send a totally different order to the exchange system.

As des Saules wants the price to be changed, Bianchi clicks once on the upward arrow next to the "Price" text field. The field then displays the increased price of 503.00.

Bianchi has now made the necessary change and transmits the order to the exchange system by clicking on "Submit". The exchange system confirms the order and the *new* order number appears in the *message area*.

The new order is executed immediately and the trade appears on Bianchi's *Personal Trades Ticker Pane*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-23
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Order changes can also be performed via the pop-up menu, just like order deletions. To do this, the trader selects the order to be changed in the *Detailed Order Book Pane* or in the *Personal Orders Ticker Pane*, activates the pop-up menu with a mouse click and selects the *Replace* option. All subsequent steps are identical to those described in the context of a change by way of *Drag & Drop*.

### 6.3.7. Changing an Unreleased Order

Unlike on-exchange orders, which can only be changed by deletion and new entry, *Unreleased Orders* can be modified directly. This has the advantage that the size or the price limit of an *Unreleased Order* can be changed without losing the time priority of related orders already held in the order book of the exchange system.

The change can be performed in the same fashion as already explained for other cases, via the "Change"[1] pop-up menu or via *Drop Site Pane* ("Replace" field). Orders that have already been *released* (i.e. currently held in the order book) are not affected by the change.

### 6.3.8. Round-Lot Order and Odd-lot Order

Bianchi receives an *Unreleased Order* to sell 85 S Holding shares at 501.00 or better from one of the investment advisors. It must be noted that the round lot for S Holding is 10 shares. The customer order is therefore composed of 8 *round lots* of 10 shares and an *odd-lot* portion of 5 shares *(Round-Lot Plus* order). As soon as at least one *round lot* has been executed, the system automatically separates the *odd-lot* portion from the initial order. The odd-lot portion is converted into a separate market order by the exchange system.

---

[1]. Contrary to that of *Unreleased Orders*, the pop-up menu option for the change of on-exchange orders is called "Replace" (deletion and new entry).

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-24
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Before going ahead with this order, Bianchi asks the investment advisor to confirm that the order has a size of 85 shares. After receiving the confirmation he enters the entire order into the order book (*Unreleased Orders Ticker Pane*, pop-up menu – *Release*).

At the time of order entry, the best ask price for the S Holding stock is 501.00 with a combined size of 300 shares. The order's *round lot* portion of 80 shares is therefore executed immediately, while the *odd-lot* portion of 5 appears as a market order in the order book.

The remaining *odd-lot* portion of the sell order appears at the top of the *Detailed Order Book Pane*



Fig. 63: *Detailed Order Book Pane* with an *odd-lot* sell order. It would also appear at the top of the window if it were an *odd-lot* buy order.

This portion will result in a trade at the last paid price as soon as a buy order of 5 S Holding shares is entered. It can also be matched if additional *odd lots* are entered on the sell side, so that their aggregated size contains a *round lot*. However, the trade price can under no circumstances be less favorable than the last price paid for a round lot order. This means that a corresponding round lot order must have been present on the buy side[1].

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-25
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The validity of the *odd-lot* portion is the same as that of the initial order.

### 6.3.9. Order Routing

The *Personal Orders Ticker Pane* and the *Personal Trades Ticker Pane* display certain orders and trades with Bianchi's *Trader ID*, although these orders have not been submitted to the exchange system by Bianchi himself.

This is the result of orders transmitted to the Trading System via the bank's host computer. The interface has been configured to allow orders that meet certain *routing criteria* to be forwarded directly to the exchange system.

Bernardo Bianchi wants to avoid having to deal with small orders. In the case of S Holding and B Chemie stocks, the system is configured to forward all limit orders with a volume below Sfr. 10'000 directly to the exchange system, provided the order data is complete (order size, security, price, etc.). These orders are automatically associated with Bianchi's *Trader ID*.

---

1. Matching rules are explained in Chapter 16.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-26
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 64: *Routing Criteria Window*. Using this window, the system administrator specifies which orders from portfolio managers and investment advisors are automatically routed to the exchange system.

Via the *Personal Orders Ticker Pane*, Bianchi has an overview of automatically entered and not yet executed orders, whereas the *Personal Trades Ticker Pane* shows the resulting trades. Orders that have not yet been executed can be deleted or changed.

Routing criteria can only be set by users with system administrator privileges - in general the system administrator. The choice of filter criteria is jointly decided upon by Bianchi, the chief trader and possibly other persons in charge within the bank.

## 6.4.   Hidden Size Order

At 12:10, Bianchi speaks to an institutional customer with whom he works directly and who wishes to sell a substantial number of S Holding shares. Bianchi first

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-27
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

explains the current state of the order book to his customer.

```
              Detailed Order Book Pane
  S Holding
  Member    O  B Size    Price    S Size  O  Member
                          Odd         5   *
                        505.00      300
                        505.00      100
                        502.00      200
                    220 501.00
  ABankGE           100 500.00
                    300 500.00
                    200 499.00
  BDE LG            100 498.00
                    200 497.00
```

Fig. 65: *Detailed Order Book Pane* before entering the *Hidden Size Order.*

The customer is also interested in how the market in S Holding stocks has done up to now. Bianchi can find this information on the *Trade History Enquiry Pane* for S Holding.

The *Trade History Enquiry Pane* shows all trades within a specified time span. It is not limited to trades made on-exchange, i.e. it also lists off-exchange trades, with the exception of *reported* trades.



*AO* in the Type column: a trade made off-exchange *(Addressed Offer)*

```
                Trade History Enquiry Pane
  Security   Size   Price   Mkh   Type   Trd Date   Time
  S Holding   400   502.00                15Apr    10:01
  S Holding  2000   501.00         AO     15Apr    10:08
  S Holding   200   502.00                15Apr    10:20
  S Holding    30   502.00                15Apr    11:09
  S Holding   150   503.00                15Apr    11:20
  S Holding    80   501.00                15Apr    11:59
```

Fig. 66: *Trade History Enquiry Pane* shows all trades in S Holding shares since the start of the continuous trading period.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-28
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

After a thorough discussion with Bianchi, the customer issues an order to sell 10'000 S Holding shares at 501.00. As Bianchi does not want to enter this order directly into the order book, and because he might also execute a portion of it off-exchange, he records the order as an *Unreleased Order* so that he can take the time needed to work on it.

To enter the *Unreleased Order*, Bianchi uses the *Order Entry Window*, which he opens via the "On Exchange" pulldown menu. He enters the full order size, the price, buy or sell, and possibly an internal bank reference just as he would for an order going directly to the exchange system. By clicking on the *Unreleased Flag* checkbox, he identifies the order as an *Unreleased Order*, so that clicking on "Submit" causes the order to be stored in the Bank's Trading System.



It is possible to indicate the time and date when the order is to be released without further confirmation to the exchange system

*Unreleased* has been selected

**Fig. 67:** *Order Entry Window* for the entry of an *Unreleased Order.* Rather than being sent directly to the exchange system, an *Unreleased order* is stored locally on the member's trading system.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-29
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Using the *Unreleased Orders Ticker Pane*, Bianchi can now process the order. To begin with, he decides to enter a *hidden size* order of 2'000 shares into the exchange system.

The order exceeds the minimum order size for *Hidden Size Orders* for S Holding (100 *round lots*, equivalent in this case to 1'000 shares). Bianchi can therefore enter this order as a hidden size order. He indicates 1'000 shares as the visible size[1].

### 6.4.1.  Entry of a Hidden Size Order

To enter the *hidden size order*, Bianchi opens the Order Entry Window via *Unreleased Orders Ticker Pane* and the *Drop Sites* - as he would proceed to enter a *Normal Order*.



Fig. 68: *Order Entry Window* for the entry of a *hidden size order*

---

1. The minimum size for *hidden size orders* is 101 times the size of a *round lot* and minimum visible size is 100 times the size of a *round lot*. Details on *hidden size orders* are available in *EBS Story*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-30
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Fig. 69: *Detailed Order Book* after the entry of the *hidden size order*. The "greater than" sign "+" in front of the order size makes it clear to other members that this is a *hidden size order*, i.e. that the real order size is larger than the size displayed.

Most of the data has been pre-set automatically by the Trading System. Bianchi needs only adapt the size of the order, change the order type to "Hidden" and set the visible order size.

After clicking on the "Submit" button, Bianchi receives the order number and the *hidden size order* appears in the order book with the visible size of 1,000 S Holding shares. The *hidden size* nature of the order can be seen by other members owing to the "greater than" sign in front of the order size.

Bianchi cannot see from the order book how much of his order remains and which trades have already resulted from it. To get this information, he can take a look at the *Unreleased Orders Ticker Pane*. He can

also find it in the *Personal Trades Ticker Pane* or in the *Personal Orders Ticker Pane.*

Bianchi recognises from the difference between Cur Size and Org Size that one or several trades for a total of 220 S Holding shares have been made.



```
                        Personal Orders Ticker Pane
Security  B/S  Cur Size  Org Size  Price   Vbl Size  Bank Ref  Expiry  Order No
S Holding  S         1780     2000  501.00      1000            15Apr      8620
S Holding  S            5        5                       3002   15Apr      5730
XYZ        B          100      100  815.00            2005555   15Apr      2432
```

Fig. 70: *Personal Orders Ticker Pane.* The trader can see what portion of his *hidden size order* has already been executed.

Bianchi can tell from the *Personal Orders Ticker Pane* that 220 S Holding shares from his *hidden size order* have already been executed. The remaining size of 1'780 is still greater than the visible size, so that the "greater than" sign continues to be displayed in front of the order size. As soon as the remaining size is equal to or smaller than the visible size, the "greater than" sign disappears and the order size actually remaining is displayed in the order book.

### 6.4.2. Deletion and Modification

If the customer so wishes, Bianchi can delete or change the *hidden size* order. Changing or deleting *Hidden Size Orders* is done in the same way as for a *Normal Order* (*pop-up menu* or *drop sites*).

Even a change of the "visible size" will be treated like a modification of a *Normal Order.* The original order is deleted first and the modified order is then entered into the system. The order therefore loses its original time stamp, even if no changes have been made to the limit price or the order size.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-32
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 6.5. Accept Order

A colleague of Bianchi's, William Black, is also active in trading S Holding stocks. However, he trades for the bank's own account. For this reason, his *Order Entry Window* is configured to select the "Nostro" (member's own account) flag by default.

Just like Bianchi, Black has configured a couple of *panes* in *Views* which are now displayed on his screen. In addition to the *Market Overview Pane*, he also finds the *Detailed Order Book Pane* and the *Drop Site Pane* very important in his work.

In the early afternoon, Black sees that a buy order of 200 S Holding with a limit price of 503.00 has been entered into the order book. Black judges this offer price to be very good and therefore decides to enter an *Accept Order* of 100 S Holding shares. He avoids using a *Normal Order* because he does not want his order to remain in the order book.

```
                 Detailed Order Book Pane
S Holding
Member    O  B Size   Price   S Size  O  Member
                      505.00    300
                      505.00    100
                      504.00    100
                200   503.00
                300   501.00
ABankGB         100   500.00
BDE LG          100   498.00
                200   497.00
```

Fig. 71: *Detailed Order Book Pane* before the entry of the *Accept Order*. (We assume that the order book has changed in the meantime and our explanations are now based on the above constellation.)

### 6.5.1. Entry of an Accept Order

Black likes to use the *Drop Site Pane* as much as possible to enter his order. He proceeds in a similar fash-

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-33
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

ion as explained earlier in the context of a *Normal Order*.



"Accept" already selected based on the input via the "Accept Input" *Drop Site*

The "Nostro" (member's own account) flag has already been selected because this is the default for Black's *Order Entry Window*

Black's *default book* is set automatically. (The *Book* function is explained in Chapter 9.)

Fig. 72: *Order Entry Window* for the entry of a *Nostro Accept Order*. The trader has configured the setting of the "Nostro" flag as the default for order.

Bianchi selects the best buy order with a click of the mouse and, holding down the mouse button, drags it from the *Detailed Order Book Pane* to the "Accept Input" field of the *Drop Site Pane*. The system now opens a pre-configured *Order Entry Window* for an *accept* sell order. The price is set at 503.00 and the size is "0". Black only needs to set the size – he wants to sell 100 shares – and can transmit the order to the exchange system by clicking on the "Submit" button.

Upon successful transmission, the System tries to execute as much of the order as possible against orders currently held on the opposite side of the order book. The rest of the order, whatever the remaining size, is automatically deleted, so that an *Accept Order* can never appear in the order book.

  
Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-34
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 6.5.2. Execution and Confirmation

After receiving the order, the exchange system acknowledges the receipt in the form of a message that contains the order number and appears in the *message area* of the *Order Entry Window.*

Black's *accept order* has been executed entirely

| Security | B/S | Size | Price | Personal Trades Ticker Pane Member | Val Date | Cl | Bank Ref | Trade No | Order No |
|---|---|---|---|---|---|---|---|---|---|
| S Holding | B | 200 | 502.00 | BBB Ge | 15Apr | | 3002222 | 0244400000001980 | 2221 |
| S Holding | B | 200 | 502.00 | CBC Ba | 15Apr | | 3002222 | 1981 | 2221 |
| S Holding | S | 100 | 503.00 | ZHB Zh | 15Apr | | 3008765 | 2001 | 4567 |

Fig. 73: *Personal Trades Ticker Pane.* The trader can see whether the *accept order* has been executed entirely, partially or not at all.

Black cannot tell from the order book, which no longer displays the buy order of 200 S Holding at 503.00, whether his *accept order* has led to a trade or not. This information is visible in the *Personal Trades Ticker Pane,* the *Personal Orders Ticker Pane* and in the *Own Deleted Orders Enquiry Pane.* Black looks at the new row in the *Personal Trades Ticker Pane* and sees that his order has been fully executed. As explained earlier, fully executed orders are listed with the *delete reason* "Mch" (fully matched) in the *Personal Orders Ticker Pane* and in the *Own Deleted Orders Enquiry Pane.*

### 6.6. Fill-or-Kill Order

The best offer price for 500 S Holding shares is currently 502.00. In order to exploit an arbitrage opportunity, Black tries to buy all of these shares at once.

He decides to enter the order in the form of a *Fill-or-Kill order* for 500 S Holding at 502.00. The advantage

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-35
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

```
                    Detailed Order Book Pane
S Holding
Member   O B Size     Price    S Size  O  Member
                      505.00     300
                      505.00     100
                      504.00     200
                      502.00     500
              300     501.00
ABankGE       100     500.00
BDE LG        100     498.00
              200     497.00
```

Fig. 74: *Detailed Order Book Pane* before a *Fill-or-Kill Order* is entered.

of this method is that he will either get the full number of shares at 502.00 (or better) or else the order will be deleted.

## 6.6.1.  Entering a Fill-or-Kill Order

As he did in the case of the *accept order*, Black now enters a *Fill-or-Kill order* via the *drop sites*.

In the *Detailed Order Book Pane* he clicks on the sell order of 500 S Holding at 502.00 and drags it to the "Fill-or-Kill All" field on the *Drop Site Pane*[1] while holding down the mouse button. The order is now transmitted to the exchange system without any further confirmation and Black receives a message acknowledging the entry of the order.

## 6.6.2.  Execution and Confirmation

Like an *Accept Order*, a *Fill-or-Kill Order* is never shown in the order book. Black can see, however, that there have been changes to the order book which may have affected the order he entered.

The best offer price for S Holding stocks is still at 502.00, but the current size is now only 300. This can

---

1.  If Black had used the "Fill-or-Kill Input" field, a pre-configured *Order Entry Window* would have been opened (as in the case of the *accept order*). The *Fill-or-Kill* option would already have been selected, leaving only the order size to be specified.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-36
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

be the result of a buy order from another trader for 200 S Holding executed at 502.00, or the replacement of the original size of 500 by a new order for 300 shares.

```
                         Detailed Order Book Pane
    S Holding
    Member     O B Size        Price    S Size  O  Member
                               505.00     100
                               505.00     100
                               504.00     200
                               502.00     300
                       300     501.00
    ABankGE        100         500.00
    BQE LG         100         498.00
                   200         497.00
```

Fig. 75: *Detailed Order Book Pane* after the entry of the *Fill-or-Kill order.*

Black therefore assumes that his *Fill-or-Kill Order* has not been executed, i.e. that it has been automatically deleted by the system. This is why he takes a look at the already opened *Personal Orders Ticker Pane.*

The order entered by Black is listed with the *delete reason* "Failed" *(Fld).* Had it been possible to execute the order, Black would be able to see this from the delete reason "Fully matched" *(Mch)* in the *Personal Orders Ticker Pane.* Moreover, the trade would be listed on the *Personal Trades Ticker Pane.*

Black can tell from the delete reason "'Fld" *(failed)* that his order was not executed and that it has been deleted from the order book

```
                                 Personal Orders Ticker Pane
          Security      B/S  Cur Size  Org Size   Price  Vol Size  Bank Ref   Expiry  Order No
    Del   S Holding     S         300      300   504.00                       15Apr     8620
    Mch   S Holding     S         100      100   503.00                       15Apr     5730
    Fld   S Holding     B         500      500   502.00                       15Apr     2432
```

Fig. 76: *Personal Orders Ticker Pane.* Next to the failed *Fill-or-Kill order,* the executed *accept order* with the delete reason "Mch" *(fully matched)* is displayed.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-37
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Black can find out via the *Own Deleted Orders Enquiry Pane* what has happened to the orders he entered. As he is only interested in the order for S Holding, he selects the security from an open pane on the newly opened *Own Deleted Orders Enquiry Pane*. This causes all the deleted orders from his member for the security S Holding to appear. Using the "Filter" option on the pop-up menu he can also enter his *Trader ID* as a criterion so as to display only his own trades.

Deleted *Fill-or-Kill order* (not executed), delete reason "failed"

| Security | B/S | Del Size | Own Deleted Orders Enquiry Pane Org Size | Price | Vbl Size | Bank Ref | Expiry | Rsn |
|---|---|---|---|---|---|---|---|---|
| S Holding | B | 500 | 500 | 502.00 | | | 15Apr | Fld |
| S Holding | S | 300 | 300 | 504.00 | | 3002543 | 15Apr | Del |
| S Holding | S | 100 | 100 | 503.00 | | | 15Apr | Mch |

Fig. 77: *Own Deleted Orders Enquiry Pane*. Next to the failed *Fill-or-Kill order*, the executed *accept order* with delete reason "matched" is displayed.

## 6.7. Conditional Orders

Black would like to cover a short position of 200 S Holding in case the price starts to rise. In order to avoid having to keep looking at the inside market of S Holding, he enters an *On Stop Order* with a *Trigger Price* of 503.00. This order is stored on the Trading System until a price of 503.00 or higher is paid. If this happens, the Trading System automatically generates a market buy order of 200 S Holding stocks which is immediately transmitted to the exchange system[1].

---

1. A conditional *Sell* Order is called a *Stop Loss Order*. In the case of a *Stop Loss Order*, the Trading System generates an order as soon as the last paid price is lower than or equal to the *Trigger Price*. If the conditional buy or sell order is not entered as a market order but with a price limit, the term used is *Stop Limit Order*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-38
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 6.7.1. Entering Conditional Orders

Even though the conditional order is not sent directly to the exchange system, it is entered via the *Order Entry Window*. Just as he would do to enter a normal order, Black clicks on "Buy", enters the order size of 200, selects the security "S Holding" and chooses "Market" in the price field (so as to create a market order). He can also enter an internal bank reference text.



If "Conditional" has been selected, a *Trigger Price* must be entered in the adjacent field

Clicking on the "Market" button causes the flag "Market" to appear in the price field. It is also possible to enter a price limit here *(Stop Limit Order)*

The *Trigger Price* determines under which conditions the order will be transmitted to the exchange system

Fig. 78: *Order Entry Window* for an *On Stop Order*

Black also selects *Conditional Order* as order type and enters the *Trigger Price* required in the adjacent field. All the required data has thus been entered and Black can press "Submit" to store the order locally in the Trading System. The *message area* displays the *Conditional Order* Number.

After entering the order, Black would like to see an overview of conditional orders because, besides

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-39
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

S   Holding, he has also entered conditional orders on
other stocks. He finds this information on the *Conditional Orders Enquiry Pane.*



Fig. 79: *Conditional Orders Enquiry Pane.* As the order has not yet been transmitted to the exchange system, it is only identified by the Trading System-Internal *Conditional Order Number.* As soon as the order is received by the exchange system, it is assigned an order number by the exchange system.

The last price paid for S Holding rises to 503.00 later
during the trading. As the condition for the *On Stop
Order* entered by Black is now satisfied, the Trading
System automatically converts the conditional order
into a market order[1]. This market order is automatically transmitted to the exchange system, where it will
be executed immediately or remain in the order book.

Black can see in the *Triggered Conditional Orders
Pane* which of his orders have been triggered and sent
to the exchange system. In this case, the conditional
order has been deleted. The *Triggered Conditional
Orders Pane* shows all deleted orders whose delete
reason is "triggered", i.e. for which an order has been
generated and sent to the exchange system.

1.  In the case of a *Stop Limit Order,* the Trading System would generate a corresponding *Limit Order.*

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-40
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 80: *Triggered Conditional Orders Pane.* As the buy order has been sent to the exchange system, it now has an *order number* assigned by the exchange system in addition to the *conditional order number* assigned by the Trading System.

### 6.7.2. Deletion and Modification of Conditional Orders

Just as the conditional order entry procedure is similar to that used for normal orders, modifications and deletions of a conditional order follow the same pattern: one method is to use the pop-up menu of the *Conditional Orders Enquiry Pane*, the other is to use the *Drop Site Pane (Delete or Replace)*.

Although conditional orders are not held in the exchange system, modifications are made according to the same principle as for *Normal Orders*.



Fig. 81: *Deleted Conditional Orders Enquiry Pane.* It shows the triggered *On Stop Order* for S Holding and the deleted original version of the B Chemie *Stop Limit Order.* In addition to "Triggered" *(Trg)* and "deleted by member" *(Del)*, the delete reason can also be expiration of the validity of the order *(Exp)*.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-41
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Black would like to change the size of his B Chemie *Stop Limit Order*. He selects the order in the *Conditional Orders Enquiry Pane* and, holding down the mouse button, drags it onto the "Replace" field on the *Drop Site Pane*. This causes the *conditional order* (in the Trading System) to be deleted and, thereafter, an *Order Entry Window* with the data of the deleted order to be opened. Black can now change the order size to 400 and confirm the entry. In the *Conditional Orders Enquiry Pane*, the B Chemie *Stop Limit Order* now appears with a new order size and a new *Conditional Order Number*.

## 6.8.   Trade Slips

Bianchi and Black do not normally require *Trade Slips* for trading because all trades can be displayed on screen and all trade data is stored on the Trading System. It may happen, however, that they require *Trade Slips* of certain transactions for the back office or for a customer.

The printing of *Trade Slips* cannot be initiated by Bianchi or Black themselves. When the need arises, the function must be activated by the person in charge of the system or the system administrator.

The *Trade Slip* is divided into three sections. The upper section contains information on the trade, the middle concerns the settlement and the lower portion contains data on the contracting parties.

Swiss Exchange SWX
TS User Manual
Continuous Trading

Page 6-42
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

| BOUGHT | Nostro | | |
|---|---|---|---|
| Trade Date: | 15Apr96 | Trade Time: | 11:34 |
| Trade No.: | 00203O00000012345 | Order No.: | 158751 |
| Bank Reference: | 26053084 | | |
| Book: | Trading_Black | | |
| Memorandum Text: | Test Trade | | |
| Security: | S Holding | | |
| Valor No.: | 213767 | ISIN: | CH0002137674 |
| Size: | 500 | Price: | 501.00 |
| Month: | Spot | Settlement Date: | 18Apr96 |
| Settlement Amount: | 250,500 | Manual Clearing: | |
| Accrued Interest: | | Accrued Days: | |
| Change Fac | | | |
| Trader: | William Black (2521) | | |
| Counterparty: | PW Banque GE | Paul M. Blanc (1111) | |
| Print Date: | 15Apr96 | Trade Slip No.: | 457478 |

Fig. 82: *Trade Slip* for the purchase of 500 S Holding at 501.00. If the trade were not the result of an on-exchange order but of an *Addressed Offer*, a *Trade Confirmation* or a *Post Recorded Trade*, this would be visible on the first line on the right.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 7.     Off-exchange Trading

The Swiss Exchange SWX supports its members' off-exchange trading with the special functions known as "Statement of Interest", "Addressed Offer", "Trade Confirmation" and "Reported Trade", which are available throughout the Swiss Exchange's operating hours, including continuous trading. Off-exchange orders traded via the SWX never appear in the order book.

SWX-functions for off-exchange trading may be used for trades made during the pre-opening period or, for orders which exceed the limit concerning the duty to trade on the exchange during continous trading. This does not apply for forward transactions, which always have to be concluded off-exchange, regardless of their size.

Black often trades spot transactions in shares during continuous trading for amounts exceeding CHF 200'000, which for this reason do not fall within the scope of the duty to trade on the exchange[1]. He is therefore free to choose whether to execute the order on or off the exchange.

The use of SWX-functions for off-exchange trades has the advantage of freeing the trader from any further reporting duty, since the trade is already in the system.

---

1. The duty to trade on the exchange does not apply to individual orders for bonds with a nominal value exceeding 100'000. For further details regarding the duty to trade on the exchange and off-exchange trading, please refer to the document *EBS Story*.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 96

## 7.1.    Statement of Interest

One of Bianchi's clients wishes to buy 300 S Holding shares for the standard June 1996 delivery at a maximum price of 505.00. As seen before, this forward transaction must be executed off-exchange. Bianchi therefore uses the possibility of making a non-binding offer to all other exchange members (a so-called *Statement of Interest*) for this forward buy order. He intends to gain a good market overview regarding interest and price from the members' reaction. The *Statement of Interest* addressed to all members contains a reference to the trader, in the present case Bianchi's short name BianB, in order to allow the other members to reply via SWX-functions or by telephone.

### 7.1.1.    Entering a Statement of Interest

A *Statement of Interest* can be entered into the system via the *Statement of Interest Entry Window*, which Bianchi opens in the *Off Exchange Pulldown Menu (Statement of Interest)*.



Fig. 83: *Off Exchange Pulldown Menu.* By clicking on "Statement of Interest", the *Statement of Interest Entry Window* opens.

When entering a *Statement of Interest* it is not compulsory to indicate whether the interest is for purchase or sale, nor need a price or size be specified. However,

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi would like the other members to know that he wishes to buy. Because of the small size of his interest, he also wants to let them know the number of shares, i.e. 300 S Holding. However, he does not indicate a price limit because he would like to get an idea of the price the other members might be willing to accept.



By selecting "Quote", the trader does not indicate to the other members if he wishes to buy or to sell. The size and price text field maintain their standard background color.

Time limit for the validity of the Statement of Interest

Choice of the maturity for the transaction offered

Fig. 84: *Statement of Interest Entry Window.* Among the optional information, Bianchi has indicated the size and his interest to buy, but has left the price open.

Similar to the entry of a *Normal Order*, Bianchi keeps the selection "Buy" (active at the moment the window is opened) to indicate his interest to buy. When this selection is activated, the background color of the size and price text fields maintain the color which signals a buy interest. If Bianchi had not wished to indicate his intention to buy, he could have clicked on the "Quote" button. As a result, the background color of the size and price text fields in the *Statement of Interest Entry Window* would have changed to the standard color. In

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

this case, the *Buy/Sell* column in the *Statements of Interest Received Pane*, in which the other members are informed about the *Statement of Interest*, remains empty.

Bianchi then chooses the order size by clicking three times on the field "+100" and enters the symbol for S Holding shares, which will be displayed in the Security text field. Since he does not wish to indicate a price, there is no need to enter a figure in the price text field.

The trading system automatically completes the *Expiry Time* text field according to the trader's configuration. Bianchi's system is configured to indicate a validity period of 60 minutes for *Statements of Interest*. The *Expiry Time* text field is set to 15:15. This time, Bianchi would like his *Statement of Interest* to be valid for only 30 minutes and therefore changes the entry to 14:45.

Bianchi's offer refers to a forward transaction (standard delivery month). Therefore, he must click on the "Spot" field and select the desired delivery month "Jun96"[1] from the displayed list.

Now that Bianchi has entered all the details, he can transmit his *Statement of Interest* to the exchange system by clicking on the *Submit* button. The system acknowledges receipt by indicating the *Statement of Interest* number in the *Message Area* of the entry window.

---

1. The *Statement of Interest* is a non-binding offer and, therefore, the trader can only indicate the standard delivery for a given month. When the trade is made, it is possible to agree on individual dates. When an *Addressed Offer* is made, it is possible to enter an individual maturity.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

In the *Statements of Interest Sent Pane*, Bianchi can see all *Statements of Interest* referring to a selection of stocks that originated from his organisation.



Fig. 85: *Statements of Interest Sent Pane* containing Bianchi's *Statement of Interest*.

All other exchange members can now view the *Statement of Interest* entered by Bianchi in the *Statements of Interest Received Pane*. Those traders who have opened a *view* containing the *Statements of Interest Received Pane* with the corresponding *Display Profile*, and reduced it to an icon, are alerted by the blinking of the icon that the pane has received new data.

Fig. 86: *Statements of Interest Received Pane*. The *Statement of Interest* entered by Bianchi is displayed to all members in this form.

Bianchi now awaits the other traders' reactions, which he may get in the form of an *Addressed Offer* or by telephone.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 87: Sending out a *Statement of Interest (SOI)*. It is addressed to all exchange members. It is visible to all traders who have configured a *Statements of Interest Received Pane* for the receipt of *SOIs* for the corresponding stock.

### 7.1.2.  Delete and Change a Statement of Interest

It is now 14:35 and Bianchi has not yet received any reaction to his *Statement of Interest*. He therefore decides to add a price indication to the *Statement of Interest*. He takes the price limit given by his client, 505.00.

As we have seen earlier when discussing the *Normal Order*, *Statements of Interest* can be changed either via the pop-up menu or in the *Drop Site Pane*. Bianchi chooses the pop-up menu because his *Drop Site Pane* is not open at the moment.

He selects his *Statement of Interest* in the *Statements of Interest Sent Pane* by clicking with the left mouse button and activates the pop-up menu with the right mouse button. He selects the option "Replace", thus deleting the selected *Statement of Interest* from the exchange system. Once the *Statement of Interest* has effectively been deleted, the *Statement of Interest Entry Window* opens, containing the data of the deleted *Statement of Interest*. Bianchi can simply enter the figure "505.00" in the price text field.

Bianchi would like the changed *Statement of Interest* to be valid for one hour, i.e. until 15:35. The time was

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

automatically entered in the *Expiry Time* text field. By clicking on the *Submit* button, Bianchi can transmit the new *Statement of Interest* to the exchange system.

Having been informed of the deleted *Statement of Interest*[1], the traders working for other exchange members have their attention drawn to Bianchi's new *Statement of Interest* in the *Statements of Interest Received Pane*.

Bianchi can check the deleted *Statements of Interest* in the *Statements of Interest Sent Deleted Enquiry Pane*.



Fig. 88: *Statements of Interest Sent Deleted Enquiry Pane*. This pane contains the original *Statement of Interest* which Bianchi deleted. However, in order to see the current data, he must activate the *Refresh* option in the pop-up menu, as is the case for all *Enquiry Panes*.

If Bianchi is no longer interested in concluding such a trade or if he finds a counterparty before the *Statement of Interest* expires, he can delete the *Statement of Interest* and will thus no longer receive any requests from interested traders. A *Statement of Interest* can be deleted either by using the option "Delete" in the pop-up menu of the *Statements of Interest Sent Pane* or via the *Delete* function in the *Drop Site Pane*.

## 7.2.   Addressed Offer

Trader Roth from CBank in Zurich is interested in Bianchi's modified *Statement of Interest* at 505.00 and

---

1. The deleted *Statement of Interest* is displayed in the *Statements of Interest Received Pane* in grey but is not removed.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

decides to issue an *Addressed Offer* to Bianchi's bank. He could also negotiate with Bianchi by telephone.

An *Addressed Offer* is a binding offer to another exchange member, who can either accept, ignore or reject it. An *Addressed Offer* can be used as a reply to a *Statement of Interest.*

In the present case, the *Addressed Offer* issued by Roth refers to an existing *Statement of Interest.* It is binding and addressed exclusively to Bianchi's bank. It is therefore not displayed on the other members' screens.

## 7.2.1.  Entering an Addressed Offer

Since the *Addressed Offer* issued by trader Roth directly refers to Bianchi's *Statement of Interest,* Roth can use the data already entered by Bianchi in his *Statement of Interest* to enter his *Addressed Offer.* He selects the corresponding *Statement of Interest* in the *Statements of Interest Received Pane,* opens the pop-up menu and selects the option "Create AO". He could also drag the selected *Statement of Interest,* keeping the middle mouse button pressed, and drop it onto the "Accept Input" field in the *Drop Site Pane*[1].

---

1. If an *Addressed Offer* does not refer to a *Statement of Interest,* the trader must select the *Addressed Offer Entry Window* via the Pulldown Menu (Off Exchange) of a *View* and enter the relevant data himself.



Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-9
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The validity period is entered automatically according to Roth's configuration

Member to whom the AO is addressed

*Statement of Interest* to which the *Addressed Offer* refers

For forward transactions, manual clearing is automatically selected

Fig. 89: *Addressed Offer Entry Window* created via the "Create AO" option in the pop-up menu of the *Statements of Interest Received Pane* or with "Accept Input" in the *Drop Site Pane*. The data for the counter-offer is recuperated as far as possible from the *Statement of Interest*

The trading system automatically opens a pre-configured *Addressed Offer Entry Window* containing the data for a counter-offer to the *Statement of Interest*. In the present case, Bianchi has issued a *Statement of Interest* for the purchase of S Holding shares; in the *Addressed Offer Entry Window* generated by Roth, the option "sell" has already been activated. The window also displays the name of the security (S Holding), the size of the order (300) and the price (505.00) if stated in the *Statement of Interest*. The member who issued the *Statement of Interest* is automatically indicated in the member text field, in which the addressee is to be specified. The delivery month is also adopted automatically. Data that is optional in a *Statement of Interest* is compulsory in an *Addressed Offer* because an AO is a binding offer.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-10
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Roth chooses not to accept Bianchi's price limit but to offer the stock at 506.00. He clicks once on the upward pointing arrow next to the price text field, which has so far shown 505.00. The price thus increases to 506.00.

The validity of the *Addressed Offer* is calculated automatically based on the period set by the trader[1] and the exact expiration time for the offer is displayed in the *Expiry Time* text field. It is now 15:00 and Roth has specified 60 minutes as validity for his offer. The *Expiry Time* text field therefore shows 16:00[2].

Because the offer refers to a forward buy order, the trading system automatically selects manual clearing. Roth being a nostro trader, his system is configured to automatically select the option "Nostro".

Now, all the required data has been entered and Roth can transmit his *Addressed Offer* to the exchange system by clicking on the "Submit" button. The exchange system acknowledges receipt of the offer in the *Message Area* of the *Addressed Offer Entry Window*. Furthermore, the exchange system forwards the *Addressed Offer* to Bianchi's bank, where it appears in the *Addressed Offers Received Pane*.

While waiting for an answer from Bianchi, Roth can check his *Addressed Offers* in the *Addressed Offers Sent Pane*.

---

1. Detailed explanations regarding the user configuration can be found in Chapter 12 of the TS User Manual.
2. As for the *Statement of Interest*, the trader can enter the validity manually.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-11
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 90: *Addressed Offers Sent Pane*. For forward orders, the trading system automatically switches to manual clearing.

### 7.2.2.  Changing and Deleting Addressed Offers

In his *Addressed Offers Received Pane*[1], Bianchi can see the sell offer from Roth. As his client specified 505.00 as a price limit, he cannot accept the offer in this form. He decides to call Roth to explain the situation.



Fig. 91: Bianchi's *Addressed Offers Received Pane*. Roth would like to sell Bianchi 300 S Holding at 506.00, delivery June 1996. His response to Bianchi's buy offer *(Statement of Interest)* is a sell offer.

Roth is willing to change the price of his *Addressed Offer*. He can do so using the pop-up menu ("Replace") or the *Drop Site Pane* ("Replace" field), as explained for the *Normal Order* and the *Statement of Interest*.

---

1. If the *View* containing the *Addressed Offers Received Pane* has been reduced to an icon, the icon starts to blink when a new Addressed Offer arrives. (see Statement of Interest, Chapter 7.1.1.).

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-12
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The original *Addressed Offer* is deleted and an *Addressed Offer Entry Window* containing the data of the deleted offer opens. All Roth needs to do is reduce the price of 506.00 to 505.00 by clicking once on the downward pointing arrow next to the price text field. The validity period for the *Addressed Offer* is automatically set to the current time plus 60 minutes (16:20) as specified by Roth. As Roth does not wish to extend the validity of his offer, he can transmit the offer directly by clicking on the "Submit" button. The new *Addressed Offer* with its price of 505.00 and its *Expiry Time* of 16:20 is displayed in Roth's *Addressed Offers Sent Pane.*



Fig. 92: Sending an *Addressed Offer (AO)*. The offer is addressed to a specific exchange member but can be seen by all traders working for this member if they have configured an *Addressed Offers Received Pane* for the corresponding security. As is the case in our example, an *Addressed Offer* can be issued in reply to a *Statement of Interest.*

In Bianchi's *Addressed Offers Received Pane* the color of the deleted *Addressed Offer* changes to grey, but the offer continues to be displayed. The modified *Addressed Offer* with its price of 505.00 is displayed in a new line.

In the *Addressed Offers Sent Deleted Enquiry Pane* Roth can once again check the *Addressed Offers* that he has deleted.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-13
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 7.2.3.  Reply to an Addressed Offer

Bianchi has kept his *Addressed Offers Received Pane* open and sees Roth's new offer immediately. He can now accept, reject or ignore Roth's new *Addressed Offer*. An *Addressed Offer* cannot be executed partially. If Bianchi were interested in a partial execution, i.e. an offer for a reduced size, he could send an *Addressed Offer* for the corresponding size to Roth or call Roth to discuss a change of his *Addressed Offer*, just as they did for the price.

Deleted *Addressed Offer* displayed in grey.

New, modified *Addressed Offer* from Roth to Bianchi



| Security | B/s | Size | Price | Val | Date | Cl | Expiry | Member | Trader | AO No | AO Date |
|----------|-----|------|-------|-----|------|----|--------|--------|--------|-------|---------|
| S Holding | S | 300 | 501.00 | | Jun | D | 14:00 | CBA ZH | RotR | 12 | 15Apr |
| S Holding | S | 300 | 505.00 | | Jun | M | 16:20 | CBA ZH | RotR | 14 | 15Apr |

Fig. 93:  Bianchi's *Addressed Offers Received Pane*. Roth would like to sell Bianchi S Holding shares, delivery June 1996. He has therefore replied to Bianchi's buy offer *(Statement of Interest)* by addressing a sell offer to him.

Bianchi accepts the offer. An *Addressed Offer* can be accepted via the pop-up menu of the *Addressed Offers Received Pane* or the "Accept Input" field of the *Drop Site Pane*. Bianchi simply selects the corresponding *Addressed Offer*, activates the pop-up menu and selects the option "Take", or, keeping the middle mouse button pressed, drags the selected *Addressed Offer* to the *Accept Input* field in the *Drop Site Pane*.

The *Addressed Offer Take Window* opens. It has been pre-configured to contain all data of the *Addressed Offer* received. Bianchi completes the window by indicating an internal bank reference and accepts the

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-14
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Addressed Offer* by clicking on "Take". If this had been a nostro transaction, he could also have clicked on Nostro and indicated a book and the *Adjustment Price*[1]. If the trade had referred to an *Unreleased Order*, Bianchi could have indicated the corresponding *Unreleased Order ID* in this window.

Before accepting the *Addressed Offer*, Bianchi can indicate an internal bank reference



Fig. 94: *Addressed Offer Take Window.* Contains all data of the *Addressed Offer*, which cannot be modified. However, the trader can complete an internal bank reference, select Nostro or attribute the offer to an *Unreleased Order*.

In Roth's *Addressed Offers Sent Pane*, the background color of the accepted offer changes to the color signifying a sale. If a buy offer had been accepted, the color would have changed to the specific color for a buy offer.

---

1. The functions *Book* and *Adjustment Price* (specific for TS(X)) are explained in chapter 9.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-15
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 95: Accepting an *Addressed Offer (AO)*. The exchange system generates a trade between the sender and the receiver of the *Addressed Offer*. The price of this trade is communicated to all exchange members.

Bianchi could have rejected the *Addressed Offer* by using the option "Reject" in the pop-up menu or "Delete" in the *Drop Site Pane*. The rejection would have been signalled to Roth by a change in the display[1] of the rejected *Addressed Offer* in the *Addressed Offers Sent Pane*. If Bianchi had ignored the *Addressed Offer* and not reacted to it at all, it would automatically have been deleted by the system upon its expiration.

By accepting the *Addressed Offer*, Roth and Bianchi concluded an off-exchange transaction with the help of the SWX functions.

This trade is immediately reported to all members via the *Trade Ticker*. Bianchi and Roth have no further reporting duty, since all the data is already in the exchange system.

---

1. The background color changes to a color other than those reserved for buy and sell.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-16
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Trade resulting from the acceptance of an *Addressed Offer*

Off-exchange transaction

Fig. 96: *Trade Ticker Pane.* The trade resulting from the acceptance of the Addressed Offer is the last on the list and therefore the latest trade.

The trade is also displayed in Bianchi's and Roth's *Personal Trades Ticker Panes.*



Off-exchange trade between Bianchi and Roth

The "A" in the Trade No indicates a trade resulting from an *Addressed Offer*

Addressed Offer number in the "Order No" column

Fig. 97: Bianchi's *Personal Trades Ticker Pane.* The corresponding trade is also displayed in Roth's *Personal Trades Ticker Pane.*

When the *Addressed Offer* is accepted, it is automatically deleted from the exchange system. The accepted *Addressed Offer* is therefore displayed in Roth's *Addressed Offers Sent Deleted Enquiry Pane*, while the color of the corresponding *Addressed Offer* changes to grey in Bianchi's *Addressed Offers Received Pane*[1].

---

1. When the *Addressed Offers Received Pane* is opened again, the accepted *Addressed Offer* is no longer displayed.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-17
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 98: Roth's *Addressed Offers Sent Deleted Enquiry Pane*. The *Rsn* column indicates the reason for deleting the offer. For the first *Addressed Offer* it says *Deleted* (*Del* – deleted by a trader). For the second it says *Taken* (*Tkn* – accepted).

## 7.2.4. Unreleased Order and Addressed Offer

### 1. Issuing an *Addressed Offer*

Around noon, Bianchi received a large sell order for S Holding shares from one of his institutional clients. He entered it as an *Unreleased Order* and has partially executed it via the exchange. While discussing his forward trade with Roth, he mentioned his interest in a cash sale of S Holding shares. Roth is equally interested and is now awaiting Bianchi's Addressed Offer to sell 600 S Holding at 502.00.

Bianchi selects the corresponding *Unreleased Order* in the *Unreleased Own Orders Enquiry Pane*, activates the pop-up menu and selects the option "Addressed Offer". A pre-configured *Addressed Offer Entry Window* opens. Bianchi changes the order size, enters CBank's name in the member text field as the offer is addressed to that member, and transmits the *Addressed Offer* to the exchange system by clicking on "Submit".

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-18
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



The trader must complete the member's reference

From this number, the trader can tell that the *Addressed Offer* refers to an *Unreleased Order*

Fig. 99: *Addressed Offer Entry Window* created using the option "Addressed Offer" in the *Unreleased Own Orders Enquiry Pane*. From the *Unreleased Order ID* in the window header, the trader can tell that this *Addressed Offer* refers to an *Unreleased Order*.

The exchange system acknowledges receipt of the *Addressed Offer* by displaying the *Addressed Offer ID* in the *Message Area*. The *Addressed Offer* is indicated in the "Off Size" column on a new line in the *Unreleased Orders Ticker Pane*. After refreshing his *Unreleased Own Orders Enquiry Pane*, Bianchi can also see it there. But Bianchi would like to see only the current *Unreleased Orders* for S Holding shares. In an open pane, he therefore selects S Holding and, using the *Drag & Drop* function of his mouse, moves it to the *Unreleased Own Orders Enquiry Pane*. The pane now displays the updated situation of *Unreleased Orders* for S Holding shares.[1]

---

1. Up-to-date data can be displayed using the "Refresh" option in the pop-up menu.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-19
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The information in the "Off Size" column
shows that there are *Addressed Offers*
which have not yet received a reply.



| Security | B/S | Org Size | Unreleased Exec Size | Own Orders Open Size | Enquiry Pane Off Size | Unall Size | Price | Memoran |
|----------|-----|----------|----------------------|----------------------|-----------------------|------------|-------|---------|
| S Holding | B | 1000 | 400 | | | 600 | 502.00 | |
| S Holding | S | 300 | | 300 | | 300 | 503.00 | End week |
| S Holding | S | 10000 | 3520 | 980 | 600 | 4900 | 502.00 | |

Fig. 100: *Unreleased Own Orders Enquiry Pane*. As soon as the counterparty has reacted to the *Addressed Offer*,
the information disappears from the "Off Size" column and is added either to the "Exec Size" or the "Unall Size".
Off-exchange trades that have been reported by a *Trade Confirmation* or a *Reported Trade* are immediately added
to the "Exec Size".

As soon as Roth has accepted the *Addressed Offer*,
600 is added to "Exec Size". If Roth had changed his
mind and rejected the *Addressed Offer*, 600 would
again be added to "Unall Size".

2. Accepting the *Addressed Offer*

Trader Greg Green from F Finanz in Zurich has heard
from Roth that Bianchi wants to sell a large position in
S Holding. As he is interested in entering a large posi-
tion in this security, he sends an *Addressed Offer* for
the purchase of 1'000 S Holding at 502.00 to Banca
del Monte Rosa.

Bianchi, who has reduced the *view* with his *Addressed
Offers Received Pane* to an icon, sees that the icon is
blinking, signalling a change in this *Pane*. He displays
the full *view* and checks the *Addressed Offers
Received Pane*, whose *Display Profile* contains only
the S Holding share.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-20
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Addressed Offer from Green



| | Security | B/S | Size | Price | Val Date | C1 | Expiry | Member | Trader | AO No | AO Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Del | S Holding | S | 300 | 506.00 | | Jun | M | 16:00 | CBA ZH | RotK | 12 | 15Apr |
| Tkn | S Holding | S | 300 | 505.00 | | Jun | M | 16:20 | CBA ZH | RotR | 14 | 15Apr |
| | S Holding | B | 1000 | 502.00 | | | | 16.00 | PFI ZH | GreG | 18 | 15Apr |

Fig. 101: Bianchi's *Addressed Offers Received Pane*. Having selected the *Addressed Offer*, Bianchi can open the *Addressed Offer Take Window* via the option "Take" in the pop-up menu.

In the *Unreleased Orders Ticker Pane*, Bianchi sees that 2'500 of his sell order for 10'000 S Holding shares have not yet been processed. He therefore decides to accept the *Addressed Offer* and to allot the transaction to the *Unreleased Order*.

To begin with, he selects the offer in the *Addressed Offers Received Pane* and generates via the option "Take" in the pop-up menu the *Addressed Offer Take Window*, which contains all information regarding the *Addressed Offer*.

Before accepting the *Addressed Offer*, Bianchi must complete it with the *Unreleased Order ID*. In the *Unreleased Orders Ticker Pane*, he selects the *Unreleased Order* and, using *Drag & Drop*, moves it to the *Addressed Offer Take Window*, which then indicates the number in the corresponding field.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-21
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 102: *Addressed Offer Take Window* and *Unreleased Orders Ticker Pane*. By indicating the *Unreleased Order ID* in the *Addressed Offer Take Window* (using *Drag & Drop*), the trader can attribute an accepted *Addressed Offer* to an *Unreleased Order*.

When the *Unreleased Order ID* was attributed, the relevant internal bank reference was automatically taken over and Bianchi can now accept the *Addressed Offer* simply by clicking on "Take".

Accepting the *Addressed Offer* results in a trade for 1'000 S Holding at 502.00 between Banca del Monte Rosa and F Finanz. In the updated line in the *Unreleased Orders Ticker Pane* the trade for 1'000 is immediately attributed to "Exec Size".

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-22
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 7.3.    Trade Confirmation

Black regularly checks the *Statements of Interest Received Pane* to stay posted on off-exchange trade opportunities with other exchange members.

| Security | B/S | Size | Price | Mth | Expiry | Statements of Interest Received Pane Member | Trader | SOI No | SOI Date | SOI Time |
|----------|-----|------|-------|-----|--------|--------|--------|--------|----------|----------|
| B Chemie ABC | B | 1200 | 224.00 | | 15:00 | PMB ZH | BrunJP | 2200 | 15Apr | 12:08 |
| | | | | Aug | 17:30 | CBC BA | SchwÜ | 2309 | 15Apr | 12:40 |

Fig. 103: *Statements of Interest Received Pane.* Shows the trader all *Statements of Interest* issued by other exchange members.

He finds a *Statement of Interest* for the purchase of 1'200 B Chemie shares at 224.00 from PMB ZH. Black would like to sell 1'500 shares and decides to call trader Brun to negotiate. He uses the trading system's reference data to find the phone number of PMB ZH. The reference data is made available by the Swiss Exchange SWX to its members; it refers to the securities traded, issuers, members and SWX member organisations as well as the *Change Fix* and the system parameters. The system also provides a calendar[1].

Black wants to find some data concerning a member. He opens the *Reference Pulldown Menu* in his current *view* and selects "Member/Trader" from the options displayed. The *Member/Trader Reference Data Window* opens and Black can select PMB ZH from the list displayed by clicking on the "Member" button *(Member Selection Window)*. The reference data will now be displayed and Black can find the phone number he is looking for.

---

[1]. Detailed information on reference data is to be found in Chapter 11.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-23
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Clicking on the "Member" button opens the *Member Selection Window*

Member reference

Reference to the member organisation

Information about the member's traders

Fig. 104: *Member/Trader Reference Data Window.* Contains data regarding the member organisations, members and their traders. Data is made available to all members by the Swiss Exchange SWX.

Black gets in touch with Brun by telephone and they agree to trade 1'500 B Chemie shares at a price of 224.00. Since this trade was not concluded via the SWX functions for off-exchange trades, it must be reported to SWX within 30 minutes. As both Black and Brun are exchange members, they can use the *Trade Confirmation* function for their *Reporting* [1], which fully supports automatic *clearing* and *settlement* by analogy to the functions for exchange trading. Both members have to enter a *Trade Confirmation.* To confirm the trade, the data regarding market side, size security, price, counterparty, date and *clearing* entered by each of the parties must correspond.

---

1. For details on the reporting duty please refer to *EBS Story.*

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-24
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 7.3.1. Entering Trade Confirmations

To enter a trade confirmation, Black opens the *Trade Confirmation Entry Window.*



Counterparty member. Selection via the *Member Selection Window*

Trade's time stamp

Manual *clearing* is not selected because automatic *clearing* is available and desired

To be selected if a reported trade is reversed

Fig. 105: *Trade Confirmation Entry Window.* The other party to the trade must enter a corresponding *Buy Trade Confirmation.*

Apart from indicating a sale by clicking on "Sell", on the security reference, on the size agreed on and on the price, Black must indicate in the Member field with whom he has made a trade. Knowing the symbol for PMB ZH, Black enters it in the text field next to "Member". He could also have selected PMB ZH in the *Member Selection Window* by clicking on the "Member" button. Furthermore, Black must enter the date and time of the trade, which need not necessarily be identical to the information entered by his counterparty.

Since Black has configured his system accordingly, Nostro was entered by default. Moreover, automatic *clearing* has been selected.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-25
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Now that all information has been supplied, Black transmits the *Trade Confirmation* to the exchange system by clicking on the *Submit* button. The system acknowledges receipt of the *Trade Confirmation* in Black's *Message Area*.

As soon as Brun has sent his *Buy Trade Confirmation* to the exchange system, the trade is confirmed and published in the *Trade Ticker* to inform the other exchange members. Black and Brun receive additional confirmation of the trade in their *Personal Trades Ticker Pane*.

If the data entered does not correspond, the trade is not confirmed and the traders have to make the necessary adjustments within 30 minutes at most.

In his *Trade Confirmations Enquiry Pane*, the trader can see which of his *Trade Confirmations* have not yet been confirmed. This may occur if the counterparty has not yet entered the *Trade Confirmation* or if it is incorrect.

Because Black was faster in entering his *Trade Confirmation*, it is still displayed in the *Trade Confirmations Enquiry Pane*.

If the trader ID is missing, the *Trade Confirmation* was entered by another member who indicates his own bank as counterparty, and it has expired.

If there is a trader ID, it is a member's own *Trade Confirmation*.



Fig. 106: *Trade Confirmations Enquiry Pane*. Indicates all *Trade Confirmations* which have not yet been confirmed or which have expired.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-26
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Shortly after, Brun enters his *Trade Confirmation*. As the data from Brun and Black corresponds, the exchange system generates a trade for 1'500 B  Chemie shares at a price of 224.00, which is published in the *Trade Ticker*. Brun and Black can also see the trade in their *Personal Trades Ticker Pane*.

### 7.3.2. Change and Delete a Trade Confirmation

If the exchange system was not able to generate a trade based on the two *Trade Confirmations* because one of the parties made a mistake when entering the data, the *Trade Confirmation* can be changed via the pop-up menu of the *Enquiry Pane or* via *the Drop Site Pane (Replace)*. The *Trade Confirmation* to be replaced is deleted and a *Trade Confirmation Entry Window* containing the original data is opened. The trader can now make the necessary changes and transmit the changed *Trade Confirmation* to the exchange system by clicking on "Submit".

As is the case for exchange-traded orders, it is also possible to delete *Trade Confirmations* which have not yet been confirmed, for example if there was a misunderstanding between the two parties and no trade was made.

Deleted *Trade Confirmations* can be checked in the *Deleted Trade Confirmations Enquiry Pane*.

The *Deleted Trade Confirmations Enquiry Pane* also indicates the *Trade Confirmations* deleted by the system because they had expired. They can be either a trader's own *Trade Confirmations* or *Trade Confirmations* which were entered by another member and which concern the first member[1].

---

1. *Trade Confirmations* which are not confirmed are automatically deleted once a day, at the end of SWX operating hours. *Trade Confirmations* that are not confirmed remain in the system for a period of at least 30 minutes, to give members enough time to report the trade. This means that a *Trade Confirmation* which was entered shortly before the end of operating hours will still be in the system the following day.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-27
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 7.3.3. Trade Reversal

Trades (concluded on or off-exchange) can be reversed by a *Trade Reversal* if both parties agree. *Trade Reversals* can be entered by both parties via the *Trade Confirmation Entry Window*. The data entered for market side, size and price must correspond to the data of the original trade. To reverse the original trade, the trader must click on "Trade Reversal". As soon as both parties have entered their trade reversal, the size of the trade is displayed in the *Trade Ticker Pane* and the *Personal Trades Ticker Pane* with a negative sign, to indicate that it is a reversed trade. Clicking on "Trade Reversal" also leads to a correction of the daily trading volume.

## 7.4.   Trade Reporting

Black and Bianchi use the *Trade Reporting* to report all other off-exchange trades, which they conclude with a counterparty other than an exchange member. Such *Reported Trades* are entered by their assistant Heinrich Grün.

Bianchi has just concluded one off-exchange trade, while Black has concluded two. Grün must enter them within 30 minutes.

1. At 14:30 Black bought 1'000 S Holding shares at 499.50 from VBank, a Swiss bank with a B licence. Because the size of this order is below the limit which defines the duty to trade on the exchange, he was able to trade it off-exchange. However, the trade must be reported using the *Reported Trade* function, because VBank is not an exchange member.

2. Furthermore, at 14:40, Black bought 200 S Holding at the London Stock Exchange for 497.00. The trade was made in London and must therefore be reported via the *Reported Trade* function.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-28
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

3. At 14:35, Bianchi concluded a transaction for 1'200 S Holding shares at 500.00 between two of his clients. He needs to report this trade, because it was not executed in the matcher, since its size was not within the limit defining the duty to trade on the exchange.

Grün enters the trades which have to be reported in the *Reported Trade Entry Window*, which is similar to the *Trade Confirmation Entry Window*. It differs insofar as there is no detailed indication of the counterparty and no automatic *clearing*.



Fig. 107: *Reported Trade Entry Window*. As the trade is entered by one party only, the type of counterparty or the place where the trade was made must be stated. Automatic *clearing* is not possible for *Reported Trades*.

First, Grün enters Black's trade with VBank. He specifies the market side (purchase), order size, security and price and completes the date and time of the trade as well as the category of counterparty. As the trade was concluded with another securities trader, he selects "EFFH" on the *Counterparty* button. The ex-

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-29
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

change at which the trade took place (button next to *Trade Reversal)* is left on "Other", because this trade was not made at a different exchange.

As it is not a trade reversal, the function *Trade Reversal* is not selected. Like most of Black's trades, this one is a nostro transaction; he therefore clicks on the "Nostro" button. By clicking on the "Submit" button, the *Reported Trade* is transmitted to the exchange system. The system acknowledges receipt by sending back a *Reported Trade* number which is displayed in Grün's message area. At the same time, the trade is published to all other traders in the *Trade Ticker Pane*[1].

To enter Black's second trade, Grün first of all changes the size and price as well as the time of the trade. As the trade was made on another exchange, he does not need to indicate the counterparty. He therefore selects "None". However, he must enter "LON" in the exchange ID field, because the trade was made at the London Stock Exchange.

---

1.  The name of the exchange at which the trade took place is displayed in the Exh column of the *Trade Ticker Pane*.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-30
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Because the place of the trade is indicated, there is no need to specify the type of counterparty.

The exchange ID field displays London.

Fig. 108: *Reported Trade Entry Window* for a trade which took place at another exchange.

For Bianchi's trade, Grün must change the size, price and time as well as the counterparty. The trade was made between two clients, so he must enter "Customer" in the counterparty field. As both sides are within his own bank, Grün can choose to enter the trade as a purchase or a sale (he leaves it on Buy). He must also make sure not to select Nostro. He does not need to indicate the exchange at which the trade was made. The exchange ID field remains on "Other".

If Bianchi had sold the S Holding shares to his client out of the bank's nostro portfolio, Grün would have had to report the trade from the bank's point of view. He would have had to indicate "Sell", "Customer" as counterparty and "Nostro".

As well as in the *Trade Ticker Pane*, where all trades are published, Black and Bianchi can also check that their trades have been correctly entered on their *Own Reported Trades Enquiry Pane*.

Swiss Exchange SWX
TS User Manual
Off-exchange Trading

Page 7-31
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Trade number. "R" signals that the trade was
entered as a Reported Trade.



| Security | B/S | Size | Price | Own Reported Cpty | Trades Mth | Enquiry Ech | Pane Trade NO | User | Trd Date | Trd Time |
|----------|-----|------|-------|-------------------|------------|-------------|---------------|------|----------|----------|
| S Holding | B | 1000 | 499.50 | EFFH |  |  | 02444R0000006622 | Grün | 15Apr | 14:20 |
| S Holding | B | 200 | 437.00 | EFFH |  | LSE | 02444R0000006627 | Grün | 15Apr | 14:40 |
| S Holding | B | 1200 | 500.00 | CUST |  |  | 02444R0000006629 | Grün | 15Apr | 14:35 |

Fig. 109: *Own Reported Trades Enquiry Pane.* Displays the member's *Reported Trades.*

Because all trades entered as *Reported Trades* in the
exchange system are published immediately to all
other members, mistakes can only be corrected by
way of a *Trade Reversal* followed by a new entry of the
*Reported Trade.* As we saw when discussing the
*Trade Confirmation,* the original order must be entered
in the exchange system with the *Trade Reversal* button
activated. If *Trade Reversal* is selected when entering
the trade, the trade size is preceded by a negative sign
in the display on the *Trade Ticker Pane* and the *Own
Reported Trades Enquiry Pane.* As soon as the erro-
neous trade has been reversed, the correct trade must
be entered into the exchange system via the *Reported
Trade Entry Window.*

Swiss Exchange SWX
TS User Manual
Aggregated Orders

Page 8-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 8.    Aggregated Orders

Whenever possible, portfolio manager Nicolas Nussbaumer works with aggregated orders, rather than entering numerous small orders in the same security for various clients. He attributes the order to different customer accounts in the central computer system. Via the host interface, the aggregated order as well as the corresponding client order details are transferred to the trading system and processed by the trader concerned.

Today, Nussbaumer decides to buy 300 S Holding shares for each of 20 customer portfolios. He enters the corresponding aggregated order (and the attributions to the customer accounts) in his trading system, which transmits the order, together with the customer details, to the TS(X). Nussbaumer does not indicate a price because, in the interest of the clients, the order is to be executed as a market order at the best possible price.

## 8.1.    Processing in the Form of an Unreleased Order

As the order exceeds the routing criteria for automatic entry into the exchange system, Bianchi can see this order in his *Unreleased Own Orders Enquiry Pane*.



| Security | B/S | Org Size | Exec Size | Open Size | Off Size | Unall Size | Price | Trader A |
|---|---|---|---|---|---|---|---|---|
| B Chemie | B | 1000 | 1000 | | | | 240.00 | BBian |
| S Holding | S | 400 | 400 | | | | 504.00 | BBian |
| S Holding | S | 3000 | 3000 | | | | | BBian |
| S Holding | B. | 6000 | | | | 6000 | | BBian A |

Fig. 110: *Unreleased Own Orders Enquiry Pane* indicating an aggregated order.

Swiss Exchange SWX
TS User Manual
Aggregated Orders

Page 8-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

As an *Unreleased Order*, the aggregated order can be processed in the form of several partial orders. In view of the market situation, Bianchi decides to enter a *Hidden Size Order* for 3'000 shares with a price limit at 505.00. He posts the *Notify Flag* in order to be informed about the execution of his order.

He succeeds in buying another batch of 3'000 shares by telephone from Lindenhof Bank (also an exchange member) in Zurich at 504.00 and enters a corresponding *Trade Confirmation*.

Bank reference for the underlying *Unreleased Order*

The *Aggregated Order Flag* is not posted, because the underlying *Unreleased Order* has it already



Fig. 111: *Trade Confirmation* as partial execution of an aggregated order.

The *Aggregated Order Flag* cannot be changed for the entries concerning the aggregated order, because the underlying *Unreleased Order* already has the relevant attribute. Bianchi can view a list of aggregated orders in his *Aggregated Orders Enquiry Pane*.

Swiss Exchange SWX
TS User Manual
Aggregated Orders

Page 8-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 112: *Aggregated Orders Enquiry Pane* and the corresponding pop-up menu.

From the *Trade Notification Ticker Pane*, he can see that the *Hidden Size Order* was executed in several parts. The trade price for each part is thus known.

## 8.2.    Further processing of Client Details

Once the order is completely filled, Bianchi returns to his *Aggregated Orders Enquiry Pane*. In order to see whether Nussbaumer has entered client details, he selects the corresponding aggregated order and drags it with the *Drag & Drop* function to the *Client Order Details Enquiry Pane*, in which he can see the corresponding client details.

Case 1:08-cv-02412    Document 21-19    Filed 06/04/2008    Page 125 of 250

Swiss Exchange SWX
TS User Manual
Aggregated Orders

Page 8-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 113: *Client Order Details Enquiry Pane* and corresponding pop-up menu. The trader can filter information by security (*Drag & Drop* security name) as well as by security and *Aggregated Order* number (*Drag & Drop* aggregated order).

### Calculating the average price

As the order was completely filled, he attributes the partial trades at the average price before the data is transmitted to the host for further processing.

To calculate the average price, he views all partial trades belonging to this aggregated order. As seen previously for the client order details, Bianchi pulls the aggregated order selected in the *Aggregated Orders Enquiry Pane* onto the *Own Trades Enquiry Pane*, using the Drag & Drop function.

Swiss Exchange SWX
TS User Manual
Aggregated Orders

Page 8-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 114: *Own Trades Enquiry Pane* and corresponding pop-up menu. With the help of the «Calculate...» function, he can determine the average price of the selected trades.

This *pane* only displays the trades resulting from the aggregated order. Bianchi selects all the lines with the mouse. He asks the system to calculate the average price for the selected trades via the "Calculate" option in the pop-up menu; the price is displayed in a separate window.

All he needs to do now is to enter the trade size and price in the client order details. He selects the details for each client order individually in the *Client Order Details Enquiry Pane* and enters the trade size and price in the *Client Order Details Entry Window*, which he has opened via the "Change..." option in the pop-up menu.



**Fig. 115:** *Client Order Details Window.* In this window the trader can change or complete the client order details which the investment advisor has already entered in the bank's central computer system. If the portfolio manager uses TS(X), he can also use this window to enter client order details and to allocate trades.

### 8.2.1.  Ways of entering aggregated orders

Aggregated orders can be entered either via the host interface or by the trader himself. In the latter case, the trader posts the *Aggregated Order Flag* in the *Order Entry Window,* in the *Addressed Offer Entry Window,* in the *Trade Confirmation Window,* etc. The trader can also record *Client Order Details* and enter or delete additional *Client Order Details* (see pop-up menu *Aggregated Orders Enquiry Pane* and *Client Order Details Enquiry Pane*).

An aggregated order need not necessarily be entered as an *Unreleased Order,* as assumed for the purpose of the above example. The advantage of an *Unreleased Order* is the possibility of executing it in several parts, either on or off the exchange. The *Client Order Details Enquiry Pane* and the *Own Trades Enquiry Pane* show all partial trades belonging to the aggregated order if it is pulled to the corresponding *pane* using the *Drag & Drop* function.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 9.    Market Making

SWX is an order-driven market, in which orders are automatically matched against each other. However, the system offers functions that support *voluntary market making* by exchange members without additional obligations towards the exchange or specific incentives for the members. *Market-Making Orders* can be entered and managed via the *Price-Model Window* and the related mass functions or via the *Double Order Entry Window.*

Apart from S Holding, Black is also in charge of nostro positions in the following shares: "Muster", "XYZ" and "Noname". He quotes bid and ask prices for all four shares. Because this is *voluntary market making*, neither order size nor spread are set by the General Conditions.

## 9.1.    Price-Model Window – Mass Functions

It is 9:00 a.m. and the stock market is still in the pre-opening period. Black has informed himself about the most relevant events and defined his trading strategy for the day. On his screen, he has called up the Black *Market-Making View,* containing the *Market Overview Pane,* among others.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

```
                        Black Market Making View

  View   On Exchange   Off Exchange   Reference   Nostro         Help

                      Market Overview Pane
  Security    T B Size  B Price   S Price   S Size   TS     Last      Opng
  S Holding      300    501.00    501.00     200    Pre    501.00    501.00
  XYZ            400    820.00    821.00     450    Pre    821.00    821.00
  Muster         180    784.00    786.00     180    Pre    780.00    785.00
  Noname         220    500.00    Market     380    Pre    499.00    500.00
  ABC            680   1300.00   1310.00     220    Pre   1300.00   1300.00
```

Fig. 116: Black's *Market-Making View*. The view contains not only the *Market Overview Pane* but also the *Detailed Order Book* for "S Holding", "Muster" and "XYZ" shares.

### 9.1.1.  Entering Market-Making Orders with Mass Functions

Using the system's facilities, Black prepares his *Market-Making Orders* in such a way that he can check them briefly just before the market opens and transmit them rapidly to the exchange system. He uses the *Price-Model Window*, where he can enter as many *Market-Making Orders* as he likes in a so-called *Price Model* and save them locally in the trading system. In this phase, the orders are not yet in the exchange system and, therefore, cannot be seen by the other members' traders. Security name, order size and price can be modified at any moment. When Black decides to transmit the orders in the *Price Model* to the exchange system, he can simply click on the "Mass Insert" button. To facilitate the management of his positions, the current own *Market-Making Orders*, which are still in the order book for the corresponding stock, are displayed in the *Own Market* columns of the *Price-Model Window*. The *Price Model* columns remain unchanged until modified by the trader.

To open the *Price-Model Window*, Black clicks on "On Exchange" in the menu bar of his *Market-Making View* and selects "Price Model" from the options in the pull-down menu.

Selection of *Price Model* columns to enter price and size, as well as the corresponding book – in TS(X)

Saving *Price Model* columns. Clicking on the "Refresh" button displays the previously saved *Price Model* again



The *Mass Insert* button is used to transmit the *Market-Making Orders* displayed in the *Price Model* columns to the exchange system

Adjusting *Market-Making Orders* in the corresponding order books to the data displayed in the *Price Model*

Deleting *Market-Making Orders* for all securities displayed in the *Price-Model Window*

Increase or decrease one or several selected prices or sizes (*Price Model*) by a given number of increments or a percentage

Fig. 117: *Price-Model Window.* Black has entered the best bid and ask prices of the relevant stocks (except for Noname) in the *Price Model* columns. The *Own Market* columns are still empty, because the system currently has no open *Market-Making Orders* for this member. (Compared to the TS(X)-version, the *Price Model* of the TS-version has no *book* columns and no corresponding buttons.)

By clicking on "Profile", Black first of all selects the stocks for which he would like to quote bid and ask prices. In the profile list displayed, he selects *profile* "PM1"; the *security* column of the *Price-Model Window* now displays the stocks S Holding, Muster, XYZ and Noname. Black can now enter the corresponding orders for the selected securities into the *Price Model.*

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

He first enters the sell and buy prices for each security, setting them to the best bid and ask price, before making any other changes. Contrary to the ordinary *Order Entry Window*, Black does not have to enter every price individually, but can select all price fields (bid and ask prices) of the *Price Model* columns and input the best prices into the *Price Model* by clicking on the "Set Best" button. As he does not yet want to quote prices for Noname, he skips the corresponding fields when selecting the others.

Now, Black wishes to increase the best bid prices for all securities by one price increment (*step*). He therefore selects the bid price column (except Noname) and clicks on it with the mouse button while holding down the shift key. Then, he simultaneously increases all prices in the selected fields by one increment using the *steps* function. With the arrows to the right of the Steps text field, he can select the price increment.



If he clicks on "+" to the left of the *Steps* text field, the selected prices are increased by one increment and displayed in the *Price Model*.



As the currently entered ask prices do not correspond to the market, Black changes them individually for each stock. First, he selects the S price field for Muster, which he would like to increase by one increment. The *Steps* text field is still set on "1" and he can therefore simply click on "+" once to increase the selected price for the Muster stock to 787.00. To increase the ask price for S Holding by two steps to 503.00, Black selects the price in question and clicks twice on "+".

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

He then wishes to increase the sell price for XYZ by five steps to 1306.00. The quickest way to do so is to enter "5" into the *Steps* text field using the keyboard and clicking once on "+".

Black wishes to set the order size for all stocks to 300. He holds down the Shift key, selects the B Size fields and the S Size fields (except Noname) with the mouse and enters "300" into the Size text field using the keyboard. Clicking on "Set Size", all selected size fields are set to 300.



TS(X) offers Black functions to calculate profits and losses automatically. He therefore wishes to configurate his Price-Model Window in such a way that it includes all orders in a book named "Blck". (calculation functions and configuration possibilities for books are discussed further down.) He clicks on "Book..." and selects the book "Blck" from the list.

Then, holding down the shift key, he selects with the mouse all fields in the "Book" columns and clicks on "Book". As a result, all orders are included in the book "Blck". Black could also have attributed selected orders to other books.



Before transmitting his orders to the exchange system, Black saves the Price model by clicking on "Save" in the *Price-Model Window*. He can thus come back to the orders entered during pre-opening at any time when opening other *Price-Model* windows or after having made changes in a window and wanting to get

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

back to the original *Price Model* (clicking on the "Refresh" button).

It is 9:50 a.m. and Black transmits the *Price Model* orders to the exchange system by clicking on *Mass Insert*. The trading system first checks them to make sure that there are no duplicate or overlapping orders. If there are any, the trader receives a message and the orders are not transferred to the exchange system. The quoted prices must be changed.

For orders entered via *Mass Insert*, the trading system automatically posts the *Nostro-* and *Market-Making Flags*. However, the other members cannot see that the orders entered are *Market-Making Orders* (which are always nostro orders)[1]. The identification of an order as a *Market-Making* order is relevant for the further processing of the order with mass functions, because only those *Market-Making Orders* of a member that have not yet been executed are displayed in the *Own Market* columns of the *Price-Model Window* (buy orders to the left of the *Price Model* and sell orders to the right). The orders displayed there correspond to the current entries in the order book. Open *Market-Making Orders* are, of course, also displayed in the *own open orders pane* and identified in the nostro column with an "M".

As stock trading is still in pre-opening and no orders have been executed yet, the *Price Model* and *Own Market* columns contain the same orders, after Black has clicked on "Mass Insert"[2].

---

1. The identification of an order as *Market-Making* order is saved only in the trading system and not transmitted to the exchange system.
2. Black is the only nostro trader in his bank entering *Market-Making Orders* for S Holding, Muster, XYZ and Noname.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

| Security | Own Market | | Price Model | | Price Model | | Own Market | |
|---|---|---|---|---|---|---|---|---|
| | B Size | B Price | B Size | B Price | S Price | S Size | S Price | S Size |
| S Holding | 300 | 502.00 | 300 | 502.00 | 503.00 | 300 | 503.00 | 300 |
| Muster | 200 | 785.00 | 200 | 785.00 | 787.00 | 200 | 787.00 | 200 |
| XYZ | 300 | 1301.00 | 300 | 1301.00 | 1306.00 | 300 | 1306.00 | 300 |
| Noname | | | | | | | | |

Fig. 118: *Own Market* and *Price Model* columns of the *Price-Model Window*. During *pre-opening*, the *Own Market* as well as the *Price Model* may display the same orders. No orders were entered for Noname. (The "Book" columns which normally appear in the TS(X) version of the *Price-Model Window* have been left out for lack of space.)

### 9.1.2. Changing Market-Making Orders using Mass Functions

During the opening period, Black's orders have been partially executed; therefore, the orders in the *Own Market* columns are no longer identical with those in the *Price Model* columns. Furthermore, Black can consult the *Own Trades Enquiry Pane* to gain an overview of the executed orders. The *Market-Making Orders* that remain in the system are displayed in the *Own Market* columns.



The *Own Market* columns display
the *Market-Making Orders* that
have not been executed

| Security | Own Market | | Price Model | | Price Model | | Own Market | |
|---|---|---|---|---|---|---|---|---|
| | B Size | B Price | B Size | B Price | S Price | S Size | S Price | S Size |
| S Holding | | | 300 | 502.00 | 503.00 | 300 | 503.00 | 100 |
| Muster | 50 | 785.00 | 200 | 785.00 | 787.00 | 200 | 787.00 | 200 |
| XYZ | | | 300 | 1301.00 | 1306.00 | 300 | 1306.00 | 250 |
| Noname | | | | | | | | |

Fig. 119: *Own Market* and *Price Model* columns of the *Price-Model Window* after opening. Some of Black's *Market-Making Orders* were executed during opening.

In the course of the morning, Black receives information which leads him to lower his bid and ask quotes by 0.5%. Because of the mass functions of the *Price-Model Window*, he does not need to change the prices

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

of each order individually, but can make a global change for all *Market-Making Orders*. He wishes to leave those *Market-Making Orders* that have not yet been executed in the exchange system[1].

Because Black has not changed his original *Price Model*, he need not click on *Refresh* in the *Price-Model Window*. To lower the bid and ask prices by 0.5%, he selects both price columns in the *Price Model* (except Noname). Then he enters 0.5 in the % field and clicks on the "-" sign next to the % field. The modified bid and ask prices are now displayed in the price columns.

Black has now made the required changes and can transmit the new *Market-Making Orders* to the exchange system.

| Security | Own Market | | Price Model | | Price Model | | Own Market | |
|---|---|---|---|---|---|---|---|---|
| | B Size | B Price | B Size | B Price | S Price | S Size | S Price | S Size |
| S Holding | | | 300 | 499.00 | 500.00 | 300 | 503.00 | 100 |
| Muster | 50 | 785.00 | 200 | 781.00 | 783.00 | 200 | 787.00 | 200 |
| XYZ | | | 200 | 1292.00 | 1297.00 | 200 | 1306.00 | 200 |
| Noname | | | | | | | | 250 |

Fig. 120: *Own Market* and *Price Model* columns of the *Price-Model Window*. Black has lowered the bid and ask prices of the original *Price Model* (see *Price Model* columns) by 0.5%. He has not yet clicked on *Mass Update* and therefore the *Own Market* columns are still unchanged.

He wishes to delete the *Market-Making Orders* that remain in the exchange system and which he can check in the *Own Market* columns of the *Price-Model Window*. By clicking on "Mass Update", he prompts the

---

1. All *Market-Making Orders* of a member for a given *Security Profile* can be deleted by clicking on "Mass Delete". All orders which have a *Market-Making Flag* will thus be deleted, whether they have been entered via the *Price-Model Window* or not.

trading system first to send an order to delete all remaining open *Market-Making Orders* to the exchange system and then to transmit the *Market-Making Orders* in the *Price Model*.

| Security | Own Market B Size | Own Market B Price | Price Model B Size | Price Model B Price | Price Model S Price | Price Model S Size | Own Market S Price | Own Market S Size |
|----------|-------|---------|-------|---------|---------|--------|---------|--------|
| S Holding | 300 | 499.00 | 300 | 499.00 | 500.00 | 300 | 500.00 | 300 |
| Muster | 200 | 781.00 | 200 | 781.00 | 783.00 | 200 | 783.00 | 200 |
| XYZ | 200 | 1292.00 | 200 | 1292.00 | 1297.00 | 200 | 1297.00 | 200 |
| Noname | | | | | | | | |

Fig. 121: *Price-Model Window* after using the *Update* function. The *Own Market* columns now contain the same volumes and prices as the *Price Model*. Depending on the other orders in the book, some of the newly entered orders might be executed before they appear in the *Price-Model Window*.

## 9.2.   Double Order Entry

During continuous trading, Black decides to quote prices for Noname shares. He would like to find the quickest way to enter these quotes. As he only wants to quote new bid and ask prices for one stock and does not wish to delete open *Market-Making Orders*, he chooses the *Double Order Entry Window*.

To open the *Double Order Entry Window*, he uses the pulldown menu in his Black *Market Making View* and selects the option "Double...".

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-10
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 122: In the *Double Order Entry Window*, the trader can simultaneously enter a nostro buy order and a nostro sell order for the same security.

The *Double Order Entry Window* is basically configured like the *Normal Order Entry Window*, so that Black can enter his data in the same way. However, in the *Double Order Entry Window*, he can enter a buy and a sell order for the same security simultaneously. These orders are automatically considered as spot nostro orders.

In a first step, Black enters the symbol for Noname in the *Security* text field. Then he enters 500 into the bid and the ask price field by clicking once on the field "+500". He also has to select a price limit for the bid and the ask side. To do so, he clicks on the field "Best Prices". The best bid price (502.00) and the best ask price (504.00) are now displayed. Black wants to increase the bid price by one step and therefore clicks once on the upward arrow next to the bid price field.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-11
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

The ask price remains unchanged. Because the orders entered via the *Double Order Entry Window* are automatically nostro orders, the *Default Book* "Blck" has already been selected.

Before he transmits the orders to the exchange system by clicking on *Submit*, Black clicks on "Market Making".

New buy order entered via the
*Double Order Entry Window*

The *Price Model* columns
are unchanged



Fig. 123: *Own Market* and *Price Model* columns in the *Price-Model Window* after the Noname orders were entered via the *Double Order Entry Window*. The new orders are displayed in the *Own Market* columns as long as they remain open. The *Price Model* columns are unchanged.

The advantage is that the orders identified as *Market-Making Orders* are displayed in the *Own Market* columns of the *Price-Model Window* and can therefore be modified with the mass functions. The *Price Model* columns remain unchanged when orders are entered via the *Double Order Entry Window.*

The new *Market-Making Orders* that have not yet been executed are also displayed in the *Personal Orders Ticker Pane* and can be changed or modified there.

## 9.3.    Calculating profits/losses and positions

To calculate automatically the realised or unrealised losses on a given security, Black indicates the book to which nostro orders are to be attributed in the *Price-*

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-12
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

*Model Window* as well as the *Double Order Entry Window*. This function is available in TS(X).

The purpose of the book is to group trades in various securities. Net positions per security are calculated and can be broken down by value date. Each trade leads to a new entry in the book to which the security was attributed[1].

## 9.3.1. Calculations

TS(X) offers the following calculation functions:

*Position Value*

Position value is calculated based on the principle of the weighted average price.

*Realised Profit/Loss*

Realised profits/losses on a position change when the position has been reduced by a trade (i.e. reduction of a *long* position through a sale or reduction of a *short* position by a purchase). The change is equal to the difference between the original average cost price and the trade price multiplied by the size of the trade.

*Unrealised Profit/Loss*

Unrealised profit/loss is equal to the difference between the position value and the position valuation based on the last price paid[2]. The user can call up an updated calculation of the unrealised profit/loss for all positions in a book using the "Unrealised Profit" function.

---

1. TS(X) differentiates between positions with future value dates and the overall balance of the safe-custody deposit. The latter corresponds to the positions whose original value date is past, and which are presumably contained in the deposit at the current date.
2. TS(X) can also be configured to calculate unrealised profits/losses based on the best bid price (for long positions) or ask price (for short positions).

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-13
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 9.3.2. Consolidated Books

Several books can be consolidated. There are two types of books: the so-called *Low-level Books* and *High-level Books*. *Low-level Books* contain trades while *High-level Books* contain several books *(Low-level Books* or *High-level Books*, which may also contain several books).

In the following example, nostro traders Frédéric Forestier, William Black and Daniel Dubois manage a number of books in TS(X), which were configured by the system administrator at their request.



Fig. 124: Overview of the books at Banca del Monte Ross. Each of the three nostro traders manages a personal book which is at the same time his *Default Book*.

The top *High-level Book* with the name of "Global-Bank" indicates the overall positions; it is composed of the two *High-level Books* "Long-Term" and "Trading".

They contain the *Low-level Books* "Stocks-LT" (long-term stocks), "Bonds-LT" (long-term bonds), "For" (trading, nostro trader Forestier's *Default Book*), "Blck" (trading, nostro trader Black's *Default Book*) and "Dub" (trading, nostro trader Dubois' *Default Book*).

Forestier and Dubois basically trade the same stocks but Forestier concentrates mainly on the Swiss market while Dubois focuses on the international markets. Both have authorised access to all *Low-level* books with the exception of their colleagues' *Default Books*.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-14
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 9.4. Entering an order with a book attribution

### 9.4.1. On-exchange order

Forestier is currently increasing his position in diversified finance companies and enters a large order for S Holding. This security belongs to his *Default Book* (For), but the corresponding position is currently nil.



Fig. 125: *Order Entry Window* and *Book Selection* dialogue box.

Forestier opens the *Order Entry Window* by dragging the best ask price for S Holding from the *Market Overview Pane* and dropping it on the *Drop Site Accept Input*. Forestier's *Default Book* (For) is already displayed in the text field next to "Book..." in the *Order Entry Window*. Forestier can select another book by clicking on the "Book..." button. If he had entered the

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-15
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

order directly with *Drop Site Accept All*, it would have been attributed to the *Default Book*. The nostro flag was also posted (according to Forestier's *User Preferences*).

After entering the order size of 1'000, Forestier clicks on the *Submit* button; the order is immediately executed in part by two trades of 200 and 400 stocks.

Forestier opens his "Fred Book View", in which he has configured several *panes*, relating to his book or one of the *High-level Books*. His *Book Security Enquiry Pane* refers to the top book ("Global-Bank").

Attribution to a book is automatically taken over for each trade



The global position is aggregated in the higher-ranking books

**Fig. 126:** *Own Trades Enquiry Pane* and *Book Security Enquiry Pane*. The latter displays the positions in one security for a given book and the books included therein.

Forestier chooses the menu option "Security" in the pop-up menu of the *Book Security Enquiry Pane* and selects S Holding. The *pane* now displays all positions in S Holding which are contained in the books belonging to Global-Bank[1].

---

1. If the *Book Security Position Enquiry Pane* is open, a security can also be attributed by *dragging & dropping* the security name in question (e.g. from the *Market Overview Pane*).

### 9.4.2.  Entering a forward transaction

Forestier notices that the price for S Holding is increasing. To build up his position in S Holding he looks at the forward market, where he believes he could obtain a better price.

He therefore calls a trader in another bank and asks for a quote in S Holding. The trader offers to sell 800 S Holding, maturity July and asks Forestier to enter an *Addressed Offer* at 510.00. Forestier thinks that this price is fair because it corresponds to a spot price of 504.00 under the current interest-rate conditions.

Forestier opens the *Addressed Offer Entry Window* via the "Off Exchange" pulldown menu in one of his *views*.

Offered price
(trade price, if accepted)

Price registered in the book if the offer is accepted (only for forward transactions)



Fig. 127: *Addressed Offer Entry Window.* All input windows function in the same way for book attributions

By analogy to the *Order Entry Window*, his *Default Book* is selected as soon as he chooses a security which can be traded in this book. Because this is a forward transaction, he enters "Jul" (the standard delivery for July).

He enters the spot price, which theoretically corresponds to the forward price in the "Price" field, into the text field "Adjustment Price" – which is only available for forward transactions.

### Why a Forward Adjustment Price?

TS(X) does not take account of interest rates or dividends which accrue until the value date when calculating the position value. Therefore, if the trade was registered in the book at the forward price, this would lead to a valuation error. Thus, the trader can enter the spot price which he has calculated himself and which theoretically corresponds to the forward price. The price entered in the input field under "Adjustment Price" is used instead of the trade price for the purpose of calculating the position value.

Forestier releases the *Addressed Offer* and notices shortly after in the *Addressed Offers Sent Pane* that Black has accepted it.

### Display according to value date

In the *Dated Security Position Enquiry Pane*, positions can be listed according to their value date. This is par-

| Security | Dated Security Position For S Holding |       |               |            |
|          | L/S                                   | Posn  | Average Price | Prev. Size |
|----------|---------------------------------------|-------|---------------|------------|
| TOTAL    | L.                                    | 1600  | 504.00        | 1200       |
| 21APR96  | L.                                    | 600   | 504.00        | 600        |
| 26JUL96  | L.                                    | 1000  | 504.00        |            |

Fig. 128: *Dated Security Position Enquiry Pane*. The positions for a given stock are shown per value date in each book.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-18
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

ticularly important if there are short and long positions with different value dates. In Forestier's "Fred Book View", it is already configured for the "For" book.

S Holding is displayed after he has dragged the security name from the *Market Overview Pane* and dropped it on the *Dated Security Position Enquiry Pane*. If a change occurs in the security to be displayed, the *pane* is updated simultaneously, so that Forestier's last trade is already taken into consideration.

## 9.5.    Unrealised Profit & Loss

Forestier can see in the *Market Overview Pane* that the price for S Holding has already increased to 520. There are also substantial price changes for other securities contained in his book. Forestier decides to update unrealised profits/losses for all positions in his book.

The *Accumulated Profit/Loss Enquiry Pane* contains a list of all securities belonging to a book. It is contained in Forestier's "Fred Book View" and relates to the "For" book.



Fig. 129: *Accumulated Profit/Loss Enquiry Pane* with pop-up menu before unrealised profits/losses are updated.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-19
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Forestier clicks on the line for S Holding, selects the "Unrealised Profit..." option, whereby he opens a dialogue box displaying the unrealised profit for S Holding, calculated on the basis of the last price paid.



Fig. 130: Display of unrealised profit/loss in a given security. The trader can display this data on the *Accumulated Profit/Loss Enquiry Pane* without writing it into the database.

By clicking on the *Display* button, the corresponding figure for the selected security is entered in the *Accumulated Profit/Loss Enquiry Pane*.

| Security | L/S | Posn | Accumulated Profit/Loss For | | | | |
| | | | Real P/L | Unreal P/L | Value | Pr Real P/L | Pr Unreal P/L |
|---|---|---|---|---|---|---|---|
| S Holding | L. | 1600 | | 25600 | 806400 | | |
| SEE Engineering | L. | 600 | 3050 | | 600960 | | |
| FS Finance Serv | L. | 1000 | -3900 | | 430800 | | 700 |
| S Chemie | L. | 250 | 2122 | | 40202 | | 1080 |

Fig. 131: *Accumulated Profit/Loss Enquiry Pane* after updating the unrealised profit/loss. The column *Pr Unreal P/L (Previous Unrealised Profit/Loss)* indicates the previous value, if the calculation was made several times.

However, the figure in the database does not change, and the unrealised profit/loss is reset to zero when the *Accumulated Profit/Loss Enquiry Pane* is opened again.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-20
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 9.6.    Position Entry and Profit/Loss Entry

Forestier and Dubois have been advised to manage a nostro deposit, for which they had not previously been responsible. The positions are to be attributed to the *Low-level Book* "Stocks-LT". Dubois is currently entering a position in 300 B Chemie stocks. At the beginning of the year, this position contained 500 stocks, 200 of which have been sold in the meantime with a profit of CHF 3'021.00. The position value of the remaining 300 stocks, calculated on the basis of the average cost price, is CHF 60'600.00.

Dubois has to enter two figures: the new position (taking into account that the "Stocks-LT" book already contains positions in B Chemie) and the new realised profit (Dubois adds the profit realised earlier to the profit realised since the beginning of the year on B  Chemie in the "Stocks-LT" book).

He opens the *Position Entry Window* by selecting the line with B Chemie for the desired value date on the *Dated Security Position Enquiry Pane* and choosing the option "Change" in the pop-up menu.

The *Position Entry Window* opens, displaying the current position in B Chemie for the book "Stocks-LT" and the selected date. The selection can be changed by means of the push buttons "Security...", "Book..." or "Value Date...".

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-21
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 132: *Position Entry Window* before the change was made.

The text fields "New Position Size" and "Current Position Size" currently show 250. Dubois enters the new figure of 550 — the previous position of 250 plus the position entered (300) — in the field entitled "New Position Size".



Fig. 133: *Position Entry Window* after the change was made.

The change is shown on the *Accumulated Profit/Loss Enquiry Pane* after Dubois has clicked on *Refresh*.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-22
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Modified position

| Security | L/S | Posn | Profit/Loss Stocks-LT | | Value Pr | Real P/L Pr | Unreal P/L |
| | | | Real P/L | Unreal P/L | | | |
|---|---|---|---|---|---|---|---|
| Auguri | L. | 400 | 30800 | 0 | 806408 | 0 | 0 |
| Aconsult | L. | 200 | 120300 | 2940 | 600960 | 0 | 3050 |
| Btres Software | L. | 1000 | 3800 | -14200 | 430800 | 700 | -5600 |
| B Chemie | L. | 550 | 2122 | 1120 | 40202 | 0 | 0 |

**Fig. 134:** *Accumulated Profit/Loss Enquiry Pane* after the position was modified in the *Position Entry Window*. The value columns still show the old figures because the position value has not been entered yet.

As not only the additional position but also the corresponding profit/loss must be registered, Dubois clicks on the line with "B Chemie" and selects "Change" from the pop-up menu. The *Profit/Loss Entry Window* opens, displaying the figures which were valid until now – realised profit, unrealised profit and position value – for this position.



Newly entered position value (old position value plus change)

Newly entered realised profit/loss

Indication before the change

**Fig. 135:** *Profit/Loss Entry Window.*

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-23
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

In "Position Value", Dubois enters the sum of the previous position value in the book and the value (at the beginning of the year) of the newly entered 300 stocks: 40'202.00 + 60'600.00 = 100'802.00.

He leaves the text field "Unrealised Profit/Loss" unchanged, because it is simple enough to calculate the unrealised profit/loss using the "Unrealised Profit..." function.

In "Realised Profit/Loss", he enters the sum of the previous realised profit/loss and the profit/loss of the added position: 2'122.00 + 3'021.00 = 5'143.00.

The text fields "Position Size" and "Prev. Position Size" in the *Profit Loss Entry Window* show the input made previously in the *Position Entry Window*. They are displayed for information purposes only.

Once Dubois has entered the positions, he can select a given line and calculate the unrealised profit/loss on the positions with the "Unrealised Profit..." function, which is available in the pop-up menu of the *Accumulated Profit/Loss Enquiry Pane* or the *Profit/Loss Enquiry Pane*.



Fig. 136: *Accumulated Profit/Loss Enquiry Pane, after the new position was entered.*

Following a *Refresh*, the *Accumulated Profit/Loss Enquiry Pane* shows the latest situation. TS(X) does not verify the changes made; the two nostro traders are responsible for entering only data which reflects the true values.

### 9.7.   Partial Liquidation of a Position, Realised Profit/Loss

Dubois and Forestier have decided on the changes to be made in the new "Stocks-LT" book. Among other changes, they would like to reduce the position in B Chemie shares by one third.

Dubois enters a *Normal Order* to sell 200 B Chemie shares at 225.00, indicating the "Stocks-LT" book. The order is executed immediately at the specified price.

| Security | L/S | Accumulated Profit/Loss for Stocks-LT | | | | | |
|---|---|---|---|---|---|---|---|
| | | Posn | Real P/L | Unreal P/L | Value Pr | Real P/L | Pr Unreal P/L |
| Turück | L. | 400 | 30800 | | 806400 | | |
| Automelt | L. | 200 | 120300 | 2940 | 600960 | | 3050 |
| Fones Software | L. | 1000 | 3800 | -14200 | 430800 | 700 | -5680 |
| Chemie | L. | 350 | 13488 | 14603 | 64146 | | |

*Fig.: Accumulated Profit/Loss Enquiry Pane after the sale of 200 B Chemie shares at 225.00. The system automatically calculates the new values which are displayed on the pane after a refresh.*

The sale of part of a long position represents a partial liquidation. Therefore, TS(X) automatically calculates the profit realised on this transaction and adds it to the amount of *Realised Profit/Loss*.

As the number of shares has been reduced, the position value is updated.

### 9.8.   Marking to Market

With the *Mark-to-Market* function, unrealised profit/loss on a position is added to realised profit/loss, so that the new position value corresponds to the market value and the new unrealised profit/loss is equal to zero.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-25
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

At Banca del Monte Rosa, the *Mark-to-Market* function is only used at the close of a book-keeping period and, in individual cases, if large potential losses occur.

The book "Stocks-LT" contains a position in "C Electric" shares, which have recently suffered a substantial price decline. As the market value of this position is largely below the position value in the book, Dubois would like to substitute the position value by the market value. He selects the "C Electric" share on the *Accumulated Profit/Loss Enquiry Pane* and selects the "Mark to Market..." option in the pop-up menu.



Fig. 138: *Mark-to-Market* dialogue box. After clicking on the "Mark" button, the average cost prices are replaced by the market prices in the database.

The *Mark-to-Market* dialogue box indicates the realised loss on the position in "C Electric". As soon as Dubois has confirmed the dialogue entry by clicking on "Mark", the old profit/loss figure is replaced by the new one. (If the user quits the dialogue box pressing on *Cancel*, the data remains unchanged.)

## 9.9.    Transferring positions from one book to another

A few days later, Dubois and Forestier decide to increase the position in S Holding in the "Stocks-LT" book by 200 shares.

The book "For" already contains 200 S Holding shares as a deposit, as well as a forward long position of 800

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-26
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

for July delivery. Since he bought this position, the spot price has increased from around 504.00 to 521.00. Forestier, who is responsible for the book "For", would like to reduce his position by transferring the shares in his deposit.

As far as the "For" and "Stock-LT" books are concerned, the transfer represents a sale from "For" to "Stock-LT". For the market and the bank's internal security accounting, it has no consequences other than a transfer from one book to another.



Fig. 139: *Dated Security Position Enquiry Pane* and corresponding pop-up menu. After selecting a position with a given value date, the trader can call up the *Book-to-Book Movement Entry Window* using the "Transfer" option.

Forestier is authorised to access both books and so he carries out the transfer. He opens the *Dated Security Position Enquiry Pane* and selects the security "S Holding" and the "For" book, using the pop-up menu "Security..." and "Book..." options.

He then selects the spot position of 600 shares and the pop-up menu "Transfer..." option.

Swiss Exchange SWX
TS User Manual
Market Making

Page 9-27
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 140: *Book-to-Book Movement Entry Window*. The trader who carries out the transfer must be authorised to gain access to both books concerned.

The *Book-to-Book Movement Entry Window* opens, displaying the data regarding book, security and value date. In the field "Buy from", Forestier leaves the input unchanged; in "Sell to" he enters the book "Stocks-LT". He sets the position value *(P/L Value)* to 104'200 – the current market value (521.00) multiplied by the size (200).

He clicks on *Submit* to transfer the position. In his own book, the realised profit is recorded as if he had sold the position in the market.

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 10.    Exceptional trading situations

In exceptional circumstances, the SWX system may signal a *Non Opening* (market orders left at opening) or a *Stop Trading* (excessive price fluctuations)[1].

### 10.1.  Non Opening

At 9:35, Bianchi gets a call from a client wishing to sell 400 B Chemie shares. Bianchi views the current data in the *Detailed Order Book Pane* and informs the client that the best bid price is 223.00 and the best ask price is 225.00. The client decides to limit his order at 223.00.

Bianchi opens the *Order Entry Window* and enters the sell order for 400 B Chemie shares.

```
                  Detailed Order Book Pane
   B Chemie
   Member    O  B Size    Price    S Size   O  Member
                          Market    400
                          225.00    100
                   150    223.00    400    *
                   100    221.00
                   150    220.00
```

Fig. 141: *Detailed Order Book Pane* for B Chemie shares after Bianchi has entered the client order. If the market opened at this very moment, the market order would be executed against the three buy orders at 220.00.

Shortly before the stock market opens, Bianchi sees in the *Market Overview Pane* that the *Inside Market* for B  Chemie has changed. He would like to know if his client order will be executed and, after doing a *Refresh*, consults the current *Detailed Order Book* for B Chemie.

---

1. See EBS Story for further details on the Exchange Regulations.

The bid side is unchanged, but on the ask side a new market order has been added.

```
                    Detailed Order Book Pane
    B Chemie
    Member   O  B Size      Price    S Size  O  Member
                            Market     200
                            Market     400
                    150     225.00     100
                    100     223.00     400   •
                    150     221.00
                    150     220.00
```

Fig. 142: Modified *Detailed Order Book Pane* for B Chemie. There are now sell market orders for a total of 600 shares and buy market orders for a total of 400 shares. This will trigger a *Non Opening* situation.

If the market were to open now, there would be a *Non Opening*, because there are more market orders on the ask side than on the bid side. In this situation, there is no theoretical opening price and, therefore, the message in the *Opening* price colum (Opng) of the *Market Overview Pane* will read "Non Op".

If the market were to open now, it would not be possible to execute all market orders and this would result in a non opening for B Chemie. Neither would there be a theoretical opening price.

```
                        Market Overview Pane
    Security   T  B Size   B Price   S Price   S Size   TS    Last      Opng
    S Holding     300      501.00    501.00     200    Pre   501.00    501.00
    XYZ           400      820.00    821.00     450    Pre   821.00    821.00
    Muster        120      784.00    Market     100    Pre   780.00    784.00
    B Chemie      400      223.00    Market     600    Pre   223.00    Non Op
    ABC           680      1300.00   1310.00    220    Pre   1300.00   1300.00
```

Fig. 143: *Market Overview Pane*. All securities are still in pre-opening.

It is now 10:01, and the opening procedure for B Chemie starts while the order book remains unchanged. Because it is not possible to execute all market orders, continuous trading in B Chemie will not start; the share will receive *Non Opening* status.

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi can see this in the TS column of his *Market Overview Pane*, which reads "Non Op" for B Chemie. The *Opng* column should indicate the opening price, but since trading in B Chemie did not open, there is no opening price and the column still contains the message "Non Op".

B Chemie is in *Non Opening* status, i.e. it was not possible to execute all market orders in the opening phase. As soon as there is a change in the order book, the opening procedure starts again.

| Security | T | B Size | B Price | S Price | S Size | TS | Last | Opng |
|---|---|---|---|---|---|---|---|---|
| S Holding | | 300 | 501.00 | 501.00 | 200 | Pre | 501.00 | 501.00 |
| XYZ | | 400 | 820.00 | 821.00 | 450 | Pre | 821.00 | 821.00 |
| Muster | | 430 | 784.00 | 786.00 | 370 | Trd | 784.00 | 784.00 |
| B Chemie | | 150 | 223.00 | Market | 600 | Nop | 223.00 | Non Op |
| ABC | | 700 | 1301.00 | 1308.00 | 500 | Trd | 1301.00 | 1300.00 |

Fig. 144: *Market Overview Pane*. At 10:01 continuous trading in Muster and ABC shares has already started, while S Holding and XYZ are still in pre-opening. Trading in those two stocks will open shortly. B Chemie remains in *Non Opening* status.

The *Non Opening* status for B Chemie prevails until there is a change in the order book. As soon as an order has been added or removed, the opening procedure for this security starts again. If all market orders can be executed, continuous trading in B Chemie starts. Otherwise, the *Non Opening* status continues until another change has occurred.

At 10:10 another of Bianchi's clients calls in, wanting to buy 450 B Chemie shares. Bianchi recommends a price limit at 222.00. The client agrees and Bianchi enters the buy order for 450 B Chemie at 222.00.

With this new order, the book has changed and the opening procedure for this security starts again. The two sell market orders for a total of 600 shares are executed at 222.00 against the buy market order for 150, limited at 223.00 and the own buy market order for 450 shares, limited at 222.00. Thus B Chemie

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

shares opened and are now in continuous trading. The opening price is 222.00. If the buy market orders and sell market orders had still not matched after this change, B Chemie would have remained in *Non Opening* status.

Like the other shares, B Chemie is now in continuous trading



Fig. 145: *Market Overview Pane.* After the order book for B Chemie had changed, the opening procedure for this share was launched once again. Since all market orders were executed, continuous trading in B Chemie shares has started.

An excess of market orders on one side of the book during continuous trading has no consequences for trading; the orders are simply displayed in the book.

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 10.2.  Stop Trading

The *Stop Trading* mechanism allows the exchange to suspend trading in a given share for a specified number of minutes if the orders in the book would lead to a price fluctuation in excess of a specified range. The exchange can set the parameters – price fluctuation and suspension period – for each market segment individually. The *Stop Trading* parameters applicable to a given security are defined in the reference data.

In the following example, it is assumed that, for Swiss stocks, a price fluctuation of more than 2% would lead to a trading halt of 15 minutes.

In the early afternoon of the same day, Bianchi gets a call from a client wishing to buy B Chemie shares. The client is convinced that the price for B Chemie will drop until the end of the week and, therefore, wants to enter an order for 300 shares at 199.00, valid until the end of the week, despite the fact that the best bid price is currently 221.00 and the last trade price was 222.00. Bianchi enters the order in the *Order Entry Window*.

The following afternoon, the best bid price is 223.00 and the best ask price is 225.00.

```
                  Detailed Order Book Pane
B Chemie
 Member    O  B Size      Price    S Size   O  Member
                          226.00      100
                          225.00      500
                  100     223.00
                  100     222.00
          *       300     199.00
                  400     197.00
```

Fig. 146: *Detailed Order Book Pane* for B Chemie during continuous trading.

Another member enters a sell market order for 300 B Chemie shares. First, 100 shares of this sell order are bought at 223.00 and then another 100 at 222.00.

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Continuous trading is then suspended by a *Stop Trading*, because the price to be paid would drop by more than 2% compared to the last paid price[1]. In the present situation, the remaining 100 shares of the sell order could only be sold against Bianchi's buy order at 199.00.

Bianchi is informed about the *Stop Trading* in the *Market Overview Pane*.

Trading in B Chemie is currently suspended *(Stop Trading)*

| Security | T | B Size | Market Overview Pane | | S Size | TS | Last | Opng |
|---|---|---|---|---|---|---|---|---|
| | | | B Price | S Price | | | | |
| S Holding | | 700 | 498.00 | 501.00 | 300 | Trd | 501.00 | 501.00 |
| XYZ | | 430 | 822.00 | 825.00 | 150 | Trd | 822.00 | 821.00 |
| Master | | 360 | 783.00 | 787.00 | 400 | Trd | 780.00 | 785.00 |
| B Chemie | | 400 | 199.00 | Market | 100 | Stp | 222.00 | 221.00 |
| ABC | | 200 | 1302.00 | 1308.00 | 520 | Trd | 1303.00 | 1290.00 |

Fig. 147: *Market Overview Pane. Stop Trading* in B Chemie shares is signalled in the TS column by the mention "Stp".

During stop trading, members can delete or change existing orders and enter new orders. After 15 minutes, trading opens again according to the normal procedure. This means that if there is an imbalance between buy and sell orders, the situation could result in a *Non Opening*.

During *Stop Trading* a few more buy orders are entered.

---

1. Bond trading is suspended *(Stop Trading)*, if the price to be paid varies by more than 2% from the reference price, i.e. the last paid price or the reference price entered manually by the Swiss Exchange. See Stop Trading Rules in SWX Communication No 36/96.

Swiss Exchange SWX
TS User Manual
Exceptional trading situations

Page 10-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 148: *Detailed Order Book Pane* for B Chemie shortly before the end of *Stop Trading*.

Until 14:51 no other changes have occurred in the order book and trading in B Chemie shares opens again with an opening price of 221.50. Depending on the situation in the order book, trading in B Chemie could have started at 199.00 or less. Price fluctuations are therefore irrelevant for the end of a *Stop Trading* situation. Once continuous trading in B Chemie is resumed and prices fluctuate heavily again, a new *Stop Trading* might occur[1].

If the opening price of a security differs by more than 2% from the reference price, the security does not open for trading but receives the status "Delay Opening". Just like *Stop Trading* during continuous trading, *Opening* is delayed by 15 minutes. During this period of time it is possible to enter new orders or delete existing ones. The *Delay Opening* is signalled in the TS column of the *Market Overview Pane* by the indication "Dop".

1. For further details on *Stop Trading* rules, please refer to SWX Communication No. 36/96.

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 11.    Reference Data

The Swiss Exchange makes the following data available through its trading system:

- Security reference data (securities and issuers)
- Members and traders
- Change Fix
- System parameters
- Calendar

For Bianchi and Black, reference data is also particularly helpful when trading off-exchange with a member not yet well known to their bank[1] or when a new security is listed on the Exchange.



Fig. 149: Reference Pulldown Menu. The menu options give the user access to reference data on securities, issuers, members, the trading calendar, system parameters and the exchange rate for currency conversions.

Black will be the person in charge within his institution for own-account trading in the UTS (United Training Solutions Inc.) convertible bond (ex-warrant), which will be listed on the Exchange a week later. In addition to the information he has already received from within his bank, Black would like to find out what reference data is published through the SWX System to all members.

---

1.  For information on member/trader reference data please refer to Chapter 7.

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 11.1.  Security Reference Data

Black first wants to see the reference data related to this convertible bond. In one of the active *views*, he selects the "Reference" pulldown menu and from there the "Security..." menu option to open the *Security Reference Data Window*. This window is empty at that stage. He must first select the security he is interested in. Just like the *Order Entry Window*, the *Security Reference Data Window* also calls up the *Security Selection Window* where the user can enter the symbol, the short name or a portion thereof to select a security.

Related derivatives. If one of these securities is selected, additional data can be called up via the "Associated..." button

Reference data related to the selected security



Fig. 150: *Security Reference Data Window.* Displays reference data related to a given security. The buttons "Detail...", "Associated...", "Trading...", "Clearing...", "Cash Flow..." and "Miscellaneous..." can be used to display additional data.

Via the keyboard, Black enters a portion of the security symbol into the *Security* text field. As the character string matches multiple securities, a selection dialogue

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

appears with a list of securities from which Black selects the desired convertible bond.

Black now has the reference data for the 2% UTS convertible bond (ex-warrant) displayed on his screen. To access a detailed description, he clicks on the *Detail* button, which causes the *Bond Reference Data Window*[1] to open.



Fig. 151: *Bond Reference Data Window.* Contains details related to a bond.

After viewing the information, he clicks on the "Close" button to quit this window; this brings him back to the *Security Reference Data Window.* At this stage, he is not interested in additional information about related *Derivatives, Clearing, Cash Flow* and other data[2], and he opens the window containing *Trading Data* by clicking on the "Trading" button. Black can close this window by clicking on the "Close" button.

---

1. If Black had selected a stock under *Security,* the *Share Reference Data Window* would have been opened. The same applies for *Derivatives;* the corresponding *Derivative Reference Data Window* would have been opened.
2. For more information please see the TS Reference Manual.

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 152: *Trading Reference Data Window*. Displays important data related to trading in a given security. If the data relates to a stock, the specific bond market fields are not displayed.

## 11.2. Issuer Reference Data

Black has seen all the reference data he needs on UTS bonds. However, he is also interested in the *Rating* of United Training Solutions Inc. This type of information can be found in the *Issuer Reference Data Window*, which he can access through the already open *Security Reference Data Window*. By clicking on "Reference", he opens the pulldown menu, from which he selects "Issuer".

The data related to UTS can be found by entering the company name or code. If the entry matches multiple

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

issuers, a selection dialogue is opened, from which Black can select the appropriate issuer.



Data displayed after entering issuer name or issuer code

Fig. 153: *Issuer Reference Data Window*. Contains information related to the issuer of a listed security.

## 11.3. Calendar

Black plans to take a long week-end in the next couple of months. For this reason, he would like to find out when there are bank holidays in May. From the *Issuer Reference Data Window* still open on his screen, he can select the "Calendar" option on the *Reference* pulldown menu.

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



*Fig. 154: Calendar Reference Data Window.*

The calendar for March 1996 (current month) is shown. As Black is interested in May 1996, he clicks twice on the arrow on the right of the month indicator, causing the display to move to May. Week-ends and holidays are marked in a different color. In order to find additional information regarding a given day, Black must click on the corresponding date. If additional information is available for that day, it will then be displayed.

Black has been able to view key reference data and would now like to close the open reference data windows. In the Calendar window, he selects the *Window* pulldown menu and clicks on the "Close" option. He does the same for the *Issuer Reference Data Window* and the *Security Reference Data Window.*

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 11.4. Change Fix

For the conversion of trade prices Into foreign curren-
cies, the Exchange publishes daily exchange rates for
the most important currencies. These can be viewed
under the option *Change Fix* in the *Reference menu*.



Fig. 155: *Change Fix Window.*

## 11.5. System Parameters

Some information specifically related to the member's
TS can be viewed on the *System Parameters Refer-
ence Data Window*. This information window indicates,
among other things, under which name the member is
registered.

Case 1:08-cv-02412    Document 21-19    Filed 06/04/2008    Page 169 of 250

Swiss Exchange SWX
TS User Manual
Reference Data

Page 11-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Indicates if the exchange
system is currently ready
to receive *Post-recorded
Trades*

Trades with the members
listed here are not cleared
via the exchange

Fig. 156: *System Parameters Reference Data Window.*

Banca del Monte Rosa has a special relationship with
Banque du Mont Rose in Geneva. Trades with the
partner institution are not cleared via the SWX's auto-
matic settlement system, but rather settled directly
between the two institutions. The trader can check on
the System Parameters that this option is activated in
the exchange system, so that trades between the two
institutions do not generate settlement instructions to
SECOM.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 12. User Configuration

## 12.1. Who Decides What?

The Trading System user interface can be configured for each individual user, so that each trader can define and name his or her own *Views, Panes, Profiles, Filters*, etc. The user can also choose a series of system settings *(User Preferences)*. Some of the user-related configuration options are not directly accessible to the user, but must be set by the system administrator. These are generally settings related to access rights (e.g. *Authorised Securities, Authorised Functions*) granted to the user.

| Settings chosen by user (Preferences) | Configured and named by user | User-related configuration by System Administrator | System-related configuration |
|---|---|---|---|
| Properties of the *Order Entry Window* (Size buttons, Price step buttons, Nostro Indicator, etc.) Language of securities names, News and Help function Market activity indicator Properties of *Pop-in Market Overview Pane* | Views Panes Pane Column Config Profiles Filters | Assignment of Trader ID *Authorised Securities* *Authorised Functions* Printing (yes/no) of *Trade Slips* | *Yield Calculation* Book hierarchy (Low-Level Books, High-Level Books) Routing Criteria |

Fig. 157: Configuration settings are not linked to a given trader workstation, but to the trader's *User ID*. The traders of Banca del Monte Rosa do not always work on the same workstation, but they do keep their respective user configurations when switching to another workstation.

The *Configuration Menu* provides access to the various configuration options available to the user. This menu can be called up via the "Config" option of the *Control Panel* or via the "Configure..." menu option on the pulldown menus of *Views*.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Access to *Preferences Window*    →

Access to *View Configuration Management Window*    →

Access to *Pane Configuration Management Window*    →

Access to *Profile Configuration Management Window*    →

Access to *Filter Configuration Management Window*    →

Access to *Column Configuration Window for Market Overview Panes*    →

Closes the configuration menu    →

Fig. 158: *Configuration Menu.* Provides access to the various *Configuration Windows* available to the user.

## 12.2. Preferences

The *Preferences* settings adapt the user interface to the needs of a specific user. Bianchi has configured them to minimise his workload when handling customer trades in the stock market. The most important settings for this purpose are related to the pre-configuration of the *Order Entry Window.* As Bianchi trades on behalf of customers, his default settings for the Nostro Indicator and the *Market-Making* Indicator are "off". Whenever he opens a new *Order Entry Window* – be it via *Drop Sites* or via the pulldown menu – the respective flags are set as defined in *Preferences.* The *Reset* button of the *Order Entry Window* also conforms to the *Preferences* settings.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 96



Selection of *Brief/Full Order Entry Window* and activation of *Command Line*

The *Addressed Offer Entry Window* expiration field is automatically set to current time plus the indicated number of minutes

Language of security names, news, help function

Clicking on the *Reset* button causes the data to be set back to the settings specified in the *Preferences*

Shape (+/–; Arrows, Colours) and display duration of activity indicators on the *Market Overview Panes*

The *Pop-in settings* define above which threshold and for how much time the *Inside Market* of a security is to be displayed on the *Pop-in Market Overview* type of Panes

| Security | T | B Size | B Price | S Price | S Size | TS |
|---|---|---|---|---|---|---|
| NTSInfo | | 110 | 985.00 | 986.00 | 70 | Trd |
| S Holding | | 400 | 505.00 | 507.00 | 300 | Trd |

Pop-inPop-in Market Overview Pane

Fig. 159: *Preferences Window* and some of the windows it has an influence on. The *Preferences Window* is called via the *Configuration Menu*. After a change, the new *Preferences* are valid for all windows opened after saving the preferences (by clicking on *Apply* or *OK*). The parameters of orders entered via the "All" *Drop Site* are the same as those specified in *Preferences*.

Unlike Bianchi, Black is a nostro trader (i.e. trading for the member's own account) and therefore prefers to have the Nostro Indicator set to "on" whenever he opens an *Order Entry Window*. He has adapted his *Preferences* accordingly. His *Market-Making Indicator* setting in the *Preferences* is "off". Black normally uses *Normal Orders* valid for the trading day, a value he has also entered into the *Preferences*. As he hardly ever

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

needs to change the lower portion of the *Order Entry Window,* he prefers to use the *Brief Order Entry Window.* These settings are, of course, only the predefined attributes of the *Order Entry Window;* whenever he needs other attributes he can change them before pressing the "Submit" button.

The "Confirm Threshold" field defines the order value above which the Trading System must require an additional confirmation for order entry. This additional confirmation is a protection against input errors (e.g. entering an additional zero digit). Trading generally on behalf of institutional investors, Camila Castanho has configured the threshold at 250'000, whereas most of her colleagues use 100'000. An additional confirmation is required whenever the order value (price multiplied by order size) or the nominal value (in the case of bonds) is higher than the value set in *Preferences.*

Other differences in configuration between various traders concern the securities they generally trade. For instance, Castanho, as a bond trader, uses *Fixed Size* buttons between 1'000 and 10'000'000. She has set the *Price Step Arrows* to 0.1 and 0.05. As she likes to indicate the trading interest of her bank in her market segment, her *Preferences* default setting for the *Disclose Flag* is "on". This means that Castanho's orders are pre-configured to make the *Member ID* of Banca del Monte Rosa visible in the *Detailed Order Book.* Naturally, Castanho can turn off the *Disclose Flag* for any specific order before submitting it.

### 12.2.1. Changes in Preferences

Traders sometimes change their configuration during their work. For instance, Bianchi may find at some point that some "heavy" stocks often require orders for a small number of shares. Therefore, he would like to change the *Fixed Size Pushbutton* to a size of 10. To do this, he opens the *Configuration Window* and calls up the *Preferences Window,* in which he sets lower values for the pushbuttons.

Changed settings on the *Preferences Window* for *Size Pushbuttons* on the *Order Entry Windows*

Appearance of an *Order Entry Window* opened after saving the change in *Preferences*



Fig. 160: Change in *Preferences* concerning *Fixed Size Buttons*. In general, configuration changes apply to newly opened windows. The windows already open keep their initial configuration until they are closed.

While he is changing *Preferences,* Bianchi already has an open *Order Entry Window.* This window remains unchanged when he clicks on the "OK" or "Apply" button of the *Preferences Window.* As soon as Bianchi opens a new *Order Entry Window,* the modified pushbuttons appear.

## 12.3.  Settings Configured by the System Administrator

### 12.3.1. Authorised Functions

The System Administrator determines which actions every user is authorised to perform. For a specific user, the administrator can, for instance, authorise the entry of *Reported Trades* and prohibit order entry. Some staff of Banca del Monte Rosa have data entry authorisations although they are not registered SWX Traders. Transactions for which no *Trader ID* is required include *Trade Reports* and *Unreleased Orders* entered by portfolio managers.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 12.3.2. Trade Slips

The System Administrator can specify whether, for nostro or customer trades (or for both), *Trade Slips* are to be printed after the trade has been executed. *Trade Slips* contain all the information needed for settlement. They can be printed either continuously or in batches.

*Trade Slips* can also be used if manual settlement is required for any reason.

It is also possible to print or regenerate *Trade Slips* later.

### 12.3.3. Authorised Securities

The TS System Administrator defines the securities authorised for each individual trader. The *Authorised Securities List* contains stocks selected according to various criteria. The trader is allowed to enter or delete orders concerning those securities. Although the trader can follow the market of securities he or she is not authorised to trade, it is not possible to enter or delete orders for these securities, nor to perform any other transactions with respect to them.

The allocation of *Authorised Securities* is up to the exchange member and is related to a specific user of the trading system. At Banca del Monte Rosa, each trader has been assigned certain securities, depending on their tasks. The System Administrator has configured each trader's *Authorised Securities* accordingly, while naturally ensuring that one trader can act as a substitute for a colleague if need be.

## 12.4. Configuration of Views and Panes

A *View* is composed of one or several *Panes* and identified by a name. To simplify the user's work, a series of *Views*, each composed of a single *Pane*, have been pre-configured (e.g. *Drop Site View* containing a *Drop Site Pane*, *Market Overview View* containing a *Market*

*Overview Pane).* In addition to these views, traders configure their own *Views* depending on the demands of their work. To do this, they also define their own *Panes, Filters* and *Column Configurations.*

### 12.4.1. Possible Pane Properties

To configure a *Pane,* the user defines the associated security or securities *Profile* and the *Pane Type.* He or she can also define the associated *Filter* and/or the associated *Column Configuration.*



Fig. 161: Relationships between some *Views, Panes, Column Configs, Filters* and *Profiles* as configured by user Bianchi. *Profiles, Filters* and *Column Configs* can be used for one or several user-defined *Panes;* a *Pane* in turn can be used in several *Views. Panes* and *filters* are based on *Pane types* and *Filter types* defined in the Trading System (e.g. *Pane type* "Market Overview", *Filter type* "Trades Filter")

### 12.4.1.1. Profiles – Selecting the Securities

A *Profile* is a list of securities configured by the user. It may contain securities not included in the list of *Authorised Securites* for the trader concerned. Bianchi, for example, does not trade bonds. Consequently, bonds

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

are not part of his *Authorised Securites;* nevertheless, he has defined a series of bond *Profiles* for market observation purposes. If he entered an order for one of those bonds, the order would be rejected by the Trading System.

*Profiles* are used on all *Panes* that are not intrinsically related to a single security but rather to a specific selection of securities.

A *Pane* related to orders or trades is generally associated with a *Profile* (if it can cover more than one security at once) or with a single security. When a *Pane* has not been assigned a *Profile*, it automatically covers the trader's *Authorised Securities.*

### 12.4.1.2. Filters – Selecting the Rows Displayed

*Filters* are used to select the rows displayed on a *Pane* according to certain criteria. Most *Pane types* allow for the use of *Filters*. Depending on the type of information displayed on the *Pane*, there are specific types of *Filters.*

Whenever the user has not assigned a given *Filter* to a *Pane*, the standard *Filter criteria* for the respective *Pane type* apply. On the *Own Trades Enquiry Pane*, for instance, only the trades made on that day are displayed unless the user specifies selection criteria. By adding selection criteria, the user may possibly cause more rows to be displayed than without using a *Filter.*

### 12.4.1.3. Column Configurations – Selecting the Column Headings

*Column Configurations* are used to select the columns to be displayed and the order in which they are displayed. They are available for *Panes* of the *Market Overview, Pop-in Market Overview* and *Rolling Market Overview* type.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-9
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 12.4.2. Example: Market Overview Pane with Profile and Column Configuration

Bianchi would like to configure a *Market Overview Pane* containing all the securities that interest him in the Chemicals sector. He would also like to make the Pane as narrow as possible to save screen space, so that it only displays key data such as price and size.

#### 12.4.2.1. Profile

In order to select the securities, Bianchi creates a new *Profile*. He calls it Chem *Profile* and uses the *Display Configuration Window* to create it. A *Profile* is a fixed list of securities, but it can be set up on the basis of selection criteria such as instrument type, geographic region and industry sector. To do so, Bianchi creates a new *Profile* by clicking on the "New..." button on the *Profile Configuration Management Window*. The "Add..." button in the *Display Profile Configuration Window* enables him to assign securities from a *Security Selection Window* to the *Profile*.



Fig. 162: *Profile Configuration Management Window* and *Display Profile Configuration Window*. To begin selecting securities, the user clicks on the "Add" pushbutton, which opens a *Security Selection Window*.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-10
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Bianchi then selects "Shares" under "Instrument Type" and "Chemicals" under "Industry Sector". Clicking on the "Filter" pushbutton displays a list of securities which fulfil these criteria. In the list of securities, he can click on the ones he wishes to include in his *Profile* and press the "Add" pushbutton.



Fig. 163: *Security Selection Window.* It is used to select one or several securities for insertion into the window from which the *Security Selection Window* has been called (here, the *Display Profile Configuration Window*).

The selected securities are inserted in the *Display Configuration Window.* Bianchi can now select one or several securities and change their sequence using the "Move up"/"Move down" buttons. He enters a name and clicks on the "OK" button; the *Profile* is stored.

The *Profile* defined in this fashion can now be used for several *Panes.*

Case 1:08-cv-02412     Document 21-19     Filed 06/04/2008     Page 180 of 250

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-11
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 12.4.2.2. Column Configuration

In order to obtain the "slimmest" possible *Pane*, Bianchi defines a *Column Configuration*. The only columns he wishes to use are security name, bid size, ask size, bid price and ask price. He would also like to see the last price paid in some cases, but without always having to devote screen space to this column.



Fig. 164: *Column Configuration Window.* It can be used to specify the columns in *Panes* of the *Market Overview*, *Pop-in Market Overview* and *Rolling Market Overview* type.

## 12.4.2.3. Creating and Naming a Market Overview Pane

Bianchi has created a *column configuration* named "Eiffel" and *Profile* named "Chem" based on his requirements. In order to define a new *Pane*, he clicks on the "New..." button of the *Pane Configuration Management Window.*

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-12
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



*5. Pane Configuration Management Window and Pane Configuration Window.* They are used for the creation and the maintenance of *Panes.* The attributes available depend on the *Pane type* and are visible from the ... pushbuttons.

This opens an empty *Pane Configuration Window* in which he selects the desired *Pane type,* "Market Overview". *Market Overview Panes* can be associated with a *Profile* and a *Column Configuration,* which is why those Pushbuttons are active. The *Profile* "Chem" and the *Column Configuration* "Eiffel" can now be assigned via the keyboard on the text fields or via the respective selection windows opened by clicking on the pushbuttons. The new configuration requires a name: "Chemicals Pane". After Bianchi clicks on "OK" or "Apply", the *Pane* is defined according to his requirements. Now, he need only include it in a *View.*

When the "Chemicals Pane" is opened (i.e. when a *View* to which it has been assigned is opened), it will display the securities of the Chem *Profile* and its columns will correspond to the "Eiffel" *Column Configuration.*

### 12.4.3. Example: Own Trades Enquiry Pane with Filter

#### 12.4.3.1. Configuration of a Trades Filter

Bianchi now wants to create an *Own Trades Enquiry Pane* on which he can see his own trades, i.e. all trades by his bank associated with his *Trader ID*. This restriction can be defined with a *Trades Filter*.

Creation of a new *filter* followed by          ... which opens the *Trades*
the selection of a *filter type*...              *Filter Configuration Window*



Fig. 166: *Filter Configuration Management Window, Filter Type Selection Window* and *Trades Filter Configuration Window*. A *Trades Filter* is one of five filter types.

#### 12.4.3.2. Unused Filter Criteria

The fact that Bianchi does not provide any argument for certain *Filter* criteria does not mean that all the matching trades are displayed. For instance, if there are no time criteria, the Trading System only displays trades made on the current trading day. These *default Filter* arguments are defined for various criteria so that the absence of a *Filter* argument results in the application of the most frequently required selection.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-14
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 12.4.3.3. Configuration of an Own Trades Enquiry Pane without Profile

In order to create a *Pane* to which the newly created *Filter* can be assigned, Bianchi uses the *Pane Configuration Management Window* and the *Pane Configuration Window* as he did earlier. He selects the *Pane Type* "Own Trades Enquiry" and gives the new *Pane* the name of "My Trades".

The *Pane type* "Own Trades Enquiry" allows the use of *Filters* and *Profiles*. As Bianchi only specifies a *Filter* and no *Profile*, the Trading System has to make a selection when the *Pane* is opened (i.e. when a *View* is opened to which the "My Trades" *Pane* belongs). This selection corresponds to the *Authorised Securities* assigned by the System Administrator. It is better to assign a *Profile* in all cases, because the *Authorised Securities* often involve a large number of records.



Fig. 167: *Relationship between Profiles and Authorised Securities*. A trader's *Authorised Securities* represent the set of securities which fulfil the criteria specified by the System Administrator (industry sector, geographic area...). The securities contained in a *Profile* used by a trader are not restricted to the *Authorised Securities*.

As a *Profile* can also contain securities not included in the *Authorised Securities*, the number of records in a *Pane* can potentially be greater with *Profile* than without a *Profile*.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-15
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

### 12.4.4. Configuration of Views

*Panes* cannot be displayed directly on the screen. In order to be displayed, they must be part of a *View*. Bianchi has defined a series of *Panes* which he would like to insert into *Views*. New *Views* can be created and modified with the *View Configuration Management Window* and the *View Configuration Window*.



Fig. 168: *View Configuration Management* and *View Configuration Window*. The *View Configuration Management Window* contains a list of all existing *Views*. The pushbuttons "New..." and "Change..." provide access to the *View Configuration Window* for the creation of new *Views* or the modification of existing ones.

Bianchi would like to combine two *Panes* he has defined, the "Chemicals Pane" and the "Blue Chips" *Pane* in one *View*. He opens the *View Configuration Management Window* via the *Configuration Menu* and clicks on the "New" Pushbutton. The *View Configuration Window* appears. Under *View Name*, Bianchi enters the name he wants to use, "Eiffel View".

In the list of "Available Panes", he selects the two *Panes* to be included and appends them to the list of "Included Panes", using the "Add" button. The new *View* is stored by clicking on the "OK" or "Apply" Pushbuttons.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-16
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

To open a new *View*, Bianchi can proceed through the *Control Panel*, through the Pulldown Menu of another *View* or via the "Open" Pushbutton of the *View Configuration Management Window*.

A given *Pane* can be assigned to various *Views*. Moreover, a *View* can be opened more than once, so that the same *Panes* appear several times on the screen. These can then be modified by way of temporary configuration changes (e.g. a change of the assigned *Profile* or a change in Filter criteria) so as to reflect the user's current requirements.

## 12.4.5. Temporary Changes to a Pane

### 12.4.5.1. Temporary Profile or Security Assignment

The *Profile* belonging to a *Pane* can also be changed when the *Pane* is already open (i.e. when a *View* containing it is open). This type of change is not stored, so that the next time the *Pane* is opened, the original (stored) attributes apply again.

### 12.4.5.2. Assignment via Pop-up Menu

The *Pop-up* Menu of each *Pane* allows the assigned security or *Profile* to be changed. For instance, in Bianchi's *Own Trades Enquiry Pane*, there is no "Chem Profile" *Filter* for his own trades. His "Personal View" contains the "My Blue Trades" *Pane* of the *Own Trades Enquiry* type. It does have the corresponding *Filter*, but it is based on the Blue Chips *Profile*.

In order to change the *Profile*, Bianchi selects the "Profile..." option in the *Pop-up* menu of the Blue Trades *Pane*. A selection dialogue appears with all the *Profiles* defined for Bianchi. After he selects the "Chem Profile", the Blue Trades *Pane* shows Bianchi's trades in chemicals stocks.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-17
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

If Bianchi opens a new instance of "Personal View", the "My Blue Trades" *Pane* contained in it is again defined with the Blue Chips *Profile*.

### 12.4.5.3. Assignment of Securities with Drag & Drop

The "My Blue Trades Pane" filtered for Bianchi's personal trades in "Personal View" can also be associated with a single security. In order to perform this change, Bianchi only has to select the respective security from another *Market Overview Pane*, drag it onto his "My Blue Trades" *Pane* and drop it there. Instead of the Blue Chips *Profile*, the dropped security now applies.

In order to revert to the initial configuration, Bianchi can select the Blue Chips *Profile* via the *Pop-up* menu.

### 12.4.6. Temporary Filter Criteria

Bianchi's "Personal View" contains the "Hidden Orders Pane" he defined. This *Pane* is of the "Own Open Orders Enquiry" type and has an *Orders Filter*, selecting all *hidden size orders*. Bianchi would like to temporarily change the *Filter* criteria so that only hidden non-nostro orders are visible. To do this, he selects the "Filter..." option on the *Pop-up* menu of his "Hidden Orders Pane", which opens the *Orders Filter Configuration Window*.

Contrary to the situation he would find when creating a new *Filter*, the name of the *Filter* cannot be changed. Bianchi enters the new *Filter* argument (Non-Nostro) and confirms by clicking on "Apply".

Swiss Exchange SWX
IS User Manual
User Configuration

Page 12-18
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. *Orders Filter Configuration* when called via the *Pop-up* menu of the respective *Own Open Orders Pane*.
... changes are not stored, but merely applied to the open *Pane*.

The orders shown on the "Hidden Orders Pane" now reflect the restrictions defined in the *Filter* criteria, but this change is only valid for the open *Pane*.

## Taking over Objects from other Users

In order to be able to replace colleagues when they are absent, it is sometimes easier to work with the same *Views* and *Panes* as those defined by the colleague. By copying the *Views* defined by Bianchi, Camila Castanho prepares her user configuration so that she can act as Bianchi's substitute.

Castanho copies a *View* (including the associated *Panes*, *Filters*, column configurations and *Profiles*) with the help of the *Import* function available on the *View Configuration Management Window*.

Swiss Exchange SWX
TS User Manual
User Configuration

Page 12-19
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98



Fig. 170: *View Configuration Management* and *Import View Window.* The *views* imported from colleagues are taken over in the user's own catalogue. They can then be renamed and changed independently of their originals.

On the *View Configuration Management Window,* Castanho presses the "Import" Pushbutton. This opens the *Import View Dialogue* with a list of traders known to the Trading System. After Castanho has selected Bianchi's *User ID,* the list on the right shows the *Views* available in Bianchi's catalogue. Castanho selects the Bianchi Market *View* and presses the "OK" Pushbutton.

When importing a *View,* the system checks whether the catalogue already contains a *View* of the same name. In such a case it asks for confirmation of the import command. If it is confirmed, the existing object is replaced with the imported object.

The same applies to the *Panes, Profiles, Column configurations* and *Filters* associated with a *View.* If Castanho wishes to import a *Profile* with the same name as one that exists in her own configuration, she will first have to rename her own object and then import her colleague's *Profile.*

Swiss Exchange SWX
TS User Manual
Post-recorded Trades

Page 13-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 13.  Post-recorded Trades

Like any electronic system, the electronic environment of the Exchange may be subject to system problems and system failures. The Swiss Exchange aims at maintaining trading activity − even if this is possible only partially − in case of a system failure. To make trading possible by telephone if the worst comes to the worst, SWX has to suspend the duty to trade on the exchange for all members or for the members concerned if there is a failure of the exchange system or of one or more trading systems[1].

Banca del Monte Rosa is informed by SWX that the trading system at XFin in Zug has failed and that all open orders entered by that company have been deleted from the order books. Consequently, the duty to trade on the exchange has been suspended with respect to that member.

Shortly after Black received this message on the *Newsboard Pane*, trader Sabine Schwarz of XFin calls him, wishing to sell 500 S Holding shares at 502.00. Black is interested in this transaction.

Because the trade was made during a failure of the trading system at XFin, it has to be recorded using the *Post-recorded Trade* function, which also supports automatic *Clearing* and *Settlement*. As is the case with *Trade Confirmations*, the trade has to be entered into the system by both parties, i.e. by Black and by Sabine Schwarz − as soon as the trading system of XFin is available again. The Swiss Exchange determines when *Post-recorded Trades* are to be processed in the exchange system and published to the other members (see also *System Parameters Window*).

---

1. For the emergency procedure please refer to the publication *EBS Story*.

Swiss Exchange SWX
TS User Manual
Post-recorded Trades

Page 13-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Black can enter the trade immediately using the *Post-recorded Trade* function, as his trading system is working. The TS can save *Post-recorded Trades* locally until they are called up by the exchange system.

## 13.1.  Entering a Post-recorded Trade

To enter the trade, Black opens the *Post-recorded Trade Entry Window* via the *Off-Exchange* pulldown menu by clicking on the option *Post-recorded Trade*.



Fig. 171: *Post-recorded Trade Entry Window. Post-recorded Trades* like *Trade Confirmations* have to be entered by both parties. If the data corresponds, the system confirms the trade.

The *Post-recorded Trade Entry Window* contains the same input fields as the *Trade Confirmation Entry Window.* Black enters the data of the trade as well as the counterparty and transmits the *Post-recorded Trade* by clicking on "Submit".

Swiss Exchange SWX
TS User Manual
Post-recorded Trades

Page 13-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

As soon as the trading system of XFin is available again, Sabine Schwarz has to enter a corresponding *sell Post-recorded Trade*. If the data entered by Black and Sabine Schwarz correspond, the system confirms the trade in the *Trade Ticker Pane* and the *Personal Trades Ticker Pane*. Black and Sabine Schwarz can also see the trade in their *Own Trades Enquiry Pane*.

In his *Post-recorded Trades Enquiry Pane* (by analogy to the *Trade Confirmations Enquiry Pane*), the trader can see which of his *Post-recorded Trades* have not been confirmed.



Fig. 172: *Post-recorded Trades Enquiry Pane*. Displays all *Post-recorded Trades* which have not yet been confirmed or which have expired.

The reason for this might be that the exchange system has not started to process the *Post-recorded Trades* or that the counterparty has not yet entered the corresponding *Post-recorded Trade* or has made a mistake when doing so.

Swiss Exchange SWX
TS User Manual
Post-recorded Trades

Page 13-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## 13.2.  Deleting a Post-recorded Trade

If the trader has made a mistake when entering the data for a *Post-recorded Trade*, he can delete it and enter it again, as long as the trade has not been confirmed. As explained earlier, a *Post-recorded Trade* can be deleted via the *Pop-up* menu of the *Post-recorded Trades Enquiry Pane* or in the *Drop Site Pane (Delete)*.

Deleted *Post Recorded Trades* are displayed in the *Deleted Post Recorded Trades Enquiry Pane*. This pane also shows the *Post-recorded Trades* which have expired. These may be either a member's own *Post-recorded Trades* or trades entered by another member which concern this member.

## 13.3.  Trade Reversal

Even *Post-recorded Trades* which have been entered and confirmed may be cancelled with a *Trade Reversal*, under the condition that both parties agree. *Trade Reversals*, by analogy to *Trade Confirmations*, are entered by both parties in the *Post-recorded Trade Entry Window* by clicking on "Trade Reversal". All data must be identical to the original input.

Swiss Exchange SWX
TS User Manual
Index

Page 14-1
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

# 14.    Index

**A**

Accept Input (Drop Site Pane) ...................................6-33
Accept Input (Drop Site) ...............................6-33, 7-8
Accept Order ...................................................6-32
Access rights ..................................................12-1
Activity time ...................................................6-5
Addressed Offer .........................................7-1, 7-7
Addressed Offer (Unreleased Own Orders Enquiry Pane) . 7-17
Addressed Offer Entry Window .............................7-9
Addressed Offer Entry Window (Einstellungen) .............. 12-3
Addressed Offer number .....................................7-16
Addressed Offer Take Window ..............................7-13
Addressed Offers Received Pane ..................7-10, 7-11
Addressed Offers Sent Deleted Enquiry Pane ...........7-12, 7-16
Addressed Offers Sent Pane ...............................7-10
Adjustment Price ............................................9-17
Aggregated order .............................................1-5
Aggregated orders .............................2-7, 8-1, 8-6
Aggregated Orders Enquiry Pane ............................8-2
Authorised Functions ...............................12-1, 12-5
Authorised Securities ...............................12-1, 12-6
Average price ..................................................8-4

**B**

Bank reference ...............................................4-8
Bond Reference Data Window ..............................11-3
Brief Order Entry Window ..................................4-13
Broadcast from Exchange System .........................2-3

**C**

Calendar .....................................................11-5
Calendar (Reference Pulldown Window) ...................11-5
Change ......................................................6-23
Change (Addressed Offer) .................................7-11
Change (Statement of Interest) ............................7-6
Change (Trade Confirmation) ..............................7-26
Changing (market making orders) .........................9-7
Changing an Order ..........................................6-20
Changing an Unreleased Order ............................6-23
Clearing ...............................................7-24, 13-1
Client Order Details ..................................8-1, 8-3
Client Order Details Enquiry Pane .........................8-3
Client Order Details Entry Window .........................8-5
Column Configuration Window ....................12-2, 12-11
Column Configurations .....................................12-8

Swiss Exchange SWX
TS User Manual
Index

Page 14-2
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Conditional (Order Entry Window) ..................................... 6-38
Conditional Order Number .................................... 6-38, 6-39
Conditional Orders ................................................. 6-37
Conditional Orders Enquiry Pane ............................... 6-39
Config (Control Panel) ............................................ 12-1
Configuration ...................................................... 12-1
Configuration Menu ................................... 12-1, 12-3
Configuration options ............................................ 12-1
Configure, View Pulldown Menu ............................... 12-1
Confirm Threshold ................................................ 12-4
Continuous Trading ............................................... 6-1
Continuous trading ............................................... 4-17
Control Panel ............................................... 3-1, 3-3
Control Panel, Config ............................................ 12-1
Counterparty (Reported Trade) ................................ 7-28
Create AO (Popup Menu) ......................................... 7-8
Current Size ...................................................... 5-3

**D**

Data entry windows ............................................... 3-8
Default Book ...................................................... 9-13
Delete (Addressed Offers) ...................................... 7-11
Delete (Drop Site) ............................................... 6-19
Delete (Popup Menu) ............................................. 6-18
Delete (Post Recorded Trade) ................................... 13-4
Delete (Statement of Interest) .................................. 7-6
Delete (Trade Confirmation) .................................... 7-26
Delete reason ............................................. 6-34, 6-36
Deleted Conditional Orders Enquiry Pane .................... 6-40
Deleted Trade Confirmations Enquiry Pane .................. 7-26
Deletion (Conditional Orders) ................................. 6-40
Deletion (Hidden Size Order) ................................... 6-31
Deletion of an order ............................................. 6-17
Deletion of an unreleased order ............................... 6-19
Delivery month .................................................... 7-4
Detailed Order Book Pane ..................... 4-16, 5-2, 6-14
Disclose .......................................................... 4-14
Disclose Flag ..................................................... 12-4
Display Profile ............................................. 4-3, 6-3
Display Profile Configuration Window ......................... 12-9
Double Order Entry ......................................... 9-1, 9-9
Double Order Entry Window ...................................... 9-10
Double... (On Exchange Pulldown Menu) ........................ 9-9
Drag & Drop .............................................. 4-12, 6-18
Drag & Drop (assignment of securities) ...................... 12-17
Drop Site Pane .............................................. 4-5, 6-2
Drop Site Pane (Delete) ......................................... 13-4
Drop Sites ................................................. 6-14, 6-21
Drop Sites – All .................................................. 6-15

Swiss Exchange SWX
TS User Manual
Index

Page 14-3
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Drop Sites - Input .............................................. 6-13
Duty to trade on the exchange ........................... 7-1, 7-27, 13-1

**E**

EBS Story .............................................. 1-1, 1-3, 13-1
Emergency procedure ........................................... 13-1
End of Day .......................................... 4-11, 6-12
Exchange ID ...................................................... 7-28
Exchange System ............................................... 2-1
Exchange System - ES ........................................ 1-4
Exec Size ........................................................ 6-12
Expiry Time (Statement of Interest) ..................... 7-4

**F**

Failed .............................................................. 6-36
Fill-or-Kill All (Drop Site Pane) ........................... 6-35
Fill-or-Kill Input (Drop Site Pane) ...................... 6-35
Fill-or-Kill Order .............................................. 6-34
Filter ....................................................... 12-1, 12-8
Filter Conditions .............................................. 12-18
Filter Configuration Management Window .......... 12-2
Filter Configuration Window ............................. 12-13
Filter criteria, unused ...................................... 12-13
Filter... (Popup Menu) ..................................... 12-17
Fixed Size Pushbuttons ..................................... 12-4
Forward transactions ........................................ 9-17
Full Order Entry Window ........................... 4-13, 4-15
Fully matched .................................................. 6-36

**G**

Gateway .......................................................... 1-5
GUI - Graphical User Interface ...................... 2-2, 3-2

**H**

Help function .................................................. 3-10
Hidden Size Order ........................................... 6-26
High Level Book ............................................... 9-13
Host Interface - HI ........................................... 1-5

**I**

Icon ........................................................... 3-2, 3-4
Import Pushbutton (View Configuration Management Window) .
12-19
Import View Window ....................................... 12-19
Inside Market .................................................. 4-3
Interest threshold ............................................. 6-4
Internal bank reference ................................... 4-13
ISIN ........................................................... 4-13

Swiss Exchange SWX
TS User Manual
Index

Page 14-4
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

**K**

Issuer Reference Data ............................................. 11-4, 11-5

**L**

Keyword (help function) ........................................... 3-10

Last Paid Price Pane ............................................... 6-1
Limit order .......................................................... 4-5, 6-8
Low Level Book ..................................................... 9-13

**M**

Manual Clearing ..................................................... 7-9, 7-24
MAPI Interface ....................................................... 2-4
Mark to Market ...................................................... 9-24
Market depth ........................................................ 4-4
Market Making ....................................................... 9-1
Market Making Flag ................................................. 9-6
Market Making Indicator .......................................... 12-2, 12-3
Market Making Indicator (Double Order Entry Window) ...... 9-11
Market order ......................................................... 6-39
Market order overflow ............................................. 5-4
Market Overview (Pane Type) .................................... 3-6
Market Overview Pane ............................................. 4-3, 4-4, 5-1, 6-2
Mass functions ...................................................... 9-2
Mass Insert .......................................................... 9-6
Mass Insert Button ................................................. 9-2
Mass Update (Price Model Window) .............................. 9-8
Matching rules ...................................................... 5-1
Maximize ............................................................. 3-7
Member (Addressed Offer Entry Window) ....................... 7-9
Member (Trade Confirmation Entry Window) ................... 7-24
Member Selection Window ......................................... 7-22
Member/Trader Reference Data Window ........................ 7-22
Memorandum Text ................................................... 4-8, 6-8
Message Area ....................................................... 4-9, 6-11, 6-34
Message Area (Addressed Offer Entry Window) ............... 7-10
Minimal order size (hidden size order) ......................... 6-29
Minimize ............................................................. 3-7
MOA - Member Own Application ................................... 2-4
Modification (Conditional Orders) ............................... 6-40
Modification (Hidden Size Order) ................................. 6-31

**N**

Net position ......................................................... 9-12
Newsboard Pane ..................................................... 6-2, 6-6, 13-1
Non Opening ......................................................... 5-4, 10-1
Normal Buy All (Drop Site Pane) ................................ 6-16
Normal Buy Input (Drop Site Pane) ............................. 4-6, 6-9
Normal Order ........................................................ 6-8

Swiss Exchange SWX
TS User Manual
Index

Page 14-5
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Normal Orders ................................................. 4-14
Normal Sell Input (Drop Site Pane) ...................... 6-15
Nostro (Order Entry Window) ............................... 6-32
Nostro (Reported Trade Entry Window) ................. 7-30
Nostro Indicator ................................... 9-6, 12-2, 12-3
Nostro Pulldown Menu ...................................... 3-7
Notify Flag .................................................... 8-2

O

Odd Lot ......................................................... 6-23
Odd lot .......................................................... 6-24
Off Exchange Pulldown Menu .................... 3-7, 7-2, 13-2
Off-exchange Trading ......................................... 7-1
On Exchange Pulldown Menu ...................... 3-7, 4-11
On stop order ........................................... 6-37, 6-38
Open pushbutton (Control Panel) .......................... 3-4
Open Size ............................................. 4-11, 6-12
Opening ................................... 4-1, 5-1, 10-1
Order book ...................................................... 4-4
Order Book (Pane Type) ..................................... 3-6
Order Book Pane ............................. 4-5, 4-10, 6-2
Order Book State ............................................. 5-1
Order Entry Window .................... 3-4, 4-7, 4-11, 4-15
Order Entry Window (Einstellungen) ..................... 12-2
Order Entry Window (Settings) .......................... 12-1
Order Entry Window, Brief ........................ 12-3, 12-4
Order Entry Window, Full .................................. 12-3
Order entry, acknowledge receipt ......................... 4-9
Order identification number ......................... 4-9, 4-10
Order number ................... 5-2, 6-11, 6-22, 6-40
Order routing .................................................. 6-25
Order... (On Exchange Pulldown Menu) ............... 4-11
Order-driven market .......................................... 9-1
Orders, aggregated ........................................... 2-7
Orders, early recording of ................................... 2-6
Orders, partial ................................................. 2-6
Original Size .................................................... 5-3
Own Deleted Orders Enquiry Pane ............... 6-18, 6-34
Own Market Columns (Price Model Window) .......... 9-2
Own Open Orders Enquiry Pane ........................... 5-3
Own Order Flag ............................................... 4-10
Own Reported Trades Enquiry Pane ..................... 7-31
Own Trades Enquiry Pane ............. 5-3, 6-30, 7-30, 13-3

P

Pane ....................................... 3-4, 12-1, 12-6
Pane Configuration Management Window .......... 12-2, 12-12
Pane Configuration Window ............................... 12-12
Pane Type ..................................................... 3-6

Swiss Exchange SWX
TS User Manual
Index

Page 14-6
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Partial offsetting of a position ............................................. 9-24
Personal Orders Ticker Pane ........................................... 5-3, 6-2
Personal Trades Ticker Pane ........................................... 5-2, 6-2
Pop-In Market Overview Pane ........................................ 6-2, 6-4
Popin Settings ................................................................... 12-3
Pop-up Menu ....................................................................... 6-7
Popup Menu ............................................................... 3-8, 13-4
Post Recorded Trade ......................... 13-1, 13-2, 13-3, 13-4
Post Recorded Trade Entry Window ...................... 13-2, 13-4
Post Recorded Trades .............................................. 13-1, 13-3
Post Recorded Trades Enquiry Pane ............................... 13-3
Preferences .............................. 12-1, 12-2, 12-3, 12-4
Preferences Window ................................................. 12-2, 12-3
Pre-opening .......................................................................... 4-1
Pre-opening period .............................................................. 1-2
Price increment ................................................................... 4-15
Price Model Window .............................................................. 9-1
Price priority ....................................................................... 4-10
Price Step Arrows ............................................................... 12-4
Profile ............................................. 6-3, 12-1, 12-7
Profile (Price Model Window) ............................................. 9-3
Profile Configuration Management Window ...................... 12-2
Profile... (Popup Menu) ..................................................... 12-16
Profiles (compared to Authorised Securities) ................... 12-14
Profit & Loss ........................................................... 9-12, 9-18
Pulldown menu ....................................................................... 3-7

Q

Quote (Statement of Interest Entry Window) ...................... 7-3

R

Reference data .............................................................. 3-8, 7-22
Reference Pulldown Menu ............................................ 3-7, 11-2
Referenzhandbuch ......................................................... 1-3, 6-1
Refresh ............................................................................... 4-16
Reject (Addressed Offer) .................................................... 7-15
Release ........................................................................ 4-5, 6-9
Replace (Drop Site Pane) .................................................... 6-21
Replace (Popup Menu) ......................................................... 6-23
Reported Trade ..................................................................... 7-1
Reported trade .................................................................... 6-27
Reported Trade Entry Window ........................................... 7-28
Reporting .............................................................................. 7-23
Reset ..................................................................................... 12-3
Rolling Market Overview Pane ............................................ 6-1
Round Lot ............................................................................ 6-23
Round Lot Plus .................................................................... 6-23
Routing criteria ................................................................... 6-25
Routing Criteria Window ...................................................... 6-26

Swiss Exchange SWX
TS User Manual
Index

Page 14-7
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

## S

Save (Price Model Window) ............................................9-5
Scroll Bars ...................................................................3-8
SEB .............................................................................13-1
Security Event (Newsboard Pane) ..............................6-7
Security Reference Data .............................................11-2
Security Selection Window .............................4-12, 4-13, 4-15
Server ..........................................................................1-4
Settlement ...................................................................13-1
Short/long positions ...................................................9-18
Spot price ...................................................................9-17
Statement of Interest .............................7-1, 7-2, 7-8
Statement of Interest No ............................................7-4
Statements of Interest Received Pane ...................7-5, 7-7
Statements of Interest Sent Deleted Enquiry Pane .......7-7
Statements of Interest Sent Pane .............................7-5
Steps text field (Price Model Window) ......................9-4
Stop Limit Order .........................................................6-37
Stop Loss Order .........................................................6-37
Stop Trading ......................................................5-4, 10-5
Submit ................................................................4-8, 4-14
SWX (Duty to trade on the exchange) .......................13-1
System Administrator .........................1-5, 6-26, 12-1
System failures ..........................................................13-1
System problems ........................................................13-1

## T

Take (Addressed Offer) ..............................................7-13
Temporary changes (Panes) .......................................12-16
Temporary filter criteria .............................................12-17
Theoretical Opening Price .......................4-3, 4-15, 10-2
Threshold (Popin Settings) ........................................12-3
Time priority ...............................................................4-17
Time stamp .................................................................6-31
Trade Confirmation .............7-1, 7-22, 7-23, 13-1, 13-2
Trade Confirmation Entry Window .....................7-24, 13-2
Trade Confirmations Enquiry Pane ............................13-3
Trade History Enquiry Pane ...............................6-1, 6-27
Trade No .....................................................................5-2
Trade Notification Ticker Pane ..................................8-3
Trade number ..............................................................5-2
Trade Reporting ..........................................................7-27
Trade Reversal ...................................................7-27, 13-4
Trade Reversal (Post Recorded Trade) .....................13-4
Trade Slips ...........................................................6-41, 12-6
Trade Ticker Pane ...............6-2, 6-5, 6-13, 7-16, 13-3
Trader ID ..............................................................3-2, 6-25
Trades Filter ...............................................................12-13

Swiss Exchange SWX
TS User Manual
Index

Page 14-8
I-MSC-TSM-200/E
Version 2.0, 31 Dec 98

Trades Filter Configuration Window .................................12-13
Trading Book Management ........................................2-7
Trading day ...................................................1-2
Trading Period ................................................1-2
Trigger Price ................................................6-38
Trigger Price (Order Entry Window) ...........................6-38
Triggered Conditional Orders Pane ............................6-39
TS ...........................................................2-1
TS(X) .................................................1-1, 2-1
TS(X) functions ..............................................2-4

**U**

Unall Size - Unallocated Size ................................4-8
Unix login ...................................................3-1
Unreleased Flag .............................................6-28
Unreleased Order ...........................1-5, 4-1, 4-2, 6-8
Unreleased Order No ....................................4-8, 6-10
Unreleased Orders Ticker Pane ..........................4-1, 6-2
Unreleased Own Orders Enquiry Pane .....................6-9, 7-18
Urgent flag (Newsboard Pane) .................................6-7
User Configuration ..........................................12-1
User ID .............................................3-1, 3-2, 12-1
User interface ...............................................2-2
User Preferences ............................................12-1
User Preferences Entry Window ................................6-4

**V**

Validity ....................................................6-11
Validity (Addressed Offer Entry Window) .....................7-10
Value date ..................................................9-12
View ...............................................3-4, 12-1, 12-6
View Configuration Management Window .............12-2, 12-15
View Configuration Window ..................................12-15
View Pulldown Menu ...........................................3-7
View Pulldown Menu, Configure ...............................12-1
Visible size ................................................6-31
Visible size (hidden size order) ............................6-29
Voluntary market making .....................................9-1

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-1
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

## 15.    Matching Rules

### 15.1. Introduction

#### 15.1.1. Purpose & Scope

The document presents the SWX Matching Rules in the context of the Exchange System Functional Specifications.

### 15.2. SWX Matching Rules – an Overview

#### 15.2.1. Types of "Matching" used

There are three distinct "matching" procedures that are used on SWX:

1. Pre-opening -- "Theoretical" matching of orders in the orderbook to determine a Theoretical Opening Price

   The orders in the orderbook are "theoretically" matched (i.e. no updates to the orderbook are performed, and no trades are produced) in order to determine the theoretical opening price (i.e. the opening price that would result if the orderbook were to open at that point). The orderbook can have one of three "next" states, based on the calculation of the theoretical opening price:

   • Non-opening

     If one or more Round Lot Market Orders cannot be matched, then a theoretical opening price cannot be determined and a non-opening condition exists.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-2
I-MSC-TSM-201/E
Version 2.1, 31 Dec 96

- Delay open

  If the calculated theoretical opening price differs from the reference price by more than or equal to an exchange defined range (Stop Trading Range), a delay open condition exists. The Stop Trading Range may be an absolute range, a percentage range, or a number of price steps range. A delay open condition delays the opening for a period of time defined by the exchange (Stop Trading Duration).

- Openable

  If no Round Lot Market Orders remain unmatched, and the calculated theoretical opening price does not cause a delay open condition, the orderbook is openable.

2. Opening – Matching of orders in the orderbook to produce trades at the opening price.

   The orders in the orderbook are matched to produce trades at the last calculated theoretical opening price (which becomes the opening price), determined during the theoretical matching in pre-opening. The orderbook is updated during the matching.

3. Continuous Trading – Matching of an incoming order against orders in the orderbook to produce trades.

   The incoming order is matched against the orders already in the orderbook to produce trades. The trade price is determined each time a trade is produced (from matched orders), and so one incoming order can potentially result in several trades at different prices. The orderbook is updated during the matching.

## 15.2.2. Business Concepts

*Price – Time priority*

Before matching, the orders on each side of the orderbook are ordered in price-time priority, regardless of which matching procedure is being executed:

Best price to worst price (price priority)

- Buy: Market Orders followed by Limit Orders (highest limit to lowest limit)

- Sell: Market Orders followed by Limit Orders (lowest limit to highest limit)

then, within price, oldest to youngest (time priority)

- For orders at a particular price, the orders that have been in the orderbook the longest will be considered first.

*Size Matching*

When two orders match, the matched size is the smaller of the sizes of the two matched orders. After the matching, the order that had the larger size has its size reduced by the amount of the matched size (the smaller order is completely matched).

*Odd Lot Orders*

Odd Lot Orders match (fully or partially) against other Odd Lot Orders at the reference price.

*Odd Lot Accumulation*

In some cases, Odd Lot Orders can be (fully or partially) accumulated to match with Round Lot Orders. The sizes of the Odd Lot Orders are accumulated in time sequence (the price of an Odd Lot can only be "bestens", so price priority is the same for all Odd Lots) to form Round Lot sizes that can match with Round Lot Orders. Accumulated Odd Lots can only match against a Round Lot at the reference price or better (for the accumulated Odd Lots). This may involve the splitting of an Odd Lot Order.

*Round Lot Plus Orders*

When a Round Lot Plus order is matched against a Round Lot (or Round Lot Plus) Order, only the Round Lot part is taken into consideration. The Odd Lot part is split off and becomes an Odd Lot Order (retaining

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-4
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

the time stamp of the original Round Lot Plus Order, to maintain its place in the price-time sequence). The split off Odd Lot may then match on its own, or as part of an accumulation of Odd Lots, during the same matching procedure, or a later one.

In the remainder of this document, the term "Round Lot Orders" includes Round Lot Orders AND Round Lot Plus Orders, unless explicitly stated otherwise.

## 15.3. Pre-opening Matching Rules

### 15.3.1. Principles

- This is just a calculation to determine the theoretical opening price; no updates are made to the orders and no trades are created.

- All Round Lot Market Orders must be matched in order to be able to determine a theoretical opening price, and so to prevent a non-opening condition.

- The theoretical opening price is determined by Round Lot Orders. In three exceptional cases, Odd Lot Orders are also used in the determination of the price. These are:

  - when Round Lot Market Orders on one side of the orderbook cannot be matched against other Round Lot Orders; if sufficient Odd Lot Orders can be accumulated to completely match the Round Lot Market Orders, then this is done to prevent a non-opening condition;

  - when there are no matches possible between Round Lot Orders; if Odd Lot Orders can be accumulated to match against Round Lot Orders at the reference price or better (for the accumulated Odd Lots), then this is done;

  - when there are no matches possible between Round Lot Orders, and Odd Lot Orders cannot be accumulated to match against Round Lot Orders

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-5
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

at the reference price or better (for the accumulated Odd Lots), the following rule applies:

- If there remain Odd Lots on both sides of the book, the theoretical opening price is set at the reference price (see Section A.1. "Pre-opening Matching Scenarios", scenario 1a), otherwise, the theoretical opening price is set at NULL (see Section A.1. "Pre-opening Matching Scenarios", scenario 1b, 1c).

- If the following conditions are fulfilled:

  - non-opening condition is avoided by matching Round Lot Market Order(s) fully with accumulated Odd Lots;

  - Round Lot Market Order has matched with a Round Lot Limit Order during the same pre-matching procedure.

  The last two matching Round Lot Market and Round Lot Limit Orders form the basis for the determination of the theoretical opening price, together with the best remaining order in the orderbook (if there is one) and the reference price. The theoretical opening price must be better than or equal to the limit of the best orders (buy and sell) remaining in the orderbook (see Section A.1. "Pre-opening Matching Scenarios", scenarios 11a, 11b and 11c).

- Otherwise, the last pair of orders matched forms the basis for the determination of the theoretical opening price, together with the best remaining Limit Order in the book, and the reference price. The theoretical opening price must be better than or equal to the limit of the best orders (buy and sell) remaining in the orderbook.

- The theoretical opening price must lie on a valid price step.

- If the theoretical opening price differs from the reference price by more than or equal to an exchange

defined range (Stop Trading Range), a delay open condition exists. The Stop Trading Range may be an absolute range, a percentage range, or a number of price steps range. A delay open condition delays the opening for a period of time defined by the exchange (Stop Trading Duration). After this time elapses (and a non-opening condition does not exist), the opening procedure will be performed irrespective of the theoretical opening price.

- When a hidden order is being matched, its actual size is used as the size of the order and not the visible size.

## 15.3.2. Match Orders

Round Lot Orders are taken from one side of the orderbook (in price-time sequence) and matched against the Round Lot Orders from the opposite side of the book (in price-time sequence).

This is only possible while the bid price (of the buy order being considered) is greater than or equal to the ask price (of the sell order being considered).

Matching continues until one of the following two conditions prevail:

- No more Round Lot Orders are left on one side of the book.

  If Round Lot Market Orders remain on the other side of the book, then if Odd Lot Orders can be accumulated to completely match the remaining Round Lot Market Orders, this is done.

- No more orders can be matched (bid price is less than the ask price)

  If NO Round Lot Orders were matched, then if Odd Lot Orders on one side of the book can be accumulated to match against Round Lot Limit Orders on the other side of the book at the reference price or better (for the accumulated Odd Lots), then this is done.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-7
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

### 15.3.3. Determination of the Opening Price

If any Round Lot Market Orders remain unmatched, then a non-opening condition is set, and a theoretical opening price is unable to be determined.

If there are no matches possible between Round Lot Orders and Odd Lot Orders cannot be accumulated to match against Round Lot Orders at the reference price or better (for the accumulated Odd Lots), the following rule applies:

- If there remain Odd Lots on both sides of the book, the theoretical opening price is set at the reference price (see Section A.1. "Pre-opening Matching Scenarios", scenario 1a), otherwise, the theoretical opening price is set at NULL (see Section A.1. "Pre-opening Matching Scenarios", scenario 1b, 1c).

If the following exceptional conditions are fulfilled:

- A non-opening condition is avoided by matching Round Lot Market Order(s) fully with accumulated Odd Lots;

- A Round Lot Market Order has matched with a Round Lot Limit Order during the same pre-matching procedure.

The last two matching Round Lot Market and Round Lot Limit Orders, form the basis of the determination of the theoretical opening price (see Section A.1. "Pre-opening Matching Scenarios", scenarios 11a, 11b and 11c).

In all other cases, the last pair of orders matched forms the basis for the determination of the theoretical opening price.

The following table shows the possible combinations of the last pair of matched orders, the resulting theoretical opening price, and the reference to the decision tree that shows the case in more detail.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-8
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

Decision trees following the table give more detail, and scenarios for the determination of the theoretical opening price are given in appendix A.1, scenarios 2 to 14.

| Orders | Round Lot Market (sell) | Round Lot Limit (sell) | Accumulated Odd Lot (buy) |
|---|---|---|---|
| Round Lot Market (buy) | The best price of:<br><br>1. Best remaining buy limit price (> reference price)<br><br>2. Best remaining sell limit price (< reference price)<br><br>3. Reference price<br><br><br><br><br>(section 15.3.3.1) | The better price of: (i.e. largest)<br><br>1. Best remaining sell limit price<br><br>2. Sell limit price<br><br><br><br><br><br><br><br><br>(section 15.3.3.2) | If a Market Order has matched with a Limit Order during pre-matching, then the rule for Market (buy) vs. Limit (sell) applies for the last matching Round Lot Orders.<br><br>Otherwise, the best price of:<br><br>1. Best remaining buy limit price (< reference price)<br><br>2. Reference price<br><br>(section 15.3.3.4) |
| Round Lot Limit (buy) | The better price of (i.e. smallest):<br><br>1. Best remaining sell limit price<br><br>2. Buy limit price<br><br><br><br><br><br><br><br><br><br>(section 15.3.3.2) | The best price of:<br><br>1. Arithmetic mean of buy and sell limit prices, rounded to the nearest price step<br><br>2. Best remaining buy limit price (> mean price)<br><br>3. Best remaining sell limit price (< mean price)<br><br>(section 15.3.3.3) | Buy limit price (reference price)<br><br><br><br><br><br><br><br><br><br><br>(section 15.3.3.5) |

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-9
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

| Orders | Round Lot Market (sell) | Round Lot Limit (sell) | Accumulated Odd Lot (buy) |
|---|---|---|---|
| Accumulated Odd Lot (buy) | If a Market Order has matched with a Limit Order during pre-matching, then the rule for Limit (buy) vs. Market (sell) applies for the last matching Round Lot Orders.<br><br>Otherwise, the best price of:<br><br>1. Best remaining sell limit price (< reference price)<br><br>2. Reference price<br><br>(section 15.3.3.4) | Sell limit price (reference price)<br><br><br><br><br><br><br><br>(section 15.3.3.5) | |

Table 1.     Determination of the Theoretical Opening Price

The following "decision-trees" are read from left to right; the last pair of orders to match are shown on the left, the "condition" of the orderbook (where applicable) is shown in the centre, and the theoretical opening price applicable to the specific situation is shown on the right.

### 15.3.3.1. Market Order against Market Order

Only Round Lot Market Orders match. If there are no Limit Orders in the book, the reference price is used as the opening price. If there are Limit Orders in the book that are better than the reference price, the best of those Limit Orders is taken as the opening price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-10
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



### 15.3.3.2. Market Order against Limit Order

A Round Lot Market and a Round Lot Limit Order match last. The last matched Limit Order determines the opening price if there are no Limit Orders with better prices left (for the Limit Order). Otherwise the best remaining Limit Order determines the opening price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-11
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



### 15.3.3.3. Limit Order against Limit Order

Two Round Lot Limit Orders match last. If there is a better Limit Order than the arithmetic mean price of these two matching orders, then this Limit Order determines the price, otherwise, the opening price is set at the arithmetic mean of the two matching orders, rounded to the nearest price step; if this arithmetic mean is half way between price steps, the opening price is set at the higher price step.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-12
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

*Last Matched Orders*          *Possible Conditions*                    *Opening Price*



### 15.3.3.4. Accumulated Odd Lot Orders against Round Lot Market Order

Round Lot Market Orders remain on one side of the book. Odd Lot Orders can be accumulated to completely match the remaining Round Lot Market Orders (to prevent non-opening). If a Round Lot Market Order has previously matched with a Round Lot Limit Order during the same pre-matching procedure, then the rule "Market Order against Limit Order" (see section 15.3.3.2) applies for the last matching Round Lot Limit and Round Lot Market Orders. Otherwise, the reference price determines the opening price unless there are better Limit Orders in the book (for the accumulated Odd Lots).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-13
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



### 15.3.3.5. Accumulated Odd Lot Orders against Round Lot Limit Order

No Round Lot Orders can match against Round Lot Orders. However, accumulated Odd Lot Orders can match against Limit Orders if the limit price is better than or equal to the reference price (for the accumulated Odd Lot Orders). In this case, the last Limit Order matched determines the opening price.

*Last Matched Orders*          *Possible Conditions*          *Opening Price*



15.4. **Opening Matching Rules**

### 15.4.1. Principles

- The trade price for all trades created during opening is the last theoretical opening price calculated during pre-opening.

- Opening is only performed if the orderbook is in an openable condition, as determined during pre-opening.

- The official opening price can only be set at the first opening of the day. If trades have been generated during the first opening procedure of the day, the official opening price is set at the last theoretical opening price calculated during pre-opening, otherwise there is no official opening price for that day (official opening price is set at NULL).

### 15.4.2. Match Orders

Round Lot Orders are taken from one side of the orderbook (in price-time sequence) and matched against the Round Lot Orders from the opposite side of the book (in price-time sequence).

This is only possible while the bid price (of the buy order being considered) is greater than or equal to the ask price (of the sell order being considered).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-15
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

Matching of Round Lot Orders continues until one of the following two conditions prevail:

- No more Round Lot Orders are left on one side of the book.

  Odd Lot Orders are accumulated (if possible) to match against the remaining Round Lot Orders on the other side of the book at the opening trade price or better (for the accumulated Odd Lot Orders).

  When no more accumulation of Odd Lot Orders to match against Round Lot Orders is possible, Odd Lot Orders are matched against Odd Lot Orders.

- No more Round Lot Orders can be matched (bid price is less than the ask price)

  Odd Lot Orders on one side of the book are accumulated to match against the remaining Round Lot Limit Orders on the other side of the book at the opening price or better (for the accumulated Odd Lot Orders).

  When no more accumulation of Odd Lot Orders to match against Round Lot Orders is possible, Odd Lot Orders are matched against Odd Lot Orders.

Note that more orders may match during the opening than were theoretically matched during the pre-opening matching to determine the theoretical opening price.

## 15.4.3. Determination of the Opening Trade Price

The opening trade price is the last calculated theoretical opening price during pre-opening.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-16
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

## 15.5. Continuous Trading Matching Rules

### 15.5.1. Principles

- Each incoming order can result in a number of trades, each of which can potentially have a different trade price.

- A new Trade Price can only be determined by a Round Lot Order (incoming or existing) that matches against either another Round Lot Order, or an accumulation of Odd Lot Orders.

- An accumulation of Odd Lot Orders can only match against a Round Lot Order at the reference price or better (for the accumulated Odd Lot Orders).

- Odd Lot Orders match against Odd Lot Orders at the reference price.

- A new Trade Price must be better than or equal to the limit of the best order remaining in the orderbook (for the incoming order).

- Each time a match occurs, a Stop Trading Check is performed to determine whether a trade will be allowed. This check involves the comparison of the new trade price with the reference price before the current order was entered. If the difference in these trade prices is more than or equal to the Stop Trading Range (which can be based on an absolute range, a percentage range, or a number of price steps), then a Stop Trading condition occurs. The match that caused the Stop Trading condition does NOT create a trade. A Stop Trading condition stops trading in the orderbook for a period of time defined by the exchange (Stop Trading Duration). The maximum allowable number of Stop Tradings in a day is set by the exchange for each orderbook.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-17
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

- The order type of the incoming order determines how the matching rules are applied

  - Normal and Hidden Orders are matched to create trades until either:

    they are completely matched,

    a Stop Trading condition ensues – the orderbook is placed into a Stop Trading state, or

    no more matching is possible

    Any remaining size is written to the orderbook.

  - Accept Orders are matched to create trades until either

    they are completely matched, or

    a Stop Trading condition ensues – the orderbook is NOT placed into a Stop Trading state, or

    no more matching is possible

    Any remaining size is NOT written to the order-book.

  - Fill-or-KillFill-or-Kill Orders must be able to be completely matched in order to create trades

    if the whole Fill-or-Kill Order is able to be filled (i.e. completely matched, without causing a Stop Trading condition), then trades are created;

    if the whole Fill-or-Kill Order is not able to be filled, then it is killed (i.e. NO trades

    are created, and the order is NOT written to the orderbook).

  - A Normal, Accept and Fill-or-Kill Order may be an Odd Lot Order, a Round Lot Order, or a Round Lot Plus Order. A Hidden Order may be a Round Lot Order or a Round Lot Plus Order.

Swiss Exchange SWX

TS User Manual

Matching Rules

Page 15-18

I-MSC-TSM-201/E

Version 2.1, 31 Dec 98

### 15.5.2. Match incoming Order

*Incoming order is a Round Lot Order*

Round Lot Orders are taken from the other side of the orderbook (in price-time sequence) and matched against the incoming order.

This is only possible while the bid price (of the buy order being considered) is greater than or equal to the ask price (of the sell order being considered).

If the Round Lot Order on the other side of the book is a Round Lot Plus Order, the Odd Lot part is split off and becomes an Odd Lot Order (retaining the time stamp of the original Round Lot Plus Order, to maintain its place in the price-time sequence).

Each time a match occurs, a Stop Trading Check is carried out, and if a Stop Trading condition occurs, then the matching is stopped.

When no more Round Lot matches are possible, if Odd Lot Orders on either side of the book can be accumulated to match against a Round Lot Order on the other side of the book at the reference price or better (for the accumulated Odd Lots), then this is done.

When no more accumulated Odd Lot Orders can be matched against Round Lot Orders, Odd Lot Orders are matched against other Odd Lot Orders.

*Incoming order is an Odd Lot Order*

If possible, the incoming Odd Lot Order is accumulated with Odd Lot Orders already in the orderbook to match against a Round Lot Order on the other side of the book at the reference price or better (for the accumulated Odd Lots).

If accumulation of Odd Lot Orders to match against a Round Lot Order is not possible, or after the incoming Odd Lot Order is accumulated and matched against a Round Lot Plus Order, Odd Lot Orders are matched against other Odd Lot Orders.

*Incoming order is a*
*Round Lot Plus Order*    Round Lot Orders are taken from the other side of the orderbook (in price–time sequence) and matched against the incoming order.

This is only possible while the bid price (of the buy order being considered) is greater than or equal to the ask price (of the sell order being considered).

Each time a match occurs, a Stop Trading Check is carried out, and if a Stop Trading condition occurs, then the matching is stopped.

After the first Round Lot Order matches against the incoming Round Lot Plus Order, the Odd Lot part is split off and becomes an Odd Lot Order (retaining the time stamp of the original Round Lot Plus Order, to maintain its place in the price-time sequence).

When no more Round Lot matches are possible, if Odd Lot Orders on either side of the book can be accumulated to match against a Round Lot Order on the other side of the book at the reference price or better (for the accumulated Odd Lots), then this is done.

When no more accumulated Odd Lot Orders can be matched against Round Lot Orders, Odd Lot Orders are matched against other Odd Lot Orders.

## 15.5.3. Determination of the Trade Price

The trade price is determined each time a match occurs to produce a trade. The following table shows the possible combinations of matched orders, the resulting trade price, and the reference to the decision tree that shows each case in more detail.

Decision trees following the table give more detail, and examples of the determination of the trade price are given in Appendix A.2. "Continuous Trading Matching Scenarios" on page 15-40.

| Orders | Existing Round Lot Market | Existing Round Lot Limit | Accumulated Odd Lot | Odd Lot |
|--------|---------------------------|--------------------------|---------------------|---------|
| Incoming Round Lot Market | The best price of:<br><br>1. Best remaining buy limit price (> ref. price)<br><br>2. Best remaining sell limit price (< ref. price)<br><br>3. Reference price<br><br>(section 15.5.3.1) | Existing Round lot limit price<br><br><br><br><br><br>(section 15.5.3.2) | Reference price<br><br><br><br><br><br>(section 15.5.3.8) | |
| Incoming Round Lot Limit | The best price of:<br><br>1. Best remaining buy limit price (> inc. lim. price)<br><br>2. Best remaining sell limit price (< inc. lim. price)<br><br>3. Incoming Round Lot limit price<br><br>(section 15.5.3.3) | Existing Round lot limit price<br><br><br><br><br><br>(section 15.5.3.4) | Incoming Round Lot limit price (better than or equal to the reference price for the accumulated Odd Lots)<br><br>(section 15.5.3.6) | |

| Orders | Existing Round Lot Market | Existing Round Lot Limit | Accumulated Odd Lot | Odd Lot |
|---|---|---|---|---|
| Accumulated Odd Lot | The best price of:<br>1. Best remaining buy limit price (> ref. price)<br>2. Best remaining sell limit price (< ref. price)<br>3. Reference price<br>(section 15.5.3.7) | Existing Round lot limit price (better than or equal to the reference price for the accumulated Odd Lots)<br><br>(section 15.5.3.5) | | |
| Odd Lot | | | | Reference price<br>(section 15.5.3.9) |

Table 2.    Determination of the Trade Price

The following "decision-trees" are read from left to right; the orders matched are shown on the left, the "condition" of the orderbook (where applicable) is shown in the centre, and the trade price applicable to the specific situation is shown on the right.

### 15.5.3.1.Market Order against Market Order

The incoming order is a Market Order. It matches against the oldest Market Order in the book. The reference price will determine the price if there are no better Limit Orders in the book (for the incoming Market Order). Otherwise the best limit in the book determines the price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-22
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



### 15.5.3.2. Market Order against Limit Order

The incoming order is a Market Order. It matches against the best Limit Order in the book. This limit determines the price.



### 15.5.3.3. Limit Order against Market Order

The incoming order is a Limit Order. It matches against the oldest Market Order in the book. The limit determines the price if there are no better Limit Orders in the book (for the incoming Limit Order). Otherwise the best limit in the book determines the price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-23
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



### 15.5.3.4. Limit Order against Limit Order

The incoming order is a Limit Order. It matches against the best Limit Order in the book (bid price ask price) for the incoming Limit Order. The best Limit Order in the book determines the price.



### 15.5.3.5. Accumulated Odd Lot Orders against Limit Order

The incoming order is an Odd Lot Order. It accumulates with the oldest Odd Lots in the book and matches against the best Limit Order on the other side of the book if the limit price is better than or equal to the reference price (for the accumulated Odd Lot Orders). The Limit Order determines the price.

*Matched Orders*                 *Possible Conditions*                 *Price*



### 15.5.3.6. Limit Order against Accumulated Odd Lot Orders

The incoming order is a Limit Order. There are no Round Lots that can match on the other side of the book. Accumulated Odd Lot Orders can only match against a Limit Order if the limit price is better than or equal to the reference price (for the accumulated Odd Lot Orders). The Limit Order matches against the oldest Odd Lot Orders in the book. The Limit Order determines the price.

*Matched Orders*                 *Possible Conditions*                 *Price*



Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-25
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

### 15.5.3.7. Accumulated Odd Lot Orders against Market Order

The incoming order is an Odd Lot Order. This accumulates with the oldest Odd Lot Orders in the book to match with the oldest Market Order. The reference price will determine the price if there are no better Limit Orders in the book for the accumulated Odd Lot Orders. Otherwise the best limit in the book determines the price.



### 15.5.3.8. Market Order against Accumulated Odd Lot Orders

The incoming order is a Market Order. There are no Round Lots on the other side of the book. It matches against the oldest (accumulated) Odd Lot Orders in the book at the reference price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-26
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

*Matched Orders*                    *Possible Conditions*                    *Price*



Scenario 29

### 15.5.3.9. Odd Lot Order against Odd Lot Order

The incoming order is an Odd Lot Order. It matches with the oldest Odd Lot Order in the book at the reference price.

*Matched Orders*                    *Possible Conditions*                    *Price*



Scenario 30

# Appendix A. – Matching Scenarios

## A.1.   Pre-opening Matching Scenarios

This appendix provides one example for each case described in the decision trees from the section "Pre-opening Matching Rules – Determination of the Opening Price" (15.3.3). For each case, there are many scenarios that could have been chosen.

The following scenarios show how the theoretical opening price is determined. Scenario 1 (a, b and c) shows examples of when no matching occurs during the pre-opening matching procedure. The remaining scenarios show the state of the orderbook after matching has occurred for all orders except for the last two orders in the orderbook that can match. The theoretical opening price is determined from the matching of the last two orders in the orderbook that can match, the reference price and the remaining orders in the orderbook (with the exception of the situation described in the pre-matching principles when a non opening condition is avoided by matching an accumlated Odd Lot with a Market Order).

In the following tables, the circled price is the theoretical opening price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-28
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

```
┌─────────────────────────────────────────────────────────┐
│  Scenario 1a                                              │
│                                                           │
│  Round-lot Size   = 100                                   │
│  Reference Price  = (44)                                  │
│                                                           │
│                      Bid                          Ask     │
│                                                           │
│                      140  50  │          53  120          │
│  Round-lot           150  49  │ No Matching  56  100      │
│                      100  48  │                           │
│                      100  46  │                           │
│  Odd-lot                                                  │
│                       10  —   │ Matching    —  10         │
│                                                           │
│  Theoretical Opening Price  = 44                          │
└─────────────────────────────────────────────────────────┘
```

*Scenario 1a:*　　No (Round Lot) Orders matching: Odd Lot on both sides of the book.

```
┌─────────────────────────────────────────────────────────┐
│  Scenario 1b                                              │
│                                                           │
│  Round-lot Size   = 100                                   │
│  Reference Price  = 44                                    │
│                                                           │
│                      Bid                          Ask     │
│                                                           │
│                      140  50  │          53  120          │
│  Round-lot           150  49  │ No Matching  56  100      │
│                      100  48  │                           │
│                      100  46  │                           │
│  Odd-lot                                                  │
│                               │             —  10         │
│                                                           │
│  Theoretical Opening Price  = NULL                        │
└─────────────────────────────────────────────────────────┘
```

*Scenario 1b:*　　No orders matching: Odd Lot on one side of the book.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-29
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



*Scenario 1c:*     No orders matching: No Odd Lots in book.

*Scenario 2:*     Market Order against Market Order. No Limit Orders left in book better than the reference price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-30
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

**Scenario 3**

Round-lot Size  = 100
Reference Price = 44

|  | Bid |  | Ask |
|---|---|---|---|
| Round-lot | 100 — | ←matching→ | — 100 |
|  | 100 (45) |  |  |
|  | 100  45 |  |  |
|  | 100  44 |  |  |
| Odd-lot |  |  |  |

Theoretical Opening Price  = 45

*Scenario 3:*   Market Order against Market Order. Buy Limit Order left in book better than the reference price.

**Scenario 4**

Round-lot Size  = 100
Reference Price = 44

|  | Bid |  | Ask |
|---|---|---|---|
| Round-lot | 100 — | ←matching→ | —  100 |
|  |  | (42) | 100 |
|  |  | 43 | 100 |
|  |  | 44 | 100 |
| Odd-lot |  |  |  |

Theoretical Opening Price  = 42

*Scenario 4:*   Market Order against Market Order. Sell Limit Order left in book better than the reference price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-31
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



**Scenario 5**

Round-lot Size  = 100
Reference Price = 44

|  | Bid | | | | Ask |
|---|---|---|---|---|---|
| Round-lot | 200 | --- | ←— matching —→ | 45 | 200 |
| | 200 | 41 | | | |
| | 200 | 40 | | | |
| Odd-lot | | | | | |

Theoretical Opening Price  = 45

*Scenario 5:*     Market Order against Limit Order. No Limit Orders left in book better than the Limit Order price (for the Limit Order).

**Scenario 6**

Round-lot Size  = 100
Reference Price = 44

|  | Bid | | | | Ask |
|---|---|---|---|---|---|
| Round-lot | 200 | --- | ←— matching —→ | 45 | 200 |
| | 200 | 46 | | | |
| | 200 | 45 | | | |
| Odd-lot | | | | | |

Theoretical Opening Price  = 46

*Scenario 6:*     Market Order against Limit Order. Buy Limit Order left in book better than the Limit Order price (for the Limit Order).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-32
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



*Scenario 7:*    Market Order against Limit Order. Sell Limit Order left in book better than the Limit Order price (for the Limit Order).



*Scenario 8:*    Limit Order against Limit Order. No Limit Orders left in book better than the arithmetic mean of the last two Limit Orders matched.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-33
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



**Scenario 9**

Round-lot Size   = 100        Price Step   = 0.25
Reference Price  = 44
Arithmetic Mean  = 39.5

|              | Bid |            |          | Ask     |
|--------------|-----|------------|----------|---------|
| Round-lot    | 100 | 40.00      | matching | 39.00 100 |
|              | 100 | 39.75      |          |         |
| Odd-lot      |     |            |          |         |

Theoretical Opening Price  = 39.75

Scenario 9:

Limit Order against Limit Order. Buy Limit Order left in book better than the arithmetic mean of the last two Limit Orders matched.

**Scenario 10**

Round-lot Size   = 100       Price Step   = 0.25
Reference Price  = 44
Arithmetic Mean  = 39.5

|              | Bid |            |          | Ask       |
|--------------|-----|------------|----------|-----------|
| Round-lot    | 100 | 40.00      | matching | 39.00 100 |
|              |     |            |          | 39.25 100 |
| Odd-lot      |     |            |          |           |

Theoretical Opening Price  = 39.25

Scenario 10:

Limit Order against Limit Order. Sell Limit Order left in book better than the arithmetic mean of the last two Limit Orders matched.



**Scenario 11a:**

Accumulated Odd Lot Orders against Market Order.

Round Lot Market Order(s) left on one side of the book.

Market Order(s) have matched with Limit Order(s).

No Limit Orders left in book better than the last matched Limit Order price (for the accumulated Odd Lots).



*Scenario 11b:*

Accumulated Odd Lot Orders against Market Order.

Round Lot Market Order(s) left on one side of the book.

Market Order(s) have matched with Limit Order(s).

Buy Limit Order left in book better than the last matched Limit Order price (for the accumulated Odd Lots).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-36
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



| Scenario 11c | | | | |
|---|---|---|---|---|
| Round-lot Size   = 100 | | | | |
| Reference Price = 44 | | | | |
| | | Bid | | Ask |
| Round-lot | | 100  49 | | —  100 |
| | | 100  42 | matching | —  100 |
| | | | | —  100 |
| | | | | (40) 100 |
| Odd-lot | | Accumulated 100 | | |
| Theoretical Opening Price  =  40 | | | | |

Scenario 11c:    Accumulated Odd Lot Orders against Market Orde.r

Round Lot Market Order(s) left on one side of the book.

Market Order(s) have matched with Limit Order(s).

Sell Limit Order left in book better than the last matched Limit Order price (for the accumulated Odd Lots).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-37
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 11

Round-lot Size = 100
Reference Price = (44)

Theoretical Opening Price = 44

*Scenario 11:*     Accumulated Odd Lot Orders against Market Order.

Round Lot Market Order(s) left on one side of the book.

No Limit Orders left in book better than the reference price (for the accumulated Odd Lots).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-38
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



**Scenario 12**

Round-lot Size = 100
Reference Price = 44

| Round-lot | Bid | | Ask |
|---|---|---|---|
| | 100 — | | |
| | 100 (45) | | |
| | 100 45 | matching | |
| | 100 44 | | |
| Odd-lot | | | Accumulated 100 |

Theoretical Opening Price = 45

*Scenario 12:*    Accumulated Odd Lot Orders against Market Order.

Round Lot Market Order(s) left on one side of the book.

Buy Limit Order left in book better than the reference price (for the accumulated Odd Lots).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-39
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 13:     Accumulated Odd Lot Orders against Market Order.

Round Lot Market Order(s) left on one side of the book.

Sell Limit Order left in book better than the reference price (for the accumulated Odd Lots).



Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-40
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 14b

Round-lot Size = 100
Reference Price = 44

Scenario 14:    Accumulated Odd Lot Orders against Limit Order.

No Round Lots match against Round Lots.

Limit Order left in book better than or equal to the reference price (for the accumulated Odd Lots).

The last Limit Order matched determines the opening price.

## A.2.  Continuous Trading Matching Scenarios

This appendix provides one example for each case described in the decision trees from the section "Continuous Trading Matching Rules – Determination of the Trade Price" (15.5.3). For each case, there are many scenarios that could have been chosen.

In the following tables, the bolded order is the incoming order, and the circled price is the trade price, and hence the new reference price.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-41
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 15:          Incoming Market Order against Market Order.

No Limit Orders in book better than the reference price
(for the incoming Market Order).

---

**Scenario 16**

Round-lot Size  = 100
Reference Price = 44

|            | Bid |      |          |     | Ask |
|------------|-----|------|----------|-----|-----|
| Round-lot  | 100 | —    | matching | —   | 100 |
|            | 100 | (45) |          |     |     |
|            | 100 | 45   |          |     |     |
|            | 100 | 44   |          |     |     |
| Odd-lot    |     |      |          |     |     |

New Reference Price  = 45

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-42
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

*Scenario 16:*     Incoming Market Order against Market Order.

Buy Limit Order in book better than the reference price (for the incoming Market Order).



*Scenario 17:*     Incoming Market Order against Market Order.

Sell Limit Order in book better than the reference price (for the incoming Market Order).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-43
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



**Scenario 18:**     Incoming Market Order against Limit Order.

No condition.



**Scenario 19:**     Incoming Limit Order against Market Order.

No Limit Orders better than the incoming limit price (for the incoming Limit Order).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-44
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 20:

Incoming Limit Order against Market Order.

Buy Limit Order better than the incoming Limit Order price (for the incoming Limit Order).



Scenario 21:

Incoming Limit Order against Market Order.

Sell Limit Order better than or equal to the incoming Limit Order price (for the incoming Limit Order).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-45
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

```
┌─────────────────────────────────────────────────┐
│ Scenario 22                                       │
│                                                   │
│ Round-lot Size  = 100                             │
│ Reference Price = 44                              │
│                                                   │
│              Bid                        Ask       │
│              100 (40) ←── matching   39  100      │
│ Round-lot    100  38                 41  100      │
│              100  38               . 43  100      │
│                                                   │
│ Odd-lot                                           │
│                                                   │
│ New Reference Price  = 40                         │
└─────────────────────────────────────────────────┘
```

Scenario 22:    Incoming Limit Order against Limit Order.

Buy Limit Order better than or equal to the incoming sell Limit Order price (for the incoming Limit Order).

```
┌─────────────────────────────────────────────────┐
│ Scenario 23                                       │
│                                                   │
│ Round-lot Size  = 100                             │
│ Reference Price = 44                              │
│                                                   │
│              Bid                        Ask       │
│              100  40 ←── matching ──→ (39) 100    │
│ Round-lot    100  38                  41  100     │
│              100  38                  43  100     │
│                                                   │
│ Odd-lot                                           │
│                                                   │
│ New Reference Price  = 39                         │
└─────────────────────────────────────────────────┘
```

Scenario 23:    Incoming Limit Order against Limit Order.

Sell Limit Order better than or equal to the incoming buy Limit Order price (for the incoming Limit Order).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-46
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 24:

Incoming Odd Lot accumulates to match against Limit Order.

Limit Order price better than or equal to the reference price (for the accumulated Odd Lots).



Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-47
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

*Scenario 25:*  Incoming Limit Order against accumulated Odd Lot Order.

No Round Lots can match.

Limit Order price better than or equal to the reference price (for the accumulated Odd Lot Orders).



**Scenario 26**

Round-lot Size  = 100
Reference Price = (44)

|  | Bid |  | Ask |
|---|---|---|---|
| Round-lot | 100 — |  |  |
|  | 100  43 |  |  |
|  |  | matching |  |
| Odd-lot |  |  | — 50 |
|  |  |  | — 50 |

New Reference Price  =  44

*Scenario 26:*  Incoming Odd Lot accumulates to match against Market Order.

No Limit Orders in orderbook better than the reference price (for the accumulated Odd Lot Orders).

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-48
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98



Scenario 27:    Incoming Odd Lot accumulates to match against Market Order.

Buy Limit Order in orderbook better than the reference price (for the accumulated Odd Lot Orders).



Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-49
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

*Scenario 28:*

Incoming Odd Lot accumulates to match against Market Order.

Sell Limit Order in orderbook better than the reference price (for the accumulated Odd Lot Orders).



*Scenario 29:*

Incoming Market Order against accumulated Odd Lot Orders.

No Round Lots on other side of book.

Swiss Exchange SWX
TS User Manual
Matching Rules

Page 15-50
I-MSC-TSM-201/E
Version 2.1, 31 Dec 98

---

### Scenario 30

Round-lot Size  = 100
Reference Price = (44)

|  | Bid |  | Ask |  |
|---|---|---|---|---|
|  |  | 42 | 43 | 200 |
| Round-lot | 100 | 42 | 45 | 200 |
|  | 100 | 41 | 46 | 300 |
| Odd-lot | 50 | — ← matching → — | 70 |  |
|  |  |  | (20 of this odd-lot remains in the book) |  |

New Reference Price  = 44

---

*Scenario 30:*　　　　Incoming Odd Lot Order against Odd Lot Order.

Odd Lot cannot accumulate to match with Round Lot.

EXHIBIT 18

EXHIBIT 18: '629 INVALIDITY TABLE
Swiss Exchange SWX TS User Manual (DEC., 1998)

| '629 Claim Language | Teachings of SWX |
|---|---|
| **27.** An automated trading method for use in an electronic exchange system network, comprising: | The SWX reference teaches an automated trading method linked to the Swiss Exchange:<br><br><br><br>[SWX, Figure 1.]<br><br>• "The TS/TX(X) User Manual is an introductory description of the ***Trading System*** (TS) user interface." [SWX, at 1-1.]<br><br>• "The TS User Manual starts by describing the work of a fictitious trader named Bernardo Bianchi who works for the equally fictitious small exchange member Banca del Monte Rosa in Lugano." [SWX, at 1-3.]<br><br>• "The ***link between the trader workstations*** on the internal network of Banca del Monte Rosa ***and the exchange system*** is maintained through the local Gateway." [SWX, at 1-5.] |
| using equipment to perform trading of a first traded item or a second traded item related to the first traded item, including: | The trading method utilizes networked workstations to manage orders and trades of securities:<br><br>• "All traders at Banca del Monte Rosa work on a ***Trading System*** (TS) which can be accessed from a group of ***networked workstations***." [SWX, at 1-4.]<br><br>• "The extended functions of TS(X) have been designed to answer the user's need in two additional areas: the management of ***orders and trades*** on one hand, and the management of positions with profit/loss calculations on the other. Also part of TS(X) is a ***data interface for the member's internal computer system*** which supports the typical functional in this context." [SWX, at 2-4.] |

| '629 Claim Language | Teachings of SWX |
|---|---|
| receiving market price information for the first traded item; | The trading method receives the current market price of all securities from the exchange system:<br><br><br><br>[SWX, Figure 46.]<br><br>• "The **link between the trader workstations** on the internal network of Banca del Monte Rosa **and the exchange system** is maintained through the local Gateway."  [SWX, at 1-5.]<br><br>• "The server database is kept up to date with the **latest information from the exchange system** (ES). Owing to this principle, the trader workstations can access data on the server and do not need to use the capacity of the exchange system for each piece of data they require."  [SWX, at 1-4.]<br><br>• "Based on the executed trades and the **current market prices**, it is possible to calculate the realised and unrealised (potential) profit or loss."  [SWX, at 2-8.] |
| identifying a desired price for the first traded item in a look-up table based on price information for the second traded item; | The trading method identifies a trigger price for a security from a locally stored table.  The trigger price is based on the market price of the underlying security:<br><br><br><br>[SWX, Figure 79 (illustrating "trigger price" in a table).]<br><br>• "Black would like to cover a short position of 200 S Holding in case the price starts to rise. In order to avoid having to keep looking at the inside market of S Holding, he enters an *On Stop Order* with a **Trigger Price** of 503.00. This order is stored on the Trading System until a *[market] price* of 503.00 or higher is paid."  [SWX, at 6-37.]<br><br>• "Just as he would do to enter a normal order, Black clicks on the "Buy", enters the order size of 200, selects the security "S Holding" and chooses "Market" in |

| '629 Claim Language | Teachings of SWX |
|---|---|
| | the price field (so as to create a market order). … Black also selects Conditional Order as order type and enters the Trigger Price required in the adjacent field. All the required data has thus been entered and Black can press "Submit" to *store the order locally* in the Trading System."  [SWX, at 6-38.] |
| | • "Conditional orders, for example, are therefore *stored locally* in the TS and only transmitted to the Exchange System if and when the conditions are met." [SWX, at 2-3.] |
| comparing the received market price information for the first traded item to the desired price for the first traded item; and | The trading method compares the market price of the security to the trigger price: |
| | • "The last price paid for S Holding rises to 503.00 later during the trading. *As the condition* for the *On Stop Order* entered by Black *is now satisfied*, the Trading System automatically converts the conditional order into a market order."  [SWX, at 6-39.] |
| | • This order is stored on the Trading System *until a [market] price* of 503.00 or higher is paid."  [SWX, at 6-37.] |
| | • "Conditional orders, for example, are therefore stored locally in the TS and only transmitted to the Exchange System *if and when the conditions are met*." [SWX, at 2-3.] |
| | • "A conditional *Sell* Order is called a *Stop Loss Order*. In the case of a *Stop Loss Order*, the Trading System generates an order as soon as the *last paid price is lower than or equal to the Trigger Price*."  [SWX, at 6-37 fn1.] |
| generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price. | When the trigger condition is satisfied, the trading method automatically generates and transmits a market order for the security to the exchange: |
| | • "As the condition for the *On Stop Order* entered by Black is now satisfied, the Trading System *automatically* converts the conditional order into a market order. This market order is *automatically transmitted to the exchange system*, where it will be executed immediately or remain in the order book."  [SWX, at 6-39.] |
| | • "In the case of a *Stop Loss Order*, the Trading System *generates an order as soon as* the last paid price is lower than or equal to the Trigger Price."  [SWX, at 6-37 fn1.] |

| '629 Claim Language | Teachings of SWX |
|---|---|
| **36.** An automated trading method for use in an exchange system network, comprising: | The SWX reference teaches an automated trading method linked to the Swiss Exchange:<br><br><br><br>[SWX, Figure 1.]<br><br>• "The TS/TX(X) User Manual is an introductory description of the **_Trading System_** (TS) user interface." [SWX, at 1-1.]<br><br>• "The TS User Manual starts by describing the work of a fictitious trader named Bernardo Bianchi who works for the equally fictitious small exchange member Banca del Monte Rosa in Lugano." [SWX, at 1-3.]<br><br>• "The **_link between the trader workstations_** on the internal network of Banca del Monte Rosa **_and the exchange system_** is maintained through the local Gateway." [SWX, at 1-5.] |
| using equipment in a network architecture to perform trading of a first traded item including: | The trading method utilizes networked workstations to manage orders and trades of securities:<br><br>• "All traders at Banca del Monte Rosa work on a **_Trading System_** (TS) which can be accessed from a group of **_networked workstations_**." [SWX, at 1-4.]<br><br>• "The extended functions of TS(X) have been designed to answer the user's need in two additional areas: the management of **_orders and trades_** on one hand, and the management of positions with profit/loss calculations on the other. Also part of TS(X) is a **_data interface for the member's internal computer system_** which supports the typical functional in this context." [SWX, at 2-4.] |

4

| '629 Claim Language | Teachings of SWX |
|---|---|
| receiving market information for the first traded item; | The trading system receives the current market price of all securities from the exchange system:<br><br><br><br>[SWX, Figure 46.]<br><br>• "The **link between the trader workstations** on the internal network of Banca del Monte Rosa **and the exchange system** is maintained through the local Gateway."  [SWX, at 1-5.]<br><br>• "The server database is kept up to date with the **latest information from the exchange system** (ES). Owing to this principle, the trader workstations can access data on the server and do not need to use the capacity of the exchange system for each piece of data they require."  [SWX, at 1-4.]<br><br>• "Based on the executed trades and the **current market prices**, it is possible to calculate the realised and unrealised (potential) profit or loss."  [SWX, at 2-8.] |
| identifying a transaction value for the first traded item in a look-up table of transaction values for the first traded item, wherein the identifying is responsive to receiving the market information for the first traded item and wherein the transaction values in the | The trading method identifies a trigger price for a security from a locally stored table.  The trigger price is based on the market price of the underlying security:<br><br><br><br>[SWX, Figure 79 (illustrating "trigger price" in a table).]<br><br>• "Black would like to cover a short position of 200 S Holding in case the price starts to rise. In order to avoid having to keep looking at the inside market of S Holding, he enters an *On Stop Order* with a **Trigger Price** of 503.00. This order is stored on the Trading System until a *[market] price* of 503.00 or higher is paid."  [SWX, at 6-37.]<br><br>• "Just as he would do to enter a normal order, Black clicks on the "Buy", enters the order size of 200, selects the security "S Holding" and chooses "Market" in |

| '629 Claim Language | Teachings of SWX |
|---|---|
| look-up table are based on price information for a second traded item related to the first traded item; | the price field (so as to create a market order). … Black also selects Conditional Order as order type and enters the Trigger Price required in the adjacent field. All the required data has thus been entered and Black can press "Submit" to **store the order locally** in the Trading System." [SWX, at 6-38.]<br><br>• "Conditional orders, for example, are therefore **stored locally** in the TS and only transmitted to the Exchange System if and when the conditions are met." [SWX, at 2-3.] |
| and using at least the identified transaction value in determining whether to submit an order for the first traded item. | The trading method compares the market price of the security to the trigger price. When the trigger condition is satisfied, the trading method automatically generates and transmits a market order for the security to the exchange:<br><br>• "As the condition for the *On Stop Order* entered by Black is now satisfied, the Trading System ***automatically*** converts the conditional order into a market order. This market order is ***automatically transmitted to the exchange system***, where it will be executed immediately or remain in the order book." [SWX, at 6-39.]<br><br>• "In the case of a *Stop Loss Order*, the Trading System ***generates an order as soon as*** the last paid price is lower than or equal to the Trigger Price." [SWX, at 6-37 fn1.] |

# EXHIBIT 19

# NUMERICAL METHODS IN FINANCE

*edited by*

L.C.G. Rogers

*University of Bath*

and

D. Talay

*INRIA, Sophia-Antipolis*


**CAMBRIDGE**
UNIVERSITY PRESS

PUBLISHED BY THE PRESS SYNDICATE OF THE UNIVERSITY OF CAMBRIDGE
The Pitt Building, Trumpington Street, Cambridge, United Kingdom

CAMBRIDGE UNIVERSITY PRESS
The Edinburgh Building, Cambridge CB2 2RU, UK    http://www.cup.cam.ac.uk
40 West 20th Street, New York, NY 10011–4211, USA    http://www.cup.org
10 Stamford Road, Oakleigh, Melbourne 3166, Australia

© Cambridge University Press 1997

This book is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without
the written permission of Cambridge University Press.

First published 1997
Reprinted 1999

Printed in the United Kingdom at the University Press, Cambridge

Typeset in Computer Modern

*A catalogue record for this book is available from the British Library*

ISBN 0 521 57354 8 hardback

# Fast, Accurate and Inelegant Valuation of American Options

## *Adriaan Joubert and L.C.G. Rogers*

In this short article, we describe the pricing of an American option (call or put) on a share which may pay continuous dividends, using a method described by Broadie & Detemple (1997) as 'not very elegant'. The method is simply to build a look-up table of option prices, which thus splits the problem of pricing American option prices into three sub-problems:

(A) accurate calculation of the values in the table;

(B) storage of the table, and access to it;

(C) rapid calculation of prices for given parameter values.

The most important problems are clearly B and C; in principle, we may take as long as necessary to fill up the table, since this calculation is done off-line, once only. Any of the methods discussed elsewhere in this volume by Broadie & Detemple (1997) and by AitSahalia & Carr (1997) could be used to compute the values in the table. We used the binomial method with 5000 time steps using Black-Scholes in the last step, as recommended by Broadie & Detemple.

It is worth remarking that by computing and storing the table of values, we are able to calculate greeks, and the exercise boundary with relatively little extra cost; this is a valuable advantage of this inelegant approach.

To describe the storage problem, let us first state the parametrisation which we used. The price of an American put option written on a share paying continuous dividends at rate $\delta$ is

$$P(S_0, K, r, \sigma, T, \delta) \equiv \sup_{0 \le \tau \le T} E[(Ke^{-r\tau} - S_0 e^{\sigma W(\tau) - (\delta + \sigma^2/2)\tau})^+],$$

where $T$ is the expiry of the option, $\tau$ is a stopping time with values in $[0, T]$, $K$ is the strike price, $S_0$ is the price of the share at time 0, and $\sigma$ is the volatility of the share returns. Though the price ostensibly depends on six parameters, we can reduce the problem somewhat by rewriting

$$
\begin{aligned}
P(S_0, K, r, \sigma, T, \delta) &= \sup_{0 \le \tau \le \sigma^2 T} E[(Ke^{-r\sigma^{-2}\tau} - S_0 e^{W(\tau) - (\delta\sigma^{-2} + (1/2))\tau})^+] \\
&\equiv P(S_0, K, r\sigma^{-2}, 1, \sigma^2 T, \delta\sigma^{-2}) \\
&= KP(S_0/K, 1, r\sigma^{-2}, 1, \sigma^2 T, \delta\sigma^{-2}) \\
&\equiv Kp(S_0/K, rT, \sigma^2 T, \delta T),
\end{aligned}
$$

say; thus there are effectively only four parameters of the problem, $S_0/K$, $\sigma^2 T$, $rT$, and $\delta T$. We therefore only have to store a four-dimensional table,

88

| $S$ ($) | $T$ (Years) | $\sigma$ (%) | $r$ (%) | Binomial ($) | Look-Up ($) | Rel. Err. | Abs. Err. |
|---|---|---|---|---|---|---|---|
| 80 | 0.500 | 40 | 6 | 21.6057 | 21.6057 | 0.0000 | 0.0000 |
| 85 | 0.500 | 40 | 6 | 18.0370 | 18.0368 | 0.0000 | 0.0002 |
| 90 | 0.500 | 40 | 6 | 14.9178 | 14.9178 | 0.0000 | 0.0000 |
| 95 | 0.500 | 40 | 6 | 12.2306 | 12.2303 | 0.0000 | 0.0003 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 105 | 0.500 | 40 | 6 | 8.0265 | 8.0267 | 0.0000 | -0.0003 |
| 110 | 0.500 | 40 | 6 | 6.4337 | 6.4339 | 0.0000 | -0.0002 |
| 115 | 0.500 | 40 | 6 | 5.1257 | 5.1253 | 0.0001 | 0.0003 |
| 120 | 0.500 | 40 | 6 | 4.0602 | 4.0601 | 0.0000 | 0.0001 |
| 100 | 0.500 | 40 | 2 | 10.7734 | 10.7739 | 0.0000 | -0.0005 |
| 100 | 0.500 | 40 | 4 | 10.3441 | 10.3447 | -0.0001 | -0.0006 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.500 | 40 | 8 | 9.5707 | 9.5712 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 10 | 9.2186 | 9.2191 | 0.0000 | -0.0005 |
| 100 | 0.500 | 30 | 6 | 7.2110 | 7.2114 | -0.0001 | -0.0004 |
| 100 | 0.500 | 35 | 6 | 8.5774 | 8.5779 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.500 | 45 | 6 | 11.3116 | 11.3123 | -0.0001 | -0.0006 |
| 100 | 0.500 | 50 | 6 | 12.6767 | 12.6774 | -0.0001 | -0.0007 |
| 100 | 0.083 | 40 | 6 | 4.3732 | 4.3743 | -0.0003 | -0.0012 |
| 100 | 0.167 | 40 | 6 | 6.0716 | 6.0718 | 0.0000 | -0.0002 |
| 100 | 0.250 | 40 | 6 | 7.3070 | 7.3074 | -0.0001 | -0.0004 |
| 100 | 0.333 | 40 | 6 | 8.3149 | 8.3154 | -0.0001 | -0.0005 |
| 100 | 0.417 | 40 | 6 | 9.1869 | 9.1874 | -0.0001 | -0.0005 |
| 100 | 0.500 | 40 | 6 | 9.9448 | 9.9454 | -0.0001 | -0.0006 |
| 100 | 0.583 | 40 | 6 | 10.6247 | 10.6253 | -0.0001 | -0.0006 |
| 100 | 0.667 | 40 | 6 | 11.2500 | 11.2506 | -0.0001 | -0.0006 |
| 100 | 0.750 | 40 | 6 | 11.8172 | 11.8178 | -0.0001 | -0.0006 |
| 100 | 0.833 | 40 | 6 | 12.3424 | 12.3430 | -0.0001 | -0.0006 |
| 100 | 0.917 | 40 | 6 | 12.8374 | 12.8380 | -0.0001 | -0.0007 |

Seconds Per Put : 0.00027

Mean Relative Error $\left(\frac{1}{n}\sum \epsilon_i\right)$ : -0.000045

Root mean square error $\left(\sqrt{\frac{1}{n}\sum \epsilon_i^2}\right)$ : 0.000068

Mean Absolute Relative Error $\left(\frac{1}{n}\sum |\epsilon_i|\right)$ : 0.000053

Maximum Relative Error $(\max |\epsilon_i|)$ : -0.000263

Maximum Absolute Error $(\max |p_i - \hat{p}_i|)$ : 0.001150

(Here $n = 30$, $p_i$=Binomial price, $\hat{p}_i$=Look-up Table price, $\epsilon_i = \frac{p_i - \hat{p}_i}{p_i}$)

Table 1: Results for short term puts with a strike price of $100 and no dividends. Here $S$ is the stock price, $T$ the expiry of the option, $\sigma$ the volatility and $r$ the risk-free interest rate. The results in the 'Binomial' column were calculated with a 5000-step binomial tree, using Black-Scholes in the last step. The relative and absolute errors are given in the last two columns.

*Joubert and Rogers*

which is feasible. In fact, the ranges we took were:

| | | | |
|---|---|---|---|
| $S/K$ | $[\,0.7\,,1.3\,]$ | $T$ | $[\,0.003,\,1.0\,]$ |
| $r$ | $[0.01,0.10]$ | $\sigma$ | $[\,0.03\,,0.60]$ |
| $\delta$ | $[0.00,0.10]$ | | |

There are many practical difficulties in the construction of such a look-up table. Close to the exercise boundary the option pricing function $p$ changes very rapidly, and at the exercise boundary its second derivative is large. Interpolating in intervals that straddle the exercise boundary causes larger errors. For this reason the exercise boundary is pinpointed accurately for the $S/K$ grid lines while the table is constructed, and its position stored in a separate table. Furthermore $S/K$ is confined to values where options have a significant value, i.e. are bigger than $10^{-5}$. Consequently the grid spacing decreases when the option has a short running time — this is essential to obtain reasonable estimates for short maturities.

The grid spacing for $\delta T$ is fixed, but for every grid point in the $\delta T$ dimension bounds for $rT$ are determined, so that only the range of parameters that are of interest is covered. The reason is that choosing $\delta T$, and having a fixed range for $\delta$ imposes restrictions on the values for $T$ that have to be considered. The same is true for the grid for $\sigma\sqrt{T}$. This simple optimisation reduces the size of the table roughly by half.

We also experimented with non-equidistant grids in order to have more points in regions where $T$ is assumed to be small, but the slight improvement in precision did not seem to justify the additional complication in accessing the table and interpolating the option prices.

For the results presented here, a table with 21 points in the $T$ and $S/K$ dimensions and 16 points in the $\delta$ and $\sigma$ dimensions is used. The total amount of space required to store this was 0.94 MB, which is quite acceptable (it easily fits on a single floppy disc).

It is possible to use so little storage only because we use a judicious choice of grids and a polynomial interpolation method. There are various interpolation schemes well known in numerical analysis; we used a modified Neville interpolation. For an account of the method, see, for example, the book by Stoer (1983).

For the interpolation 4 points are used in every grid dimension, giving a total of 256 points. Heuristics are use to exclude some points if they are outside the exercise boundary. If the option price is not close to the exercise boundary and has a long maturity, quite acceptable results can be achieved using only quadratic or even linear interpolation. In the results reported here the interpolation is not optimised to choose the number of interpolation points dynamically.

Even in a first implementation, this method can price around 3000 options per second with high accuracy. We used a similar test to Broadie & Detem-

ple for 5000 options, with parameters chosen independently from a uniform distribution, such that:

| | | | |
|---|---|---|---|
| $K$ | 100 | $S$ | [ 70 , 130] |
| $T$ | [0.1, 1.0 ] | $r$ | [0.01,0.10] |
| $\sigma$ | [0.1,0.60] | $\delta$ | [0.00,0.10] |

We follow them in rejecting options with a price less then 0.005, which left 4687 option prices; we similarly define the relative error as $\epsilon = (p - \hat{p})/p$, where $p$ is the put price calculated with a 5000-step binomial algorithm, using Black-Scholes in the last step, and $\hat{p}$ is the price obtained from the look-up table. The relative root-mean-square error (RMS) is then defined as

$$\sqrt{\frac{1}{n} \sum \left( \frac{p - \hat{p}}{p} \right)^2}.$$

With the look-up table defined above, the relative root-mean-square error was 0.001001, and the maximum relative error (chosen such that 99.5% of the observations have smaller errors) was $-0.006011$. Warnings are issued for options for which the enclosing cube in the $(\delta T, rT, \sigma\sqrt{T})$ space (8 points) contains points which are outside the exercise boundary. Ignoring options for which warnings are issued halved the relative root-mean-square error (RMS=0.000553) and reduces the relative maximum error to 0.003394.

Table 1 shows results similar to those presented by Aït-Sahalia & Carr. For this parameter set the look-up method compares favourably with any of the direct calculation methods. The fact that no dividends are present is not taken into account explicitly, so that 256 instead of only 64 points are used in this calculation. Taking this into account would reduce the computation time significantly.

The current implementation is still far from optimal, and could easily be speeded up. Currently 89 calls to a Neville interpolation routine are made during every look-up, and this routine could be in-lined and tailored to the problem. A more important optimisation would be to dynamically change the number of points used for the interpolation.

The accuracy can be increased by choosing a larger grid, which comes at the cost of higher memory usage, or by splitting the domain and using a finer grid for short maturities. For particularly difficult cases, such as when some of the interpolation points lie outside the exercise boundary, or the life-span is very short, it is always possible to fall back on a slower direct calculation.

## Conclusions

The results in this article demonstrate the feasibility of using look-up tables for pricing American options with continuous dividends. It turns out that

organising the look-up table to (i) restrict it to an acceptable size, and (ii) to get high accuracy, is harder than might have been thought. A key factor for the accuracy is to take explicitly into account that the price function changes very rapidly at the exercise boundary. Accessing the table has to be thought out carefully, and cubic polynomial interpolation is used to maintain accuracy. The American put is fundamentally quite a simple option, and we find that the look-up table is broadly comparable in speed and accuracy with the best of the methods discussed elsewhere in this volume. If we were now to envisage the pricing of an American put where the assumption of a constant interest rate were to be replaced by a Vasicek model for the interest rate, the various methods used elsewhere are going to suffer badly, whereas the look-up approach is still as good; filling the look-up table will of course take much longer, but once it is filled, the interpolation method will give the same sort of speed as we have found here (thousands of options per second). In addition to its speed, a key advantage of look-up tables is that the greeks can be estimated very cheaply.

# References

AitSahalia, F. & Carr, P. (1997) 'American options: a comparison of numerical methods'. This volume.

Broadie, M. & Detemple. J. (1997) 'Recent advances in numerical methods for pricing derivative securities'. This volume.

Stoer, J. (1983) *Einführung in die Numerische Mathematik I*, 4th ed., Springer.

# EXHIBIT 20



# UNITED STATES PATENT AND TRADEMARK OFFICE



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/618,222 | 07/18/2000 | John M. Marynowski | 048289-5003 | 8771 |

9629        7590        02/24/2006

MORGAN LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVENUE NW
WASHINGTON, DC  20004

| EXAMINER |
|---|
| FELTEN, DANIEL S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3624 | |

DATE MAILED: 02/24/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Interview Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/618,222 | MARYNOWSKI ET AL. |
| | Examiner | Art Unit | |
| | Daniel S. Felten | 3624 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Daniel S. Felten*.                          (3)_____.

(2) *John Zele (Reg. No. 39,887)*.               (4)_____.

    Date of Interview: *15 February 2006*.

    Type:  a)☒ Telephonic   b)☐ Video Conference
             c)☐ Personal [copy given to: 1)☐ applicant   2)☐ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes   e)☒ No.
    If Yes, brief description: _____.

Claim(s) discussed: *1,10 and 13*.

Identification of prior art discussed: *See Continuation Sheet*.

Agreement with respect to the claims f)☐ was reached.   g)☐ was not reached.   h)☒ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: *An amendment to incorporate the  claim language of  dependent claims 10 & 13 into the independent claims  was suggested by the Examiner  to allow the case* .

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW.  (See MPEP Section 713.04).  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

DANIEL S FELTEN
AU 3624
Business Methods

Examiner Note:  You must sign this form unless it is an Attachment to a signed Office action.

_____
Examiner's signature, if required

### Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132).

**37 CFR §1.2 Business to be transacted in writing.**
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

 -   ₂

**Continuation Sheet (PTOL-413)**                    **Application No.   09/618,222**

Continuation of Identification of prior art discussed:  Kane (US 6,317,728); Daughtery,III (US 6,263,321 &  US 5,884,286; and Joubert, A. and Rogers, L.C.G. (1997) "Fast, accurate and inelegant valuation of American Options", Numerical Methods in Finance, eds L.C.G. Rogers & D. Talay,pgs 88-92, (Cambridge). .

VINCENT MILLIN
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 3600

3

# EXHIBIT 21



PATENT
ATTORNEY DOCKET NO. 048289-5003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| John M. MARYNOWSKI, *et al.* | ) | Confirmation No.: 8771 |
| | ) | |
| Application No.: 09/618,222 | ) | Group Art Unit: 3624 |
| | ) | |
| Filed: July 18, 2000 | ) | Examiner: Daniel S. Felten |
| | ) | |
| For:   **AUTOMATED TRADING SYSTEM** | ) | **MAIL STOP Amendment** |
| **IN AN ELECTRONIC TRADING** | ) | |
| **EXCHANGE** | ) | |

Commissioner for Patents
**MAIL STOP Amendment**
Alexandria, VA 22314

Sir:

## REQUEST FOR RECONSIDERATION

This paper is responsive to the third, non-final Office Action dated February 24, 2006.

This response is filed within the three month statutory period set in the Office Action. No fee is

required.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 2

## LISTING OF CLAIMS

1.    (original)    An automated trading system for use in an electronic exchange system network, comprising:

a receiver interface that receives market price information for a first traded item from an exchange;

a transaction value calculator that generates a transaction value for the first traded item based on price information for a second traded item related to the first traded item;

decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit a response to buy or sell the first traded item; and

an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to said decision logic.

2.    (original)    The automated trading system according to claim 1, wherein the transaction value calculator receives current price information for the second traded item and uses the current price information to generate the transaction value.

3.    (original)    The automated trading system according to claim 2, wherein said transaction value calculator generates the transaction value using interpolation.

4.    (original)    The automated trading system according to claim 2, wherein said transaction value calculator generates the transaction value by extrapolation.

5.    (original)    The automated trading system according to claim 2, wherein the transaction value calculator generates the transaction value by using some precalculated terms.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 3

6.    (original)    The automated trading system according to claim 2, wherein the second traded item is a security and the first traded item is an option on the security.

7.    (original)    The automated trading system according to claim 1, wherein the request for market transaction is an order for the first traded item.

8.    (original)    The automated trading system according to claim 1, wherein the request for market transaction is a quote for the first traded item.

9.    (original)    The automated trading system according to claim 1, said decision logic compares at least a portion of the received market price information to the transaction value when automated trading in the first item first becomes enabled.

10.    (original)    The automated trading system according to claim 1, further comprising safety check logic, responsive to said decision logic, to prevent transmission of a request for market transaction for the first traded item to the exchange if the request does not meet a predetermined criterion.

11.    (original)    The automated trading system according to claim 10, wherein the predetermined criterion is a maximum trade quantity for the first traded item.

12.    (original)    The automated trading system according to claim 10, wherein the predetermined criterion is a maximum resulting delta position in the second traded item.

13.    (original)    The automated trading system according to claim 10, wherein said predetermined criterion is a maximum number of market transaction attempts within a predetermined period of time and said decision logic compares at least a portion of the received

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 4

market price information to the transaction value when the maximum number of attempts is increased.

14.    (original)    The automated trading system according to claim 1, where the receiver interface receives the market price information for the first traded item indirectly from the exchange via an exchange interface.

15.    (original)    The automated trading system according to claim 1, wherein the decision logic compares the transaction value to at least a portion of the received market price information.

16.    (original)    The automated trading system according to claim 15, wherein the transaction value is a minimum sell price for the first traded item, and the market price information includes a market bid price for the first traded item.

17.    (original)    The automated trading system according to claim 15, wherein the transaction value is a maximum buy price for the first traded item, and the market price information includes a market ask price for the first traded item.

18.    (original)    The automated trading system according to claim 15, wherein the transaction value is a theoretical value of the first traded item based on a mathematical model.

19.    (original)    The automated trading system according to claim 15, wherein the price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the current market price for the second traded item changes.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 5

    20.    (original)    The automated trading system according to claim 15, wherein said price information for the second traded item corresponds to a current market price for the second traded item and said decision logic generates a comparison when the price information for the first traded item changes.

    21.    (original)    The automated trading system according to claim 1, wherein a backend computer includes said receiver interface, said transaction value calculator, said decision logic, and said output interface and further comprising a trader station separate from said backend computer, said trader station coupled to said backend computer through a communication link, said trader station including a graphic user interface to enable a trader to monitor the operation of said backend computer.

    22.    (original)    The automated trading system according to claim 21, wherein said backend computer is located substantially closer than said trader station to the exchange that transmits the market price information for the first traded item.

    23.    (original)    The automated trading system according to claim 1, wherein:
said output interface outputs a request for market transaction for the first traded item; and
said receiver interface further receives trade confirmation information for the first traded item in response to the request for market transaction for the first traded item,
and said automated trading system further comprises:
hedge logic for generating a request for market transaction for the second traded item in response to the trade confirmation information, wherein said request for market transaction for the second traded item hedges at least some of the risk of the market transaction for the first traded item.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 6

24.    (previously presented)An automated trading method for use in an electronic exchange system network, comprising:

receiving market price information for a first traded item;

automatically calculating a transaction price for the first traded item based on price information for a second traded item related to the first traded item;

comparing the received market price information for the first traded item to the transaction price for the first traded item; and

automatically generating a request for market transaction for one of the first traded item and the second traded item based on the comparison of the received market price information to the transaction price.

25.    (original)     The automated trading method according to claim 24, wherein said first traded item corresponds to an option and the second traded item corresponds to a security underlying the option.

26.    (original)     The automated trading method according to claim 24, wherein said step of calculating a transaction price, comprises:

(a)    receiving current market price information for said second traded item;

(b)    generating said transaction price for said first traded item using said current market price information for said second traded item.

27.    (previously presented)The automated trading method according to claim 26, wherein said step of calculation uses interpolating the transaction price.

28.    (original)     The automated trading method according to claim 26, wherein said step of generating said transaction price comprises extrapolating the transaction price.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 7

29.    (previously presented)An automated method of trading in an electronic exchange system network, comprising:

receiving a current market price for an option from an electronic exchange;

automatically comparing the current market price for the option with a transaction price for the option, where the transaction price for the option is calculated at least in part from current price information for an underlying security for the option; and

based on the result of the comparing step, automatically submitting an order or quote for the option to the electronic exchange within 96 microseconds of the step of receiving the current market price for the option.

30.    (previously presented)An automated method of trading in an electronic exchange system network, comprising the steps of:

receiving a current market price for a security from a market source;

automatically calculating a transaction price for an option of the security using the current market price for the security;

comparing the current market price for the option with a transaction price for the option; and

based on the step of comparing, automatically submitting an order or quote for the option to an electronic exchange within 154 microseconds of the step of receiving the current market price for the security.

31.    (original)     The automated trading method according to claim 30, wherein said step of submitting an order or quote is performed within 97 microseconds of the step of receiving the current market price for the security.

32.    (original)     The automated trading method according to claim 31, further comprising the step of performing safety checks before the submitting step.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 8

33.    (original)    The automated trading method according to claim 32, wherein said step of calculating is performed within 80 microseconds.

34.    (previously presented) An automated trading method for use in an electronic exchange system network, comprising the steps of:

receiving market price information for a first traded item;

automatically calculating a transaction value for the first traded item based on at least one of (a) price information for a second traded item related to the first traded item and (b) received market information for the first traded item; and

using at least the calculated transaction value in automatically determining whether to submit an order for the first traded item.

35.    (original)    The automated trading method according to claim 34, wherein the calculated transaction value is an implied volatility value corresponding to the first traded item.

36.    (original)    The automated trading method according to claim 34, wherein the calculated transaction value is a maximum buy value for the first traded item.

37.    (original)    The automated trading method according to claim 34, wherein the calculated transaction value is a minimum sell value for the first traded item.

38.    (original)    The automated trading method according to claim 34, wherein the calculated transaction value is a theoretical value for the first traded item generated based on a mathematical model.

39.    (original)    The automated trading method according to claim 34, further

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 9

comprising the steps of:

    (a) submitting an order for the first traded item;

    (b) receiving confirmation of a transaction from an exchange responsive to the order submitted; and

    (c) submitting an order for the second traded item to hedge a delta risk associated with the confirmed transaction.

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 10

## REMARKS

Claims 1-39 are presently pending.

Claims 9-11, 13-19, 22, and 25 stand provisionally rejected under 35 U.S.C. § 101 as allegedly claiming the same invention as claims 9-11, 12-18, 26, and 40 of co-pending application no. 09/417,774 ("the '774 application").

Claims 1, 24, 29, 30 and 34 stand provisionally rejected on the ground of nonstatutory double patenting over claims 1, 27, 32, and 36 of the '774 application.

Claims 2-8, 12, 20-21, 23, 26-28 31-33 and 35-39 are indicated as rejected on the summary page of the Office Action, but no reason for rejection is provided in the Office Action. Accordingly, Applicant considers these claims patentable. *E.g., 35 U.S.C. §102 ("A person is entitled to a patent unless ....).*

Applicants request reconsideration.

### The Telephone Interview

The Examiner contacted Applicants' representative on February 15, 2006 proposing that claim 1 be amended to incorporate the subject matter of dependent claims 10 and 13. The Examiner indicated that he would be willing to allow claim 1, if amended as proposed. The Examiner stated that he was considering U.S. Patent Nos. 6,317,728, 6,236,321, and 5,884,286, and an article by Joubert and Rogers. The Examiner stated that he did not have a copy of the Joubert and Rogers article. Applicants note that the Examiner has not cited these references in connection with the present application. It appears that, upon further consideration, the

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 11

Examiner did not consider these references to be relevant. In any event, Applicants cite these references in an Information Disclosure Statement filed herewith.

In a subsequent telephone call on the same date, the Examiner indicated that if the subject matter of claims 10 and 13 could be added to the other independent claims of the present application, he would consider those claims to be allowable.

On February 16, 2006, Applicants' representative left a voice mail message for the Examiner declining the offer to amend the claims and requesting that the Examiner mail an Office Action if he considered the claims to be unpatentable over the prior art.

### Claims 2-8, 12, 20-21, 23, 26-28, 31-33 and 35-39 Are Allowable

The Office Action does not assert any rejections or objection to claims 2-8, 12, 20-21, 23, 26-28 31-33 and 35-39. 37 C.F.R. § 1.104(c)(1) provides that "[I]f an invention is not considered patentable, or not considered patentable as claimed, the claims, or those considered unpatentable will be rejected." Because claims 2-8, 12, 20-21, 23, 26-28, 31-33 and 35-39 are not rejected, they are allowable.

### The Rejection of Claims 1, 24, 29, 30 and 34

The Office Action provisionally rejects claims 1, 24, 29, 30 and 34 under the judicially-created nonstatutory "obviousness-type" double patenting. The reason provided in the Office Action for the provisional rejection is that the present application and the '774 application are claiming "common subject matter," namely "an automated trading system for use in an electronic exchange network." However, the Office Action does not compare the text of the claims in the

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 12

present application to the text of the claims of the '774 application or explain why the differences

would have been obvious.

      While not conceding the propriety of the rejection or the sufficiency of the Office Action,

Applicants submit herewith a terminal disclaimer obviating the rejection.

***The Rejection of Claims 9-11, 13-19, 22, and 25***

      Dependent claims 9-11, 13-19, 22, and 25 stand provisionally rejected under 35 U.S.C. §

101 as allegedly claiming the same invention as claims 9-11, 12-18, 26, and 40 of the '774

application. Applicants disagree.

      Claims 9-11, 13-19 and 22 are dependent claims that incorporate independent claim 1,

either directly or through another dependent claim. The Examiner apparently compared the text

of dependent claims 9-11, 13-19, 22, and 25 to claims of the '774 application <u>without</u>

considering the incorporated subject matter. When the claims are considered with the

incorporated subject matter, it is clear that claims 9-11, 13-19 and 22 differ from claims 9-11, 12-

18, 26, and 40 of the '774 application. In fact, the Office Action acknowledges that independent

claim 1 is directed to a different invention than claim 1 of the '774 application by asserting an

"obviousness-type" rejection. Because claims 9-11, 13-19 and 22 differ from the claims of the

'774 application, the rejection under 35 U.S.C. § 101 is improper.

      Similarly, claim 25 is a dependent claim that incorporates claim 24. When the

incorporated subject matter is considered, it is clear that claim 25 differs from claim 40 of the

'774 application. Because the claims differ, the rejection under 35 U.S.C. § 101 is improper.

1-WA/2535985.1

ATTORNEY DOCKET NO. 048289-5003
Application No.: 09/618,222
Page 13

The provision rejection of claims 9-11, 13-19, 22, and 25 should be withdrawn.

*Conclusion*

**Except** for issue fees payable under 37 C.F.R. 1.18, the Commissioner is hereby authorized by this paper to charge any additional fees during the entire pendency of this application including fees due under 37 C.F.R. 1.16 and 1.17 which may be required, including any required extension of time fees, or credit any overpayment to Deposit Account No. 50-0310. This paragraph is intended to be a **CONSTRUCTIVE PETITION FOR EXTENSION OF TIME** in accordance with 37 C.F.R. §1.136(a)(3).

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: John D. Zele
Reg. No. 39,887

Dated: **March 14, 2006**

**CUSTOMER NO. 009629**
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000

1-WA/2535985.1

PATENT

ATTORNEY DOCKET NO.: 048289-5003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | Confirmation No.: 8771 |
| | ) | |
| John M. MARYNOWSKI et al. | ) | Group Art Unit: 3624 |
| | ) | |
| Application No.: 09/618,222 | ) | Examiner: Daniel S. Felten |
| | ) | |
| Filed: July 18, 2000 | ) | |
| | ) | |
| For:  AN AUTOMATED TRADING SYSTEM | ) | |
|   IN AN ELECTRONIC TRADING | ) | |
|   EXCHANGE | ) | |

Commissioner for Patents
U.S. Patent and Trademark Office
Customer Window
Randolph Building
401 Dulany Street
Alexandria, VA  22314

Sir:

### INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. § 1.97(c)

This Information Disclosure Statement is being filed after the events recited in § 1.97(b)

but, to the undersigned's knowledge, before the mailing date of a Final Office Action, a Notice

of Allowance, or another action that closes prosecution in the above-referenced application.

Under the provisions of 37 C.F.R. § 1.97(c), a fee of $180.00 accompanies this Information

Disclosure Statement as specified in 37 C.F.R. § 1.17(p).

Copies of the listed documents that are not U.S. patents are provided herewith.

Applicants respectfully request that the Examiner consider the listed documents and

evidence that consideration by making appropriate notations on the attached PTO 1449 form.

03/16/2006 HALI11  00000022 500310  09618222
01 FC:1806    180.00 DA

1-WA/2537837.1

Attorney Docket No.: 048289-5003
Application No.: 09/618,222
Page 2

Applicants respectfully request that the Examiner consider the above-listed documents.

This submission does not represent that a search has been made or that no better art exists and does not constitute an admission that each or all of the listed documents are material or constitute "Prior Art." If it should be determined that any of the listed documents do not constitute "Prior Art" under United States law, Applicants reserve the right to present to the office the relevant facts and law regarding the appropriate status of such document.

Applicants further reserve the right to take appropriate action to establish the patentability of the disclosed invention over the listed documents, should one or more of the documents be applied against the claims of the present application.

If there is any fee due in connection with the filing of this Information Disclosure Statement, please charge the fee to our Deposit Account No. 50-0310.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated: March 14, 2006        By:  _John D. Zele_____
                                  John D. Zele
                                  Registration No. 39,887

Customer No.: 009629
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202-739-3000
Fax: 202-739-3001

1-WA/2537837.1

| INFORMATION DISCLOSURE CITATION | | Attorney Docket No. 048289-5003 | | Application No.: 09/618,222 | |
|---|---|---|---|---|---|
| (Use several sheets if necessary) | | Applicant(s): John M. **MARYNOWSKI**, *et al.* | | | |
| | | | | | **PAGE 1 of 2** |
| PTO Form 1449 | | Filing Date: July 18, 2000 | | Group Art Unit: 3624 | |

### U.S. PATENT DOCUMENTS

| *Examiner Initial | | Document Number | Date | Name | Class | Sub Class | Filing Date |
|---|---|---|---|---|---|---|---|
| | | 5,101,353 | 03-1992 | Lupien et al. | 705 | 37 | |
| | | 6,061,662 | 05-2000 | Makivic, Miloje S. | 705 | 36R | |
| | | 6,058,391 | 05-2000 | Gardner, Jonathan | 707 | 4 | |
| | | 6,839,686 | 01-2005 | Galant, Paul S. | 705 | 36R | |
| | | 6,304,858 | 10-2001 | Mosier et al. | 705 | 37 | |
| | | 6,594,643 | 07-2003 | Freeny, Jr., Charles C. | 705 | 36R | |
| | | 6,236,980 | 05-2001 | Reese, John | | | |
| | | | | | | | |
| | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Sub Class | **Translation** YES    NO | |
|---|---|---|---|---|---|---|---|---|
| | | WO 90 10910 | 09-1990 | PCT | | | | |
| | | WO 97 37735 | 10-1997 | PCT | | | | |
| | | EP 0573991A1 | 06-1993 | Europe | | | | |
| | | | | | | | | |
| | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| | Barone-Asesi, G. and Whaley. R., "Efficient Analytic Approximation of American Option Values", Journal of Finance., Vol, 42, No. 2 (June 1987), pp. 301-320. |
| | Web-Pop (Professional Options Package) (www.pmpublishing.com) |
| | |

| Examiner | | Date Considered |
|---|---|---|
| Examiner: | Initial if reference considered whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | |

| INFORMATION DISCLOSURE CITATION | | Attorney Docket No.<br>048289-5003 | | Application No.:<br>09/618,222 | | |
|---|---|---|---|---|---|---|
| (Use several sheets if necessary) | | Applicant(s):  John M. **MARYNOWSKI**, *et al.* | | | | |
| | | | | | | **PAGE 2 of 2** |
| PTO Form 1449 | | Filing Date:  July 18, 2000 | | Group Art Unit: 3624 | | |

## U.S. PATENT DOCUMENTS

| *Examiner<br>Initial | Document<br>Number | Date | Name | Class | Sub<br>Class | Filing Date |
|---|---|---|---|---|---|---|
| | 6,317,728 B1 | 11-2001 | Kane, Richard L. | 705 | 36R | |
| | 6,263,321 B1 | 07-2001 | Daughtery, III, Vergil L. | 705 | 36R | |
| | 5,884,286 A | 03-1999 | Daughtery, III, Vergil L. | 705 | 36R | |
| | 6,016,483 A | 01-2000 | Rickard et al. | 705 | 36R | |
| | 6,173,270 B1 | 01-2001 | Cristofich et al. | 705 | 37 | |
| | 6,546,375 B1 | 04-2003 | Pang et al. | 705 | 37 | |
| | 4,674,044 | 06-1987 | Kalmus et al. | 705 | 37 | |
| | 5,038,284 | 08-1991 | Kramer, Robert M. | 705 | 37 | |
| | 5,870,730 A | 02-1999 | Furuya et al. | 706 | 47 | |
| | 4,903,201 | 02-1990 | Wagner, Susan W. | 705 | 37 | |
| | 5,315,634 A | 05-1994 | Tanaka et al. | 379 | 93.02 | |
| | 4,412,287 | 10-1983 | Braddock, III, Walter D. | 705 | 37 | |
| | 3,573,747 | 04-1971 | Adams et al. | 705 | 37 | |

## FOREIGN PATENT DOCUMENTS

| | Document<br>Number | Date | Country | Class | Sub<br>Class | **Translation**<br>YES      NO |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | | |
| | | |

| Examiner | Date Considered |
|---|---|
| | |

| Examiner: | Initial if reference considered whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. |
|---|---|

1-WA/2537824.1

# EXHIBIT 22

US006546375B1

(12) **United States Patent**

Pang et al.

(10) Patent No.: **US 6,546,375 B1**

(45) Date of Patent: **Apr. 8, 2003**

(54) **APPARATUS AND METHOD OF PRICING FINANCIAL DERIVATIVES**

(75) Inventors: **Jong-Shi Pang**, Timonium, MD (US); **Jacqueline Huang**, East Hills, NY (US)

(73) Assignee: **Johns Hopkins University**, Baltimore, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/400,855**

(22) Filed: **Sep. 21, 1999**

(51) Int. Cl.$^7$ .................................... G06F 17/60

(52) U.S. Cl. ................................................ **705/37**

(58) Field of Search ...................... 705/35, 36, 37

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,557,517 A | * | 9/1996 | Daugherty, III | ............... | 705/37 |
| 5,692,233 A | | 11/1997 | Garman | .................... | 705/36 |
| 5,745,383 A | | 4/1998 | Barber | ...................... | 705/36 |
| 5,812,988 A | * | 9/1998 | Sandretto | .................. | 705/36 |
| 5,819,238 A | | 10/1998 | Fernholz | ................... | 705/36 |
| 5,884,286 A | | 3/1999 | Daugherty, III | ............. | 705/36 |
| 6,061,662 A | * | 5/2000 | Makivic | .................... | 705/36 |
| 6,173,276 B1 | * | 1/2001 | Kant et al. | ................ | 706/50 |
| 6,321,212 B1 | * | 11/2001 | Lange | ...................... | 705/37 |

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| JP | | 2001-67409 A | * | 3/2001 | ........... G06F/17/60 |
| JP | | 2001-222620 A | * | 8/2001 | ........... G06F/17/60 |
| WO | | WO 97/07475 | * | 2/1997 | ......... G06F/157/00 |

OTHER PUBLICATIONS

Huang, Jacqueline, "American Options and Complementarity Problems", 2000, The Johns Hopkins University.*

Margrabe, Bill, "Equity Basket Swaps and Options: Part II", Dec. 18, 2000, Derivatives Week, vol. 9, No. 51, p. 5.*

Dumas, Bernard et al., "Implied Volatility Functions: Empirical Tests." Dec. 1998, Journal of Finance, vol. 53, No. 6, pp. 2059–2063.*

Tufano, Peter, "The Determinants of Stock Price Exposure: Financial Engineering and the Gold Mining Industry", Jun. 1998 Journal of Finance, vol. 53, No. 3, pp. 1015–1053.*

Focardi, Sergio, "From Equilibrium to Non–linear Dynamics in Investment Management." Summer 1996, Journal of Portfolio Management, vol. 22, No. 4, pp. 19–30.*

Jacqueline Huang and Jong–Shi Pang, "Option Pricing and Linear Complementarity", vol. 2, No. 1, Fall 1988.

Zhi–Quan Luo, Jong–Shi Pang and Daniel Ralph, "Mathematical Programs with Equilibrium Constraints", 1996.

* cited by examiner

Primary Examiner—Robert P. Olszewski
Assistant Examiner—Bryan Jaketic
(74) Attorney, Agent, or Firm—Dickstein Shapiro Morin & Oshinsky LLP

(57) **ABSTRACT**

An apparatus for and method of determining the price of financial derivatives such as options. One preferred embodiment of the invention employs a discretized partial differential linear complementarity problem (PDLCP) based system to determine the forward pricing of financial instruments such as vanilla American options. In this embodiment, an optimization problem in the form of a mathematical program with equilibrium constraints (MPEC) is implemented to derive implied volatilities of the assets underlying the subject derivatives. The implied volatilities thus derived are used as inputs in the PDLCP-based system to accurately determine the forward pricing of the subject derivatives.

**20 Claims, 10 Drawing Sheets**





Figure 1

**Figure 2**



**Figure 3**

Figure 4





Fig. 5 : Example 1, volatility surface produced by PIPA, 2 observed options



Fig. 6 : Example 1, volatility surface produced by IMPA, 2 observed options



Fig. 7 : Example 1, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 8



Fig. 8 : Example 1, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 9



Fig. 9 : Example 2, volatility surface produced by PIPA, 11 observed options



Fig. 10 : Example 2, volatility surface produced by IMPA, 11 observed options



Fig. 11 : Example 2, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 8



Fig. 12 : Example 2, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 9



Fig. 13 : Example 3, volatility surface produced by PIPA, 14 observed options



Fig. 14 : Example 3, volatility surface produced by IMPA, 14 observed options



Fig. 15 : Example 3, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 8



Fig. 16 : Example 3, options values calculated using constant/PIPA/IMPA volatility surfaces, E = 9

US 6,546,375 B1

1

## APPARATUS AND METHOD OF PRICING FINANCIAL DERIVATIVES

### BACKGROUND OF THE INVENTION

The pricing of an option of an asset is a fundamental problem of significant practical importance in today's financial markets. In 1973, a mathematician, Fischer Black, and an economist, Myron Scholes, devised one of the first mathematically accepted approaches for pricing what is known as a "European" option, which are options that can only be exercised at its expiration date. What has become known as the Black-Scholes option formula was described first in "The pricing of options and corporate liabilities," *Journal of Political Economy* 81 (1973). The Black-Scholes option formula is presently of widespread use in financial markets all over the world. The price of such an option can be found by solving the Black-Scholes equation with the initial condition at expiration (i.e., the payoff of the option). The Black-Scholes equation is a reverse diffusion equation with parameters determined by the statistical characteristics of involved stocks and currencies such as risk free interest rate, holding cost or expected dividends, and volatility.

As an example, the Black-Scholes formula for the theoretical price of a vanilla European call option is:

$$C(S, t) = SN(d_1) - Ee^{-r(T-t)}N(d_2),  \quad (1)$$

where the notation is fairly standard, as described by P. Wilmott, J. N. Dewynne and S. Howison, *Option Pricing: Mathematical Models and Computation*, Oxford Financial Press, Oxford (1993).

Unlike a European option, an "American" option gives the owner of the option the right of exercising the option before its expiration date. In recent years, the American option has become more prevalent than the European option. Due to the additional feature of early exercise, the pricing of an American option is generally considered to be more difficult than the pricing of a European option, especially when one considers "exotic" options which are variations and refinements of a basic American option. From a mathematical point of view, part of this difficulty is due to the price of American options obeying the Black-Scholes equation only in the region where it is statistically appropriate to hold the option rather than to exercise it immediately.

Therefore, in the case of American options, the above formula (1) and its analogs are no longer valid. In fact, as shown in P. Jaillet, D. Lamberton, and B. Lapeyre, "Variational inequalities and the pricing of American options," *Acta Applicandae Mathematicae* 21 (1990) 263–289, a rigorous mathematical model for pricing an American option is an infinite-dimensional free boundary problem. As such, there is in general no explicit formula or finite procedure for computing the exact price of an American option. As a result, various mathematical models have been devised in an attempt to approximate the price of such options.

However, the option prices computed from a mathematical model are of a theoretical nature. In computing these prices, various inputs are fed into the model and an algorithm produces an answer. In practice, the computed prices may not be consistent with the observed market prices, e.g., the prices on the trading floor. Ideally, these two sets of prices should coincide. However, such a result is difficult, if not impossible, using known models. Two principal reasons for this are: (i) the assumptions that lead to the construction of the mathematical model may not be realistic; and (ii) the inputs to the model are not correct.

2

Knowing the correct inputs is crucial to the success of any pricing model. Ideally the two sets of option prices, computed and observed, are within an acceptable range of one another. In general, the problem of computing a proper set of inputs to a forward pricing model so that the computed outputs obey certain prescribed criteria is called an "inverse" pricing problem. One such input which is crucial to the forward pricing model of American options is the implied volatility of an option. The volatility of an asset is an important input to an option pricing model and it is also an input that is most difficult to estimate. Black and Scholes assumed this parameter to be a constant when deriving their famous formula for the theoretical price of a vanilla European call option. In the above equation (1), for example, the two constants $d_1$ and $d_2$ contain the volatility parameter $\sigma$. As it is now well known, this parameter is, in general, not a constant; indeed it is a highly complicated function of several deterministic and random factors.

Previous approaches for dealing with this difficult problem of unknown volatility are numerous and include: (i) statistical estimation methods based on historical data (such as J. Hull, *Options, Futures, and Other Derivative Securities*, Second Edition, Prentice Hall, New Jersey (1989), Section 10.4 and R. Gibson, *Option Valuation: Analyzing and Pricing Standardized Option Contracts*, McGraw-Hill, New York (1991), Section 1; (ii) mathematical models of stochastic volatilities such as those in J. Hull and A. White, "The pricing of options on assets with stochastic volatilities," *The Journal of Finance* 42 (1987) 281–300; H. Johnson and D. Shanno, "Option pricing when the variance is changing," *Journal of Financial and Quantitative Analysis* 22 (1987) 143–151; and (iii) implied volatilities based on observed option prices (suggested originally by H. A. Latané and R. J. Rendleman, "Standard deviations of stock price ratios implied in option prices," *The Journal of Finance* 31 (1976) 369–381 and empirically tested by S. Beckers, "Standard deviation implied in option prices as predictors of future stock price volatility" *Journal of Banking and Finance* 5 (1981) 363–381).

The problem of computing implied volatilities of (European or American) options is an instance of an inverse problem that is the counterpart of the forward problem of pricing these options. Specifically, in the forward option pricing problem, a constant volatility parameter, along with other constants, such as the interest rate and asset dividend, is taken as an input to a mathematical model that produces the theoretical or modeled option prices. By using an incorrect volatility parameter in the forward pricing model, the computed option price is bound to deviate, often substantially, from the option price observed on the trading floor.

### SUMMARY OF THE INVENTION

An apparatus for and method of determining the price of financial derivatives such as options. One preferred embodiment of the invention employs a discretized partial differential linear complementarity problem (PDLCP) based system to determine the forward pricing of financial instruments such as vanilla American options. In this embodiment, an optimization problem in the form of a mathematical program with equilibrium constraints (MPEC) is implemented to derive implied volatilities of the assets underlying the subject derivatives. The implied volatilities thus derived are used as inputs in the PDLCP-based system to accurately determine the forward pricing of the subject derivatives.

### BRIEF DESCRIPTION OF THE DRAWINGS

Many advantages, features, and applications of the invention will be apparent from the following detailed description

US 6,546,375 B1

3

of the invention which is provided in connection with the accompanying drawings in which:

FIG. 1 is a block diagram of a financial engine in accordance with a preferred embodiment of the invention;

FIG. 2 illustrates a flow chart which describes the operational flow of a preferred embodiment of the invention;

FIG. 3 illustrates a flow chart which describes a preferred embodiment of the invention that employs an implicit programming algorithm (IMPA);

FIG. 4 illustrates a flow chart which describes a preferred embodiment of the invention that employs a penalty interior point algorithm (PIPA);

FIG. 5 is a graph which depicts the volatility surface produced by the exemplary penalty interior point algorithm employed in accordance with a preferred embodiment of the invention;

FIG. 6 is a graph which depicts the volatility surface produced by the exemplary implicit programming algorithm employed in accordance with a preferred embodiment of the invention;

FIG. 7 is a graph which depicts the exemplary option values calculated using the volatility surface shown in FIGS. 5 and 6;

FIG. 8 is another graph which depicts the exemplary option values calculated using the volatility surface shown in FIGS. 5 and 6;

FIG. 9 is another graph which depicts the volatility surface produced by the exemplary, penalty interior point algorithm employed in accordance with a preferred embodiment of the invention;

FIG. 10 is another graph which depicts the volatility surface produced by the exemplary implicit programming algorithm employed in accordance with a preferred embodiment of the invention;

FIG. 11 is a graph which depicts the exemplary option values calculated using the volatility surface shown in FIGS. 9 and 10;

FIG. 12 is another graph which depicts the exemplary option values calculated using the volatility surface shown in FIGS. 9 and 10;

FIG. 13 is another graph which depicts the volatility surface produced by the exemplary use of the penalty interior point method in accordance with a preferred embodiment of the invention;

FIG. 14 is another graph which depicts the volatility surface produced by the use of the implicit programming method in accordance with a preferred embodiment of the invention;

FIG. 15 is a graph which depicts the option values calculated using the exemplary volatility surface shown in FIGS. 13 and 14; and

FIG. 16 is another graph which depicts the option values calculated using the exemplary volatility surface shown in FIGS. 13 and 14.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Preferred embodiments and applications of the invention will now be described with reference to FIGS. 1–16. Other embodiments may be realized and structural or logical changes may be made to the disclosed embodiments without departing from the spirit or scope of the invention. Although the invention is particularly described as applied to the analysis, synthesis, and pricing of financial derivatives,

4

particularly calculation and application to American options, it should be readily apparent that the invention may be applied to any other financial or economic instruments having the same or similar problems.

In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as issuing control signals for use by automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets. The financial engine 100 may be a stand-alone computer hardware system, incorporated in (or distributed among) one or more locally or remotely located computer systems.

In a preferred embodiment, financial engine 100 is composed of a plurality of modules: data source 10, implied volatility calculator 12, financial instrument controller 14, forward pricing unit 16, and user interface device 18. In the illustrated embodiment, the modules are connected by a single transmission bus 13. (It should be understood that the illustration of bus 13 is merely representative of the various connectivity technologies available to those of ordinary skill in the art including single/multiple, wired, wireless, and other transmission mediums.) For illustrative purposes only, the modules depicted within financial engine 100 have been selected to illustrate a preferred embodiment of the invention that provides forward pricing of "vanilla" options (i.e., options limited to either buying or selling an underlying asset), particularly vanilla American options. The modules may be changed as needed for the specific financial instrument to be used (e.g., "exotic" options such as barrier options, digital options, compound options, Asian options, etc.).

In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 10 may include one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data, and may also include its own information retrieval system(s). The information received by data source 10 is forwarded to one or more of the other modules depending on the particular information provided. Volatility calculator 12, which may be implemented using a computer program or algorithm (described below) executed by central processing unit (CPU) 120, and stored in memory 122, is used to calculate the implied volatility in price of the underlying asset of the American option.

Forward pricing unit 16, which may also be implemented using a computer program or algorithm (described below) stored in memory 162 and executed by CPU 160, receives information from data source 10, volatility calculator 12, and user interface device 18 to determine the forward price or value $V_{BS}(S, t)$ (as a function of the price (S) of the underlying asset over time (t)). User interface device 18 is used to exchange information between the user and financial engine 100. Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), the information may include the observed market price of the underlying asset, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information. (This information may also be provided by (or output to) data source 10.)

Financial instrument controller 14 may exchange information from all of the modules in financial engine 100.

US 6,546,375 B1

5

Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as controlling trading or allocation of funds in options (or other financial instruments), simulating market reactions based on input conditions, through signals output to network 110. (The depiction of network 110 is made to represent a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), small order exchange systems (SOES), on-line brokers or other trading networks, etc.)

In order to accurately project or determine the forward price or value of financial or economic instruments such as American options, a preferred embodiment of the financial engine 100 utilizes an inverse pricing model to determine the inputs to be used by forward pricing unit 16 such that a more accurate forward theoretical price can result by solving the equation:

$$V_{BS}(S, t) = V_{obs} \qquad (2)$$

where $V_{obs}$ represents the value of the option observed in the market, for example, as reported by data source 10 or input to user interface device 18. In determining the forward option price, a preferred embodiment of the invention utilizes a calculation of the implied volatility of the underlying asset as determined by volatility calculator 12.

In a preferred embodiment, volatility calculator 12 includes CPU 120 that is used to execute a computer program or algorithm stored in memory 122. As will be discussed in detail below, in a preferred embodiment of the invention, the computer program calculates the implied volatilities of American options using a mathematical programming equilibrium constraints (MPEC) approach. A detailed explanation of the MPEC approach is given by Z. Q. Luo, J. S. Pang, and D. Ralph, in *Mathematical Program with Equilibrium Constraints*, Cambridge University Press, Cambridge (1996), which is incorporated herein by reference in its entirety.

Using the calculations made by volatility calculator 12, forward pricing unit 16 can project or determine the forward price or value of the option as a function of the price of the underlying asset and time. In a preferred embodiment, forward pricing unit 16 employs CPU 160 to execute a computer program or algorithm stored in memory 162. The computer program formulates the forward pricing task as a discretized linear complementarity problem (LCP), as described in "Option Pricing and Linear Complementarity," *Journal of Computational Finance* 2 (Fall 1998), by Jacqueline Huang and Jong-Shi Pang, which is incorporated herein by reference in its entirety. The basic framework of the forward pricing program is that of Black and Scholes, wherein the price of a risky asset is assumed to satisfy the following stochastic differential equation:

$$dS = \mu S dt + \sigma(S, t) S dW_t$$

where S denotes the asset price that is a function of the time $t \in [0, T]$, with T>0 being the duration of a vanilla European option written on the asset, $\mu$ is the drift of the stochastic price process of the asset, dW is a standard Wiener process, and $\sigma(S, t)$ is the volatility that is taken to be an unknown function of the pair $(S, t)$, which defines the volatility surface.

In a preferred embodiment, the value $V(S, t)$ of an American option should satisfy the following partial differ-

6

ential linear complementarity problem (PDLCP) for t in [0, T) and S in [0, ∞):

$$0 \le V(S, t) - \Lambda(S, t),$$

$$0 \le L_{BS}(V),$$

$$0 = (V(S, t) - \Lambda(S, t)) L_{BS}(V), \qquad (3)$$

where

$$L_{BS} = \frac{\partial}{\partial t} + \frac{1}{2} \sigma^2 S^2 \frac{\partial^2}{\partial S^2} + (r - D_0) S \frac{\partial}{\partial S} - r,$$

is the Black-Scholes partial differential operator, with r being the constant interest rate of a risk-free asset (e.g., U.S. government security), $D_0$ being the constant dividend rate of the asset, and $\Lambda(S, t)$ being the payoff function when early exercise occurs. Preferably, boundary values of $V(S, t)$ at S=0 and S=∞, and terminal values of $V(S, t)$ at t=T, the expiry time, are assumed.

In a preferred embodiment, the financial instrument engine 100 employs a finite difference scheme for approximating the partial differential equation (3). Specifically, the state variable S is truncated to a finite range $[0, N\delta S]$, where N is a positive integer and $\delta S>0$ is the step size that will be used for discretizing the partial differentiation with respect to S. Preferably, a time step $\delta t>0$ is used for which $M=T/\delta t$ is an integer for, discretizing the partial differentiation with respect to t. In the program, the following approximations may be employed:

$$\frac{\partial V}{\partial t}(S, t) = \frac{V(S, t + \delta t) - V(S, t)}{\delta t} + O(\delta t),$$

$$\frac{\partial^2 V}{\partial S^2}(S, t) = \theta \frac{V(S + \delta S, t) - 2V(S, t) + V(S - \delta S, t)}{(\delta S)^2} +$$

$$(1 - \theta) \frac{V(S - \delta S, t + \delta t)}{(\delta S)^2} + O((\delta S)^2),$$

$$\frac{\partial V}{\partial S}(S, t) = \theta \frac{V(S + \delta S, t) - V(S - \delta S, t)}{2\delta S} +$$

$$(1 - \theta) \frac{V(S + \delta S, t + \delta t) - V(S - \delta S, t + \delta t)}{2\delta S} + O((\delta S)^2).$$

where a function $f(x)$ is said to be $O(g(x))$ if

$$\limsup_{g(x) \to 0} \frac{|f(x)|}{|g(x)|} < \infty$$

and $\theta \in [0, 1]$ is a given parameter whose specialization yields the explicit approximation ($\theta=0$), the implicit approximation ($\theta=1$), and the Crank-Nicolson approximation ($\theta=\frac{1}{2}$). Based on the above finite difference scheme and the initial and boundary values of $V(S, t)$, the financial engine will derive the unknown option and volatility values at the grid points $(n\delta S, m\delta t)$, for n=1, 2, . . . , N-1 and m=0, 1, 2, . . . M-1, in the (state, time)-product space. Let

$$V_{mn} = V(n\delta S, m\delta t) \text{ and } \sigma_{mn} = \sigma(n\delta S, m\delta t)$$

denote these unknown values. The boundary values

$$V_{m0} = V(0, m\delta t), V_{mN} = V(N\delta S, m\delta t), V_{Mn} = V(n\delta S, T),$$

for m=0, . . . , M-1 and n=1, . . . , N-1 are all given. We also let

$$\Lambda_{mn} = \Lambda(n\delta S, m\delta t)$$

US 6,546,375 B1

7

denote the payoff function evaluated at the grid point ($\eta \delta S$, m$\delta t$). For each m, let $V_m$, $\sigma_m$ and $\Lambda_m$, denote, respectively, the $(N-1)$-vectors $(V_{mn})_{n=1}^{N-1}$, $(\sigma_{mn})_{n=1}^{N-1}$ and $(\Lambda_{mn})_{n=1}^{N-1}$. Along with suitable boundary conditions, the PDLCP (3) is approximated by the following (M-1) LCPs, each of order $(N-1)$: at each time t=m$\delta t$ for m=M-1, M-2, . . . , 1, 0,

$$0 \leqq V_m - \Lambda_m \perp b_m(\sigma_m) + Q(\sigma_m)V_m + N(\sigma_m)V_{m+1} \geqq 0 \qquad (4)$$

where $\perp$ is the notation for "perpendicular to" and for an arbitrary $(N-1)$-vector $\omega$,

$$Q(\omega) = (\delta t^{-1}+r)I_{N-1} + L_\theta(\omega), \; N(\omega) = -\delta t^{-1}I_{N-1} + L_{1-\theta}(\omega),$$

$$b_\theta(\omega) = \frac{1}{2} \begin{bmatrix} \frac{1}{2}[\theta V_{m0} + (1-\theta)V_{(m+1)0}](r - D_0 - \omega_1)\omega_1 \\ 0 \\ \vdots \\ 0 \\ -\frac{1}{2}[\theta V_{mN} + (1-\theta)V_{(m+1)N}](r - D_0 + \omega_{N-1})\omega_{N-1}, \end{bmatrix}$$

with $I_{N-1}$ being the identity matrix of order N-1 and $L_{\alpha\alpha}(\omega)$ being the $(N-1)\times(N-1)$ tridiagonal matrix whose entries are given by: for i, j=1, 2, . . . , N-1,

$$(L_\alpha(\omega))_{ij} = \begin{cases} -\frac{\alpha}{2}i^2\omega_i^2 + \frac{\alpha}{2}i(r - D_0) & \text{if } j = i - 1 \\ \alpha i^2\omega_i^2 & \text{if } j = i \\ -\frac{\alpha}{2}i^2\omega_i^2 - \frac{\alpha}{2}i(r - D_0) & \text{if } j = i + 1 \\ 0 & \text{otherwise} \end{cases}$$

Provided that

$$\frac{1}{\delta t} + r \geq N(r - D_0). \qquad (5)$$

the matrix $L_\alpha(\omega)$, and hence $Q(\sigma_m)$ is strictly diagonally dominant, thus positive definite, for all vectors $\omega$ and scalars $\alpha\in[0, 1]$. It is assumed that the condition of equation (5) on $\delta t$ is satisfied.

To solve the forward pricing problem where the volatilities $\sigma_{mn}$ are all given, the LCPs (4) are time stepped starting with m=M-1; since $V_M$ is known, by solving the LCP at time t=(M-1)$\delta t$, a unique solution $V_{M-1}$ can be obtained. Proceeding backward in time, a set of discrete option prices $V_{MN}$ can be computed, that depend on the input volatilities $\sigma_{mn}$. In order to better illustrate the details of this dependence the M LCPs (4) are written as an aggregate LCP of size M(N-1). Indeed, define the M(N-1)×M(N-1) matrix:

$$A(\sigma) = \begin{bmatrix} Q(\sigma_0) & N(\sigma_0) & & & \\ & Q(\sigma_1) & N(\sigma_1) & & \\ & & \ddots & \ddots & \\ & & & Q(\sigma_{M-2}) & N(\sigma_{M-2}) \\ & & & & Q(\sigma_{M-1}) \end{bmatrix}$$

8

and the M(N-1)-vector

$$b(\sigma) = \begin{bmatrix} b_1(\sigma_1) \\ \vdots \\ b_M(\sigma_M) \end{bmatrix}$$

where $\sigma$ is the M(N-1)-vector whose entries are the discretized volatilities $\sigma_{mn}$ for m=0, . . . , M-1 and n=1, . . . , N-1:

$$\sigma = \begin{Bmatrix} \sigma_0 \\ \vdots \\ \sigma_{M-1} \end{Bmatrix}$$

Similarly, we define the aggregate M(N-1)-vectors of option prices and payoffs:

$$V = \begin{Bmatrix} V_1 \\ \vdots \\ V_M \end{Bmatrix} \text{ and } \Lambda = \begin{Bmatrix} \Lambda_1 \\ \vdots \\ \Lambda_M \end{Bmatrix}.$$

The above time-stepping scheme for computing the forward prices of a vanilla American option can be summarized as the following LCP of size M(N-1):

$$0 \leq V - \Lambda \perp b(\sigma) + A(\sigma)V \geq 0. \qquad (6)$$

Under the condition (5), A($\sigma$), preferably being a block upper triangular matrix with positive definitive diagonal blocks, is a P-matrix, albeit A($\sigma$) is not symmetric or positive definite. A comprehensive treatment of P-matrices and the LCP is described in R. W. Cottle, J. S. Pang, and R. S. Stone, *The Linear Complementarity Problem*, Academic Press, Boston (1992), which is incorporated herein by reference in its entirety. A($\sigma$) depends on the finite-difference scheme preferably being used to discretize the Black-Scholes partial differential operator $L_{BS}$ and is independent of the option, i.e., the payoff function and the expiration. Presumably, if a different discretization of this operator is used, a different matrix is obtained. The embodiment presented below applies to other discretization schemes as well, provided that the resulting A($\sigma$) is a P-matrix. In contrast to A($\sigma$), the vectors $\Lambda$ and b($\sigma$) are both dependent on the option.

In another embodiment of the invention, multiple options written on the same underlying asset may be present. In such a case the LCP (6) can be embedded in a larger system in accordance with the preferred embodiment of the invention. Specifically, suppose that there are K American options each being characterized by its payoff function $\Lambda^k(S, t)$ at exercise. The prices of these options are all calculated under the same volatility function $\sigma(S, t)$ of the asset. Thus for each k=1, . . . , K, the LCP:

$$0 \leq V^k - \Lambda^k \perp b^k(\sigma) + A(\sigma)V^k \geq 0,$$

is solved to obtain the discretized option prices $V^k_{mn}$ of type k. Preferably, all these LCPs may be defined by the same matrix A($\sigma$). Concatenating these K LCPs, the final LCP formulation is determined for the forward pricing problem of multiple American options on a single asset:

$$0 \leq x - \rho \perp q(\sigma) + M(\sigma)x \geq 0, \qquad (7)$$

US 6,546,375 B1

9

where

$$x = (V^k)_{k=1}^K, \qquad p = (\Lambda^k)_{k=1}^K.$$

are, respectively, the KM(N−1)-dimensional vectors of unknown option prices and known payoffs at the discretized grid points,

$$q(\sigma) = (b^k(\sigma))_{k=1}^K,$$

is the KM(N−1)-dimensional vector that contains the given initial and boundary values of the options, and M(σ) is the KM(N−1)×KM(N−1) block diagonal matrix all of whose K diagonal blocks are equal to the M(N−1)×M(N−1) matrix A(σ).

Thus, the forward option pricing problem is implemented by the program as the LCP (7), referred to herein as the "forward option LCP." The forward option LCP preferably requires the discretized volatility matrix σ as an input, while the output from the forward option LCP yields the discrete option prices $V^k$ (n≤S, m≤t) of K options. By the P-property of the matrix M(σ), the forward option LCP has a unique solution x(σ) that depends on the input volatilities. This option function x(σ) is only implicitly known; for any given σ, x(σ) can be evaluated by solving the forward option LCP.

The optimization problem overcome by financial engine 100 of the joint computation of the volatility matrix σ and the option price vector x(σ) is subject to a set of criteria that is the result of some input or detected market considerations. Preferably, the constraints on the unknown volatilities are modeled by the set $\Gamma \subseteq R^{M(N-1)}$ in the computer program stored in memory 122. The constraints preferably include, for example, upper and lower bounds on σ and may include any other constraints known or desired in the art. The objective is described by the function Θ(σ, x). A variety of objective functions may serve as the fundamental basis for the computations. Θ(σ, x) may be, for example, a standard least-squares deviation from observed option prices and historical volatilities. More precisely, a subset of option prices $V^{obs,k}_{mn}$ with (k, m, n) belonging to a subset O of $\{1, \ldots, K\} \times \{0, \ldots, M-1\} \times \{1, \ldots, N-1\}$ and a subset of volatilities $\sigma^{his}_{mn}$ with (m, n) belonging to a subset S of $\{0, \ldots, M-1\} \times \{1, \ldots, N-1\}$ are given (e.g., the observed market prices and historical volatilities). Knowing (σ, x) allows the computed values to be minimally deviated from the given values. Mathematically, the objective function is then represented by:

$$\theta(\sigma, x) = \sum_{(k,m,n)\in O} (V^k_{mn} - V^{obs,k}_{mn})^2 + \sum_{(m,n)\in S} (\sigma_{mn} - \sigma^{his}_{mn})^2.$$

where $V^k_{mn}$ is the theoretical option price (collectively, these prices are the components of x). Another example of θ would be a function similar to the one used in T. Coleman, Y. Li and A. Verma, "Reconstructing the unknown local volatility function," Risk (1998), which is incorporated herein by reference in its entirety.

In a preferred embodiment, financial engine 100 computes a discretization of the volatility surface so that a prescribed objective function is minimized subject to given constraints on the unknown volatilities and option prices that includes a measure of the smoothness of the discretized volatility surface. Variations of these functions and/or other realistic objective functions are amenable to the same implementation.

10

In accordance with a preferred embodiment of the invention, with the set Γ and the objective function θ given, the implied volatility problem of American options is implemented by the computer program as the following constrained optimization problem: compute (σ, x) to

minimize Θ(σ, x)

subject to σ∈Γ

and 0≤x−p⊥q(σ)+M(σ)x≥0.          (8)

In terms of the option function x(σ), this optimization problem may be rewritten as an implicit program in the variable σ alone:

minimize φ(σ)≡Θ(x(σ), σ)

subject to σ∈Γ.

The terms σ and x are vectors in the Euclidean spaces $R^{M(N-1)}$ and $R^{KM(N-1)}$, respectively. Let

$$F(\sigma, x) = q(\sigma) + M(\sigma)x$$

be the function defining the option LCP (7). The partial Jacobian matrix of F(σ, x) with respect to x is denoted $J_x F(\sigma, x)$; since F(σ, x) is linear in x, the partial Jacobian matrix of F(σ, x) with respect to x is equal to the matrix M(σ). For an arbitrary σ, three index sets can be defined associated with the solution x(σ):

$$\alpha(\sigma) = \{i: (x(\sigma) - p)_i > 0 = (q(\sigma) + M(\sigma)x)_i\}$$

$$\beta(\sigma) = \{i: (x(\sigma) - p)_i = 0 = (q(\sigma) + M(\sigma)x)_i\}$$

$$\gamma(\sigma) = \{i: (x(\sigma) - p)_i < 0 = (q(\sigma) + M(\sigma)x)_i\}.$$

These index sets play an important role in the local properties of x(σ) when σ undergoes small perturbations. The particular case where β(σ), called the degenerate set, is the empty set is particularly noteworthy. This case corresponds to the solution x(σ) being nondegenerate. As seen from the theorem below, x(.) is then locally smooth around this value σ. Similar to the "big O" notation, f(x)=o(g(x)) can be written if

$$\lim_{g(x)\to 0} \frac{f(x)}{g(x)} = 0.$$

The following result summarizes the key properties of the option function x(σ).

Assuming that the condition (5) holds, the option function x(σ) is Lipschitz continuous and directionally differentiable in its argument σ∈$R^{M(N-1)}$. The directional derivative of x(σ) at any σ∈$R^{M(N-1)}$ along any direction dσ∈$R^{M(N-1)}$, denoted x'(σ; dσ), is the unique solution dx∈$R^{KM(N-1)}$ to the following mixed LCP:

$$\begin{cases} (J_\sigma F(\sigma, x(\sigma))d\sigma + M(\sigma)dx)_i = 0, \quad \forall i \in \alpha(\sigma), \\ 0 \leq (dx)_i \perp (J_\sigma F(\sigma, x(\sigma))d\sigma + M(\sigma)dx)_i \geq 0, \\ \qquad \forall i \in \beta(\sigma), \\ (dx)_i = 0, \quad \forall i \in \gamma(\sigma). \end{cases} \quad (10)$$

Furthermore,

$$x=(\sigma+d\sigma)=x(\sigma)+x'(\sigma; d\sigma)+o(\|d\sigma\|). \quad (11)$$

Finally, if β(σ) is empty, then x is Fréchet differentiable at σ.

US 6,546,375 B1

11

In a preferred embodiment, the implied volatility problem as formulated as either (8) or (9) preferably has a solution if the objective function $\theta(\sigma, x)$ is continuous and the feasible volatility region $\Gamma$ is compact.

Thus, in a preferred embodiment where the objective function $\theta(\sigma, x)$ is continuous and $\Gamma$ is compact, then an optimal solution to (8) exists.

A consequence of programming financial engine **100** in this manner is that it provides a computationally effective way of approximately updating as set of option values when the volatilities undergo small perturbations, without recomputing the exact values from scratch. Indeed, the formula (11) yields

$$x(\sigma') \text{ approx. equal to } x(\sigma) + x'(\sigma; d\sigma), \text{ where } d\sigma = \sigma' - \sigma$$

preferably with $\sigma'$ being a sufficiently small perturbation of $\sigma$. Thus, financial engine **100** can compute an approximation to $x(\sigma')$ from $x(\sigma)$ by simply computing the directional derivative $x'(\sigma, d\sigma)$. In general, the computation of this derivative involves the solution of a mixed LCP of reduced size. The latter problem may be of reduced size because the last equation in (10) allows the $\gamma$-components of $dx$ to be fixed at zero. For example, when $x(\sigma)$ is a nondegenerate solution (i.e., when $\beta(\sigma)$ is empty), the mixed LCP (10) reduces to a single system of linear equations involving only the variables $dx_i$ for $i \in \alpha(\sigma)$. In the general case, the mixed LCP (10) is preferably solved as stated or converted into a standard LCP involving only the variables $dx_i$ for $i \in \beta(\sigma)$, by using the first equation in (10) to eliminate the variables $dx_i$ for all $i \in \alpha(\sigma)$.

Since the option function $x(\sigma)$ is preferably not a smooth function, (9) is a nonsmooth optimization problem in general. Nevertheless, if the original objective function $\theta(\sigma, x)$ is smooth, then the composite objective function $\phi(\sigma)$ is "B(ouligand)-smooth," meaning that it is locally Lipschitz continuous and directionally differentiable. As such, a descent method can be applied in solving the problem (9) in accordance with a preferred embodiment of the invention. Furthermore, the "B-derivative" of $\phi$ can be used to describe the stationarity conditions of the program (9).

The operation of the financial engine **100** in accordance with a preferred embodiment of the invention can be used to implement the method of pricing financial derivatives such as vanilla American options shown in FIG. 2. In the retrieval step S20, for example, both data source **10** and user interface device **18** can be used to retrieve data to be input into one or more of the modules contained in financial engine **100**. In one embodiment, for example, initial parameters such as the price of the underlying asset (e.g., stock price), risk-free interest rate, maturity date of derivative, dividend yield, and initial volatility parameter can be input to forward pricing unit **16** through data source **10** and/or user interface device **18**. Based on this information, initial option pricing data can be determined and output by forward pricing unit **16** for use by other modules in financial engine **100**, including volatility calculator **12** (as represented by the broken line path in FIG. 2). Volatility calculator **12**, for example, may utilize the theoretically calculated option price for comparison with observed option prices input from data source **10** (or user interface device **18**) in optimizing its calculations (in step S22) of the volatility implied from the market, as will be discussed in detail below.

Once optimized, the implied volatilities calculated in S22 are used as inputs by forward pricing unit **16**, together with additional inputs to derive the forward price of the subject derivative (e.g., vanilla American option). The forward pricing information can then be included in a report output

12

to the user via, for example, user interface device **18**, or via network **110** (in step S26). The may include the volatility calculation itself, the forward pricing data, additional calculations based on the calculated data (e.g., positions taken, projected, predicted, simulated, etc.), and other pertinent data. The calculated volatility and pricing information may also be used in effecting trading by issuing control signals through financial instrument controller **14** or the like (step S26) to trading systems (represented by network **110**) based on the calculations made in steps S22 and S24.

The calculations made within step S22 may be performed, in accordance with a preferred embodiment of the invention, through the use of computer program or algorithm referred to herein as "Implicit Programming Algorithm (IMPA)" of the invention. In a preferred embodiment, IMPA is used by financial engine **100** to solve the implied volatility problem based on the optimization formulation (9). For illustration purposes, the feasible volatility region $\Gamma$ is assumed to be a relatively simple set such as a polyhedron; as a result, the directional subprograms in IMPA can be easily solved.

With $\phi(\sigma)$ being directionally differentiable, an iterative descent algorithm of the sequential quadratic programming kind is employed to minimize the formulation (9). In describing IMPA we let $\sigma^v \in \Gamma$ be a given volatility vector that is not stationary for (9). Write $x^v = x(\sigma^v)$ and

$$\alpha_v = \alpha(\sigma^v), \ \beta_v = \beta(\sigma^v), \text{ and } \gamma_v = \gamma(\sigma^v).$$

A descent direction of the objective function $\phi(\sigma)$ at $\sigma^v$ can be generated by solving the following minimization problem: for any symmetric positive definite matrix

$$Q_v \in R^{M(N-1) \times M(N-1)},$$

minimize $\phi'(\sigma^v; d\sigma) + \frac{1}{2} d\sigma^T Q_v d\sigma$

subject to $\sigma^v + d\sigma \in \Gamma.$

Since

$$\phi'(\sigma^v; d\sigma) = \nabla_\sigma \phi(\sigma^v, x^v)^T d\sigma + \nabla_x \phi(\sigma^v, x^v)^T x'(\sigma^v; d\sigma),$$

the above directional minimization problem is equivalent to:

minimize $\nabla_\sigma \phi(\sigma^v, x^v)^T d\sigma + \nabla_x \phi(\sigma^v, x^v)^T dx + \frac{1}{2} d\sigma^T Q_v d\sigma$

subject to $\sigma^v + d\sigma \in \Gamma$

$(J_{\sigma_v} F(\sigma^v, x^v) d\sigma + M(\sigma^v) dx)_{\alpha_v} = 0, \ \forall i \in \alpha_v,$

$0 \leq (dx)_i \perp (J_{\sigma_v} F(\sigma^v, x^v) d\sigma + M(\sigma^v) dx)_i \geq 0, \ \forall i \in \beta_v,$

$(dx)_i = 0, \ \forall i \in \gamma_v.$    (12)

where the directional derivative $x'(\sigma^v; d\sigma)$ has been substituted. The latter optimization problem is another MPEC whose solution is not trivial. A preferred embodiment provides a solution which simplifies directional computation while providing accurate results for implied volatility inputs. The method of solving the optimization problem is an implicit programming algorithm (IMPA) formulated in accordance with the invention. The following additional notation is used in the description of the use of IMPA in the preferred embodiment illustrated in FIG. 3:

$$\phi_v = \phi(\sigma^v, x^v), \ d\phi_{\sigma,v} = \nabla_\sigma \phi(\sigma^v, x^v), \ d\phi_{x,v} = \nabla_x \phi(\sigma^v, x^v), \text{ and } J_{\sigma_v} F^v = J_{\sigma_v} F(\sigma^v, x^v).$$

An initialization step S30 initializes parameters $\rho, \gamma \in (0, 1)$ as given scalars and $Q_0$ as a given symmetric positive definite matrix of order $M(N-1)$. $\sigma^0 \in \Gamma$ is also given, and $v=0$ is set.

US 6,546,375 B1

**13**

A direction generation step S32 allows β' to be an arbitrary subset of β<sub>v</sub>, and solves the convex quadratic program

$$\text{minimize } (d\phi_\sigma)^T d\sigma + (d\phi_x)^T dx + \tfrac{1}{2} d\sigma^T Q_v d\sigma$$

subject to σ''+dσ∈Γ,

$$(J_{\sigma v} F^v d\sigma + M^v dx)_i = 0, \ \forall i \in \alpha_v \cup \beta',$$

$$(dx)_i = 0, \ \forall i \in \gamma_v \cup (\beta_v \backslash \beta'), \tag{13}$$

to obtain the search direction dσ and the auxiliary vector dx, both of which is preferably necessarily unique.

In the termination test step S34 a check is made to determine if the computed implied volatility is within acceptable values, e.g., if

$$\|d\sigma\| \leq \text{prescribed tolerance,}$$

IMPA is stopped, as shown in step S36, and the pair σ'', x'' is taken to be the desired approximate solution of (9). If

$$\|d\sigma\| > \text{prescribed tolerance}$$

IMPA is continued with step S38. The step size determination step S38 requires that with

$$\sigma^v(\tau) = \sigma^v + \tau d\sigma \text{ and } x^v(\tau) = x(\sigma^v(\tau)), \ \forall \tau \in [0, 1], \tag{14}$$

set

$$\tau_v = \max(0.01, \rho^{l_v})$$

where l<sub>v</sub> is the smallest nonnegative integer l such that with τ=ρ<sup>l</sup>,

$$\phi(\sigma^v(\tau), x^v(\tau)) - \phi_v \leq \tau \eta[(d\phi_\sigma)^T d\sigma + (d\phi_x)^T dx].$$

Set σ<sup>v+1</sup>=σ<sup>v</sup>(τ<sub>v</sub>). A symmetric positive definite matrix Q<sub>v+1</sub> is chosen and v is replaced by v+1. IMPA then returns to step S30.

The choice of the matrices {Q} could presumably affect the practical performance of the algorithm. Preferably, the matrices {Q} are chosen to reflect some second-order information of the objective function φ(σ, x). In a preferred embodiment, a lower bound of 0.01 on the step size is used. The step size determination is preferably the well-known Armijo inexact line search rule in standard unconstrained optimization algorithms, although other known rules may be used. A convergence analysis of the algorithm without the modification of the directional step may be used as described in Z. Q. Luo, J. S. Pang, and D. Ralph, *Mathematical Program with Equilibrium Constraints*, Cambridge University Press, Cambridge (1996), which is incorporated herein by reference in its entirety.

In another embodiment of the invention, a computer program or algorithm for solving the implied volatility problem based upon formulation (8) is provided, which is referred to herein as the "Penalty Interior Point Algorithm (PIPA)," and executed by financial engine 100. For illustration purposes, the feasible volatility region Γ is assumed to be a relatively simple set such as a polyhedron; as a result, the directional subprograms in PIPA can be easily solved. Unlike IMPA (described above) that originates from an iterative descent algorithm for solving smooth nonlinear programs, PIPA originates from a penalty method coupled with an interior point routine to deal with complementarity constraint in the other formulation (8) of the implied volatility problem.

**14**

In a preferred embodiment, PIPA is executed by volatility calculator 12 to operate on the following reformulation of (8):

$$\text{minimize } \theta(\sigma, x)$$

subject to σ∈Γ

w−q(σ)−M(σ)x=0

w○(x−p)=0

(w, x−p)≧0

where ○ denotes the Hadamard operator on two vectors; that is, w○x is the vector whose i-th component is equal to the product of the i-th components of w and x. The following additional notation is useful in describe the use of PIPA in a preferred embodiment of the invention, as shown in FIG. 4.

$$G(\sigma, x, w) = w − q(\sigma) − M(\sigma)x = w − F(\sigma, x)$$

In addition, the residual function of the complementarity conditions is preferably defined as:

$$r(\sigma, x, w) = (G(\sigma, x, w))^T G(\sigma, x, w) + (x−p)^T w$$

The penalized objective function is preferably defined as:

$$P_c(\sigma, x, w) = \theta(\sigma, x) + cr(\sigma, x, w),$$

where c>0 is a penalty scalar to be adjusted. For a given vector x, diag(x) is assumed to be the diagonal matrix whose diagonal entries are the components of this vector.

PIPA is an iterative algorithm that generates a sequence of iterates {(σ<sup>v</sup>, x<sup>v</sup>, w<sup>v</sup>)} preferably satisfying the following conditions for all v:

a. (feasible volatilities) σ<sup>v</sup>∈Γ;

b. (positivity of state variables) x<sup>v</sup>−p>0 and w<sup>v</sup>>0; and

c. (centrality condition) (x<sup>v</sup>−p)○w<sup>v</sup>≧η g<sub>v</sub>1<sub>M(N−1)</sub>, where η∈(0, 1) is a given scalar, 1<sub>M(N−1)</sub> is the M(N−1)-vector of all ones, and

$$g_v = \frac{(x^v − p)^T (w^v)}{M(N − 1)}$$

is the average "complementary gap" between x<sup>v</sup> and w<sup>v</sup>.

While maintaining these conditions, PIPA is executed by volatility calculator 12 attempts to decrease the objective function θ(σ, x) by reducing the penalty function Pc(σ, x, w). In a preferred embodiment, this can be accomplished via an Armijo inexact line search using a properly defined search direction and a proper choice of the penalty scalar c. PIPA drives the residual r(σ, x, w) toward zero, thereby achieving feasibility to the MPEC, and obtains a satisfactory "minimum" value of the objective θ(σ, x).

At the beginning of each iteration v, a triple σ<sup>v</sup>, x<sup>v</sup>, w<sup>v</sup> satisfying the above conditions is preferably given. Consistent with the notation used so far, the triple can be written:

$$G^v = G(\sigma^v, x^v, w^v) \text{ and } r_v = r(\sigma^v, x^v, w^v).$$

At this triple, a Newton linearization step is applied to the equation:

$$w − q(\sigma) − M(\sigma)x = 0$$

US 6,546,375 B1

15

and also to the following perturbed complementarity equation:

$$w \bigcirc (w - \bar{q}) = \kappa g_\nu 1_{M(N-1)}$$

where $\kappa$ is a given constant in the interval (0, 1). The resulting linear equations are preferably used to define a directional quadratic program whose solution yields a search direction along which the aforementioned line search is carried out.

As shown in FIG. 4, running PIPA calculator 12 initializes (8) in initialization step S40 by letting $\rho, \gamma, \kappa_0$, and $\eta$ be given scalars in the interval (0, 1). In addition, $c_{-1} \geq 1$ and $\zeta > 0$ are given scalars, and $H_\nu$ is a given symmetric positive (semi) definite matrix of order $2M(N-1)$. $(\sigma^0, x^0, w^0)$ is a given triple satisfying the three conditions (a, b, c), while $v$ is set to 0.

In the direction generation step S42 is applied to solve the convex quadratic program

$$\text{minimize } (d\varphi_\nu^*)^T d\sigma + (d\varphi_x^*)^T dx + \frac{1}{2} \begin{pmatrix} d\sigma \\ dx \end{pmatrix}^T H_\nu \begin{pmatrix} d\sigma \\ dx \end{pmatrix}$$

subject to $\sigma^\nu + d\sigma \in \Gamma$

$$G^\nu + dw - J_{\sigma}{}^{\nu} x^\nu d\sigma - M^\nu dx = 0$$

$$(x^\nu - r^\nu) \bigcirc w^\nu + \text{diag}(x^\nu) dw + \text{diag}(w^\nu) dx = \kappa_\nu g_\nu 1_{M(N-1)}$$

$$\| d\sigma \|_\infty \leq \zeta r_\nu \tag{15}$$

to obtain the search triple $(d\sigma, dx, dw)$.

PIPA then applies a termination test in step S44 to determine if the computed implied volatility is within acceptable values. If

$$\|(d\sigma, dx, dw)\| \leq r_\nu \text{ is prescribed tolerance,}$$

PIPA as shown in step S46, and the triple $(\sigma^\nu, x^\nu)$ is taken to be a desired approximate solution of (8).

If the termination condition is not met, the PIPA of the invention applies a penalty update in step S47. In this step $s_\nu \geq 1$ is taken as the smallest integer $s \geq 1$ such that

$$(d\varphi_\nu \gamma)^T d\sigma + (d\varphi_x \gamma)^T dx - c_{\nu-1}{}^s[2(G^\nu)^T G^\nu + (1-\kappa_\nu)(x^\nu)^T w^\nu] < -r_\nu.$$

Set $c_\nu = c_{\nu-1}{}^{s\nu}$.

In step S48 PIPA determines the next step size, preferably using centrality, with

$$\begin{pmatrix} \sigma^\nu(\tau) \\ x^\nu(\tau) \\ w^\nu(\tau) \end{pmatrix} = \begin{pmatrix} \sigma^\nu \\ x^\nu \\ w^\nu \end{pmatrix} + \tau \begin{pmatrix} d\sigma \\ dx \\ dw \end{pmatrix}$$

determine the largest $\tau \in (0, 1]$ such that

$$x^\nu(\tau) \bigcirc w^\nu(\tau) \geq \kappa_\nu g_\nu(\tau) 1_{M(N-1)},$$

where

$$g_\nu(\tau) = \frac{(x^\nu(\tau) - \rho)^T(w^\nu(\tau))}{M(N-1)}.$$

16

Set

$$\tau_\nu^1 = 0.9999\tau.$$

In step s49, calculator 12 preferably determines step size using an Armijo line search by setting

$$\tau_\nu = \tau_\nu^1 \rho^{l_\nu}$$

where $l_\nu$ is the smallest nonnegative integer $l$ such that with

$$\tau = \tau_\nu^1 \rho^l,$$

$$P_{c_\nu}(\sigma^\nu(\tau), x^\nu(\tau), w^\nu(\tau)) - P_{c_\nu}(\sigma^\nu, x^\nu, w^\nu) <$$

$$\gamma \tau [(d\varphi_\nu^*)^T d\sigma + (d\varphi_x^*)^T dx - c_{\nu-1}{}^s(2(G^\nu)^T G^\nu + (1 - \kappa_\nu)(x^\nu)^T w^\nu)].$$

Set $(\sigma^{\nu+1}, x^{\nu+1}, w^{\nu+1}) = (\sigma^\nu(\tau_\nu), x^\nu(\tau_\nu), w^\nu(\tau_\nu))$. Choose a scalar $\kappa_{\nu+1} \in (0, \kappa_\nu)$ and a symmetric positive (semi) definite matrix $H_{\nu+1}$. Return to Step 1 with $v$ replaced by $v+1$.

It should be noted that the program or algorithm such as IMPA or PIPA, executed by calculator 12 can be written in different computer languages for different computer modules or systems. The programs can be stored on a hard drive, floppy disk, CD-ROM or other permanent or semi-permanent storage medium, as well as downloaded, for example, from a server computer, or the Internet, or transmitted as a data signal over a communications path, e.g., over the Internet or on a transmitted carrier wave, as is known in the art.

EXAMPLES

The following examples were performed through a computer program written using MATLAB® to illustrate the numerical performance of algorithms such as IMPA and PIPA, in accordance with preferred embodiments of the invention. The inverse pricing of $K \in \{2, 11, 14\}$ American put options as examples in order to determine the discretized volatilities implied by certain given option values. Thus for $k = 1, \ldots, K$, the payoff function of option $k$ is given by:

$$\Lambda^k(S, t) = \max(S - E_k, 0)$$

where $E_k$ is the strike price of the option at its expiry date $T_k$. For each option $k$, a set of discretized American option prices $V_n^{obs,k} = V_n^{obs,k}(n\delta S, 0)$, representing the set of currently observable option prices, is generated by solving the single-option LCP (4) using a constant volatility of $\sigma_0 = 0.04$ and the following parameters: $N = 16$, $\delta S = 1$, $T = T_k$, $\delta t = 0.125$, $r = 0.05$, and $D_0 = 0.02$.

The constant $\sigma_0$ is not known to IMPA or PIPA; instead, we use the values $V_n^{obs,k}$ were used to define the following least-squares objective function:

$$\theta(x) = \frac{1}{2} \sum_{k=1}^{K} \sum_{n \in N_k} (V^k(n\delta S, 0) - V_n^{obs,k})^2.$$

The index set $N_k$ is a singleton in all the runs; it consists of $\{n'\}$ such that $n'\delta S = S_0$ the current asset price. With the objective of minimizing $\theta(x)$, the following examples show the use of IMPA or PIPA in obtaining an objective value of $\theta$ close to zero. In addition, $\Gamma$ is taken to be a rectangular

US 6,546,375 B1

17 | 18

box, meaning that the unknown volatility vector σ is subject to simple upper and lower bounds.

In implementing IMPA in accordance with a preferred embodiment, the major computations in each iteration were (i) the direction generation step which involves solving the convex quadratic program (13), and (ii) the evaluation of $x''(\tau)$ for various step sizes $\tau=\rho l'$. By using the equality constraints in (13), the variables $dx_{\tau}$ for iex,Uβ' can be solved in terms of $d\sigma$, thereby converting (13) into a strictly convex quadratic program in the variable $d\sigma$ alone. In the experiments below, each Qv is chosen to be the identity matrix to simplify the resulting quadratic program.

The evaluation of $x''(\tau)$ involves solving the forward option LCP (7) corresponding to $\sigma''(\tau)$ This LCP decomposes into K independent linear complementarity subproblems each corresponding to a given option. In turn, as mentioned above, each single-option LCP can be solved backward in time. Thus, the evaluation of $x''(\tau)$ amounts to solving KM time-stepped LCPs each of the form (4). In principle, there are many methods applicable for solving the latter LCP (4). For example, when N (the number of discretized asset prices) is large, an interior point algorithm is the preferred method for solving the LCP (4). Thus, this interior point algorithm is chosen as the principal tool for evaluating $x''(\tau)$.

The main computation in each iteration of PIPA is the solution of the convex quadratic program (15). Unlike IMPA, there is no need to solve herein any forward option LCP. As in IMPA, the program (15) can be converted into one in the variable $d\sigma$, alone. In both cases, the highly special structure of the matrices involved is exploited to facilitate the computations.

The termination test for IMPA is

$$\min(|d\sigma|, \theta(x'', \sigma'')) \leq 10^{-6} \qquad (16)$$

A maximum number of 80 iterations has also been imposed. Since IMPA maintains the feasibility of the pair $(\sigma'', x'')$ to the MPEC (8), if IMPA terminates after 80 iterations without satisfying (16), an implied volatility vector $\sigma''\epsilon I'$ is obtained with associated American option prices $x''$ that are deemed satisfactory. The resulting objective values $\theta(x'')$ at termination of IMPA in all runs were invariably very small.

The termination test for PIPA is

$$|(d\sigma, dx, dw)|+r_v \leq 10^{-8}. \qquad (17)$$

At termination, the iterate $(\sigma'', x'')$ produced by PIPA is an approximate feasible solution to the MPEC (8) with the feasibility accuracy being less than $10^{-8}$. The objective value $\theta(x'')$ is reported in each run.

### Example 1

Two observed put option values are given (K=2):

| k | $(E_k, T_k)$ | $V^{obs,k}$ |
|---|---|---|
| 1 | (8, 0.5) | 0.8003 |
| 2 | (8, 1.0) | 1.1217 |

The current asset price is $S_0=8$. An initial value $\sigma_{init}=0.255$ is used to start both algorithms. The discretized volatility surfaces computed by PIPA and IMPA are shown in FIGS. 5 and 6, respectively. The outputs from the two algorithms are summarized in Table 1 below. Note that the

objective value obtained by PIPA is larger than that obtained by IMPA even though the residual is quite small. The two surfaces in FIG. 5 and FIG. 6 have similar shape, but are not identical.

TABLE 1

| # iter | residual | $\|d\sigma\|$ | θ |
|---|---|---|---|
| | | PIPA | |
| 31 | 3.0995e-09 | 1.2694e-11 | 1.0832e-02 |
| | | IMPA | |
| 73 | | 4.7601e-04 | 8.7225e-07 |

Since PIPA and IMPA did not produce identical surfaces and neither recovered the original constant volatility surface used to generate the observed option data, as a test to determine how close the option prices calculated from given volatility are being reproduced, the volatility surfaces obtained by PIPA and IMPA are used now as parameters in the forward problem to re-calculate the option values. For given strike prices E=8 and E=9, the three set of option values were computed and plotted using: 1) $\sigma(S, t)=0.4$, 2) $\sigma(S, t)=\sigma_{PIPA}(S, t)$, and 3) $\sigma(S, t)=\sigma_{IMPA}(S, t)$, shown in FIGS. 7 and 8. It is apparent that the IMPA of the invention reproduces the option prices $V_{obs}$ rather closely.

### Example 2

Eleven observed put option values are given (K=11):

| k | $(E_k, T_k)$ | $V^{obs,k}$ | k | $(E_k, T_k)$ | $V^{obs,k}$ |
|---|---|---|---|---|---|
| 1 | (3, 1.0) | 0.0041 | 7 | (9, 1.0) | 1.7287 |
| 2 | (4, 1.0) | 0.0288 | 8 | (10, 1.0) | 2.4339 |
| 3 | (5, 1.0) | 0.1156 | 9 | (11, -1.0) | 3.2277 |
| 4 | (6, 1.0) | 0.3131 | 10 | (12, 1.0) | 4.0994 |
| 5 | (7, 1.0) | 0.6497 | 11 | (13, 1.0) | 5.0117 |
| 6 | (8, 1.0) | 1.1217 | | | |

The corresponding parameters are the same as those given in Example 1.

| # iter | residual | $\|d\sigma\|$ | θ |
|---|---|---|---|
| | | PIPA | |
| 73 | 7.0148e-09 | 6.8803e-15 | 2.2206e-03 |
| | | IMPA | |
| 80 | | 1.2632e-03 | 1.8398e-04 |

The discretized volatility surfaces computed by PIPA and IMPA are shown in FIGS. 9 and 10, respectively. Again, the re-calculated option values were plotted for strike prices E=8 and E=9, as shown in FIGS. 11 and 12. In this example, both, IMPA and PIPA reproduce the observed option curve very closely.

US 6,546,375 B1

19

20

## Example 3

| k | $(E_k/T_k)$ | $V^{\text{obs},k}$ | k | $(E_k/T_k)$ | $V^{\text{obs},k}$ |
|---|---|---|---|---|---|
| 1 | (5, 0.5) | 0.0279 | 8 | (5, 1.0) | 0.1156 |
| 2 | (6, 0.5) | 0.1240 | 9 | (6, 1.0) | 0.3131 |
| 3 | (7, 0.5) | 0.3884 | 10 | (7, 1.0) | 0.6497 |
| 4 | (8, 0.5) | 0.8003 | 11 | (8, 1.0) | 1.1217 |
| 5 | (9, 0.5) | 1.4496 | 12 | (9, 1.0) | 1.7287 |
| 6 | (10, 0.5) | 2.1913 | 13 | (10,1.0) | 2.4339 |
| 7 | (11, 0.5) | 3.0533 | 14 | (11, 1.0) | 3.2277 |

Fourteen observed put option values are given (K=14):

Following the procedure of Example 1, the following results were obtained:

| # iter | residual | $\|d\sigma\|$ | θ |
|---|---|---|---|
| | | PIPA | |
| 66 | 2.0231e-09 | 1.3517e-15 | 2.6059e-03 |
| | | IMPA | |
| 80 | | 1.7086e-03 | 1.576e-04 |

The discretized volatility surfaces computed by PIPA and IMPA are shown in FIGS. 13 and 14, respectively. The re-calculated option values for strike prices E=8 and E=9 are plotted in FIGS. 15 and 16.

In all three examples, the volatility surface calculated by PIPA is lower than that calculated by IMPA. This is also reflected in the plots of the option values: the option values calculated from $\sigma_{PIPA}(S, t)$ are below those calculated from $\sigma_0=0.4$ and $\sigma_{IMPA}$.

## Example 4

Again taking the option values calculated from the constant volatility ($\sigma_0=0.4$)

$$\tilde{V}_n^{\text{obs},k} = V_n^{\text{obs},k} + 0.0707$$

to be the observed values, each observed values is perturbed by a small amount; i.e.

Thus, the new objective function is given by

$$\theta(x) = \frac{1}{2} \sum_{k=1}^{K} \sum_{n \in N_k} \left( V^k(n\delta S, 0) - \tilde{V}_n^{\text{obs},k} \right)^2$$

$$= \frac{1}{2} \sum_{k=1}^{K} \sum_{n \in N_k} \left( V^k(n\delta S, 0) - \tilde{V}_n^{\text{obs},k} - 0.0707 \right)^2$$

Clearly, $\sigma(S, t) = \sigma_0$ for all $(S, t)$ is a feasible solution to the optimization problem (9). This gives an upper bound on the optimal objective value:

$$\theta_{optimal} \leq K(0.0707)^2 = UB.$$

Examples 1–3 were repeated using this new objective function to investigate how well the IMPA and PIPA of the invention perform in relation to this upper bound value UB, starting at $\sigma_{init}=0.255$. The results are summarized below (with the "IMPA" results achieved after 80 iterations):

| | PIPA | IMPA | UB |
|---|---|---|---|
| 2 options | 2.5859e-02 | 8.8725e-07 | 1.0000e-02 |
| 11 options | 1.5442e-02 | 4.3301e-03 | 5.4983e-02 |
| 14 options | 1.0045e-02 | 6.9930e-04 | 6.9979e-02 |

While preferred embodiments of the invention have been described and illustrated, it should be apparent that many modifications to the embodiments and implementations of the invention can be made without departing from the spirit or scope of the invention. For example, while only vanilla American options are explained in the interest of simplicity, the same general approach can be applied to computing volatilities implied by exotic American options and/or American options with transaction costs ,as well as the inverse pricing of other financial derivatives not described herein. The modules illustrated in FIG. 1 as making up financial engine 100 may be one or more hardware, software, or hybrid components residing in (or distributed among) one or more local or remote computer systems. Although the modules are shown as physically separated components, it should be readily apparent that the modules may be combined or further separated into a variety of different components, sharing different resources (including processing units, memory, clock devices, software routines, etc.) as required for the particular implementation of the embodiment. Indeed, even a single general purpose computer executing a computer program to produce the functionality described herein may be utilized to implement the illustrated embodiments. User interface device 18 may be any device used to input and/or output information during an exchange of information between user and financial engine 100. The interface device 18 may be implemented as a graphical user interface (GUI) containing a display or the like, or may be a link to other user input/output devices known in the art.

In addition, memory units 122, 162 described herein as used respectively in volatility calculator 12 and forward pricing unit 16 may be any one or more of the known storage devices (e.g., Random Access Memory (RAM), Read Only Memory (ROM), hard disk drive (HDD), floppy drive, zip drive, compact disk-ROM, DVD, bubble memory, etc.), and may also be memory devices embedded within CPUs 120, 162, or shared with one or more of the other components within financial engine 100. The computer programs or algorithms described herein may easily be configured as one or more hardware modules, and the hardware module shown may easily be configured as one or more software modules without departing from the invention. Although the illustrated embodiments may have described the use the class of iterative algorithms in implementing the financial engine to approach the linear complementarity issues forming part of the option pricing problem, it should be readily apparent that other known algorithms such as the class of pivotal algorithms may also be used in any implementation of the invention. Accordingly, the invention is not limited by the foregoing description or drawings, but is only limited by the scope of the appended claims.

What is claimed as new and desired to be protected by Letters Patent of the United States is:

1. A method of pricing a financial derivative whose value is based on an underlying asset, the method comprising the steps of:

retrieving input data used to generate a forward price of the financial derivative;

US 6,546,375 B1

21

using a computer to calculate implied volatility of the underlying asset, wherein said calculating step is an optimization process in the form of a mathematical program with equilibrium constraints (MPEC) to derive the implied volatility of the underlying asset;

generating a forward price of the financial derivative based on retrieved input data and the calculated implied volatility; and

issuing a report to a user including the forward price generated.

2. The method of pricing a financial derivative according to claim 1, wherein said step of generating a forward price employs a discretized partial differential linear complementarity problem to generate the forward price of the financial derivative.

3. The method of pricing a financial derivative according to claim 2, wherein said step of generating further comprises, based on the implied volatilities 20 calculated in said calculation step, the substep of time stepping linear complementarity problems represented below, wherein for each m, let $V_m$, $\sigma_m$ and $\Lambda_m$ denote, respectively, the (N−1)-vectors $(V_{mn})_{n-1}^{N-1}$, $(\sigma_{mn})_{n-1}^{N-1}$ and $(\Lambda_{mn})_{n-1}^{N-1}$,

$$0 \leq V_m - \Lambda_m \perp b_m(\sigma_m) + Q(\sigma_m)V_m + N(\sigma_m)V_{m+1} \geq 0$$

where $\perp$ is the notation for "perpendicular to" and for an arbitrary (N−1)-vector $\omega$,

$$Q(\omega) = (\delta t^{-1} + r)I_{N-1} + L_0(\omega), \ N(\omega) = -\delta t^{-1}I_{N-1} + L_{1-\theta}(\omega),$$

$$b_m(\omega) = \frac{1}{2} \begin{bmatrix} \frac{1}{2}[\theta V_{m0} + (1-\theta)V_{(m+1)0}](r - D_0 - \omega_1)\omega_1 \\ 0 \\ \vdots \\ 0 \\ -\frac{1}{2}[\theta V_{mN} + (1-\theta)V_{(m+1)N}](r - D_0 + \omega_{N-1})\omega_{N-1} \end{bmatrix}$$

with $I_{N-1}$ being the identity matrix of order N−1 and $L_\alpha(\omega)$ being the (N−1)×(N−1) tridiagonal matrix whose entries are given by: for i, j=1, 2, . . . , N−1,

$$(L_\alpha(\omega))_{ij} = \begin{cases} -\frac{\alpha}{2}f^2\omega_i^2 + \frac{\alpha}{2}f(r - D_0) & \text{if } j = i-1 \\ \alpha f^2\omega_i^2 & \text{if } j = i \\ -\frac{\alpha}{2}f^2\omega_i^2 - \frac{\alpha}{2}f(r - D_0) & \text{if } j = i+1 \\ 0 & \text{otherwise.} \end{cases}$$

4. The method of pricing a financial derivative according to claim 2, wherein said step of generating is applied to multiple options using the LCP:

$$0 \leq V^k - \Lambda^k \perp b^k(\sigma) + \Lambda(\sigma)V^k \geq 0,$$

for each k=1, . . . , K, a discretized option price $V^k_m$ of type k is generated.

5. The method of pricing a financial derivative according to claim 1, wherein the optimization process of said step of calculating is used to minimize an objective function representing deviation of an observed price of a financial derivative from the price generated in said generating step.

6. The method of pricing a financial derivative according to claim 5, wherein the objective function in the optimization process of said step of calculating is decreased by reducing a penalty function via an Armijo inexact line search algorithm.

22

7. A process of implementing a forward pricing model, the process comprising the steps of:

using a computer to generate inputs to a forward pricing model from an inverse of said forward pricing model;

applying said inputs to said forward pricing model;

applying a finite difference scheme to approximate the partial differential equation of a financial derivative price model having an unknown price variable and at least one unknown input that is not said unknown price variable;

solving said approximation to obtain a solution for said unknown price of variable;

further solving said solution for said at least one unknown input to said solution to provide at least one known input; and

applying said at least one known input to said financial derivative price model.

8. The process of claim 7, wherein said step of generating inputs includes the step of generating the implied volatility of the financial derivative.

9. An apparatus for pricing a financial derivative whose value is based on an underlying asset, the apparatus comprising:

a processing unit; and

a memory, wherein a computer program is stored for execution by said processing unit to derive a forward price of the financial derivative based on a solution of an inverse pricing process, wherein the solution of the inverse pricing process produces implied volatilities of the underlying asset by minimizing an objective function.

10. The apparatus for pricing a financial derivative as recited in claim 9, wherein the computer program executes an iterative descent algorithm to minimize the objective function so as to produce implied volatilities of the underlying asset of the financial derivative.

11. The apparatus for pricing a financial derivative as recited in claim 10, wherein the computer program utilizes the implied volatilities in deriving prices for the financial derivatives, and allocates funds based on the prices derived.

12. The apparatus for pricing a financial derivative as recited in claim 11, wherein the financial derivative is a vanilla American option.

13. A financial instrument engine comprising:

a data source retrieving data from external sources;

a user interface device inputting data from a user;

a volatility calculator calculating volatility utilizing an optimization of a mathematical program with equilibrium constraints (MPEC); and

a forward pricing unit, coupled to said data source, said user interface device, and said volatility calculator, determining forward pricing of a financial instrument based on data input to said forward pricing unit, wherein said forward pricing unit determines a projected value of the financial instrument based in part on the volatility calculated by said volatility calculator.

14. The financial instrument engine of claim 13, wherein said forward pricing unit receives as an input initial parameters, including an initial constant volatility and determines an initial theoretical forward price for use by said volatility calculator in calculating implied volatilities of an asset upon which the financial instrument is based.

15. The financial instrument engine of claim 14, further comprising a financial instrument controller issuing summary reports to the user for display through said user

US 6,546,375 B1

23

24

interface device, wherein the summary reports include the implied volatilities calculated and the value of the financial instrument projected by said forward pricing unit.

16. The financial instrument engine of claim 14, wherein said volatility calculator comprises a central processing unit (CPU) and a memory, wherein a computer algorithm is stored in the memory for execution by the CPU, the computer algorithm containing an optimization formulation that applies an iterative descent algorithm used to minimize an objective function representing deviation between observed value of the financial instrument and the value projected by said forward pricing unit.

17. An article of manufacture comprising a machine-readable storage medium having stored therein indicia of a plurality of machine-executable control program steps, the control program comprising the steps of:

  (a) inputting pricing data used in the calculation of a forward price of a financial derivative, including an observed trading price;

  (b) determining an initial theoretical price based on the pricing data received in said inputting step (a);

  (c) calculating implied volatility data based on the pricing data input in said inputting step (a) and the initial theoretical price determined in said determining step (b), wherein said calculating step (c) comprises the substep of optimizing an objective function representing the difference between the observed trading price and the initial theoretical price;

  (d) generating a final theoretical price of the financial derivative based on the implied volatility data calculated in said calculating step (c); and

  (e) issuing user reports containing the final theoretical price generated in said generating step (d).

18. The article of manufacture as recited in claim 17, wherein said calculating step (c) utilizes a mathematical program with equilibrium constraints (MPEC) in optimizing the difference between the observed trading price and the initial theoretical price resulting from said determining step (b).

19. The article of manufacture as recited in claim 18, wherein the objective function is based on a measure of smoothness of a surface formed by the implied volatility data produced in said calculating step (c).

20. The article of manufacture as recited in claim 18, wherein the objective function is represented by

$$0 \leq x - p.\bot.q(\sigma) + M(\sigma)x \geq 0,$$

where

$$x = (V^k)_{k=1}^K, \ p = (\Lambda^k)_{k=1}^K,$$

are, respectively, the KM(N−1)-dimensional vectors of unknown option prices

$$q(\sigma) = (b^k(\sigma))_{k=1}^K,$$

and known payoffs at the discretized grid points,

is the KM(N−1)-dimensional vector that contains the given initial and boundary values of the options; and M(σ) is the KM(N−1)×KM(N−1) block diagonal matrix all of whose K diagonal blocks are equal to the M(N−1)×M(N−1) matrix A(σ).

\* \* \* \* \*

# EXHIBIT 23

EXHIBIT 23: '629 INVALIDITY TABLE
U.S. Patent No. 6,546,375 to Pang (SEP. 21, 1999)
in view of Joubert, *Fast, Accurate and Inelegant
Valuation of American Options* (1997)

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| **27.** An automated trading method for use in an electronic exchange system network, comprising: | The Pang reference teaches an automated trading method for use with various types of electronic exchanges:<br><br><br><br>[Pang, Figure 1 (*see* interface between "Financial Instrument Controller 14" and "Network 110").]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others ***through network 110***, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, through signals output to network 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)." [Pang, at col. 5, ll. 1-14.] |
| using equipment to perform trading of a first traded item or a second traded item related to the first traded | The trading method is implemented by one or more computer hardware systems:<br><br>• "The financial engine 100 may be a ***stand-alone computer hardware system***, incorporated in (or distributed among) ***one or more locally or remotely located computer systems***." [Pang, at col. 4, ll. 13-16.]<br>• "In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as ***issuing control signals for use by*** |

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| item, including: | *automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets*." [Pang, at col. 4, ll. 5-13.]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, through signals output to network 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)." [Pang, at col. 5, ll. 1-14.] |
| receiving market price information for the first traded item; | The trading method receives current market price information from a connection to a variety of automatic quotation systems/services:<br><br><br><br>[Pang, Figure 2 (*see* "Retrieve Data S20").]<br><br>• "In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 100 may include ***one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data***, and may also include its own information retrieval system(s). The information received by data source 100 is forwarded to one or more of the other modules depending on the particular information provided." [Pang, at col. 4, ll. 35-44.] |
| identifying a desired price | The trading method identifies the expected price of a security based on information of the underlying asset: |

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| for the first traded item in a look-up table based on price information for the second traded item; | • "Using the calculations made by volatility calculator 12, forward pricing unit 16 can *project or determine the forward price or value of the option as a function of the price of the underlying asset* and time…The basic framework of the forward pricing program is that of Black and Scholes…" [Pang, at col. 5, ll. 42-54.]<br><br>• "Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), the information may include the observed market price of the *underlying asset*, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information. (This information may also be provided by (or output to) data source 10.)" [Pang, at col. 4, ll. 58-65.]<br><br>Joubert teaches the use of a lookup table of option prices:<br><br>• "The method is simply to build a *look-up table of option prices*…" [Joubert, at 88.]<br><br><br><br>[Joubert, at 91.]<br><br>One skilled in the art would have known to use the look-up tables in Joubert to increase the speed of processing options calculations in Pang, as taught by Joubert: | |

• "Table 1: Results for short term puts with a strike price of $100 and no dividends. Here $S$ is the stock price, $T$ the expiry of the option, $\sigma$ the volatility and $r$ the risk-free interest rate. The results in the 'Binomial' column were calculated with a 5000-step binomial tree, using Black-Scholes in the last step." [Joubert, at 89.]

• "The results in this article demonstrate the *feasibility of using look-up tables for pricing American options* with continuous dividends."

3

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
|  | • "**Fast**, Accurate and Inelegant Valuation of American Options"  [Joubert, Title.] <br><br> • "The method is simply to build a look-up table of option prices, which thus splits the problem of pricing American option prices into three sub-problems: a) accurate calculation of the values in the table; b) storage of the table; and access to it; c) **rapid calculation of prices for given parameter values**."  [Joubert, at 88.] <br><br> • "Seconds Per Put : 0.00027" [Joubert, at 89.] <br><br> • "The total amount of space required to store this [look-up table] was 0.94 MB, which is quite acceptable (it easily fits on a single floppy disc)."  [Joubert, at 90.] |
| comparing the received market price information for the first traded item to the desired price for the first traded item; and | The trading method compares theoretical values with observed option prices and utilizes the information to effect trading: <br><br> • "Volatility calculator 12, for example, **may utilize the theoretically calculated option price for comparison with observed option prices input from data source 10 (or user interface device 18) in optimizing its calculations**…." [Pang, at col. 11, ll. 57-63.] <br><br> • "**The calculated volatility and pricing information may also be used in effecting trading by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems** (represented by network 110) **based on the calculations made in steps S22 and S24**."  [Pang, at col. 12, ll. 6-10.] |
| generating an order for one of the first traded item and the second traded item based on the comparison of the received market price information to the desired price. | The trading method utilizes the values calculated from the forward pricing unit to generate orders for the trading of securities: <br><br>  <br><br> [Pang, Figure 2 (*see* "Issue Report or Control S26").] |

4

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| | • "*The calculated volatility and pricing information may also be used in effecting trading* by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems (represented by network 110) based on the calculations made in steps S22 and S24." [Pang, at col. 12, ll. 6-10.]<br><br>• "*Based on the information provided*, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as *controlling trading* or allocation of funds in options (or other financial instruments), simulating market reactions based on input conditions, *through signals output to network* 110. (The depiction of network 110 is made to represent a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), *small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)" [Pang, at col. 5, ll. 1-14.] |
| **36.** An automated trading method for use in an exchange system network, comprising: | The Pang reference teaches an automated trading method for use with various types of electronic exchanges:<br><br><br><br>[Pang, Figure 1 (*see* interface between "Financial Instrument Controller 14" and "Network 110").]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as *controlling trading or allocation of funds in options (or other financial instruments)*, simulating market reactions based on input conditions, through signals output to network 110. (*The depiction of network 110 is made to represent* a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), |

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| | *small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)." [Pang, at col. 5, ll. 1-14.] |
| using equipment in a network architecture to perform trading of a first traded item including: | The trading method is implemented by one or more computer systems:<br><br>• "The financial engine 100 may be a *stand-alone computer hardware system*, incorporated in (or distributed among) *one or more locally or remotely located computer systems*." [Pang, at col. 4, ll. 13-16.]<br><br>• "In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as *issuing control signals for use by automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets*." [Pang, at col. 4, ll. 5-13.]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as *controlling trading or allocation of funds in options (or other financial instruments)*, simulating market reactions based on input conditions, through signals output to network 110. (*The depiction of network 110 is made to represent* a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), *small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)." [Pang, at col. 5, ll. 1-14.] |
| receiving market information for the first traded item; | The trading method receives current market data from one or more automatic quotation services: |

6

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
|  | <br><br>[Pang, Figure 2 (*see* "Retrieve Data S20").]<br><br>•   "In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 100 may include ***one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data***, and may also include its own information retrieval system(s). The information received by data source 100 is forwarded to one or more of the other modules depending on the particular information provided." [Pang, at col. 4, ll. 35-44.] |
| identifying a transaction value for the first traded item in a look-up table of transaction values for the first traded item, wherein the identifying is responsive to receiving the market information for the first traded item | The trading method identifies the expected price of a security based on information of the underlying asset:<br><br>•   "Using the calculations made by volatility calculator 12, forward pricing unit 16 can ***project or determine the forward price or value of the option as a function of the price of the underlying asset*** and time…The basic framework of the forward pricing program is that of Black and Scholes…" [Pang, at col. 5, ll. 42-54.]<br><br>•   "Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), the information may include the observed market price of the ***underlying asset***, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information. (This information may also be provided by (or output to) data source 10.)" [Pang, at col. 4, ll. 58-65.]<br><br>Joubert teaches the use of a lookup table of option prices:<br><br>•   "The method is simply to build a ***look-up table of option prices***…" [Joubert, at 88.] |

| '629 Claim Language | Teachings of Pang & Joubert | |
|---|---|---|
| and wherein the transaction values in the look-up table are based on price information for a second traded item related to the first traded item; | <br><br>[Joubert, at 91.] | • "Table 1: Results for short term puts with a strike price of $100 and no dividends. Here $S$ is the stock price, $T$ the expiry of the option, $\sigma$ the volatility and $r$ the risk-free interest rate. The results in the 'Binomial' column were calculated with a 5000-step binomial tree, using Black-Scholes in the last step." [Joubert, at 89.]<br><br>• "The results in this article demonstrate the *feasibility of using look-up tables for pricing American options* with continuous dividends." |

One skilled in the art would have known to use the look-up tables in Joubert to increase the speed of processing options calculations in Pang, as taught by Joubert:

• "*Fast*, Accurate and Inelegant Valuation of American Options" [Joubert, Title.]

• "The method is simply to build a look-up table of option prices, which thus splits the problem of pricing American option prices into three sub-problems: a) accurate calculation of the values in the table; b) storage of the table; and access to it; c) *rapid calculation of prices for given parameter values*." [Joubert, at 88.]

• "Seconds Per Put : 0.00027" [Joubert, at 89.]

• "The total amount of space required to store this [look-up table] was 0.94 MB, which is quite acceptable (it easily fits on a single floppy disc)." [Joubert, at 90.]

| and using at least the identified transaction value in | The trading method utilizes the values calculated from the forward pricing unit to submit trade orders: |
|---|---|

8

| '629 Claim Language | Teachings of Pang & Joubert |
|---|---|
| determining whether to submit an order for the first traded item. |  [Pang, Figure 2 (*see* "Issue Report or Control S26").]<br><br>• "***Based on the information provided***, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, ***through signals output to network*** 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)" [Pang, at col. 5, ll. 1-14.] |

# EXHIBIT 24

## EXHIBIT 24: '833 INVALIDITY TABLE
## U.S. Patent No. 6,546,375 to Pang (SEP. 21, 1999)

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| **1.** An automated trading system for use in an electronic exchange system network, comprising: | The Pang reference teaches an automated trading system for use with various types of electronic exchanges:<br><br><br><br>[Pang, Figure 1 (*see* interface between "Financial Instrument Controller 14" and "Network 110").]<br><br>• "In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as ***issuing control signals for use by automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets***." [Pang, at col. 4, ll. 5-13.]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, through signals output to network 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)." [Pang, at col. 5, ll. 1-14.] |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| a receiver interface that receives market price information for a first traded item from an exchange; | The trading system receives current market price information from a connection to a variety of automatic quotation systems/services:<br><br><br><br>[Pang, Figure 2 (*see* "Retrieve Data S20").]<br>• "In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 100 may include ***one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data***, and may also include its own information retrieval system(s). The information received by data source 100 is forwarded to one or more of the other modules depending on the particular information provided." [Pang, at col. 4, ll. 35-44.] |
| a transaction value calculator that generates a transaction value for the first traded item based on price information for a second traded item related to the first traded item; | The trading method identifies the expected price of a security based on information of the underlying asset: |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| |  [Pang, Figure 2 (*see* "S22/S24").] <br><br> • "*Volatility calculator 12, for example, may utilize the theoretically calculated option price for comparison with observed option prices input from data source 10 (or user interface device 18) in optimizing its calculations (in step S22) of the volatility implied from the market*…." [Pang, at col. 11, ll. 57-63.] <br><br> • "An apparatus for and method of determining the price of financial derivatives such as options." [Pang, Abstract.] <br><br> • "Forward pricing unit 16, which may also be implemented using a computer program or algorithm (described below) stored in memory 162 and executed by CPU 160, receives information from data source 10, volatility calculator 12, and user interface device 18 to determine the forward price or value V.sub.BS (S, t) (*as a function of the price (S) of the underlying asset* over time (t)). User interface device 18 is used to exchange information between the user and financial engine 100. Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), *the information may include the observed market price of the underlying asset, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information*." [Pang, at col. 4, ll. 50-64.] <br><br> • "Using the calculations made by volatility calculator 12, forward pricing unit 16 can *project or determine the forward price or value of the option as a function of the price of the underlying asset* and time…The basic framework of the forward pricing program is that of Black and Scholes…" [Pang, at col. 5, ll. 42-54.] |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| decision logic using at least a portion of the received market price information and the transaction value to generate a decision whether to submit a response to buy or sell the first traded item; | The trading system includes an instrument controller that utilizes the price calculated from the forward pricing unit in determining whether to request a trade:<br><br><br><br>[Pang, Figure 2 (*see* "Issue Report or Control S26").]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, ***through signals output to network*** 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a ***company intranet, the Internet, electronic communications network*** (**ECNs**), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)**"  [Pang, at col. 5, ll. 1-14.] |
| and an output interface for outputting a request for market transaction for one of the first traded item and the second traded item for transmission to the exchange in response to | The trading system includes an instrument controller that requests and controls trading on an exchange: |

4

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| said decision logic. | <br>[Pang, Figure 2 (*see* "Issue Report or Control S26").]<br><br>• "***The calculated volatility and pricing information may also be used in effecting trading*** by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems (represented by network 110) based on the calculations made in steps S22 and S24." [Pang, at col. 12, ll. 6-10.]<br><br>• "***Based on the information provided***, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading*** or allocation of funds in options (or other financial instruments), simulating market reactions based on input conditions, ***through signals output to network*** 110. (The depiction of network 110 is made to represent a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)" [Pang, at col. 5, ll. 1-14.] |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| **24.** An automated trading method for use in an electronic exchange system network, comprising: | The Pang reference teaches an automated trading method for use with various types of trading exchanges:<br><br><br><br>[Pang, Figure 1 (*see* interface between "Financial Instrument Controller 14" and "Network 110").]<br><br>• "In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as ***issuing control signals for use by automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets***." [Pang, at col. 4, ll. 5-13.]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, through signals output to network 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)."  [Pang, at col. 5, ll. 1-14.] |

6

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| receiving market price information for a first traded item; | The trading method receives current market price information from a connection to a variety of automatic quotation systems/services:<br><br><br><br>[Pang, Figure 2 (*see* "Retrieve Data S20").]<br><br>• "In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 100 may include *one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data*, and may also include its own information retrieval system(s). The information received by data source 100 is forwarded to one or more of the other modules depending on the particular information provided." [Pang, at col. 4, ll. 35-44.] |
| automatically calculating a transaction price for the first traded item based on price information for a second traded item related to the first traded item; | The trading method identifies the expected price of a security based on information of the underlying asset: |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| | <br>[Pang, Figure 2 (*see* "S22/S24").]<br><br>• "An apparatus for and method of determining the price of financial derivatives such as options." [Pang, Abstract.]<br><br>• "Forward pricing unit 16, which may also be implemented using a computer program or algorithm (described below) stored in memory 162 and executed by CPU 160, receives information from data source 10, volatility calculator 12, and user interface device 18 to determine the forward price or value V.sub.BS (S, t) (*as a function of the price (S) of the underlying asset* over time (t)). User interface device 18 is used to exchange information between the user and financial engine 100. Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), *the information may include the observed market price of the underlying asset, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information*." [Pang, at col. 4, ll. 50-64.]<br><br>• "Using the calculations made by volatility calculator 12, forward pricing unit 16 can *project or determine the forward price or value of the option as a function of the price of the underlying asset* and time…The basic framework of the forward pricing program is that of Black and Scholes…"  [Pang, at col. 5, ll. 42-54.] |
| comparing the received market price information for the first traded item to the | The trading method compares theoretical values with observed option prices and utilizes the information to effect trading:<br><br>• "Volatility calculator 12, for example, *may utilize the theoretically calculated option price for comparison with observed option prices input from data source 10 (or user interface device 18) in optimizing its calculations*…." [Pang, |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| transaction price for the first traded item; and | at col. 11, ll. 57-63.]<br><br>• *"The calculated volatility and pricing information may also be used in effecting trading by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems* (represented by network 110) *based on the calculations made in steps S22 and S24."* [Pang, at col. 12, ll. 6-10.] |
| automatically generating a request for market transaction for one of the first traded item and the second traded item based on the comparison of the received market price information to the transaction price. | The trading method generates requests to trade securities on an exchange based on calculations from the forward pricing unit:<br><br><br><br>[Pang, Figure 2 (*see* "Issue Report or Control S26").]<br><br>• *"The calculated volatility and pricing information may also be used in effecting trading* by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems (represented by network 110) based on the calculations made in steps S22 and S24." [Pang, at col. 12, ll. 6-10.]<br><br>• *"Based on the information provided*, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as *controlling trading* or allocation of funds in options (or other financial instruments), simulating market reactions based on input conditions, *through signals output to network* 110. (The depiction of network 110 is made to represent a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), *small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)" [Pang, at col. 5, ll. 1-14.] |

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| **34.** An automated trading method for use in an electronic exchange system network, comprising the steps of: | The Pang reference teaches an automated trading method for use with various types of trading exchanges:<br><br><br><br>[Pang, Figure 1 (*see* interface between "Financial Instrument Controller 14" and "Network 110").]<br><br>• "In a preferred embodiment, the invention is implemented in a financial instrument engine 100, as shown in FIG. 1, used to analyze financial and economic signals provided by the financial markets and, based upon user input data and commands, issue position statements or reports for use by the user (or other components or systems), as well as ***issuing control signals for use by automated systems to effect positions (e.g., increase, decrease, change, etc.) held by the user in the financial markets***." [Pang, at col. 4, ll. 5-13.]<br><br>• "Based on the information provided, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as ***controlling trading or allocation of funds in options (or other financial instruments)***, simulating market reactions based on input conditions, through signals output to network 110. (***The depiction of network 110 is made to represent*** a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), ***small order exchange systems (SOES), on-line brokers or other trading networks, etc.***)."  [Pang, at col. 5, ll. 1-14.] |

10

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| receiving market price information for a first traded item; | The trading method receives current market data from one or more automatic quotation services:<br><br><br><br>[Pang, Figure 2 (*see* "Retrieve Data S20").]<br>• "In a preferred embodiment, data source 10 is used to provide external financial and economic data, signals, or other information to financial engine 100. Data source 100 may include ***one or more transmission links or connections (wired, wireless, etc.) to a variety of automatic quotation systems/services that provide current market data***, and may also include its own information retrieval system(s). The information received by data source 100 is forwarded to one or more of the other modules depending on the particular information provided." [Pang, at col. 4, ll. 35-44.] |
| automatically calculating a transaction value for the first traded item based on at least one of (a) price information for a second traded item related to the first traded item and (b) received market | The trading method identifies the expected price of a security based on information of the underlying asset: |

11

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| information for the first traded item; | <br><br>[Pang, Figure 2 (*see* "S22/S24").]<br><br>• "An apparatus for and method of determining the price of financial derivatives such as options." [Pang, Abstract.]<br><br>• "Forward pricing unit 16, which may also be implemented using a computer program or algorithm (described below) stored in memory 162 and executed by CPU 160, receives information from data source 10, volatility calculator 12, and user interface device 18 to determine the forward price or value V.sub.BS (S, t) (*as a function of the price (S) of the underlying asset* over time (t)). User interface device 18 is used to exchange information between the user and financial engine 100. Depending on the commands to be implemented (e.g., forward price calculation, implied volatility calculation, option exercise, etc.), *the information may include the observed market price of the underlying asset, volatility (local, implied, etc.), interest rate (e.g., risk-free), maturity (e.g., expiration date), strike price, dividend yield, and other pertinent information*." [Pang, at col. 4, ll. 50-64.]<br><br>• "Using the calculations made by volatility calculator 12, forward pricing unit 16 can *project or determine the forward price or value of the option as a function of the price of the underlying asset* and time…The basic framework of the forward pricing program is that of Black and Scholes…" [Pang, at col. 5, ll. 42-54.] |
| and using at least the calculated transaction value in automatically | The trading method generates requests to trade securities on an exchange based on calculations from the forward pricing unit: |

12

| '833 Claim Language | Teachings of Pang (U.S. 6,546,375) |
|---|---|
| determining whether to submit an order for the first traded item. | <br>[Pang, Figure 2 (*see* "Issue Report or Control S26").]<br><br>• "*The calculated volatility and pricing information may also be used in effecting trading* by issuing control signals through financial instrument controller 14 or the like (step S26) to trading systems (represented by network 110) based on the calculations made in steps S22 and S24." [Pang, at col. 12, ll. 6-10.]<br><br>• "*Based on the information provided*, financial instrument controller 14 can provide statements and reports to the user (e.g., containing pricing, volatility, position information, etc.) or to others through network 110, as well as provide a host of services based on the information such as *controlling trading* or allocation of funds in options (or other financial instruments), simulating market reactions based on input conditions, *through signals output to network* 110. (The depiction of network 110 is made to represent a variety of known networks and connected systems such as local or wide area networks, e.g., as a company intranet, the Internet, electronic communications network (ECNs), *small order exchange systems (SOES), on-line brokers or other trading networks, etc.*)" [Pang, at col. 5, ll. 1-14.] |

# EXHIBIT 25

US005267148A

# United States Patent [19]

## Kosaka et al.

[11] **Patent Number:** **5,267,148**

[45] **Date of Patent:** **Nov. 30, 1993**

[54] **COMPUTER AIDED REAL-TIME DECISION SUPPORT SYSTEM AND METHOD**

[75] Inventors: **Michitaka Kosaka**, Sagamihara; **Hirotaka Mizuno; Toshiro Sasaki**, both of Yokohama; **Hidenori Naoe**, Kawasaki; **Kuniaki Matsumoto**, Tokyo, all of Japan

[73] Assignee: **Hitachi, Ltd.**, Tokyo, Japan

[21] Appl. No.: **475,731**

[22] Filed: **Feb. 6, 1990**

[30] **Foreign Application Priority Data**

Feb. 27, 1989 [JP] Japan ..................................... 1-42970

[51] Int. Cl.⁵ ........................................... G06F 15/20
[52] U.S. Cl. ................................... **364/408**; 364/401; 379/93; 379/96; 379/97; 379/98
[58] Field of Search .................. 364/408, 401; 379/96, 379/93, 97, 98

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,656,654 | 4/1987 | Dumas | 379/96 |
| 4,677,552 | 6/1987 | Sibley, Jr. | 364/408 |
| 5,077,665 | 12/1991 | Silverman et al. | 364/408 |

*Primary Examiner*—Roy N. Envall, Jr.
*Assistant Examiner*—Gita D. Shingala
*Attorney, Agent, or Firm*—Fay, Sharpe, Beall, Fagan, Minnich & McKee

[57] **ABSTRACT**

A computer in a securities dealing decision support system is connected via a communication line to a dealer/trader terminal device and customer terminal device. A voice communication line is connected between the dealer/trader terminal device and customer terminal device. The information generated at the computer is outputted to both the terminal devices at the same time. The customer can decide the securities dealing by using the voice communication line while looking at the same information as that for the dealer/trader.

**14 Claims, 16 Drawing Sheets**



# FIG.1



# F I G.2



# F I G.3A



# F I G.3B



# FIG.4



# FIG.5



# F I G.6



# F I G.7

| INFORMATION TYPE | INFORMATION SUPPLY LEVEL |
|---|---|
| A | 1 |
| B | 2 |
| C | 3 |
| | |
| | |
| | |

16

# F I G.8



# F I G.9



# F I G.10



# F I G.11





FIG.12

18

26 INFORMATION FROM HOST

25 PROMPTER AREA FOR
ESTABLISHMENT OF
CUSTOMER COMMUNICATION

CUSTOMER GROUP 1

FIG.13

CUSTOMER
GROUP

CUSTOMER NAME ----- WORK STATION NO.
CUSTOMER NAME ----- WORK STATION NO.
CUSTOMER NAME ----- WORK STATION NO.
CUSTOMER NAME ----- WORK STATION NO.

CUSTOMER
GROUP

CUSTOMER NAME ----- WORK STATION NO.

CUSTOMER NAME ----- WORK STATION NO.

FIG.14

CUSTOMER GROUP
CUSTOMER NAME

18

# F I G.15

START

CHECK DEALING CONDITIONS OF
CUSTOMERS FOR EACH
TRADER/DEALER                    100

DEALING                          120
CONDITIONS SATISFIED ?           NO

YES

                                 130
FORM CUSTOMER DEALING CONDITIONS
SATISFIED INFORMATION FILE

                                 140
TRANSFER FILE TO WORK STATION OF
TRADER/DEALER

                ABOVE
        PROCESSES  ARE
NO      CARRIED OUT FOR  ALL      150
        DEALERS/TRADERS ?

                YES

                END

# F I G.16



START

RECEIVE CUSTOMER DEALING CONDITIONS SATISFIED
INFORMATION FILE                                     210

FLASH PROMPTER AREA OF CUSTOMER GROUP                 220

WAIT FOR OPERATOR INPUT                               230

DISPLAY CUSTOMER OF INPUT CUSTOMER
GROUP, AND FLASH CUSTOMER                             240

WAIT FOR OPERATOR INPUT                               250

CONNECT SPEECH COMMUNICATION LINE TO
INPUT CUSTOMER                                        260

END

# F I G.17



Case 1:08-cv-02412     Document 21-27     Filed 06/04/2008     Page 15 of 27

# F I G.18



| MASTER WORK STATION NO. | SLAVE WORK STATION NO. |
|---|---|
| | |
| | |
| | |
| | |

70

# F I G.19

| CUSTOMER GROUP | CUSTOMER NAME | REQUEST ORDER | WORK STATION NO. |
|---|---|---|---|
| | | | |

71

# F I G.20



# F I G.21



# F I G.22



# F I G.23

START

UPDATE RECEPTION COUNTER IN RESPONSE TO SPEECH REQUEST

410

WRITE CONTENTS OF RECEPTION COUNTER IN COMMUNICATION
REQUEST MANAGEMENT FILE

420

FLASH PROMPTER OF CUSTOMER GROUP INCLUDING SPEECH
REQUEST CUSTOMER

430

IN RESPONSE TO INSTRUCTION FROM TRADER/DEALER,
DISPLAY  CUSTOMER NAME INCLUDED IN INSTRUCTED
CUSTOMER GROUP

440

IN RESPONSE TO CUSTOMER NAME INSTRUCTION, START
COMMUNICATION WITH CUSTOMER WORK STATION AND SUBTRACT
CONTENTS OF RECEPTION COUNTER BY 1

450

END

5,267,148

1

# COMPUTER AIDED REAL-TIME DECISION SUPPORT SYSTEM AND METHOD

## BACKGROUND OF THE INVENTION

The present invention relates to an information control method for a securities dealing support system such as a trading support system which supports, or assists in the dealing of securities such as bonds and debentures, and to a securities dealing support system itself.

A conventional dealing system for bonds, debentures or the like is disclosed in Japanese Patent Laid open Publication JP-A-61-86867. With this system, customers who intend to deal with bonds or debentures are supplied with a plurality of type of data made at a host computer in menu form, or with the information requested by customers. The system automatically processes securities dealing proposed by customers. Information exchange between investors and dealers and/or traders is carried out in the following manner. The term "dealers and/or traders" is represented by "dealer/-trader" hereinunder where applicable.

There is shown in FIG. 2 the flow of information about the decision support for the dealer/trader who deals with bonds and debentures, and about the dealings between the dealer/trader and customers. Namely, in accordance with the market information at a stock exchange 21 or the like dealing with bonds, debentures and the like, the dealer/trader 23 consults customers 24 for securities dealing. In accordance with the securities dealing information supplied from customers 24, the dealer/trader 23 sends an order to the market. The information has been transferred heretofore via a telephone between dealers and traders or between traders and customers. The dealing information has been supplied to the dealer/trader in such a manner that a computer calculates the dealing support information in real time on the basis of market information and outputs the information to the display 22 of a work station at the dealer/trader. There is shown in FIGS. 3A and 3B an example of a conventional trading support computer system. In the system shown in FIG. 3A, market information is received at a computer 31 which selects desired information and sends it onto a Local Area Network (LAN) 32. A terminal device 33 picks up desired information from the information flowing on LAN 32 to thereby supply necessary information for dealing with bonds, debentures or the like. The dealer/trader communicates with customers via a communication system 34 while observing the screen of the terminal device 33.

In the system shown in FIG. 3B, A computer 31 receives market information and calculates desired securities dealing support information which is supplied to a terminal device 33. The dealer/trader communicates with customers via a communication system 34 while observing the screen of the terminal device 33.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a method and system having a nature of information simultaneity between the dealer/trader and customers, capable of allowing the dealer/trader and investors or customers to consult with each other with regard to a dealing decision involving securities such as bonds and debentures while observing common information (i.e., the screens displaying the common information).

2

It is another object of the present invention to provide a method and system having a function to protect information, capable of allowing the accessible dealing support information of the dealer/trader, which essentially differs from that of the customers, to be protected so as not to be accessible by customers.

It is a further object of the present invention to provide a method and system having a nature of real-time decision of dealing timing, capable of allowing the dealing timing requested by a customer to be supplied in real-time in accordance with the ever-changing market information, and when a suitable dealing timing comes, identifying a particular customer for that timing.

It is a still further object of the present invention to provide a method and system capable of, even during a speech communication between the dealer/trader and a customer, allowing a communication request by another customer or a dealing timing suitable for a particular customer to be displayed on the screen.

It is another object of the present invention to provide a method and system capable of, when communication requests are made by a plurality of customers at the same time, allowing a priority order to be determined so that the customers can be accessed from a higher priority order.

In order to achieve the above objects of the present invention, there is provided a decision support system wherein the information necessary for securities dealing is obtained on the basis of securities information, the system comprising a computer for outputting the obtained information, a dealer/trader terminal for displaying the information from the computer and inputting-/outputting voice information, and a customer terminal for displaying the information from the computer and inputting/outputting voice information to/from the dealer/trader terminal.

In this system, the above objects of the present invention can be achieved by the provision of the decision support method wherein the information necessary for securities dealing is obtained on the basis of securities information, the obtained information is outputted to the dealer/trader and customer terminals, and inputting/outputting voice information is allowed between the dealer/trader and customer terminals.

According to an aspect of the present invention, a communication request from another customer is accepted and displayed on the dealer/trader terminal while displaying the information necessary for securities dealing.

According to another aspect of the present invention, there is provided a knowledge data base for storing the dealing conditions for securities, and if the conditions stored in the knowledge data base are met, there is established a communication between a customer with the satisfied dealing conditions and the dealer/trader.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates the structure of a real-time decision support system.

FIG. 2 illustrates the relationship between real-time information and securities dealing.

FIGS. 3A and 3B show the structure of conventional trading support systems.

FIG. 4 illustrates the relationship between trader/-dealer and customers.

FIG. 5 shows the communication state management frames.

5,267,148

| 3 | 4 |

FIG. 6 shows the contents of the communication state management frame.

FIG. 7 shows the generated information protect management table.

FIG. 8 shows the dealing timing detection conditions knowledge data base.

FIG. 9 shows an example of a multi-window display.

FIG. 10 shows the structure of a real-time decision support system using ISDN (Integrated Services Digital Network).

FIG. 11 shows the logical information flow in the real time decision support system.

FIG. 12 shows an example of a dealing timing display.

FIG. 13 illustrates the management for customer group and customers.

FIG. 14 shows an example of displaying a customer group and customers satisfying the dealing timing conditions.

FIG. 15 is a flow chart showing the dealing timing check processes at the host computer.

FIG. 16 is a flow chart showing the dealing timing check processes at the work station.

FIG. 17 is a flow chart for dealing timing detection.

FIG. 18 is a master/slave relation table.

FIG. 19 is a customer request management table.

FIG. 20 is a flow chart showing the customer request processes.

FIG. 21 shows an example of displaying a customer group and customers who made a request.

FIG. 22 is a flow chart showing processes at the host computer for the simultaneous communication of voice and information between work stations.

FIG. 23 is a flow chart showing processes at the host computer upon a speech communication request by a customer.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments of this invention will be described with reference to the accompanying drawings.

FIG. 1 shows the outline of the decision support system of this invention. This system is constructed of a host computer 50 and work stations 51. There are provided in the host computer 50 a data input program 11 for inputting data such as market information from external medium via a communication line or the like, an information output control program 12, a decision support information processing program 13, and a communication request reception program 17. The host computer 50 is further provided with a knowledge data base 14 for storing dealing timing detection conditions, a frame storage area 15 for the management of communication state with work stations 51, and a generated information protect management table 16.

Work stations 51 shown in FIG. 1 are used for both the dealer/trader and customers. Each work station is a multi-window work station 18. A communication request 19 is made by each work station.

The system elements shown in FIG. 1 will be described in detail hereinunder.

(1) Logical Communication State Management Frame 15

It is first necessary for the host computer 50 to recognize the communication state among work stations. The communication network state among dealers/traders A and B and customers C to H shown in FIG. 4 is man-

aged by representing it in the form of frames as shown in FIG. 5. In this frame representation, each node in the network shown in FIG. 4 is an one-to-one correspondence with a single frame representation. The contents of a frame representation for a dealer/trader frame 40 and a customer frame 41 include the following factors by way of example.

(a) Dealer/trader Communication State Management Frame 40

The dealer/trader frame 40 shown in FIG. 5 is composed of:

(1) A work station number (WSNo) indicative of which work station is used.

(2) IDNo indicative of what dealer/trader is using the workstation, and information supply level indicative of to what level information can be supplied.

(3) Customers Communicable are grouped into customer groups and managed in the manner as shown in FIG. 6. The following information is provided for the management of each customer:

|  | CG-ST: | customer group state change detection flag |
|---|---|---|
|  | CG: | information supply level of the customer |
|  | IDNo: | ID number of the customer |
|  | WSNo: | work station number used by the customer |
|  | C-ST: | customer state |
|  |  | 0 . . . off |
|  |  | 1 . . . free |
|  |  | 2 . . . request from the customer work station |
|  |  | 3 . . . under communication |
|  | C-OR: | priority order of the customer |
|  | C-COND: | customer dealing conditions satisfied flag |
| (4) | State of Its Own Work Station | |
|  | W-ST: | work station state |
|  |  | 0 . . . no communication |
|  |  | 1 . . . under communication |
|  | C-DST: | ID number of communication destination |
|  | C-WS: | work station of communication destination |
|  | C-COND: | satisfied dealing timing |

(b) Customer communication State management Frame 41

The customer frame 41 shown in FIG. 5 is composed of:

(1) A work station number (WSNo) indicative of which work station is used.

(2) IDNo indicative of what customer is using the workstation, and information supply level (IL)

(3) Data such as what dealer/trader is communicable with the work station user, whether or not the dealer/-trader is free or not, and other data.

|  | WSNo-T: | work station number of the dealer/trader |
|---|---|---|
|  | IDNo-T: | ID number of the dealer/trader |
|  | D-ST-T: | work station state at the dealer/trader |
|  |  | 0 . . . free |
|  |  | 1 . . . during communication with another dealer/trader |
|  |  | 2 . . . during request from another work station |
|  |  | 3 . . . during communication with its own work station |
| (4) | State of Its Own Work Station | |
|  | W-ST | |
|  | C-DST | Same as the dealer/trader work station |
|  | C-WS | |
|  | C-COND | |

5,267,148

5 | 6

Of the data within this frame **41**, static data is read out from the data base under management by the host computer **50** and set within the frame **41** at the start of using the work station. Such static data includes:

IL, CG, IDNo and C-OR for the dealer/trader communication state management frame, and IL and IDNo for the customer communication state management frame.

The other data are set within the frame at the start of using the work station or at any time when the state changes.

According to the frame data described above the host computer can grasp the communication state of the network.

### (2) Generated Information Protect Management Table 16

There is provided the table **16** (FIG. 7) indicating to which level the information generated by the host computer **50** can be accessed so as to inhibit unnecessary information supply (for the purpose of information protect). Particular information to be protected is managed by the table **16**.

### (3) Dealing Timing Detection Conditions Knowledge Data Base 14

It is necessary to judge the dealing timing of the asset of a particular customer in accordance with the information input in real-time. There are stored in the knowledge data base **14** the dealing timing conditions of customers in the representation form of "if (. . .) then (. . .)". If the dealing timing conditions within the knowledge data base **14** are satisfied, the corresponding dealing timing satisfied flag is made turned ON. The computer **50** can therefore detect the dealing timing automatically in accordance with the data input in real-time. There is shown in FIG. **8** the structure of the dealing timing detection knowledge data base. As shown in FIG. 8, the data base has a hierarchic structure that the dealer/-trader, customer group and customer are arranged in this order and the dealing conditions are stored respectively for each customer.

### (4) Information Multi-window Output 18

For the dealer/trader and customers, it is necessary to monitor at the work stations the dealing support information, dealing timings, and communication requests by the dealer/trader and customers. To this end, the screen **18** of a work station is divided into three areas including

(1) an area for displaying information requested by the work station,

(2) an area for displaying dealing timings, and

(3) an area for displaying communication requests so as to allow continuous monitoring and judgement of the current state. The size and position of three information output areas are not fixed but may be changed in accordance with the application object.

### (5) Information Output Control 12

This program is used for outputting to each work station the processed result, by the decision support information processing program **13**, of the logical communication state management frame **15** and generated information protect management table **16**.

### (6) Communication Request Input 19

This program is used for inputting a communication request by another work station and sending it to the host computer **50**.

### (7) Communication Request Reception 17

This program is used for receiving a communication request by another work station and updating the contents of the communication state management frame **15**.

### (8) Data Input 11

This program is used for receiving from the external via a communication line the data necessary for the dealing timing judgement process and decision support information.

### (9) Decision Support Information Processing 13

This program is used for processing decision support information by using real-time data. The contents of the information processing include:

(1) dealing support processing for displaying the information requested by the work station on the requested information display area at the work station, and

(2) dealing timing detection processing on the basis of the contents of the dealing timing conditions detection knowledge data base.

The results of the dealing timing detection processing are reflected upon the communication state management frame **15**.

The functions achieved by the above-described programs and tables are described hereinunder.

The first issue, that the dealer/trader and customer or investor consult each other for the dealing decision while looking at the same information, can be achieved in the following manner. It is possible from the communication state management frame **15** to check which work station is communicating with another work station. In accordance with the check results, the voice communication line of ISDN is connected between the work stations under communication. Supplying the decision support information on the basis of the data input in real-time can be achieved by supplying the information to both the work stations under communication by means of the information output program **12**, in accordance with the contents of the communication state management frame **12**.

The second issue of information protect management can be achieved in the following manner. The information requested by a work station is judged, on the basis of the information supply level in the communication state management frame **15** and the contents of the generated information protect table **16**, whether it can be supplied to the requester, and if the information is to be protected, it is not outputted.

The third and fourth issues of real-time decision of the dealing timing can be achieved in the following manner. The dealing timing is detected by the decision support information processing program **13**, by using the data input in real-time and in accordance with the contents of the dealing timing detection conditions knowledge data base **14**, and the detection results are reflected upon the dealing conditions satisfied flag of the communication state management frame **15**, and displayed on the multi-window display screen **18** of the work station at the dealing timing display area by using the information output control program **12**.

5,267,148

7

The fourth and fifth issues of occurrence of a plurality of communication requests by customers can be achieved in the following manner. The information about requesters is written in the communication state management frame 15 by means of the communication request reception program 17 so that the priority order of the requesters can be judged because the frame 15 stores therein the priority order of each communication destination (customer). Under control of the information output control program 12, the communication request contents of the communication state management frame 15 are displayed on the multi-window display screen 18 of the work station at the communication request display area. It is therefore possible to perform the information output control for real-time dealing support.

The invention will be further described in particular with reference to the accompanying drawings.

FIG. 10 shows an example of the system arrangement embodying the present invention. A host computer 50 is coupled to a dealer/trader work station 51 via a communication equipment 55 at an information supplier such as a stock dealing company. A processor 56 of the host computer 50 receives real-time data such as market information by using the data input program 11. In accordance with the input data, there are executed the decision support information processing program 13 and information output control program 12. The host computer 50 also includes a time series data base 57 used during the processings, dealing timing detection conditions knowledge data base 14, communication state management frame 15 and generated information protect management table 16. The work station 51 has a multi-window display 18 and a telephone 58. A customer work station 53 is connected via a communication equipment 60 to a telephone 63 and processor 61.

In FIG. 10, although the dealer/trader work station 51 is shown as installed near the host computer 50, it may be connected to the host computer 50 via ISDN 52.

The logical flow of information and data in the trading support system using ISDN is shown in FIG. 11. Namely, the style of information supply to each terminal device via the host computer 50 is as follows:

(1) real-time dealing timing information display for the real-time data at the reception unit (indicated at circle 1),

(2) information display requested by a terminal device (indicated at circle 2), and

(3) simultaneous display, or communication of voice and text information indicated at circle 3). The more particular contents thereof will be described hereunder.

(1) Real-time Detection and Display of Dealing Timing

For the trading support system, it becomes necessary to detect a dealing timing while the market information ever-changes and inform a dealer/trader of the detected dealing timing. To this end, there is provided a table for storing the dealing conditions of each customer. This table is the dealing timing detection conditions knowledge data base 14. The dealing conditions are stored on the knowledge unit basis of "if (. . .) then (. . .)" type. As the data are input in real-time, the dealing conditions of each customer in the dealing timing detection conditions knowledge data base shown in FIG. 8 are checked, and if there is any customer with satisfied dealing conditions, the corresponding dealer/trader is notified of such effect.

8

The state of a customer with satisfied dealing conditions results in a change of C-COND and CG-ST at (3) in the dealer/trader frame 40 and C-COND at (4) in the customer frame 41 respectively of the communication state management frames shown in FIGS. 5 and 6, to thereby detect that the dealing conditions for that particular customer have been satisfied.

The dealer/trader is doing another work in most cases. In view of this, there is provided, on the display 18 of the work station 51 of the dealer/trader, a prompter area 25 shown in FIG. 12 for urging the dealer/trader to contact a customer. Since the prompter area 25 is small, all the customer information cannot always be displayed thereon. In view of this, there is introduced a concept of a customer group (FIG. 13) covering a plurality of customers. When the dealing conditions (a change in CG-ST shown in FIG. 6) for a customer are satisfied, a prompter area corresponding to the customer group including the customer is flashed, while referring to the structure shown in FIG. 13. When the dealer/trader points the flashing customer group with a mouse or light pen, the customer name shown in the structure of FIG. 13 is displayed and flashed on the screen 18 of the dealer/trader work station as shown in FIG. 14. When the dealer/trader points the flashing customer name with the mouse or light pen, a voice communication line is connected to the work station of the customer to allow a speech communication. Since the host computer can manage the work station number of a customer by using the table shown in FIG. 5, the image information shown in FIG. 14 and the work station number corresponding to a customer shown in FIG. 13 can also be managed.

The above operations carried out by the host computer 50 and dealer/trader work station 51 are illustrated in the flow charts shown in FIGS. 15 and 16.

First, the processes by the host computer 50 will be described with reference to the flow chart shown in FIG. 15.

Step 100

Each dealer/trader checks the dealing conditions of his customers. This check is carried out as shown in FIG. 17. Market information is received in real-time (step 11). The host computer 50 forms a real-time market information table 27. In accordance with this table 27 and with the dealing timing detection conditions knowledge data base 14 for each dealer/trader shown in FIG. 8, it is checked if the dealing conditions are satisfied (step 28). First, the condition satisfied flag for each customer is cleared to "0". Next, the dealing conditions of customers are checked one after another. If the conditions are satisfied, the corresponding condition satisfied flag is set at "1".

Step 120

Upon completion of the above-described check, if there is a condition satisfied flag set at "1" for a particular customer, it is necessary to notify the associated dealer/trader of such effect. The flow therefore advances to step 130. If all the condition satisfied flags are "0", it means that all the dealing conditions are not satisfied, and the customer dealing conditions table for the next dealer/trader is checked.

Step 130

The contents of the communication state management frames 40 and 41 are updated for those with satis-

5,267,148

9
10

fied conditions, and there is formed a customer dealing conditions satisfied information file 29 which is constructed of, as shown in FIG. 17, the contents of the customer dealing conditions table 14 and the work station numbers of customers to be communicated which are obtained from the contents of the tables 40 and 41 shown in FIG. 5.

### Step 140

The number of the work station used by the dealer/-trader now concerned is obtained from the table shown in FIG. 5, and the prepared customer dealing conditions satisfied information file 29 is supplied via ISDN to the identified work station (step 30).

The above processes are carried out for all dealers/-traders managed by the host computer 50 (step 150), and the processes by the host computer 50 are completed.

The processes by the dealer/trader work station to which data have been transmitted from the host computer, are executed in accordance with the procedure shown in FIG. 16.

### Step 210

The customer dealing conditions satisfied information file transmitted from the host computer 50 is received.

### Step 220

The customer group including a conditions satisifed flag set at "1" is flashed within the prompter area 25 shown in FIG. 12.

### Step 230

A state of waiting for an input by an operator. The operator points the flashing customer group with a mouse or light pen.

### Step 240

A list of customers belonging to the designated customer group is displayed as shown in FIG. 14, and the customer name with the conditions flag set at "1" is flashed.

### Step 250

A state of waiting for an input by the operator. The operator points a desired customer with the mouse or light pen.

### Step 260

The number of a work station for the designated customer is searched from the customer dealing conditions satisfied information file 29, and the searched work station is connected via ISDN.

With the above operations, it is possible to establish the communication line to the customer to whom the host computer 50 has determined the satisfied dealing timing.

(2) Display of Information Requested by Work Station

Displaying the information requested by a work station is similar to the general communication between a host computer and a work station. It is however necessary to conduct information protect management because of various types of information requests by many persons such as traders, investors and the like. It is necessary therefore to notify the host computer 50 of what dealer/trader or customer is using a work station.

At each work station, a user ID number and password are inputted at the start of operation. The host computer 50 recognizes the person using the work station, in accordance with a specific number of the work station corresponding to its telephone number and in accordance with the contents of the communication state management frame 40 or 41. The communication state management frame 40 or 41 has the information related to the information supply level representative of that the information accessible by a work station is up to a certain level. The host computer 50 also has a table 16 for discriminating the information serviceable to general customers and the information not serviceable. The structure of this table is shown in FIGS. 5, 6 and 7. By using these tables, it becomes possible to judge the information supply level of a work station under communication. If the information requested by a work station is found to be coincident with the information supply level, while referring to the table 16 shown in FIG. 7, the requested information is supplied to the work station. Otherwise, the requested information is protected. With the above arrangement, even if a general customer tries to access secret information, the customer can be identified to judge if the information is allowed to be supplied, so that the information can be protected.

(3) Simultaneous Communication of Voice and Information

Communications between a dealer/trader and a customer includes information transfer via the host computer 50 and the voice transfer via a telephone. Voice transfer via a telephone uses a voice communication line of ISDN 52.

The information requested by a work station and generated by the host computer 50 is transmitted, together with voices, via ISDN 52 to the work stations at the dealer/trader and customer The information to be transmitted to a customer sometimes include secret information to be protected. In view of this, it is necessary for the host computer 50 to have a function to supervise the communication between work stations and a function to control the information supply to the dealer/trader and customer in a master/slave fashion. To realize this, the host computer 50 controls the information supply by forming a master/slave relation table 70 shown in FIG. 18 including pairs of a master work station and slave work station or stations, in accordance with the contents of the communication state management frames 40 and 41. In accordance with the master/-slave relation table 70 shown in FIG. 18, when the host computer 50 supplies information to a master work station, it also supplies the information to the slave work stations.

The host computer 50 manages the work station state by grouping it into a speech mode and an information supply mode. In the case of the information supply mode, the protect management is effected for the information supply. If a work station is a slave work station, the speech mode is used. These states are managed by the communication state management frames 40 and 41.

The above procedures on the sides of the work station and host computer 50 will be described with reference to FIG. 22.

### Step 310

When a communication is acknowledged between a master work station and a slave work station, the host computer 50 registers the number of the master work

5,267,148

11

station (dealer/trader WS) and the number of the slave work station (customer WS) in the master/salve relation table **70**. The contents of the communication state management frames **40** and **41** of the work stations shown in FIG. **5** are changed to those for the speech mode.

#### Step 320

If the master work station is under communication with the slave work station, requested information and conditions used for calculating information are transferred between the master work station and host computer **50**. The communication line between the host computer **50** and slave work station is used only for transmitting from the host computer the same information as for the master work station.

#### Step 330

Upon completion of the speech communication between the master and slave work stations, the master work station notifies the host computer **50** of the end of communication.

#### Step 340

When the communication end is received from the master work station, the host computer **50** deletes the number of the corresponding work station from the master/slave relation table **70**, and switches the mode at the slave work station from the speech mode to the information supply mode to thereafter terminate the speech communication between the dealer/trader and customer.

It is also necessary to provide a procedure for a speech request from a customer.

A speech communication between the dealer/trader and customer is initiated upon instruction of a dealing timing from the host computer **50** or upon a request from a customer. Upon a request from a customer work station, a customer group (FIG. **13**) in the prompter area (indicated at circle **3** in FIG. **9**) and the customer name (FIG. **14**) are flashed. In this case, it is necessary to discriminate the dealing timing instruction from the host computer **50** and to identify the earliest customer request. To this end, a customer speech request management file **71** is provided as shown in FIG. **19**. The file **71** includes therein a customer group, customer name, and request order number. A number 0 is used for no request.

The procedure upon a speech request from a customer will be described with reference to FIG. **20** and the flow chart of FIG. **23**.

#### Step 410

A speech request from a customer is received at a communication equipment **55**, and a counter indicating a customer request order is incremented by +1.

#### Step 420

While referring to the number of requester work station, the contents of the counter **72** are entered into the column of the request order number of the speech request management file **71** shown in FIG. **19**.

#### Step 430

The customer group having the request order number other than 0 within the speech request management file **71** is flashed within the prompt area **73** at the right portion of the screen. Flashing within the prompter area

12

**73** is carried out at different positions (lower portion and right portion of the screen) and with different colors, respectively for the dealing timing instruction from the host computer and for the customer speech request.

#### Step 440

When a dealer/trader selects the dealing timing instruction from the host computer **50**, the image shown in FIG. **14** is displayed on the lower portion of the screen. If a customer speech request is selected, the request order (number within the parentheses in FIG. **21**) of a customer is searched from the speech request management file **71**, and displayed and flashed at the side of the customer name as shown in FIG. **21**.

#### Step 450

When the dealer/trader points the flashing customer name, a communication is established with its work station. The counter **21** shown in FIG. **20** is then decremented by −1, and the request orders following the designated customer are found from the table **71** shown in FIG. **19** to be decremented each by −1.

With the above procedure, a customer speech request can be identified and managed without intercepting the information supply process for the trading support.

As appreciated from the foregoing description of the present invention, the information generated at the host computer can be used in common, and the dealer/trader of securities is allowed to communicate by using both information and voice. The following advantages essential for such system can be expected.

(1) The dealing conditions of a customer are checked in accordance with real-time market information, and if the conditions are satisfied, the dealer/trader is notified of such effect, to thereby allow information supply to the customer at a most suitable timing.

(2) A speech request is displayed on the prompter area so that it is notified even during monitoring the dealing support information.

(3) Flashing color is changed on the basis of either a speech request or a dealing timing instruction, or the speech request priority order is displayed, thereby allowing the degree of importance of a speech request.

(4) There are also provided secret information protection and a master/slave relation with respect to information supply. Therefore, even if both the dealer/-trader and customer access the system, there is no chance for secret information to be leaked out, while supplying necessary dealing information to a customer.

We claim:

1. A decision support system for inputting and outputting information useful for assisting a customer in making decisions related to securities dealing while referring to substantially identical display information as that for a dealer and/or trader, the system comprising:

a computer for obtaining text information necessary for the dealing of securities in accordance with input information corresponding to said securities, and outputting said text information necessary for the dealing of said securities;

a communication network connected to said computer for transferring the text information and voice information;

a first terminal device used by said dealer and/or trader and connected to said communication network for displaying said text information necessary for the dealing of said securities supplied from said

5,267,148

**13**

computer, and for inputting and outputting the voice information;

a second terminal device used by said customer and connected to said communication network for displaying said text information necessary for the dealing of said securities supplied from said computer, and for inputting and outputting said voice information to and from said first terminal device via said communication network;

a knowledge data base connected to said computer for storing dealing conditions regarding said securities of said customer; and,

a communication management frame for grouping communication counterparts into groups and for managing a communication request to determine from which customer the communication request is received;

wherein if the input information regarding said securities satisfies said dealing conditions stored in said knowledge data base, said computer outputs, to said first terminal device via said communication network, customer information regarding said customer and corresponding to said dealing conditions and said text information necessary for the dealing of said securities and,

further wherein priority information is provided to said dealer and/or trader to determine which of a plurality of customer terminals connected to said communication network is to be selected as a counterpart terminal for one to one communication based on a condition of said knowledge data base and the state of said communication management frame and to establish a one-to-one communication with a customer having a high priority.

**2.** The decision support system according to claim 1, wherein said first terminal device displays the customer information regarding another customer while displaying said text information necessary for the dealing of said securities regarding to said customer.

**3.** The decision support system according to claim 1, further comprising:

a third terminal device to be used by another customer and connected to said communication network for inputting a communication request to said dealer and/or trader and for outputting said input communication request to said computer via said communication network;

wherein said computer outputs customer information regarding said communication request supplied from said third terminal device to said first terminal device via said communication network; and

further wherein said first terminal device displays the customer information regarding said communication request by said another customer while displaying said text information necessary for the dealing of said securities regarding said customer.

**4.** The decision support system according to claim 3, wherein said first terminal device displays said customer information regarding said communication request by said another customer in a mode different from that of said text information necessary for the dealing of said securities.

**5.** The decision support system according to claim 3, wherein if there are a plurality of other customers, the customer information regarding communication requests by said plurality of other customers is displayed

**14**

in accordance with a priority order assigned to each of said plurality of other customers.

**6.** The decision support system according to claim 1, further comprising means for storing a condition for an information disclosure level of each customer, wherein said computer includes a table for storing management information for managing an output of said text information necessary for the dealing of said securities, and if said management information stored in said table indicates a permission of outputting said text information necessary for the dealing of said securities to said second terminal device, said text information necessary for the delaying of said securities is outputted to said second terminal device via said communication network, so that a judgment of information as to whether the information is allowed to be provided is made in accordance with the information disclosure level of the customer.

**7.** A decision support method for inputting and outputting information useful for assisting a customer in making decisions related to securities dealing while referring to substantially identical display information as that for a dealer and/or trader, in a system including a computer, a first terminal device to be used by the dealer and/or trader, and a second terminal device to be used by the customer, the method comprising steps of:

obtaining by the computer text information necessary for the dealing of securities in accordance with input information corresponding to said securities;

outputting by the computer said text information necessary for the dealing of said securities to said first and second terminal devices;

permitting an input and output of voice information between said first terminal device to be used by said dealer and/or trader and said second terminal device to be used by said customer;

storing dealing conditions regarding said securities of said customer in a knowledge data base connected to said computer;

grouping communication counterparts into groups and managing a communication request to determine from which customer the communication request is received by a communication management frame;

wherein if the input information regarding said securities satisfies said dealing conditions stored in said knowledge data base, outputting by said computer, to said first terminal device via a communication network, customer information regarding said customer and corresponding to said dealing conditions and said text information necessary for the dealing of said securities and providing priority information to said dealer and/or trader to determine which of a plurality of customer terminals connected to said communication network is to be selected as a counterpart terminal for one to one communication based on a condition of said knowledge data base and a state of said communication management frame and to establish the one-to-one communication with a customer having a high priority.

**8.** The decision support method according to claim 7, wherein

when the input information regarding said securities satisfies said dealing conditions stored in said knowledge data base, the outputting to said first terminal device customer information regarding said another customer and corresponding to said

5,267,148

15

dealing conditions occurs while displaying said text information necessary for the dealing of said securities regarding said customer.

**9.** The decision support method according to claim 7, wherein there is provided a third terminal device to be used by another customer, the method further comprising:

inputting from said third terminal device a communication request to said dealer and/or trader; and,

outputting said input communication request to said first terminal while displaying said text information necessary for the dealing of said securities regarding said customer.

**10.** The decision support method according to claim 9, wherein the displaying by said first terminal device of customer information regarding said communication request by said another customer occurs in a mode different from that of said text information necessary for the dealing of said securities regarding to said customer.

**11.** The decision support method according to claim 9, wherein if there are a plurality of other customers, the method further comprises displaying customer information regarding communication requests by said plurality of other customers in accordance with a priority order assigned to each of said plurality of other customers.

**12.** The decision support method according to claim 7, wherein there is provided a table for storing management information for managing an output of said text information necessary for the dealing of said securities, the method further comprising:

outputting, if said management information stored in said table indicates a permission of outputting said text information necessary for the dealing of said securities to said second terminal device, to said second terminal said text information necessary for the dealing of said securities; and

storing a condition for an information disclosure level of each customer, so that a judgment of information as to whether the information is allowed is provided in accordance with the information disclosure level of the customer.

**13.** A securities dealing support system having a computer for assisting a customer known to a dealer/trader in making a decision in securities dealing, the system comprising:

a customer terminal;

a dealer/trader terminal;

16

means for receiving market information, the market information comprising shared text information and protected text information;

a communication network for transferring the shared and protected text information and voice information in the system;

means for providing the shared text information to the customer through the customer terminal and the dealer/trader through the dealer/trader terminal by using the communication network;

means for displaying the shared text information on the customer terminal and the dealer/trader terminal;

means for providing the protected text information to only the dealer/trader terminal by using the communication network;

means for displaying customer information corresponding to another customer on the dealer/trader terminal while the shared text information is being displayed thereon;

a knowledge data base connected to said computer for storing dealing conditions regarding said securities of said customer; and,

a communication management frame for grouping communication counterparts into groups and for managing a communication request to determine from which customer the communication request is received;

wherein if the input information regarding said securities satisfies said dealing conditions stored in said knowledge data base, said computer outputs, to said first terminal device via said communication network, customer information regarding said customer and corresponding to said dealing conditions and said text information necessary for the dealing of said securities; and,

further wherein priority information is provided to said dealer/trader to determine which of a plurality of customer terminals connected thereto is to be selected as a counterpart terminal for one to one communication based on a condition of said knowledge data base and a state of said communication management frame and to establish the one-to-one communication with a customer having a high priority is made possible.

**14.** The system of claim 13 further including means for allowing simultaneous exchange of the voice information and the shared text information between the customer and the dealer/trader.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :     5,267,148

DATED       :     November 30, 1993

INVENTOR(S) :     Michitaka Kosaka, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Claim 1, column 13, line 32, delete "the" and substitute therefor --a--.

Claim 6, column 14, line 13, delete "delaying" and substitute therefor --dealing--.

Column 13, line 34, "a" has been changed to read --the--.

Signed and Sealed this

Twenty-eighth Day of June, 1994

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# EXHIBIT 26



# HULL GROUP INC

## FORM S-1
### (Securities Registration Statement)

## Filed 05/13/99

| | |
|---|---|
| Address | 311 SOUTH WACKER DRIVE SUITE 1400 |
| | CHICAGO, IL 60606 |
| CIK | 0001085868 |
| SIC Code | 6211    - Security Brokers, Dealers, and Flotation Companies |
| Fiscal Year | 12/31 |

Powered By EDGAROnline
http://www.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON MAY 13, 1999
REGISTRATION NO. 333-

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM S-1
### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# THE HULL GROUP INC.
(Exact name of registrant as specified in its charter)

| DELAWARE | 6211 | 36-4292284 |
|---|---|---|
| (State of incorporation) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**311 SOUTH WACKER DRIVE**
**CHICAGO, IL 60606**
(312) 697-2700
(Address, including zip code, and telephone number, including area code, of
registrant's principal executive offices)

**M. BLAIR HULL, CHAIRMAN AND CHIEF EXECUTIVE OFFICER**
**THE HULL GROUP INC.**
**311 SOUTH WACKER DRIVE**
**CHICAGO, IL 60606**
(312) 697-2700
(Name, address, including zip code, and telephone number, including area code,
of agent for service):

**Copies to:**

| EDWARD S. BEST, ESQ. | WILLIAM R. KUNKEL, ESQ. |
|---|---|
| MAYER, BROWN & PLATT | SKADDEN, ARPS, SLATE, MEAGHER & FLOM |
| 190 SOUTH LASALLE STREET | (ILLINOIS) |
| CHICAGO, IL 60603 | 333 WEST WACKER DRIVE |
| (312) 782-0600 | CHICAGO, IL 60606 |
| | (312) 407-0700 |

**APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC: As soon**

as practicable after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. [ ]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If delivery of the prospectus is expected to be made pursuant to Rule 434 under the Securities Act, check the following box. [ ]

**CALCULATION OF REGISTRATION FEE**

## OUR INDUSTRY

### OVERVIEW

We compete primarily in the global equities industry, which consists of the equity derivatives market and the equity securities market. The global equity derivatives market consists primarily of standardized exchange-listed products traded on electronic and open-outcry exchanges worldwide. The market also includes customized, over-the-counter products created by major financial institutions for their customers. The global equity securities market consists primarily of securities of corporate issuers that are traded on stock exchanges or over-the-counter. The following table shows the equity market capitalization and exchange-traded equity options volume in the United States, Europe and Asia and the recent compound annual growth rate in those measures.

### GLOBAL EQUITY MARKET CAPITALIZATION & EXCHANGE-TRADED EQUITY OPTIONS VOLUME

|  | EQUITY MARKET CAPITALIZATION(a) | | EXCHANGE-TRADED EQUITY OPTIONS VOLUME(b) | |
|---|---|---|---|---|
|  | CAPITALIZATION ON DECEMBER 31, 1998 (USD IN THOUSANDS) | COMPOUND ANNUAL GROWTH RATE (1996-1998) | 1998 ANNUAL CONTRACT VOLUME (IN THOUSANDS) | COMPOUND ANNUAL GROWTH RATE (1996-1998) |
| United States........ | $12,922,580,000 | 26.4% | 447,576 | 21.4% |
| Europe.............. | 7,203,476,000 | 29.0% | 269,174 | 31.1% |
| Asia................ | 5,078,321,000 | 13.1% | 40,636 | 16.2% |

(a) Source: Federation Internationale des Bourses de Valeurs

(b) Source: Futures Industry Association, Inc.

The market participants in the derivatives market can be divided into two types of parties: customers and dealers. Customers include financial institutions, commercial firms, mutual and pension funds, private investment companies and retail investors. Customers typically use derivatives to manage financial risks. Dealers include market makers, large banks, securities firms and other market professionals. Dealers generate revenue by meeting customer demand to buy or sell derivatives, and also use derivatives to manage risk. Dealers, unlike customers, may also make markets by standing ready to make a two-way market in derivatives products. A market maker will typically hedge a given trade by entering into an offsetting transaction with another customer or dealer or by establishing a position in a highly correlated instrument. Market makers, like our firm, provide trading liquidity on regulated exchanges and generally have an obligation to make fair and orderly markets.

Market makers typically offer to buy securities from, or sell securities to, other dealers and customers. Firms that have elected to make a market in a security may display the price at which they are willing to buy or sell those securities. They will adjust their prices in response to the forces of supply and demand for each security. A market maker typically acts as principal and derives most of its revenues from the difference between the price paid when a security is bought and the price received when that security is sold.

In the equity derivatives market, brokerage firms typically execute their orders by dealing with independent market makers. In the equity securities markets, most discount and online brokers do not have internal market-making functions and, as a result, rely entirely on independent market makers for trade execution. In addition, traditional brokerage firms in the

35

equity securities markets are increasingly electing to focus on their core competencies and to outsource their market-making functions to independent market makers.

## RECENT TREND TOWARD ELECTRONIC TRADING PLATFORMS

There has been a worldwide trend toward the use of electronic trading platforms that has transformed a number of key equity markets. Electronic exchanges have emerged as a result of advances in technology, including electronic order routing, trade matching, trade reporting and enhanced availability of real-time price quotations. We believe the trend toward electronic trading will ultimately result in fully electronic worldwide markets.

In the United States, trading is conducted primarily on open outcry exchanges, although electronic trading is becoming more common. A majority of the equity derivatives and equity securities exchanges worldwide, including those in France, Germany, Japan, Sweden and Switzerland, are now completely electronic. For example, Eurex, a combination of the German Deutsche Terminborse and the Swiss Options and Financial Futures Exchange, has a completely electronic order matching system, and is now the largest derivatives exchange in the world. In addition, the Tokyo Stock Exchange recently closed its trading floor and now conducts stock trading entirely electronically. Also, the Sydney Futures Exchange and the Australian Stock Exchange have announced their intent to merge, close their open outcry floors and use fully electronic trading systems. Several other exchanges, including exchanges in the United Kingdom, have announced plans to convert to electronic trading platforms. Although the large exchanges in the United States remain open outcry, even some of those exchanges are adopting electronic trading mechanisms. For example, the "E-mini," an electronically traded futures contract on the S&P 500 Index, was recently launched to trade on the Chicago Mercantile Exchange, commonly called the CME. Since it began trading in September 1997, the fully electronic trading of the E-mini has grown from 190,000 in monthly contract volume to 831,000 in April 1999. Additionally, the ISE, a new U.S.-based exchange formed by a consortium of leading online brokers, has announced it will begin fully electronic equity options trading in the first quarter of 2000. The following table summarizes the current trading format of seven major equity derivatives exchanges and eight major equity securities exchanges worldwide.

| EXCHANGE | ELECTRONIC | OPEN OUTCRY |
|---|---|---|
| EQUITY DERIVATIVES EXCHANGES: | | |
| CME (United States) ............................................... | | X |
| CBOE (United States) .............................................. | | X |
| Eurex (Germany and Switzerland) ............................ | X | |
| Osaka (Japan) ....................................................... | X | |
| LIFFE (United Kingdom) (a) ..................................... | X | X |
| Marche des Options Negociables de Paris (France) .......... | X | |
| Hong Kong Futures Exchange (China) (b) ...................... | | X |
| EQUITY SECURITY EXCHANGES: | | |
| NYSE (United States) .............................................. | | X |
| Nasdaq (United States) ........................................... | X | |
| Tokyo Stock Exchange (Japan) .................................. | X | |
| London Stock Exchange (England) .............................. | X | X |
| Osaka Stock Exchange (Japan) ................................... | X | |
| Frankfurt Stock Exchange (Germany) ........................... | X | X |
| Paris Stock Exchange (France) .................................. | X | |
| Swiss Stock Exchange (Switzerland) ........................... | X | |

(a) LIFFE has announced plans to convert to a fully electronic trading format in 2000.

(b) The Hong Kong Futures Exchange has announced plans to convert to a fully electronic trading format in October 1999.

**THE EQUITY DERIVATIVES INDUSTRY**

Derivatives are financial instruments that derive their value from underlying assets, indices, reference rates or a combination of these variables. Equity derivatives typically include options, futures, forwards, convertibles and swaps. Equity derivatives provide dealers and customers the opportunity to harness market volatility and manage risk. Market makers use derivatives to facilitate customer transactions, to take proprietary positions and to manage risk.

## U.S. EQUITY DERIVATIVES INDUSTRY

Currently, equity derivatives in the United States are primarily listed and traded on open outcry exchanges. These exchanges are both self-regulated and regulated by the SEC and the CFTC. The U.S. OTC equity derivatives market is substantially smaller by volume than the exchange market and is dominated by major U.S. investment banks and other large financial institutions.

Significant growth in the volume of equities traded from 1996 to 1998 has had a positive impact on the U.S. equity derivatives markets. During this period, the volume of exchange-traded equity derivatives increased as well. Approximately 450 million options contracts were traded in 1998 on U.S. exchanges. The compound annual growth rate in equity options contract volume on U.S. exchanges from 1996 to 1998 was approximately 21.4%.

## INTERNATIONAL EQUITY DERIVATIVES INDUSTRY

Equity derivatives in international markets are primarily listed and traded on electronic exchanges. Today, equity derivatives are traded on more than 30 exchanges in at least 18 countries around the world. Significant equity derivatives markets exist in the United Kingdom, continental Europe and several Asian countries. The European equity derivatives market is growing faster than the U.S. market, with compound annual growth rates in equity options contract volume from 1996 to 1998 of approximately 31.1% on European exchanges.

**THE EQUITY SECURITIES INDUSTRY**

Equity securities are traded on more than 87 exchanges in at least 60 countries. During recent years, the volume of equity securities traded has grown dramatically. We believe that the demand for equity securities will continue to grow as the global economy expands.

## U.S. EQUITY SECURITIES INDUSTRY

Equity securities in the United States are traded on both open-outcry exchanges, including the NYSE, and electronic markets, including Nasdaq. Due to favorable market conditions, companies have increasingly raised capital through the U.S. equity securities markets. This has resulted in a significant increase in the number of companies that are traded on exchanges or OTC.

During recent years, the trading volumes in U.S. equity markets have grown dramatically. The average daily volume of equity securities traded on Nasdaq increased from 569.4 million shares in December 1996 to 867.1 million shares in December 1998. The average daily volume of equity securities traded on the NYSE increased from 433.1 million shares in December 1996

37

to 692.8 million shares in December 1998. The increase in trading volume has resulted from a number of factors, including:

- increased cash flows into equity-based mutual funds;

- high returns in U.S. equity markets;

- the emergence of the Internet and the rapid growth of online discount brokers; and

- reduced transaction costs.

## INTERNATIONAL EQUITY SECURITIES INDUSTRY

Equity securities in international markets are traded primarily on electronic exchanges. The international equity securities markets have experienced significant growth as local companies have increasingly used equity capital as an alternative to debt financing. This growth is also the result of increased participation in international equity securities markets by individuals and institutions.

During recent years, the trading volumes in international equity securities markets have grown dramatically. The total annual turnover of securities traded on the eight major European exchanges increased from $3.6 trillion in 1996 to $7.4 trillion in 1998, representing an increase of 105.6%.

38

## OUR BUSINESS

### OVERVIEW

We are a leading global market maker in exchange-traded equity derivatives and an active market maker in equity securities worldwide. We provide market-making and transaction execution services to a diverse group of participants on 28 exchanges in nine countries. Our market-making activities focus on providing customers with rapid executions at the best possible price. Since 1985, we have been at the forefront in developing and applying financial theory, along with information and communication technology, to trading equity derivatives and equity securities. Our dedicated team of financial engineers, software developers and traders develop proprietary, real-time valuation and risk management systems to price and trade equity derivatives and equity securities for our own account. The Hull System combines financial engineering, trading and electronic systems to create a competitive advantage. We have applied the Hull System to expand successfully, first into U.S. markets and then into international electronic markets.

Our lines of business are worldwide market-making activities and asset management. We make markets in listed U.S. equity index derivatives and in selected individual equity options in all major markets in the United States. We also make markets in a variety of equity index options and individual equity options in eight foreign countries, primarily on electronic exchanges located in Europe and Asia. In addition to derivatives market making, we make markets in individual equity securities on U.S. and foreign exchanges. Through Hull Transaction Services, our market-making activities include executing and routing orders forwarded to us by online brokers, large retail broker-dealers, money center banks and hedge funds. We also provide asset management services to outside investors by applying our expertise in valuation, electronic trading, portfolio construction, technology and risk management.

Our net revenues have increased from $51.7 million in 1994 to $103.1 million in 1998, representing a compound annual growth rate of 18.8%. Over this period, electronic trading has become increasingly important to our business, as net revenues from electronic trading have increased from 12.5% to 66.9% of our net revenues. We have proven our ability to deliver profitable results over time as demonstrated by our average annual pre-tax return on average equity over the last ten years of 38.9% and over the last five years of 42.4%.

### COMPETITIVE STRENGTHS

We believe the Hull System has positioned us to compete effectively in the global equities market, based on the following strengths:

We Are a Globally Diversified Industry Leader. We are a leading market maker in both the United States and Europe. Starting from a single exchange in 1985, we have successfully expanded by applying our U.S. market-making strategies to equity derivatives and equity securities markets worldwide. We trade over 3,700 products on 28 exchanges in nine countries worldwide. Our breadth of business activities across numerous geographic markets provides a diverse revenue stream and valuable knowledge. In addition to the United States, we are now a

39

leading market maker in equity derivatives and equity securities internationally. In 1998, we generated 56.7% of our net revenues from our activities in the following countries:

- China (Hong Kong)
- France
- Germany
- Japan
- Norway
- Sweden
- Switzerland
- United Kingdom

**We Develop and Use Sophisticated Technology.** We are recognized by major exchanges as a pioneer in applying information and communication technology to market-making activities worldwide, particularly on electronic exchanges. This recognition provides opportunities for our technical experts to help develop the hardware and software standards that guide the evolving use of computer systems in the equity derivatives and equity securities markets. We are often approached at an early stage by leading exchanges seeking to cooperate in the development of pilot projects. Some of our significant technological accomplishments include:

- 1999 -- First remote access member of the Swiss Stock Exchange

- 1998 -- First remote access member of the Paris Bourse from Germany

- 1998 -- One of a select group of participants in beta testing for LIFFE CONNECT(TM), the electronic trading system of the LIFFE

- 1997 -- Only firm given responsibility by the CBOE for calculating the publicly distributed index option quotes for the Dow Jones Industrial Average, commonly called the DJIA

- 1997 -- First to electronically quote markets on the "E-Mini" S&P 500 Index future on the CME, which is a miniature version of the S&P 500 Index futures contract traded entirely through an electronic system

- 1994 -- First electronic connection to GLOBEX, the 24-hour per day electronic trade matching system run by a joint venture among the Chicago Mercantile Exchange, Reuters and the Marche a Terme Internationale de France, commonly known as MATIF

- 1992 -- Among the first to use wireless handheld computers for options pricing on an exchange trading floor

We believe our future growth and profitability will depend largely on our continued investment in new technology systems and personnel. In order to strengthen our position as a leader in applying technology to market-making activities we will continue to invest significantly in state-of-the-art financial engineering and information and communication technology.

**We Are an Innovator in Financial Engineering and Valuation.** Our financial engineers, many with Ph.D.'s, create our proprietary valuation and portfolio management models. These models allow us to better understand the relationships between derivatives and securities. This understanding increases the efficiency and effectiveness of our market-making activities. Our typical financial engineer has a strong mathematical and technological background and trading experience. Working directly with our traders, our financial engineers are able to continuously refine our existing models and create new models. Each financial engineer's compensation is

40

linked to a particular profit center's risk-adjusted profitability, reinforcing the strong working relationship.

We Have Strong Trading Capabilities. We successfully combine our trading expertise with state-of-the-art technology and quantitative models. We have a trading staff of over 100 people, who implement our proprietary valuation models. Our traders' compensation is based on risk-adjusted return on capital, which creates a financial incentive for our traders to avoid making high-risk trades.

We Have Sophisticated Risk Management Systems. Our risk management systems are central to our success. Our market-making systems immediately incorporate all new trades into each profit center's aggregate portfolio. Our systems allow for real-time risk management and enable us to evaluate current market exposure and make appropriate portfolio management decisions. These decisions must adhere to risk limits that are set by our executive committee and monitored by our risk and capital oversight committee both at the profit center level and firm-wide.

## OUR GROWTH STRATEGY

We intend to enhance our position as a leader in the market-making industry and grow by:

Capitalizing on Growth in Electronic Trading. We believe we are well-positioned to capitalize on the growth in electronic trading. Through the use of advanced information and communication technology, we are able to expand our market-making activities into new electronic markets from an existing trading center, thereby creating economies of scale and avoiding capital expenditures. We intend to use our technology to expand our operations in electronic exchanges, many of which are in foreign markets. We believe the U.S. markets will become increasingly electronic, and we intend to apply our expertise in electronic trading to benefit from this trend.

Continuing to Expand Our Market-Making Activities. We intend to use our ability to successfully combine financial engineering, technology and risk management to expand our market-making activities to include:

- Additional equity-based products in our current geographic markets;

- Equity-based products in new geographic markets; and

- Non-equity based derivatives.

We have demonstrated our ability to adapt our business model to new markets and products, and will continue to expand into new markets and products. For example, we started on the CBOE, and later diversified into other U.S. exchanges including the AMEX, the NYSE, the Pacific Stock Exchange and Nasdaq. We also transported our expertise to equity index options and options on individual equities in eight other countries.

Developing Hull Transaction Services. We intend to expand Hull Transaction Services through investments in technology, further development of models and marketing to become a significant provider of trade routing and order execution services to capitalize on the growth in online trading. We currently execute order flow in over 1,000 issues for our clients, and have agreed to provide these services to several quantitative research institutions and other institutional investors.

41

Expanding Our Asset Management Business. We intend to expand our asset management business to become a significant provider of diversified, risk-controlled products for institutional investors and high net worth individuals. In addition, we are developing new trading strategies and new funds, and intend to expand beyond our current three funds to respond to customer needs.

Attracting, Retaining and Developing Highly Skilled Employees. We intend to continue to aggressively recruit high caliber personnel and retain them through equity-based incentives. The ultimate success of our financial engineering, risk management and market-making functions depends on our ability to continue to develop our professional employee base. As a result, we carefully select, train and retain highly skilled personnel.

## OUR LINES OF BUSINESS

Our lines of business are worldwide market-making activities and asset management. In addition, we have recently expanded our market-making activities through the formation of Hull Transaction Services, which consists of executing and routing orders forwarded to us by online brokers, large retail broker-dealers, money center banks and hedge funds.

### WORLDWIDE MARKET-MAKING ACTIVITIES

We make markets worldwide in equity index derivatives, individual equity options and individual equity securities. Our market-making activities accounted for 93.3% of our 1998 net revenues. The following table summarizes our major market-making activities in 1998:

| | INDUSTRY EQUITY INDEX OPTION VOLUME (IN CONTRACTS) | HULL MARKET SHARE (IN THOUSANDS, | INDUSTRY INDIVIDUAL EQUITY OPTION VOLUME (IN CONTRACTS) EXCEPT PERCENTAGE | HULL MARKET SHARE INFORMATION) | HULL EQUITY SECURITIES VOLUME (IN SHARES) |
|---|---|---|---|---|---|
| United States........ | 80,171 | 6.8% | 325,780 | 0.9% | 2,021,508 |
| Europe.............. | 38,487 | 15.2% | 81,548 | 16.8% | 306,932 |
| Asia................ | 6,039 | 5.4% | 2,083 | 10.7% | 763,022 |

U.S. In 1998, we traded about 28 million equity derivative contracts. We believe we rank among the top three market makers in actively traded U.S. equity index options, including the S&P 500, the Dow Jones Industrial Average and the Russell 2000, where we have historically maintained a 6% to 8% market share. We also make markets in select individual equity options, targeting highly capitalized equities primarily in the high-tech sector. In addition to our market making in equity derivatives, we make markets in individual equity securities to capitalize on market opportunities as they arise. We are active in both the index options and equity options markets, and we use similar valuation models in both. We also actively trade the underlying stocks and index futures. We gather and apply price, volatility and other relevant information between markets on a real-time basis, which improves the efficiency of our market-making activities. We believe our real-time price monitoring and trade execution system allows us to effectively hedge our risk.

In 1998, our automated equity trading system traded more than two billion shares of stock, representing about 1.2% of the volume on the NYSE. This system uses our proprietary valuation models to identify market mispricings and execute trades that seek to profit from these short-lived mispricings.

The following table lists the U.S. index options, individual equity options and individual equity securities which typically are among the greatest volume of our U.S. market-making activity:

| INDEX OPTIONS | INDIVIDUAL EQUITY OPTIONS | INDIVIDUAL EQUITY SECURITIES |
|---|---|---|
| S&P 500 | Microsoft Corp. | Microsoft Corp. |
| S&P 100 | Cisco Systems, Inc. | General Electric Co. |
| DJIA | International Business Machines Corp. | Wal-Mart Stores, Inc. |
| Russell 2000 | Compaq Computer Corp. | Intel Corp. |
| Nasdaq 100 | General Electric Co. | Exxon Corp. |

Europe. In Europe, we operate through two wholly owned subsidiaries, Hull Trading, GmbH (Germany) and Hull Trading UK, Limited (England). Through these subsidiaries, we are active market makers in the index options and all constituent equity options on European exchanges. We also actively trade the underlying stocks and index futures. In Frankfurt, this includes a Eurex membership where we serve as a market maker for both the German and Swiss equity derivatives markets. We are also a direct member of the underlying stock markets for Germany (Xetra) and for Switzerland (SWX). Also in Frankfurt, we are a direct member of the SBF Paris Bourse, where we trade remotely. In London, we are a member of the LIFFE and the London Stock Exchange, and make markets in the Swedish (OMLX) and Norwegian equity derivatives markets. We have captured significant market shares in index and individual equity options, including the German DAX, the U.K. FT-SE, the Swiss SMI and the French CAC 40, that we trade on 11 European exchanges. In some cases, these market shares are as high as 24%.

We believe the evolution of the pan-European market resulting from the EMU, will increase cross-border equity investment and trading activity. We currently make markets in options on the STOXX 50 and the Euro STOXX 50 pan-European equity indexes. We intend to increase the number of products and exchanges in which we make markets in Europe in order to realize the greater economies of scale and additional arbitrage opportunities afforded by the EMU.

The following table lists the European index options, individual equity options and individual equity securities which typically are among the greatest volume of our European market-making activity:

| INDEX OPTIONS | INDIVIDUAL EQUITY OPTIONS | INDIVIDUAL EQUITY SECURITIES |
|---|---|---|
| German Deutscher Aktien Index (DAX) | Daimler Chrysler AG | Daimler Chrysler AG |
| U.K. Financial Times -- Stock Exchange 100 (FT-SE) | BP Amoco plc | BP Amoco plc |
| Swiss Market Index (SMI) | Nestle S.A. | Nestle S.A. |
| Swedish OMX | Nokia Corp. | Nokia Corp. |
| French Compagnie des Agents de Change 40 Index (CAC 40) | France Telecom | France Telecom |
| Euro STOXX 50 | Deutsche Bank | Deutsche Bank |

Asia. In Asia, we operate through our wholly owned Hong Kong subsidiary, Hull Trading Asia, Ltd., as well as through an alliance with Daiwa Securities SB Capital Markets Co. Ltd., a strategic alliance between Daiwa Securities, the second largest securities firm in Japan, and Sumitomo Bank, the second largest bank in Japan. We are active market makers in Hang Seng index options, options on the individual equities underlying the index and exchange-traded stock and index warrants. We have benefited from the automation of the Hong Kong Stock Exchange

43

and expect to realize further advantages when and if the Hong Kong stock index options also become electronic.

Our alliance with Daiwa Securities SB gives us access to the Japanese equity derivatives markets. Under this arrangement, Daiwa Securities SB make markets in Japanese equity index options and futures, individual equity options and individual equities using our proprietary technology. We believe the continued deregulation of the Japanese markets serves as an important growth area for us in the near future.

The following table lists the Asian index options, individual equity options and individual equity securities which typically are among the greatest volume of our Asian market-making activity:

| INDEX OPTIONS | INDIVIDUAL EQUITY OPTIONS | INDIVIDUAL EQUITY SECURITIES |
|---|---|---|
| Nikkei 225 | Sony Corp. | Sony Corp. |
| Nikkei 300 | NTT Data Corp. | NTT Data Corp. |
| Hang Seng 33 | HSBC Holdings | HSBC Holdings |
| Tokyo Stock Price Index | Honda Motor Co. | Honda Motor Co. |
| Hang Seng 100 | China Telecom | China Telecom |

Hull Transaction Services. Hull Transaction Services, which Hull Liquidity Fund, L.P. currently operates, provides customers with transaction execution services by leveraging our existing technology and automated trading systems. We intend to transfer this business to a new subsidiary of Hull. These services include executing and routing orders forwarded to us by online brokers, large retail broker-dealers, money center banks and hedge funds.

Hull Transaction Services has applied its real-time trade execution system and market-making capability to develop a system that allows institutional investors to trade large amounts of equity securities on a single day while being guaranteed the volume-weighted average price, or VWAP, for those securities. VWAP is increasingly being used in our industry to measure the quality of execution services being provided to customers. Therefore, by guaranteeing VWAP, we add value for our customers by increasing their ability to enter and exit the market with minimal market impact.

Hull Transaction Services is exploring opportunities to obtain new avenues for order flow for both equity derivatives and equity securities, which could include payments for order flow. We are rapidly expanding this business into other applications to which we can apply our technology. We will continue to invest in technology, the development of proprietary models and marketing. We currently execute order flow in over 1,000 issues for our clients. In addition, we have agreed to provide execution services to several quantitative research institutions and other institutional investors. Through our automated technology, Hull Transaction Services provides customers with the following benefits:

- improved liquidity;

- faster trade execution;

- competitive spreads; and

- lower transaction costs.

44

## ASSET MANAGEMENT BUSINESS

In addition to our market-making activities, we also manage several private investment funds. We established Hull Equity Management, L.L.C. as our subsidiary to develop private investment funds using our core competencies including financial engineering, model building, trading expertise and electronic trade execution. Our objective is to expand our capacity to provide diversified, risk-controlled products that are quantitatively driven. We provide these alternative investment products for qualified eligible purchasers, which include high net worth individuals, endowments and other institutional investors. Our asset management business accounted for 9.7% of our 1998 net revenues.

Hull Equity Management manages the Hull Liquidity Fund, L.P. and two relatively new funds, Hull Quantitative Fund, L.L.C. and Hull Quantitative Offshore Fund, L.L.C. We have made investments in Hull Liquidity Fund and Hull Quantitative Fund. Each quantitative fund holds its stock positions for an average of 30 days, while the average turnover of the Hull Liquidity Fund is approximately two days.

|  | HULL LIQUIDITY FUND | HULL QUANTITATIVE FUND | HULL QUANTITATIVE OFFSHORE FUND |
|---|---|---|---|
| Inception | January 1994 | July 1998 | January 1999 |
| Assets Under Management as of March 31, 1999 | $61.6 million | $25.5 million | $28.1 million |
| Management Fee | None | Based on assets under management | Based on assets under management |
| Incentive Fee | Based on return in excess of a minimum benchmark | Based on return | Based on return |
| Securities | Equities | Equities | Equities |
| Investment Philosophy | Market-neutral | Market-neutral | Market-neutral |

Hull Liquidity Fund. To develop a trading strategy for this fund, we used technology developed for our market-making business. This fund's system collects real-time trading information electronically and uses it to generate very short-term forecasts of a stock's theoretical value. Our system automatically places an order to buy or sell when the current price and theoretical value are out of line. This system allows this fund to trade the highest capitalized securities in the marketplace, averaging over 20,000 trades per day, and is fully automated. However, the program is continuously monitored and traders can adjust the valuation parameters guiding these trades. This fund is currently closed to new investors. We hold a 1.0% general partnership interest and a 18.3% limited partnership interest in Hull Liquidity Fund.

Our Quantitative Funds. We believe our quantitative funds allow for much greater assets under management than the Hull Liquidity Fund. These funds execute trades entirely through an objective mathematical program, which reduces trading costs and substantially removes human decision making from individual equity trades. The major difference between the Hull Quantitative Fund and the Hull Quantitative Offshore Fund is that the offshore fund serves non-U.S. clients. We have a 13.1% membership interest in Hull Quantitative Fund.

## OUR RISK MANAGEMENT SYSTEM

We have a comprehensive risk management system to monitor, evaluate and manage the aggregate risks inherent in our business, including our European and Asian operations. This system balances our ability to profit from market making with our exposure to potential losses. Our main exposure is equity price risk. Equity price risk results from changes in prices and

45

volatilities of individual equity securities, equity baskets and equity indexes. We seek to manage this risk exposure through diversifying exposures, controlling position sizes and establishing hedges in related securities or derivatives. For example, we may hedge a portfolio of common stock by taking an offsetting position in a related equity index futures contract. Our ability to manage an exposure may, however, be limited by adverse changes in the liquidity of the security or the related hedge instrument and in the correlation of price movements between the security and the related hedge instrument.

We use a number of quantitative tools to manage our exposure to market risk. These proprietary tools include:

- Systems that immediately incorporate all new trades into our aggregate position information;

- Pricing models that provide real-time information regarding our risk profile and hedge management capabilities;

- Risk evaluation models that calculate our value-at-risk, or VaR, under a variety of different assumptions and approximations; and

- Risk management systems that compare the VaR, under these differing scenarios, to predetermined risk limits for each profit center.

We use VaR to measure the potential loss in value of our trading positions due to adverse movements in markets over a defined time horizon within a specified confidence level. We calculate VaR estimates under a variety of market scenarios every day, some of which assume that:

- Asset returns are not normally distributed,

- Substantial shifts in volatility may occur, and

- Substantially larger than normal price changes may occur.

We set targeted limits for the components of VaR and limits for the maximum probable losses in a catastrophic scenario. When establishing catastrophic limits, we take into account the amount of capital used as well as expected profits. Managing these risks is an integral part of trading. RAROC, which we use for profit center bonus pool calculations, is a key measure in determining a trader's or portfolio manager's compensation. We use VaR to calculate risk adjustments in determining RAROC. Because we compensate each individual trader and portfolio manager based on risk-adjusted returns, we give them a financial incentive to operate within our predetermined risk limits.

46

Separation of duties and management oversight are fundamental elements of our risk management process. Our risk management system includes active participation at all levels of the firm, from our executive committee to our trading staff, as the following chart shows:

## RESPONSIBILITIES

[This chart shows the groups at our firm that are part of our risk management system, and describes each group's responsibilities, as further described in the following text.]

Executive Committee. Our executive committee has ultimate responsibility for our overall risk management policies. This committee establishes all risk limits and reviews each profit center's performance. This committee evaluates the risks and opportunities presented by proposed profit centers.

Risk and Capital Oversight Committee. Our risk and capital oversight committee evaluates and recommends trading and risk exposure limits to our executive committee. This committee monitors adherence to these limits on a weekly basis and provides general oversight of the risk management system. In addition, this committee reviews potential exposures based on "what if" scenarios. Our risk and capital oversight committee reports all violations of risk limits to our executive committee.

Risk Department. Our Risk Department monitors our risk exposures on a daily basis and immediately reports all violations of risk limits to our risk and capital oversight committee. The risk department has the authority to implement risk-reducing trades in any profit center worldwide in order to achieve firm-wide compliance with risk limits.

47

# EXHIBIT 27

## COMBINED DECLARATION FOR PATENT APPLICATION AND POWER OF ATTORNEY

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

ATTORNEY DOCKET NO.: 048289-5003

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

### AN AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE

the specification of which:

is attached hereto; or

was filed as United States application Serial No. _____ on _____ and was amended on _____(if applicable); or

was filed as PCT international application Number _____ on _____ and was amended under PCT Article 19 on_____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose to the U.S. Patent and Trademark Office information which is material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal Regulations, §1.56.

I hereby claim foreign priority benefits under Title 35, United States Code, §119(a)-(d) or §365(b) of any foreign application(s) for patent or inventor's certificate or §365(a) of any PCT international application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application(s) for patent or inventor's certificate or any PCT international application(s) designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed:

| PRIOR FOREIGN APPLICATION(S): | | | |
|---|---|---|---|
| COUNTRY (if PCT, indicate PCT) | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED |
| | | | [  ] Yes      [  ] No |
| | | | [  ] Yes      [  ] No |
| | | | [  ] Yes      [  ] No |
| | | | [  ] Yes      [  ] No |

1-WA/1437528.1

Page 1 of 3

Combined Declaration For Patent Application and Power of Attorney - (Continued)
(includes Reference to PCT International Applications)

ATTORNEY DOCKET NO.: 048289-5003

I hereby claim the benefits under Title 35, United States Code §119(e) of any United States provisional application(s) listed below.

U.S. PROVISIONAL APPLICATIONS

| U.S. PROVISIONAL APPLICATION NO. | U.S. FILING DATE |
|---|---|
|  |  |
|  |  |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) or §365(c) of any PCT international application(s) designating the United States of America that is/are listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in that/those prior application(s) in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information known to me to be material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal Regulations, §1.56 which became available between the filing date of the prior application(s) and the national or PCT international filing date of this application:

PRIOR U.S. APPLICATIONS OR PCT INTERNATIONAL APPLICATIONS DESIGNATING THE U.S. FOR BENEFIT:

| U.S. APPLICATIONS | | STATUS (Check One) | | |
|---|---|---|---|---|
| U.S. APPLICATION NO. | U.S. FILING DATE | PATENTED | PENDING | ABANDONED |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**POWER OF ATTORNEY:**  As a named inventor, I hereby appoint the registered practitioners of Morgan, Lewis & Bockius LLP included in the Customer Number provided below to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith, and direct that all correspondence be addressed to that Customer Number.

Customer Number: 009629

Direct Telephone Calls To:
(name and telephone number)

**John D. Zele**
**(202) 467-7418**

Combined Declaration For Patent Application and Power of Attorney - (Continued)
(includes Reference to PCT International Applications)

ATTORNEY DOCKET NO.: 048289-5003

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

| FULL NAME OF SOLE OR FIRST INVENTOR | John M. MARYNOWSKI | |
|---|---|---|
| RESIDENCE & CITIZENSHIP | 3 Bayley Street<br>Flat 4, wc1<br>London<br>UNITED KINGDOM | COUNTRY OF CITIZENSHIP<br><br>USA |
| POST OFFICE ADDRESS | Same as above | |
| FIRST OR SOLE INVENTOR'S SIGNATURE | *John Marynowski* | DATE 12~Jun~00 |
| FULL NAME OF SECOND INVENTOR | Catalin D. VOINESCU | |
| RESIDENCE & CITIZENSHIP | Aleea Sandulesti nr. 2<br>Bl. 0D7 sc. D ap. 182<br>Bucuresti sect. 6<br>ROMANIA | COUNTRY OF CITIZENSHIP<br><br>Romania |
| POST OFFICE ADDRESS | Same as above | |
| SECOND INVENTOR'S SIGNATURE | *signature* | DATE 12 jun 2000 |
| FULL NAME OF THIRD INVENTOR | Stefan PUSCASU | |
| RESIDENCE & CITIZENSHIP | Bd. Victoriei nr. 13,<br>bl. 34 sc. C ap. 29<br>Brasov 2200 BV<br>ROMANIA | COUNTRY OF CITIZENSHIP<br><br>Romania |
| POST OFFICE ADDRESS | Same as above | |
| THIRD INVENTOR'S SIGNATURE | *signature* | DATE July the 7th, 2000 |

Listing of Inventors Continued on attached page(s)    [ ] Yes    [X] No

# EXHIBIT 28

COMBINED DECLARATION FOR PATENT APPLICATION AND POWER OF ATTORNEY

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

ATTORNEY DOCKET NO.:  048289-5002

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

AN AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE

the specification of which:

is attached hereto; or

was filed as United States application Serial No. _____ on _____ and was amended on _____ (if applicable); or

was filed as PCT international application Number _____ on _____ and was amended under PCT Article 19 on_____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose to the U.S. Patent and Trademark Office information which is material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal Regulations, э1.56.

I hereby claim foreign priority benefits under Title 35, United States Code, э119(a)-(d) or э365(b) of any foreign application(s) for patent or inventor's certificate or э365(a) of any PCT international application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application(s) for patent or inventor's certificate or any PCT international application(s) designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed:

PRIOR FOREIGN APPLICATION(S):

| COUNTRY (if PCT, indicate PCT) | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED |
|---|---|---|---|
| | | | [ ] Yes [ ] No |
| | | | [ ] Yes [ ] No |
| | | | [ ] Yes [ ] No |
| | | | [ ] Yes [ ] No |

1-WA/1291071.1

Page 1 of 3

CDV

...ent Application and Power of Attorney - (Co......d)
...r International Applications)
... Ref. No.: 048289-5002

... ...benefits under Title 35, United States Code ɔ119(e) of any United States provisional application(s) listed below.

...SIONAL APPLICATIONS

...SIONAL APPLICATION NO.                    U.S. FILING DATE

...by claim the benefit under Title 35, United States Code, ɔ120 of any United States application(s) or ɔ365(c) of any PCT ...national application(s) designating the United States of America that is/are listed below and, insofar as the subject matter of ...of the claims of this application is not disclosed in that/those prior application(s) in the manner provided by the first paragraph ...f Title 35, United States Code, ɔ112, I acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information ...nown to me to be material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal ...gulations, ɔ1.56 which became available between the filing date of the prior application(s) and the national or PCT international filing date of this application:

PRIOR U.S. APPLICATIONS OR PCT INTERNATIONAL APPLICATIONS DESIGNATING THE U.S. FOR BENEFIT:

| U.S. APPLICATIONS | | STATUS (Check One) | | |
|---|---|---|---|---|
| U.S. APPLICATION NO. | U.S. FILING DATE | PATENTED | PENDING | ABANDONED |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**POWER OF ATTORNEY:** As a named inventor, I hereby appoint the registered practitioners of Morgan, Lewis & Bockius LLP included in the Customer Number provided below to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith, and direct that all correspondence be addressed to that Customer Number.

Customer Number: 009629

Direct Telephone Calls To:
(name and telephone number)

**John D. Zele**
**(202) 467-7418**

1-WA/1291071.1

CD

Declaration For Patent Application and Power of Attorney - (Continued)
(Reference to PCT International Applications)

ATTORNEY DOCKET NO.: 048289-5002

I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

| FULL NAME OF SOLE OR FIRST INVENTOR | John M. MARYNOWSKI | |
|---|---|---|
| RESIDENCE & CITIZENSHIP | 93 Ivyhurst Road Amherst, NY 14226 | COUNTRY OF CITIZENSHIP USA |
| POST OFFICE ADDRESS | Same as above | |
| FIRST OR SOLE INVENTOR'S SIGNATURE | *[signature]* | DATE 05-Oct-99 |
| FULL NAME OF SECOND INVENTOR | Catalin D. VOINESCU | |
| RESIDENCE & CITIZENSHIP | Calea Bucuresti nr. 96 Bl. 206 sc. D ap 43 2200 Brasov, ROMANIA | COUNTRY OF CITIZENSHIP Romania |
| POST OFFICE ADDRESS | Same as above | |
| SECOND INVENTOR'S SIGNATURE | *[signature]* | DATE 07-Oct-1999 |
| FULL NAME OF THIRD INVENTOR | Stefan PUSCASU | |
| RESIDENCE & CITIZENSHIP | Bd. Victoriei 13, bl. 34 sc. C, ap. 29 2200 Brasov ROMANIA | COUNTRY OF CITIZENSHIP Romania |
| POST OFFICE ADDRESS | Same as above | |
| THIRD INVENTOR'S SIGNATURE | Stefan PUSCASU *[signature]* | DATE 4 OCT 1999 |

Listing of Inventors Continued on attached page(s)    [ ] Yes    [X] No

1-WA/1291071.1

Page 3 of 3

CDV

# EXHIBIT 29

PATENT
ATTORNEY DOCKET NO.: 048289-5003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| John M. MARYNOWSKI et al. | ) | Confirmation No.: 8771 |
| | ) | |
| Application No.: 09/618,222 | ) | Group Art Unit: 3624 |
| | ) | |
| Filed: July 18, 2000 | ) | Examiner: Daniel S. Felten |
| | ) | |
| For: AN AUTOMATED TRADING SYSTEM | ) | **Mail Stop Amendment** |
| IN AN ELECTRONIC TRADING | ) | |
| EXCHANGE | ) | |

Commissioner for Patents
U.S. Patent and Trademark Office
**Mail Stop Amendment**
Alexandria, VA 22314

Sir:

## REQUEST TO CORRECT
## INVENTORSHIP UNDER 37 C.F.R. § 1.48(a)

In accordance with 35 U.S.C. § 116 and 37 C.F.R. § 1.48(a), Applicants

respectfully request to correct the inventorship of the above-identified application by

adding the name of Thomas M. O'Donnell as an inventor.

Pursuant to § 1.48(a), the following are filed concurrently herewith:

- a statement from Thomas M. O'Donnell that the error in inventorship

  occurred without deceptive intention on his part;

- a declaration from each inventor as required under 37 C.F.R. § 1.63;

- the processing fee of $130.00 as set forth under 37 C.F.R. § 1.17(i); and

06/29/2006 MBEYENE1 00000044 500310  09618222
01 FC:1464       130.00 DA

1-WA/2588270.1

- a written consent by the assignee, Edge Capture, LLC, to the correction of inventorship.

If there are any other fees due in connection with the filing of this response, please charge the fees to our Deposit Account No. 50-0310.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: _[signature]_ Robert J. Goodall
Reg. No. 41,947
John D. Zele
Reg. No. 39,887

Dated: June 27, 2006

**Customer No. 009629**
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-739-3000

I-WA/2588270.1



PATENT
ATTORNEY DOCKET NO.:  048289-5003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:                )
                                     )
    John M. MARYNOWSKI et al.        )    Confirmation No.:  8771
                                     )
Application No.:  09/618,222         )    Group Art Unit: 3624
                                     )
Filed:  July 18, 2000                )    Examiner:  Daniel S. Felten
                                     )
For:    AN AUTOMATED TRADING SYSTEM  )    **Mail Stop Amendment**
        IN AN ELECTRONIC TRADING     )
        EXCHANGE                     )

Commissioner for Patents
U.S. Patent and Trademark Office
**Mail Stop Amendment**
Alexandria, VA 22314

<u>**INVENTOR'S STATEMENT REGARDING**</u>
<u>**CORRECTION OF INVENTORSHIP UNDER 37 C.F.R. § 1.48(a)(2)**</u>

        I, Thomas M. O'Donnell, am an inventor of the invention set forth in at least one of

the claims of the above-identified application.  My name was erroneously left off the list of

inventors.  I hereby state that the error in inventorship occurred without deceptive intention

on my part.  This statement is being filed for the purpose of filing a Request to Correct

Inventorship Under 37 C.F.R. § 1.48(a).  I hereby request that the error regarding the

inventorship of this application be corrected and I, Thomas M. O'Donnell, be added as an

actual inventor of the above-identified application.

        I further declare that all statements made herein of my own knowledge are true, and

that all statements made on information and belief are believed to be true; and further that

these statements were made with the knowledge that willful false statements and the like so

I-WA/2090133.1

ATTORNEY DOCKET NO. : 048289-5003
Application No.: 09/618,222
Page 2

made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the

United States Code, and that such willful false statements may jeopardize the validity of the

above-referenced application or any patent issuing thereon.

Signature: _Thomas M. O'Donnell_

Typed Name:  Thomas M. O'Donnell

Date:  6/23/06

# EXHIBIT 30

PATENT
ATTORNEY DOCKET NO.: 048289-5002

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| John M. MARYNOWSKI et al. | ) | Confirmation No. 7919 |
| | ) | |
| Application No.: 09/417,774 | ) | Group Art Unit: 3624 |
| | ) | |
| Filed: October 14, 1999 | ) | Examiner: Daniel S. Felten |
| | ) | |
| For: AN AUTOMATED TRADING SYSTEM | ) | Mail Stop 313(c) |
| IN AN ELECTRONIC TRADING | ) | |
| EXCHANGE | ) | |

Commissioner for Patents
U.S. Patent and Trademark Office
**Mail Stop 313(c)**
Alexandria, VA 22314

**RECEIVED**
JUN 2 6 2006
**OFFICE OF PETITIONS**

## INVENTOR'S STATEMENT REGARDING
## CORRECTION OF INVENTORSHIP UNDER 37 C.F.R. § 1.48(a)(2)

I, Thomas M. O'Donnell, am an inventor of the invention set forth in at least one of

the claims of the above-identified application. My name was erroneously left off the list of

inventors. I hereby state that the error in inventorship occurred without deceptive intention

on my part. This statement is being filed for the purpose of filing a Request to Correct

Inventorship Under 37 C.F.R. § 1.48(a). I hereby request that the error regarding the

inventorship of this application be corrected and I, Thomas M. O'Donnell, be added as an

actual inventor of the above-identified application.

I further declare that all statements made herein of my own knowledge are true, and

that all statements made on information and belief are believed to be true; and further that

these statements were made with the knowledge that willful false statements and the like so

1-WA/2090133.1

ATTORNEY DOCKET NO. : 048289-5002
Application No.: 09/417,774
Page 2

made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the

United States Code, and that such willful false statements may jeopardize the validity of the

above-referenced application or any patent issuing thereon.

Signature: _Thoms M. O'Donnell_

Typed Name: _Thomas M. O'Donnell_

Date: _6/23/06_

2

**COMBINED DECLARATION FOR PATENT APPLICATION AND POWER OF ATTORNEY**

U.S. DEPARTMENT OF COMMERCE
  Patent and Trademark Office

| ATTORNEY DOCKET NO.: 048289-5002 |
| --- |

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

**AN AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE**

the specification of which:

is attached hereto; or

was filed as United States application Serial No. 09/417,774 on October 14, 1999 and was amended on ____ (if applicable); or

was filed as PCT international application Number _____ on _____ and was amended under PCT Article 19 on_____ (if applicable).

RECEIVED
JUN 2 6 2006
OFFICE OF PETITIONS

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose to the U.S. Patent and Trademark Office information which is material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal Regulations, §1.56.

I hereby claim foreign priority benefits under Title 35, United States Code, §119(a)-(d) or §365(b) of any foreign application(s) for patent or inventor's certificate or §365(a) of any PCT international application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application(s) for patent or inventor's certificate or any PCT international application(s) designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed:

PRIOR FOREIGN APPLICATION(S):

| COUNTRY (if PCT, indicate PCT) | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED |
| --- | --- | --- | --- |
| | | | [ ] Yes        [ ] No |
| | | | [ ] Yes [ ] No |
| | | | [ ] Yes [ ] No |
| | | | [ ] Yes [ ] No |

1-WA/2586040.1

Combined Declaration For Patent Application and Power of Attorney - (Continued)
(includes Reference to PCT International Applications)
ATTORNEY DOCKET NO.: 048289-5002

I hereby claim the benefits under Title 35, United States Code §119(e) of any United States provisional application(s) listed below.

U.S. PROVISIONAL APPLICATIONS

| U.S. PROVISIONAL APPLICATION NO. | U.S. FILING DATE |
|---|---|
| | |
| | |
| | |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) or §365(c) of any PCT international application(s) designating the United States of America that is/are listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in that/those prior application(s) in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information known to me to be material to the patentability of claims presented in this application in accordance with Title 37, Code of Federal Regulations, §1.56 which became available between the filing date of the prior application(s) and the national or PCT international filing date of this application:

PRIOR U.S. APPLICATIONS OR PCT INTERNATIONAL APPLICATIONS DESIGNATING THE U.S. FOR BENEFIT:

| U.S. APPLICATIONS | | STATUS (Check One) | | |
|---|---|---|---|---|
| U.S. APPLICATION NO. | U.S. FILING DATE | PATENTED | PENDING | ABANDONED |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

POWER OF ATTORNEY: As a named inventor, I hereby appoint the registered practitioners of Morgan, Lewis & Bockius LLP included in the Customer Number provided below to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith, and direct that all correspondence be addressed to that Customer Number.

Customer Number: 009629

Direct Telephone Calls To:

**John D. Zele
(202) 739-5418**

Page 2 of 4

1-WA/2586040.1

Combined Declaration For Patent Application and Power of Attorney - (Continued)
(includes Reference to PCT International Applications)
ATTORNEY DOCKET NO.:  048289-5002

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

| FULL NAME OF SOLE OR FIRST INVENTOR | John M. MARYNOWSKI | |
|---|---|---|
| RESIDENCE & CITIZENSHIP | | COUNTRY OF CITIZENSHIP<br><br>USA |
| POST OFFICE ADDRESS | Same as above | |
| FIRST OR SOLE INVENTOR'S  SIGNATURE | | DATE |
| FULL NAME OF SECOND INVENTOR | Catalin D. VOINESCU | |
| RESIDENCE & CITIZENSHIP | | COUNTRY OF CITIZENSHIP<br><br>Romania |
| POST OFFICE ADDRESS | Same as above | |
| SECOND INVENTOR'S  SIGNATURE | | DATE |
| FULL NAME OF THIRD INVENTOR | Stefan PUSCASU | |
| RESIDENCE & CITIZENSHIP | | COUNTRY OF CITIZENSHIP<br><br>Romania |
| POST OFFICE ADDRESS | Same as above | |
| THIRD INVENTOR'S  SIGNATURE | | DATE |

Listing of Inventors Continued on attached page(s)     [X] Yes     [ ] No

Page 3 of 4

1-WA/2586040.1

| Combined Declaration For Patent Application and Power of Attorney - **(Continued)** (includes Reference to PCT International Applications) ATTORNEY DOCKET NO.: 048289-5002 | | |
|---|---|---|
| **FULL NAME OF FOURTH INVENTOR** | Thomas M. O'DONNELL | |
| **RESIDENCE & CITIZENSHIP** | 1201 South Valley Hill Road Woodstock, IL 60098 | **COUNTRY OF CITIZENSHIP** <br><br> USA |
| **POST OFFICE ADDRESS** | Same as above | |
| **FOURTH INVENTOR'S SIGNATURE** | *Thomas M. O'Donnell* | **DATE** 6/20/06 |

Listing of Inventors Continued on attached page(s)     [ ] Yes     [X] No

1-WA/2586040.1

# EXHIBIT 31

PATENT
ATTORNEY DOCKET NO.: 048289-5002

## STATEMENT CLAIMING SMALL ENTITY STATUS
### 37 C.F.R. §§1.9(f) and 1.27(c)-SMALL BUSINESS CONCERN

Applicant or Patentee:  John M. Marynowski et al.
Application or Patent No.:  To Be Assigned
Filed or Issued:  Herewith
Title:  AN AUTOMATED TRADING SYSTEM IN AN ELECTRONIC TRADING EXCHANGE

I hereby state that I am
    [ ]    the owner of the small business concern identified below:
    [X]    an official of the small business concern empowered to act on behalf of the concern identified below:

| NAME OF CONCERN: | International Specialists, Inc. |
| --- | --- |
| ADDRESS OF CONCERN: | 440 S. LaSalle Street, Suite 2500 |
| | Chicago, IL  60605 |

I hereby state that the above identified small business concern qualifies as a small business concern as defined in 13 C.F.R. §121, and reproduced in 37 C.F.R. §1.9(d), for purposes of paying reduced fees to the United States Patent and Trademark Office, in that the number of employees of the concern, including those of its affiliates, does not exceed 500 persons.  For purposes of this statement, (1) the number of employees of the business concern is the average over the previous fiscal year of the concern of the persons employed on a full-time, part-time or temporary basis during each of the pay periods of the fiscal year, and (2) concerns are affiliates of each other when either, directly or indirectly, one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both.

I hereby state that rights under contract or law have been conveyed to and remain with the small business concern identified above with regard to the invention, entitled   AN AUTOMATED TRADING SYSTEM IN AN  ELECTRONIC   TRADING EXCHANGE

described in:
    [X]    the specification filed herewith with the title as listed above.
    [ ]    the application identified above.
    [ ]    the patent identified above.

If the rights held by the above identified small business concern are not exclusive, each individual, concern or organization having rights in the invention is listed below and no rights to the invention are held by any person, other than the inventor, who would not qualify as an independent inventor under 37 C.F.R. §1.9(c) if that person made the invention, or by any concern which would not qualify as a small business concern under 37 C.F.R. §1.9(d) or a nonprofit organization under 37 C.F.R. §1.9(e).

| NAME: | | |
| --- | --- | --- |
| ADDRESS: | | |
| [ ] INDIVIDUAL | [ ] SMALL BUSINESS CONCERN | [ ] NON PROFIT ORGANIZATION |
| NAME: | | |
| ADDRESS: | | |
| [ ] INDIVIDUAL | [ ] SMALL BUSINESS CONCERN | [ ] NON PROFIT ORGANIZATION |

1-WA/12911001

(1/98)

ATTORNEY DOCKET NO.: 048289-5002
Application No.: To Be Assigned
Page 2

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small business entity is no longer appropriate. (37 C.F.R. §1.28(b)).

| NAME OF PERSON SIGNING: | Thomas M. O'Donnell |
| TITLE OF PERSON IF OTHER THAN OWNER: | PRESIDENT |
| ADDRESS OF PERSON SIGNING: | 440 S. LaSalle Street, Ste. 2500 |
|  | Chicago, IL 60605 |

SIGNATURE _Thomas M. O'Donnell_    DATE _10/13/99_

1-WA/1291100.1

(1/98)

# EXHIBIT 32



Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

**H**Izzo Golf, Inc. v. King Par Golf Inc.
W.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
IZZO GOLF, INC., f/k/a Dancorp Investors, Inc.,
Plaintiff,
v.
KING PAR GOLF INCORPORATED, d/b/a Knight
Golf Company, Defendant.
**No. 02-CV-6012T.**

July 5, 2007.

Neal L. Slifkin, Paul J. Yesawich, III, Harris Beach
Llp, Pittsford, NY, for Plaintiff.
Andrew Peter Zappia, Kristen Mollnow Walsh, Nixon
Peabody Llp, Rochester, NY, Marshall G. Macfarlane,
Young & Basile, P.C., Ann Arbor, MI, for
Defendants.
Michael R. Wolford, Wolford & Leclair Llp,
Rochester, NY, James D. Kole, Sidley Austin Brown
& Wood Llp, Chicago, IL, for Counter
Defendants/Counter Claimant.
Neal L. Slifkin, Harris Beach Llp, Pittsford, NY, for
Counter Defendants.

**DECISION and ORDER**

MICHAEL A. TELESCA, United States District
Judge.

***INTRODUCTION***

**\*1** Plaintiff Izzo Golf, Inc., ("Izzo") brings this action
pursuant to federal patent law, (codified at 35 U.S.C. §
100 et. seq.), claiming that defendant King Par Golf,
Incorporated ("King Par") has infringed Izzo's United
States Patent No. 5,042,704 (filed March 23, 1990)
(hereinafter "the '704 patent"), by manufacturing and
selling golf bags with straps for carrying the bags that
infringe upon claims 1, 2, 7, 8, 11 and 14 of the ' 704
patent. The '704 patent, entitled "Dual Strap Carrying
System for Golf Bags" generally discloses a strap
designed to evenly distribute the weight of a golf bag
across both shoulders of the person carrying the bag.
The strap system can also be used to carry a golf bag
across only one shoulder.

On November 30, 2005, a hearing was held by the
Honorable Charles J. Siragusa of this court pursuant to
*Markman v. Westview Instruments, Inc.,* 517 U.S. 370,
372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) for the
purpose of construing the disputed claims of the '704
patent.[FN1] In a Decision and Order dated July 26, 2006,
Judge Siragusa construed the meaning of the disputed
claim terms found in Claims 1, 2, 7, 8, 11, and 14 of
the '704 patent.

> FN1. By Order dated May 10, 2007, the
> above titled action was transferred to this
> Court.

King Par now moves for summary judgment on the
issues of infringement and validity of the patent
claiming that there are no material issues of fact in
dispute, and that as a matter of law, its golf bags do not
infringe upon any of the claims of the '704 patent, and
that Claim 14 of the '704 patent is invalid. For the
reasons set forth below, I grant-in part and deny
in-part defendant's motion for summary judgment on
the issue of infringement, and deny without
prejudice defendant's motion for summary judgment on
the issue of the validity of Claim 14 of the '704 patent.

***BACKGROUND***

I. *The Patented Invention*

United States Patent 5,042,704 discloses a dual strap
carrying system for golf bags. The crux of the
invention is the utilization of two straps to carry the
bag across both shoulders, rather than the use of a
single strap (as traditionally found on golf bags) to
carry the bag over a single shoulder. By carrying the
bag across both shoulders instead of one, the weight of
the bag is more evenly distributed across the entire
back of the person carrying the bag, and the person
carrying the bag experiences less strain and muscle
fatigue which typically occurs when the entire weight
of the bag is imbalanced, and borne by only one
shoulder. As stated in the background section of the
patent:

A disadvantage to [the single strap] system ... results

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from the fact that the entire weight of the golf clubs and ba[g] ... strains the muscles of the neck and shoulders unduly and further causes muscular strain resulting from the imbalanced nature of this method of carriage. Indeed, the imbalance can cause associated muscle soreness in the hips and the lower back due to the fact that the center of gravity of the bag is offset with respect to the spine. This is of particular concern to those golfers who experience back problems.

**\*2** '704 Patent at col. 2, lns. 3-15.

Although the strap disclosed in the '704 Patent is designed to be used for carrying a bag over both shoulders, a feature of the invention is that because of its design, it can also be utilized to carry the bag over a single shoulder if the user prefers to carry his or her bags in the more traditional method. ' 704 Patent at col. 2, lns. 43-45. Another important feature of the strap is that because of its design, it can be retro-fitted to work

with existing, traditional golf bags. '704 Patent at col. 2, lns. 32-36.

II. *The Accused Products*

There are two types of bags manufactured by the defendant that are in dispute. The parties have referred to the bags as the "new-style bags" and the "old-style bags." Illustration 1 below depicts the new-style bag, and Illustration 2 depicts the old-style bag. As can be seen from the illustrations, the new-style bag utilizes a dual-strap that is attached at four locations, two near the open-end of the bag, and two below the handle. The old style bag also contains four attachment points: one of which is near the open-end of the bag, one at the top of the handle, another at the bottom of the handle, and the final attachment point below the handle.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

KING FAR NEW STYLE BAG



Illustration 1

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 4
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**



Illustration 2

Plaintiff objects that the above illustrations, which were requested from the defendant by the court following briefing of the motion and argument of the motion before Judge Siragusa, on grounds that the perspective chosen for the drawings obscures some of the attachment locations, and that the drawings do not accurately depict how those attachment points can be aligned along an axis. I find, however, that the renderings are fair and accurate depictions of the new and old-style bags.

III. *The Asserted Claims of the '704 Patent and Construction of the disputed claim terms.*

A. *The Asserted Claims*

Izzo contends that King Par is infringing three independent claims of the ' 704 patent: Claims 1, 8, and 14. Claim 1 of the '704 discloses:

In a golf bag adapted to receive a set of golf clubs which each have a club head and an elongated shaft, said golf bag being in the form of an elongated tube including a surrounding sidewall, a closed end and an open end whereby the shafts of said golf clubs may be longitudinally inserted into said golf bag through the open end so that said golf clubs are stored in a position with the club heads projecting out of said golf bag proximate the open end, the improvement comprising a strap assembly adapted to permit a person to carry said golf bag on either or both shoulders, said strap assembly including a single strap comprising a first

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
(Cite as: 2007 WL 1987789 (W.D.N.Y.))

strap portion including a first central pad, a first strap portion first end attached on one end of said first central pad and a first strap portion second end attached on another end of said first central pad whereby said first strap portion has a first strap first end secured to said golf bag at a first location proximate said open end and a first strap portion second end secured to said golf bag at a second location axially spaced from the first location so that said first strap portion defines a first strap portion opening, and including a second strap portion including a second central pad, a second strap portion first end attached on one end of said second central pad and a second strap portion second end attached on another end of said second central pad whereby said second strap portion has a second strap portion first end secured to said golf bag proximate the second location and having a second strap portion second end secured to said golf bag at a third location axially spaced from the second location between the second location and said closed end to define a second strap portion opening, said first and second strap portions being sized so that one arm of the person can be inserted through the first strap portion opening and another arm of the person can be inserted through the second strap portion opening whereby said golf bag may be supported by said first strap portion extending across one shoulder of the person and by said second strap portion extending across another shoulder of the person.

**\*3** While at first glance the language of Claim 1 may appear unduly cumbersome, the claim, in its most basic terms, discloses a dual strap system for carrying a golf bag in which either one or both straps can be used to carry the bag over either shoulder or both shoulders of the person carrying the bag. As will be discussed further below, the claim also contains a number of limitations defining the scope of the dual strap system.

Claim 8 of the '407 patent discloses:

A golf bag adapted to receive a set of golf clubs for transport by a person, comprising:

an elongated tubular body having a longitudinal axis and including a surrounding sidewall, a closed end and an open end such that golf clubs may be inserted into said tubular body through said open end;

a shoulder strap assembly including first and second shoulder strap elements, said first strap element having a first strap end portion and a first strap element free end opposite said first strap end portion and said second strap element having a second strap element end portion and a second strap element free end opposite said first end portion;

first mounting means on said golf bag at a first location, said first mounting means connected to said first strap element free end for securing said first strap free end to said golf bag at the first location;

second mounting means on said golf bag at a second location axially spaced from the first location, said second mounting means connected to said first and second strap end portions for securing said end portions to said golf bag at the second location;

third mounting means on said golf bag at a third location axially spaced from the second location between the second location and said closed end wherein, said third mounting means secures said second strap element free end to said golf bag at the third location; and

said first and second shoulder strap elements sized to form first and second strap openings respectively when secured whereby the person may selectively carry said golf bag across one shoulder with only said first strap element and selectively carry said golf bag with both shoulders in a fully supported state by inserting his/her arms respectively through the first and second strap openings so that said golf bag is suspended from and supported by both shoulders with said golf bag oriented transversely across the back of the person.

Finally, Claim 14 of the '704 patent discloses:

In a golf bag to be carried by a person, a golf bag having an elongated enclosure including a surrounding sidewall, a closed end and an open end whereby golf clubs may be inserted lengthwise into said golf bag through the open end, the improvement comprising:

a shoulder strap assembly disposed externally of said sidewall including first and second strap members, each of said strap members having opposite ends;

Slip Copy                                                                                                    Page 6
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

first and second securing means for securing each of said opposite ends of said first strap member to longitudinally spaced locations on said sidewall including a first location proximate said open end and a second location longitudinally spaced from said first location whereby said first strap member defines a first strap opening through which one arm of the person can be inserted; and

**\*4** third and fourth securing means for securing each of said opposite ends of said second strap member to longitudinally spaced locations on said sidewall to define a second strap opening that another arm of the person can be inserted through said second strap opening whereby said golf bag can be selectively supported on one shoulder by said first strap member to incline downwardly across the back of the person carrying said golf bag and can be selectively supported on both shoulders by said first and second strap members with said golf bag extending transversely across the back of the person carrying said golf bag.

B. *Construction of the Disputed Terms of the '704 Patent.*

Pursuant to *Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)*( "*Markman*" ), the parties requested that the court construe the disputed claim terms of the asserted claims. On November 30, 2005, the Honorable Charles Siragusa held a *Markman* hearing at which the parties set forth their respective positions as to how the claim terms at issue should be construed, and thereafter, on July 26, 2006, Judge Siragusa issued a Decision and Order construing the disputed claim terms (hereinafter "the *Markman* Ruling").

With respect to the disputed term "end" or "strap end," Judge Siragusa defined that term as "the point where one designated section of strap ends and another begins."*Markman* Ruling at pp. 13-14.A strap end need not be affixed directly to the golf bag. *Id.* The term "secured to said golf bag" was defined by Judge Siragusa as meaning that "a strap end is attached to the outer surface of the golf bag by a securing means."*Markman* Ruling at p. 15.According to Judge Siragusa's construction, a "securing means" is "any means used to secure a strap to a golf bag disclosed in the specification, i.e., rings, clips, straps, and any equivalents thereof."*Markman* Ruling at p. 14.A

"strap opening" is defined as "an opening for the arm of a user, formed by a section of strap as it extends from one securing point to another."*Markman* Ruling at p. 15.According to Judge Siragusa's construction, a "securing means" is "any means used to secure a strap to a golf bag disclosed in the specification, i.e., rings, clips, straps, and any equivalents thereof."*Markman* Ruling at p. 14.A "strap opening" is defined as "an opening for the arm of a user, formed by a section of strap as it extends from one securing point to another."*Markman* Ruling at p. 15.

Two additional terms were construed by Judge Siragusa in his *Markman* Ruling. Judge Siragusa defined the term "axially spaced" as referring to objects that are "located on, or around, or in the direction of an axis."*Markman* Ruling at p. 11.In so holding, Judge Siragusa specifically explained that the term "axially spaced" does not apply to "attachment points that are permanently circumferentially offset, such that they are incapable of being axially aligned."*Markman* Ruling at p. 12.Judge Siragusa further held that the term "longitudinally spaced" attachment points, as used in Claim 14, had a meaning distinct from the term "axially spaced" attachment points, and referred to attachment points that are "spaced lengthwise along the golf bag, without regard to being positioned in relation to an axis."*Markman* Ruling at p. 13.

### DISCUSSION

I. *Defendant's Motion for Summary Judgment*

**\*5** Based on the court's construction of the disputed Claims of the '704 patent, King Par moves for summary judgment on grounds that its golf bags and straps do not infringe the '704 patent, and that Claim 14 of the '704 Patent is invalid. Although normally the question of whether or not a product infringes on a patent is a question of fact to be determined by the trier of fact, where there are no relevant facts in dispute, the question of literal infringement collapses into one of claim construction, "and is thus amenable to summary judgment."*Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed.Cir.1996).See also Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)* (summary judgment also appropriate on issue of infringement under the doctrine of equivalents).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 7
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

Izzo opposes defendant's motion and argues, *inter alia*, that because every element of the applicable disputed claims is present in the accused devices, the King Par bags infringe the '704 patent. Izzo also contends that defendant's motion must be denied because defendant has failed to support its motion with admissible evidence upon which a motion for summary judgment could be granted. In support of this contention, plaintiff argues that King Par: (1) has failed to submit expert testimony on the issue of infringement; (2) has submitted unauthenticated exemplars of purported King Par bags preventing the court from comparing the accused King Par bags to the '704 Patent; and (3) relies on attorney affidavits in violation of Rule 56(e) of the Federal Rules of Civil Procedure which provides that affidavits in support of or opposition to a motion for summary judgment must be made on personal knowledge.

I find however, that defendant's motion is adequately supported by admissible evidence, and does not unduly rely on attorney affidavits. Defendant has submitted actual golf bags to the court representing the accused products. Plaintiff has had an opportunity to inspect these bags and object to them as not being representative of the accused bags, and no such objection has been made. Further, plaintiff has not objected that the bags submitted to the court do not represent all of the accused products. Accordingly, I find that the bags submitted to the court constitute admissible evidence, and are accurate and complete examples of the accused King Par products.

Moreover, I find that defendant is not required to submit expert testimony on the issue of infringement in this case. While expert testimony may be particularly useful to the court for purposes of determining the meaning of disputed claims, the state of the art in the field of the invention, and the level of ordinary skill in a particular art, in cases where the art at issue is not highly technical, the Federal Circuit Court of Appeals has "never *required* a party to proffer expert testimony on claim interpretation or on the application of claim language to accused devices."*Moleculon Research Corporation v. CBS, INC.,* 793 F.2d 1261, 1270 (Fed.Cir.1986) (emphasis in the original) (dismissing argument that expert testimony was necessary to determine infringement issues with respect to the popular "Rubik's Cube" puzzle game as "border[ing] on the frivolous.")

II. *The "New Style" King Par Golf Bag does not infringe the '704 patent.*

**\*6** Generally, an accused product will be found to infringe upon a patent if "each properly construed claim element reads on the accused product or process."Herbert F. Schwartz, *Patent Law and Practice* 167 (5th ed.2006). If a claim is expressed in means-plus-function language, literal infringement occurs "only when the accused product (a) employs means identical to the means disclosed in the patent's specification to perform the identical function of the claim or element or (b) employs means that is the structural equivalent to the means disclosed in the patent's specification to perform the identical function of the claim element ."Schwartz, *Patent Law and Practice* at 168 (citing *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,* 389 F.3d 1370, 1376, (Fed.Cir.2004)).

In cases where an accused product does not literally infringe upon a patent claim, infringement may still be found under the doctrine of equivalents. "An accused product that does not literally infringe a claim may infringe under the doctrine of equivalents if 'it performs substantially the same function in substantially the same way to obtain the same result.' " *Southwall Technologies v. Cardinal IG Co.,* 54 F.3d 1570, 1579 (quoting *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).

In the instant case, plaintiff contend that the defendant's new-style bag infringes the '704 patent both literally and under the doctrine of equivalents. I find, however, that the new-style bag lacks several key elements of the '704 patent, and therefore does not infringe any claims of the ' 704 patent.

A. *Claim 1 of the '704 Patent*

Based on Judge Siragusa's claim construction, Claim 1 of the '704 Patent requires a strap assembly comprised of two strap portions. The first strap portion is comprised of three elements: a central pad and two strap ends. The first of the three elements is a "central pad." Attached to one end of the central pad is a strap end known as the "first end" of the strap portion. Attached to the opposite end of the central pad is a strap end known as the "second end" of the first strap portion. The first end of the first strap portion is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

secured to the golf bag at a location near the open end of the bag, and the second end of the first strap portion is secured to the bag at a second location that is "axially spaced" from the first location. The strap portion, as attached, defines a "strap opening" through which a user's arm can extend, and the strap and pad can be rested upon the users shoulder.

Similar to the first strap portion, the second strap portion is comprised of three elements: a central pad and two strap ends. Just as with the first strap portion, attached to the central pad of the second strap portion is a strap end known as the "first end" of the second strap portion. Attached to the opposite end of the central pad is a strap end known as the "second end" of the second strap portion. The first end of the second strap portion is attached to the golf bag at a location that must be "proximate" the second attachment location. The second end of the second strap portion is secured to the bag at a third location that is "axially spaced" from the second location, between the second location and the closed end of the bag. The second strap portion, as attached, defines a second "strap opening" through which a user's arm can extend, and the strap and pad can be rested upon a user's shoulder.

**\*7** Because the drafters of the '704 patent choose to use similar-sounding terms for different elements of the disclosed invention (i.e. "first strap portion first end, first strap portion second end, second strap portion first end, second strap portion second end), the patent claims can, at first glance, appear confusing. For purposes of clarity, I shall refer to the "first strap portion, first end" as used in the '704 Patent and as found in the King Par bags as "End A." The first strap portion, second end shall be referred to as "End B." The second strap portion, first end, shall be referred to as "End C," and the second strap portion, second end, shall be referred to as "End D."

As can be seen from Illustration 3 below, (which is taken from Figure 2 of the '704 Patent), each strap has two ends. Although Ends A and B are not labeled in Figure 2, Ends C and D are labeled as Items 54 and 56 respectively. Item no. 54 in Figure 2 of the '704 Patent is described as the "second end ... of [the] first strap." '704 Patent at c. 6, l. 10. Item no. 56 is described as the "first end" of the second strap." '704 Patent at c. 6, lns 13-14.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**



As can be seen in Illustration 4 below, (which is taken from Figures 3 and 4 of the '704 Patent), Ends A and B are depicted in Figures 3 and 4 as items 52 and 58 respectively. Figure 3 is a side view of the top portion of the golf bag, and Figure 4 is a side view of the mid-portion of the bag. Item no. 52 in Figure 3 of the '704 Patent is described as the "first strap first end." '704 Patent at c. 6, lns. 7-8. Item no. 58 is described as the "second end" of the "second Strap." '704 Patent at c. 6, lns. 15-16. Figure 3 of the '704 Patent also depicts Ends B and C, which are labeled as items 54 and 56 respectively.

Slip Copy

Slip Copy, 2007 WL 1987789 (W.D.N.Y.)

**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

Page 10



Illustration 4

The accused King Par new-style bag does not infringe upon Claim 1 of the '704 patent because the new-style bag does not employ a "first strap portion second end [End B] secured to said golf bag at a second location that is axially spaced from the first location" as required by Claim 1, and also does not employ a "second strap portion first end [End C] secured to said golf bag proximate the second [attachment] location and having a second strap portion second end [End D]

secured to said golf bag at a third location axially spaced from the second [attachment] location between the second location and said closed end [of the golf bag] ..." '704 patent at cl. 15, lns. 23-25, 31-37. Instead, the new-style King Par bag: (1) utilizes a "first strap portion second end" (End B) that is attached to the bag in a location that is *not axially spaced from the attachment point for End A* and (2) utilizes a "second strap portion first end" (End C) that is secured to the golf bag in a location that *is not proximate the second*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 11
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
(Cite as: 2007 WL 1987789 (W.D.N.Y.))

*attachment location.*

1. *The attachment point of End B of the King Par new-style bag is not axially spaced from the attachment point for End A*

**\*8** As shown in illustration 5, the new-style King Par Bag utilizes four attachment points to attach the four ends of the two straps to the golf bag.



Illustration 5

The first end of the first strap (End A) is attached to the bag near the open end of the bag. The second end of the first strap (End B) is also attached to the bag near the open end of the bag on a horizontal plane. Because End B is attached in a location that is the same distance vertically from the open end of the bag as End A, End B is horizontally spaced from End A-not "axially spaced" as required by the '704 patent. This is true because the patent discloses that the "axis" upon which the second attachment location must lie is a vertical axis, not a horizontal axis. As stated in the specification, "the invention ... broadly includes a pair of straps which are connected to and oriented *longitudinally along a golf bag to define an attachment axis."* '704 Patent at Cl. 5, lns 37-41. Because Ends A and B of the new-style King Par bag do not lie along a vertical or longitudinal axis, the King Par bag does not practice the requirement of

Claim 1 of the '704 patent that the attachment points of the first strap first end and first strap second end be "axially spaced."

2. *The Attachment point of End C of the King Par new-style bag is not proximate the attachment point of End B*

The new-style King Par bag utilizes four attachment points to secure the ends of the two carrying straps. As seen in Illustration 5, the ends of the first strap are attached near the open end of the bag along a horizontal plane. The ends of the second strap, Ends C and D, are attached approximately mid-way between the open and closed ends of the bag, below the bag's handle. As a result of this configuration, the first end of the second strap (End C) is attached at a location that is farther away than any other attachment point from the attachment point for the second end of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 12
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

first strap (End B). Accordingly, the attachment point of End C is not proximate the attachment point of End B, and therefore does not practice the requirement of the '704 patent that the first end of the second strap portion be near the second attachment point. Indeed, Ends B and C could not be attached at locations any more distant from each other. I therefore find that the new-style King Par bag does not utilize a second strap portion first end that is secured to the golf bag proximate the second attachment location.

Plaintiff contends that the attachment points of the King Par bag are capable of being aligned along an axis because the attachment points are not the locations where the straps are secured to the sidewall of the bag, but instead are the points where the strap is connected to the pad. Plaintiff argues that when the attachment points are considered to be the points where the straps are connected to the pad-and not the bag, the attachment points are capable of being aligned on an axis, and axially spaced. This characterization of the attachment points, however, has no basis in the '704 Patent itself, but instead appears to be a post hoc argument made to conform plaintiff's infringement allegations with Judge Siragusa's *Markman* Ruling.

**\*9** The attachment axis that is required by Claims 1 and 8 of the '704 Patent is a longitudinal axis that exists along the outer edge of the golf bag and which is defined by the attachment locations. '704 Patent at cl. 6, lns 19-20. As can be seen in Illustration 3 above the attachment axis (marked with the letter "A") is clearly depicted in the Figure 2 of the '704 Patent, and is a fixed line along the bag that serves as a reference point for the location of other features of the bag.[FN2]For example, the '704 Patent describes a pillow feature that is circumferentially offset 90 degrees from the attachment axis. '704 Patent at cl. 3 lns 59-61. Additionally, a wedge-shaped structure that is used to prevent clubs from slipping out of the bag is attached in the open end of the bag "diametrically opposite axis A". '704 Patent at cl. 6, lns 20-24. Slits in the covering of the bag are circumferentially offset from the attachment axis. '704 Patent at cl. 6, lns 53-55.

> **FN2.** While the attachment points themselves need not be fixed (as in the case of the preferred embodiment in which attachment points of the strap are tethered to mounting device on the bag, the axis line is fixed along

the spine of the bag.

If the attachment axis were, as plaintiff claims, above the bag at the location where the straps meet that pad, then the axis line would not be in a fixed location, but instead would be constantly changing depending on how the straps were held, and indeed, would vanish when the bag is in use-as it would be impossible to align the attachment points on any single axis. Nowhere in the '704 patent is it suggested that the axis line exists in a varying location somewhere above the bag, and is capable of vanishing when the strap is used as intended. Indeed if the axis line did reside above the bag in an unspecified location that is subject to change with every movement of the straps, then the location of those parts of the bag (such as the pillow, the wedge-shaped structure preventing clubs from falling out of the bag, and the slits in the covering) that are located with reference to the axis line, could not be reliably determined.

Further, the contention that a strap end is located where the strap meets the pad is without support in the '704 Patent. Plaintiff attempts to characterize the cushioned pad of the King Par bag as constituting the two straps disclosed in the '704 Patent, and contends that the straps emanating from the pads of the King Par bag are "securing means" rather than strap ends. Such a characterization, however, is at odds with the teachings of the '704 Patent.

Claim 1 of the '704 patent teaches that a "strap" *includes* a central pad. ' 704 Patent at cl. 15 lns 16-18. According to the Claim, a single strap is comprised of "a first strap portion *including* a first central pad ...." *Id.* (emphasis added) The Claim further states that the first end of the first strap portion is "attached on one end of said first central pad, and a first strap portion second end [is] attached on another end of said first central pad .... " *Id.* lns. 18-21. Thus according to the plain language of Claim 1, a strap is *comprised* of two ends that are attached to a central pad. Further, it is these strap ends that themselves are secured (via a securing means that may include clips, hooks or straps) to the golf bag at specified locations. *Id.* at lns. 22-25.

**\*10** Because the patent requires that the pad have strap ends attached to it, and because the patent specifies that the pad is merely one component of an entire strap, plaintiff's characterization of the pad of the King Par new style bag as constituting the entire strap is without

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 13
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

basis. Such a reading ignores the definition of a strap as set forth in the Patent.

Additionally, pursuant to the teachings of the '704 patent, each strap of the strap system defines a strap opening through which a user may insert his arm and hoist the bag across his or her shoulder for carrying. Yet under plaintiff's characterization of the pad as comprising the whole of the strap, there is no such functional strap opening. Further, because the patent does not disclose a strap opening that is defined by the strap ends in combination with the securing means, only the strap itself may be considered when determining the strap opening. *See e.g.* '704 Patent at c. 7, lns. 19-35 (the "first strap ... is secured at a first location proximate the open end ... of [the] golf bag ... and at a second location longitudinally spaced from the first location so *that [the] first strap ... defines a first strap opening ... sized to accommodate one of the shoulders of a person who seeks to carrying [sic] [the] golf bag*....") Because plaintiff's characterization of the pad as a strap does not account for the requirement that the strap define a strap opening, I decline to consider the pad to be the entire strap.

B. *Claim 8 of the '704 Patent*

Like Claim 1 of the '704 patent, Claim 8 of the '704 patent claims a dual strap system for carrying a golf bag. Claim 8, however, uses slightly different language in describing the straps. Whereas Claim 1 referred to each strap as a "strap portion," Claim 8 refers to the straps as "strap elements." ' '704 Patent c. 16, lns. 16-17. Moreover, whereas Claim 1 referred to each strap portion as having a first and second end, Claim 8 refers to each strap element as having an "end portion" and "free end." '704 Patent c. 16, lns. 17-22.

Despite the difference in nomenclature, Claim 8, like Claim 1, requires that the four ends of the strap elements be attached to the golf bag in a specific manner. Accordingly, the four ends can continue to be referred to as Ends A, B, C, and D. As used in Claim 8, the "first strap element free end" corresponds to End A. The "first strap end portion" corresponds to End B. The "second strap end portion" corresponds to End C, and the second strap element free end refers to End D.

In accordance with Judge Siragusa's claim construction, Claim 8 of the '704 patent requires the use of a first mounting means for mounting the first

strap element free end (End A) to the golf bag at an unspecified location. Unlike Claim 1, Claim 8 does not require that End A be secured to the bag at a location proximate the open end of the bag. A second mounting means is attached to the bag at a location that is axially spaced from the first location. The first strap end (End B) and second strap end (End C) are attached to the second mounting means. Finally, a third mounting means is attached to the bag at a position that is located between the attachment location for the second mounting means and the closed end of the bag, and is axially spaced from the second attachment location. The second strap element free end (End D) is attached to the third mounting area.

**\*11** For the reasons set forth below, I find that the King Par new-style bag does not practice three elements of Claim 8 of the '704 patent. First, unlike the requirement of Claim 8 that the ends of the first and second straps be attached to a second mounting means, the King Par new-style bag does not utilize any single mounting means to which the ends of the first and second straps are attached. Second, the new-style bag does not utilize a second mounting means that is axially spaced from the first mounting means as required by Claim 8 of the '704 Patent. Finally, the new-style bag employs four mounting means instead of the three mounting means as required by Claim 8.

1. *The new-style King Par bag does not utilize a second mounting means to which first and second strap ends are attached.*

Claim 8 of the '704 patent requires that Ends B and C be connected to a second mounting means. The new-style King Par bag, however, does not utilize any single mounting means to which two strap ends are attached. Rather, all four strap ends are connected to separate mounting means. Accordingly, the new-style King Par bag does not practice the claim that strap ends B and C be attached to a second mounting means.

Even if the court were to consider the two lower mounting means (to which strap ends C and D are attached) of the new-style King Par bag as a *single* mounting means, the King Par bag does not practice the claim disclosed in Claim 8 because according to that Claim, the end portions of the first and second straps (Ends B and C) must be attached to the second mounting means. In the King Par bag, however, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 14
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

two ends of the second strap (Ends C and D) are attached to the lower mounting means. See Illustration 5 above. Accordingly, even if the lower mounting means were considered to be a single mounting means (which it is not) the King Par bag still doesn't infringe because only the ends of the second strap are attached: not the ends of the first and second strap as set forth in Claim 8.

2. *The new-style King Par Bag does not utilize a second mounting means that is axially spaced from the first mounting means.*

Because the new-style King Par bag does not utilize a second mounting means to which strap ends B and C are attached, the new-style bag does not practice the claim limitation that the second mounting means be axially spaced between the first mounting means and the closed end of the bag. Because the King Par bag uses two separate locations for the attachment of Ends B and C to the bag, there are two possible locations that could be considered the location of the second mounting means on the new-style King Par bag. End B is attached at a location that is horizontally spaced from the attachment point of End A. End C is attached between the End A and the closed end of the bag, but is longitudinally spaced from End A-not axially spaced as required by Claim 8.

Although End C is attached at a location that is between End A and the closed end of the bag, because the attachment points for Ends A and C are permanently affixed to the bag, and because they are on opposite sides of the central axis line that bisects the bag, those attachment points are not axially spaced. As stated by Judge Siragusa in his *Markman* ruling, the term "axially spaced" does "not apply to attachment points that are permanently circumferentially offset, such that they are incapable of being axially aligned."*Markman* Ruling at p. 12.In so holding, Judge Siragusa distinguished between attachment points that were attached in a fixed location to the bag (such as the attachment points of the King Par new-style bag, and attachment points (as disclosed in the '704 Patent) that are tethered along a horizontal axis, rendering the attachment points moveable, and when positioned correctly, capable of coming into axial alignment with other attachment points. Because the new-style King Par bags do not utilize attachment points to which the ends of the two straps are tethered, and because the attachment points

of Ends A and C are not axially aligned, the bags do not employ a second mounting means that is axially spaced from the first mounting means.

3. *The new-style King Par bag utilizes four mounting means.*

**\*12** Claim 8 of the '704 patent discloses the use of a first mounting means to which End A is attached, a second mounting means to which Ends B and C are attached, and a third mounting means to which End D is attached. As disclosed, the four ends of the two straps are secured by three-and only three-securing means.

The new-style King Par bag, however, utilizes four securing means, to which each end of a strap is attached. See Illustration 5 above. Because the new-style bag uses four, and not three, means for securing the ends, the bag does not practice the invention disclosed in Claim 8 of the '704 patent.

C. *Claim 14 of the '704 Patent*

Like Claims 1 and 8 of the '704 patent, Claim 14 of the '704 patent claims a dual strap system for carrying a golf bag. Claim 14, however, does not require the use of attachment points that are axially spaced. Rather, Claim 14 discloses the use of attachment points that are longitudinally spaced. Longitudinally spaced attachment points are points that are "spaced lengthwise along the golf bag, without regard to being positioned in relation to an axis."*Markman* Ruling at p. 13.

Claim 14, just as with Claims 1 and 8, discloses the use of two straps, with each strap having an end for a total of four strap ends. Unlike Claims 1 and 8, in which each of the four strap ends was assigned a different and uniquely identifying name, Claim 14 does not differentiate between each end of the strap, and instead refers to each end simply as an "end." The Claim does require, however, that the two ends of each strap define a "strap opening" which is the open space through which a user's arm is inserted for purposes of picking up and carrying the bag in its intended manner.

Accordingly, the four ends of the two straps described in Claim 14 can continue to be referred to as Ends A, B,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C, and D. As used in Claim 14, strap one contains two strap ends-Ends A and B. Either End A or B may be attached to a first securing means, which must be located proximate the open-end of the golf bag. The other End (either End A or End B) must be attached to a second securing means that is longitudinally spaced between the first attachment location and the closed end of the bag. The second strap also contains two strap ends-Ends C and D. Ends C and D must be attached to the bag via two separate securing means that are longitudinally spaced from each other. Unlike the securing means used to secure the first strap, there is no requirement that either of the securing means used to secure the second strap to the bag be proximate the open end.

For the reasons set forth below, I find that the new-style King Par bag does not infringe upon Claim 14 of the '704 patent. The new-style bag does not employ a second securing means that is longitudinally spaced from the first securing means as required by Claim 14, and does not employ third and fourth securing means that are longitudinally spaced from one another.

1. *The new-style King Par bag does not employ a second means for securing the first strap that is longitudinally spaced from the location of the first securing means.*

**\*13** As stated above, Claim 14 requires that the securing means for the ends of strap one be longitudinally spaced from one another. However, as I have previously discussed, in the King Par new-style bag, the ends of strap one (which define the first strap opening) are attached on a horizontal plane, and are not longitudinally spaced from one another. See Illustration 5 above. Accordingly, the King Par bag does not utilize securing means that are longitudinally spaced for attaching the ends of strap one to the bag.

2. *The new-style King Par bag does not employ third and fourth means for securing the second strap that are longitudinally spaced from one another.*

Claim 14 of the '704 patent requires that the two securing means used to hold either of the two ends of the second strap be longitudinally spaced. The new-style King Par bag, however, utilizes two means for securing the ends of the second strap that are horizontally spaced. See Illustration 5 above.

Accordingly, the new-style bag does not practice the limitation that securing means three and four be longitudinally spaced from each other.

In plaintiff's opposition to defendant's motion for summary judgment, the plaintiff contends that the new-style bag infringes upon Claim 14 of the '704 Patent because the ends of each strap member are attached in a way to make them "longitudinally spaced." To make this argument, plaintiff labels Ends A and C as the ends of the first strap, and Ends B and D as the ends of the second strap. By labeling the ends as such, the attachment points are indeed longitudinally spaced.

This characterization of the strap ends, however, is fundamentally flawed. As required by the language of Claim 14 itself, the ends of each strap define a strap opening through which the arm of the user can be inserted. Because the ends of each strap *must* define the strap opening, neither the plaintiff nor any other party may simply characterize any pair of the four ends of the two straps as being the ends of a single strap. Instead, only those ends which define a strap opening can be considered the ends of a single strap. With respect to the new-style King Par bag, only Ends A and B, and C and D respectively, form strap openings. Ends A and C do not form a strap opening because the user's arm and shoulder do not fit between those strap ends. Instead, the arm and shoulder fits between strap Ends A and B. Moreover, if strap ends A and C did define a strap opening, it would be literally impossible for a user to fit his arm between strap ends B and D, and therefore Ends B and D, by definition, can not be the ends of a single strap because they cannot define a strap opening.

B. *The New-Style King Par Bag Does not infringe the '704 Patent under the doctrine of Equivalents.*

Defendant contends that its new style bag does not infringe the '704 Patent either literally or under the doctrine of equivalents. "An accused product that does not literally infringe a claim may infringe under the doctrine of equivalents if 'it performs substantially the same function in substantially the same way to obtain the same result.' " *Southwall Technologies,* 54 F.3d at 1579 (quoting *Graver Tank & Manufacturing Co.,* 339 U.S. at 608).

**\*14** The new-style bag performs essentially the same

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

function as the strap and bag disclosed in the '704 Patent, that is, it allows the user of the bag to carry the bag using either two straps over both shoulders or by using one strap over one shoulder. The new-style King Par bag, however, accomplishes this task by utilizing two straps with ends that are horizontally aligned, rather than longitudinally or axially aligned straps as required by the '704 Patent. Accordingly, I find that the function of carrying the new-style bag using either or both of the straps is accomplished in a different manner than the method and apparatus disclosed in the '704 Patent. Moreover, horizontally aligned attachment points can not be deemed equivalent for purposes of infringement analysis to axially or longitudinally spaced attachment points because such an interpretation would vitiate the axially or longitudinally spaced requirements. Where "a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment [in favor of the alleged infringer] should be rendered by the court as there would be no material issue for the jury to resolve." *Warner-Jenkins on Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 39, n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146. (1997). In this case the requirement that the attachment points be axially or longitudinally spaced would be rendered meaningless if attachment points that were horizontally spaced could be considered infringing.

III. *The Old Style King Par Bag infringes claims 1, 2, 7 and 14 of the '704 Patent.*

The old-style King Par bag is significantly different from the new-style bag. Although both bags employ four attachment points for attachment of the strap ends to the bag, the old-style bag utilizes four attachment points that are aligned along the spine of the bag in a longitudinal array. See Illustration 2 above. Moreover, unlike the new-style bag, in which one strap is attached to the top of the bag and the other strap is attached towards the middle of the bag, the old-style bag employs the use of attachment points in which the bottom of the top strap and the top of the bottom strap are both attached to the handle of the bag. As can be seen from the Illustration 6, the four strap ends of the old-style bag can be labeled Ends A, B, C, and D. Ends A and B form a strap opening, as do Ends C and D.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



## Illustration 6

A. *The Old-Style King Par Bag infringes upon Claim 1 of the '704 Patent*

As stated above, Claim 1 of the '704 Patent requires a strap assembly comprised of two strap portions. Each strap portion has two strap ends. The first end of the first strap portion is secured to the golf bag at a location near the open end of the bag, and the second end of the first strap portion is secured to the bag at a second location that is "axially spaced" from the first location. The strap portion, as attached, defines a "strap opening" through which a user's arm can extend, and the strap and pad can be rested upon the users shoulder. The first end of the second strap portion is attached to the golf bag at a location that must be "proximate" the second attachment location. The second end of the second strap portion is secured to the bag at a third location that is "axially spaced" from the second location, between the second location and the closed end of the bag. The second strap portion, as attached, defines a second "strap opening" through

which a user's arm can extend, and the strap and pad can be rested upon a user's shoulder.

**\*15** Based on the limitations set forth in Claim 1, I find that the old-style bag infringes Claim 1 of the '704 Patent. The old-style bag employs (as disclosed in Claim 1) a first strap end (End A) that is secured to a first location that is proximate the open end of the bag; a first strap second end (End B) that is attached to a location that is axially spaced from the first location and which, in combination with End A, forms a strap opening; a second strap first end (End C) that is attached at a location proximate to the location of the attachment point for End B; and a second strap second end (End D) that is attached to the bag at a fourth location that is axially spaced between the second attachment location and the closed end of the bag.

The fact that the old-style bag utilizes four attachment points instead of three as disclosed in Claim 1 of the '704 Patent is not material for purposes of infringement. As set forth in Claim 1, the first end of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the second strap (End C) need only be attached to a location that is proximate the attachment location for the first strap second end (End B). In the case of the old-style bag, the attachment locations of Ends B and C, though separate, are proximate one another, with both being attached to the handle of the bag. This configuration reads on the limitation that the second strap first end be attached at a location proximate the first strap second end. Because the old-style King Par bag reads on all of the limitations of Claim 1 of the '704 Patent, I find that the old-style bag infringes upon Claim 1.

**B.** *The Old-Style King Par Bag infringes upon Claim 2 of the '704 Patent*

Claim 2 of the '704 Patent discloses:

The improvement according to claim 1 wherein said first and second central pads are arcuate in configuration so that, when said golf bag is supported, each of said central pads extends upwardly from the second location, forwardly across the shoulders of the person, downwardly and outwardly from the shoulders and then rearwardly to the first and third locations respectively.

'704 Patent at cl. 15 lns 46-53.

I find that the old-style King Par bag infringes claim 2 of the '704 Patent. The pads of the strap are arcuate in shape, and extend upwardly from the second attachment location, forwardly across the user's shoulders, and downwardly and outwardly from the shoulders to the attachment locations. Accordingly, the old-style bag infringes upon Claim 2 of the '704 Patent.

**C.** *The Old-Style King Par Bag infringes upon Claim 1 of the '704 Patent*

Claim 7 of the '704 Patent discloses:

The improvement according to claim 1 wherein one of said first and second central pads has a covering that is constructed of material that resists sliding with respect to clothing of a person.

The evidence of record is insufficient for the Court to make a determination as to whether or not the King

Par old-style bag utilizes first and second pads that are covered with material that resists sliding when worn over clothing. There is no evidence in the record with respect to the composition of material used to cover the pads, or the manner in which it is affixed to the pads. Accordingly, I decline to grant or deny defendant's motion with respect to this claim.

**D.** *The Old-Style Bag does not infringe upon Claim 8 of the '704 Patent.*

**\*16** As stated above, based on Judge Siragusa's construction of the disputed terms of the '704 Patent, Claim 8 of the '704 Patent requires the use of a first mounting means for mounting the first strap element free end (End A) to the golf bag at an unspecified location. Unlike Claim 1, Claim 8 does not require that End A be secured to the bag at a location proximate the open end of the bag. A second mounting means is attached to the bag at a location that is axially spaced from the first location. The first strap end (End B) and second strap end (End C) are attached to the second mounting means. Finally, a third mounting means is attached to the bag at a position that is located between the attachment location for the second mounting means and the closed end of the bag, and is axially spaced from the second attachment location. The second strap element free end (End D) is attached to the third mounting area.

Unlike Claim 1 of the '704 Patent (which requires that End C be attached at a location *proximate* End B), Claim 8 specifies that End C must be connected to the same mounting means as End B. Specifically, the patent claims a "second mounting means on said golf bag ... connected to said first and second strap end portions for securing said end portions to said golf bag at the second location ...." '704 Patent at c. 16, lns. 27-31. Because the old-style bag utilizes separate means for attaching Ends B and C, those ends are not attached to the bag by use of a single mounting means as required by Claim 8. Accordingly, I find that the old-style bag does not infringe upon Claim 8 of the '704 Patent.

**E.** *The Old-Style Bag does not infringe upon Claim 11 of the '704 Patent*

Claim 11 of the '704 Patent discloses "[a] golf bag according to claim 8, wherein said first, second and third mounting means include means for releasably

connecting said strap elements to said first, second, and third locations, respectively." '704 Patent at c. 16, lns. 57-60. Because the old-style bag does not practice the limitations set forth in Claim 8 of the '704 patent, I find that the old-style bag does not infringe upon Claim 11 of the ' 704 Patent.

F. *The Old-Style King Par Bag infringes on Claim 14 of the '704 Patent.*

As stated above, Claim 14 of the '704 patent, like Claims 1 and 8, claims a dual strap system for carrying a golf bag. Claim 14, however, does not require the use of attachment points that are axially spaced. Rather, Claim 14 discloses the use of attachment points that are longitudinally spaced. Longitudinally spaced attachment points are points that are "spaced lengthwise along the golf bag, without regard to being positioned in relation to an axis."*Markman* Ruling at p. 13.Although longitudinally spaced attachment points *may* be axially aligned, they are not required to be axially aligned, as are the attachment points claimed in Claims 1 and 8.

Claim 14 discloses the use of two straps, with each strap having an end for a total of four strap ends. Claim 14 does not differentiate between each end of the strap, and instead refers to each end simply as an "end." The Claim does require, however, that the two ends of each strap define a "strap opening" which is the open space through which a user's arm is inserted for purposes of picking up and carrying the bag in its intended manner.

**\*17** One end of the first strap must be attached to a first securing means which must be located proximate the open-end of the golf bag. The other end of the first strap must be attached to a second securing means that is longitudinally spaced between the first attachment location and the closed end of the bag. The second strap must be attached to the bag via two separate securing means that are longitudinally spaced from each other.

I find that the old-style bag infringes on Claim 14 of the '704 patent. The old-style bag utilizes a first strap with an end attached at a location proximate the open end of the bag, and a second end attached at a location that is longitudinally spaced from the first location. The second strap is attached to the bag using two attachment locations that are longitudinally spaced

from one another. Accordingly, because the old-style bag practices the limitations set forth in Claim 14 of the '704 Patent, I find that the old-style bag infringes on that Claim.

IV. *Validity of Claim 14 of the '704 Patent.*

A. *Defendant has failed to establish that Claim 14 of the '704 Patent is Anticipated by prior art.*

Defendant contends that Claim 14 of the '704 Patent is invalid because it is anticipated by several prior-art references. Pursuant to 35 U.S.C. § 102, a patent claim may be determined to be invalid it the invention disclosed in the claim is anticipated by prior art. A claim is "anticipated" if a single prior-art reference "discloses each and every limitation of the claimed invention."*Schering Corp. v. Geneva Pharm., Inc.,* 339 F.3d 1373, 1377 (Fed.Cir.2003). Whether or not a claim is anticipated by prior art is a question of fact. *Eaton Corp. v. Rockwell International Corp.,* 323 F.3d 1332 (Fed.Cir.2003). However, where there are no material facts in dispute, the issue of validity may be resolved on motion for summary judgement. *See Key Pharmaceuticals v. Hercon Laboratories Corp.,* 161 F.3d 709, 714 (Fed.Cir.1998) (claims of anticipation amenable to summary judgment where there are no material issues of fact in dispute).

Although patents issued by the patent office are presumed to be valid. *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 662 (Fed.Cir.2000), the presumption of validity may be overcome where the party seeking to invalidate a patent presents clear and convincing evidence that the patent is invalid. *Al-Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999). In determining whether or not a patent claim is anticipated in light of prior art, the court must first construe the claims of the patent at issue, and then compare the construed claims to the prior art. *Key Pharmaceuticals,* 161 F.3d at 715. Anticipation analysis is similar to infringement analysis in that art which would infringe on a patent claim if it appeared after a patent was issued will anticipate a claim if the art predates the patent. *Aerotec Industries of Cal. v. Pacific Scientific Co.,* 381 F.2d 795 (9th Cir.1967) ("That which infringes, if later, will anticipate, if earlier.")

**\*18** In the instant case, defendant has failed to establish by clear and convincing evidence that Claim

14 of the '704 patent is invalid. There is insufficient evidence in the record to determine whether or not the prior-art references cited by the defendant actually anticipate the '704 patent. For example, defendant contends that Japanese Patent Document 6-36843 ("the 6-36843 Patent") anticipates Claim 14 of the '704 patent because it discloses a golf bag with a dual strap carrying system in which that attachment points for the straps are longitudinally spaced. There is no evidence, however, that the bag and strap disclosed in the 6-36843 Patent can be used to carry the bag in a transverse manner across the back of a user, a limitation present in Claim 14 of the '704 Patent. Although defendant *argues* that the bag may be carried in such a manner by simply adjusting the length of the straps of the bag, there is no *evidence* that such manipulation of the straps would allow the bag to be carried transversely across the back. Similarly, Claim 14 of the '704 patent requires that the first attachment location for a strap must be proximate the open end of the bag. It is not clear, however, as a matter of law or fact, that the first attachment location on the bag disclosed in 6-36843 Patent is located "proximate" the open end of the bag.

With respect to Japanese Patent Document 50-149169, defendant has failed to establish by clear and convincing evidence that the bag disclosed in that patent can be carried transversely across the back of the user, or whether the bag utilizes four attachment points, as required by Claim 14 of the '704 Patent. As to Japanese Patent Document 57-159070, defendant has failed to demonstrate by clear and convincing evidence that the bag disclosed in that patent can be carried transversely across the back, utilizes four attachment points, or employs the use of a first attachment point that is proximate the open end of the bag.

Finally, with respect to the two United States Patent references, defendant has failed to present clear and convincing evidence that the bag disclosed in U.S. Patent 2,853,111, (the "Williams Patent") can be carried over either one shoulder or both shoulders as required by Claim 14 of the '704 Patent, and whether the strap attachment points on the bag are longitudinally spaced. With respect to U.S. Patent 4,953,768, ("the Muse Patent" or "Muse") defendant argues that if the court adopts plaintiff's arguments with respect to considering the strap ends of the new-style King Par bag to be securing means rather

than strap ends, then the Muse Patent invalidates Claim '14 of the ' 704 Patent. However, because the court has not adopted plaintiff's position, defendant's arguments do not establish that the '704 Patent is invalidated by Muse.

B. *Obviousness.*

Although defendant did not move for summary judgment on the issue of obviousness, defendant now seeks permission to brief the issue of obviousness to the court, and have the court consider granting defendant summary judgment on grounds that the '704 Patent is obvious in light of prior art. In support of this argument, defendant contends that the recently decided case of *KSR International Co. v. Teleflex, Inc., et al,* 550 U.S. ---- (2007) has significantly changed the law with respect to "obviousness," and that while an obviousness defense in this case may have been tenuous before *KSR,* it is now meritorious.

*19 The Supreme Court's unanimous decision in *KSR* has been described by commentators as "one of the most significant patent rulings in decades" representing a "sea change" in patent law turning established precedent "upside down." *See* Charles Emerick, *Missouri Patent Ruling not Obvious to All,* Missouri Lawyers Weekly, May 14, 2007; Robert C. Sheinfeld and Parker H. Bagley, *Key Decisions from Supreme Court, Federal Circuit,* New York Law Journal, May 23, 2007 (describing *KSR* decision as one of several marking a sea change in patent law); Correy Stephenson, *U.S. Supreme Court Turns Patent Law Upside Down,* South Carolina Lawyers Weekly, May 28, 2007. Several commentators have suggested that under the new precedent set forth in *KSR,* it will become harder to obtain a patent, and easier to invalidate a patent on grounds of obviousness. Edward Rice and Marina Saito, *Recent Patent Law Changes: Good or Bad for Business,* 15 Metropolitan Corporate Counsel 6 (June 2007); Xenia Kobylarz, *The Reset Button: Recent Supreme Court Decisions Mean More work for Patent Lawyers,* 29 American Lawyer 6 (June 2007); *U.S. Supreme Court Turns Patent Law Upside Down,* South Carolina Lawyers Weekly, May 28, 2007.

Because *KSR* has substantively changed the law of obviousness with respect to the validity of a patent, defendant should be allowed to present an obviousness defense to the court if it so chooses, and

Slip Copy                                                                                                Page 21
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)
**(Cite as: 2007 WL 1987789 (W.D.N.Y.))**

leave to file a motion for summary judgment on the issue of obviousness is granted. Such a motion, if it is to be made, shall be filed no later than 60 days from the date of this Decision and Order.

*CONCLUSION*

For the reasons set forth above, I grant in-part and deny in-part defendant's motion for summary judgment. I find that the new-style King Par bag does not infringe upon the '704 Patent, and accordingly, I grant defendant's motion on that claim. I find that the old-style King Par bag does infringe upon claims 1, 2 and 14 of the '704 patent, and therefore deny defendant's motion for summary judgment with respect to that claim. Finally, I deny defendant's motion for summary judgment on the issue of the validity of Claim 14 of the '704 Patent.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2007.
Izzo Golf, Inc. v. King Par Golf Inc.
Slip Copy, 2007 WL 1987789 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 33



Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.))**

Ondeo Nalco Co. v. EKA Chemicals, Inc.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ONDEO NALCO COMPANY, a Delaware
Corporation, Plaintiff,
v.
EKA CHEMICALS, INC., a Delaware Corporation,
Defendant.
**No. Civ.A.01-537-SLR.**

June 10, 2002.

MEMORANDUM ORDER

ROBINSON, J.
**\*1** At Wilmington this 10th day of June, 2002, having
reviewed the briefs submitted by the parties with
respect to plaintiff's pending motions;

IT IS ORDERED that plaintiff's motion to dismiss
defendant's counterclaims (D.I.23) is granted; and
plaintiff's motion for leave to filed an amended
complaint (D.I.42) is granted, for the reasons that
follow:

1. The court has jurisdiction over this action pursuant
to 35 U.S .C. §§ 271 and 281 and 28 U.S.C. § 1338(a).

2. Motion to Dismiss Counterclaims. In analyzing a
motion to dismiss pursuant to Rule 12(b)(6), the court
must accept as true all material allegations of the
complaint and it must construe the complaint in favor
of the plaintiff. See*Trump Hotels & Casino Resorts,
Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d
Cir.1998).*"A complaint should be dismissed only if,
after accepting as true all of the facts alleged in the
complaint, and drawing all reasonable inferences in
the plaintiff's favor, no relief could be granted under
any set of facts consistent with the allegations of the
complaint."*Id.* Claims may be dismissed pursuant to a
Rule 12(b)(6) motion only if the plaintiff cannot
demonstrate any set of facts that would entitle him to
relief. See*Conley v. Gibson, 355 U.S. 41, 45-46 (1957).*
The moving party has the burden of persuasion.
See*Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d
1406, 1409 (3d Cir.1991).*

3. Plaintiff argues that defendant's counterclaims,
which allege that plaintiff's products infringe three of
defendant's patents,[FN1] fail to provide fair notice of the
claims and the grounds upon which they rest, as
required by Federal Rule of Civil Procedure
8(a).*Conley, 355 U.S. at 47* (Rule 8(a) requires that a
claim provide "fair notice of what the plaintiff's claim
is and the grounds upon which it rests"). Plaintiff
asserts that the counterclaims insufficiently identify
which products are accused of infringement [FN2] and
fail to adequately plead induced infringement.[FN3]
Plaintiff also objects that the counterclaims do not
specify when the alleged infringement occurred (the
'961 and '150 patents are now expired) and they
combine the direct, contributory, and induced
infringement claims into one count for each patent.

> FN1.United States Patent No. 5,603,805
> ("the '805 patent"); United States Patent No.
> 4,385,961 ("the '961 patent"); and United
> States Patent No. 4,388,150 ("the '150
> patent").

> FN2. The infringing products are described
> as "Nalco's products, including the 8692
> product."(D.I.22, ¶¶ 29,34,40) The only
> additional clue to the identity of the alleged
> infringing products is the averment "Nalco
> makes and sells products, including the
> product numbered 8692, ... that are used in
> paper-making processes ..." or "to make
> paper." (*Id.* at ¶ 24)

> FN3. Defendant simply avers that "[u]pon
> information and belief, Nalco has induced
> the infringement of the claims of the ... patent,
> in violation of 35 U.S.C. § 271(b), by selling
> its products, including the 8692 product, and
> in instructing and encouraging others in the
> use of its products, including the 8692
> product."(D.I.22, ¶¶ 30,36,42)

4. The court agrees with plaintiff that the
counterclaims do not satisfy Rule 8(a). With the
exception of the description of the 8692 product, the
pleadings are too vague to provide plaintiff with fair

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.))**

notice of which products are accused of infringing defendant's patents. *See* *Conley, 355 U.S. at 47;* *Gen-Probe, Inc. v. Amoco Corp.,* 926 F.Supp. 948, 961 (S.D.Cal.1996) (vague reference to "products and/or kits" does not provide adequate notice). *Compare* *Interdigital Technology Corp. v. OKI America, Inc.,* 845 F.Supp. 276, 283 (E.D.Pa.1994) (patent claim need not identify specific products that are alleged to infringe by name so long as they are "sufficiently identified in some way"). In addition, the pleadings fail to allege direct infringement by a party other than ONDEO Nalco and, therefore, insufficiently plead induced infringement. *See* *Met-Coil Systems Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986) (direct infringement required element of induced infringement); *Shearing v.. Optical Radiation Corp.,* 30 U.S.P.Q. 1878, 1880 (D.Nev.1994) (complaint must allege direct infringement by someone other than the inducer).

**\*2** 5. Based on the above, the court dismisses defendant's counterclaims with leave to amend.

6. Motion for Leave to File a First Amended Complaint. Under Federal Rule of Civil Procedure 15(a), leave to file amended complaints "shall be freely given when justice so requires." *See also* *Gooding v. Warner-Lambert Co.,* 744 F.2d 354, 358 (3d Cir.1984). Plaintiff seeks leave to amend its complaint (a) to remove two alien defendants whom plaintiff and defendant have agreed to dismiss with prejudice (see Stipulation and Order, D.I. 20, ¶ 1); and (b) to add declaratory judgment counts related to invalidity of the patents-in-suit. Defendant objected that the proposed amended complaint would be deficient for failure to plead with specificity inequitable conduct and for asserting "unenforceability" of the subject patents in combination with invalidity. In response, plaintiff added more specific allegations of inequitable conduct with respect to the procurement of the '805 patent to a revised first amended complaint (D.I.45, Ex. D, ¶¶ 22-54); plaintiff makes no inequitable conduct allegations with respect to the '150 patent or the '961 patent(*Id.* at 5-6; Ex. D, ¶¶ 55-65). Based on the above, the court grants plaintiff leave to file a first amended complaint.

D.Del.,2002.
Ondeo Nalco Co. v. EKA Chemicals, Inc.
Not Reported in F.Supp.2d, 2002 WL 1458853

(D.Del.)

END OF DOCUMENT

# EXHIBIT 34



Hewlett-Packard Co. v. Intergraph Corp.
N.D.Cal.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
HEWLETT-PACKARD COMPANY, Plaintiff,
v.
INTERGRAPH CORPORATION, Defendant.
**No. C 03-2517 MJJ.**

Sept. 6, 2003.

Morgan Chu, David Isaac Gindler, Elliot Brown, Jason Dean Linder, Rachel Marie Capoccia, Irell & Manella LLP, Los Angeles, CA, Peter P. Chen, McDermott, Will & Emery, Palo Alto, CA, for Plaintiffs.
Bureden J. Warren, McDermott Will & Emery, Eric S. Namrow, James R. Burdett, Peter Curtin, William D. Coston, Venable LLP, Washington, DC, Cole M. Fauver, Inge Larish, William H. Manning, Robins Kaplan Miller & Ciresi, Minneapolis, MN, David V. Lucas, Todd P. Guthrie, Intergraph Corporation, Huntsville, AL, Bijal V. Vakil, McDermott, James E. Glore, Stephen J. Akerley, McDermott Will & Emery, Palo Alto, CA, Jeffrey G. Knowles, Coblentz, Patch, Duffy & Bass, Jennifer Lynn Polse, Martin D. Bern, Munger Tolles & Olson LLP, San Francisco, CA, George F. Pappas, Venable LLP, Baltimore, MD, Michael W. Robinson, Venable LLP, Vienna, VA, for Defendants.

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

JENKINS, J.
***1** On May 28, 2003, Plaintiff Hewlett-Packard Company ("Plaintiff") filed a complaint against Defendant Intergraph Corporation ("Defendant") alleging direct patent infringement, contributorily infringement, and inducing infringement of four United States patents ("patents-in-suit") in violation of 35 U.S.C. § 271.[FN1] Defendant now moves to dismiss Plaintiff's complaint or, in the alternative, for a more definite statement. *See* FRCP 12(b), (e). Specifically, Defendant argues that Plaintiff's allegations are cursory and fail satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure. Having considered the briefing in this matter, the Court GRANTS Defendant's motion.

> FN1. The specific patents-in-suit are United States patents (1) 5,297,241; (2) 4,649,499; (3) 6,105,028; and (4) 4,635,208. *See* Complaint ¶¶ 7-10. Plaintiff is the owner by assignment of all rights, title, and interest in each of these patents.

A. Infringement Generally

According to Rule 8(a)(2) "a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has found that this provision is satisfied so long as the factual allegations give "defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In the context of patent litigation, the Federal Circuit has noted that "[t]his requirement ensures that an accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself." *Phonometrics v. Hospitality Franchise Systems, Inc.,* 203 F.3d 790, 794 (Fed.Cir.2000). In addition, Form 16 of the Federal Rules of Civil Procedure provides the following as an example of a direct patent infringement claim that is sufficient under Rule 8(a)(2):

Defendant has for a long time past been and still is infringing [the patent-in-suit] by making, selling, and using electric motors embodying the patented invention, and will continue to do so unless enjoined by this court.

*See also* FRCP 84 ("[t]he forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate").

Here, the complaint simply alleges:

[Defendant], in violation of 35 U.S.C. § 271, has been and is currently infringing, contributorily infringing, or inducing infringement of [the patents-in-suit] by, among other things, *making, using, offering to sell*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*and/or selling infringing software and hardware products* without authority or license from [Plaintiff].

Complaint ¶¶ 11 (emphasis added).

However, Defendant "produces some 150 core technology platforms which are implemented in over 4000 end-user application products."*See* Motion to Dismiss or For a More Definite Statement ("Motion") at 7:15-17. In light of these facts, Plaintiff's claim must be read as follows: one or more of Defendant's 4000-plus products directly infringes, contributorily infringes, or induces infringement of at least one claim in each of the patents-in-suit. Form 16 simply does not address a factual scenario of this sort. Not only is the example in Form 16 limited to a single "type" of product (*i.e.,* electric motors) there is no indication as to the number of different electric motors the hypothetical defendant made, sold, or used. In this case, there are at least 150 different "types" of products (*i.e.* core technology platforms) with more than 4000 end-user applications. Based on these facts, the Court finds that Plaintiff's allegations do not provide Defendant with "fair notice" of what Plaintiff's claim or claims are and, therefore, fail to satisfy Rule 8(a)(2).*See Conley, 355 U.S. at 47-48 (1957).*[FN2]

> FN2. The Court acknowledges Defendant's citation to several district court opinions, including one from this district, which seem to interpret Rule 8(a)(2) and Form 16 more liberally. *See, e.g., OKI Electric Industry Co. v. LG Semicon Co., Ltd., 1998 WL 101737, *3 (N.D.Cal.1998)* ( "[t]he phrase 'devices that embody the patented methods' from [plaintiff's] allegation is substantially similar to the phrase 'electric motors embodying the patented invention' found in Form 16"). However, Plaintiff cites an equal number of decisions that reach the opposite conclusion based on similar facts. *See, e.g., Gen-Probe, Inc. v. Amoco Corporation, Inc., 926 F.Supp. 948, 961 (S.D.Cal.1996)* ("Rule 8(a)(2) eliminates the needless distinctions and technicalities of code pleading, but still 'envisages the statement of circumstances, occurrences, and events in support of the claim ...' ") (quoting Advisory Committee's 1955 Report). None of these decisions are binding on this Court.

**B. Specific Requirements for Contributory Infringement and Inducement**

**\*2** Defendant also argues that Plaintiff's complaint fails to sufficiently allege particular elements necessary to state claims for contributory infringement and inducing infringement. The Court will address each of these claims in turn.

1. Contributory Infringement

In order to state a claim for contributory infringement pursuant to § 271(c), Plaintiff must allege that Defendant offered to sell or sold a *"component* of a patented machine ... constituting a material part of the invention, *knowing* the same to be especially made or especially adapted for use in an infringement of such patent...."*Id.*(emphasis added); *see* also *Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964)*. Although Plaintiff alleges that Defendant's conduct was "willful," which implies knowledge, Plaintiff fails to allege that Defendant offered to sell or sold any particular component or that such component was a material part of an infringing device. Plaintiff merely alleges that Defendant "committed acts of infringement in this District, for example, by selling infringing products to Calpine Corporation, which is headquartered in this District."Complaint ¶ 5. This is not sufficient to state a claim for contributory infringement.

2. Inducing Infringement

An inducement claim requires allegations of (1) specific intent and (2) direct infringement by someone other than the inducer. *See Hewlett-Packard Co. v. Bausch & Lomb, 909 F.2d 1464, 1449 (Fed.Cir.1990)*("proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement"); *Met-Coil Systems v. Korners Unlimited, Inc. 803 F.2d 684, 687 (Fed.Cir.1987)*. As stated above, although the allegation of willfulness is sufficient to satisfy the state of mind requirement necessary for inducement-in this case specific intent-there are no allegations of direct infringement by a third-party. Again, the alleged sales of "infringing products" to Calpine Corporation is insufficient to state a claim for inducing infringement.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.))**

Page 3

Therefore, Defendant's motion to dismiss is GRANTED without prejudice; Plaintiff may file an amended complaint within twenty (20) days of this order.

IT IS SO ORDERED.

N.D.Cal.,2003.
Hewlett-Packard Co. v. Intergraph Corp.
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 35

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.))**

**C**

General Patent Corp. v. Hayes Microcomputer
C.D.Cal.,1997.
Only the Westlaw citation is currently available.
United States District Court, C.D. California.
GENERAL PATENT CORPORATION Plaintiff,
v.
Hayes MICROCOMPUTER, et al. Defendants.
**No. SA CV 97-429-GLT ANX.**

Oct. 20, 1997.

ORDER BIFURCATING PATENT VALIDITY
AND ENFORCEABILITY ISSUES FROM IN-
FRINGEMENT AND DAMAGES ISSUES AND
STAYING DISCOVERY AND TRIAL OF IN-
FRINGEMENT AND DAMAGES ISSUES

TAYLOR, District J.
**\*1** Defendants' Motion to Bifurcate Patent Validity
and Enforceability Issues From Infringement and
Damages Issues is GRANTED. Discovery and Trial
of Infringement and Damages Issues is STAYED.

A. *Bifurcation of the Trial*

Federal Rule of Civil Procedure 42(b) governs bi-
furcation of trails:

The court, in furtherance of convenience or to avoid
prejudice, or when separate trials will be conducive
to expedition and economy, may order a separate
trial of any claim, cross-claim, counterclaim, or
third party claim, or of any separate issues or of any
number of claims ...'

Fed.R.Civ.P. 42(b). These considerations are in the
alternative. *Id.* Thus, bifurcation may be proper
upon a showing of any of these factors. Granting or
denying severance lies within the trial court's sound
discretion.[FN1] *Davis & Cox v. Summa Corp.,* 927
F.2d 1473, 1479 (9th Cir.1985).

FN1. GPC claims "[i]n patent cases, as in
any other case, it is well-settled that separ-
ate trails are the exception, not the
rule."No such preference has been ex-
pressed in patent cases reviewed by the
Ninth Circuit. *See International Environ-
mental Dynamics, Inc. v. Fraser,* 647 F.2d
77, 79 (9th Cir.1981)(affirming a separate
jury trial pursuant to Fed.R.Civ.P. 42(b) on
the sole issue of the validity of the
plaintiff's patent); *Filtrol Corporation v.
Kelleher,* 467 F.2d 242, 245 (9th
Cir.1972)(upholding district court's bifurc-
ation of patent infringement and validity
claims). In fact, bifurcation or even trifurc-
ation is common in patent cases. *See* The
Manual For Complex Litigation, 3d §
33.62, pp. 360-61 (Federal Judicial Center,
1995)(recognizing the need and encour-
aging trial judges to bifurcate or trifurcate
patent trials).

Bifurcation of the issues in this case would be effi-
cient and convenient. Since GPC has asserted the
same four patents against all defendants, the issues
of patent validity and enforceability are common to
all defendants. The infringement and damages is-
sues, however, are specific to each defendant be-
cause they involve the particular products made by
each defendant.[FN2]Accordingly, it would be in the
interest of convenience to separate the collective
patent validity/enforceability issues from the indi-
vidual infringement/damages issues.

FN2. In total, defendants estimate they
have hundreds of thousands of pages of
documents relating to the sales, costs, and
profitability of the accused modems. Mo-
tion at 6.

Additionally, "[b]ifurcation is particularly appropri-
ate when resolution of a single claim or issue could
be dispositive of the entire case."[FN3]*Cook v.
United Service Auto. Ass'n.,* 169 F.R.D. 359

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.))**

(D.Nev.1996); *see also O'Malley v. United States Fidelity and Guaranty Company,* 776 F.2d 494, 501 (5th Cir.1985); 9 Wright & Miller, Federal Practice and Procedure: Civil 2d, § 2388, p. 476 (1994). Thus, efficiency indicates this court should first consider the validity and enforceability claims if they are potentially dispositive issues. *See, e.g., Wang Laboratories v. Mitsubishi Electronics America, Inc.,* 29 U.S.P.Q.2d (BNA) 1481, 1482 (C.D.Cal.1993).

> FN3. Although the Ninth Circuit has left this determination entirely within the discretion of the district judge, other courts developed criteria to determine whether a separate trial on dispositive issues is appropriate. *See Engelhard Minerals and Chemicals Corp. v. Anglo-American Clays Corp.,* 212 U.S.P.Q. 668, 669 (M.D.Ga.1981); *Ludlow Corp. v. Textile Rubber & Chemical Co.,* 77 F.R.D. 752, 753 (N.D.Ga.1978). Defendants appear to meet the criteria set out by these courts.

Here it appears the validity and enforcement issues may be dispositive. If the patents are found invalid or unenforceable there will be no need to resolve the infringement and damages claims. Conversely, if the patents are found valid and enforceable it will likely promote settlement of the action before trial on the infringement and damages issues. Thus, it will almost certainly be efficient for this court to first address the issues of validity and enforceability before turning to the other claims.[FN4]

> FN4. Additionally, defendants' preliminary investigation leads them to believe "focused discovery ... will confirm the invalidity and unenforceability of [GPC's] claims."Motion at 6. Defendants insist that devices, which possessed the technology at issue in this case, were on sale and in public use at least a year before the effective filing date of each patent. Dunlavey Dec. ¶ 10. Assuming such evidence does exist, this reinforces this court's belief that the

validity and enforceability issues may be dispositive in this case.

In opposing this motion, GPC relies on *Procter & Gamble Co. v. Nabisco Brands, Inc.,* 604 F.Supp. 1485 (D.Del.1985)(*P & G*) for the proposition that the existence of overlapping evidence weighs against separate trials.[FN5] However the facts in this case are distinguishable from the facts in *P & G.* First, the *P & G* court denied the motion for a separate trial on validity because the movant had failed to demonstrate that a trial on infringement would be either long or complex. *Id.* at 1492.This case is complex-it involves multiple patents, multiple defendants, and multiple accused products. Second, the *P & G* court was concerned with two areas of overlapping evidence which do not arise in this case: claim construction and the question of commercial success. *Id.* Here the court will construe the asserted claims only in the first trial. That construction will then be the law of the case and will govern in a later trial on the infringement and damages issues. *See Magnesystems, Inc. v. Nikken, Inc.,* 933 F.Supp. 944, 949 (C.D.Cal.1996)(stating the "law of the case" rule for a patent infringement lawsuit). Additionally, the defendants in this case have offered to stipulate to "commercial success" for the purpose of the separate validity and enforceability trial. Reply at 9. Thus, the overlapping evidence which formed the basis of the *P & G* court's concerns does not appear in this case.

> FN5. In addition to *P & G,* GPC incorrectly cites four Federal Circuit cases for the proposition that bifurcation is inappropriate when there is substantial evidentiary overlap. None of these cases mention bifurcation or Fed.R.Civ.P. 42(b).*See* Opp. at 6-7; *Witco Chem. Corp. v. Peachtree Doors, Inc.,* 787 F.2d 1545 (Fed.Cir.1986); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452 (Fed.Cir.1984); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.))**

*Corp.,* 713 F.2d 1530 (Fed.Cir.1983).

**\*2** Finally, GPC's assertion the time and cost of two trials is unduly prejudicial is unconvincing. First, GPC's assertion assumes a second trial will be held. It is because this court believes resolution of these initial claims will be either dispositive, or likely lead to settlement, that bifurcation is proper. Second, should the case ultimately result in two trials, the burdens associated with two trials will not fall unduly on any particular party. Third, GPC is not engaged in the design, manufacture, and sale of products-rather, GPC receives royalties under these patents. Thus, should there be a second trial, potential damages will have continued to accrue. Any delay will not prejudice GPC's royalties.

Since bifurcation is convenient, efficient, and will not unduly prejudice any party, the motion to bifurcate is GRANTED. Trial of the infringement and damages issues is STAYED.

### B. *Divided Discovery*

Under Fed.R.Civ.P. 42(b), "[i]t is implicit that the court also had power to limit discovery to the segregated issues." *Ellingson Timber Co. v. Great Northern Ry. Co.,* 424 F.2d 497, 499 (9th Cir.1970)."One of the purposes of Rule 42(b) is to permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues."*Id.* However, GPC believes if this court bifurcates discovery it will lead to increased motion practice over what the parties should produce in the first wave of discovery, and what is relevant only later. Apparently, such discovery disputes have already started. Opp. at 2.FN6

> FN6. Defendants assert GPC's initial discovery request sought a broad range of information, including detailed technical and financial information which is only relevant to infringement and damages issues and is highly confidential competitive

business data. Motion at 3.

Fed.R.Civ.P. 26(g) imposes an affirmative duty on attorneys to use discovery in a responsible manner and to avoid discovery abuses. *See Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership,* 76 F.3d 1003, 1008 (9th Cir.1996). This court is confident that as the litigation proceeds the parties will adhere to the federal rules, and use their sound discretion, in conducting discovery; discovery sanctions are available if they do not. Accordingly, pending outcome of the validity and enforceability claims, discovery solely concerning the infringement and damages issues is STAYED.

C.D.Cal.,1997.
General Patent Corp. v. Hayes Microcomputer
Not Reported in F.Supp., 1997 WL 1051899 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 36

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1994 WL 362186 (N.D.Ill.), 34 U.S.P.Q.2d 1474
**(Cite as: Not Reported in F.Supp., 1994 WL 362186 (N.D.Ill.))**

**H**

C.R. Bard, Inc. v. M3 Systems, Inc.
N.D.Ill.,1994.

United States District Court, N.D. Illinois, Eastern
Division.
C.R. BARD, INC., Plaintiff-Counterdefendant,
v.
M3 SYSTEMS, INC., Defendant-Counterclaimant.
**No. 93 C 4788.**

July 11, 1994.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.
**\*1** In this contentious case, C.R. Bard, Inc.
("Bard") sues M3 Systems, Inc. ("M3 Systems")
for patent infringement. On June 7, 1994, this court
severed the trial into four segments: (1) M3 Sys-
tems' alleged infringement of Bard's patents; (2) the
validity of Bard's patents; (3) Bard's alleged anti-
trust violations; and (4) if necessary, damages for
patent infringement or an antitrust violation.
Memorandum Opinion and Order, 93 C 4788
(N.D.Ill. June 7, 1994). M3 Systems moves for re-
consideration and/or clarification of this court's
June 7, 1994 quadrification order.

*DISCUSSION*

1. Reconsideration

M3 Systems moves for reconsideration of this
court's decision to separate the infringement and
validity inquiries into two separate phases of the
trial. M3 Systems argues that the infringement and
validity stages should be combined into a single tri-
al on liability. Alternatively, if the two inquiries are
not combined, M3 Systems argues that their se-
quence should be reversed; *i.e.,* that the jury should
determine the validity/enforceability of Bard's pat-

ents before deciding whether M3 Systems infringed
Bard's patents.

There is a lively debate within the legal community
regarding management of patent infringement tri-
als. In 1987, Howard T. Markey, then Chief Judge
of the United States Court of Appeals for the Feder-
al Circuit, wrote an article entitled "On Simplifying
Patent Trials." 116 F.R.D. 369 (1987). Judge Mar-
key suggested that the plaintiff's case-in-chief in
patent infringement cases be limited to the present-
ation of evidence on the infringement claim; evid-
ence of the patent's validity should only be intro-
duced (in the defendant's rebuttal case) if the
plaintiff has introduced sufficient evidence of in-
fringement. Judge Markey explained that:

[E]very patentee's suit for infringement that in-
volves an invalidity defense is composed of two
separate trials. The first is on infringement. In that
trial the patentee alone has the burden and should
go first and last. The second trial is on the invalid-
ity defense. In that trial, the defendant alone has the
burden and should go first and last. When the judge
does not issue a Rule 42(b) order, therefore, in-
fringement should still be tried first and the invalid-
ity defense should be tried (if necessary) second.

*Id.* at 378. Judge Markey's article sparked discus-
sion.

At the Sixth Annual Conference of the United
States Court of Appeals for the Federal Circuit,
held in Washington, D.C. on May 13, 1988, the pat-
ent and trademark breakout session included a de-
bate of Judge Markey's bifurcation proposal by two
patent attorneys and a discussion by judges and
scholars. 122 F.R.D. 281, 397-421 (1988). A 1989
article by Rita Mankovich Irani summarized the bi-
furcation debate and, disagreeing with Judge Mar-
key's proposal, suggested alternatives to bifurca-
tion. Rita Mankovich Irani, "The New Skirmish in
Patent Cases: Who Goes First at Trial and with
What Evidence?", 17 *Am.Intell.Prop.L. Ass'n Q.J.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 (1989).

**\*2** Thus, whether to bifurcate patent infringement cases into separate trials on infringement and validity is an ongoing debate within the patent bar. There is not one correct way to manage a complex patent case such as this one. Instead, judges have broad discretion to separate trials in order to avoid jury confusion and to foster clarity and economy. *See* Fed.R.Civ.P. 42(b); *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed.Cir.1987).

M3 Systems is correct that "[c]laim interpretation, the central focus and hotly contested issue in any infringement analysis, cannot take place in a vacuum." Mot. at 1. This court understands that the jury's consideration of infringement requires the introduction of significant background information. However, this court disagrees with M3 Systems' assertion that trying the infringement segment first will "deprive[ ] the jury of a logical and complete presentation of this essential claim interpretation background or [ ] will be redundant when the issues of invalidity and unenforceability are reached." Mot. at 2.

First, the jury will need to hear the factual background of the case no matter which segment is tried first. Second, the court has discussed with counsel the procedural safeguards it plans to institute to assist the jury and to alleviate the need for redundant testimony. As the court explained at the pretrial conference on June 9, 1994, the court reporter will prepare a transcript of the proceedings for the jury that excludes objections, sidebar discussions and any evidence that is stricken ("the sanitized transcript"). June 9, 1994 transcript at 9-10. Thus, testimony need not be repeated; instead, when seeking to rely on testimony elicited during one segment of the trial to support an argument in another segment, counsel may simply designate the relevant pages in the sanitized transcript to be resubmitted to the jury. *Id.* at 10, 12. While witnesses may be recalled to testify on different issues, they may not be recalled to repeat previous testimony. *Id.* at 15. Thus, M3 Systems' concerns about presenting testimony

twice-redundancy, potential inconsistencies-are moot.

A recent Northern District of Illinois case cited by M3 Systems provides support for bifurcating the infringement and validity inquiries, in that sequence. In his decision in *Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation* (a bench trial), Judge Easterbrook, sitting by designation on this court, first considered whether the defendant infringed the plaintiff's patent for a certain type of hemodialysis catheter. 831 F.Supp. 1354, 1357 (N.D.Ill.1993). After concluding that the defendant's catheter infringed on the plaintiff's patent, Judge Easterbrook proceeded to consider the validity of the plaintiff's patent. *Id.* at 1361. It appears that Judge Easterbrook heard the evidence regarding both the infringement and validity claims together, then organized his opinion to discuss infringement first, validity second. The need to separate the inquiries was clear to Judge Easterbrook, as was the logical order of addressing the claims: first infringement, then validity.

**\*3** In this case, where the jury will not have the benefit, as did Judge Easterbrook in the *Mahurkar* case, of being involved with the litigation for at least three years, it is well within this court's discretion to separate the infringement and validity inquiries at trial. The same jury will hear the evidence in each segment. This procedure should reduce the significant potential for jury confusion over a myriad of complex issues, while conserving scarce jury resources. M3 Systems submits no persuasive reason on to combine the infringement and validity inquiries or to reverse their order. The quadrification of the trial articulated in this court's June 7, 1994 decision must stand.

2. Clarification

In its June 7, 1994 ruling, this court explained that its decision to sever the trial into four separate inquiries stems from "the complexity of the issues, the inordinate volume of jury instructions, and the

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 362186 (N.D.Ill.), 34 U.S.P.Q.2d 1474
**(Cite as: Not Reported in F.Supp., 1994 WL 362186 (N.D.Ill.))**

impracticable number and specificity of special interrogatories." June 7, 1994 decision at 2. In a footnote, the court explored some of the potential permutations that may arise from the quadrifurcated trial. Specifically, the court noted that:

In the first step, if the jury finds no infringement, then there is no need for step two (determination of patent validity). If the jury finds infringement, then the trial proceeds to step two: whether the patents are valid. If so, then there is no need for step three (antitrust counterclaim). If Bard loses on either steps one or two (*i.e.,* there is no infringement or the patents are invalid), then the trial proceeds to step three: the antitrust counterclaim. Finally, after all the claims are resolved, step four is a proceeding to determine damages, if necessary, for either patent infringement or an antitrust violation.

June 7, 1994 decision at 2 n. 1.

In this footnote, the court incorrectly concluded that the validity segment of the trial may be obviated by a finding of no infringement. In fact, the validity segment of the trial is required even if the jury does not find infringement, because the validity/enforceability of Bard's patents is relevant to (1) whether this is an exceptional case entitling M3 Systems to attorneys fees and (2) the antitrust inquiry. Of course, the parties could settle their dispute in part or in full at any point in the quadrifurcated proceedings, obviating the need for some or all of the remaining segments of the trial. Since footnote one in this court's June 7, 1994 decision misstates some potential outcomes, it is confusing and must be deleted.

*CONCLUSION*

Defendant M3 Systems' motion for reconsideration of this court's June 7, 1994 decision is denied. Defendant M3 Systems' motion for clarification of this court's June 7, 1994 decision is granted. Footnote 1 on page 2 of this court's June 7, 1994 decision is stricken.

N.D.Ill.,1994.
C.R. Bard, Inc. v. M3 Systems, Inc.
Not Reported in F.Supp., 1994 WL 362186 (N.D.Ill.), 34 U.S.P.Q.2d 1474

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 37

| *Notice of Allowability* | Application No. | Applicant(s) |  |
|---|---|---|---|
| | 09/618,222 | MARYNOWSKI ET AL. | |
| | Examiner | Art Unit | |
| | Daniel S. Felten | 3624 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to 3/14/2006.

2. ☒ The allowed claim(s) is/are 1-39.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     a) ☐ All   b) ☐ Some*   c) ☐ None   of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

     * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

     (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .

     (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

     Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Attachment(s)

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☒ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date 3/14/2006

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☐ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

Ex. Daniel Felten
AU 3624
Business Methods

Application/Control Number: 09/618,222                                    Page 2
Art Unit: 3624

## DETAILED ACTION

### *Allowable Subject Matter*

1.    Claims 1-39 are allowed.

2.    The following is an examiner's statement of reasons for allowance: the closest prior art of record was Rickard and Garber. Rickard is directed to a computer-based system for determining opening prices for options in an option exchange where the delta and gamma values are used by options traders. Rickard fails to disclose an *automated* trading system, as in claims 1-39, but relies upon human inputs. The secondary reference Garber is directed to a system and method for linking a rolling spot currency contract with a principle market maker program. Col. 7, line 51-col. 8 line 32 describe an electronic currency exchange served by rolling a spot currency market maker computer. The rolling spot currency maker computer interfaces with an options market maker to buy and sell options to neutralize inventory risk. Garber does not make *automated* buy/sell decisions based on received prices and value calculations. Thus Garber describes trading that involves human interaction, not automated trading. Neither Rickard or Garber, in light of claims relate to automated trading or suggest "decision logic using at least a portion of the received market price information and transaction value to generate a decision whether to submit a response to buy or sell the first traded item." Thus claims 1-39 are allowed over the applied prior art.

    Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

Application/Control Number: 09/618,222                                    Page 3
Art Unit: 3624

fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

                                    *Conclusion*

        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Daniel S. Felten whose telephone number is (571) 272-6742.

The examiner can normally be reached on Flex.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Vincent Millin can be reached on (571) 272-6747.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

        applications is available through Private PAIR only.  For more information about the

PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you

would like assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.



                                            Daniel S Felten
                                            Examiner
                                            Art Unit 3624

DSF                                                         VINCENT MILLIN
May 29, 2006                                    SUPERVISORY PATENT EXAMINER
                                                TECHNOLOGY CENTER 3600